## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## (COLUMBIA DIVISION)

|  |  |
|---|---|
| **SAMUEL R. FLOYD, III on behalf of Himself and all others similarly situated,**<br><br>**Plaintiff,**<br><br>v.<br><br>**Deloitte & Touche, LLP,**<br>**Deloitte LLP,**<br><br>**Defendants.** | **No:**  3:19-3304-MBS<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

---

## CLASS ACTION SECURITIES COMPLAINT

---

Gordon Ball
Jonothan Tanner Ball
Steven Chase Fann
GORDON BALL, LLC
7001 Old Kent Drive
Knoxville, Tennessee 37919
Tel:  (865) 525-7028
Email: gball@gordonball.com TNBPR#001135
 jtannerball@gmail.com TNBPR#037011
chasefann@wfptnlaw.com TNBPR#36794
*(Motion for Pro Hac Vice to be filed)*

Edward D. Sullivan, JD, LLM, CPA
Sullivan Law Firm, PC
Edward D. Sullivan
PO Box 11714
Columbia, SC 29211
Tel: (803) 451-2775
Email: esullivan@esullivanlaw.com
SC Bar #0011248/ USDC #5016

Thomas C. Jessee
Jessee & Jessee
P.O. Box 997
Johnson City, TN 37605
Tel: (423) 928-7175
Email: jjlaw@jesseeandjessee.com
TNBPR #000113/ SC Bar #2996

Daryl G. Hawkins
Law Offices of Daryl G. Hawkins, LLC
P.O. Box 11906
Columbia, SC 29211
Tel: (803) 733-3531
Email: dgh@dghlaw.net
SC Bar #002844/ USDC #01781

Counsel for Plaintiff

## **TABLE OF CONTENTS**

I.      JURISDICTION AND VENUE…………………………………………………3

II.     THE PARTIES……………………………………………………………………..4

III.    RELEVANT NON-PARTIES……………………………………………………...5

IV.     CLASS ACTION ALLEGATIONS…………………………………………………..9

V.      FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS
        OF FRAUD…………………………………………………………………………10

VI.     SCIENTER……………………………………………………………………….29

VII.    LOSS CAUSATION………………………………………………………………..31

VIII.   DELOITTE AUDITS WERE NO AUDITS AT ALL…………………………...36

IX.     INAPPLICABILITY OF SAFE HARBOR………………………………………37

X.      PRESUMPTION OF RELIANCE………………………………………………...38

XI.     FRAUDULENT CONCEALMENT………………………………………………...39

XII.    CAUSE OF ACTION COUNT ONE………………………………………………39

XIII.   PRAYER FOR RELIEF……………………………………………………………42

XIV.    JURY TRIAL DEMAND…………………………………………………………...42

EXHIBIT 1:
        KEN BROWN REPORT……………………………………………………………16

EXHIBIT 2:
        LETTER FROM ATTORNEY WENICK TO DEFENDANT DELOITTE………..17

Plaintiff, Samuel R. Floyd, III, ("Plaintiff") individually and on behalf of all others similarly situated (the "Class") through his undersigned attorneys, makes the following allegations against Defendants, Deloitte & Touche, LLP and Deloitte, LLP ("Deloitte") based on his personal knowledge, information, belief, and on the investigation of Plaintiff's counsel, which included a review of relevant U.S. Securities and Exchange Commission filings by SCANA Corporation ("SCANA"). These allegations are also based upon records of judicial proceedings in the United States District Court for the District of South Carolina, Columbia Division, as well as, regulatory filings, reports, press releases, depositions and answers to Interrogatories filed in the South Carolina State Court and regulatory proceedings. Public statements, news articles and security analyst reports about SCANA and other readily obtainable information have been used in the Complaint. Plaintiff believes that evidentiary support exists for the allegations set forth herein.

## I.  **JURISDICTION and VENUE**

1. This Complaint asserts claims under Section 10b of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC rule 10b-5, 17 C.F.R. § 240.10b-5.

2. This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337.

3. Venue is proper in the District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391 (b), (c), and (d).  Many of the acts and omissions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in this District.

4. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of national securities exchange.

II.   <strong><u>THE PARTIES</u></strong>

<u>PLAINTIFF</u>

5. Plaintiff, Samuel R. Floyd, III, ("Floyd") purchased and/or otherwise acquired shares of SCANA common stock during the Class Period, as defined below, and was damaged as a result of Defendants' wrongdoing as alleged in this Complaint.

<u>DEFENDANTS</u>

6. Deloitte & Touche, LLP is the accounting arm of Deloitte, LLP, the United States affiliate of the "Big 4" international accounting firm Deloitte Touche Tohmatsu Limited headquartered in the United Kingdom. Deloitte & Touche, LLP offers audit and enterprise risk services. As part of its business, the firm provides clients with audit and financial statement reviews. Other services include financial reporting, regulatory updates, employee benefit audits and venture capital services. Deloitte & Touche, LLP has more than 90 offices and 95,000 employees in the United States. It is registered with the Office of the South Carolina Secretary of State and is authorized to conduct business, and in fact does business, in South Carolina.

7. Deloitte, LLP also manages U.S. subsidiaries that offer tax, consulting, and financial advisory services. Deloitte, LLP is the largest professional service organization in the U.S. with U.S. revenue, in 2018, of $19.9 billion.

8.  Deloitte & Touche, LLP and Deloitte, LLP ("Deloitte") are Delaware limited liability partnerships duly organized and exist under the laws of the State of Delaware, with its main office at 30 Rockefeller Plaza, New York, New York. Deloitte also has an office at 550 South Tryon Street in Charlotte, North Carolina.

9.  For the purposes of this Complaint, references to Deloitte refer to Deloitte & Touche, LLP and Deloitte, LLP or both entities, unless otherwise noted.

DELOITTE AGENTS

Eileen Little

10. Eileen F. Little ("Little") is a certified public accountant. Little joined Deloitte as a staff auditor in the Atlanta office in 1992 and was admitted as an Audit Partner in 2011. Little served as the Audit Engagement Partner for both SCANA and SCE&G for the 2014, 2015, and 2016 engagements.

Sean Bird

11. Sean M. Bird ("Bird") is a certified public accountant with a Bachelor of Science degree in Business Administration in Accounting from Penn State University. He joined Deloitte as a staff auditor in May 1997 and was admitted as an Audit Partner in 2012. Bird served as the Audit Engagement Partner for both SCANA and SCE&G for the 2017 and 2018 engagements. **In the deposition of Jimmy Addison, Bird was identified as the Audit Engagement Partner that informed him that Deloitte's local, as well as the national offices, had reviewed their audit work in disclosures, post abandonment of the Project, and did not see "any gaps" in disclosures made in the financial statements**.

### III.    RELEVANT NON-PARTIES

SCANA Corporation

12. SCANA was incorporated in South Carolina and maintained its principal executive offices at 220 Operations Way, Cayce, South Carolina 29033. During the Class Period, SCANA's stock was traded on the New York Stock Exchange ("NYSE") under the ticker symbol "SCG". For purposes of this Complaint, references to SCANA refer to SCANA, SCE&G, or both companies, unless otherwise noted.

13. SCANA's principal subsidiary, South Carolina Electric & Gas ("SCE&G") is a regulated public utility engaged in the generation, transmission, distribution and sale of electricity primarily in South Carolina. Upon information and belief, Deloitte maintained an office at SCANA's corporate office in Cayce, South Carolina.

