**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 98 PENSION FUND on behalf of itself and all others similarly situated,<br><br>      Plaintiffs,<br><br>vs.<br><br>DELOITTE & TOUCHE, LLP; DELOITTE LLP,<br><br>      Defendants. | Case No. 3:19-cv-3304 |

## DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT AND SUPPORTING MEMORANDUM OF LAW

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................1

BACKGROUND ON DELOITTE'S ROLE AND STATEMENTS...............................4

    I.      Deloitte's Role as Independent Auditor of SCANA..............................................4

    II.     Specific Statements Attributable to Deloitte........................................................6

HEIGHTENED PLEADING STANDARD ...............................................................8

ARGUMENT ..........................................................................................................9

    I.     PLAINTIFFS DO NOT MEET THE EXACTING PLEADING
           REQUIREMENTS TO STATE A VALID SECURITIES FRAUD
           CLAIM AGAINST DELOITTE UNDER SECTION 10(b) ....................................9

          A.     The Very Slim Set of Facts Alleged That Could Even Remotely
                  Relate to Deloitte's Actions and Statements Fall Far Short of
                  Supporting a Claim Against Deloitte Under Section 10(b) .....................10

                1.     Plaintiffs Have Not Alleged that Deloitte Was Responsible
                       for Auditing the Construction Schedule, and their Allegations
                       Regarding Deloitte's "Special Audits" of the Costs of
                       Nuclear Project Fail to Plausibly Suggest Otherwise ...................10

                2.     Plaintiffs' Allegations Regarding Production Tax Credits are
                       Unavailing....................................................................................12

                3.     Plaintiffs Have Not Plausibly Alleged That Deloitte Had
                       Contemporaneous Knowledge of the Bechtel Report....................13

           B.     The Complaint Alleges No Actionable Misstatements or
                   Omissions by Deloitte of a Material Fact ...................................15

                 1.     Only Deloitte's Opinions in the SCANA 10-Ks are Properly at
                       Issue ...........................................................................................16

                2.     Deloitte's Audit Opinions Are Statements of Opinion, Not
                       Fact..............................................................................................18

                3.     Plaintiffs Have Not Adequately Alleged Deloitte's Audit
                       Opinions were False.....................................................................18

                    i.      Plaintiffs Fail to Allege That Deloitte Subjectively
                         Did Not Believe Its Audit Opinions...................................19

                  ii.    Plaintiffs Fail to Allege That Deloitte's Opinions
                         Regarding SCANA's Financial Statements
                         Contained Embedded Misstatements of Fact.....................23

                    iii.   Plaintiffs Fail to Allege That Deloitte's Opinions
                         Regarding SCANA's Financial Statements
                         Contained a Material Omission ........................................23

C.    Plaintiffs Fail to Allege a Strong Inference of Scienter ............................24

1. Plaintiffs' Stringent Pleading Burden ..................................24

2.    Plaintiffs Fail to Plead Severe Recklessness Sufficient to Show Scienter ............................................................................26

i.    Plaintiffs' Allegations of PCAOB, GAAS, and GAAP Violations Do Not Establish Scienter ..................27

ii.    Plaintiffs' Allegations Regarding Deloitte's Purported Knowledge of the Bechtel Report and Deloitte's Special Audits are Unfounded, Conclusory, and, in any Event, Unavailing ......................28

a.    The Bechtel Materials ..................................28

b.    The "Special Audits." ..................................32

iii.    Plaintiffs' "Red Flags" Theory is Speculative and Fails to Adequately Allege Scienter ..................................33

iv.    The Remaining Circumstances Alleged by Plaintiffs Fail to Establish Scienter....................................37

3.    Plaintiffs' Failure to Plead Motive Supports a Lack of Scienter ...39

D.    Plaintiffs Fail to Properly Plead Loss Causation ......................................40

II.    PLAINTIFFS' CLAIM IS TIME-BARRED BY THE TWO-YEAR STATUTE OF LIMITATIONS ....................................................................45

CONCLUSION ..........................................................................................................................48

## TABLE OF AUTHORITIES

**Cases**

*Amorosa v. Ernst & Young LLP,*
    682 F. Supp. 2d 351 (S.D.N.Y. 2010)........................................................41, 44

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)....................................................................................8

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)....................................................................................8

*Buttonwood Tree Value Partners, LP v. Sweeney,*
    910 F. Supp. 2d 1199 (C.D. Cal. 2012) ......................................................19

*Cozzarelli v. Inspire Pharms. Inc.,*
    549 F.3d 618 (4th Cir. 2008) ..................................................................9, 24

*Dobina v. Weatherford Int'l Ltd.,*
    909 F. Supp. 2d 228 (S.D.N.Y. 2012).........................................................26

*Dronsejko v. Thornton,*
    632 F.3d 665 (10th Cir. 2011) ....................................................................25

*Dura Pharmaceuticals, Inc. v. Broudo,*
    544 U.S. 336 (2005)........................................................................ 8, 40-41

*Fidel v. Farley,*
    392 F.3d 220 (6th Cir. 2004) ...........................................................20, 28, 38

*Ganey v. PEC Sols., Inc. (In re PEC Sols., Inc. Sec. Litig.),*
    418 F.3d 379 (4th Cir. 2005) .....................................................................27

*Great Neck Capital Appreciation Inv. P'ship, L.L.P. v. PricewaterhouseCoopers, L.L.P.,*
    137 F. Supp. 2d 1114 (E.D. Wis. 2001).......................................................16

*In re aaiPharma, Inc.,*
    521 F. Supp. 2d 507 (E.D.N.C. 2007)..................................................... 16-17

*In re Acterna Corp. Sec. Litig.,*
    378 F. Supp. 2d 561 (D. Md. 2005)...................................................... *passim*

*In re Advanced Battery Technologies, Inc.,*
    781 F.3d 638 (2d Cir. 2015)......................................................................26

*In re DNTW Chtd. Accountants Sec. Litig.,*
    172 F. Supp. 3d 675 (S.D.N.Y. 2016).........................................................34

*In re First Union Corp. Sec. Litig.*,
　128 F. Supp. 2d 871 (W.D.N.C. 2001) ........................................................32

*In re Humphrey Hosp. Tr., Inc. Sec. Litig.*,
　219 F. Supp. 2d 675 (D. Md. 2002) ...........................................................35

*In re Lehman Bros. Sec. & ERISA Litig.*,
　799 F. Supp. 2d 258 (S.D.N.Y. 2011) ...................................................19, 21

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
　910 F. Supp. 2d 561 (S.D.N.Y. 2012) ........................................................27

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
　245 F. Supp. 3d 870 (S.D. Tex. 2017) ........................................................24

*Iowa Pub. Employee's Ret. Sys. v. Deloitte & Touche LLP*,
　919 F. Supp. 2d 321 (S.D.N.Y. 2013) ........................................................36

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
　351 F. Supp. 2d 334 (D. Md. 2004) ...................................................... 39-40

*In re SCANA Corp. Sec. Litig.*,
　No. 3:17-2616-MBS, 2019 U.S. Dist. LEXIS 54176
　(D.S.C. Mar. 29, 2019) ..................................................... 18-19, 43-44

*In re SCB Computer Tech., Inc.*,
　149 F. Supp. 2d 334 (W.D. Tenn. 2001).....................................................34

*In re Scottish Re Grp. Sec. Litig.*,
　524 F. Supp. 2d 370 (S.D.N.Y. 2007)........................................................26

*In re Witness Sys., Inc. Sec. Litig.*,
　No. 1:06-CV-1894-CC, 2008 U.S. Dist. LEXIS 109173 (N.D. Ga. Mar. 31, 2008)........41

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
　432 F. Supp. 2d 571 (E.D. Va. 2006) ............................................ 25, 27-28, 32

*Janus Capital Grp., Inc. v. First Derivative Traders*,
　564 U.S. 135 (2011)............................................................... 16-17

*Katyle v. Penn*,
　637 F.3d 462 (4th Cir. 2011) ......................................................... 5, 40-41, 43

*Lattanzio v. Deloitte & Touche LLP*,
　476 F.3d 147 (2d Cir. 2007)............................................................ 17, 44-45

*McIntire v. China Mediaexpress Holdings, Inc.*,
　927 F. Supp. 2d 105 (S.D.N.Y. 2013)...........................................................2

*Merck & Co. v. Reynolds*,
  559 U.S. 633 (2010)........................................................................................45

*Oaktree Capital Mgmt., L.P. v. KPMG*,
  963 F. Supp. 2d 1064 (D. Nev. 2013) ...........................................................19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)......................................................................16, 19, 21, 23

*Ottmann v. Hanger Orthopedic Grp., Inc.*,
  353 F.3d 338 (4th Cir. 2003) ....................................................................25, 39

*Phillips v. LCI Int'l, Inc.*,
  190 F.3d 609 (4th Cir. 1999) ..........................................................................39

*Plaisance v. Schiller*,
  No. H-17-3741, 2019 U.S. Dist. LEXIS 42073 (S.D. Tex. Mar. 14, 2019) ..........19, 26, 37

*Pressley v. Tupperware Long Term Disability Plan*,
  553 F.3d 334 (4th Cir. 2009) ..................................................................... 45-46

*Pub. Emples. Ret. Ass'n v. Deloitte & Touche LLP*,
  551 F.3d 305 (4th Cir. 2009) ................................................................ 24-25, 36

*In re Puda Coal Sec., Inc.*,
  30 F. Supp. 3d 230 (S.D.N.Y. 2014)................................................................19

*Querub v. Moore Stephens Hong Kong*,
  649 F. App'x 55 (2d Cir. 2016) ................................................................18, 23

*Reiger v. Price Waterhouse Coopers Llp*,
  117 F. Supp. 2d 1003 (S.D. Cal. 2000).....................................................26, 40

*SEC v. Price Waterhouse*,
  797 F. Supp. 1217 (S.D.N.Y. 1992)................................................................25

*Singer v. Reali*,
  883 F.3d 425 (4th Cir. 2018)  ................................................................. 40-41

*Special Situations Fund III QP, L.P. v. Deloitte Touche*,
  33 F. Supp. 3d 401 (S.D.N.Y. 2014)...................................................... 16-17, 36

*Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*,
  243 F. Supp. 3d 1109 (E.D. Cal. 2017) ..................................................... 23-24

*Starr Int'l U.S.A. Invs., LC v. Ernst & Young, LLP*,
  131 F. Supp. 3d 241 (S.D.N.Y. 2015)..............................................................18

*Teachers' Ret. Sys. v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) .........................................................................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007*)*.............................................................................9, 24

*Zak v. Chelsea Therapeutics Int'l, Ltd.,*
    780 F.3d 597 (4th Cir. 2015) .......................................................................5

**Statutes**

15 U.S.C.S. § 78j(b) ("Section 10(b)") ................................................... *passim*

15 U.S.C. § 78u-4(b)(1) ....................................................................................6, 9

15 U.S.C. § 78u-4(b)(2) ....................................................................................6, 9

15 U.S.C. § 78u–4(b)(3)(A).............................................................................1, 9

15 U.S.C. § 78u-4(b)(4) .......................................................................................40

28 U.S.C. § 1658(b) .............................................................................................45

S.C. Code Ann. §§ 58-33-210, *et seq.* .............................................................10

S.C. Code Ann. § 58-33-275(A) .........................................................................11

S.C. Code Ann. § 58-33-270(E)(1).....................................................................11

**Other Authorities**

17 C.F.R. § 240.10b-5 ("SEC Rule 10b-5") ........................................................6

Accounting Standards Classification (ASC) 980..............................................20

Accounting Standards Classification (ASC) 980-340-25-1..............................12

Federal Rule of Civil Procedure Rule 8 ..............................................................1

Federal Rule of Civil Procedure Rule 9(b) ................................................ *passim*

Federal Rule of Civil Procedure Rule 12(b)(6)................................................1, 9

PCAOB AS § 1001 ............................................................................................4-5

PCAOB AS § 1001.01 ........................................................................................18

PCAOB AS § 1001.02 ........................................................................................6

PCAOB AS § 1001.05 ......................................................................................18

PCAOB AS § 2710.04 ....................................................................................4, 6

Defendants Deloitte & Touche, LLP ("Deloitte") and Deloitte LLP (collectively, "Defendants"), under Rules 8, 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4(b)(3)(A), hereby move to dismiss Plaintiffs' Consolidated Complaint, Dkt. No. 44 (the "Complaint") for the reasons below.

## PRELIMINARY STATEMENT

This action arises out of allegations made in a previous action against SCANA and its management in which a class of plaintiffs alleged that SCANA had fraudulently deceived investors about SCANA's expected completion of a nuclear energy project in Fairfield County, South Carolina.  In this action, Plaintiffs seek to attach liability to Deloitte, which as the independent auditor of SCANA's financial statements, was tasked with obtaining reasonable assurance that the financial statements in SCANA's Form 10-Ks were materially accurate.  ***Deloitte was not the auditor of, and expressed no opinion regarding, SCANA's non-financial statement disclosures, which were the primary focus of the case against SCANA and its management***.  Nonetheless, the majority of the allegations in this Complaint come directly from that case.  In other words, the vast majority of Plaintiffs' lengthy consolidated complaint in this case pertains to statements made by ***SCANA***, not Deloitte, and which the federal securities laws and well-settled case law make clear cannot form the basis of a claim against Deloitte.  Simply put, this action cannot be viewed through the lens of the prior case—Deloitte is not interchangeable with SCANA under federal securities law.

