**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 98 PENSION FUND on behalf of itself and all others similarly situated, | Case No. 3:19-cv-3304 |
| Plaintiff, | **CLASS ACTION** |
| vs. | |
| DELOITTE & TOUCHE, LLP; DELOITTE LLP, | |
| Defendants. | |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .............................................................................................1

STATEMENT OF FACTS..................................................................................................3

I.  Deloitte's Long-Standing Relationship with SCANA ............................................3

II.  SCANA Undertakes the Largest Capital Project in Its History................................3

III. Deloitte Knew at Least as Early as the Fall of 2015 that the Nuclear Project Would Not Be
    Completed in Time to Receive the Nuclear Tax Credits.........................................4

    A.  The Nuclear Project Suffers Significant Delays from the Start ........................4

    B.  Internationally-Renown Bechtel Corporation Finds that the Nuclear Project is Being
        Poorly Managed and Will Not Be Completed in Time for the Nuclear Tax Credits..........5

    C.  The Nuclear Project Continues to Suffer from Cost Overruns and Schedule Delays.........7

    D.  Deloitte's Special Audits Make Further Clear that the Nuclear Project is Significantly
        Over Budget and Behind Schedule.......................................................8

IV. Deloitte Helps Conceal SCANA's Fraud from Investors......................................8

V.  The Fraud and Its Impact is Gradually Revealed...................................................9

    A.  Deloitte Helps SCANA Cover-Up the True Impact of Toshiba and Westinghouse's
        Financial Meltdown on the Nuclear Project ..................................................9

    B.  SCANA Abandons the Nuclear Project and Records $2.5 Billion in Impairment Losses 10

    C.  News Outlets Further Reveal the Extent of Defendants' Fraud, the Risks of the Fraud
        Materialize, and Criminal and Civil Investigations Commence .......................................10

    D.  Post-Class Period Developments......................................................................11

    E.  Deloitte's Knowledge of the Bechtel Reports First Becomes Public..............................11

LEGAL STANDARD..................................................................................................12

ARGUMENT............................................................................................................13

I.  Deloitte Acted with Scienter..........................................................................13

    A.  Legal Standards for Scienter .....................................................................13

    B.  Deloitte Knew of the Bechtel Engagement and Findings Before its 2015 Clean Audit
        Report .....................................................................................13

i

C.  Deloitte Knew Through Its Special Audits that the Nuclear Project was Above Budget and Behind Schedule .......................................................................................................20

D.  PCAOB Standards Obligated Deloitte to Obtain and Examine Information Which Further Demonstrated that SCANA's Public Disclosures Were Not in Accordance with GAAP.21

E.  Publicly Available Information Provided Further Red Flags of the Fraud......................25

F.  Additional Evidence of Deloitte's Scienter ...................................................................26

II.  Deloitte's Clean Audit Reports Were Materially False and Misleading ...............................29

A.  Legal Standards ...............................................................................................................29

B.  Deloitte's False Statements of Fact Are Actionable.......................................................30

C.  Deloitte's False Statements of Opinion Are Actionable.................................................37

III.  Plaintiff Adequately Pleads Loss Causation ........................................................................45

IV.  Plaintiff's Claims are Timely................................................................................................49

CONCLUSION..............................................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abramson v. Newlink Genetics Corp.*,
    965 F.3d 165 (2d Cir. 2020) ................................................................29

*In re Acterna Corp. Sec. Litig.*,
    378 F. Supp. 2d 561 (D. Md. 2005) ......................................................26

*In re Advanced Battery Technologies, Inc.*,
    781 F.3d 638 (2d Cir. 2015) ................................................................19

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002) ...........................................................28, 42

*In re Am. Serv. Grp., Inc.*,
    3:06-0323, 2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) .................42

*In re Ambrac Fin. Grp., Inc. Sec. Litig.*,
    693 F. Supp. 2d 241 (S.D.N.Y. 2010) ..................................................42

*Amorosa v. Ernst & Young LLP*,
    682 F. Supp. 2d 351 (S.D.N.Y. 2010) ..................................................48

*Anderson v. Simpson*,
    Civil Action No. 6:08-3034-GRA-WMC, 2009 U.S. Dist. LEXIS 68281
    (D.S.C. July 14, 2009) .........................................................................49

*Borough of Moosic v. Darwin Nat'l Assurance Co.*,
    556 F. App'x 92 (3d Cir. 2014) ...........................................................17

*Carlucci v. Han*,
    907 F. Supp. 2d 709 (E.D. Va. 2012) ..............................................46, 49

*In re Carter's, Inc. Sec. Litig.*,
    No. 1:08-CV-02940-AT, 2012 WL 3715241 (N.D. Ga. Aug. 28, 2012) ..............................34

*Chao Sun v. Daqing Han*,
    Civil Action No. 15-703 (JLL), 2015 U.S. Dist. LEXIS 170005 (D.N.J. Dec.
    21, 2015) .............................................................................................25

*City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prod. Co.*,
    827 F. Supp. 2d 559 (D.S.C. 2011) ......................................................47

*CMNY Capital, L.P. v. Deloitte & Touche*,
    821 F. Supp. 152 (S.D.N.Y. 1993) .......................................................15

*In re Comput. Scis. Corp. Sec. Litig.*,
    890 F. Supp. 2d 650 (E.D. Va. 2012)................................................................40

*Cosby v. KPMG, LLP*,
    No. 3:16-CV-121-TAV-DCP, 2018 U.S. Dist. LEXIS 130244 (E.D. Tenn.
    Aug. 2, 2018) .............................................................................................*passim*

*Dobina v. Weatherford International Ltd.*,
    909 F. Supp. 2d 228 (S.D.N.Y. 2012) ...............................................................19

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ..........................................................................................45

*Epstein v. World Acceptance Corp.*,
    203 F. Supp. 3d 655 (D.S.C. 2016)..............................................................*passim*

*Fidel v. Farley*,
    392 F.3d 220 (6th Cir. 2004) .............................................................................42

*Fresno County Emps.' Ret. Assn. v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017) ...............................................................35

*In re First Merchs. Acceptance Corp. Sec. Litig.*,
    No. 97 C 2715, 1998 U.S. Dist. LEXIS 17760 (N.D. Ill. Nov. 2, 1998).......................*passim*

*In re Fleming Cos. Sec. & Deriv. Litig.*,
    No. 5-03-MD-1530 (TJW), 2004 U.S. Dist. LEXIS 26488 (E.D. Tex. June 10,
    2004)..............................................................................................................17, 26

*In re Genworth Fin. Inc. Sec. Litig.*,
    103 F. Supp. 3d 759 (E.D. Va. 2015) ............................................................30, 31

*In re Global Brokerage, Inc.*,
    1:17-CV-00916-RA, 2019 WL 1428395 (S.D.N.Y. Mar. 28, 2019) .....................................42

*In re Global Crossing, Ltd. Sec. Litig.*,
    322 F. Supp. 2d 319 (S.D.N.Y. 2004) ..........................................................35, 42

*Gould v. Winstar Commc'ns, Inc.*,
    692 F.3d 148 (2d Cir. 2012) ..............................................................................38

*Hayes v. Crown Centr. Petroleum Corp.*,
    249 F. Supp. 2d 725 (E.D. Va. 2002), *aff'd in part, vacated in part*, 78 F.
    App'x 857 (4th Cir. 2003) .................................................................................29

*In re Henry Schein, Inc. Sec. Litig.*,
    18-CV-01428, 2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) .............................31

iv

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
  66 F. Supp. 2d 622 (E.D. Pa. 1999) ..................................................................31

*In re IMAX Sec. Litig.*,
  587 F. Supp. 2d 471 (S.D.N.Y. 2008) ...............................................................25

*In re Parmalat Sec. Litig.*,
  375 F. Supp. 2d 278, 288-89 (S.D.N.Y. 2005) ..................................................45

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
  432 F. Supp. 2d 571 (E.D. Va. 2006)........................................................... 19, 42

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
  No. 15-CV-02393, 2016 WL 3981236 (D.S.C. July 25, 2016) ...................... 12, 41

*Lattanzio v. Deloitte & Touche LLP*,
  476 F.3d 147 (2d Cir. 2007) .............................................................................48

*In re LDK Solar Sec. Litig.*,
  584 F. Supp. 2d 1230 (N.D. Cal. 2008).............................................................42

*Longman v. Food Lion, Inc.*,
  197 F.3d 675 (4th Cir. 1999) ............................................................................41

*Masterson v. Commonwealth Bankshares, Inc.*,
  2 F. Supp. 3d 824 (E.D. Va. 2014).....................................................................49

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*,
  576 F.3d 172 (4th Cir. 2009) ............................................................................13

*McIntire v. China MediaExpress Holdings, Inc.*,
  927 F. Supp. 2d 105 (S.D.N.Y. 2013) ...............................................................30

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000).............................................................28

*Merck & Co. Reynolds*,
  559 U.S. 633 (2010) .........................................................................................49

*MF Global Holdings Ltd. v. PricewaterhouseCoopers LLP*,
  232 F. Supp. 3d 558 (S.D.N.Y. 2017) ...............................................................36

*In re MGM Mirage Sec. Litig.*,
  No. 2:09-CV-01558-GMN, 2013 WL 5435832 (D. Nev. Sept. 26, 2013)............47

*In re MicroStrategy, Inc. Sec. Litig.*,
  115 F. Supp. 2d 620 (E.D. Va. 2000).........................................................*passim*

*Miller Inv. Tr. v. Morgan Stanley & Co., LLC*,
  308 F. Supp. 3d 411 (D. Mass. 2018) ............................................................. 32, 34

*N.M. State Inv. Council v. Ernst & Young LLP*,
  641 F.3d 1089 (9th Cir. 2011) ................................................................... *passim*

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
  367 F. Supp. 3d 16 (S.D.N.Y. 2019) .................................................................. 31

*Ollila v. Babcock & Wilson Enters., Inc.*,
  No. 3:17-cv-109, 2018 WL 792069 (W.D.N.C. Feb. 8, 2018) ....................................... 41, 44

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) ............................................................................. *passim*

*In re Oxford Health Plans, Inc. Sec. Litig.*,
  51 F. Supp. 2d 290 (S.D.N.Y. 1999) .................................................................. 22

*P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*,
  142 F. Supp. 2d 589 (D.N.J. 2001) .............................................................. 31, 33

*Reiger v. Price Waterhouse Coopers LLP*,
  117 F. Supp. 2d 1003 (S.D. Cal. 2000) ............................................................... 19

*In re Rent-Way Sec. Litig.*,
  209 F. Supp. 2d 493 (W.D. Pa. 2002) ................................................................. 33

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ......................................................................... 47

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
  351 F. Supp. 2d 334 (D. Md. 2004) ................................................................... 26

*Rudolph v. Arthur Andersen & Co.*,
  800 F.2d 1040 (11th Cir. 1986) ...................................................................... 38

*In re SCANA Corp. Sec. Litig.*,
  CV 3:17-2616-MBS, 2019 WL 1427443 (D.S.C. Mar. 29, 2019) ................................... *passim*

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) .......................................................................... 41

*In re Scottish Re Group Sec. Litig.*,
  524 F. Supp. 2d 370 (S.D.N.Y. 2007) ................................................................. 19

*SEC v. Merch. Capital, LLC*,
  483 F.3d 747 (11th Cir. 2007) ....................................................................... 47

*SEC v. SCANA Corp.*,
No. 3:20-cv-00882 (D.S.C. Feb. 27, 2020), ECF No. 1 .................................................. 11, 43

*SEC. v. True N. Fin. Corp.*,
909 F. Supp. 2d 1073 (D. Minn. 2012) ................................................................................39

*In re Signet Jewelers Ltd. Sec. Litig.*,
16 CIV. 6728 (CM), 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ....................................42

*Singer v. Reali*,
883 F.3d 425 (4th Cir. 2018) ...................................................................................... *passim*

*Sparling v. Daou (In re Daou Sys.)*,
411 F.3d 1006 (9th Cir. 2005) ............................................................................................28

*Spec. Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*,
243 F. Supp. 3d 1109 (E.D. Cal. 2017) ..............................................................................33

*In re Suprema Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006) ........................................................................................ *passim*

*Teachers' Ret. Sys. of LA v. Hunter*,
477 F.3d 162 (4th Cir. 2007) ..............................................................................................45

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ........................................................................................... 12, 13, 17

*In re Under Armour Sec. Litig.*,
Civil Action No. RBD-17-0388, 2020 U.S. Dist. LEXIS 11383 (D. Md. Jan.
22, 2020).............................................................................................................................27

*United States v. Arthur Young & Co.*,
465 U.S. 805 (1984) ...........................................................................................................38

*In re Washington Mut., Inc. Sec., Deriv. & ERISA Litig.*,
694 F. Supp. 2d 1192 (W.D. Wash. 2009) ................................................................... 30, 43

*In re WorldCom, Inc. Sec. Litig.*,
No. 02 CIV. 3288(DLC), 2003 WL 21488087 (S.D.N.Y. June 25, 2003)............................26

*Zayas v. Adcor Indus.*,
No. GJH-16-03193, 2017 U.S. Dist. LEXIS 157208 (D. Md. Sep. 26, 2017) ......................49

## STATUTES AND RULES

17 C.F.R. § 210.1-01(b) .........................................................................................................39

17 C.F.R. § 240.10b-5.............................................................................................................29

28 U.S.C. § 1658(b)(1)................................................................................................49

**OTHER AUTHORITIES**

Andrew Brown and Thad Moore, *Insight that would've alerted problems with nuclear project scrubbed from audit two years ago*, THE POST AND COURIER (Nov. 22, 2017) ...................................................................................................3

Andrew Brown and Thad Moore, *SCANA decided not to disclose critical review of SC nuclear project when auditor asked*, THE POST AND COURIER (Oct. 12, 2018)................................................................................................................12

## PRELIMINARY STATEMENT

After years of delay and budget overruns, SCANA was forced in 2015 by its partner, Santee Copper, to hire the Bechtel Corporation ("Bechtel") to evaluate the "current status and potential challenges" facing their $9 billion Nuclear Project. Consistent with the information reflected in dozens of internal SCANA reports, presentations, metrics, documents, and Deloitte's own Special Audits, Bechtel found that the Nuclear Project was years behind schedule and significantly over budget, with little chance that it could be completed in time to receive the $1.4 billion in Nuclear Tax Credits SCANA investors were promised. As this Court knows all too well, rather than disclose Bechtel's findings, SCANA buried them and continued to tell investors in its annual financial statements that the Nuclear Project was "expected to be operational and to qualify for the nuclear production tax credits." Each time, Deloitte—SCANA's purportedly independent auditor and critical gatekeeper—not only blessed these and other related representations as free from misstatement, but told investors that its blessing carried significant weight because its audits were conducted in accordance with governing standards.