THE OFFICER AND DIRECTOR NON-PARTIES OF SCANA

**The responsibility and actual persons that performed all of the reporting requirements for SCANA and SCE&G to the Securities Exchange Commission ("SEC"), state regulatory bodies and shareholders all were certified public accountants who had strong current or former senior leadership positions with Deloitte. In addition, all of these persons had extensive experience in the investor-owned electric utility industries, including clients that were operating and building nuclear power plant projects.**

KEVIN B. MARSH

14. Kevin B. Marsh ("Marsh") is a certified public accountant with a Bachelor of Business Administration degree in Accounting from the University of Georgia. Marsh worked at Deloitte in Columbia, South Carolina, for seven years prior to joining SCANA in 1984. Marsh became Vice President and Chief Financial Officer ("CFO") of SCANA in 1996, President of SCE&G in 2006, and President

and Chief Operating Officer ("COO") of SCANA in January 2011.  In December

2011, Marsh became Chairman of the SCANA Board of Directors and Chief

Executive Officer ("CEO") of SCANA.  On October 31, 2017, SCANA

announced that Marsh would resign as a director effective December 31, 2017.

<u>JIMMY E. ADDISON</u>

15. Jimmy E. Addison ("Addison") is a certified public accountant with a Bachelor of

Science degree in Business Administration in Accounting and a Masters of

Accountancy degree from the University of South Carolina.  Addison worked at

Deloitte for seven years prior to joining SCANA.  Addision served as SCANA's

Chief Financial Officer ("CFO") since April 2006, and its Executive Vice

President since January 2012.  On October 31, 2017, SCANA announced that

Addison would become SCANA's CEO and relinquish his role as CFO effective

January 1, 2018.  **In an October 3, 2018 deposition, Addison said he was not

aware of details of the Bechtel Report, but relied on Deloitte as to disclosure

of Bechtel findings in SCANA's financial statements and filings with the

Securities and Exchange Commission ("SEC").**

<u>JAMES E. SWAN</u>

16. James E. Swan ("Swan") is a certified public accountant with a Bachelor of

Science Degree in Business Administration in Accounting from Clemson

University.  Swan worked at Deloitte for eighteen years, ultimately becoming an

Audit Partner in the Washington, D.C. office.  Swan joined SCANA in August

2000 as Vice President and Controller.  James Swann was the lead person from

SCANA that interacted day to day with the Deloitte audit engagement team.

GREGORY E. ALIFF, SCANA BOARD NON-PARTY AND RETIRED
DELOITTE VICE CHAIRMAN

17. Gregory E. Aliff ("Aliff") is a certified public accountant with a Bachelor of
Science degree in Business Administration in Accounting, and a Masters of
Business Administration degree from Virginia Tech University.  Aliff retired
from Deloitte & Touche, LLP in May 2015 after serving as a Partner for 28 years.
During his career at Deloitte & Touche, LLP, Aliff became the company's Vice
Chairman.  Aliff served as Vice Chairman and Senior Partner of the Energy &
Resources division of Deloitte, LLP.  Aliff was also the leader of Deloitte's
Energy and Natural Resources Management services.  Aliff retired from Deloitte
& Touche, LLP in May 2015 and became a member of the SCANA Board of
Directors and head of SCANA's Audit Committee in October 2015, prior to the
first Bechtel Report.

SOUTH CAROLINA PUBLIC SERVICE AUTHORITY (SANTEE COOPER)
AND LONNIE CARTER

18. South Carolina Public Service Authority, also known as Santee Cooper ("Santee
Cooper") is the South Carolina's state-owned electric and water utility.  Santee
Cooper was founded in 1934 and maintains principal executive offices at One
Riverwood Drive, Monks Corner, South Carolina, 29461.  Santee Cooper
provides electricity to more than two million South Carolina customers.

19. Lonnie Carter ("Carter") is the former President and Chief Executive Officer
("CEO") for Santee Cooper.  Carter retired on August 27, 2017 after serving 35
years (last 13 years as CEO) in various financial and planning positions.  Carter

received a Bachelor of Science degree in Business Administration in 1982, and a

Masters of Business Administration degree in 1987, both from The Citadel.

## IV.    **CLASS ACTION ALLEGATIONS**

20. Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of

the Federal Rules of Civil Procedure on behalf:

> *of all persons or entities who purchased or otherwise acquired SCANA publicly-traded securities from February 27, 2015 through December 20, 2017, inclusive, and who were damaged thereby (the"Class").  Excluded from the Class are:  Defendants; members of the immediate family of any Defendant who is an individual; the officers and directors of SCANA and Deloitte during the Class Period; any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; the Company's employee retirement and benefit plan(s); and the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity.*

21. The members of the Class are so numerous that joinder of all members is

impracticable.  Throughout the Class Period, SCANA common stock was actively

traded on the New York Stock Exchange.  While the exact number of Class

members is unknown to Plaintiff at this time and can be ascertained only through

appropriate discovery, Plaintiff believes that there are hundreds or thousands of

members in the proposed Class.  Record owners and other members of the Class

may be identified from records maintained by SCANA or its transfer agent, and

may be notified of the pendency of this action by mail, using the form of notice

similar to that customarily used in securities class actions.

22. The disposition of the claims in a class action will provide substantial benefits to

the parties and the Court.  As of October 31, 2017, SCANA had 142,616,254

shares of stock outstanding, which were owned publicly by at least hundreds of

persons or entities.

23. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- Whether the federal securities laws were violated by Defendant Deloitte's acts as alleged herein;

- Whether Defendant Deloitte acted knowingly or recklessly in issuing false and misleading financial statements;

- Whether the prices of SCANA securities during the Class Period were artificially inflated because of Defendant Deloitte's conduct complained of herein; and

- Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

24. Plaintiff's claims are typical of the claims of other members of the Class, as all members of the Class are similarly affected by Defendant Deloitte's wrongful conduct in violation of the federal law that is complained of herein.

25. Plaintiff will adequately protect the interests of the Class and has retained competent counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

## V.    FACTUAL BACKGROUND

## AND SUBSTANTIVE ALLEGATIONS OF FRAUD

26. This securities fraud class action asserts claims arising from one of the most high-profile fiascos in modern South Carolina history—SCANA's failed, $9 Billion decade-long effort to build two nuclear reactors in South Carolina in partnership

with state-owned utility South Carolina Public Service Authority ("Santee Cooper").

27. Deloitte is the leading auditor of financial statements for the investor-owned electric utility industry in the United States.

28. Deloitte has served as the auditors of SCANA Corporation since 1945.

29. Deloitte issued unqualified audit reports on SCANA and SCE&G's financial statements for the years ending December 31, 2014, December 31, 2015, December 31, 2016 and December 31, 2017, certifying that it had audited those statements in accordance with the standards of the Public Company Accounting Oversight Board for the United States ("PCAOB") and that the statements presented the financial position of SCANA and SCE&G fairly and in conformity with Generally Accepted Accounting Principles ("GAAP").

30. As set forth below, Deloitte knowingly or recklessly abdicated its responsibilities in connection with its audits of SCANA and SCE&G's financial statements for fiscal years 2014 through 2017. Had Deloitte conducted its audits in compliance with Generally Accepted Auditing Standards ("GAAS") and PCAOB standards, the investors, including Plaintiff and the Class, would have been furnished with the information that there was concern that the project would not be finished in time to receive the tax credits.