Once the Complaint is filtered for allegations directly relevant to a claim against Deloitte, Plaintiffs' pleading failures are stark.  Only statements actually made by Deloitte are even potentially actionable under the securities laws.  Though the Complaint is long on allegations about

the statements made by *others*, only two statements are alleged to have been made by Deloitte:[1]
(i) Deloitte's opinion that based on its audit, performed following professional standards, the
financial statements, taken as a whole, fairly represented SCANA's financial position; and
(ii) Deloitte's opinion that based on its audit, performed following professional standards, the
company maintained, in all material respects, effective internal controls over financial reporting.
These statements were made in connection with Deloitte's two annual audits during the putative
class period and not in connection with quarterly reviews, upon which auditors do not issue any
public statements.  Likewise, both are statements of opinion that are not actionable under well-
established securities law on the facts pleaded here.  Indeed, the Complaint comes nowhere close
to creating a compelling inference that Deloitte did not believe the opinions it offered at the time
offered, as would be required for Plaintiffs' claim to survive.  The Complaint can and should be
dismissed for that reason alone.

But the flaws in the Complaint run deeper.  For example, Plaintiffs have failed to plead
facts supporting a "strong inference" of scienter by Deloitte, as is required for their claim under
the PSLRA.  Nothing in the Complaint makes it any more plausible that Deloitte knew or was
reckless with respect to the alleged fraud at SCANA than that it was unaware of such conduct.

---

[1] Each of these statements was made by Deloitte & Touche, LLP, and all of the audit work that
forms the basis of Plaintiffs' allegations was performed by Deloitte & Touche, LLP.  The
Complaint does not specifically allege that Deloitte LLP, which is a separate legal entity, made
any public statement at all, nor does it make any allegations about actions taken by Deloitte LLP.
This is hardly surprising since Deloitte LLP does not perform audits or provide any other
professional services, whether for SCANA or any other entity.  *See* Deloitte, *About Us*,
https://www2.deloitte.com/ui/en/legal/about-deloitte.html (last visited July 17, 2020).  Plaintiffs'
claim against Deloitte LLP must therefore be dismissed without further analysis.  *See, e.g.,
McIntire v. China Mediaexpress Holdings, Inc.*, 927 F. Supp. 2d 105, 137-38 (S.D.N.Y. 2013)
(dismissing Section 10(b) claims against Deloitte LLP where Plaintiffs failed to allege that Deloitte
LLP had ultimate authority over alleged misstatements in an audit report issued by another Deloitte
entity).

This, too, is sufficient reason to dismiss the Complaint altogether.  And even if Plaintiffs had properly identified a misstatement or omission of fact and had plausibly pleaded facts creating a compelling inference of scienter, Plaintiffs also have not adequately alleged loss causation because they have not pleaded that the losses they claim to have suffered have any nexus to anything Deloitte did or failed to do.  Finally, even though each of these other infirmities is enough to dispense with this Complaint, Plaintiffs' claim should also be dismissed because it is time-barred based on Plaintiffs' own allegations showing that this action was filed more than two years after discovery of the relevant facts.

Despite its heft, this Complaint falls far short of the mark.  Plaintiffs cannot satisfy the stringent pleading standards applicable to securities fraud cases by padding their Complaint with irrelevant allegations, as they have tried to do here.  Plaintiffs' inability to plead a proper claim against Deloitte is not surprising given the overall context of these proceedings.  Most securities fraud cases brought against auditors involve a restatement of the issuer's financial statements to correct an error in the company's accounting.  While a restatement does not necessarily suggest flaws in an independent audit, it at least serves as an indication that the issues the company is confronting impacted its financial statements.  There has been no restatement here because the issues SCANA has had to confront do not impact its financial statements, which were the only aspect of SCANA's operations subject to Deloitte's audits.  Despite extensive investigations of SCANA by regulators and prosecutors, scrutiny by elected representatives in the South Carolina legislature, and SCANA's settlement of a prior class action (which, notably, concerned disclosures other than its financial statements), SCANA never restated its financial statements.  Plaintiffs here have sought to create a claim against Deloitte where none exists.  The Court should dismiss this Complaint.

## BACKGROUND ON DELOITTE'S ROLE AND STATEMENTS

### I.     Deloitte's Role as Independent Auditor of SCANA.

Deloitte is an international accounting firm that provides financial statement audit and review services for its clients.  Deloitte was the independent outside auditor for SCANA and provided audit services to SCANA during the Class Period and, to this day, remains the independent outside auditor for SCANA's now-parent company, Dominion Energy.  (*See, e.g.*, Compl. at 27, ¶ 80.)  Despite Plaintiffs' 210-page Complaint, the only statements Deloitte made that relate to Plaintiffs' claim consist of two sets of single-page audit opinions on SCANA's financial statements and internal controls over financial reporting for fiscal years 2015 and 2016, which were included in SCANA's annual reports on Form 10-K for those years.

Deloitte's limited role is critical to an evaluation of Plaintiffs' securities fraud claim against Deloitte.  Public companies, such as SCANA, are required to file quarterly Form 10-Q and annual Form 10-K reports with the Securities and Exchange Commission ("SEC").  A company's annual 10-K must include financial statements that have been audited by an independent accounting firm registered with the Public Company Accounting Oversight Board ("PCAOB"), such as Deloitte.[2] Form 10-Ks also include content that is not audited, such as Management's Discussion and Analysis ("MD&A").[3]  As conceded by Plaintiffs, SCANA's Form 10-Q quarterly reports, by contrast, contain no audited financial information, nor do they contain audit opinions or any other statements made by a company's independent auditor.  (*See* Compl. at 46, ¶ 114.)  Thus, Deloitte made no statements, let alone actionable ones, in connection with any of SCANA's quarterly Form

---

[2] *See* PCAOB AS 1001; 2710.04.

[3] *See id.*

10-Qs, and Plaintiffs' criticism of those disclosures must be ignored when assessing the sufficiency of their allegations against Deloitte.

Public company audits are performed in accordance with PCAOB standards, which incorporate and expound upon Generally Accepted Auditing Standards ("GAAS"). Under SEC rules, certain public companies—including SCANA—are required to undergo integrated audits, which include both a financial statement audit and an audit of internal controls over financial reporting. As SCANA's independent auditor, Deloitte provided audit opinions on the financial statements filed in connection with SCANA's Form 10-Ks and on the effectiveness of SCANA's internal controls over financial reporting, as of December 31, 2015 and 2016. (*See* Ex. A, SCANA Form 10-K filed Feb. 26, 2016 at 44, 142; Ex. B, SCANA Form 10-K filed Feb. 24, 2017 at 44, 99; *see also* Compl. at 172-74, 183-85, ¶¶ 441-44, 458-61.)[4] These opinions were dated, respectively, February 26, 2016 and February 24, 2017. (Ex. A at 44, 142; Ex. B at 44, 99.) Both opinions explained that Deloitte audited SCANA's financial statements in accordance with PCAOB standards, which require that auditors obtain "reasonable assurance" about whether the financial statements are free of material misstatement, and that an audit includes examining "on a test basis" evidence supporting amounts and disclosures in those statements.[5] (Ex. A at 44; Ex. B at 44.) The standards governing Deloitte's audits expressly state that the auditor "has no

---

[4] In ruling on this motion to dismiss, the Court may consider the accompanying exhibits, which are incorporated into the Complaint by reference. *See, e.g.*, *Katyle v. Penn*, 637 F.3d 462, 466 (4th Cir. 2011). The first reference to each exhibit contains a cite to the Complaint paragraph that incorporates the exhibit. The attached exhibits—SCANA's Form 10-Ks (which include Deloitte's audit opinions) and publicly available testimony and correspondence cited by Plaintiffs—include only excerpts of the full documents to limit the volume of information provided. If the Court prefers, Deloitte can provide the full documents. Although unnecessary given this incorporation, the accompanying exhibits also may be considered at this stage as matters of public record subject to judicial notice. *See, e.g.*, *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015).

[5] *See* PCAOB AS 1001; AS 2201.

responsibility to plan and perform the audit to obtain reasonable assurance that misstatements, whether caused by errors or fraud, that are not material to the financial statements are detected." PCAOB AS 1001.02.

As prescribed by PCAOB standards, Deloitte's audit opinions stated that the financial statements "are the responsibility of [SCANA's] management" and that Deloitte's responsibility "is to express an opinion on the financial statements and financial statement schedule based on [its] audits." (Ex. A at 44; Ex. B at 44.) Deloitte further stated that it believed its audits provided "a reasonable basis for [its] opinion." (*Id.*) Moreover, they reported Deloitte's "opinion" that SCANA's financial statements presented fairly, in all material respects, SCANA's financial position in accordance with GAAP, as of the end of the fiscal year. (*Id.*) Finally, Deloitte expressed an unqualified opinion of SCANA's internal control over financial reporting. (*See* Ex. A at 142; Ex. B at 99.) As such, Deloitte's opinions were restricted to the fair presentation of SCANA's financial statements as of a point in time. As is standard with audit opinions, they did not extend to any other sections of SCANA's annual report or other statements made by SCANA and its executives regarding the nuclear project.[6]

## II.     Specific Statements Attributable to Deloitte.

The Complaint asserts a claim against Deloitte for securities fraud under Section 10(b) of the Exchange Act and SEC Rule 10b-5. Under the PSLRA's exacting pleading standards for such a claim, a plaintiff must note the specific statements of a defendant that are the bases for the claim. 15 U.S.C. § 78u-4(b)(1), (b)(2). Here, the specific Deloitte statements on which Plaintiffs base

---

[6] PCAOB AS 2710.04 states that an "auditor's responsibility with respect to information in a document does not extend beyond the financial information identified in his report, and the auditor has no obligation to perform any procedures to corroborate other information contained in a document."

their claim are limited to just two sets of opinions that Deloitte issued that were included in each

of SCANA's 2015 and 2016 10-Ks:[7]

| Statement | Complaint Paragraph |
|---|---|
| Deloitte's opinion that based on its audit, performed following professional standards, the financial statements, taken as a whole, fairly represented in all material respects SCANA's financial position. | ¶¶ 8, 191, 264-65, 284, 288-89, 298, 307, 439, 442-43, 459-60 |
| Deloitte's opinion that based on its audit, performed following professional standards, the company maintained, in all material respects, effective internal controls over financial reporting. | ¶¶ 8, 307, 444, 461 |

These opinions, which are included in Exhibits A and B attached hereto, are the only statements

Deloitte made during the Class Period, and thus the only statements upon which any claim against

Deloitte could potentially lie.  Deloitte never made any statement, of any kind, about the nuclear

project, the progress of construction, or their completion.

The remaining statements identified in Plaintiffs' 210-page Complaint are all statements

of individuals or entities other than Deloitte and cannot support a claim against Deloitte.  For

example, none of the following statements are attributable to or actionable against Deloitte:

- "[A]t this time SCANA was still publicly insisting that Unit 2 would be completed by August 31, 2019, in direct contrast to SCANA's own internal conclusions.  For example, on a July 28, 2016, earnings call, Byrne stressed that **'[t]he guaranteed [substantial] completion dates remain at August of 2019 for Unit 2 and August 2020 for Unit 3.  We don't see anything to change those.'"** (*Id.* at 87, ¶ 235 (emphasis and alterations in original).)

---

[7] Although Plaintiffs allege that Deloitte made additional statements, those statements occurred in the context of an engagement for another public company, totally unrelated to SCANA, for a time period years after the Deloitte audits at issue here, which were performed under audit standards that did not apply to Deloitte's work for SCANA.  Those allegations are thus wholly irrelevant to, and cannot support, Plaintiffs' claim.  (*See* Compl. at 37-38, 41 ¶¶ 98-100, 103 (discussing statements allegedly made by Deloitte in a February 19, 2020 Audit Report of Southern Company—an entity wholly unrelated to SCANA).)

- "[O]n a February 18, 2016 earnings call, Addison and Byrne discussed the supposed financial protections that the EPC Contract provided SCANA, including the fixed price option. Byrne further stated that 'if there were to be a cessation of operations by the contractor [Westinghouse], that we could finish the plant on our own,' thus falsely minimizing the risk of such a potential bankruptcy." (*Id.* at 95, ¶ 261 (alterations in original).)