In its motion to dismiss ("Mot."), Defendants do not dispute that Deloitte failed to comply with accounting standards when it told investors that it had done so. Further, faced with overwhelming contemporaneous documents and sworn testimony by a senior SCANA officer demonstrating that Deloitte was aware of Bechtel's findings prior to issuing its first Class Period clean audit report, Defendants also concede both that the Bechtel engagement was material to SCANA investors and that "Deloitte may have been aware of the [Bechtel] engagement."

Nevertheless, Deloitte argues it is not responsible for the significant harm suffered by investors when the truth about the Nuclear Project was finally revealed, offering a defense that is as stunning as it is incoherent. Deloitte first argues that, despite its knowledge of the Bechtel *engagement*, it was not aware of Bechtel's *findings*, claiming that the sworn deposition of former

SCANA Chief Financial Officer Jimmy Addison, in which he testified under oath that Deloitte had "reviewed all the disclosures *at the point in time that they were made*, and read [the Bechtel Report]," somehow does not sufficiently demonstrate at the motion to dismiss stage that Deloitte was aware of Bechtel's findings prior to issuing its first Class Period clean audit report. Then, Deloitte claims that, even if it did know about Bechtel's findings, because SCANA's "ability or inability to achieve the tax credits did not affect SCANA's financial statements," it was not responsible for those statements. However, auditing standards make abundantly clear that the notes to the financial statements—where these representations indisputably appeared—are part and parcel of the financial statements and are subject to audit. See, Deloitte says, nothing to see here— after all, what inference could be drawn from evidence showing that before Deloitte issued its clean bill of health for SCANA, Deloitte was aware of Bechtel's findings demonstrating the Company's "bet the family farm" strategy had almost assuredly resulted in SCANA losing the farm?

This Court, of course, has already answered that question, finding that SCANA's financial statements "misleadingly represented" that the Nuclear Project "would qualify for [the] Energy Policy Act." *In re SCANA Corp. Sec. Litig.*, CV 3:17-2616-MBS, 2019 WL 1427443, at *8 (D.S.C. Mar. 29, 2019) ("*SCANA I*"). Further, claiming, as Defendants (wrongly) do, that Deloitte's clean audit reports were exclusively "opinion statements," does not save Defendants either, as "any statements that could be construed as opinions are actionable because (1) Defendants could not have sincerely believed these opinions, given the Bechtel reports, monthly progress reports, and other internal correspondence that described deficiencies in the progress of the Project; and (2) Defendants omitted material facts showing that they lacked the basis for making those statements that a reasonable person would expect." *Id.* at *9.

As one South Carolina state representative explained: "This is a cover up. This is deception at its core. The bottom line is they lied to everyone and they did it intentionally."[1] Deloitte knew that SCANA lied. By telling investors that SCANA's statements were accurate and that it had conducted the required auditing procedures to assure that the Company was not lying, Deloitte either intentionally or recklessly misled investors.

## STATEMENT OF FACTS[2]

### I.    Deloitte's Long-Standing Relationship with SCANA

Deloitte served as SCANA's "independent auditor" for more than 70 years. ¶ 80. Deloitte also acted as a "feeder" to SCANA senior management, with many former Deloitte employees serving as senior officers, managers and Board members at SCANA during the Class Period. ¶ 81.

Deloitte was responsible for auditing SCANA's 2015 and 2016 financial statements included in the Company's Forms 10-K, and also for conducting interim reviews of SCANA's quarterly financial information presented in the SCANA's Quarterly Reports on Form 10-Q filed with the SEC during the Class Period. ¶ 83. Deloitte was paid nearly $10 million for its audit work for SCANA and SCE&G just for the years 2015, 2016, and 2017. ¶ 82. Deloitte was also retained by SCANA and Santee Cooper to conduct separate, regular "special audits" of the Nuclear Project's costs and schedule during the Class Period. ¶ 297.

### II.    SCANA Undertakes the Largest Capital Project in Its History

SCANA, a utility company engaged in electric and natural gas utility operations, and the

---

[1] Andrew Brown and Thad Moore, *Insight that would've alerted problems with nuclear project scrubbed from audit two years ago*, THE POST AND COURIER (Nov. 22, 2017), https://www.postandcourier.com/business/insight-that-wouldve-alerted-problems-with-nuclear-project-scrubbed-from-audit-two-years-ago/article_691272a4-cf0f-11e7-a289-bf59c8d8d969.html.

[2] All citations in the form "¶__" are to the Consolidated Complaint ("Complaint"). All capitalized terms and abbreviations are defined as in the Complaint unless otherwise noted. All alterations, citations, and internal quotation marks are omitted, and all emphasis is added, unless noted.

principal of SCE&G (¶ 34), jointly owned with Santee Cooper the original sole nuclear reactor on the V.C. Summer Site. *Id.* In 2006, SCE&G and Santee Cooper announced that they intended to build the Nuclear Project on the V.C. Summer Site. ¶¶ 36-37. The Nuclear Project was the largest capital project undertaken in SCANA's history. The total cost for the Nuclear Project was originally estimated at approximately $9.8 billion—more than two times SCANA's entire market capitalization at that time. ¶ 39. Westinghouse and Stone & Webster were hired to build the Nuclear Project, with Westinghouse as the lead contractor. ¶ 37. Under the terms of the contract, April 1, 2016 and January 1, 2019 were designated as the Guaranteed Substantial Completion Dates for the two units comprising the Nuclear Project, respectively. ¶ 38. Under these dates, the Nuclear Project was scheduled to be operational and producing power by the end of 2020, and thus qualify for the Nuclear Tax Credits under the Energy Policy Act enacted in 2005. ¶ 42. SCANA repeatedly told investors in its Forms 10-K, including in the financial statements, that the Nuclear Project was projected to qualify for Nuclear Tax Credits estimated to be "as much as" $1.4 billion in total over 8 years. *See, e.g.*, ¶¶ 278; 308; 357; 449; 455; 467.

III.  **Deloitte Knew at Least as Early as the Fall of 2015 that the Nuclear Project Would Not Be Completed in Time to Receive the Nuclear Tax Credits**

  A.  **The Nuclear Project Suffers Significant Delays from the Start**

Construction on the Nuclear Project began in 2013, and within months it was already significantly behind schedule. ¶ 116. Throughout 2013 and 2014, dozens of internal SCANA documents and metrics consistently made clear that the Nuclear Project was "in danger," that "missed deadlines put potentially unrecoverable stress on the milestone schedule," and that based on the Nuclear Project's historical date-to-date performance, it would take ***26.5 years*** to complete the Nuclear Project. ¶¶ 117-119, 120-131. By 2014, there was already substantial doubt throughout SCANA that the Nuclear Project could be completed at all; a former senior SCANA engineer later

4

testified that "the absurdity of finishing the project on schedule at the current rates of performance" was so obvious that "even Ray Charles could have seen it." ¶ 120.

By February 2015—2 years after construction began—only about 15% of the Nuclear Project was complete. ¶ 132. At that rate of progress, only about 30% of the Nuclear Project would be complete by July 2019. *Id.* Throughout 2015, internal SCANA documents and metrics consistently further demonstrated that: (i) the total costs for the Nuclear Project would substantially exceed public cost estimates; (ii) construction on the Nuclear Project was progressing roughly 0.33% per month, and would need to improve, immediately, to over *six times* the current rate in order to qualify for the Nuclear Tax Credits; (iii) SCANA and Santee Cooper had "no confidence in [Westinghouse's] ability to complete Unit 3 by the end of 2020 and suspect[ed] that production tax credits are in jeopardy for that unit"; and (iv) "Production Tax Credits are at risk"; "Financing Costs are at risk for increasing"; and "BLRA rate recovery is at risk." ¶¶ 133, 138-144. Under PCAOB Standards, Deloitte was required to review these documents and metrics, and to speak with those individuals knowledgeable about the Nuclear Project's status. ¶¶ 84-115.

### B. Internationally-Renown Bechtel Corporation Finds that the Nuclear Project is Being Poorly Managed and Will Not Be Completed in Time for the Nuclear Tax Credits

In 2015, after repeated urging from Santee Cooper, SCANA hired Bechtel to assess the Nuclear Project for $1 million. ¶ 159. Bechtel conducted an in-depth assessment of the Nuclear Project. ¶¶ 164-65. Bechtel provided regular updates to SCANA and Santee Cooper regarding the progress of its assessment, including weekly calls and reports (*id.*), and in October 2015, Bechtel presented its assessment to SCANA's and Santee Cooper's executive management (the "Bechtel Assessment"). ¶ 168. The Bechtel Assessment projected that, under a best-case scenario that its recommendations were implemented and the rate of construction was significantly improved from 0.5% to 3%, Unit 2 would not be in operation until "**18-26 months beyond the current June 2019**

5

commercial operation date" and Unit 3 would not be completed until "**24-32 months beyond the current June 2020 commercial operation date**." ¶¶ 169, 179. The Bechtel Assessment further found, among other things, that "[t]o-go scope quantities, installation rates, productivity, and staffing levels all point to completion later than current forecast," and "[t]he Consortium's forecasts for schedule durations, productivity, forecasted manhour peaks, and percent complete **are unrealistic**." ¶¶ 170, 172. These findings were then detailed in the 130-page First Bechtel Report, dated November 9, 2015, which again concluded that the completion dates of June 2019 and June 2020 were impossible to achieve. ¶¶ 176-78. It also stated that, among other things, "**the plans and schedules are not reflective of actual project circumstances**" and "[t]he oversight approach [to project management] taken by [SCANA and Santee Cooper] **does not allow for real-time, appropriate cost and schedule mitigation**." ¶¶ 180-81. Around February 5, 2016, Bechtel delivered the Second Bechtel Report, which again made clear that it would be impossible for the Nuclear Project to be completed by end of 2020. ¶¶ 184-85.

The Bechtel Assessment and Reports were discussed at multiple SCANA Board and Joint SCANA-Santee Cooper Board Meetings. ¶¶ 197, 204-08. However, SCANA rejected many of Bechtel's recommendations, including its recommendation to hire an independent EPC management firm to address the problems with the Nuclear Project. ¶ 203.

Deloitte was aware of both the Bechtel engagement and findings when they were issued. On October 3, 2018, Addison testified that Deloitte had "gone back with their local team and their national team and reviewed all the disclosures *at the point in time that they were made*, and read [the Bechtel report]." ¶ 275. Addison also stated that Deloitte did "not see any gaps in the disclosure at the time they were made." *Id.* Deloitte's knowledge of the Bechtel Reports was again confirmed in an email that month sent from SCANA Controller James Swan stating "FYI —

6

Deloitte will be asking about whether (or why not) we mention the Bechtel consulting engagement. . . . The initial thinking I believe is that we will not mention it. . . . Stay tuned" (the "Swan Email"). ¶¶ 306, 429. Further, Deloitte was obligated under PCAOB Standards to review the Board Minutes discussing the Bechtel reports and findings.

### C. The Nuclear Project Continues to Suffer from Cost Overruns and Schedule Delays

Around June 30, 2016, the Executive Director of the Office of Regulatory Staff of South Carolina ("ORS") sent a letter to SCANA stating that "**ORS has no confidence that Unit 3 can meet the Current Federal Production Tax Credit Deadline of December 31, 2020**. . . . This makes the validity of the current schedule highly suspect," and indicating that it wished to depose a Westinghouse representative regarding the Nuclear Project. ¶ 213. Under PCAOB Standards, Deloitte was required to review this regulatory correspondence. ¶ 438.

Shortly thereafter, in July 2016, SCANA established a Construction Oversight Review Board (the "CORB") to evaluate the Nuclear Project. ¶ 232. The CORB provided executive debriefs in August and November of 2016, and circulated reports in September and December of 2016. ¶¶ 232-38. The CORB reached many of the same conclusions as Bechtel. *Id.* However, SCANA also failed to implement the CORB's recommendations. ¶ 238. Under PCAOB Standards, Deloitte was required to review the CORB documents. ¶¶ 232, 438.

Throughout 2016, SCANA executives continued to receive reports, exchange correspondence, and hold meetings demonstrating that the Nuclear Project continued to suffer from significant and material delays and would be unable to meet the deadline necessary to receive the tax credits.[3] Under PCAOB Standards, Deloitte was also required to review these documents.

---

[3] *See, e.g.*, ¶¶ 220-21 (June 2016 reports recognizing that Bechtel had raised "valid concerns" with the construction schedule and indicating that the monthly construction progress rate remained at

*See, e.g.*, ¶¶ 121, 128, 129, 139, 152, 202, 204, 206, 207, 208, 220, 223, 248, 438. Nevertheless, SCANA continued to publicly insist that the Nuclear Project would be completed in time to qualify for the Nuclear Tax Credits, *see, e.g.*, ¶ 235, and Deloitte continued to tell investors that these representations were in accordance with GAAP.

### D. Deloitte's Special Audits Make Further Clear that the Nuclear Project is Significantly Over Budget and Behind Schedule

In its Special Audits throughout the Class Period, Deloitte tested the Nuclear Project's costs and schedule to determine whether they were presented fairly in accordance with GAAP. ¶ 297. Internal documents show that these Special Audits involved examination of "audit evidence about the amounts and disclosures in the [Nuclear Project] schedule." *Id.* These Special Audits demonstrated further to Deloitte that the Nuclear Project's costs were significantly over budget and that its construction was considerably behind schedule. *Id.*

## IV.    Deloitte Helps Conceal SCANA's Fraud from Investors

On February 26, 2016, SCANA filed its annual report on Form 10-K for the fiscal year 2015. The 2015 Form 10-K represented in the <u>financial statements</u> that "**[b]ased on the guaranteed substantial completion dates provided above [August 2019 and 2020], both New Units are expected to be operational and to qualify for the nuclear production tax credits**." Deloitte issued an unqualified, clean audit report to SCANA's 2015 Form 10-K, stating that it had conducted its audit "in accordance with the standards of the Public Company Accounting Oversight Board (United States)" and that SCANA's financial statements "present fairly, in all

---

0.5%); ¶¶ 226-27 ("New Nuclear Construction Update" presentation from SCANA's July 26, 2016 Board of Directors meeting, which highlighted the unreliability of the construction schedule and raised serious doubts about SCANA's ability to complete the expansion project in time to receive the production tax credits); ¶ 230 ("[S]chedule delays" and the receipt of "production tax credits" for the Nuclear Project were recognized as "key risk[s]" facing the company at the July 27, 2016 Risk Management Committee meeting).

material respects, the financial position" of SCANA "in conformity with accounting principles generally accepted in the United States." ¶¶ 441-454.