**Deloitte's Unique Knowledge of South Carolina and Georgia Nuclear Construction Projects**

31. In 2008, after SCANA and Santee Cooper announced the two nuclear units in South Carolina, Georgia Power, a wholly owned subsidiary of the Southern

Company, announced construction of two new nuclear plants to be built in Georgia.

32. South Carolina and Georgia were using Westinghouse's AP1000 design. The two Projects were considered "sister projects" and Deloitte was the outside auditor on both Projects.

33. Deloitte had the institutional knowledge of knowing the problems, delays and impacts of both AP1000 on both companies and the resulting disclosures that should have been made to the investors of SCANA.

**Financial Plan for the Georgia Nuclear Project**

34. The Georgia Project called for using debt and equity to fund the construction costs. The Georgia Project received federal loan guarantees from the Department of Energy totaling $12 Billion dollars as of March 2019. The loan guarantees from the federal government to the Georgia Project precluded the use of production tax credits.

**South Carolina Nuclear Projects and Federal Production Tax Credits**

35. In order to fund the construction of nuclear plants, the federal government passed the Energy Policy Act of 2005 ("the Energy Project Act"). The Act created a federal production tax credit for new nuclear production projects. The tax credits were only available if the projects were in service before January 1, 2021. If the South Carolina plants were not in service by the end of 2020, SCANA would lose approximately $1.4 Billion dollars in tax credits.

36. This federal production tax credit deadline was the overriding factor that ultimately stopped SCANA and the South Carolina Project.

37. Plaintiff alleges that Deloitte knew SCANA's financial ability from the start of the South Carolina Projects and knew that SCANA could not financially complete the Project unless the January 2021 date was achieved.

**BASE LOAD REVIEW ACT AND SOUTH CAROLINA PUBLIC SERVICE COMMISSION**

38. In 2007, the South Carolina legislature passed the Base Load Review Act, South Carolina Code Annotated §§ 58-33-210, et seq. ("BLRA"). The BLRA was designed to allow utility companies to recoup "prudently incurred" capital and operating costs for a base load generating power plant during its construction, rather than waiting until it was built. **Prior to the BLRA's passage, South Carolina required utilities to complete construction and begin commercial operations before charging ratepayers for the costs associated with that construction.**

39. SCANA's base load review application contained, among other things, **the construction schedule, the capital costs, and the schedule for incurring those costs,** the selection of principal contractors and suppliers, the proposed rate design used in formulating revised rates, and the revised rates that the utility intended to put in place after the issuance of a base load review order. South Carolina Code Annotated § 58-33-250 (2007).

40. The BLRA contained some backstops against imprudently incurred costs, and thus put SCANA at risk of being forced to bear them. Specifically, South Carolina Code Annotated § 55-33-275(E) of the Base Load Review Act provided:

*"In cases where a party proves by a preponderance of the evidence that there has been a material and adverse deviation from the approved schedules,*

13

*estimates, and projections set forth in Section 58-33-270(B)(1) and 58-33-270(B)(2), as adjusted by the inflation indices set forth in Section 58-33-270(B)(5), the commission may disallow the additional capital costs that result from the deviation, but only to the extent that the failure by the utility to anticipate or avoid the deviation, or to minimize the resulting expense, was imprudent considering the information available at the time that the utility could have acted to avoid the deviation or minimize its effect."*

Further, while the BLRA allows a utility to recover costs from ratepayers even for abandoned construction projects, such recovery is not allowed "to the extent that the failure by the utility to anticipate or avoid the allegedly imprudent costs, or to minimize the magnitude of the costs, was imprudent considering the information available at the time that the utility could have acted to avoid or minimize the costs." Thus, Deloitte's management and Board were on notice from the outset that the Company's ability to recover costs from South Carolina ratepayers was limited by the BLRA's prudence requirement.

## THE BLRA RATES BEING BILLED AND COLLECTED FROM THE RATEPAYER DURING THE CONSTRUCTION PERIOD WERE MATERIAL TO SCANA'S INCOME STATEMENT

41. The construction costs were being reflected on SCANA's Balance Sheet as an asset and being represented to the investing public that its costs were going to be recovered in future rates as an operating generating plant. **Both the Balance Sheet and Income Statement are part of the SCANA financial statements that Deloitte gave an unqualified, i.e., "clean" opinion, the highest type of opinion a CPA firm can issue, during the Class Period.**

In actuality, SCANA ended up with a partially-completed, abandoned nuclear plant that is not only of no value (a non-asset), it is actually a liability, as ultimately the site must be returned back to raw ground at a great expense.

**DELOITTE AUDITED COST SUBMISSIONS ANNUALLY PLUS SPECIAL AUDIT STARTING IN 2015**

42. The record has numerous incidents of SCANA making incomplete, untruthful and direct omissions of the true costs to complete the VC Summer Project, the progress to date and the true estimated completion date to the PSC, ORS, SEC, the public and its investors that were inconsistent with their own monthly internal reporting and Bechtel assessment.

All of this was known to the Defendants throughout the Class Period. Deloitte had access to all of this information during its annual and special audits of SCANA and SCE&G. Deloitte was required to audit SCANA's ratemaking submissions to the PSC and the revenue internal control systems (including the billing to its SCANA customers) for compliance with those submissions and the internal reports supporting those calculations. This is required by GAAS and PCAOB auditing standards.

The BLRA rate component was a large part of the average bill to SCANA residential customers averaging $27 per month. This was a material misstatement of SCANA revenue and represents hundreds of millions of dollars of false revenue reported annually that resulted in overstating of Net Income and Earning Per Share. All of this had the impact of overstating SCANA stock price. These

material misstatements were in the financial statements of SCANA that Deloitte

certified as being free of material misstatements.

In a recent settlement of a class action lawsuit on this very issue SCANA's

successor, Dominion Energy, has agreed to refund $2 Billion dollars of this

falsely collected BLRA revenue to its customers.

43. SCANA Corporation's construction costs and accounting for the VC Summer

Project were problematic.  The two reasons for this are (1) BLRA and (2) the

federal production tax credit.  These two sources of funding represented

approximately half of the originally budgeted costs of SCANA's share of the

Project.  SCANA would be financially unable to take on the VC Summer Project

without these two sources of funds.

**INSIDERS AND DELOITTE KNEW IN EARLY 2015 THAT THE SOUTH
CAROLINA PROJECT WOULD NEVER MEET THE TAX CREDIT
DEADLINE**

44. Ken Browne was an engineer with SCANA, whose deposition was taken after

SCANA failed. Browne stated that by 2014, there was substantial doubt that the

Project would be completed at all and that one did not need the Bechtel Report to

understand the problem,  *Lightsey, et. al. v. South Carolina Electric & Gas*

*Company, et. al. Case No. 2017-CP-25-0335.*

45. Mr. Browne provided:

"Performance Factor ("PF") is the critical measurement concerning construction

progress.  Performance Factor is the ratio of actual craft labor hours to be budgeted

for the Project".

16

46. In January 2015, Browne prepared a chart entitled, "Target Construction Productivity," which he shared with his superiors at SCANA. Browne's analysis was that, considering the history, completion of the Project would take 26.5 more years to complete (attached hereto as "EXHIBIT 1").

**DELOITTE SPECIAL AUDIT**

47. Relying on Browne's report, SCANA commissioned Deloitte to do a special audit beginning in early 2015. Plaintiff and Plaintiff's Class discovered the existence of Deloitte's special audit of construction costs only by reading the sworn answers to interrogatories filed by SCANA in the case of *Lightsey et al v. SCE&G and SCANA Case No. 2017-CP-25-0335* in Hampton, South Carolina after the South Carolina Project failed.