- "Byrne similarly reassured investors on the same call that Toshiba's financial difficulties would not derail the completion of the Nuclear Project, stating that '[a]lthough ideally Toshiba would be without these stresses, **we still anticipate completing our two new nuclear units.**' Indeed, despite the substantial evidence that neither the GSDCs nor the tax credits deadline would be met, Byrne told investors that by January 1, 2021, the Nuclear Project would be 'operating at or near 100% for a period of time where they can guarantee – where they can prove to us that the output guarantee has also been met.'" (*Id.* at 121-22, ¶ 321 (alterations and emphasis in original).)

## HEIGHTENED PLEADING STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Whether a claim for relief is plausible depends on the *factual* allegations, because "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* Accordingly, a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

Plaintiffs assert a single claim for securities fraud under Section 10(b) of the Exchange Act, which requires Plaintiffs to plead: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Because Plaintiffs allege federal securities fraud, Plaintiffs must not only satisfy the rigid pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, but also heightened pleading standards under the PSRLA, through which "Congress charged courts to be vigilant in preventing

meritless securities fraud claims from reaching the discovery phase of litigation." *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 623 (4th Cir. 2008).

Fed. R. Civ. P. 9(b) requires Plaintiffs to "state with particularity the circumstances constituting fraud." The PSLRA further requires a securities fraud claim to (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (quoting 15 U.S.C. § 78u-4(b)(1), (b)(2)). The Fourth Circuit has also noted that the PSLRA modifies the traditional Rule 12(b)(6) analysis: "(1) by requiring a plaintiff to *plead facts* to state a claim and (2) by authorizing the court to assume that the plaintiff has indeed stated *all* of the facts upon which he bases his allegation of a misrepresentation or omission." *Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162, 172 (4th Cir. 2007) (emphasis in original). A district court must dismiss a complaint on motion of any defendant if the plaintiff fails to meet the pleading requirements of the PSLRA. 15 U.S.C. §78u-4(b)(3)(A).

## **ARGUMENT**

### I.  **PLAINTIFFS DO NOT MEET THE EXACTING PLEADING REQUIREMENTS TO STATE A VALID SECURITIES FRAUD CLAIM AGAINST DELOITTE UNDER SECTION 10(b).**

Plaintiffs' Section 10(b) claim fails to meet the PSLRA's exacting pleading standard because the only factual allegations proffered by Plaintiffs that could potentially relate to Deloitte's actions and statements fail to adequately allege that Deloitte engaged in securities fraud (*see infra* Part I.A). In addition, Plaintiffs fail to adequately allege: an actionable misstatement or omission by Deloitte (*see infra* Part I.B); that Deloitte acted with scienter (*see infra* Part I.C); or that any alleged loss was caused by an alleged misstatement or omission by Deloitte (*see infra* Part I.D). Each of these pleading failures serves as an independent basis for dismissal of the Complaint.

9

A.     **The Very Slim Set of Facts Alleged That Could Even Remotely Relate to Deloitte's Actions and Statements Fall Far Short of Supporting a Claim Against Deloitte Under Section 10(b).**

Plaintiffs' allegations against Deloitte must be viewed through the prism of Deloitte's role as independent outside auditor to SCANA.  At best, Plaintiffs' Complaint attempts to allege that Deloitte's audit opinions were false or misleading because they conflicted with purportedly undisclosed facts relating to: (1) the feasibility of the construction schedule and costs of the nuclear project; (2) the possibility of obtaining production tax credits in connection with the project; and (3) the adverse findings in the Bechtel Report (defined below).  However, the few facts alleged by Plaintiffs do not support the inferences advanced by Plaintiffs in the Complaint.  As explained below, while these allegations may have been sufficient to state a claim against SCANA and certain of its executives, none of these allegations support a plausible inference that any of the statements of opinion made by Deloitte are actionable.

1.     **Plaintiffs Have Not Alleged that Deloitte Was Responsible for Auditing the Construction Schedule, and their Allegations Regarding Deloitte's "Special Audits" of the Costs of Nuclear Project Fail to Plausibly Suggest Otherwise.**

In May 2008, SCANA's subsidiary, South Carolina Electric and Gas Company ("SCE&G"), and the South Carolina Public Service Authority ("Santee Cooper") entered into an agreement to construct two nuclear reactors at an estimated cost of $9.8 billion (the "Nuclear Project").  (Compl. at 15-16, ¶¶ 37-39.)  As alleged in the Complaint, SCANA submitted the Nuclear Project's scheduled completion dates—as estimated in SCANA's contracts—to the South Carolina Public Service Commission ("PSC") for approval, which in turn were reviewed by the South Carolina Office of Regulatory Staff ("ORS") and deemed prudent by the PSC under the Base Load Review Act ("BLRA"), S.C. Code Ann. §§ 58-33-210, *et seq*.  (*See, e.g.*, Compl. at 16, 18 ¶¶ 38, 47.)

In March 2009, the PSC approved construction of the Nuclear Project. (*Id.* at 20, ¶ 56.) Pursuant to the BLRA, the PSC's approval constituted "a final and binding determination" that could "not be challenged or reopened in any subsequent proceeding" that "capital costs are prudent utility costs and expenses and are properly included in rates so long as the plant is constructed or is being constructed within the parameters of: (1) the approved construction schedule including contingencies; and (2) the approved capital costs estimates including specified contingencies." S.C. Code Ann. § 58-33-275. The PSC subsequently approved SCANA's petitions to modify the construction schedule and cost estimates, finding that the modifications were "not the result of imprudence on the part of the utility." S.C. Code Ann. § 58-33-270(E)(1); (Compl. at 21, ¶ 60; Compl. at 54, ¶ 135.). In addition, the PSC approved SCANA's petitions for rate adjustments on nine occasions. (Compl. at 21, ¶¶ 58-61.) Under the BLRA, once a prudency determination has been made, a utility's costs are then presumed to be prudent. S.C. Code Ann. § 58-33-275(A). The ORS—a regulatory auditor with investigative authority—represented the public interest of South Carolina before the PSC.[8] Plaintiffs do not allege that Deloitte had knowledge that representations of SCANA to its regulators were false.

The BLRA prudency determinations dictated how the Nuclear Project's costs had to be accounted for in SCANA's financial statements. Deloitte's responsibility as auditor was to determine whether the approved costs were accurately recorded and allocated—in other words, that the costs claimed for construction were used for that purpose. Plaintiffs reference Deloitte's "special audits" of the Nuclear Project but concede that Deloitte's special audit work only related to Nuclear Project costs. (*See, e.g.*, Compl. at 167, ¶ 437.) Specifically, the special audit was to

---

[8] *See* About ORS, South Carolina Office of Regulatory Staff, https://ors.sc.gov/about-ors (last accessed July 9, 2020).

determine whether incurred costs were being correctly recorded and allocated between SCE&G and Santee Cooper – nothing more.  From Deloitte's perspective in auditing SCANA's financial statements, therefore, the regulator-approved, bona fide costs incurred by SCANA for the Nuclear Project had to be capitalized—that is, recorded as an asset of SCANA—and then properly allocated among the relevant stakeholders.[9]

Plaintiffs' allegations that attempt to expand Deloitte's role related to the Nuclear Project are conclusory.  The Complaint fails to allege facts showing that Deloitte was required to or was engaged to audit whether SCANA was "on track" to complete the Nuclear Project on schedule. Nor does the Complaint allege that Deloitte was required to or was engaged to question the PSC's prudency determinations made pursuant to the PSC's statutory authority, or to audit the regulatory process that resulted in the prudency determinations.  Quite simply, the Complaint fails to plead that the "special audits" of cost allocation had anything to do with the schedule on which the Nuclear Project would be completed.

> ## 2. Plaintiffs' Allegations Regarding Production Tax Credits are Unavailing.

The Complaint contains several allegations regarding certain tax credits that might have been achieved if the Nuclear Project had been operational by January 1, 2021, and that Plaintiffs were somehow defrauded *by Deloitte* with respect to the possibility of obtaining the tax credits. (*See, e.g.*, Compl. at 16-17, ¶¶ 42-43.)  Again, context is important when these allegations are viewed through the proper Deloitte lens.  The Complaint fails to disclose that the production tax credits would not impact SCANA's financial statements because (among other reasons) SCANA

---

[9] *See, e.g.*, Financial Accounting Standards Board (FASB), Accounting Standards Classification (ASC) 980-340-25-1 ("Rate actions of a regulator can provide reasonable assurance of the existence of an asset.").

had committed to pass any benefit from earned tax credits directly to consumer in the form of lower rates, resulting in an effectively neutral financial statement impact. The notes to the financial statements in the 10-K explicitly informed stockholders that the tax credits would not benefit them because, if they were earned, they would be passed through to SCANA's ratepayers. (*See* Ex. A at 81; Ex. B at 90.)

Moreover, the financial statements that Deloitte was auditing did not guarantee that the completion dates would be met. Nor did SCANA guarantee as much in its public filings. For example, SCANA's statements in the (unaudited) "RISK FACTORS" section of its 10-Ks contemplated that "the ability to adhere to established budgets and construction schedules" related to the Nuclear Project "may be affected by many variables." (*See* Ex. A at 11; Ex. B at 10.) The filings also cautioned that the tax credits may be "adversely affected" to "the extent that delays occur . . . or [SCANA] otherwise become[s] unable to effectively manage and complete" the Nuclear Project. (*See* Ex. A at 12; Ex. B at 11.) Ultimately, the tax credit allegations against Deloitte do nothing to advance a shareholder securities fraud claim against the auditor.

### 3. Plaintiffs Have Not Plausibly Alleged That Deloitte Had Contemporaneous Knowledge of the Bechtel Report.

Plaintiffs allege that (1) Deloitte was informed during the 2015 or 2016 audits that an independent consultant, Bechtel, had been hired to do an assessment of the Nuclear Project, and (2) Deloitte was provided a copy of a report that Bechtel produced (the "Bechtel Report"), which allegedly made clear that the Nuclear Project would not be completed on the schedule previously stated by SCANA. Plaintiffs are quick to wave around the Bechtel Report as some sort of smoking gun. But the slightest push against the actual substantive allegations related to Deloitte and the report collapse Plaintiffs' theory. Specifically, Plaintiffs' allegations are inconsistent with the allegations of the plaintiffs in the class action against SCANA. There, the class plaintiffs alleged

that SCANA had claimed work product privilege to avoid disclosing the Bechtel Report to other parties. Yet, here, Plaintiffs allege that SCANA handed over that same report to its outside auditors.

Plaintiffs offer only two substantive alleged facts in support of this contradictory theory – neither of which neither of which supports Plaintiffs' allegations. First, Plaintiffs cite the testimony of Jimmy Addison, SCANA's former Chief Financial Officer, for the proposition that Deloitte had seen the Bechtel Reports and related presentations (collectively, the "Bechtel Materials") *before* Deloitte issued its audit opinions. (Compl. at 5, 100-02 ¶¶ 7, 275.) The complete testimony—conveniently omitted from the Complaint—reveals that this allegation is false. Mr. Addison testified that although he could not recall the specific date Deloitte saw the Bechtel Materials, his discussion with Deloitte about Bechtel occurred "post abandonment"—i.e., after the date of Deloitte's last audit opinion at issue.[10] (Ex. C, Addison Dep. 97:11-13, October 3, 2018; Compl. at 101, ¶ 275.)[11] He then specifically testified: "Q. So do you know now whether – when Deloitte became aware of the results of the Bechtel assessment? A. I do not know the answer to that." (Ex. C, Addison Dep. 99:10-13)

Second, Plaintiffs allege: "[I]n a September 21, 2015 email, James Swan IV, SCANA's Controller, states that "FYI – Deloitte will be asking about whether (or why not) we mention the Bechtel consulting engagement . . . in the next 10-Q. If Santee ends up mentioning it, they may feel strongly that we should too." (Compl. at 114-15, ¶ 306; *see also* Ex. D, Swan E-mail at 1.)

---

[10] SCANA announced its abandonment of the Nuclear Project on July 31, 2017. (Compl. at 7, ¶ 14.) Deloitte's audit opinions, however, are dated February 26, 2016 and February 24, 2017— pre-abandonment.

[11] A full transcript of Mr. Addison's testimony is available on the ORS website at https://ors-test.sc.gov/sites/default/files/Documents/Regulatory/electricNaturalGas/newNuclear/VCSummer Units/PSC/depositions%20-%20Jimmy%20Addison%20Oct.%203%2C%202018.pdf.

Plaintiffs contend that this email proves that Deloitte had a copy of the Bechtel Report in connection with rendering its audit opinions.  Not so.  The email suggests, at most, that Deloitte may have been aware of the engagement.   It says nothing about whether SCANA would share its confidential work product with its outside auditors.   And most notably, the email is dated *September 21, 2015*, before any draft of the Bechtel Report even existed according to Plaintiff's own allegations.  (*See id.* at 64, 66, 70 ¶¶ 168, 176, 184.)  Nothing about the email remotely supports an inference that SCANA shared its confidential work product with Deloitte at that time.