On February 24, 2017, SCANA filed its annual report on Form 10-K for the fiscal year 2016. The 2016 Form 10-K <u>financial statements</u> again represented that SCANA fully expected to complete the Nuclear Project in time to receive the $1.4 billion in tax credits: "**[b]ased on current tax law and the contractual guaranteed substantial completion dates (and the recently revised forecasted dates of completion) provided above [August 2019 and 2020], both New Units would be operational and would qualify for the nuclear production tax credits**." Deloitte issued another unqualified, clean audit report on these representations, stating that it had conducted its audit "in accordance with the standards of the Public Company Accounting Oversight Board (United States)" and that, SCANA's financial statements "present fairly, in all material respects, the financial position" of SCANA "in conformity with accounting principles generally accepted in the United States of America." ¶¶ 458-72.

## V.    The Fraud and Its Impact is Gradually Revealed[4]

### A.    Deloitte Helps SCANA Cover-Up the True Impact of Toshiba and Westinghouse's Financial Meltdown on the Nuclear Project

At least as early as June 2016, SCANA and Deloitte both knew that the parent company of Westinghouse, Toshiba, would likely file for bankruptcy, making it virtually impossible for the Nuclear Project to be completed on time. On June 20, 2016, SCANA and the Santee Cooper Board of Directors held a joint meeting to discuss the significant concern that Toshiba would declare bankruptcy. ¶ 255. Then, on December 26, 2016, Toshiba publicly announced an estimated impairment of several billion dollars due to cost overruns and missed deadlines for the Nuclear

---

[4] A chart of all of the alleged disclosures and concomitant stock drops is attached as Appendix A.

Project. ¶ 313. In February 2017, Toshiba quantified its impairment, stating that it would take a $6.3 billion write-down relating to the Nuclear Project, and further announced the possibility that it may sell all or part of its stake in Westinghouse. ¶ 315. Despite significant concern regarding how the Toshiba bankruptcy would impact the Nuclear Project, ¶¶ 251-262, both SCANA and Deloitte continued to reassure investors that the Nuclear Project would be completed in time to qualify for the Nuclear Tax Credits—information that both knew to be false. ¶ 317.

**B. SCANA Abandons the Nuclear Project and Records $2.5 Billion in Impairment Losses**

On July 31, 2017, SCANA announced it was abandoning the Nuclear Project due to "additional costs" necessary to complete the project and "uncertainty regarding the availability of production tax credits for the project." ¶ 344. It also attempted to blame the Westinghouse bankruptcy for its abandonment. ¶¶ 344, 350, 353. SCANA recorded impairment and related project losses totaling approximately $2.5 billion between the third quarter ended December 31, 2017 through December 31, 2018, and also announced its expectation that additional, related losses of approximately $1.3 billion would be incurred for the Nuclear Project. ¶¶ 407-411.

**C. News Outlets Further Reveal the Extent of Defendants' Fraud, the Risks of the Fraud Materialize, and Criminal and Civil Investigations Commence**

News outlets extensively reported on newly-uncovered information regarding the failure of the Nuclear Project. For example, news outlets disclosed for the first time that ORS had begun legal action regarding the abandoned Nuclear Project (¶ 360); that SCANA had engaged Bechtel to assess the Nuclear Project (¶ 364); that after obtaining the Bechtel Report, lawmakers said that "[n]o part of this construction and planning appears 'prudent' . . . the [Nuclear Project] was built to fail" (¶ 368); that the Nuclear Project, SCANA and others were the subject of numerous criminal and civil investigations (¶¶ 378, 382, 390); the Bechtel Report itself (¶ 401); and a whistleblower voicemail in which SCANA's former VP of Finance for Nuclear Construction said that SCANA

10

management had "broken every friggin' law you can break" and "[t]hey're doing it because they want to make money and they're propping up earnings to be able to make their bonuses." ¶ 422.

In total, as the news regarding the Nuclear Project fraud and its risks materialized, SCANA's stock price fell from a Class Period high of $76.12 per share on July 6, 2016, to $37.39 per share, a decline of more than 50%. ¶ 16.

### D. Post-Class Period Developments

On November 24, 2018, SCANA and SCE&G reached a $2 billion settlement in a consumer class action lawsuit alleging misconduct and mismanagement by SCANA regarding the Nuclear Project. ¶ 431. On February 27, 2020, the SEC filed a civil complaint against SCANA, Marsh, Byrne, and Dominion Energy alleging that SCANA's 2015 and 2016 Forms 10-K included "false and misleading statements regarding the [Nuclear Project] that had appeared in earlier filings," and "failed to disclose the true status of the expansion project." Complaint, *SEC v. SCANA Corp.*, No. 3:20-cv-00882 (D.S.C. Feb. 27, 2020), ECF No. 1 ¶¶ 213, 370.[5] On July 23, 2020, this Court approved a $192.5 million settlement to resolve class action claims alleging SCANA and its executives concealed from the public the construction delays and cost overruns within the Nuclear Project. ¶ 432; Order and Opinion Approving Settlement, *SCANA I*, ECF No. 238. Finally, on July 23, 2020, Byrne pled guilty to conspiracy to commit mail fraud and wire fraud. Information, *United States v. Byrne*, No. 3:20-cr-00335 (D.S.C. June 8, 2020), ECF No. 1 ¶ 1.

### E. Deloitte's Knowledge of the Bechtel Reports First Becomes Public

In October 2018, Addison's deposition transcript and the Swan Email became public, and

---

[5] Dominion has "reached an agreement in principle" to settle the SEC's claims against SCANA for a civil monetary penalty totaling $25 million, and disgorgement and prejudgment interest totaling $112.5 million. ¶ 434.

11

investors learned for the first time that Deloitte was aware of the Bechtel engagement, that it believed the Bechtel engagement to be material to SCANA investors, and that it had reviewed the Bechtel findings and report prior to issuing its clean audit opinions. ¶¶ 275, 292, 306, 428-30.[6]

## LEGAL STANDARD

"[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must . . . accept all factual allegations in the complaint as true" (*Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007)), and "liberally construe[] all reasonable inferences in the plaintiff's favor." *Epstein v. World Acceptance Corp*., 203 F. Supp. 3d 655, 662 (D.S.C. 2016). "Any attempt by the moving party to assert its own version of events should be disregarded." *Id*. at 670. A claim should only be dismissed if "it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *SCANA I* at *6.

To satisfy the heightened pleading standards of Rule 9(b) and the PSLRA, a plaintiff must allege "both the facts constituting the alleged violation, and the facts evidencing scienter." *KBC Asset Mgmt. NV v. 3D Sys. Corp*., No. 15-CV-02393, 2016 WL 3981236, at *2, 4 (D.S.C. July 25, 2016). A party must plead "with particularity the circumstances constituting the fraud or mistake . . . [including] 'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *SCANA I* at *5. Notably, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally" as "[t]he second sentence of Rule 9(b) allows conclusory allegations of the defendants' knowledge as to the true facts and of the defendants' intent to deceive." *Id*. Plaintiff meets these standards.

---

[6] *See also* Andrew Brown and Thad Moore, *SCANA decided not to disclose critical review of SC nuclear project when auditor asked*, THE POST AND COURIER (Oct. 12, 2018), https://www.postandcourier.com/business/scana-decided-not-to-disclose-critical-review-of-sc-nuclear-project-when-auditor-asked/article_41f8e652-cd84-11e8-b232-0b0f1c3de3a4.html.

**ARGUMENT**

## I.    Deloitte Acted with Scienter

### A.  Legal Standards for Scienter

Scienter allegations must "be evaluated 'holistically.'" *Epstein*, 203 F. Supp. 3d at 669. The Supreme Court directs courts to determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. If the inference of scienter is "at least as compelling" as any plausible opposing inference, the complaint must be sustained. *Id.* In the Fourth Circuit, "[p]leading recklessness is sufficient to satisfy the scienter requirement." *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009).

In auditor cases, a plaintiff can demonstrate scienter by alleging facts tending to show that "the accounting practices were so deficient that the audit amounted to no audit at all or that no reasonable accountant would have made the same decisions if confronted with the same facts." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 651 (E.D. Va. 2000). Deloitte's Class Period audits of SCANA "amounted to no audit at all." As explained below, Plaintiff adequately pleads that the information Deloitte had and was required to review under PCAOB Standards was irreconcilable with SCANA's representations that the Nuclear Project would complete in time to qualify for Nuclear Tax Credits, as well as with Deloitte's representations that it had conducted its audits in accordance with governing standards.

### B.  Deloitte Knew of the Bechtel Engagement and Findings Before its 2015 Clean Audit Report

Deloitte concedes, as it must, that it was aware at least as early as September 2015 (5

13

months before it issued its clean audit report on SCANA's 2015 financial statements), that SCANA had engaged Bechtel to conduct a comprehensive analysis regarding the "current status and potential challenges" facing the Nuclear Project. *See* Mot. at 14-15; ¶ 160. Indeed, it would be impossible for Deloitte to deny its knowledge, as the September 21, 2015 Swan Email makes clear that "Deloitte will be asking about whether (or why not) we mention the Bechtel consulting engagement […] in the next 10-Q," and Deloitte was responsible for auditing the costs associated with the Nuclear Project, which included the $1 million fee SCANA paid Bechtel for its assessment. *See* ¶¶ 159, 297, 306.[7]

Deloitte's knowledge of the Bechtel engagement alone is sufficient to plead its scienter.[8] Under PCAOB Standards, Deloitte was responsible for understanding "significant reports from external consultants hired, as well as internal reports, issued in connection with [the] Nuclear Project," including the Bechtel reports. ¶ 95.[9] Given its knowledge of the Bechtel engagement, it was also required under PCAOB Standards to determine whether Bechtel's findings conflicted with SCANA's representations regarding the Nuclear Project, especially given the importance of the Nuclear Project to SCANA and the materiality of the Bechtel engagement itself. ¶¶ 276-77,

---

[7] The hiring of Bechtel was not just the "mere hiring of an engineering consultant," as Defendants claim. Mot. at 31. On top of the fact that SCANA paid $1 million for Bechtel's assessment, the hiring was approved by the senior most officers of the Company (¶ 161), and the engagement was discussed at multiple Board and Joint Board meetings (¶¶ 197, 204-05), Bechtel is one of the world's most respected engineering, construction and project management companies, and was hired to assess one of the largest and most expensive construction projects in South Carolina history and a large and crucial part of SCANA's operations (¶¶ 2, 5).

[8] *Cf. SCANA I* at *9 (finding just the "contemplate[ion] of hiring of Bechtel to troubleshoot the project in early 2015" adequate to demonstrate "sufficient aware[ness] of the Project's deficiencies").

[9] *See also* ¶ 103 (discussing Deloitte's obligation to "collaborat[e] with construction specialists to assist in Deloitte's evaluation of SCANA's processes for on-going evaluation and monitoring of the construction schedule and cost forecast and to assess the disclosures of challenges to the achievement of such forecasts").

306. Accordingly, even if Deloitte did not obtain the Bechtel reports (which, as discussed below, it did), its knowledge of the Bechtel engagement and subsequent purported failure to "understand" any findings or reports it issued, to "collaborate" with Bechtel in order to understand the challenges to SCANA's budget and schedule forecasts, and to determine whether the Bechtel findings and report conflicted with management's representations, demonstrates that its audit "amounted to no audit at all." *See In re MicroStrategy,* 115 F. Supp. 2d at 656 (holding that allegations of "the existence of circumstances suggesting that [the auditor] was or should have been aware of [the company's] accounting practices," among other things, raised a strong inference that the auditor "intentionally or consciously participated in [the company's] alleged fraud, or that its conduct of its audits was so deficient that the audit amounted to no audit at all").[10]

But there is more. The evidence also shows that Deloitte reviewed and was aware of the Bechtel Reports and its findings prior to its audit of the Company's 2015 Form 10-K. Specifically, in October 2018, SCANA's former Chief Financial Officer Addison testified:

> Q.    You were signing your company's or certifying your company's SEC filings during the time of the Bechtel assessment, correct?
> A.    Correct.
> Q.    It doesn't disturb you at all that the company spent seven figures on assessment in 2015 regarding the status—regarding the project and you weren't made aware of the results of that assessment while you were

---

[10] *See also, e.g., N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089 (9th Cir. 2011) ("an equal inference that [the auditor] overlooked significant events without further questioning or investigation. . . . sufficiently pleads an audit so deficient that the audit amounted to no audit at all."); *In re First Merchs. Acceptance Corp. Sec. Litig.*, No. 97 C 2715, 1998 U.S. Dist. LEXIS 17760 (N.D. Ill. Nov. 2, 1998) ("[T]he allegations in the complaint, including the magnitude of the misstatements, the specific GAAP and GAAS violations and the red flags together support an inference that [the auditor's] audit amounted to no audit at all or an egregious refusal to see the obvious or investigate the doubtful."); *CMNY Capital, L.P. v. Deloitte & Touche*, 821 F. Supp. 152 (S.D.N.Y. 1993) (holding that the complaint "adequately states a claim that [the auditor] must have known of the danger" that, if proved, could support a finding of recklessness); *Cosby v. KPMG, LLP*, No. 3:16-CV-121-TAV-DCP, 2018 U.S. Dist. LEXIS 130244 (E.D. Tenn. Aug. 2, 2018) (allegations that the auditor failed to question a report from an independent consultant and the company's subsequent reliance on it, sufficient to demonstrate scienter).

certifying these SEC filings?

A.    It does not. **And part of that conclusion is we've got an international accounting firm that's auditing our records, that has gone back and looked at it completely and said the(y) did not see any gaps in our disclosures**.

Q.    **Is that Deloitte?**

A.    **Yes.**

Q.    You used to work there, right?

A.    I did about three decades ago.

Q.    So you trusted your accountants on that issue?

A.    **I have a great deal of confidence that they thoroughly vetted that issue especially with the political and regulatory ramifications of it.**

Q.    **Sitting here now, do you know that they did vet that issue?**

A.    **Yes.**

Q.    **How do you know that?**

A.    **They told me that.**

Q.    When?

A.    I don't know specifically when, sometime obviously post abandonment.

Q.    Did you have a conversation with them specifically about that issue?

A.    The conversation wasn't specific about that. It was conversation that—a topic that they offered in the middle of another—in the middle of another meeting.