48. The filed interrogatory sworn by SCANA provided:

> *"QUESTION: State the name of any consultants, companies, and/or other entities who reviewed or provided advice, audits or similar services on the VC Summer Project, and for each entity identified provide:*
> *a.   The name of the person, company or entity;*
> *b.   The purpose for that person, company or entity's services;*
> *c.   The date the consultant, company or service performed review or otherwise undertook services on the VC Summer Project;*
> *d.   The outcome of those services;*
> *e.   The name of any employees of SCE&G and/or SCANA with whom the entity interacted;*
> *f.    Whether a report was generated as part of the services.*
> *ANSWER: Defendants engaged Deloitte in 2015 to audit the schedule for Project costs. Deloitte prepared an audit letter in connection with this engagement."*

49. Deloitte prepared an engagement letter to SCANA for the special audit of construction costs. Deloitte and SCANA knew before Bechtel was hired to do a construction progress report that the project would have never met the tax credit deadline.

**BECHTEL RETAINED BY SCANA**

50. Bechtel Engineering was retained by SCANA to assess the progress of
    Westinghouse on the nuclear project. Bechtel started the assessment on August
    10, 2015.

51. As part of standard audit procedures, Deloitte received a letter from Attorney
    George Wenick of Smith, Curie & Hancok, LLP informing Deloitte that Wenick
    and his firm had been hired by SCANA to engage Bechtel to perform the
    assessment of Westinghouse's work on the Project, (attached hereto as "EXHIBIT
    2").

52. Deloitte never made any mention of Bechtel or any of Bechtel's reports in any
    10K prepared for SCANA during the Class Period.

53. Bechtel's assessment, finalized in a 130-page report on October 22, 2015, was not
    made public. Bechtel concluded that the schedule to secure the tax credit would
    be impossible to achieve.

54. In an October 3, 2018 deposition, after the failure of the South Carolina Project,
    Jimmy Addison, CFO of SCANA testified, as follows:

> *Q.    You were signing your company's or certifying your company's SEC
>        filings during the time of the Bechtel assessment, correct?*
> *A.    Correct.*
>
> *Q.    It doesn't disturb you at all that the company spent seven figures on
>        assessment in 2015 regarding the status—regarding the project and
>        you weren't made aware of the results of that assessment while you
>        were certifying these SEC filings?*
> *A.    It does not. And part of that conclusion is we've got an
>        international accounting firm that's auditing our records, that has
>        gone back and looked at it completely and said the(y) did not see
>        any gaps in our disclosures.*
>
> *Q.    Is that Deloitte?*

A.    Yes.

Q.    You used to work there, right?
A.    I did about three decades ago.

Q.    So you trusted your accountants on that issue?
A.    I have a great deal of confidence that they thoroughly vetted that
      issue especially with the political and regulatory ramifications of it.

Q.    Sitting here now, do you know that they did vet that issue?
A.    Yes.

Q.    How do you know that?
A.    They told me that.

Q.    When?
A.    I don't know specifically when, sometime obviously post
      abandonment.

Q.    Did you have a conversation with them specifically about that issue?
A.    The conversation wasn't specific about that. It was conversation
      that—a topic that they offered in the middle of another—in the
      middle of another meeting.

Q.    What was the meeting about?
A.    A routine quarterly meeting where they meet with me before the
      financials are published.

Q.    And how do they bring up the Bechtel report?
A.    I don't remember the details of it.

Q.    What did they tell you about it?
A.    That they had gone back with their local team and their national
      team and reviewed all the disclosures at the point in time that they
      were made, and read this document. They did not see any gaps in the
      disclosure at the time they were made.

Q.    And who from Deloitte told you that?
A.    The partner at Deloitte now, Sean Bird.

55. On July 31, 2017 SCANA issued a press release announcing that it was

abandoning the South Carolina Nuclear Project.

## DELOITTE'S FALSE AND MISLEADING AUDIT REPORTS RELIED UPON BY INVESTORS

56. The following audit reports were issued as a result of audits by Deloitte on SCANA and SCE&G's financial reports and included by SCANA in its annual Form 10-K filings. The audit report performed in 2015 by Deloitte of the VC Summer Project costs has not been released and is not included.

57. Every audit report of SCANA's and SCE&G's financial statements by Deloitte for 2014-2017 was a "clean opinion," an unqualified report that the financial statements were fairly presented in all material respects. This is the highest level of audit report a Certified Public Accountant ("CPA") may issue. These reports were all false and misleading. **Again, it is extremely significant that Deloitte was additionally retained in 2015 by SCE&G to specifically audit the construction schedule of the VC Summer Nuclear Project, including issuing a report.**

58. In addition, Deloitte consented to the use of its audit reports in each of SCANA's SEC Form 10K filings during the Class Period. In each of the unqualified audit reports on SCANA's and SCE&G's 2014-2017 financial statements, Deloitte certified that:

a.      Deloitte had audited SCANA's and SCE&G's financial statements in accordance with auditing standards generally accepted in the United States;

b.      Deloitte had planned and performed those audits "to obtain reasonable assurance about whether the financial statements are free of material misstatement;"

c.     In Deloitte's opinion, SCANA's and SCE&G's financial statements "present fairly, in all material respects, the consolidated financial position" of SCANA and SCE&G "in conformity with accounting principles generally accepted in the United States;" and

d.     Deloitte's audits provided a "reasonable basis" for Deloitte's opinions. During the years 2014, 2015, 2016, and 2017, the fees paid by SCANA and SCE&G to Deloitte were reported to be $12,461,917.

**False & Misleading Statements & Omissions by Deloitte & SCANA in Federal Filings**

59. In SCANA's Form 8-K filed October 27, 2015, SCANA wrote, in part:

a.     "SCE&G announces an amendment to the Engineering, Procurement, and Construction Agreement for AP1000 plants at VC Summer Station ("EPC Amendment"). The EPC Amendment "***revises the Guaranteed Substantial Completion Dates (GSCDs) for Units 2 and 3 to August 31, 2019 and 2020, respectively.***" The EPC Amendment further stated, "[T]he ***total gross construction cost of the [Nuclear] Project [was raised to] approximately $7.113 billion [$5.5 billion in 2007 dollars].***"

b.     The 8-K announced SCE&G's "exclusive and irrevocable option to, at any time prior to November 1, 2016, further amend the EPC Agreement" and exercise a "fixed price option [that] would result in SCE&G's total Project costs to increase by approximately $774 million over the $6.827 billion" approved by the PSC in September 2015. If exercised, this fixed price option "***would bring the total gross construction cost of the Project to approximately $7.601 billion***" for SCANA.