Even accepting Plaintiffs' allegations related to the Bechtel Report as true, there are no allegations regarding how the report resulted in a material misstatement of SCANA's financial statements or Deloitte's audit opinions.  The notes to SCANA's financial statements in the 2015 10-K annual report included discussion of the fact of, nature, extent, and estimated cost impacts of project delays associated with the Nuclear Project, particularly given the amendment to the Engineering, Procurement, and Construction ("EPC") contract on October 27, 2015.  (*See, e.g.*, *id.* at 178, 188-89, ¶ 449, 467.)  The disclosures also addressed the challenges to the schedule and continued risks related to the construction of the Nuclear Project.  (*See, e.g.*, *id.*)  The Bechtel Report allegations are without substance in the context of the claim against Deloitte.

**B.    The Complaint Alleges No Actionable Misstatements or Omissions by Deloitte of a Material Fact.**

Notwithstanding the lack of factual allegations setting forth even the possibility of an actionable claim against Deloitte, the Complaint should be dismissed because it fails to allege facts capable of establishing an actionable misstatement or omission by Deloitte.  Plaintiffs contend that Deloitte's allegedly false and misleading statements and omissions arise out of: (i) Deloitte's audit opinions included in SCANA's 2015 and 2016 10-Ks; (ii) SCANA's statements in its 2015 and 2016 10-K's that were not made by Deloitte; and (iii) SCANA's statements in its 2016 10-Qs that

were not made or audited by Deloitte.  (*See* Compl. at 172-92, ¶¶ 441-72.)  As explained below, the only statements potentially actionable against Deloitte are limited to those actually made by Deloitte—its audit opinions.  Under the framework set forth by the Supreme Court, Deloitte can only be liable for its audit opinions if: (i) it provided an audit opinion that it did not believe; (ii) the audit opinions contain "embedded statements of fact" that are false; or (iii) the audit opinions omit facts such that the opinion is misleading.  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183-84, 194 (2015).  The Complaint contains no facts supporting any such inference.

### 1.    Only Deloitte's Opinions in Included in the SCANA 10-Ks are Properly at Issue.

As a threshold matter, an auditor can only be held liable under Section 10(b) for statements that it made.  *See, e.g., In re aaiPharma, Inc.*, 521 F. Supp. 2d 507, 511 (E.D.N.C. 2007).  "[T]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).   The only statements alleged to have been made by Deloitte are its audit opinions that were included in SCANA's 2015 and 2016 10-K's and nothing more.  Yet, Plaintiffs purport to hold Deloitte liable for SCANA's statements in its SEC filings.  As a matter of law, statements made by SCANA cannot form the basis of a Section 10(b) claim against Deloitte.  *Id.* at 141.  It is axiomatic that Plaintiffs cannot rely on the alleged misstatements or omissions of an audited company to assert a claim against the auditor.  *See, e.g., Special Situations Fund III QP, L.P. v. Deloitte Touche*, 33 F. Supp. 3d 401, 443 (S.D.N.Y. 2014), *aff'd*, 645 Fed. Appx. 72, 75-76 (2d Cir. 2016) (summary order); *Great Neck Capital Appreciation Inv. P'ship, L.L.P. v. PricewaterhouseCoopers, L.L.P.*, 137 F. Supp. 2d 1114, 1121 (E.D. Wis. 2001) (auditor not liable for misstatements in company's press release).  An auditor does not "by virtue of auditing

16

a company's financial statements, somehow make, own or adopt the assertions contained therein." *Special Situations Fund III QP, L.P.*, 33 F. Supp. 3d at 443. As such, Deloitte cannot be liable for SCANA's quarterly statements in its 2016 10-Qs because Deloitte did not opine on them and could not have omitted anything from an opinion it never made. *See, e.g., In re aaiPharma, Inc.*, 521 F. Supp. 2d at 511 (holding auditor not liable under Section 10(b) for misstatements in quarterly financial statements); *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 156 (2d Cir. 2007) ("[M]isstatements contained in [the company's] interim financial statements cannot be attributed to Deloitte, and therefore they cannot form the basis for liability under § 10(b).").

Plaintiffs also seek to assert a claim against Deloitte based on its alleged "fail[ure] to either require SCANA management to correct [its] representations, or withdraw as SCANA's auditor." (Compl. at 183, ¶ 457.) According to Plaintiffs, "Deloitte's failure to do so are omissions of material fact." (*Id.*) However, this allegation improperly relies on the alleged "representations" of SCANA and not Deloitte. Furthermore, Plaintiffs' allegation that Deloitte's failure to somehow force SCANA to make or correct some statement it made is not an actionable "omission" because Plaintiffs have not alleged any facts showing how Deloitte could control the content of any statement made by SCANA or its management. *See, e.g., Janus*, 564 U.S. at 142 ("For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."). Thus, the only potentially actionable statements for a claim against Deloitte are those that were made by Deloitte and which are contained within its 2015 and 2016 audit opinions.

### 2.     Deloitte's Audit Opinions Are Statements of Opinion, Not Fact.

All the alleged fraudulent statements attributable to Deloitte as SCANA's independent auditor consist of statements of *opinion* on SCANA's financial statements and internal controls. (*See, e.g.*, Compl. at 184, ¶ 460 ("We ***believe*** that our audits provide a reasonable basis for our ***opinion***.") (emphasis added and citation omitted).)  Indeed, accounting principles confirm that the such statements are statements of opinion, and therefore, do not provide a guarantee over the audited company's financial statements.  "The auditor's report is the medium through which he expresses his opinion or . . . disclaims an opinion." PCAOB AS § 1001.01 (2016 Audit).  Whether the auditor expresses or disclaims an opinion, "*[i]n either case, he states whether his audit has been made in accordance with the standards of the PCAOB*." *Id.*  (emphasis added).  Importantly, however, "[i]n the observance of the standards of the PCAOB, *the independent auditor must exercise his judgment in determining which auditing procedures are necessary* in the circumstances to afford a reasonable basis for his opinion."  PCAOB AS § 1001.05 (2016 Audit) (emphasis added).  Courts likewise recognize that audit reports are "statements of opinion."  *See, e.g., Querub v. Moore Stephens Hong Kong*, 649 F. App'x 55, 58 (2d Cir. 2016); *Starr Int'l U.S.A. Invs., LC v. Ernst & Young, LLP*, 131 F. Supp. 3d 241, 250 n.44 (S.D.N.Y. 2015).

### 3.     Plaintiffs Have Not Adequately Alleged Deloitte's Audit Opinions were False.

Alleging fraud in an opinion requires much more than just pointing to reasons the opinion was wrong.  *In re SCANA Corp. Sec. Litig.*, No. 3:17-2616-MBS, 2019 U.S. Dist. LEXIS 54176, at *33 (D.S.C. Mar. 29, 2019).  "For [puffery or an opinion] to be properly alleged as misleading, it requires specific factual allegations that the speaker did not in fact hold the stated belief or the

supporting facts supplied by the speaker were untrue." *Id.* Plaintiffs fail to make the required specific factual allegations here.[12]

### i. Plaintiffs Fail to Allege That Deloitte Subjectively Did Not Believe Its Audit Opinions.

Even assuming that Deloitte's audit opinions could be second-guessed, Plaintiffs failed to allege facts showing that Deloitte subjectively did not believe the opinions that it rendered when it did so. *See, e.g.*, *In re Puda Coal Sec., Inc.*, 30 F. Supp. 3d 230, 259 (S.D.N.Y. 2014). For statements of opinion to be actionable, they must not only be objectively false, but also subjectively false—"that is, *that defendants did not honestly believe the statements when they made them*." *Id.* (emphasis added). As one court has explained, "Plaintiffs must plead subjective falsity because an auditor's GAAS and GAAP assertions are statements of professional judgment and opinion, not verifiable fact." *Buttonwood Tree Value Partners, LP v. Sweeney*, 910 F. Supp. 2d 1199, 1208 (C.D. Cal. 2012). Here, Plaintiffs' sole allegation regarding Deloitte's belief—which is contained

---

[12] "A reasonable investor does not expect that every fact known to an issuer supports its opinion statement." *Omnicare*, 575 U.S. at 190. The same is true for an auditor's opinion. *See, e.g., Plaisance v. Schiller*, No. H-17-3741, 2019 U.S. Dist. LEXIS 42073, at *29 (S.D. Tex. Mar. 14, 2019) (in context of claim against auditor, quoting *Omnicare* for proposition that "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts."). Although Plaintiffs allege that Deloitte should have planned its audit differently, they fail to allege specific facts about what audit planning Deloitte undertook or how Deloitte's chosen method was deficient. *See In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 315 n.291 (S.D.N.Y. 2011).

> To allege that an auditor defendant made a false statement about GAAS compliance, plaintiffs must do more than simply recite a GAAS rule or procedure, claim that defendants failed to follow that rule, and point to adverse results down the road. Plaintiffs must make specific allegations about the steps an auditor took, the way in which it planned its audit, and the procedures it employed.

*Oaktree Capital Mgmt., L.P. v. KPMG*, 963 F. Supp. 2d 1064, 1086 (D. Nev. 2013) (citation omitted). Without more, Plaintiffs cannot plausibly allege that Deloitte made an actionable misstatement simply because Deloitte stated that its audit was conducted in accordance with PCAOB standards.

within a single paragraph of the 210-page complaint—relates only to Deloitte's statements regarding GAAP and certain alleged "representations" regarding "SCANA's interim reports":

> [As] a result of the foregoing, Deloitte's clean audit reports did not fairly align with information both in its possession and required to be reviewed by it at the time it issued its clean audit reports, and *it did not believe its representations in its clean audit reports that SCANA's financial statements were presented in conformity with GAAP or that SCANA's interim reports were accurate and free from material misstatements*.

(Compl. at 171, ¶ 439) (emphasis added).

As an initial matter, a necessary assumption underlying this allegation is that SCANA's financial statements were not presented in conformity with GAAP, but such an assumption is undermined by the fact that SCANA has not been forced to restate its financials and that the SEC—despite a multi-year, ongoing investigation of SCANA—has not alleged in its lawsuit that SCANA's financial statements were not in accordance with GAAP. (*See, e.g.*, *id.* at 165-66, ¶¶ 433-35.) The fact that an auditor does not restate its original opinion provides a "strong inference" of subjective good faith. *Fidel v. Farley,* 392 F.3d 220, 234 (6th Cir. 2004).

Plaintiffs' allegation is also defective on its face because it mischaracterizes Deloitte's alleged statements and the scope of its audit. Deloitte never audited "SCANA's interim reports" and thus never opined—let alone "represent[ed]"—that they "were accurate and free from material misstatements." (Compl. at 171, ¶ 439.) It necessarily follows that Deloitte cannot form a belief about a statement it never made. Furthermore, Plaintiffs do not identify any line items in any of the financial statements that were misstated. This is unsurprising, because the BLRA and accounting standards—*e.g.*, ASC 980—dictated the accounting treatment for the Nuclear Project, which had been repeatedly deemed prudent by the PSC. As explained in the many of the auditing standards cited by Plaintiffs, an auditor's opinion is not a "guarantee" or "representation." (*See,*

*e.g.*, *id.* at 25, ¶ 75 (explaining that an independent audit is "clearly not a guarantee") (citation omitted).)

In any event, Plaintiffs' vague, isolated allegation that Deloitte did not believe its opinion "that SCANA's financial statements were presented in conformity with GAAP" is insufficient under the strict pleading standards of *Omnicare,* Fed. R. Civ. P. 9(b), and the PSLRA. Plaintiffs ask this Court to ignore the stringent pleading standards and draw an implausible inference of subjective disbelief based on inconclusive "red flags" that Deloitte allegedly "ignored." (*See, e.g.*, Compl. at 167-71, ¶ 468.) Putting aside the dubious nature of these "red flags," (*see infra* Part I.C.2.iii.)*,* these allegations amount to bald claims that Deloitte *should have known* that its opinions may be inaccurate. However, allegations regarding what a speaker should have known fall well short of the standard required to allege securities fraud—*e.g.*, allegations that the opinion "falsely describe[d the speaker's] state of mind[.]" *Omnicare,* 575 U.S. at 184.

Likewise, even assuming they are true, Plaintiffs' assertions that SCANA's financial statements did not conform to relevant accounting standards are irrelevant to the *Omnicare* analysis, since they say nothing about Deloitte's subjective disbelief in its audit opinion. *See, e.g.*, *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d at 303 ("[A]llegations that a company violated GAAP in preparing its financial statements are not sufficient, in and of themselves, to state a claim that an auditor's opinion of GAAP compliance is a factual misstatement."). Plaintiffs claim that SCANA admitted that its past financial statements were not in accordance with GAAP because it took certain impairment charges in 2017 and 2018, but that is simply untrue based on the public filings and an accurate understanding of the accounting standards and how they work. The impairments were not restatements; nor were they admissions that SCANA's prior financial statements "were not in accordance with GAAP." (*See* Compl. at 154-56, ¶¶ 407-11.) Rather, as

the documents Plaintiffs reference make clear, these impairments were taken because of SCANA's decision—*in 2017*—to abandon the Nuclear Project and its related decisions (a) not to seek prudency review of costs that had not yet been deemed prudent by the PSC, and (b) to commit "to regulators and the public that the recovery of the initial capital investment in the facility would not be sought from customers." (*Id.* at 155, ¶ 408.) These events in 2017 provide no evidence that the 2015 or 2016 financial statements were not in accordance with GAAP.