Q.    What was the meeting about?

A.    A routine quarterly meeting where they meet with me before the financials are published.

Q.    And how do they bring up the Bechtel report?

A.    I don't remember the details of it.

Q.    What did they tell you about it?

A.    **That they had gone back with their local team and their national team and reviewed all the disclosures <u>at the point in time that they were made, and read this document</u>. They did not see any gaps in the disclosure <u>at the time they were made</u>.**

Q.    **And who from Deloitte told you that?**

A.    **The partner at Deloitte now, Sean Bird.**[11]

Defendants misleadingly claim that this testimony indicates that "Deloitte reviewed the Bechtel Materials *after* it issued the opinions and *after* the Nuclear Project was abandoned." Mot. at 29.[12] A simple reading shows Defendants' interpretation to be false. Addison specifically

---

[11] ¶ 275; Mot. Ex. C, Addison Dep. at 96:8-98:7 ("Addison Dep.").

[12] Defendants also claim that because, the plaintiffs in the related action against SCANA alleged that SCANA had claimed work product privilege to avoid disclosure of the Bechtel Report, it must

testifies in two separate places that Deloitte's engagement partner, Sean Bird, told him directly that Deloitte had "reviewed the disclosures *at the point in time that they were made*, and read this document [the Bechtel Report]" and "did not see any gaps in the disclosure *at the time they were made*." ¶ 275; Addison Dep. at 98:2-7. In addition, in response to a question asking whether Addison was disturbed that he "[wasn't] made aware of the results of the [Bechtel] assessment when [Addison] was certifying [SCANA'S] SEC filings," Addison stated that he was not because Deloitte audited SCANA's records and "said the(y) did not see any gaps in our disclosures" and thus, he "ha[d] a great deal of confidence" that Deloitte "thoroughly vetted" the status of the Nuclear Project. *Id.* at 96:12-97:5. The only logical interpretation of this statement is that Addison had "a great deal of confidence" in Deloitte at the time he was certifying SCANA's SEC filings. Regardless, even assuming *arguendo* that there is some ambiguity regarding Addison's testimony—which there is not—at the pleading stage, the ambiguity must be construed in Plaintiff's favor. *Tellabs,* 551 U.S. at 322.[13]

      Defendants' knowledge of the Bechtel findings further demonstrates that they acted with

---

not have received the Bechtel Report. Mot. at 13-14. However, besides being an irrelevant pleading to these proceedings (*Borough of Moosic v. Darwin Nat'l Assurance Co.*, 556 F. App'x 92, 95 (3d Cir. 2014)), those plaintiffs only alleged that SCANA claimed work product privilege with regard to *regulators*, not to its auditor. *See SCANA I*, ECF No. 1 at ¶ 31. There is no indication in that action or anywhere else that SCANA claimed privilege to prevent disclosure to Deloitte. Further, even if SCANA had claimed a privilege to prevent Deloitte from obtaining the Bechtel Reports, that alone would have been a significant red flag that should have prevented Deloitte from issuing clean audit opinions on the Company's financial statements. PCAOB AU § 508: *Reports on Audited Financial Statements*, ¶¶ 22-26 (2015 Audit); PCAOB AS § 3101, *The Auditor's Report on an Audit of Financial Statements When the Auditor Expresses an Unqualified Opinion.*

[13] The fact that "Plaintiffs cite no correspondence at the time of or following the issuance of the Bechtel materials that Deloitte was ever aware of Bechtel's findings" is irrelevant. Mot. at 30. Such documents would be in the exclusive possession of Deloitte and SCANA. "[T]he particularity rules should not be interpreted to require the pleading of facts which, because of the lack of discovery, are in defendants' exclusive possession." *In re Fleming Cos. Sec. & Deriv. Litig.*, No. 5-03-MD-1530 (TJW), 2004 U.S. Dist. LEXIS 26488, at *20-21 (E.D. Tex. June 10, 2004).

scienter. The Bechtel findings make clear that the Nuclear Project would be delayed for up to three years—long after the Nuclear Tax Credit deadline—and that "the plans and schedules are not reflective of actual project circumstances." *See* ¶¶ 5, 177-81. They are also highly critical of SCANA's internal control over the Nuclear Project—which Deloitte told investors was sufficient—stating that "[t]he Owners' organization lacks the appropriate personnel to provide the proper level of review and oversight required to drive the project to successful completion." *See id.* Deloitte's issuance of clean audit opinions on SCANA's financial statements after reviewing these findings—which indisputably and credibly contradicted management's representations in the financial statements and demonstrate that Deloitte did not adequately review the Company's internal controls over financial reporting—makes clear that Defendants acted with scienter. *SCANA I* at *11 (finding scienter based on "failure to disclose the Bechtel Reports and other information regarding the viability of the Project.").[14]

Despite this overwhelming evidence, Defendants claim that Plaintiff does not "plead[] specific allegations about when and how Deloitte obtained [the Bechtel Report and assessments]"

---

[14] *See also, e.g., Cosby*, 2018 U.S. Dist. LEXIS 130244, at *15 ("[P]laintiffs have alleged numerous red flags including, among others, GAAP, GAAS, and PCAOB violations as well as SEC investigations and public inquiries. . . . Because of the number of alleged red flags, and because defendant admits to knowing of several alleged red flags, plaintiffs have sufficiently pled scienter."); *N.M. State*, 641 F.3d at 1102 (finding scienter and noting that "[t]he Complaint is loaded with specific allegations of how and why [the auditor] should have investigated deficient or missing documentation. Even after being alerted to potential problems . . . [the auditor's] behavior, and perhaps more importantly, its unqualified audit opinions, did not change. These red flags further support a strong inference of scienter."); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 281 (3d Cir. 2006) ("In the face of the numerous and not insignificant alleged accounting violations, we cannot rule out, as a matter of law, a strong and reasonable inference of [the auditor's] scienter"); *Fleming*, No. 5-03-MD-1530 (TJW), 2004 U.S. Dist. LEXIS 26488, at *130 (finding that "the totality of the allegations of scienter in the [Complaint] sufficiently support a strong inference of scienter as to [the auditor]").

and "learned of a falsity in some statement it made." Mot. at 32 n.17.[15] Defendants are wrong.

Plaintiff alleges that Deloitte learned of the Bechtel engagement through its Special Audits and, as

reflected in the Swan Email, at least by September 21, 2015, and obtained the Bechtel findings and

report prior to issuing its clean audit report on SCANA's 2015 Form 10-K financial statements,

reviewing them "**at the point in time that [the SEC filings] were made**," as reflected in the

Addison testimony. ¶¶ 7, 275; Addison Dep. at 98:3.[16] This is more than enough at the pleading

stage. *See In re MicroStrategy*, 115 F. Supp. 2d at 651 (finding scienter against auditor PwC based

on, among other things, "PwC's 'unfettered access' to the [c]ompany's resources" and "PwC's

disregard of 'red flags' regarding improper revenue recognition issues").[17]

---

[15] While Defendants misleadingly truncate a crucial part of the quotation from *Iron Workers* in order to ignore that it is only giving an "example" of a way in which a plaintiff can establish scienter, Plaintiff pleads the requirements set forth in *Iron Workers. Compare Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 579 (E.D. Va. 2006) with Mot. at 32 n.17.

[16] Defendants' reliance on *In re Advanced Battery Technologies, Inc.*, 781 F.3d 638 (2d Cir. 2015), *Dobina v. Weatherford International Ltd.*, 909 F. Supp. 2d 228 (S.D.N.Y. 2012) and *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370 (S.D.N.Y. 2007) is misplaced. *See* Mot. at 26 n.15. In *Advanced Battery*, the relevant accounting standards did not require the auditor to review the foreign regulatory filings that would have revealed the purported fraud. In *Dobina*, the plaintiff failed to show "any meaningful contemporaneous knowledge" on the part of the auditor. 909 F. Supp. 2d at 256. And in *Scottish Re* the plaintiffs relied on the mere fact that there were "very junior people," on the engagement who did not possess the "adequate technical training and proficiency as an auditor." 524 F. Supp. 2d at 397. Defendants' reliance on *Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003, 1011 (S.D. Cal. 2000) (Mot. at 25-26) is similarly misplaced. Unlike here, in *Reiger*, the plaintiffs did not allege that the red flags "appeared in any document previously reviewed by [the auditor]," nor that "any member of [company] management, or any party, ever informed [the auditor]" of such red flags. In contrast, Plaintiff here specifically alleges that Deloitte obtained information which directly contradicted SCANA's public disclosures. *Id.* at 1009.

[17] *See also, e.g., Cosby*, 2018 U.S. Dist. LEXIS 130244 at *12-13 ("Plaintiffs in this case have satisfied the scienter requirement by pleading that the defendant deliberately ignored highly suspicious facts."); *N.M. State*, 641 F.3d 1089 at 1095 (finding scienter when plaintiffs alleged "specific points when [the auditor] was faced with circumstances that would compel a reasonable auditor to further investigate and disclose" the company's fraudulent activity); *In re Suprema*, 438 F.3d at 281 (finding scienter based on allegations that "reasonably suggest that [the auditor] either

### C. Deloitte Knew Through Its Special Audits that the Nuclear Project was Above Budget and Behind Schedule

In its "special audits" of the Nuclear Project, Deloitte learned that the Nuclear Project costs were significantly higher than budgeted, and completion was significantly behind schedule—information directly contradicting SCANA's disclosure that the Nuclear Project would be completed in time to receive the Nuclear Tax Credits. ¶¶ 297, 437.

Defendants argue in response that "[n]o agreement, rule, law, or regulatory guidance required Deloitte to audit whether SCANA was 'on track' for completing the Nuclear Project on schedule." Mot. at 33. This is wrong. Internal documents make clear that the special audits required Deloitte to obtain "audit evidence about the amounts and disclosures in the [Nuclear Project] schedule." ¶ 297. Further, Defendants concede that for the special audits, Deloitte was required to audit the costs of the Nuclear Project under BLRA guidelines—meaning that Deloitte was aware of the costs incurred for the Nuclear Project, as well as the bases underlying those costs. Mot. at 32. Thus, through the Special Audits Deloitte not only knew that SCANA was not "on track" to complete the Nuclear Project in time, but also "that the Nuclear Project costs were well in excess of budgets given the level of completion." ¶ 437. "[A]llegations of recklessness have been sufficient where defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *N.M. State*, 641 F.3d at 1098 (finding scienter when the auditor failed to investigate a suspicious option grant and instead "accepted management at its word, never received requested documentation, and issued an unqualified Opinion on the accuracy of [the company's] financial statements"). And while Defendants attempt to make much hay out of the PSC's "multiple prudency approvals of revised schedules and cost estimates," Mot. at 33, as

---

knew of, or willfully turned a blind eye to, the fraud.")

discussed below, PCAOB Standards required Deloitte to apply "professional skepticism" and "critical[ly] assess[] audit evidence" to determine whether the Company's representations to the PSC were accurate. *See infra* Section II.B.1.

### D. PCAOB Standards Obligated Deloitte to Obtain and Examine Information Which Further Demonstrated that SCANA's Public Disclosures Were Not in Accordance with GAAP

There was ample additional evidence known to Deloitte which further made clear that SCANA's financial statements were not in accordance with GAAP. As Defendants admit, under PCAOB Standards, Deloitte was required to plan and perform audit procedures sufficient "to obtain[] reasonable assurance that the financial statements in SCANA's Form 10-Ks were materially accurate." Mot. at 1. "Reasonable assurance" generally means a "high level" of assurance. ¶ 89. Deloitte was also required to apply due professional care and "professional skepticism" in its audits, ¶¶ 90-91, and to perform risk assessment procedures that were "sufficient to provide a reasonable basis for identifying and assessing" the risks of material misstatements in SCANA's financial statements. ¶ 92. This would include any misrepresentations made to regulators, including to the PSC, that would have implications for SCANA's financial statements. ¶ 93. In order to fulfill its PCAOB obligations, Deloitte was required to obtain and review an abundance of information that directly contradicted SCANA's public statements.[18]

Defendants contend that Plaintiff does not allege that "the full scope of information available . . . required a conclusion that SCANA's timetable was fraudulent." Mot. at 34. However, as set forth below, the Complaint alleges with particularity that Deloitte knew of specific

---

[18] Contrary to Defendants' claim (Mot. at 4-5), SCANA's Forms 10-Q are relevant for the purposes of Deloitte's scienter. Deloitte had an obligation under PCAOB standards to review SCANA's Forms 10-Q and once it became aware of materially false and/or misleading statements within the Forms 10-Q, to require SCANA management to correct those representations or withdraw as SCANA's auditor. *See* ¶¶ 11, 455-57. It did neither.

information and was presented with numerous additional glaring red flags, which demonstrated that the Company's representations were misleading. *See* ¶¶ 168-71, 438. *See also, e.g., N.M. State*, 641 F.3d at 1102 (finding scienter when "the [c]omplaint lists a number of red flags that arguably should have alerted [the auditor] to the [company's] wrongdoing and that [the auditor] would have had to purposely or recklessly overlook," including suspicious facts surrounding the grant dates, approval timing, and pricing of the options at issue.); *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 295 (S.D.N.Y. 1999) (allegations that "the financial statements did not and could not comply with GAAP; that [the auditor] violated GAAS in conducting the audit; and that many red flags existed that at least should have caused the auditor to investigate further before issuing its opinion, . . . g[ave] rise to a strong inference that when [the auditor] . . . issued its clean opinion, it recklessly disregarded or outright ignored the risk of falsity.").[19]

*First*, Deloitte was obligated to review SCANA Board and SCANA-Santee Cooper Joint Board minutes and presentations. ¶¶ 93, 204, 206, 226, 252, 255, 272, 438. Indeed, Deloitte has admitted in a similar context that it was even required to attend these meetings to evaluate and monitor construction status and identify costs and schedule challenges. ¶ 103. These materials make clear that from as early as March 2016, SCANA and Santee Cooper knew, among other things, that "schedule adherence [was] unrealistic," "[p]lans and schedules contain unreasonable assumptions and do not reflect actual project circumstances," "[t]he majority of project milestones [had] not [been] met on their scheduled dates," and that between October 2015 and February 2017 only 10% of the Nuclear Project was completed—thus making it obvious the Nuclear Project

---

[19] There is basis to, nor do Defendants provide any support for, the conclusion that "Deloitte considered the information in its audit and concluded a different disclosure in SCANA's 10-Ks was not warranted." *See* Mot. at 36-37.

would not be completed in time to receive the Nuclear Tax Credits. ¶¶ 10, 198, 228, 248, 438.

*Second*, Deloitte was required to obtain and review Risk Management Committee Meeting minutes and presentations. ¶¶ 95, 103, 272, 438. These materials make clear that SCANA identified "schedule delays" and the receipt of Nuclear Tax Credits as "key risk[s]" facing the Company that were "progressing in a manner that could be ultimately adverse to the accomplishment of SCANA's strategic plan," and thus SCANA's proclaimed completion dates and costs were unachievable. ¶¶ 152, 208, 230.