60. In SCANA's Form 10-Q for the third quarter of 2015, signed and certified as accurate pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Marsh and Addison and filed on November 6, 2015, SCANA stated, in relevant part:

a.     "*Based on the guaranteed substantial completion dates provided above, **both New Units are expected to be operational and to qualify for the nuclear production tax credits; however, further delays in the schedule or changes in tax law <u>could</u> impact such conclusions.**"*

21

b.     *"Among other things, upon effectiveness, the October 2015 Amendment would '. . . **revise the guaranteed substantial completion dates of Units 2 and 3 to August 31, 2019 and 2020, respectively** . . .'*

c.     *"**Under the October 2015 Amendment, SCE&G's total estimated project costs will increase by approximately $286 million over the $6.8 billion approved by the SCPSC in September 2015, and will bring its total estimated gross construction cost of the project (including escalation and AFC) to approximately $7.1 billion.**"*

d.     *"Finally, upon effectiveness, the October 2015 Amendment would provide SCE&G and Santee Cooper an irrevocable option, until November 1, 2016 and subject to regulatory approvals, to further amend the EPC Contract to fix the total amount to be paid to the Consortium for its entire scope of work on the project (excluding a limited amount of work within the time and materials component of the contract price) after June 30, 2015 at $6.082 billion (SCE&G's 55% portion being approximately $3.345 billion). This total amount to be paid would be subject to adjustment for amounts paid since June 30, 2015. Were this fixed price option to be exercised, the aggregate delay-related liquidated damages amount referred to in (iii) above would be capped at $338 million per unit (SCE&G's 55% portion being approximately $186 million per unit), and the completion bonus amounts referred to in (iv) above would be $150 million per New Unit). **The exercise of this fixed price option would result in SCE&G's total estimated project costs increasing by approximately $774 million over the $6.8 billion approved by the SCPSC in September 2015, and would bring its total estimated gross construction cost (including escalation and AFC) of the project to approximately $7.6 billion.**"*

e.     *"Under the BLRA, the SCPSC has approved, among other things, a milestone schedule and a capital costs estimates schedule for the New Units. This approval constitutes a final and binding determination that the New Units are used and useful for utility purposes, and **that the capital costs associated with the New Units are prudent utility costs and expenses and are properly included in rates so long as the New Units are constructed or are being constructed within the parameters of the approved milestone schedule, including specified schedule contingencies, and the approved capital costs estimates schedule.**"*

DELOITTE & SCANA failed to disclose the existence of known trends or

uncertainties within the Company regarding the Project, namely, that

SCANA was not going to be able to complete construction of the Project

by the end of 2020, was not going to be eligible to receive $1.4 billion in

Nuclear Tax Credits, and that failure to complete the Project by the end

2020 would have material unfavorable impact on revenues.

61. In SCANA's Form 10-K filed on February 26, 2016, SCANA repeated its earlier

statement made in SCANA's Form 10-Q for the third quarter of 2015, signed and

certified as accurate pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by

Marsh and Addison and filed on November 6, 2015 stating, in relevant part:

> *"Under the BLRA, the SCPSC has approved, among other things, a milestone schedule and a capital costs estimates schedule for the New Units.  This approval constitutes a final and binding determination that the New Units are used and useful for utility purposes, and that the capital costs associated with the New Units are prudent utility costs and expenses and are properly included in rates so long as the New Units are constructed or are being constructed within the parameters of the approved milestone schedule, including specified schedule contingencies, and the approved capital costs estimates schedule."*

Again, Defendants and SCANA failed to disclose the existence of known trends

or uncertainties within the Company regarding the Project, namely, that

SCANA was not going to be able to complete construction of the Project

by the end of 2020, was not going to be eligible to receive $1.4 billion in

Nuclear Tax Credits, and that failure to complete the Project by the end

2020 would have a material unfavorable impact on revenues.

62. In SCANA's Form 10-Q filed on May 6, 2016:

> *SCANA stated, "Under the BLRA, the SCPSC has approved, among other things, a milestone schedule and a capital costs estimates schedule for the New Units.  This approval constitutes a final and binding determination that the New Units are used and useful for utility purposes, and that the capital costs associated with the New Units are prudent utility costs and expenses and are properly included in rates so*

> *long as the New Units are constructed or are being constructed within the parameters of the approved milestone schedule, including specified schedule contingencies, and the approved capital costs estimates schedule."*

Again, Defendants and SCANA failed to disclose the existence of known trends or uncertainties within the Company regarding the Project, namely, that SCANA was not going to be able to complete construction of the Project by the end of 2020, was not going to be eligible to receive $1.4 billion in Nuclear Tax Credits, and that failure to complete the Project by the end 2020 would have a material unfavorable impact on revenues.

63. In SCANA's Form 10-Q filed on August 5, 2016:

> *SCANA stated again, "Under the BLRA, the SCPSC has approved, among other things, a milestone schedule and a capital costs estimates schedule for the New Units.  This approval constitutes a final and binding determination that the New Units are used and useful for utility purposes, and that the capital costs associated with the New Units are prudent utility costs and expenses and are properly included in rates so long as the New Units are constructed or are being constructed within the parameters of the approved milestone schedule, including specified schedule contingencies, and the approved capital costs estimates schedule."*

> *SCANA stated again, "Under the October 2015 Amendment, SCE&G's total estimated project costs will increase by approximately $286 million over the $6.8 billion approved by the SCPSC in September 2015, and will bring its total estimated gross construction cost of the project (including escalation and AFC) to approximately $7.1 billion."*

Again, Defendants and SCANA failed to disclose the existence of known trends or uncertainties within the Company regarding the Project, namely, that SCANA was not going to be able to complete construction of the Project by the end of 2020, was not going to be eligible to receive $1.4

24

billion in Nuclear Tax Credits, and that failure to complete the Project by

the end 2020 would have a material unfavorable impact on revenues.

64. In SCANA's Form 10-Q filed on November 4, 2016:

> ***SCANA stated again, "Under the BLRA, the SCPSC has approved, among other things, a milestone schedule and a capital costs estimates schedule for the New Units. This approval constitutes a final and binding determination that the New Units are used and useful for utility purposes, and that the capital costs associated with the New Units are prudent utility costs and expenses and are properly included in rates so long as the New Units are constructed or are being constructed within the parameters of the approved milestone schedule, including specified schedule contingencies, and the approved capital costs estimates schedule."***

> ***SCANA stated, "On May 26, 2016, SCE&G petitioned the SCPSC seeking approval to update the capital cost schedule and construction milestone schedule for the New Units consistent with the October 2015 Amendment. Within this petition, SCE&G also informed the SCPSC that is had notified WEC of its intent to elect the fixed price option, subject to concurrence by the Santee Cooper and approval by the SCPSC. The petition reflected an increase in total project costs of approximately $852 million over the cost approved by the SCPSC in September 2015, of which approximately $505 million is directly attributable to the fixed price option. SCE&G's estimated gross construction cost for the project is now estimated to be approximately $7.7 billion, including owner's costs, transmission, escalation and AFC. After receiving Santee Cooper's concurrence in June 2016, SCE&G executed the fixed price option on July 1, 2016, subject to SCPSC approval."***

Again, Defendants and SCANA failed to disclose the existence of known trends

or uncertainties within the Company regarding the Project, namely, that

SCANA was not going to be able to complete construction of the Project

by the end of 2020, was not going to be eligible to receive $1.4 billion in

Nuclear Tax Credits, and that failure to complete the Project by the end

2020 would have a material unfavorable impact on revenues.

65. In SCANA's Form 10-K filed on February 24, 2017:

> **SCANA stated again, "Under the BLRA, the SCPSC has approved, among other things, a milestone schedule and a capital costs estimates schedule for the New Units. This approval constitutes a final and binding determination that the New Units are used and useful for utility purposes, and that the capital costs associated with the New Units are prudent utility costs and expenses and are properly included in rates so long as the New Units are constructed or are being constructed within the parameters of the approved milestone schedule, including specified schedule contingencies, and the approved capital costs estimates schedule."**

Again, Defendants and SCANA failed to disclose the existence of known trends or uncertainties within the Company regarding the Project, namely, that SCANA was not going to be able to complete construction of the Project by the end of 2020, was not going to be eligible to receive $1.4 billion in Nuclear Tax Credits, and that failure to complete the Project by the end 2020 would have a material unfavorable impact on revenues.