Finally, Plaintiffs attempt to manufacture an actionable Deloitte statement based on the notes to SCANA's financial statements, primarily contending that Deloitte must have known all along that the Nuclear Project would never be completed in time for SCANA to achieve the tax credits. (*See, e.g.*, *id.* at 176-81, ¶¶ 447-54.) This is a red herring for two reasons.

First, the tax credits were never earned and never recorded in SCANA's financial statements, and Plaintiffs do not suggest otherwise. Second, as is clear in the financial statements and the disclosures on which Plaintiffs rely, if these tax credits had ever been earned, they would have been passed through only to SCANA's ratepayers—not, as Plaintiffs allege, to its investors. Thus, if they had ever been earned, the tax credits would have been financially immaterial to SCANA and its shareholders. (*See, e.g.*, *id.* at 178, 189 ¶¶ 449, 467 ("When and to the extent that production tax credits are realized, *their benefits are expected to be provided directly to SCE&G's electric customers*") (emphasis added).) In other words, the ability or inability to achieve the tax credits did not affect SCANA's financial statements, and thus had no applicability or effect on the Deloitte opinions that must form the basis of Plaintiffs' claim. Even so, the disclosures noted that there were risks that the tax credits would not be achieved. (*See, e.g.*, *id.* at 178, ¶ 449 ("Based on the guaranteed substantial completion dates provided above [August 2019 and 2020], both New Units are expected to be operational and to qualify for the nuclear production tax credits; *however,*

*further delays in the schedule or changes in tax law could impact such conclusions*.") (quoting SCANA Form 10-K filed Feb. 26, 2016) (emphasis added).)[13]  Ultimately, these allegations do nothing to suggest that Deloitte did not believe the opinions it issued on SCANA's financial statements.

> ii.    **Plaintiffs Fail to Allege That Deloitte's Opinions Regarding SCANA's Financial Statements Contained Embedded Misstatements of Fact.**

Plaintiffs do not plead that Deloitte's audit opinions contained "embedded statements of [untrue material] facts."  Even if they did, such an allegation is not actionable because "[a]udit reports, labeled 'opinions' and involving considerable subjective judgment, *are* statements of opinion," even when they rely on a material fact in the underlying financial statements.  *Querub*, 649 F. App'x 55 at 58 (citing *Omnicare,* 575 U.S. at 185).  Accordingly, Deloitte's audit opinions "[do] not contain the financial statements as 'embedded facts'" and Deloitte "is not liable for errors in the financial statements . . . ."  *Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, 243 F. Supp. 3d 1109, 1119 (E.D. Cal. 2017).

> iii.    **Plaintiffs Fail to Allege That Deloitte's Opinions Regarding SCANA's Financial Statements Contained a Material Omission.**

Plaintiffs also do not sufficiently allege that Deloitte's audit opinions omitted material facts.  To plead a material omission under *Omnicare*, Plaintiffs are required to identify specific facts omitted from Deloitte's audit opinions and must allege specific facts showing that Deloitte knew of these facts when the audit opinions were issued.  575 U.S at 194.  Plaintiffs cannot "circumvent the particularity and materiality requirements of a § 10(b) claim by alleging in general

---

[13] Plaintiffs also mischaracterize statements about "prudency," which is a term of art under the BLRA—*i.e.*, when the PSC approves a change, that is a "prudency" determination.  (Compl. at 179-80, ¶ 451.)

terms that the defendant . . . failed to disclose some fact cutting the other way." *In re Plains All Am. Pipeline, L.P.*, 245 F. Supp. 3d 870, 892 (S.D. Tex. 2017) (internal citation omitted).

Here, the only omissions alleged in the Complaint are either contained in SCANA's statements and not Deloitte's opinions, or they otherwise relate to unaudited quarterly statements that are irrelevant to any potentially actionable statements made by Deloitte. (*See* Compl. at 174-75, 181, 183, 186-87 ¶¶ 445-46, 454, 457, 463-64.) These allegations tell this Court nothing about what facts Deloitte allegedly omitted from *its* statements—*i.e.,* its audit opinions. Accordingly, Plaintiffs fail to plead that Deloitte's opinions were false for omitting a material fact. *See Marrone Bio Innovations,* 243 F. Supp. 3d at 1119.

### C.     Plaintiffs Fail to Allege a Strong Inference of Scienter.

Not only does the Complaint fail to plead any actionable misstatement by Deloitte, it also fails to plead facts creating a "strong inference" of scienter – the requisite mental state of the defendant to establish an intent to defraud. While a strong inference of scienter is required in any case, in cases against independent auditors, as here, the standards are even more exacting.

#### 1.     Plaintiffs' Stringent Pleading Burden.

Plaintiffs have not met their heavy burden for pleading, with particularity, facts supporting a "strong inference" that Deloitte acted with scienter—*i.e.*, "intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 318-19. This "strong inference 'must be more than merely plausible or reasonable -- it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent.'" *Pub. Emples. Ret. Ass'n v. Deloitte & Touche LLP*, 551 F.3d 305, 306 (4th Cir. 2009) (quoting *Tellabs*, 551 U.S. at 314). To allege conduct sufficient to show scienter, a plaintiff must plead either "intentional misconduct" or "severe recklessness." *Cozzarelli*, 549 F.3d at 623. "Intentional misconduct encompasses deliberate illegal behavior." *Iron Workers Local 16*

24

*Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 578 (E.D. Va. 2006). Similarly, "'severe recklessness' is, in essence, 'a slightly lesser species of intentional misconduct,'" and it requires "'an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 343-44 (4th Cir. 2003) (citations omitted). Ultimately, dismissal is proper if "the inference that defendants acted innocently, or even negligently, [is] more compelling than the inference that they acted with the requisite scienter." *Pub. Emples. Ret. Ass'n*, 551 F.3d at 313.

The standard for pleading scienter for securities fraud claims against independent auditors is particularly demanding. *See, e.g., Dronsejko v. Thornton*, 632 F.3d 665 (10th Cir. 2011) (collecting cases from the Third, Fourth, Sixth, and Ninth Circuit Courts of Appeal). The especially heightened standard requires "'a mental state so culpable that it approximates an actual intent to aid in the fraud being perpetrated by the audited company.'" *Id.* at 665 (citation omitted). Plaintiffs "must demonstrate that the [auditors] were either knowingly complicit in the fraud" or that they were "so reckless in their duties that their audit 'amounted to no audit at all.'" *Pub. Emples. Ret. Ass'n*, 551 F.3d at 314 (quoting *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992)).[14] The PSLRA "does not permit district courts to speculate as to the existence of unpled and unidentified facts that could raise a strong inference of scienter." *Reiger v. Price*

---

[14] In *Pub. Emples. Ret. Ass'n*, the Fourth Circuit also articulated the recklessness standard as "so reckless in their duties as to be oblivious to malfeasance that was readily apparent." 551 F.3d at 314. However, the Fourth Circuit noted that the "no audit at all" phrasing was simply another way of describing this standard. *See id.* ("[The Company] would not have needed to go out of its way to produce false evidence of control had the [auditors] . . . been so reckless in their duties that their audit 'amounted to no audit at all,' as the Southern District of New York has described the standard.").

*Waterhouse Coopers Llp*, 117 F. Supp. 2d 1003, 1011 (S.D. Cal. 2000). Even pleading that an auditor was in "possession of documents which would lead a reasonable accountant to discover its client's fraud" is insufficient "to satisfy either the particularity or strong inference requirements of the Reform Act. . . ." *Id.* at 1012. As one court noted, the "circular reasoning" of allegations that an auditor must have acted with scienter because it failed to uncover conduct that "would have been obvious" with an adequate audit "may support an inference of negligent mismanagement, but they are not sufficient to make intentional or reckless fraud at least as compelling as plausible nonculpable explanations." *Plaisance*, 2019 U.S. Dist. LEXIS 42073 at *40-41. Courts regularly dismiss Section 10(b) claims against independent auditors for failure to plead scienter even when a claim against the company or its personnel is pleaded adequately.[15] The same result is warranted here.

### 2. Plaintiffs Fail to Plead Severe Recklessness Sufficient to Show Scienter.

Plaintiffs advance four main theories in support of their scienter allegations against Deloitte:

(i)    Deloitte violated various auditing and accounting standards in conducting its audit of SCANA's financial statements and internal controls;

(ii)   Deloitte received and ignored the Bechtel Materials as well as information regarding Nuclear Project costs that it allegedly obtained during the course of a "special audit";

(iii)  Deloitte should have discovered other alleged "red flags" in their audit; and

(iv)   Deloitte's scienter is demonstrated by several "other circumstances."

---

[15] *See, e.g., In re Advanced Battery Technologies, Inc.*, 781 F.3d 638, 643-44 (2d Cir. 2015) (district court granted motion as to auditor only); *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 246, 256 (S.D.N.Y. 2012) (scienter adequately alleged as to CFO's statement on internal controls, but not as to auditor's opinion on same); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 395, 398 (S.D.N.Y. 2007) (same).

(Compl. at 166-72, ¶¶ 436-39, 440.)  As explained below, these allegations, both individually and collectively, fail to satisfy the demanding standard for alleging auditor scienter.

> **i.    Plaintiffs' Allegations of PCAOB, GAAS, and GAAP Violations Do Not Establish Scienter.**

Plaintiffs first allege that Deloitte's purported violations of various auditing and accounting standards establish scienter.  This is wholly inadequate.  The law is clear that allegations of violations of such standards "fail to satisfy the scienter requirements of Section 10(b)" and that the "misapplication of accounting principles by an independent auditor does not establish scienter." *Ganey v. PEC Sols., Inc. (In re PEC Sols., Inc. Sec. Litig.)*, 418 F.3d 379, 389 (4th Cir. 2005) (citation omitted).  Yet, the Complaint's scienter allegations boil down to a recitation of a laundry list of auditing standards and other literature (Compl. at 24-47, ¶¶ 69-115), followed by a description of how—in Plaintiffs' opinion—Deloitte "should have" reviewed other information, conducted a better audit, and known that SCANA was allegedly fraudulently misrepresenting the Nuclear Project's construction progress.  It is not enough to identify PCAOB Standards and then allege in conclusory fashion that (i) the auditor did not comply with those standards, and (ii) if the auditor had complied with those standards, the alleged fraud of the company would have been uncovered.  *See, e.g.*, *In re PEC Sols., Inc. Sec. Litig.*, 418 F.3d at 389.  Courts routinely reject this strategy as legally insufficient to establish "the recklessness approaching actual intent required by the PSLRA." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 575 (S.D.N.Y. 2012). "Without supporting allegations suggesting that [the auditor] failed to perform even a 'cursory' audit, this generalized assertion [of audit standards violations] fails to adequately allege scienter under the PSLRA." *Id.* at 576.  And it is telling that—despite the intense scrutiny that SCANA has recently faced—Plaintiffs have not alleged that there has been a restatement of the financials or that the SEC has otherwise called for a restatement.  *See, e.g.*, *Iron Workers Local 16 Pension*

*Fund,* 432 F. Supp. 2d at 588 (noting that allegations of GAAP violations were weakened by the fact that "under the scrutiny of industry regulators, [the audited company] has not restated its earnings during the Class Period and neither the SEC nor any other entity has called for a restatement."); *see Fidel,* 392 F.3d at 230-32 (dismissing securities fraud claim against auditor, noting the lack of restatement of the subject financial statements undermines scienter). For these reasons, Plaintiffs' general allegations that Deloitte violated accounting or audit procedures, without more, fail to establish scienter.

> ii.    **Plaintiffs' Allegations Regarding Deloitte's Purported Knowledge of the Bechtel Report and Deloitte's Special Audits are Unfounded, Conclusory, and, in any Event, Unavailing.**

Plaintiffs next attempt to allege a strong inference of scienter by alleging that Deloitte knew about the Bechtel Materials, but this too falls short of alleging "severe recklessness" on the part of Deloitte. Specifically, Plaintiffs allege that (a) Deloitte received the Bechtel Materials at the time they were issued and, (b) that as a result of Deloitte's alleged "special audits," it "knew that the Nuclear Project costs were well in excess of budgets given the level of completion, and that the Nuclear Project was not progressing as budgeted—significant evidence that SCANA would not be able to complete the Nuclear Project by 2021 in order to receive the Nuclear Tax Credits." (Compl. at 167, ¶ 437.) As discussed above and below, these allegations are belied by the specific factual allegations contained in the Complaint, none of which support the inference Plaintiffs seek.