*Third*, Deloitte was required to review regulatory correspondence, in which the ORS stated that it had "no confidence" that the Nuclear Project could meet the Nuclear Tax Credit deadline, thus "mak[ing] the validity of the current schedule highly suspect." ¶¶ 213, 438. *See also* ¶ 100 (Deloitte admitting that it was required to review all relevant regulatory documents); ¶ 103 (same).

*Fourth*, Deloitte was required to obtain and review the CORB Report and presentations, which found, among other things, that "the [Nuclear Project] schedules include significant risks to achieve substantial completion"; there was a "growing backlog of constructability issues that are not getting the attention needed to not impact constructability"; and "[w]ithout improved metrics, it will be difficult to ensure the Project is and remains on track." ¶¶ 232-38, 438.

*Fifth*, Deloitte was required to obtain and review the historical date-to-date performance metrics, current rate of progress metrics, and overall performance factor metrics for the Nuclear Project—all of which consistently demonstrated that under the current rate of performance, the Nuclear Project would not be completed by the deadline. ¶¶ 128-33, 438.[20] Deloitte baldly asserts

---

[20] *See also* ¶ 103 (Deloitte admitting that it was required to "inquir[e] of management and project managers regarding the status of construction, the construction schedule, and cost forecasts to assess the financial statement disclosures with respect to project status and potential risks and uncertainties to the achievement of such forecasts").

that "[n]one of the 'progress' or 'performance' metrics could possibly constitute 'red flags.'" Mot. at 35 n.18. However, this Court has already held that knowledge "that the monthly progress rate at the Project never tipped 0.8%," meaning that "there was no material improvement in progress," is evidence of scienter, especially "when viewed in the context that the Project was the single most important component of SCANA's business." *SCANA I* at *11.

*Sixth*, Deloitte was required to speak to SCANA's partner on the project, Santee Cooper. ¶¶ 95, 103, 133, 138, 438. Santee Cooper believed as early as 2013 that the Nuclear Project was "in danger," and had issues which "place[d] the project schedule in jeopardy" and "place[d] the project's future in danger." ¶ 117. Santee Cooper also believed that "missed deadlines put potentially unrecoverable stress on the milestone schedule approved by the SC Public Service Commission," ¶ 118, and that "[t]he continued failure to meet schedule . . . has severely impacted credibility and has placed ongoing regulatory and financial support in jeopardy," ¶ 143. *See also* ¶¶ 146-50, 189, 192-200, 219, 222, 239-43, 245-48.

*Finally*, Deloitte was required to speak with key personnel involved with the Nuclear Project, including the Nuclear Project VP of Finance whistleblower who alleged that SCANA "h[ad] broken every friggin' law that you can break" and that they were "mismanaging [the Nuclear Project]" in order to "prop[] up earnings." ¶¶ 422-27, 438. *See also* ¶ 103 (Deloitte admitting that it was required to "inquir[e] of [SCANA and Santee Cooper management] . . . regarding . . . issues arising from project construction.").

All of this information demonstrated to Deloitte that the Nuclear Project would not be completed in time for the Nuclear Tax Credit deadline. In issuing its clean audit opinions, Deloitte thus ignored multiple and obvious red flags that "would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." *In re IMAX*

*Sec. Litig.*, 587 F. Supp. 2d 471, 483 (S.D.N.Y. 2008).[21] Deloitte either did obtain and/or review the above information, as was required under the applicable PCAOB standards—in which case there was further ample evidence that SCANA's statements in the financial statement notes were false and that its internal controls were deficient—or they did not, in which case Deloitte's representation that they conducted their audits in accordance with PCAOB standards was false.[22]

### E. Publicly Available Information Provided Further Red Flags of the Fraud

Deloitte was also aware, or should have been, of an abundance of public information regarding Toshiba's potential bankruptcy and its impact on the Nuclear Project. "[R]ed flags" consisting of "information that would have been available to the public" can be "'strong indicators' of auditor scienter." *Chao Sun v. Daqing Han*, Civil Action No. 15-703 (JLL), 2015 U.S. Dist. LEXIS 170005, at *52-53 (D.N.J. Dec. 21, 2015) (citing *In re Suprema*, 438 F.3d at 280). For example, Deloitte knew by December 2016 that Toshiba had announced an estimated impairment of several billion dollars due to cost overruns and missed deadlines for the Nuclear Project (¶ 313) and by February 2017, that Toshiba had announced that it would take a $6.3 billion write-down relating to the Nuclear Project, and the possibility that it might sell all or part of its stake in Westinghouse. ¶ 315. As recognized by analysts, this information showed that the Nuclear Project "may not be economically viable any longer." *Id.* Despite this information, Deloitte still issued an

---

[21] *See also In re MicroStrategy*, 115 F. Supp. 2d at 653 ("Many courts have held that allegations that an auditor ignored 'red flags' is probative of fraudulent intent or recklessness."); *Cosby*, 2018 U.S. Dist. LEXIS 130244, at *15 ("[P]laintiffs have alleged numerous red flags including, among others, GAAP, GAAS, and PCAOB violations as well as SEC investigations and public inquiries into [the audited company].").

[22] Defendants' argument, without citation, that Plaintiff does not allege "what Deloitte did or did not do upon allegedly learning of each 'red flag.'" (Mot. at 36) is baseless. There is no such requirement.

unqualified audit opinion on SCANA's 2016 Form 10-K. ¶¶ 458-72.

In addition, Deloitte was aware that SCANA petitioned the PSC for *nine* rate hikes, each time delaying the expected completion date for the Nuclear Project. ¶¶ 50-61. In these requests, SCANA represented that it would exercise close oversight over the Nuclear Project. The PSC, in approving each rate hike, relied on SCANA's representations, stating that it was essential that SCANA "prudently" manage the Nuclear Project. *Id. See also* ¶¶ 134-137. Defendants argue that "Deloitte would have no reason to disbelieve" the information that SCANA was presenting its regulators. Mot. at 34, 37. However, as further laid out below, under PCAOB Standards, Deloitte was required to apply due professional care and "professional skepticism," not simply accept SCANA's public representations wholesale. *See infra* Section II.B.1.

## F. Additional Evidence of Deloitte's Scienter[23]

The Complaint alleges voluminous additional information demonstrating Deloitte's

---

[23] Defendants also argue that Plaintiff's motive allegations (that Deloitte received more than $10 million over just three years from SCANA and had close personal relationships with SCANA management), are insufficient. Mot. at 38-39. However, courts routinely find that allegations tying motive to relationship and compensation benefits are sufficient to establish motive. *See, e.g.*, *In re MicroStrategy*, 115 F. Supp. 2d at 655-56 ("Moreover, that [the auditor] clearly would have received concrete benefits, through its partnership with [the audited company], . . . lends more weight to a stronger inference of scienter"); *In re Fleming*, 2004 WL 5278716, at *40 ("[A]llegations that D[eloitte] & T[ouche] had sufficient motive through its work as the company's consultant and receipt of consulting fees amounting to twice that of its auditing fees are sufficient to support an inference of scienter as well."); *In re WorldCom, Inc. Sec. Litig.*, No. 02 CIV. 3288(DLC), 2003 WL 21488087, at *4 (S.D.N.Y. June 25, 2003) (noting that "[the company] was the most valuable client for [the auditor's] branch office in Jackson, Mississippi"). Defendants' cases to the contrary are easily distinguishable. The *In re Royal Ahold* plaintiffs "d[id] not particularly state the extent to which the [auditor] defendants benefitted economically from any consulting or 'non-audit' work," and the court further noted that allegations including "substantial financial rewards" such as was found in *In re MicroStrategy* (and have been alleged here) would support a strong inference of scienter on the part of the defendant auditors. *See In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 390-91 (D. Md. 2004); ¶¶ 80-82. And *In re Acterna* applies exclusively to *executive* defendants. *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561 (D. Md. 2005).

scienter. *First*, Deloitte's unqualified audit opinion for SCANA's 2016 Form 10-K was issued just 5 months before SCANA announced it was abandoning the Nuclear Project. ¶ 440. While Defendants argue that the timing of SCANA's announcement cannot support a strong inference of scienter because Plaintiff does not allege that Deloitte knew that SCANA was going abandon the Nuclear Project, Mot. at 37, this argument is inapposite. SCANA abandoned the Nuclear Project for reasons that were well-known to Deloitte long before the abandonment occurred: because the Nuclear Project was "prohibitively expensive"; the Nuclear Project would not be completed in time to receive the Nuclear Tax Credits; and the Toshiba bankruptcy. *See* ¶ 440.

*Second*, the numerous ongoing criminal and civil investigations and litigation, including investigations by the DOJ, the South Carolina Attorney General, the FBI, and the SEC, are further evidence of Deloitte's scienter. *Id.* Plaintiff need not allege that Deloitte is "implicated in any criminal investigation or named in any civil action brought by any regulator." Mot. at 38. Courts regularly take into account relevant regulatory investigations when finding a "cogent and compelling" inference of scienter. *See, e.g.*, *In re Under Armour Sec. Litig.*, Civil Action No. RBD-17-0388, 2020 U.S. Dist. LEXIS 11383, at *23 (D. Md. Jan. 22, 2020). This is particularly true where, as here, the governmental investigations are ongoing and specifically request information pertaining to Deloitte's audits of SCANA. ¶¶ 15, 123 n.97, 440.

*Third*, the breadth of Deloitte's PCAOB violations are indicative of scienter." ¶ 440. Deloitte failed to conduct the most basic of audit functions throughout the Class Period. ¶¶ 265-311. *See Cosby*, 2018 U.S. Dist. LEXIS 130244, at *15 (finding the breadth of GAA, GAAS and PCAOB violations probative of scienter).[24]

---

[24] *See also N.M. State*, 641 F.3d at 1102 (noting that PCAOB standards "give strong guidance to auditors to dig deeper once there are questionable circumstances surrounding such material

*Fourth*, the simplicity of the GAAP standards implicated demonstrate Deloitte's scienter. "[I]f the GAAP rules and [the company's] accounting policies Defendants are alleged to have violated are relatively simple, it is more likely that the Defendants were aware of the violations and consciously or intentionally implemented or supported them, or were reckless in this regard." *In re MicroStrategy*, 115 F. Supp. 2d at 638. Contrary to Defendants' assertions, "[a]t the pleading stage, courts have recognized that allegations of GAAS violations, coupled with allegations that significant 'red flags' were ignored, can suffice to withstand a motion to dismiss." *In re Suprema*, 438 F.3d at 279.[25] Furthermore, the absence of a restatement (Mot. at 3, 21, 27-28) does not weaken Plaintiff's scienter allegations. *See Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("[T]he fact that the financial statements for the year in question were not restated does not end [the plaintiff's] case when he has otherwise met the pleading requirements of the PSLRA."). *See also* Section II.C.2, *infra*.

*Lastly*, Deloitte's failure to subject the Nuclear Project timeline to any meaningful scrutiny in light of the how critical the Nuclear Project and tax credits were to SCANA (¶¶ 39, 44) was, at the very least, extremely reckless. *See, e.g.*, *N.M. State*, 641 F.3d at 1099 ("[A]n auditor, in fulfilling duties of public trust, should take a long hard look at a transaction of $700 million, roughly a quarter of [the audited company's] reported revenue in 2006 of $2.5 billion.").[26]

---

transactions," and finding it "reasonable to infer scienter just as strongly as an innocent inference" when "[c]onsidering the number, magnitude, and multi-year financial impacts" of the material misstatement.).

[25] *See also In re MicroStrategy*, 115 F. Supp. 2d at 635 ("[S]pecific attributes of a GAAP violation may give rise to a stronger, or weaker, inference of scienter."); *Sparling v. Daou (In re Daou Sys.)*, 411 F.3d 1006, 1016 (9th Cir. 2005) ("Violations of GAAP standards can also provide evidence of scienter"); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000) ("When significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter. After all, books do not cook themselves.").

[26] *See also In re MicroStrategy*, 115 F. Supp. 2d at 653 ("It is simply the case that the importance

## II.    Deloitte's Clean Audit Reports Were Materially False and Misleading

### A.  Legal Standards

Statements can be "misleading[] because of both what was falsely said and what was deceptively omitted." *Singer v. Reali*, 883 F.3d 425, 439 (4th Cir. 2018). Specifically, Rule 10b-5 prohibits the (1) making of "any untrue statement of a material fact" and (2) omission of "'a material fact necessary in order to make [ ] statements made, in the light of the circumstances under which they were made, not misleading' in connection with the purchase or sale of any security." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 174 (2d Cir. 2020) (quoting 17 C.F.R. § 240.10b-5(b)). "The first part of this language unambiguously renders untrue statements of fact actionable." *Id.* Statements are "untrue" or misleading if "inconsistent" with "contemporaneous statements or information, created by, or made available to, the defendants." *Hayes v. Crown Centr. Petroleum Corp.*, 249 F. Supp. 2d 725, 732 (E.D. Va. 2002), *aff'd in part, vacated in part*, 78 F. App'x 857 (4th Cir. 2003). Or, "[i]f a reasonable investor, exercising due care, would gather a false impression from a statement, which would influence an investment decision." *Epstein*, 203 F. Supp. 3d at 666.

"[T]he second part of this language, which does not cabin 'statements' with the modifier 'of a material fact,' renders both statements of fact and those of opinion actionable when such statements would be misleading without the contextualization of material facts." *Abramson,* 2020 WL 3956263, at *5. "Opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Id*. For opinion statements to be actionable, the complaint

---

of this 'watershed' agreement to [the Company] and its enormous impact on the Company's financial status make it less likely that [the] auditors were unaware that revenue from this agreement was recognized before any contract existed between the parties.").

must plead "specific factual allegations that the speaker did not in fact hold the stated belief, or the supporting facts supplied by the speaker were untrue." *SCANA I* at *9. However, "it is not necessary for [the p]laintiff to prove absolute, incontrovertible falsity at the motion to dismiss stage." *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 771 (E.D. Va. 2015). Rather, "[i]t is enough for the plaintiff to simply allege 'sufficient facts to support a reasonable belief in the allegation that the defendant's statement was misleading.'" *Epstein*, 203 F. Supp. 3d at 666. Deloitte's clean audit reports violated both prongs of 10b-5.

### B. Deloitte's False Statements of Fact Are Actionable

1. <u>Deloitte's Statements of Compliance with PCAOB Standards are False Statements of Fact, Not Opinion</u>

In its Class Period clean audit reports, Deloitte stated: "We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)." ¶¶ 443, 450. These statements were false and Deloitte does not suggest otherwise. Indeed, Deloitte mounts *no defense* that its audit followed PCAOB standards, nor does Deloitte even hint that Plaintiff failed to adequately allege that Deloitte's audits did not. Instead, Deloitte rests exclusively on its assertion that its statement of compliance with PCAOB Standards is a "statement of opinion" rather than a statement of fact. But this is incorrect.