66. SCANA's March 29, 2017 Proxy Statement filed with the SEC included a "Chairman's Letter and 2016 Highlights." Again, SCANA stated in its Proxy Statement, "Under the BLRA, the SCPSC has approved, among other things, a milestone schedule and a capital costs estimates schedule for the New Units. This approval constitutes a final and binding determination that the New Units are used and useful for utility purposes, and *that the capital costs associated with the New Units are prudent utility costs and expenses and are properly included in rates so long as the New Units are constructed or are being constructed within the parameters of the approved milestone schedule, including specified schedule contingencies, and the approved capital costs estimates schedule.*"

67. In SCANA's Form 10-Q filed on May 5, 2017:

*Again, Defendants and SCANA stated, "Under the BLRA, the SCPSC has approved, among other things, a milestone schedule and a capital costs estimates schedule for the New Units. This approval constitutes a final and binding determination that the New Units are used and useful for utility purposes, and that the capital costs associated with the New Units are prudent utility costs and expenses and are properly included in rates so long as the New Units are constructed or are being constructed within the parameters of the approved milestone schedule, including specified schedule contingencies, and the approved capital costs estimates schedule."*

Again, SCANA failed to disclose the existence of known trends or

uncertainties within the Company regarding the Project, namely, that

SCANA was not going to be able to complete construction of the Project

by the end of 2020, was not going to be eligible to receive $1.4 billion in

Nuclear Tax Credits, and that failure to complete the Project by the end

2020 would have a material unfavorable impact on revenues.

68. In SCANA's Form 10-Q filed on May 5, 2017, again, SCANA stated, "Under the

BLRA, the SCPSC has approved, among other things, a milestone schedule and a

capital costs estimates schedule for the New Units. This approval constitutes a

final and binding determination that the New Units are used and useful for utility

purposes, and

*"that the capital costs associated with the New Units are prudent utility costs and expenses and are properly included in rates so long as the New Units are constructed or are being constructed within the parameters of the approved milestone schedule, including specified schedule contingencies, and the approved capital costs estimates schedule."*

69. SCANA's Form 8-K filed on July 31, 2017 included a Abandonment Press

Release that misled investors into believing Westinghouse's bankruptcy was the

primary reason SCANA chose to abandon the Nuclear Project, and **continued to conceal Bechtel's earlier negative findings**.

*"We arrived at this very difficult but necessary decision following months of evaluating the [P]roject from all perspectives to determine the most prudent path forward. Many factors outside our control have changed since inception of this [P]roject. Chief among them, the bankruptcy of our primary construction contractor, Westinghouse. . ." Similarly, that same day during the July 31, 2017 Abandonment Conference Call, Marsh affirmed that SCANA's actions met the test for prudency, and placed the blame for the Nuclear Project's demise on "the failure of Westinghouse to deliver on its fixed price contract." Furthermore, Marsh explained that the "Westinghouse bankruptcy removed the benefits and protection of the [F]ixed [P]rice [O]ption," which caused "SCANA and our project co-owner, Santee Cooper, to reevaluate the entire new [N]uclear [P]roject from all perspectives."*

## DELOITTE'S FIDUCIARY DUTY TO PLAINTIFF AND PLAINTIFFS CLASS

70. Every audit report of SCANA by Deloitte for years 2014-2017 was a "clean opinion". Deloitte represented that the financial statements were fairly presented in all material respects. Deloitte gave SCANA the highest-level audit report that a Certified Public Accounting Firm may give a client. Deloitte knew that their opinions were false and materially misleading to investors when they were given to the public.

## DELOITTE KNEW FROM THE BEGINNING OF SOUTH CAROLINA PROJECT THAT SCANA DID NOT HAVE FINANCIAL ABILITY TO BUILD THE NUCLEAR FACILITY WITHOUT TAX CREDITS AND BSLRA

71. Throughout the Class Period, Deloitte failed to adequately assess the significant risks associated with the SCANA engagement.

72. Deloitte knowingly or recklessly abdicated its responsibilities in connection with its audits of SCANA's financial statements for fiscal years 2014 through 2017.

Had Deloitte conducted its audits in compliance with Generally Accepted Auditing Standards ("GAAS") and PCAOB standards, it would have told the public the truth. By issuing "clean opinions" for the 2015 to 2017 fiscal years, and failing to disclose adverse material facts. Deloitte knowingly or recklessly disregarded the truth concerning the progress and significant material weaknesses in the Company's internal controls, specifically, internal controls relating to the way the Company portrayed the nuclear plant construction schedule. Furthermore, the Defendants overstated assets, overstated earnings, understated liabilities, and artificially inflated stock valuations.

## VI.    SCIENTER

73. From January 31, 2015 to December 31, 2016, SCANA officials repeatedly represented that the Guaranteed Substantial Completion Date ("GSCD") for Nuclear Project Unit 2 and Unit 3 were August 31, 2019 and August 30, 2020, respectively.  These statements were blatant lies, and Deloitte knew that the statements were false, but continued to issue unqualified opinions.

74. Including and in addition to the materially false and misleading statements and omissions set forth above, Defendants made the following material false and misleading statements and omissions during the Class Period with knowledge or reckless disregard for their falsity at the time they were made.  Indeed, as explained above, during the Class Period, Deloitte knew that (i) the Nuclear Project would not be completed in 2020; (ii) the costs of the Nuclear Project would be, at least, $935 million to $1.45 billion greater than represented; (iii) SCANA would be ineligible to receive the $1.4 billion in Nuclear Tax Credits;

(iv) the Nuclear Project was not progressing toward a 2020 completion date because the monthly progress rates never came close to the needed rate of 2.5% to 3% per month; (v) SCANA's oversight was completely inadequate to "bring the project to completion;" (vi) SCANA's May 2016 election of the fixed price option would likely force Toshiba and/or Westinghouse into bankruptcy, dooming the Nuclear Project, and (vii) Defendants' affirmative commitment to heightened transparency at the start of the Class Period was patently false as SCANA buried the Deloitte Special Audit Report and the Bechtel Assessment and Report, as well as the monthly progress reports and other internal documents that revealed the fraud.

75. Deloitte not only did the annual audit, but also was retained in 2015 to do a "special" audit of VC Summer project costs.  Deloitte knew from contemporaneous presentations, reports, analyses, and correspondence that individually and collectively informed Deloitte that SCANA's public statements concerning the status of the Project were materially false and misleading when made.  The failure to disclose the Deloitte Special Audit Report and the Bechtel Reports and other information regarding the viability of the Project are strong evidence of Scienter.

76. Deloitte knew that the monthly progress rate at the Project never tipped 0.8%, which means that there was no material improvement in progress throughout the Class Period.  Deloitte's concealment is even more incriminating when viewed in the context that the Project was the single most important component of SCANA's business and financial statements during the Class Period.  Deloitte

was motivated to keep the Project running so that SCANA could reap the benefits of the nine rate hikes permitted under the BLRA and approved by the PSC. Deloitte, being the largest auditor of investor-owned utilities in the United States, clearly knew how important to investors it was that the projects were on schedule.