> a.    **The Bechtel Materials.**

Plaintiffs' first allegation purporting to establish Deloitte's receipt and knowledge of the Bechtel Materials relies on the 2018 testimony of the CFO of SCANA, Jimmy Addison, given before the PSC. (*See id.* at 163-64, ¶ 428.) As explained in more detail above (*see supra* Part I.A.3.), the actual testimony contradicts Plaintiffs' conclusion that Addison "conclusively testified

that Deloitte had in fact reviewed the Bechtel Reports prior to issuing its clean audit report."  (*Id.*)

In addition to admitting that he did not know when Deloitte received the results of Bechtel's work,

Mr. Addison also testified that:

> "*[Deloitte] has gone back and looked at it* completely and said the(y) did not see any gaps in our disclosures."
>
> "I don't know specifically when, *sometime obviously post abandonment*."
>
> "*[T]hey had gone back* with their local team and their national team *and reviewed all the disclosures at the point in time that they were made, and read th[e Report]*. They did not see any gaps in the disclosure at the time they were made."

(*Id.* at 100-02, ¶ 275 (emphasis added).)  Thus, the basis for the allegation that Deloitte's review

of the Bechtel Materials establishes its scienter in the issuance of its audit opinions is testimony

that Deloitte reviewed the Bechtel Materials *after* it issued the opinions and *after* the Nuclear

Project was abandoned.  The "strong inference of scienter" that Plaintiffs hope to extract from

Mr. Addison's testimony collapses under even the slightest scrutiny.

The more compelling and logical inference to derive from Mr. Addison's testimony is that

Deloitte did not review the Bechtel Materials before the 2015 and 2016 10-Ks were issued.

Instead, Deloitte later looked back at the 2015 and 2016 10-Ks to evaluate the material impact, if

any, of the newly disclosed information on its audit opinions for those years.  And notably, despite

all the scrutiny applied to SCANA's disclosures by both new management at SCANA and several

government authorities, SCANA has not withdrawn or restated any of those financial statements.

Thus, the Complaint's primary "factual" allegation purportedly tying knowledge of the

Bechtel Materials to Deloitte *at the time* of the alleged violative statements does nothing of the

sort.  Plaintiffs' claim that Mr. Addison "conclusively testified that Deloitte had in fact reviewed

the Bechtel Reports *prior to issuing its clean audit report*" is wrong.

Plaintiffs' only other factual allegation purporting to establish that Deloitte knew about the Bechtel Materials at the time of the 2015 and 2016 audits arises out of a September 21, 2015 e-mail from SCANA's Controller, James Swan IV, to two other SCANA employees, stating in pertinent part: "FYI – Deloitte will be asking about whether (or why not) we mention the Bechtel *consulting engagement* in our discussion of NND in the next 10-Q." (Ex. D at 1 (emphasis added); *see also* Compl. at 114-15, ¶ 306.) According to Plaintiff, this e-mail "make[s] clear that Deloitte received" the Bechtel Reports and Presentation when they were created. (Compl. at 167, ¶ 437.) However, it does nothing of the sort. At most, this e-mail suggests that Deloitte may have been told that SCANA hired an engineering consultant for the Nuclear Project. It provides no basis to infer that Deloitte was aware of the conclusions contained in a presentation or in reports that had yet to be issued. Placed in the relevant timeline, Mr. Swan's specific reference to a "consulting engagement"—rather than an assessment, report, or presentation—is not a coincidence. Plaintiffs allege that (1) the Bechtel Presentation occurred on October 22, 2015; (2) the First Bechtel Report was not issued until November 9, 2015; and (3) the Second Bechtel Report was not issued until February 5, 2016. (*See id.* at 64, 66, 70 ¶¶ 168, 176, 184.) Thus, when Mr. Swan sent this e-mail on September 21, 2015, Bechtel's findings had not even been developed. And it is compelling that Plaintiffs cite no correspondence at the time of or following the issuance of the Bechtel Materials that suggests that Deloitte was ever aware of Bechtel's findings. It is not hard to imagine why. As the Complaint laboriously alleges—and as further exemplified by SCANA's second highest ranking executive recently pleading guilty to criminal fraud—certain SCANA executives apparently concealed the Bechtel Materials from regulators, investors, the public, and even other

SCANA executives. (*See. e.g.*, *id.* at 151-52, 165, ¶¶ 401, 432.)[16]  Given the paltry allegations offered by Plaintiffs, the more compelling inference is that Deloitte was among those kept in the dark.

Mr. Swan's e-mail is similar in effect to a witness statement which the District Court of Maryland found insufficient to establish the scienter of an outside auditor in *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561 (D. Md. 2005).  In that case—which involved overstated goodwill—the former accountant of the audited company stated that the auditor "had 'started doing the work for it [the write-off] but hadn't finished the analysis yet. We were still recalculating then. I remember because of all the work I was doing.'"  *Id.* at 579.  From this, the plaintiffs alleged "that 'Defendants knew that [the audited company] would have to take a significant goodwill impairment charge' . . . but nevertheless 'continued to represent to the investing public that its goodwill was not impaired.'"  *Id.*  In dismissing the claim, the court explained that "absent from the complaint is an allegation that once the analysis was complete, [the auditor] had concluded that there was an impairment to goodwill, and that it, nevertheless, allowed the company to issue the subsequent statements that it was not impaired."  *Id.*

Like *In re Acterna Corp.*, Mr. Swan's e-mail does not suggest that any conclusions had been reached by Bechtel or SCANA—much less Deloitte (if it can be plausibly alleged that it knew of the engagement)—at the time of the e-mail.  The mere hiring of an engineering consultant on a nuclear construction project is hardly an extraordinary event which must lead to the scienter

---

[16] As acknowledged by Plaintiffs, "SCANA[] deci[ded] to withhold the Bechtel Report . . . based on an assertion of privilege".  (Compl. at 142, ¶ 375.)  Although Plaintiffs vaguely allege that "internal documents make clear that SCANA shared the Bechtel Report with Deloitte" and thereby waived any privilege, they fail to identify the purported "internal documents" supporting this allegation.  (*Id.* at 139, ¶ 365.)

conclusion that Plaintiffs imply, and nothing in Plaintiffs' allegations plausibly suggests that the scope of the Bechtel engagement or any results of its work had ever been accurately disclosed to Deloitte.[17]  In fact, Mr. Swan's statement in the email (on which Deloitte was not copied) that "[t]he initial thinking *I believe* is that we will not mention it, since the scope of their work is so limited" suggests that he was already wary of the significance of the engagement.  (Ex. D at 1 (emphasis added).)  Ultimately, Plaintiffs have failed to plausibly allege that Deloitte received the Bechtel Materials at any time prior to issuing its opinion, and so they are unable to establish scienter through the Bechtel Materials.

### b.    The "Special Audits."

Plaintiffs seek to bolster their scienter inference by misconstruing certain "special audits" by Deloitte.  (Compl. at 110, ¶ 297.)  But Plaintiffs completely mischaracterize the scope of Deloitte's engagement related to the "special audit" work.  As noted above, SCANA sought PSC approval for the substantial completion deadlines of the Nuclear Project, which were reviewed by ORS and which the PSC deemed prudent under the BLRA, with the BLRA dictating how costs of the Nuclear Project must be accounted for in SCANA's financial statements.  (*See, e.g.*, *id.* at 18, 21 ¶¶ 47, 60-61.)  Deloitte audited SCANA's financial statements under the BLRA guidelines. Bona fide costs SCANA incurred for the Nuclear Project were required to be capitalized—that is,

---

[17] Even if this e-mail could somehow suggest—to the exclusion of all reasonable inferences—that Deloitte actually received and reviewed three sets of subsequently-issued materials from Bechtel, Plaintiffs still fail to satisfy Fed. R. Civ. P. 9(b) and the PSLRA by pleading specific allegations about when and how Deloitte obtained such materials, and when Deloitte allegedly learned of a falsity in some statement it made.  *See, e.g., Iron Workers Local 16 Pension Fund*, 432 F. Supp. 2d at 579 ("[P]laintiffs must plead specific facts concerning . . . when each defendant . . . learned that a statement was false [and] how that defendant learned that the statement was false . . . .") (citing *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 886 (W.D.N.C. 2001)).

recorded as an asset of SCANA. No agreement, rule, law, or regulatory guidance required Deloitte to audit whether SCANA was "on track" for completing the Nuclear Project on schedule.

Plaintiffs acknowledge that the "special audits" were just related to Nuclear Project costs, but they then jump to conclusions that this limited cost-allocation work by Deloitte somehow involved much more. The scope of Deloitte's "special audits" was simply to test whether the Nuclear Project's costs were presented fairly in accordance with GAAP and properly allocated between SCG&E and Santee Cooper, nothing more, and nothing about the timeliness of completion. In any event, even if Deloitte had discovered that construction costs exceeded budgets, it would not be reasonable to infer from such a discovery that Deloitte could only conclude that the 10-K footnote disclosures touching on substantial completion were wrong, much less fraudulent, particularly given the PSC's multiple prudency approvals of revised schedules and cost estimates and the acknowledgment in the 10-Ks of risks related to the schedules.

### iii.     Plaintiffs' "Red Flags" Theory is Speculative and Fails to Adequately Allege Scienter.

Plaintiffs also rely on "red flag" allegations to infer the requisite scienter by Deloitte. Stripped of the "red flag" label that Plaintiffs attach to them, however, the allegations are rife with illogical leaps and stacked inferences that contradict Plaintiffs' conclusions and the law. Plaintiffs allege that:

> In addition to the Bechtel Reports and the information it obtained in connection with its special audits, a deluge of internal documents and performance metrics available to Deloitte that it *should have* reviewed pursuant to its obligations under PCAOB Standards also consistently documented significant red flags with the Nuclear Project, including that it was hopelessly delayed, plagued by excessive costs, and could not be in service by 2021, the drop-dead date essential to receiving the Nuclear Tax Credits.

(*Id.* at 167-68, ¶ 438 (emphasis added).)

For starters, Plaintiffs would have the Court ignore that SCANA was presenting its regulators with information that supported the timetable, which Deloitte would have no reason to disbelieve. Plaintiffs are unable to allege that the full scope of information available to Deloitte— whatever that information was—required a conclusion that SCANA's timetable was fraudulent. And Plaintiffs' claim that Deloitte's audit should have determined that SCANA's timetable was fraudulent is pure speculation. Even accepting Plaintiffs' argument that Deloitte had access to some evidence that cut against management's stated view that the completion deadlines would be met, Plaintiffs have no basis for contending that the entirety of the information available to Deloitte was irreconcilable with management's stated view. And given the express statement in the financial statements that the completion dates could turn out to be too optimistic, there is no basis for an inference that Deloitte believed that management's expectations were not realistic ones, albeit subject to the caveats that also were included in the financial statements.

In any event, "courts have declined to 'extend 10b-5 liability to instances where an auditor fails to investigate certain red flags that, while themselves . . . not indicative of actual fraud, could, if pursued, [have led] to the discovery of fraud.'" *In re DNTW Chtd. Accountants Sec. Litig.*, 172 F. Supp. 3d 675, 685-86 (S.D.N.Y. 2016). "In order to justify a strong inference of scienter, . . . the 'red flags' must be closer to 'smoking guns' than to mere warning signs." *In re SCB Computer Tech., Inc.*, 149 F. Supp. 2d 334, 363 (W.D. Tenn. 2001).

Here, Plaintiffs' purported "red flags" were allegedly contained in: (1) "SCANA Board and SCANA-Santee Cooper Joint Board Minutes and Presentations"; (2) "Risk Management Committee Meeting Minutes and Presentations"; (3) "Regulatory Correspondence"; (4) "The CORB Report and Presentations"; (5) "Historical Date-to-Date Performance Metrics"; (6) "Current Rate of Progress Metrics"; (7) "Overall Performance Factor Metrics"; (8) "Toshiba's

Public Announcements Calling into Question the Viability of the Nuclear Project"; (9) "Santee Cooper's Serious Concerns"; and (10) "The Nuclear Project Whistleblower". (Compl. at 168-71, ¶ 438.) Plaintiffs' entire "red flag" theory rests on the assumptions that (a) just because these documents exist, Deloitte must have had access to them, (b) that whatever mix of information Deloitte reviewed compelled the conclusion that SCANA's announced timetable was fraudulent, and (c) since Deloitte must have had access to these documents, there can be but one inference: that Deloitte knowingly issued fraudulent audit opinions with the intent to defraud because it was on notice that SCANA was committing fraud.