As courts consistently recognize, this certification of compliance "is a verifiable factual statement." *In re Washington Mut., Inc. Sec., Deriv. & ERISA Litig.*, 694 F. Supp. 2d 1192, 1224 (W.D. Wash. 2009) ("[w]hether or not Deloitte employed the PCAOB standards is a verifiable factual statement that is material to those relying on its certification of [the company's] internal controls.").[27] Unlike the other statements in Deloitte's audit opinions, which are qualified by terms

---

[27] *See also, e.g., Cosby*, 2018 WL 3723712 at *8 (finding auditor's statement of compliance with GAAP and GAAS to be a false statement)*; McIntire v. China MediaExpress Holdings, Inc.*, 927

like "we believe" and "opinion," Deloitte's statements of compliance with PCAOB standards were unequivocal and unqualified. *In re Genworth*, 103 F. Supp. 3d at 779 (statements were not "opinions" under *Omnicare* because they "do not contain the words 'believe' or 'think,' but instead suggest a greater sense of certainty") (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 180 (2015)).[28]  Deloitte acknowledges as much, noting that the PCAOB standards draw a distinction between the audit *opinion* that the financial statements are consistent with GAAP and the auditors certification of compliance with PCAOB Standards. *See* Mot. at 18 ("Whether the auditor expresses or disclaims an opinion, "*[i]n either case, he states whether his audit has been made in accordance with the standards of the PCAOB.*") (quoting AS § 10001.01).

Deloitte nonetheless claims that its certifications of compliance with PCAOB Standards is a statement of opinion because application of the PCAOB Standards requires an "exercise [of] judgment." *Id.* (quoting AS § 1001.05). But *Omnicare* rejected this very argument, distinguishing a company's statement that "we believe we are following the law" from a statement that "'we in

---

F. Supp. 2d 105, 134 (S.D.N.Y. 2013) (finding audit report was false or materially misleading because plaintiffs adequately alleged auditor "did not conduct its audit for the [company's audit report] in accordance with the standards of the [PCAOB]"); *In re Ikon Office Solutions, Inc. Sec. Litig.,* 66 F. Supp. 2d 622, 633 (E.D. Pa. 1999) (plaintiff sufficiently identified "the offending financial practices and explain[ed] how those practices violated GAAP and/or GAAS"); *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 610 (D.N.J. 2001) (GAAP and GAAS allegations sufficiently particularized auditor's false statements).

[28] *See also In re Henry Schein, Inc. Sec. Litig.,* 18-CV-01428, 2019 WL 8638851, at *13 (E.D.N.Y. Sept. 27, 2019) (explaining that even statements ordinarily deemed conclusory are not opinions when they "do not reflect the judgment of the speaker or the speaker's expectations for the future and were not qualified by phrases such as 'I think' or 'I believe'"); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.,* 367 F. Supp. 3d 16, 32 (S.D.N.Y. 2019) (finding that the defendants' "characterization of the statements as mere opinions strains credulity" in part because "there was very little equivocation in Defendants' statements").

fact are following the law'—which is 'materially false,' no matter what the issuer thinks." *Omnicare*, 575 U.S. at 183. Indeed, in the wake of *Omnicare,* courts routinely reject Deloitte's argument that the "exercise of judgment" compels classification of such statements as opinions. After all, "the auditor itself is the one tasked with complying with the standards," so "the statement that an auditor has so complied in conducting its audit is best understood as one of fact." *Miller Inv. Tr. v. Morgan Stanley & Co., LLC*, 308 F. Supp. 3d 411, 430 (D. Mass. 2018).[29] To be sure, "one auditor may apply the standards differently from another," but as even Deloitte's own cases recognize, "there is sufficient uniformity that a fact-finder may assess compliance using a reasonable person standard, asking 'whether a reasonable auditor *would* have taken such steps under the circumstances.'" *Id.* at 431.[30]

In addition to being statements of fact, Deloitte's statements were also false, because its audit did not—as even Deloitte concedes—comply with PCAOB standards. *First,* under PCAOB standards, Deloitte was required to "plan and perform audit procedures to obtain sufficient appropriate audit evidence to provide a reasonable basis" for its audit report during the 2015 and 2016 audits. ¶¶ 87-89, 107. *See* AU § 110.02 (2015 Audit); AS § 1001.02 (2016 Audit). Deloitte failed to plan and perform required audit procedures in response to (1) the risk of material misstatement relating to SCANA's capitalized construction work in progress, including amounts capitalized in connection with the Nuclear Project, and (2) the risk that SCANA's disclosed rate

---

[29] Unlike in *Miller*, Plaintiff here does not simply allege "classic should have, had they, must have" allegations (*id.* at 437), untethered and inapplicable PCAOB standards (*id.* at 439-40) and insignificant red flags (*id.*). Rather, as set forth in Section I.B-E, Plaintiff allege through documents and testimony that Deloitte knew that SCANA's representations were false and admissions from Deloitte itself of applicable PCAOB requirement it failed to conduct, coupled with numerous, significant red flags.

[30] And, even if these statements were "opinions" (which they are not) they are still actionable for the same reasons set forth in Section II.C below.

32

revisions, estimated project costs and related unit completion schedules were unsupported or otherwise materially misstated. ¶¶ 285-298, 444. Deloitte does not suggest otherwise.

*Second,* Deloitte was required to understand SCANA's business and identify and respond to risks of material misstatements affecting SCANA's financial statements. ¶¶ 92-106. Because the audit included the Company's statements regarding the completion timeline for the Nuclear Project and eligibility for the tax credits, this requirement necessarily included obtaining reasonable assurance that the Company was "on track" with completing the Nuclear Project such that the Company would be eligible for the tax credits. Far from having such reasonable assurances, Deloitte had ample evidence that the Company's statements regarding completion of the Nuclear Project were false. ¶¶ 88-91, 269-284, 444.[31] *See Spec. Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, 243 F. Supp. 3d 1109, 1120-21 (E.D. Cal. 2017) (holding plaintiff alleged material misstatement in stating outside auditor's audit comported with PCAOB standards where plaintiff alleged that the auditor EY "failed to adequately gain an understanding of [the company's] sales contracts because EY only relied on [an executive at the company] to confirm the terms of [the company's] contracts."). Deloitte also mounts no defense on this score.

*Third,* Deloitte failed to properly assess the risk that a material weakness existed in SCANA's internal controls over financial reporting. *See* AS § 2201; ¶¶ 114-15, 299-307, 444; *Miller*, 308 F. Supp. 3d at 435 (finding plaintiff adequately pled that auditor's "internal control

---

[31] *See In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 507 (W.D. Pa. 2002) (Auditor's alleged failure to obtain adequate detail and documentation and to expand its audit procedures alleged GAAS violations); *P. Schoenfeld*, 142 F.Supp.2d at 606-08 ("The complaint asserts that [the auditor] failed to obtain sufficient competent evidential matter to form a basis for its unqualified reports . . . Plaintiffs charge that [the auditor] failed to obtain direct evidence in connection with [the audited company's] recording of revenue and elimination or reduction of expenses as a result of write offs of merger reserves. Instead, [the auditor] relied largely on management's representations . . . when combined with other circumstances suggesting fraudulent intent, allegations of improper accounting may support a strong inference of scienter.").

audit report omitted a material weakness that was known to it at the time, and that required specific disclosure under AS No. 5.91"). Deloitte again concedes this point.

*Finally,* the magnitude of the fraud can by itself "give rise to a strong inference" that the auditor did not follow PCAOB Standards. *In re Carter's, Inc. Sec. Litig.*, No. 1:08-CV-02940-AT, 2012 WL 3715241, at *2 (N.D. Ga. Aug. 28, 2012); *In re MicroStrategy*, 115 F. Supp. 2d at 652. Here, the Nuclear Project was "one of the largest and most expensive construction projects in South Carolina history" and a "bet the farm" proposition for SCANA. ¶¶ 2, 40.

Thus, Plaintiff adequately alleges that Deloitte's audits fell far short of PCAOB Standards. This is sufficient at the pleading stage to demonstrate that Deloitte's statements that it conducted its audits "in accordance with the standards of the [PCAOB]" were false and misleading when made. *See In re Suprema,* 438 F.3d at 279 ("At the pleading stage, courts have recognized that allegations of GAAS violations, coupled with allegations that significant 'red flags' were ignored, can suffice to withstand a motion to dismiss.").

Deloitte offers only one half-hearted (and meritless) defense, asserting that Plaintiff did not "identify any line items in any of the financial statements that were misstated," which it asserts is "unsurprising" because the "BLRA and accounting standards—*e.g.*, ASC 980—dictated the accounting treatment for the Nuclear Project" and this "had been repeatedly deemed prudent by the PSC." Mot. at 20. This assertion is as stunning as it is false. As set forth below, *see infra* Section II.C.1, there is no requirement that a specific "line item" in the financial statement be misstated in order for the financial statements to be false and misleading. It is more than sufficient for the notes to the financial statements to be false and misleading, as they were here.

Nor may Deloitte rely on the findings of PSC. *See* Mot. at 33, 36, 37. After all, "[i]t is of utmost importance to the profession that the general public maintain confidence in the

34

independence of independent auditors." AS § 1005.03. Indeed, Deloitte was required under PCAOB Standards to determine whether the Company's representations to regulators like the PSC were accurate—not simply take them as gospel. ¶ 91; 32 n.30-33 (citing PCAOB Standards). And, regardless, contrary to Defendants' contention (Mot. at 11), Deloitte had ample evidence that the Company's representations to the PSC were false. ¶¶ 116-264. Further, the PSC has made clear that the accounting treatment for the Nuclear Project was, in fact, not prudent. Although the PSC made prudence determinations when it initially granted the Company's petitions for nine rate hikes, eight of the nine rate hikes occurred before mid-2015 (¶ 61), and, as the PSC held last year, they were only made "[d]ue to the lack of transparency – the lack of forthrightness – with regard to reports and studies available to the Company," in which "the Company acted imprudently by not disclosing material, and even potentially decisive, information to ORS and the Commission," and had "effectively denied [the PSC] the opportunity to fully consider the prudence of continuing to expend resources on the project with all information available at the time." PSCSC Comm'n Dir. at 1, Docket No. 2017-207-E /2017-305-E2017-370-E (Jan. 14, 2019). Indeed, now having the benefit of that information—which, Deloitte had at the time—the PSC concluded that "[u]nder any definition of the term prudence, the Company was imprudent in its actions in this case with regard to costs incurred after March 12, 2015." *Id.*

Deloitte's argument also misunderstands the import of the fact that the Company's financial statements do not comport to GAAP. "This case is not about complex accounting judgments over which reasonable minds can differ." *Fresno County Emps.' Ret. Assn. v. comScore, Inc.*, 268 F. Supp. 3d 526, 546 (S.D.N.Y. 2017) (distinguishing cases where plaintiffs alleged defendant-company "applied its methodologies incorrectly" from cases where the defendant-

company "bypassed a methodology or metric" altogether).[32] Rather, it is about specific false and

misleading representations regarding the availability of the Nuclear Tax Credits and when the

Nuclear Project would be complete, neither of which are complex determinations, particularly

where—as here—all available evidence made clear that the Nuclear Project would not be complete

until years after the tax credits were no longer available. ¶¶ 116-264.

       2.  <u>Deloitte's Internal Control Statements are False Statements of Fact, Not Opinion</u>

Deloitte's unqualified statements that its "audit[s] included obtaining an understanding of

internal control over financial reporting, assessing the risk that a material weakness exists, testing

and evaluating the design and operating effectiveness of internal control based on the assessed

risk, and performing such other procedures as we considered necessary in the circumstances" (¶¶

444, 461), were similarly false and misleading when made. Indeed, as Deloitte has admitted in the

context of a similar audit, it should have "identified as a critical audit matter the evaluation of these

disclosures which involved significant audit effort requiring specialized industry and construction

expertise, extensive knowledge of rate regulation, and difficult and subjective judgments." ¶ 103.[33]

---

[32] *See also In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 339-40 (S.D.N.Y. 2004) (stating that the question was not whether the company's accounting "was arguably consistent with the terms of certain specific accounting standard, because that would not insulate them or their accountants as a matter of law from liability under the securities laws, because under both GAAP and the securities laws, business entities and their accountants are required to provide whatever additional information would be necessary to make the statements in their financial reports fair and accurate, and not misleading.").

[33] Deloitte argues that its admissions in a nearly identical audit regarding the necessary audit procedures required by PCAOB standards are "wholly irrelevant to, and cannot support, Plaintiffs' claim." Mot. at 7 n.7. But these admissions are clearly relevant, both because the standards applicable in both audits were identical (¶ 97 n.45) and because they show Deloitte's views as to the relevant standard of care and required conduct in similar and comparable audits. *MF Global Holdings Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 580 (S.D.N.Y. 2017) (holding that while auditor's internal guidance on did not "establish the standard of care," it was relevant to show how auditor "conducted its audits" of the company, "provide[d] important context" for the audit at issue, and "are relied upon by regulatory bodies to evaluate [the auditor's] work.").

Thus, Deloitte should have tested the effectiveness of internal controls over the ongoing evaluation and monitoring of the construction schedule and cost forecasts for the Nuclear Project (¶¶ 103, 105, 286; *see* AS § 2201.06-.07), including testing SCANA's monitoring and supervising over the construction of the Nuclear Project, its evaluation and monitoring of the construction schedule and capital cost forecast, and the potential reduction in rates or recovery of rates. ¶¶ 286, 302. But as Deloitte now concedes, Deloitte at least was "aware of the engagement" with Bechtel, but either did not monitor the Bechtel engagement, as it was required to do, or *did* do so but ignored Bechtel's findings. In either case, Deloitte failed to "obtain[] an understanding of internal control over financial reporting," and, thus, its statement that it did so was false.

### C. Deloitte's False Statements of Opinion Are Actionable

1. The Company's Statements Regarding the Nuclear Tax Credits and Completion Date were Not in Accordance with GAAP

In *SCANA I,* this Court held that the plaintiffs sufficiently plead that SCANA's financial statements in its 2015 and 2016 Forms 10-K were false and materially misleading because they "misrepresented SCANA's ability to complete the [Nuclear] Project by the end of 2020" and "misleadingly represented that the GSCDs for Unit 2 and Unit 3 reflected the actual completion dates, such that SCANA would qualify for Energy Policy Act tax credits." *SCANA I* at *7. Specifically, this Court found the following statements false and misleading:

- "These nuclear production tax credits (related to SCE&G's 55% share of both New Units) could total as much as approximately $1.4 billion." *SCANA I*, Ex. A; ¶¶ 43, 278 (2015 and 2016 10-Ks).