## VII.    **LOSS CAUSATION**

77. Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiff and the Class to suffer substantial losses.  During the Class Period, Plaintiff and the Class purchased SCANA securities at artificially inflated prices and were damaged thereby when the price of SCANA securities declined when the truth was revealed.  The price of SCANA securities significantly declined (causing investors to suffer losses) when the Defendants' misrepresentations, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the risks that had been fraudulently concealed by the Defendants materialized.

78. Specifically, Defendants' materially false and misleading statements misrepresented, *inter alia*, the status of the Nuclear Project (including the schedule for its completion, total costs, SCANA's ability to qualify for the crucial Nuclear Tax Credit, and the progress of construction), SCANA's purported commitment to honesty and transparency about the project, the prudency of SCANA's management of the project, the likelihood and impact or a potential Toshiba and/or Westinghouse bankruptcy, and the ongoing viability of the project.  When those statements were corrected and the truth revealed, investors suffered losses as the prices of SCANA securities declined.  Because of the

disclosure of the truth of the Defendants' fraud, SCANA's common stock price

declined over 50%, from a high closing price of $76.12 per share on July 6, 2016,

to a closing price of $37.39 per share on December 21, 2017.

The disclosures that corrected the market prices of SCANA securities and/or

revealed a previously concealed, materialized risk to reduce the artificial inflation

caused by the Defendants' materially false and misleading statements and

omissions are detailed below and summarized in the following chart.

Specifically, the chart identifies each corrective disclosure and/or materialization

of the risk event, the price declines in SCANA common stock resulting from the

event, and, for purposes of comparison, the percentage change in the S&P 500

Index on each event date:

| Date* | Corrective Event | Closing Stock Price | Common Stock Price Change | S&P 500 Price Change |
|---|---|---|---|---|
| 12/27/2016 (12/28/2016) | Toshiba announced estimated impairment of billions of dollars connected to Nuclear Project. | $ 72.92 | - 2.03% | - 0.82% |
| 02/14/2017 | Toshiba announced $6.3 billion writedown related to nuclear program and reported that it may have to sell its stake in Westinghouse. | $ 66.86 | - 4.53% | 0.43% |
| 02/16/2017 | SCANA holds conference call and discusses Toshiba announcement and possible impact on SCANA and Nuclear Project. | $ 67.32 | - 0.22% | - 0.08% |
| 03/22/2017 | Morgan Stanley issues report predicting "further cost overruns and delays" at the Nuclear Project and estimating that total costs would be 108% above the original | $ 67.74 | - 0.78% | 0.19% |

| Date* | Corrective Event | Closing Stock Price | Common Stock Price Change | S&P 500 Price Change |
|---|---|---|---|---|
| | cost estimate, and $5.2 billion greater than most recent cost estimate. | | | |
| 03/22/2017 (03/23/2017) | News coverage of Morgan Stanley report and publication of Reuters article reporting that Westinghouse had secured bankruptcy counsel and indicating that bankruptcy announcement was imminent. | $ 66.71 | - 1.52% | - 0.10% |
| 07/27/2017 (07/28/2017) | SCANA and Santee Cooper announce that (i) Toshiba agreement to honor its $2.168 billion parental guidance will not be sufficient as the costs of the two Units will "materially exceed" prior estimates, and (ii) the Nuclear Project will not be completed by 2021, "the current deadline for SCE&G to gain production tax credits for completing the reactors. | $ 61.29 | - 6.63% | - 0.13% |
| 08/02/2017 (08/03/2017) | Following news covering testimony by Marsh, Byrne, and Addison before the PSC, which stated it was "a grim day" and that the "Commission was blindsided," South Carolina lawmakers form South Carolina Energy Caucus in response to SCANA's decision to abandon the Nuclear Project, with a goal to force "the shareholders of SCANA Corp. to eat any remaining costs to be tied to the high-profile cancellation of two multi-billion-dollar nuclear reactors. | $ 65.34 | - 2.70% | - 0.20% |
| 08/04/2017 | South Carolina Attorney General announced initiation of an investigation into SCANA "to ensure that all laws were | $ 63.79 | - 2.37% | - 0.19% |

| Date* | Corrective Event | Closing Stock Price | Common Stock Price Change | S&P 500 Price Change |
|---|---|---|---|---|
| | complied with and all applicable procedures were followed," and news that legislators were planning on closely investigating SCANA's abandonment petition. | | | |
| 08/09/2017 (08/10/2017) | It is reported that the ORS moved to dismiss SCANA's abandonment petition, and the Speaker of South Carolina's House of Representatives intervened to join that motion. | $ 62.01 | - 1.10% | - 1.41% |
| 08/10/2017 (08/11/2017) | *Post and Courier* article reported that Marsh told lawmakers that he would not want to take on the Nuclear Project now "after it fell years behind schedule" and soared "billions of dollars over budget." Article also reported lawmaker statements unless SCANA pulled its request to charge ratepayers for the failed project, "you may force the General Assembly to be more rash than we would otherwise want to be." | $ 60.69 | - 2.13% | 0.13% |
| 09/07/2017 | Articles report on the fallout from the release of the Final Bechtel Report and the release of internal documents and communications that revealed new information about SCANA executives' knowledge of the significant risks facing the Nuclear Project at least by February 2016, as well as knowledge of a significant risk of bankruptcy facing Toshiba and Westinghouse and the adverse impact on the viability of the Nuclear Project from early in 2016. | $ 59.58 | - 0.75% | 0.01% |
| 09/21/2017 (09/22/2017) | SCANA announces that it had been served with a subpoena from the U.S. Attorney; followed by news of a federal grand jury being | $ 55.22 | - 3.43% | 0.07% |

| Date* | Corrective Event | Closing Stock Price | Common Stock Price Change | S&P 500 Price Change |
|---|---|---|---|---|
| | convened to look into SCANA's role in the failed Nuclear Project. Lawmakers make public comments that the U.S. Attorney could uncover securities fraud violations. On September 22, 2017, an article is published detailing the insider trading of certain SCANA executives. | | | |
| 09/26/2017 (09/27/2017) | South Carolina Attorney General issues opinion that BLRA was "constitutionally suspect," calling into question its enforceability. ORS then filed a request with the PSC to block SCANA from charging ratepayers going forward, and force SCANA to refund ratepayers for prior charges. On 09/27/2017, *The State* reported on the existence of an earlier Bechtel Report suggesting that the initial report was "originally much worse." | $ 51.22 | - 7.83% | 0.41% |
| 09/29/2017 | Credit rating agencies Fitch and Standard & Poor's both downgrade SCANA's credit ratings and place SCANA on a negative "watch" lists, indicating further downgrades might be in store. | $ 48.49 | - 4.90% | 0.37% |
| 10/19/2017 | South Carolina Governor McMaster asks SCANA to stop charging customers for Nuclear Project, and to use the $2 billion from Toshiba to repay those customers rather than fund the Nuclear Project. | $ 48.65 | - 0.98% | 0.04% |
| 10/26/2017 (10/27/2017) | Earnings declined to $34 million, driven in large part by a $210 million impairment taken on the grounds that "the public, political and | $ 46.50 | - 2.78% | 0.81% |

| Date* | Corrective Event | Closing Stock Price | Common Stock Price Change | S&P 500 Price Change |
|-------|------------------|---------------------|---------------------------|----------------------|
| | regulatory response to the abandonment decision has been extremely contentious." | | | |
| 10/31/2017 | Marsh resigns after news of his ouster. | $ 43.14 | - 6.03% | 0.10% |
| 12/20/2017 | The PSC denies request to dismiss rate relief suit; Morgan Stanley report on 12/21/2017 writes that petitioner success in any pending cases before PSC would dramatically reduce SCANA value. | $ 37.39 | - 9.51% | 0.20% |

* Date of stock price drop indicated in parentheses.