As inferences stacked upon inferences, these assumptions cannot withstand scrutiny in adequately pleading independent auditor scienter. First, for all the alleged "red flags," Plaintiffs' allegations fail to meet the strict pleadings standards of the PSLRA. *See In re Humphrey Hosp. Tr., Inc. Sec. Litig.*, 219 F. Supp. 2d 675, 684 (D. Md. 2002) ("Allegations that Defendants had actual knowledge consist largely of conclusory statements about what the [] Reports 'must have indicated' about the Company's financial health, and that the Defendants 'must have known' that their statements were misleading as a result. . . These assertions, without more particularized facts to show what Defendants knew, when and how they knew it, and how their knowledge rendered particular statements false or misleading, fail to meet the stiff pleading requirements of the PSLRA."). Instead, Plaintiffs' red flag theory relies on an insufficient allegation that Deloitte "should have reviewed" the referenced "documents and performance metrics available to [it]." (Compl. at. 167, ¶ 438.) However, even assuming these documents and metrics could be considered "red flags," they must have been actually "known" by the auditor.[18] *See, e.g., In re*

---

[18] None of the "progress" or "performance" metrics could possibly constitute "red flags," nor do they establish scienter. Even if this information were known to Deloitte, at most this information shows that construction had been delayed and that inefficiencies were apparent.

*Acterna Corp.*, 378 F. Supp. 2d at 580 (describing red flags as "known" risk factors). An auditor's knowledge of "red flags" must be pleaded specifically and may not be assumed. *See, e.g.*, *Special Situations Fund III QP, L.P. v. Deloitte Touche*, 33 F. Supp. 3d at 429; *Iowa Pub. Employee's Ret. Sys. v. Deloitte & Touche LLP*, 919 F. Supp. 2d 321, 332 (S.D.N.Y. 2013) ("[A]uditor access is not tantamount to auditor awareness.") And the Complaint does not allege such facts.

Second, the Complaint fails to plead what other facts were represented to Deloitte that supported SCANA managements' timetable for completion. Just as such information was provided to regulators, the reasonable inference in this context is that the same information was provided to Deloitte. There is no basis to assert that the total mix of information did not support management's conclusion, particularly when both the PSC and ORS vetted and adopted management's conclusion multiple times.

Third, even if Deloitte actually knew of the facts which Plaintiffs characterize as "red flags," the exacting pleading standards still require the Court to make the ultimate inferential leap that upon learning of these alleged facts, Deloitte made the decision that they were material to the scope of their audit of SCANA's financial statements, and then made the conscious decision to ignore them and instead conduct "an audit so reckless" that it approximated "an intent to defraud.'" *In re Acterna Corp.*, 378 F. Supp. 2d at 583. No case involving independent auditor liability allows for such an inferential leap. With no particularized allegations about what Deloitte knew, when they knew it, and a complete lack of specificity about what Deloitte did or did not do upon allegedly learning of each "red flag," Plaintiffs' "red flag" theory cannot support the assertion that Deloitte performed "no audit at all." *Pub. Emples. Ret. Ass'n*, 551 F.3d at 314-15. Indeed, even if it can be inferred that Deloitte knew of the alleged facts regarding these documents, the more cogent and compelling inference is that Deloitte considered the information in its audit and

concluded that a different disclosure in SCANA's 10-Ks was not warranted.  At their very best, after assuming the initial leaps of knowledge by Deloitte, Plaintiffs' allegations support a theory that Deloitte should have made a different determination under applicable accounting principles, a conclusion that is much more akin to a non-actionable auditor negligence claims than securities fraud.  *See, e.g.*, *Plaisance*, 2019 U.S. Dist. LEXIS 42073 at \*40-41.

Lastly, none of the facts alleged as "red flags" establish scienter because they ignore that the PSC continued to approve revised schedules.  For example, Plaintiffs' own allegations confirm that as of "November 9, 2016, *the PSC approved [a] revised schedule*, costs and election of the fixed price option, *and found that 'the evidence of record justifies a finding that the changes are not the result of imprudence on the part of' SCANA*."  (Compl. at 60, ¶ 157 (emphasis added).) Thus, it is unreasonable to assume that Deloitte should have disregarded the approvals of state regulators and that it acted with severe recklessness by relying on those approvals rather than interpreting previous schedule concerns and multiple past revisions as purported "red flags" showing fraud by SCANA.

### iv.    The Remaining Circumstances Alleged by Plaintiffs Fail to Establish Scienter.

In their final theory, Plaintiffs assert that "other information demonstrates Deloitte's scienter."  (*Id.* at 171, ¶ 440.)  Plaintiffs first proffer the timing of SCANA's abandonment of the Nuclear Project in relation to Deloitte's second audit opinion in the 2016 10-K.  (*Id.*)  However, this conjecture cannot support a strong inference of scienter when there is no indication from Plaintiffs' allegations that while conducting its audit Deloitte knew or recklessly disregarded information *suggesting SCANA would abandon the Nuclear Project*.  To the contrary, SCANA had publicly represented that it would take over construction if Westinghouse was unable to finish

it.  Without more, inferring scienter simply from the temporal proximity between Deloitte's report and SCANA's abandonment is nothing more than speculation.  *See, e.g., Fidel*, 392 F.3d at 232.

Plaintiffs next allege that the Nuclear Project "has resulted in numerous, ongoing investigations and litigation" and that subpoenas have been issued that "seek documents pertaining to Deloitte's audits."  (Compl. at 171, ¶ 440.)  However, Plaintiffs do not and cannot allege that Deloitte is implicated in any criminal investigation or named in any civil action brought by any regulator.  And the mere fact that Deloitte may have documents relevant to investigations of SCANA does not suggest fraud on the part of Deloitte.

Plaintiffs further allege that the simplicity of the GAAP issues implicated demonstrates Deloitte's scienter.[19]  (*Id.* at 172, ¶ 440.)  But vague allegations of "[t]he risks" and "the accounting principles at issue" are insufficient to plead scienter under the PSLRA, and Plaintiffs' allegations are further weakened because SCANA's financials have not been restated.  *See, e.g., In re Acterna Corp.*, 378 F. Supp. 2d at 583 (finding an "argument that . . . the magnitude of the misstatement and scope of the fraud 'lend further probative weight to Plaintiffs' allegations that the GAAP violations in this case raise a strong inference of scienter' is unpersuasive in light of the fact that [the audited company] . . . did not restate previously reported financial numbers . . .").  Indeed, to the extent the GAAP issues were simple, they were simple because the financial statement accounting for the nuclear costs was dictated by the PSC's prudency approvals.

Finally, Plaintiffs allege that the "critical" nature of the Nuclear Project establishes Deloitte's scienter.  (Compl. at 172, ¶ 440.)  According to Plaintiffs, "[w]ithout completion of the Nuclear Project in time to receive the Nuclear Tax Credits, SCANA was unlikely to be able to

---

[19] Plaintiffs' allegations about the breadth and length of alleged PCAOB violations are simply reiterations of their prior allegations regarding the auditing standards.  (Compl. at 171-72, ¶ 440.)

continue to operate." (*Id.*) However, Plaintiffs have not plausibly alleged that SCANA was in imminent danger of becoming insolvent if the nuclear tax credits were not received. Further, such an assertion would be contradicted by SCANA's public disclosure that "[w]hen and to the extent that production tax credits are realized, their benefits [we]re expected to be provided directly to SCE&G's electric customers." (*Id.* at 178, ¶ 449.) Thus, the pass-through benefit of these contingent tax credits would have been neutral to SCANA's financial statements; a reality supported by a lack of any restatement to SCANA's financial statements following abandonment. Accordingly, Plaintiffs' "other circumstances" also fail to establish scienter on behalf of Deloitte.

### 3. Plaintiffs' Failure to Plead Motive Supports a Lack of Scienter.

Although "courts should not restrict their scienter inquiry by focusing on specific categories of facts," *Ottmann*, 353 F.3d at 345, "*an inability to show motive can be a relevant circumstance indicating the lack of scienter.*" *In re Acterna Corp.*, 378 F. Supp. 2d at 576 (emphasis added) (citation omitted). "In order to demonstrate motive, a plaintiff must show 'concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.'" *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 621 (4th Cir. 1999) (citation omitted).

Here, Plaintiffs' sole allegations related to motive fall flat. They allege that Deloitte was motivated to issue fraudulent opinions with the intent to defraud because Deloitte has had a "prolonged" relationship with SCANA spanning more than 70 years and that "Deloitte was paid nearly $10 million for its audit work." (Compl. at 27-28, ¶¶ 80-82.) However, "a 'large independent accountant will rarely, if ever, have any rational economic incentive to participate in its client's fraud' because an 'accountant's success depends on maintaining a reputation for honesty and integrity.'" *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 390 (D.

Md. 2004) (quoting *Reiger*, 117 F. Supp. 2d at 1007).  Moreover, "[t]he Fourth Circuit has made

clear that allegations, like the ones asserted here, that merely charge that [the defendants]

committed fraud to prolong the benefits they hold . . . do not, in themselves, raise a strong inference

of scienter."  *In re Acterna Corp.*, 378 F. Supp. 2d at 576 (citations omitted).  Thus, these

allegations are insufficient to plead motive, and Plaintiffs' inability to show motive evidences a

lack of scienter.  *See, e.g., id.*

> **D.**     **Plaintiffs Fail to Properly Plead Loss Causation.**

In addition to the above, the Complaint should also be dismissed because Plaintiffs fail to

adequately plead loss causation, another essential element of a Section 10(b) claim.  *See* 15 U.S.C.

§ 78u-4(b)(4).  Loss causation refers to the "causal connection" between the alleged misconduct

and the economic loss suffered by the plaintiff.  *Dura,* 544 U.S. at 342.  Establishing loss causation

is critical because the securities laws are not intended "to provide investors with broad insurance

against market losses, but to protect them against those economic losses that misrepresentations

actually cause."  *Id.* at 345.  Consistent with Rule 9(b) of the Federal Rules of Civil Procedure,

loss causation must be pled "with sufficient specificity to enable the court to evaluate whether the

necessary causal link exists."  *Katyle*, 637 F.3d at 465-66.  It is not enough to allege that "a

misrepresentation leads to an inflated purchase price."  *Dura*, 544 U.S. at 346.  Rather, the alleged

misrepresentation or omission must be a "substantial cause" of the investment's decline in value.

*Katyle*, 637 F.3d at 472.

The Fourth Circuit recognizes two theories for pleading loss causation: (1) the corrective

disclosure theory and (2) the materialization of a concealed risk theory.  *Singer v. Reali*, 883 F.3d

425, 445-46 (4th Cir. 2018).  Under a corrective disclosure theory, a plaintiff "must provide a basis

on which to conclude the . . . alleged corrective disclosures . . . revealed 'new facts' suggesting

[the defendant] had perpetrated a fraud on the market by omitting" or misrepresenting material information in its prior statements to the market. *Katyle*, 637 F.3d at 473. Similarly, under a materialization of the concealed risk theory, a plaintiff can show loss causation by alleging facts showing that the drop in stock price was caused by "negative investor inferences drawn from the disclosures [that] were a foreseeable materialization of the risk concealed" by the defendant's fraudulent statements." *Id.* at 477 (quotation omitted). The ultimate loss causation inquiry under either theory, however, is the same: "whether a misstatement or omission concealed something from the market that, ***when disclosed***, negatively affected the value of the security." *Singer*, 883 F.3d at 446 (quotation omitted) (emphasis added). More importantly, "in cases, where, as here, a plaintiff seeks to hold a[n] . . . auditor responsible for primary violations of the securities laws, the plaintiff must plead that the market reacted negatively to some disclosure correcting the falsity ***in the . . . auditor's statements*** (and not simply the underlying fraud)." *Amorosa v. Ernst & Young LLP*, 682 F. Supp. 2d 351, 363 (S.D.N.Y. 2010) (emphasis added); *see In re Witness Sys., Inc. Sec. Litig.*, No. 1:06-CV-1894-CC, 2008 U.S. Dist. LEXIS 109173, at *28 (N.D. Ga. Mar. 31, 2008) ("[P]laintiff alleges no facts as to how any disclosure as to KPMG's 2004 audit report proximately caused the alleged loss or how any factfinder could reasonably allocate some portion of the loss to KPMG's 2004 audit report, as compared with the multiple disclosures about the Company . . . .").

While Plaintiffs' pursue both theories for pleading loss causation, they satisfy neither because they do not allege that any of Deloitte's opinions concealed something from the market that, "when disclosed, negatively affected" SCANA's stock price. Dismissal is therefore appropriate because Plaintiffs have failed to plead a direct causal connection between Deloitte's statements and the claimed losses. *See Dura*, 544 U.S. at 346-47.

Here, Plaintiffs contend that Deloitte's audit opinions concealed from the market that the Nuclear Project was behind schedule and would not be completed in time for SCANA to receive tax credits of up to $1.4 billion. (Compl. at 192, ¶ 473-74.)  Plaintiffs further allege that misstatements in Deloitte's audit opinions were corrected through a series of 18 purported corrective events from December 17, 2016 to December 21, 2017.  (*Id.* at 192-96 ¶ 475-76.)  But while it is replete with other disclosures by SCANA that are not attributable to Deloitte, the Complaint ignores SCANA's disclosures acknowledging significant risks and uncertainties with the Nuclear Project in its 2016 Form 10-K filed February 24, 2017, including the following disclosure:

> Although progress on the project was seen in December 2016 and January 2017, including the placement of the first of Unit 2's two steam generators, significant risks and uncertainties remain concerning WEC's ability to improve work force efficiency and productivity performance and to continue to fulfill its performance and financial commitments and Toshiba's ability to perform under its payment guaranty with respect to the project.