- "Based on the guaranteed substantial completion dates provided above, both New Units are expected to be operational and to qualify for the nuclear production tax credits, however, further delays in the schedule or changes in tax law impact such conclusions." *SCANA I*, Ex. A; ¶¶ 8, 190, 278 (2015 10-K).

- "Based on current tax law and the contractual guaranteed substantial completion dates (and the recently revised forecasted dates of completion) provided above, both New Units would

be operational and would qualify for the nuclear production tax credits." *SCANA I*, Ex. A; ¶¶ 263, 278, 325 (2016 10-K).

Deloitte issued unqualified and clean audit reports on these statements, stating that SCANA's and SCE&G's financial statements "present fairly, in all material respects, the financial position" of the Company "in conformity with accounting principles generally accepted in the United States of America." ¶¶ 442-43, 459-460.[34] Thus, contrary to Deloitte's suggestion that it "never made any statement, of any kind, about the nuclear project, the progress of construction or their completion," Mot. at 7, Deloitte's audit reports told investors that the Company's representations regarding the availability of the Nuclear Project Tax credits and the Nuclear Project's completion dates—the very same statements this Court has already found were false and misleading—were accurate and in compliance with GAAP.[35]

Deloitte nonetheless insists that because "the tax credits were never earned and never recorded in SCANA's financial statements," they "had no applicability or effect on the Deloitte opinions," and, regardless, that "if these tax credits had ever been earned, they would have been passed through only to SCANA's ratepayers—not, as Plaintiffs allege, to its investors." Mot. at 22. All of these claims are false.

---

[34] A chart comparing the statements sustained in *SCANA I* and the statements at issue in this case is attached as Appendix B.

[35] Much as Deloitte seeks to paint itself as playing a "limited role," Mot. at 4, its unqualified blessing of the Company's representations is no small issue. An accounting firm, especially one of the "Big Four" such as Deloitte, "knows well that its opinions and certifications are afforded great weight, and it must have known that its financial certifications with regard to [its client] would be compelling to the investors." *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 158 (2d Cir. 2012). Indeed, courts have recognized that an auditor assumes a "special relationship of trust vis-à-vis the public," *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1044 (11th Cir. 1986), and as a "public watchdog," "[t]he independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to [the] investing public." *United States v. Arthur Young & Co.*, 465 U.S. 805, 817-18 (1984).

*First,* the financial statements were replete with references to the availability of the tax credits and the Nuclear Project's completion date and their importance to the Company's financial condition. *See, e.g.,* ¶¶ 8, 43. 190, 263, 278, 325. Deloitte hangs its hat on the fact that these statements were in the "notes to the financial statements," claiming that an "auditor's responsibility with respect to information in a document does not extend beyond the financial information identified in his report." Mot. at 6 n.6, 13. But it is well-settled that an auditor's responsibility under PCAOB Standards applies to the notes to the financial statements and that the notes are part and parcel of the financial statements themselves. ¶ 68 (citing Regulation S-X Rule 1-01(b), 17 C.F.R. § 210.1-01(b) ("The term financial statements as used in this part shall be deemed to include all notes to the statements and all related schedules.")); *see also* AU 508.21 ("[A]ccompanying notes are part of the financial statements[.]").[36] As the Complaint demonstrates, citing to PCAOB Standards, Deloitte was required to audit and evaluate whether the notes to the financial statements are in accordance with GAAP. ¶ 68.[37] Indeed, Deloitte itself has admitted that "accounting for the

---

[36] Defendants' reliance on AS 2710.04 (Mot. at 6) is a red herring. As discussed above, *see supra* Section II.B.1, the "financial information" that the auditor must consider in AS 2710.05, includes the notes to the financial statements. Further, Deloitte omits the rest of AS 2710.04, which explains that auditor must also "read the other information and consider whether such information, or the manner of its presentation, is materially inconsistent with information, or the manner of its presentation, appearing in the financial statements." AS 2710.04. And "[i]f the auditor concludes that there is a material inconsistency, he should determine whether the financial statements, his report, or both require revision" and "[i]f the other information is not revised to eliminate the material inconsistency, he should communicate the material inconsistency to the audit committee and consider other actions, such as revising his report to include an explanatory paragraph, including an appropriate title, describing the material inconsistency, withholding the use of his report in the document, and withdrawing from the engagement." *Id.*; *see also* AS 2710.05.

[37] *See also, e.g.*, AS 3101.08 (explaining that an audit report must include "[a] statement indicating that the financial statements, *including the related notes* . . . , identified and collectively referred to in the report as the financial statements, were audited"); *SEC. v. True N. Fin. Corp.*, 909 F. Supp. 2d 1073, 1103 (D. Minn. 2012) (denying defendant's motion for summary judgment because "a reasonable jury could conclude that" statements in notes to financial statements were "materially misleading").

economics of rate regulation" impacts both "financial statement line items *and disclosures*." ¶ 98 (citing Deloitte Audit Report, Southern Company, dated Feb. 19, 2020, at 2); *see also* AS 2110 (referring to notes to financial statements as "disclosures"). And Deloitte's own audit reports for SCANA's 2015 and 2016 Forms 10-K state that an audit "evaluat[es] *the overall financial statement presentation*" and thus "such financial statement schedule, when considered in relation to the basic consolidated financial statements *taken as a whole*, presents fairly, in all material respects, the information set forth therein." ¶¶ 443, 460.

*Second,* as this Court has explained, "the [Nuclear] Project was the single most important component of SCANA's business" and the Company "received nearly $500 million in extra revenue per year from SCE&G customers as an advance on project costs." *SCANA I* at *11. Thus, far from simply being "passed through only to SCANA's ratepayers," the Nuclear Tax Credits were part and parcel of the Company's balance sheets, statements of income, and statements of cash flows. Indeed, the Company's revenue and income were contingent on rate increases authorized by the South Carolina PSC, which were permitted only on the expectation that the Company could complete the Nuclear Project in time to receive the Nuclear Tax Credits. *See, e.g.,* ¶¶ 2, 11, 44, 47, 50-61. SCANA's deficient oversight over the Nuclear Project threatened SCANA's ability to recover the Project's high costs under the BLRA. ¶¶ 45-49.

Moreover, as this Court has already held, the tax credits were important to investors because they "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available during the period prior to abandonment of the Project." *SCANA I* at *9.[38] See In re Comput. Scis. Corp. Sec. Litig.*, 890 F. Supp. 2d 650, 669 (E.D. Va.

---

[38] Notably, aside from this passing mention of materiality, Deloitte does not argue, because it cannot, that its statements or omissions were immaterial.

2012) ("[A] reasonable investor would surely have considered it important that [defendant-company's] own on-the-ground analysts did not believe [company] could meet critical contractual deadlines"). Indeed, the Company admitted it was "betting the family farm" on the success of the $9.8 billion Nuclear Project. ¶ 440. For this reason, the Company's progress on completing the Nuclear Project in time to receive the Nuclear Tax Credits was closely followed by analysts. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (positive analyst coverage of statements supports materiality). *See, e.g,* ¶¶ 40, 155, 322-23, 330, 337-388, 341-43, 353-54, 383, 394-95, 405, 446-47.[39]

### 2. Deloitte Did Not Sincerely Believe Its Statements that SCANA's Financial Statements were in Accordance with GAAP

Deloitte acknowledges, as it must, that statements of opinion can be false if Plaintiff adequately "allege[s] facts showing that Deloitte subjectively did not believe the opinions that it rendered when it did so." Mot. at 19. *See also SCANA I* at *9 (statements of opinion are actionable where "the speaker did not in fact hold the stated belief").[40] This Court has held that the Company's representations regarding the availability of the tax credits and the completion date of the Nuclear Project were false statements of opinion, because the Company "could not have sincerely believed these opinions, given the Bechtel reports, monthly progress reports, and other internal correspondence that described deficiencies in the progress of the Project." *SCANA I* at *9. The same is true for Deloitte, who despite receiving and having access to the very same

---

[39] The stock drops upon the alleged corrective disclosures (¶¶ 446-47) further evidence the importance of the tax credits to investors. *KBC*, 2016 WL 3981236, at *6 ("the majority rule indicates that the negative market reaction to the disclosures . . . supports the conclusion that these misrepresentations were material").

[40] *See also Ollila v. Babcock & Wilson Enters., Inc.*, No. 3:17-cv-109, 2018 WL 792069, at *6 (W.D.N.C. Feb. 8, 2018) (because "plaintiff alleges that [the defendant's opinion statements] were not sincerely held, they are actionable") (citing *Omnicare*, 575 U.S. at 175-76 and *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999)).

information as the Company regarding the Nuclear Project (¶¶ 116-189, 428-430), stated that the Company's representations regarding the availability of the tax credits and the completion date of the Nuclear Project were in accordance with GAAP.

Nevertheless, Deloitte asks the Court to draw the opposing inference because SCANA did not issue a restatement and the SEC had not yet brought a lawsuit against it. Mot. at 28. This, however, is improper factual argument.[41] *In re Signet Jewelers Ltd. Sec. Litig.*, 16 CIV. 6728 (CM), 2018 WL 6167889, at *14 (S.D.N.Y. Nov. 26, 2018) (defendant's arguments based on an assertion that the issuer had not restated its financials were "improper on a motion to dismiss").[42] In any event, "the lack of a restatement did not mean that [Deloitte] only engaged in legitimate conduct." *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1245-46 (N.D. Cal. 2008).[43] Further,

---

[41] Both *Fidel v. Farley*, 392 F.3d 220, 234 (6th Cir. 2004) and *Iron Workers*, 432 F. Supp. 2d 571 are inapposite. Mot. at 27-28, 32 n.17, 38. *Fidel* concerned whether the plaintiffs had made out a "strong inference of scienter," not falsity. Moreover, in *Fidel,* the court concluded that the class failed to allege "*any* facts that show [the auditor] knew or should have known that the 1998 financial results were in question at the time it signed off on them." *Fidel,* 392 F.3d at 234. And in *Iron Workers*, it was not the lack of a restatement that "weakened" the plaintiff's allegations of GAAP violations like Deloitte claims; rather, the court concluded those allegations were "weakened by the fact that Plaintiff *did not challenge an independent auditors* [sic] *opinion* of [the company's] financial statements." 432 F. Supp. 2d at 588. That is not the case here, obviously, because Plaintiff is *suing* the independent auditor.

[42] *See also In re Ambrac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 273 (S.D.N.Y. 2010) ("The parties' disagreements over GAAP compliance also raise issues of fact that cannot be resolved on a motion to dismiss."); *In re Global Crossing*, 322 F. Supp. 2d at 338-41 (stating that further development of the record was needed where the plaintiffs "raised allegations sufficient to call into question ... the [Defendants'] compliance with specific GAAP provisions").

[43] *See also In re Am. Serv. Grp., Inc.*, 3:06-0323, 2009 WL 1348163, at *51 (M.D. Tenn. Mar. 31, 2009) (noting that an "auditors' failure to require restatement does not conclusively prove that financial statements complied with GAAP"); *Aldridge*, 284 F.3d 72 at 83 ("that the financial statements for the year in question were not restated does not end [the plaintiff's] case when he has otherwise met the pleading requirements of the PSLRA. To hold otherwise would shift to accountants the responsibility that belongs to the courts. It would also allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement of the financial statements."); *In re Global Brokerage, Inc.*, 1:17-CV-00916-RA, 2019 WL 1428395, at *12 (S.D.N.Y. Mar. 28, 2019) (rejecting arguments that

the Company took a full impairment write-off for the Nuclear Project, demonstrating that it was not properly accounted for under GAAP. ¶¶ 393, 407-411. Finally, because on January 2, 2018, SCANA entered into a merger agreement to be acquired by Dominion, a restatement was inappropriate. ¶¶ 411-419. In situations in which investors in the acquired company have either sold or hold securities in the acquiring company, any misstated financial statements of the acquired company are no longer being relied upon by the public for purposes of making investment decisions and the SEC often does not require the financial statements be corrected.[44]

Nor may the purported lack of SEC action against Deloitte *at this time* serve as the basis for any inference in Deloitte's favor. To the contrary; the SEC only recently sued SCANA and certain of its officers, the governmental investigations are ongoing and the subpoenas issued by regulators make clear that they are reviewing documents pertaining to Deloitte's audits of SCANA's financial statements. ¶¶ 15, 123 & n.97, 440.[45]

Finally, Deloitte cannot rest on the purportedly cautionary language in the financial statements "that there were risks that the tax credits would not be achieved." Mot. at 22. This Court has already rejected that argument, concluding in *SCANA I* that the Company "misrepresented

---

allegations of GAAP violations were insufficient because there was no restatement and the CFTC did not find the issuer violated GAAP as a factual dispute improper at the pleading stage); *In re Washington Mut.* 694 F. Supp. 2d at 1224 (denying in part motion to dismiss claims against auditor despite lack of restatement).

[44] Further, purchase accounting rules (ASC 805) require only that the acquiring entity restate the acquired company's assets and liabilities by marking them to fair value, including assets not previously recorded for book purposes (*e.g.*, purchased intangible assets) at the time of acquisition. Here, the disclosures and unrecoverable assets that would have required restatement were either eliminated or effectively disclosed prior to the acquisition of SCANA by Dominion. ¶¶ 418-19.

[45] *See also* The United States' Mot. to Intervene & to Stay Civil Proceedings, *SEC v. SCANA Corp. et al.,* No. 20-cv-882 (D.S.C. June 8, 2020), ECF No. 34 at 3-4 (explaining that "[t]he criminal investigation is ongoing" and "[t]he United States anticipates filing additional criminal charges against other members of the conspiracy").

SCANA's ability to complete the project by the end of 2020." *SCANA I* at *7-8 ("[C]autionary language is meaningless if it warns only of risks that have already materialized, or if the defendants knew their statements were false or misleading when made.") (quoting *Ollila*, 2018 WL 792069, at * 4). Deloitte relies on the same "cautionary language relied on by SCANA," which as this Court explained, "fails to convey any substantive warning to investors regarding the specific deficiencies facing the Project, particularly when Defendants were sufficiently aware of the Project's deficiencies to contemplate hiring Bechtel to troubleshoot the Project in early 2015." *Id.* at *9.