79. The timing and the magnitude of the price declines in SCANA's common stock

negate any inference that the losses suffered by Plaintiff and the other Class

members were caused by changed market conditions, macroeconomic or industry

factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

Indeed, analyst commentary after each corrective disclosure and/or

materialization of the risk event attributed the large negative reaction in the stock

specifically to the alleged disclosures.

### VIII.    DELOITTE AUDITS WERE NO AUDITS AT ALL

80. Deloitte knew SCANA'S and SCE&G'S financial condition from the beginning

of the South Carolina Project. Deloitte knew that the securing of the tax credits

was crucial to finishing the Project. Deloitte's accounting practices were so

deficient that the audit amounted to no audit at all, or an egregious refusal to see

the obvious, or to investigate the doubtful, or that the accounting judgments which

were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

The red flags should have been clearly evident to any auditor performing its duties. Deloitte deliberately chose to disregard the red flags to avoid revealing the truth to the public that the tax credit deadline would not be achieved.

81. Deloitte's client, The Southern Company, experienced the same issues in Georgia. Deloitte had the unique knowledge of auditing all four AP1000 Westinghouse units in the United States.

82. SCANA hired Deloitte to do a "special audit" of construction costs in 2015. Auditing construction costs could not have been done without knowledge of construction progress.

83. Upon information and belief, Deloitte had knowledge of Bechtel's role months before the Bechtel Report was finished in late 2015.

84. Upon information and belief, almost all of the executives and board members of SCANA were former Deloitte employees. Marsh, Addison, Swan and Aliff were the relevant people who knew of SCANA's construction fiasco even before the Bechtel Report was written.

IX.    **INAPPLICABILITY OF SAFE HARBOR**

85. The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint.  The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made.  For example, many of the statements relate to the current or historical

status of the new nuclear unit project at VC Summer, including that the project is progressing well or that prior challenges have been resolved. To the extent that any of these statements might be construed to touch on the future intent, they are mixed statements of present facts and future intent and are not entitled to safe harbor protection with respect to the part of the statement that refers to the present. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

## X.    PRESUMPTION OF RELIANCE

86. Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein against Deloitte are predicated in part upon material omissions of fact that Deloitte had a duty to disclose.

87. In the alternative, Plaintiff is entitled to a presumption of reliance on Deloitte's material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for SCANA securities was open, efficient, and well-developed.

88. As a result of the foregoing, the market for SCANA securities promptly digested current information regarding SCANA from all reliable, publicly-available sources and reflected such information in the price of SCANA's securities. Under these circumstances, purchasers of SCANA securities during the Class Period

suffered injury through their purchase of SCANA securities at artificially-inflated prices and a presumption of reliance applies.

89. Accordingly, Plaintiff and other members of the Section 10(b) Class did rely and are entitled to have relied upon the integrity of the market price for SCANA securities and to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.  Additionally, Plaintiff and the Class are entitled to a presumption of reliance because the claims asserted herein against Deloitte are also predicated upon omissions of material fact, which there was a duty to disclose.

## XI.    FRAUDULENT CONCEALMENT

90. The Plaintiff and Plaintiff Class allege that (1) Deloitte intentionally and/or recklessly failed to warn the investor/public at any time during the Class Period that the construction schedule was so far behind that the tax credits would never be collected, (2) Further that Deloitte took affirmative action and/or remained silent and failed to disclose material facts despite their duty to do so, (3) Further the Plaintiff and Plaintiff Class could not have discovered the Cause of Action despite exercising reasonable care and diligence, (4) Deloitte was aware of the wrong, and (5) The concealed information was material to Plaintiff and Plaintiff Class.

## XII.    CAUSE OF ACTION COUNT ONE

**For Violation of Section 10b of The Exchange Act and Rule 10b-5 (Against All Defendants)**

91. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

92. Plaintiff asserts this Count pursuant to §10b of the Exchange Act and Rule 10b-5 promulgated thereunder against Defendants Deloitte & Touche, LLP and Deloitte, LLP.

93. During the Class Period, Defendants disseminated or approved of the false statements set forth above, which they knew or deliberately disregarded, were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

94. Upon information and belief Defendants violated 10b of the Exchange Act and Rule 10b-5 in that they:

i.      Employed devices, schemes, and artifices to defraud;

ii.     Made or caused to be made untrue statements of material facts or omitted to state material facts necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; or

iii.    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchase of SCANA securities during the class period.

95. By virtue of their positions at SCANA, as SCANA's outside auditor and auditor in charge of special audits, upon information and belief Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended thereby to deceive Plaintiff and the other members of the Class, or in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such

facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

96. Information showing that Defendant Deloitte acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. Defendant Deloitte had knowledge of the details of SCANA's internal affairs. As a result of the dissemination of false and misleading reports, releases, and public statements, the market price of SCANA securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning SCANA's business and financial condition which were concealed by Defendant Deloitte, Plaintiff and other members of the Class purchased or otherwise acquired SCANA securities at artificially-inflated prices and relied upon the prices of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Defendant Deloitte, and were damaged thereby.

97. Plaintiff and other members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for SCANA securities. Plaintiff and other members of the Class would not have purchased SCANA securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendant Deloitte's misleading statements.

XIII.     **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

    A.    This action may proceed as a class action, with Plaintiff as the designated representative of the applicable Cause of Action.

    B.    Plaintiff and the members of the Class recover damages sustained by them, as provided by law, and that a judgment in favor of Plaintiff and Class be entered against Deloitte in an amount permitted pursuant to such law;

    C.    Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

    D.    Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

    E.    Plaintiff and members of the Class receive such other and further relief as may be just and proper.

XIV.     **JURY TRIAL DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

Respectfully submitted this, the 22nd day of November, 2019.

*/s/ Daryl G. Hawkins*
Daryl G. Hawkins
Law Offices of Daryl G. Hawkins, LLC
P.O. Box 11906
Columbia, SC 29211
Tel: (803) 733-3531
Email: dgh@dghlaw.net
SC Bar #002844/ USDC #01781


Gordon Ball                                Thomas C. Jessee
Jonothan Tanner Ball                       Jessee & Jessee
Steven Chase Fann                          P.O. Box 997
GORDON BALL, LLC                           Johnson City, TN 37605
7001 Old Kent Drive                        Tel: (423) 928-7175
Knoxville, Tennessee 37919                 Email: jjlaw@jesseeandjessee.com
Tel:  (865) 525-7028                       TNBPR #000113/ SC Bar #2996
Email: gball@gordonball.com TNBPR#001135
 jtannerball@gmail.com TNBPR#037011
chasefann@wfptnlaw.com TNBPR#36794
*(Motion for Pro Hac Vice to be filed)*

Edward D. Sullivan, JD, LLM, CPA
Sullivan Law Firm, PC
Edward D. Sullivan
PO Box 11714
Columbia, SC 29211
Tel: (803) 451-2775
Email: esullivan@esullivanlaw.com
SC Bar #0011248/ USDC #5016


 Counsel for Plaintiff