(Ex. B at 89.)  This disclosure is contained in the very same Form 10-K as Deloitte's 2016 audit opinion.  Consequently, any information purportedly "concealed" from the market was revealed in the 10-K filed on February 24, 2017.  Yet, Plaintiffs do not identify this 10-K as an alleged corrective event and fail to allege the market impact of SCANA's disclosures concerning uncertainties with the Nuclear Project.  Tellingly, SCANA's stock price did not move materially on the date the 10-K was issued—it closed two cents down from the prior day's close (from $68.94 to $68.92).  The next week the stock price increased to over $70, demonstrating that Deloitte's audit opinions could not have been a "substantial cause" of Plaintiffs' claimed losses.  Moreover, all but three of the events allegedly correcting Deloitte's statements occurred after SCANA disclosed uncertainties with the Project, further demonstrating that any purported losses sustained after February 24, 2017, lack a causal connection to Deloitte's alleged misstatements.  (*See* Compl.

at 193-96, ¶ 476.)    In any event, Plaintiffs' own allegations regarding SCANA's public announcement on July 27, 2017 that the Nuclear Project would not be completed by the January 2021 deadline for receiving federal tax credits shows that any alleged false statement attributable to Deloitte regarding the status of the Nuclear Project was fully corrected by July 27, 2017, if not earlier.    To the extent there were further declines in SCANA's stock price following this announcement, they cannot relate to Deloitte's alleged misstatements because the market was fully informed by July 27, 2017 that SCANA would not in fact receive federal tax credits for the Nuclear Project.

What is more, Plaintiffs have not even adequately alleged any corrective disclosures supporting a causal connection between Deloitte's alleged misrepresentations—*i.e.*, its audit opinions for the 2015 and 2016 10-Ks—and Plaintiffs' claimed economic losses.    To qualify as a corrective event, the disclosure must "relate back to" the defendant's alleged misrepresentation, "not to some other negative information about the company."    *Katyle*, 637 F.3d at 473.    But Plaintiffs do not identify a single disclosure that allegedly corrected or revealed the truth of Deloitte's prior statements and make no effort to connect the corrective events with Deloitte's audit opinions.    Not a single alleged corrective event makes *any* reference to Deloitte's audit opinions or any other statement by Deloitte.    (*See* Compl. at 193-96, ¶ 476.)    Plaintiffs instead rely on disclosures that relate to the alleged securities fraud that was the subject of separate litigation against SCANA and its management.    Indeed, Plaintiffs' proffered list of 18 corrective events are nearly identical to the corrective events that allegedly corrected SCANA's allegedly false and misleading statements and omissions. (*Compare* Compl. at 193-96, ¶ 476 *with* Consolidated Class Action Complaint, *In re SCANA Corp. Sec. Litig.*, No. 3:17-2616-MBS (D.S.C. Mar. 30, 2018),

ECF No. 72 at 171-75, ¶ 431.)[20]  While the alleged corrective events are critical of SCANA and its management, they do not "relate back to" any statement by Deloitte.[21]  More specifically, the alleged corrective events do not correct any statements attributable to Deloitte, *i.e.*, Deloitte's opinions on SCANA's financial statements or the effectiveness of SCANA's internal controls over financial reporting.  Nor can they; SCANA has not restated any of its financial statements and neither of the operative audit opinions have been withdrawn or revised.  Plaintiffs' failure to adequately allege a corrective disclosure or the materialization of a risk that Deloitte – as opposed to SCANA – somehow concealed dooms Plaintiffs' Section 10(b) claim.  *See Amorosa*, 682 F. Supp. 2d at 367 ("[Plaintiff's] failure to plead facts connecting specific statements made by the auditor to losses incurred by [plaintiff] is fatal to his Section 10(b) claim . . ."); *Lattanzio*, 476 F.3d at 158 (2d Cir. 2007) ("Plaintiffs have not alleged facts to show that Deloitte's misstatements, among others (made by [the company]) that were much more consequential and numerous, were

---

[20] The Complaint regurgitates the same corrective events alleged in the SCANA litigation with two minor differences.  *First*, for the corrective event alleged on February 16, 2017, Plaintiffs in this case also allege "Wells Fargo issued a report on February 16, 2017, stating that 'we think the current valuation arguably overstates the risk, particularly considering the protections afforded SCG under the Baseload Review Act.'"  (Compl. at 122, ¶ 323.)  *Second*, for the corrective events alleged on October 26-27, 2017, Plaintiffs also allege (i) "During a conference call held later in the afternoon on October 26, 2017, Marsh explains that the Company was pursuing settlement with the regulators, but that '[t]his is a very different situation, given the attention that's been given to it.'"; and (ii) "On October 27, 2017, analysts from Morgan Stanley lower its price target on the grounds that analysts were 'growing increasingly concerned' about negative scenarios playing out for the Company."  (*Id.* at 195-96, ¶ 476.)  Neither of these is material to Deloitte's statements.

[21] In prior securities litigation, this Court held that the plaintiffs had adequately pleaded causation between *SCANA's* and its *management's* alleged misrepresentations and the economic losses that followed from stock price declines.  *In re SCANA Corp. Sec. Litig.*, 2019 U.S. Dist. LEXIS 54176 at *42.  Those same allegations, however, are not sufficient for adequately alleging loss causation as against Deloitte.  At best, the allegation in that case, and in the present case, are directed at establishing a causal connection between SCANA's alleged misrepresentations and the alleged economic losses, not a causal connection between Deloitte's audit opinions (or other conduct) and such losses.

the proximate cause of plaintiffs' loss; nor have they alleged facts that would allow a factfinder to ascribe some rough proportion of the whole loss to Deloitte's misstatements. Accordingly, plaintiffs have not alleged loss causation.").

For these reasons, Plaintiffs have not pleaded that Deloitte caused Plaintiffs' economic losses, and the Section 10(b) claim can be dismissed on this ground alone for failure to state a claim upon which relief may be granted.

## II.     PLAINTIFFS' CLAIM IS TIME-BARRED BY THE TWO-YEAR STATUTE OF LIMITATIONS.

In addition to its many other infirmities, Plaintiffs' claim is untimely.  Under 28 U.S.C. § 1658(b), a securities fraud claim must be brought no later than the earlier of two years after discovery of the facts constituting the violation or five years after the violation itself.  "Discovery" in this context "encompasses not only those facts the plaintiff actually knew, but also those facts a reasonably diligent plaintiff would have known."  *Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010).  According to Plaintiffs' allegations, the only alleged facts that became known within the limitations period are Mr. Swan's e-mail and Mr. Addison's testimony regarding the Bechtel Reports.  (*See* Compl. at 163-64, ¶¶ 428-430.)  But as explained above, those allegations cannot create an inference of scienter because they are belied by the record. (*See supra* Part I.B.2.ii.)  As such, even if Plaintiffs can plausibly allege scienter through Plaintiffs' remaining allegations, Plaintiffs' claim is dead on arrival because the face of the Complaint demonstrates the facts supporting such allegations were known prior to the limitations period.  Dismissal is therefore appropriate because Plaintiffs' allegations reveal that it had all the information it needed to assert a securities fraud claim against Deloitte more than two years before the commencement of this action on November 22, 2019.  *See Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009) ("[W]here facts sufficient to rule on an affirmative defense—including

the defense that the plaintiff's claim is time-barred—are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6).") (internal quotations omitted).

The alleged facts upon which Plaintiffs' Section 10(b) claim is based, were known or would have been discovered by a reasonably diligent plaintiff, more than two years before the present action was filed (*i.e.*, before November 22, 2017). Plaintiffs dedicate an 18-page section of the Complaint to public disclosures—including press articles, press releases, and South Carolina congressional testimony—that allegedly revealed the "fatal risks" facing the Nuclear Project. (*See* Compl. at 136-54, ¶¶ 359-406.) Plaintiffs allege that these disclosures began in August 2017 and that nearly all the materials purportedly revealing issues at SCANA entered the public domain more than two years before Plaintiffs initiated this litigation. (*Id.*) Most importantly, Plaintiffs expressly allege that it was publicly known by September 2017 that Deloitte had long-standing knowledge of the risks facing the Nuclear Project, which is the fundamental premise of Plaintiffs' Section 10(b) claim. (*See id.* at 140, ¶ 369.) Plaintiffs allege: "A rash of news stories were published on September 6, 2017 and September 7, 2017, reporting on the fallout of the release of the Second Bechtel Report and the release of a number of internal documents and communications that ***revealed new information concerning SCANA's and the Defendants' longstanding knowledge*** of the risks facing the Nuclear Project, and Westinghouse and Toshiba's ability to pay for the Nuclear Project once the fixed price option was elected." (*Id.* (emphasis added).) Remarkably, all but one of the eighteen alleged corrective disclosures occurred more than two years before the commencement of this litigation. (*See id.* at 193-96, ¶ 476.) The one alleged disclosure within the statute of limitations does not concern Deloitte—it was the PSC's denial of SCANA's motion to dismiss a rate relief suit and a related Morgan Stanley report. (*Id.*) Notably,

85% of the drop in the price of SCANA securities during the Class Period is attributable to allegedly corrective events outside the two-year statute of limitations. (*See id.*)

The only conceivable argument that Plaintiffs can advance to save their otherwise stale claim is that the facts constituting Deloitte's alleged scienter were not known or discoverable by a reasonably diligent plaintiff before November 22, 2017, but any such argument is also contradicted by Plaintiffs' own allegations. Plaintiffs premise their scienter allegations on the contention that Deloitte should have done more in its role as SCANA's auditor. (*See id.* at 167-72, ¶¶ 438-40.) The purported "red flags" that are the centerpiece of this contention are based on public disclosures regarding issues with the Nuclear Project, including specifically the Bechtel Reports—all of which were publicly disclosed before November 22, 2017. Plaintiffs' only relevant allegation within the two-year statute of limitations is that Deloitte's alleged knowledge of the Bechtel Reports was not known to the public until over a year after the Bechtel Reports themselves were released. (*Id.* at 163-64, ¶ 428.) But, as explained above, this argument is a red herring because Plaintiffs have not adequately alleged that Deloitte was aware of the Bechtel Reports before the Nuclear Project was abandoned. (*See supra* Part I.B.2.ii.a.) Even if Plaintiffs could adequately allege as much, that does not affect commencement of the limitations period because Plaintiffs premise scienter on a variety of other allegations that pre-date the limitations period. (*See* Compl. at 163-64, ¶¶ 438-440.) Surely, Plaintiffs' scienter allegations do not rise and fall with Deloitte's alleged knowledge of the Bechtel Reports prior to abandonment of the Nuclear Project. Moreover, to the extent that Plaintiffs seek to rely on Deloitte's special audit of the Nuclear Project costs to establish the timelines of their claim, such allegations are similarly unavailing because Plaintiffs have not pleaded specific facts demonstrating that Deloitte actually knew that the Nuclear Project would

not be completed in time to receive the federal tax credits as a result of the special audit, much less that the special audit even related to the timing or schedule for completion of the Nuclear Project.

Because Plaintiffs' allegations demonstrate that they had enough information to establish their claims as pled before November 22, 2017, Plaintiffs' Section 10(b) claim is time-barred by the two-year statute of limitations and should be dismissed.

## **CONCLUSION**

For these reasons, Deloitte respectfully requests that the Court dismiss the Complaint with prejudice.

Respectfully submitted,

 *s/Christopher A. Ogiba*
Christopher A. Ogiba, Fed. ID No. 9042
Lesley A. Firestone, Fed. ID No. 11719
Clinton T. Magill, Fed. ID No. 12459
Moore & Van Allen, PLLC
78 Wentworth Street
Charleston, South Carolina 29401
Telephone:  843-579-7066
Facsimile:  843-579-8749
Email: chrisogiba@mvalaw.com
        lesleyfirestone@mvalaw.com
        clintonmagill@mvalaw.com

Mark A. Nebrig
John A. Fagg, Jr.*
Nader S. Raja*
Kristen Kenley*
Moore & Van Allen, PLLC
100 North Tryon Street
Suite 4700
Charlotte, North Carolina 28202-4003
Telephone: 704-331-3602
Facsimile:  704-339-5974
Email: marknebrig@mvalaw.com
        johnfagg@mvalaw.com
        naderraja@mvalaw.com
        kristenkenley@mvalaw.com

*pro hac vice applications to be submitted*

48

Scott A. Edelman
Jed M. Schwartz
Andrew B. Lichtenberg
Milbank LLP
55 Hudson Yards
New York, New York 10001-2163
Telephone: 212-530-5000
Facsimile:  212-530-5219
Email:  sedelman@milbank.com
           jschwartz@milbank.com
           alichtenberg@milbank.com

*Attorneys for Defendants*
*Deloitte & Touche LLP and Deloitte LLP*

Charleston, South Carolina
July 20, 2020