3. Deloitte's Omissions of Material Facts Rendered Any Opinions in its Clean Audit Reports Materially Misleading

Statements of opinion are actionable if the defendant "omitted material facts showing that they lacked the basis for making those statements that a reasonable person would expect." *SCANA I* at *9. Deloitte claims that under *Omnicare*, Plaintiff must "identify specific facts omitted from Deloitte's audit opinions" and "must allege specific facts showing that Deloitte knew of these facts when the audit opinions were issued." Mot. at 23. But that is not what *Omnicare* says. Rather, under *Omnicare,* a statement of opinion is misleading if it does not "fairly align[] with the information in the [speaker's] possession at the time," or when the speaker "lacked the basis for making those statements that a reasonable investor would expect." *Omnicare*, 575 U.S. at 189, 196. To be sure, Plaintiff "must identify particular (and material) facts going to the basis for the [Deloitte's] opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 194. But Deloitte does not dispute that Plaintiff does this. Indeed, Deloitte's argument appears to be that, although it knew about the Bechtel engagement, it did not know of Bechtel's findings. So either Deloitte knew what Bechtel concluded, as explained above, *see supra* Section I.A., in which case Deloitte's audit

44

opinions did not "fairly align[] with the information in the [Deloitte's] possession at the time," or Deloitte knew about the Bechtel engagement but made no effort to learn of Bechtel's findings, in which case Deloitte "lacked the basis for making th[e] statements that a reasonable investor would expect." *Omnicare,* at 189, 196. In either case, Deloitte's statements were false under *Omnicare.*[46]

### III.    Plaintiff Adequately Pleads Loss Causation

"To establish loss causation, a plaintiff must plead '(1) the 'exposure' of the defendant's misrepresentation or omission, i.e., the revelation of 'new facts suggesting [that the defendant] perpetrated a fraud on the market; and (2) that such exposure 'resulted in the decline of the defendant's share price.'" *SCANA I* at *12 (citing *Singer*, 883 F.3d at 445). Loss causation is "not meant to impose a great burden" and merely requires "provid[ing] a defendant with some indication of the loss and causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). The Fourth Circuit explicitly recognizes both the "corrective disclosure theory" and the "materialization of a concealed risk theory" of loss causation. *SCANA I* at *12 (quoting *Singer*, 883 F.3d at 445). Under a materialization of the risk theory, "the plaintiffs would not need to identify a public disclosure that corrected the previous, misleading disclosure because the news of the materialized risk would itself be the revelation of fraud that caused plaintiffs' loss." *Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 187 n.3 (4th Cir. 2007). "Importantly, the ultimate loss causation inquiry under either the corrective disclosure theory or

---

[46] Defendants also argue that Plaintiff's claims against Deloitte LLP must be dismissed because "[t]he Complaint does not specifically allege that Deloitte LLP, which is a separate legal entity, made any public statement at all, nor does it make any allegations about actions taken by Deloitte LLP." Mot. at 2 n.1. That is a red herring. The Complaint alleges that Deloitte U.S. had involvement in, and control over, Deloitte & Touche, LLP (¶¶ 21-22), which is all that is required at the motion to dismiss stage. *See In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 288-89 (S.D.N.Y. 2005) (holding that plaintiffs sufficiently alleged vicarious liability as to Deloitte Touche Tohmatsu, Deloitte & Touche LLP, and Deloitte & Touche USA LLP, for allegations of false and misleading statements within certifications issued by Deloitte & Touche, S.p.A.).

the materialization of a concealed risk theory is the same: whether a misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Singer*, 883 F.3d at 446. Loss causation thus may be pled where "the relevant truth . . . leak[s] out," including "gradually . . . through a series of partial disclosures" that result in a price decline. *Id.* "The disclosure or series of partial disclosures need not precisely identify the misrepresentation or omission;" it must only "reveal to the market in some sense the fraudulent nature of such misrepresentation or omission, and must at least relate back to the misrepresentation and not to some other negative information about the company." *Id.* A series of disclosures are to be viewed "holistically," and not in isolation. *Epstein*, 203 F. Supp. 3d at 676.[47]

Plaintiff readily meets this standard. Deloitte's misconduct, including its issuance of "clean" audit reports, concealed and dramatically understated the foreseeable risk that SCANA would not complete the Nuclear Project in time and ultimately, that the Nuclear Project was destined to fail. Those concealed risks were then revealed on each of the dates identified in the Complaint, resulting in the decline of SCANA's common stock. *See* App'x. B; Complaint Sections V, IX; *SCANA I* at *12 ("The court finds that . . . Plaintiffs plausibly allege specific public disclosures and subsequent reductions in the value of SCANA's stock as the result of "the relevant truth . . . leak[ing] out.'"). Indeed, analyst commentary after each corrective disclosure and/or materialization of the risk event attributed the drop in SCANA's stock price specifically to the alleged disclosures. *See, e.g.*, ¶ 477. This is all that is required to satisfy the minimal loss causation element, which requires at the pleadings stage that a plaintiff provide the defendant with only "some indication of the loss and the causal connection that the plaintiff has in mind[.]" *Dura*

---

[47] In addition, loss causation is "usually reserved for the trier of fact." *Carlucci v. Han*, 907 F. Supp. 2d 709, 724 (E.D. Va. 2012). "So long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages" of the case. *Id.*

*Pharm.*, 544 U.S. at 347.

Defendants' arguments to the contrary are flatly wrong and raise fact issues that cannot be resolved at this stage. *First*, Defendants' misleading argument that the Complaint contains disclosures "not attributable to Deloitte" and thus, Deloitte cannot be held accountable, ignores the fact that those disclosures were contained in SCANA's financial statements, which were then verified by Deloitte's clean audit opinions. Deloitte's audit opinions represented that Deloitte had audited SCANA's financial statements in accordance with relevant accounting standards and determined that those financial statements "present[ed] fairly, in all material respects, the financial position of the Company . . . in conformity with accounting principles generally accepted in the United States of America." This was false; as later revealed, SCANA's financial statements hid the true status of the Nuclear Project, which Deloitte was aware of. When the truth was ultimately revealed, SCANA's stock price was negatively affected. *See Singer*, 883 F.3d at 446.

*Second*, SCANA's purported disclosures "acknowledging significant risks and uncertainties with the Nuclear Project in its 2016 Form 10-K" were far from sufficient to reveal the extent of the risks related to the Nuclear Project. *See* Mot. at 42. Indeed, as the Court has already held, none of the risk disclosures in SCANA's SEC filings informed the investors of the substantial problems and risks that had already been realized and were known to SCANA and Deloitte. *SCANA I* at *9. *See also In re MGM Mirage Sec. Litig.*, No. 2:09-CV-01558-GMN, 2013 WL 5435832, at *8 (D. Nev. Sept. 26, 2013). Thus, SCANA's purported disclosures "cannot be 'meaningful'" because Defendants "[knew] that the potential risks they have identified have in fact already occurred." *City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prod. Co.*, 827 F. Supp. 2d 559, 576 (D.S.C. 2011); *see also SEC v. Merch. Capital, LLC*, 483 F.3d 747, 769 (11th Cir. 2007); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).

47

*Third*, Defendants' argument that "any alleged false statement attributable to Deloitte . . . was fully corrected by July 27, 2017" is wrong. Mot. at 43. The Complaint alleges corrective disclosures and/or materialization of the risk events for several months beyond July 2017, each of which revealed new information into the market as indicated by corresponding stock price declines and negative analyst reactions. *See* ¶¶ 476-77. This Court has already held that these "subsequent reductions in the value of SCANA's stock as the result of 'the relevant truth . . . leak[ing] out'" were sufficient to establish loss causation. *SCANA I* at *12.[48]

*Finally*, Defendants' argument that Deloitte cannot be held accountable because "[n]ot a single alleged corrective event makes any reference to Deloitte's audit opinions or any other statement by Deloitte" is, again, incorrect.[49] A disclosure need not mention Deloitte at all to be "corrective"; it need only reflect part of the "relevant truth" concealed by Deloitte's misconduct. *Singer*, 883 F.3d at 447 (holding that "the Complaint satisfies the ultimate loss causation inquiry by alleging losses resulting from 'the relevant truth . . . leak[ing] out' about the Company's previously concealed fraudulent reimbursement scheme.")[50]

---

[48] While Defendants attempt to downplay this Court's prior ruling, *see* Mot. at 44 n. 21, that argument does not hold water. Defendants fail to cite any authority for this proposition, and, moreover, ignore Plaintiff's materialization of risk allegations. Indeed, as stated below, even under a corrective disclosure theory a disclosure need not mention Deloitte at all to be "corrective"; it need only reflect part of the "relevant truth" concealed by Deloitte's misconduct.

[49] Deloitte's reliance on *Amorosa v. Ernst & Young LLP*, 682 F. Supp. 2d 351 (S.D.N.Y. 2010) and *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 156 (2d Cir. 2007) is misplaced. Mot. at 44-45. In both cases, the plaintiffs failed to connect the corrective disclosures to the auditor. *See Amorosa*, 682 F. Supp. 2d at 364 (finding that the *Amorosa* plaintiff failed to "mention any audited or annual financial statement . . . and does not mention Ernst & Young or any other auditors," and instead attributed misstatements solely to the company, AOL Time Warner, Inc.); *Lattanzio* at 157 ("[T]o state a claim, plaintiffs had to allege that Deloitte's misstatements concealed the risk of Warnaco's bankruptcy."). Further, in *Amorosa*, the court had already held in a related proceeding that the alleged corrective disclosures in that case were "an insufficient basis on which to hang loss causation." 682 F. Supp. 2d at 364.

[50] *See also Cosby*, 2018 U.S. Dist. LEXIS 130244, at *19 (finding that "plaintiffs have shown a

## IV.     Plaintiff's Claims are Timely

The statute of limitations on a Section 10(b) claim "begins to run once the plaintiff discovers, or a reasonably diligent plaintiff would have discovered, the facts constituting the violation." *Carlucci*, 886 F. Supp. 2d at 515 (quoting *Merck & Co. Reynolds*, 559 U.S. 633, 648 (2010) (citing 28 U.S.C. § 1658(b)(1)). "[F]acts showing scienter are among those that constitute the violation." *Merck*, 559 U.S. at 634.[51] "Accordingly, even if a reasonably diligent investor would have noticed 'storm warnings' and thus been on 'inquiry notice' . . .  and even if inquiry by such an investor would have revealed that the reports were in fact false, ***the limitations period is still not trigged until it is discoverable that such falsity is the result of an intent to deceive or defraud***." *Masterson*, 2 F. Supp. 3d at 836 (quoting *Merck*, 559 U.S. at 648-54). A motion to dismiss on statute of limitation grounds should only be granted when it is "clear from the face of the complaint that the plaintiff can prove ***no set of facts*** that would support its claims within the applicable statute of limitations." *Anderson v. Simpson*, Civil Action No. 6:08-3034-GRA-WMC, 2009 U.S. Dist. LEXIS 68281 (D.S.C. July 14, 2009). "When the viability of a statute of limitations defense hinges on a question of fact . . . the factual question is ordinarily resolved by the jury, rather than by the court." *Zayas v. Adcor Indus.*, No. GJH-16-03193, 2017 U.S. Dist. LEXIS 157208, at *11 (D. Md. Sep. 26, 2017); *see also Cosby*, 2018 U.S. Dist. LEXIS 130244, at *23. ("[I]t is typically inappropriate to determine the issue of statute of limitations at the motion to dismiss stage.").

---

causal link between the loss and the alleged misrepresentation" sufficient to satisfy loss causation in a case against an auditor even though none of the disclosures mentioned the auditor or its opinions).

[51] *See also Masterson v. Commonwealth Bankshares, Inc.*, 2 F. Supp. 3d 824, 836 (E.D. Va. 2014) ("the limitations period in a securities fraud case 'does not begin to run until . . . a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,' **including scienter**.") (quoting *Merck*, 559 U.S. at 653) (emphasis in original).

Here, the statute of limitations only began to run when Deloitte's knowledge of the Bechtel Report and, therefore, scienter, became publicly known in October 2018. First, on October 3, 2018, Addison testified that that Deloitte had reviewed the Bechtel Reports prior to issuing its clean audit opinions. *See* ¶ 428. Second, on October 12, 2018, the *Post and Courier* released to the public for the first time an email indicating that Deloitte was aware of the Bechtel engagement. Prior to October 2018, there was no way Plaintiff could have learned that Deloitte had obtained the Bechtel Reports. Nonetheless, Deloitte circularly argues that, because it purportedly did not know about the Bechtel Reports, there was nothing to discover in Addison's testimony and, therefore, the claims are not timely. *See* Mot. at 28-29, 45. This argument is nonsensical. As discussed above, it is clear that Deloitte did obtain and review the Bechtel Reports, and that such information was not made public until October 2018—less than three years before the Complaint was filed. Thus, Plaintiff's action against Defendants was timely filed. *See Cosby*, 2018 U.S. Dist. LEXIS 130244, at *20-23 (finding Plaintiffs' complaint timely because knowledge of the auditor's scienter was not known until a SEC complaint was filed against the auditor, even though an earlier case against the issuing company was filed and settled years earlier).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.[52]

---

[52] If the Court believes any allegations are deficient, Plaintiff respectfully requests leave to amend its Complaint, particularly given that in addition to its own workpapers, Defendants have access to documents that were produced by other relevant entities which are not available to Plaintiff.

September 18, 2020

Respectfully submitted,

*/s/ William Tinkler*
William Tinkler (D.S.C. Bar Number 11794)
TINKLER LAW FIRM LLC
154 King Street, Third Floor
Charleston, SC 29401
Tel.: (843) 853-5203
Fax: (843) 261-5647
williamtinkler@tinklerlaw.com

COHEN MILSTEIN SELLERS & TOLL
PLLC
Laura H. Posner
Ji Eun Kim (Jessica)
88 Pine Street,14th Floor
New York, New York 10005
Tel.: (212) 838-7797
Fax: (212) 838-7745
lposner@cohenmilstein.com
jekim@cohenmilstein.com

Steve J. Toll
Jan Messerschmidt
1100 New York Avenue, N.W., Fifth Floor
Washington, D.C. 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
jmesserschmidt@cohenmilstein.com

*Attorneys for Lead Plaintiff and the Class*

GORDON BALL PLLC
Gordon Ball
Jonathon Tanner Ball (*pro hac vice*
forthcoming)
550 W. Main Street
Suite 600
Knoxville, TN 37902
Tel.: (865) 525-7029
Fax: (865) 525-4679
gball@gordonball.com

*Additional Counsel for the Class*

.

51

**CERTIFICATE OF SERVICE**

I certify that on September 18, 2020, I electronically filed Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss, using the Court's CM/ECF system. A copy of this filing will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ William Tinkler*
William Tinkler