# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS LOCAL 98
PENSION FUND on behalf of itself and all
others similarly situated,


               Plaintiffs,

vs.

DELOITTE & TOUCHE LLP;
DELOITTE LLP,

               Defendants.

Case No. 3:19-cv-3304

**ANSWER OF DEFENDANTS
DELOITTE & TOUCHE LLP
AND DELOITTE LLP TO
CONSOLIDATED COMPLAINT**

Defendants Deloitte & Touche LLP ("D&T") and Deloitte LLP (collectively, "Deloitte"), by their undersigned counsel, hereby answer Plaintiffs' consolidated complaint (the "Complaint"). Deloitte categorically denies any allegation that it violated any applicable laws, rules, regulations, or standards governing its conduct as the independent auditor of SCANA Corporation ("SCANA"). At all relevant times, D&T's experienced audit engagement team conducted itself with integrity and proficiency and in accordance with applicable professional standards when auditing SCANA. D&T's audit opinions were the result of carefully planned audits that were conducted professionally and in good faith. The resulting audit opinions, based on the information made available to D&T by SCANA and its executives, were entirely truthful at the time they were made. There is no basis to Plaintiffs' claim that Deloitte acted in a fraudulent or reckless manner as would be necessary for Plaintiffs' to prevail on their claim under Section 10(b).

This Answer is based on the present knowledge of Deloitte based upon a reasonable investigation following the Court's decision on the motion to dismiss. In particular, the Complaint cites to and quotes from numerous documents, and it is unreasonable for Deloitte to have to perform a search to determine whether every such document is in its possession, custody, or control. Deloitte reserves the right to supplement and amend this Answer and reserves the right to add additional defenses of which it becomes aware through discovery or other investigation.

The Complaint violates Rule 8(a) of the Federal Rules of Civil Procedure, which requires that the Complaint set forth "a short and plain statement of the claim," and Deloitte reserves all rights in connection therewith.

All allegations not specifically admitted herein are denied. To the extent a footnote contains a factual allegation, it is denied. To the extent that headings in the Complaint are not included in the numbered paragraphs, no response is required. To the extent a response is required,

Deloitte denies the allegations set forth in the headings.  Deloitte does not adopt any of the defined terms in the Complaint.

With respect to the introductory and numbered paragraphs of the Complaint, Deloitte answers as follows:

Lead Plaintiff, International Brotherhood of Electrical Workers Local 98 Pension Fund ("IBEW Local 98"), individually and on behalf of a class of similarly situated persons and entities, bring this federal securities class action against Deloitte & Touche, LLP, and Deloitte LLP (collectively, "Deloitte" or "Defendants"), on behalf of themselves and a class consisting of all persons and entities who purchased, or otherwise acquired, the publicly traded securities of SCANA Corporation ("SCANA" or the "Company") from February 26, 2016 through December 20, 2017, inclusive (the "Class Period"), and who were damaged thereby. Lead Plaintiff's and the Class's claims arise under Sections 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.

Lead Plaintiff's allegations concerning matters other than itself and its own acts are based upon the investigation conducted by and through its counsel, which included, among other things, the review and analysis of: (i) public statements made by Deloitte; (ii) transcripts, press releases, news articles, and other public statements issued by or concerning SCANA and South Carolina Electric & Gas ("SCE&G," and together, "SCANA"); (iii) research reports issued by financial analysts concerning SCANA; (iv) reports and other documents filed publicly by SCANA, including Deloitte's audit reports, with the U.S. Securities and Exchange Commission ("SEC"); (v) transcripts of hearings before SCANA's regulators and select committees of the South Carolina Senate and House of Representatives; (vi) documents produced to Lead Plaintiff through Freedom of Information Act ("FOIA") requests; (vii) documents publicly available through the South Carolina Attorney General's office; (viii) documents publicly available from the *Lightsey, et. al. v. South Carolina Electric & Gas Company, et. al.,* Case No. 2017-CP-25-0335 litigation; (ix) regulatory orders and testimony; (x) the complaint filed by the SEC in *Securities and Exchange Commission v. SCANA Corporation, et al.*, No. 3:20-CV-00882-MGL (D.S.C.) (the "SEC Complaint"), and (xi) other publicly available information. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein, including in Deloitte's audit papers, after a reasonable opportunity for discovery.

ANSWER:  The introductory paragraphs above set forth conclusions of law to which no response is required.  To the extent a response is required, Deloitte denies the allegations, except admits that Plaintiffs have asserted these claims on behalf of a putative class.

# I.    **INTRODUCTION**

1.    Throughout the Class Period, Deloitte repeatedly violated its professional responsibilities, failed in its role of gatekeeper and deceived investors about SCANA's accounting for, and expected completion of, a multi-billion dollar nuclear energy expansion project of the Virgil C. Summer Nuclear Station in Fairfield County, South Carolina (the "Nuclear Project").

Specifically, Deloitte gave unqualified, "clean" audit reports on SCANA's financial statements and internal control over financial reporting, misleading investors into believing that SCANA would complete the Nuclear Project in time to obtain $1.4 billion in nuclear tax credits. Deloitte did so despite possessing voluminous evidence that SCANA could not possibly achieve this goal—evidence so obvious that, as a former SCANA senior engineer testified, "even Ray Charles could have seen" it. By the time SCANA eventually acknowledged this reality and the true status of the Nuclear Project was revealed, SCANA's investors had suffered over a billion dollars in losses.

ANSWER NO. 1:  Deloitte denies the allegations set forth in paragraph 1, except admits that the Virgil C. Summer Nuclear Station is located in Fairfield County, South Carolina.

2.     From the very beginning, it was well-understood by SCANA, its investors, government regulators, and Deloitte that the success of the Nuclear Project—one of the largest and most expensive construction projects in South Carolina history—depended on it obtaining $1.4 billion in federal production tax credits and being able to raise energy rates on consumers to cover construction costs. But to qualify for the federal tax credits, SCANA was required to have the Nuclear Project operational and placed into service by January 1, 2021. And SCANA could only apply to raise rates after submitting detailed construction schedules, capital costs, projections and other information to the South Carolina Public Service Commission ("PSC") to demonstrate that it was managing the Nuclear Project "prudently" and that the Nuclear Project would be in service by January 1, 2021.

ANSWER NO. 2:  Deloitte denies the allegations set forth in paragraph 2, except denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first sentence of paragraph 2.

3.     As SCANA's external auditor for over 70 years, Deloitte was responsible for understanding SCANA's business, identifying and responding to risks of material misstatements, and obtaining sufficient, appropriate audit evidence in response to such risks so that it could provide a high level of assurance that SCANA's financial statements—including those portions discussing the expected completion date of the Nuclear Project and the expectation of nuclear tax credits—were in accordance with Generally Accepted Accounting Principles ("GAAP").

ANSWER NO. 3:  Deloitte denies the allegations set forth in paragraph 3, except admits that D&T was the independent registered public accounting firm for SCANA during the Class Period and that D&T's work was governed by, among other things, certain professional standards and engagement letters, which paragraph 3 incompletely summarizes.  Deloitte refers to those professional standards and engagement letters for their complete contents and affirmatively avers that Deloitte complied with the applicable standards and contractual terms at all relevant times.

4.     SCANA and its partner in the Nuclear Project, Santee Cooper, selected Westinghouse Electric Company LLC ("Westinghouse" or "WEC") to be the lead contractor on the Nuclear Project. Construction finally began in 2013, however, the Nuclear Project immediately was beset with significant delays and substantial cost overruns. Throughout 2015, it was clear to both SCANA and Deloitte that the Nuclear Project would not be in service in time for SCANA to obtain the nuclear tax credits. For example, based on historical date-to-date performance—a key metric Deloitte was required to review and test in connection with its audits—a SCANA senior engineer (and later whistleblower) projected in January 2015 that it would take 26.5 years to complete the Nuclear Project. By February 2015, other internal SCANA documents showed that at the current rate of progress—another key metric Deloitte was required to review and test in connection with its audits—only 30% of the project would be completed by 2020. Furthermore, an internal memorandum circulated on April 28, 2015, made clear that Westinghouse (i) "has no credibility for developing a realistic schedule"; (ii) that SCANA has "no confidence in [Westinghouse's] ability to complete Unit 3 by the end of 2020 and suspects that production tax credits are in jeopardy for that unit"; and (iii) "[t]he continued failure to meet schedule (Unit 2 now at least 39 months late, and Unit 3 at least 18 months late . . .) has severely impacted credibility and has placed ongoing regulatory and financial support in jeopardy."[1]

ANSWER NO. 4:  Deloitte denies the allegations set forth in paragraph 4, except denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the second and final sentences of paragraph 4, and admits the allegations set forth in the first sentence of paragraph 4.

5.     The Nuclear Project's construction issues and delays were so severe that SCANA hired Bechtel Corporation ("Bechtel"), one of the world's most respected engineering, construction and project management companies, to conduct an analysis of the Nuclear Project. By October 2015, Bechtel's initial findings demonstrated that SCANA's forecasts and schedules for the Nuclear Project were "unrealistic," that there was insufficient and inadequate oversight over all aspects of the Nuclear Project, and that SCANA's Unit 2 would not be complete until "1826 months" after the current June 2019 date—or at the earliest, December 2020—and that Unit 3 would not be complete until "24-32 months" after the current June 2020 date—or at the earliest, June 2022. These revised completion dates—based on a best-case scenario assuming implementation of Bechtel's substantial recommendations—provided SCANA with just one month to spare before the deadline to obtain tax credits expired for Unit 2, and Unit 3 would not be in service in time to qualify for the tax credits at all.

ANSWER NO. 5:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 5.

---

[1] All internal SCANA documents cited to or quoted from herein were either obtained pursuant to FOIA requests to Santee Cooper, the South Carolina Attorney General's Office and the South Carolina Office of Regulatory Staff, or from exhibits and depositions transcripts publicly available from the *Lightsey* litigation.

6.      On November 9, 2015, Bechtel then issued its formal assessment report (the "First Bechtel Report"), which concluded that "the current schedule is at risk" because "installation rates, productivity, and staffing levels all point to project completion later than the current forecast." Importantly, Bechtel concluded that the current schedule would be delayed up to three years, with the second reactor likely not coming on-line until June 2023, and June 2022 at the earliest—long after the critical deadline for the federal tax credits. Moreover, Bechtel advised that the Nuclear Project's monthly construction progress rate—which was averaging only 0.5% at the time—had to increase by six-hundred fold to 3%.

ANSWER NO. 6:  Deloitte denies the allegations set forth in paragraph 6, except admits that Bechtel produced a report in or around November 2015, and refers to that report for its complete contents.  Deloitte affirmatively avers that it did not receive the First Bechtel Report until after SCANA announced its abandonment of the Nuclear Project.

7.      Deloitte was well-aware of Bechtel's findings and its auditors reviewed and analyzed its Reports as they were made. As SCANA's former Chief Financial Officer, Jimmy Addison, confirmed in a sworn deposition, at the time of the Bechtel assessment, Sean Bird, Deloitte's audit engagement partner for the Nuclear Project, had told Addison that Deloitte had "gone back with their local team and their national team and reviewed all the disclosures at the point in time that they were made, and read [the Bechtel report]"[2] and claimed to "not see any gaps in the disclosure at the time they were made." Internal emails similarly make clear that Deloitte was aware of Bechtel's work at least as early as September 2015.

ANSWER NO. 7:  Deloitte denies the allegations set forth in paragraph 7, except admits that Addison has provided deposition testimony, and refers to that testimony for its contents.

8.      Though Deloitte knew by at least November 2015, based on the Bechtel Report and other internal documents, as well as the overall progress of construction, that the Nuclear Project could not possibly be in service by 2021, Deloitte nonetheless misleadingly told investors in violation of Public Company Accounting Oversight Board standards ("PCAOB Standards") that SCANA's financial statements confirming that the Nuclear Project was on schedule were "present[ed] fairly, in all material respects" and in accordance with GAAP, and that SCANA's related internal control over financial reporting was effective. For example, in the financial statements to SCANA's 2015 Form 10-K filed on February 26, 2016, SCANA falsely stated that "[b]ased on the guaranteed substantial completion dates," the Nuclear Project was "expected to be operational and to qualify for the nuclear production tax credits." SCANA's financial statements also misleadingly stated that of the total estimated gross construction costs of the Nuclear Project of approximately $7.6 billion, SCANA's "investment in the New Units totaled $3.6 billion, for which the financing costs on $3.2 billion have been reflected in rates under the BLRA."

---

[2] Internal quotations are omitted, and emphases added, unless stated otherwise.

ANSWER NO. 8:  Deloitte denies the allegations set forth in paragraph 8.

9.      Throughout 2016 and early 2017, Deloitte continued to receive documents, including audit evidence required to be reviewed by Deloitte, that further warned and raised substantial doubts regarding the feasibility of the Nuclear Project and SCANA's ability to place the Nuclear Project in service in time to qualify for the federal tax credits.

ANSWER NO. 9:  Deloitte denies the allegations set forth in paragraph 9.

10.     For example, a March 3, 2016 memorandum circulated in advance of a SCANA Board of Directors meeting explained that "schedule adherence [was] unrealistic" and the project management failures "do not support construction need dates." Similarly, Monthly Progress Reports showed that the Nuclear Project's monthly progress rate never improved significantly from the 0.5% rate observed by Bechtel in 2015; instead it remained, on average, at only 0.7% in 2016 and 2017—less than one-fourth the 3% rate that Bechtel stated was necessary for timely completion. A July 26, 2016 Board of Director's meeting presentation similarly reported substantial problems in "Five Project Focus Areas," including that: "The majority of project milestones are not met on their scheduled dates. The percentage of schedule activities completed on time is well below the goal and does not allow for a reliable Integrated Project Schedule."

ANSWER NO. 10:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 10.

11.     Despite this continuing, mounting evidence, and the fact that the available information also contradicted assertions made by SCANA to the PSC—thereby heightening the risk that the capitalized costs associated with the Nuclear Project would not be fully recoverable and/or previously approved electric rate increases could subject the Company to related refunds – Deloitte permitted SCANA to represent in its quarterly, interim financial statements on Forms 10Q that the Nuclear Project, at an estimated total gross construction cost of no more than $7.7 billion, would be placed into service prior to 2021, and would qualify for nuclear tax credits of "as much as approximately $1.4 billion," in violation of PCAOB Standards and without either withdrawing as SCANA's auditor or notifying the SEC.

ANSWER NO. 11:  Deloitte denies the allegations set forth in paragraph 11.

12.     It also again issued another "clean" audit report on the Company's 2016 financial statements and internal control over financial reporting in violation of PCAOB Standards in connection with SCANA's 2016 Form 10-K, filed with the SEC on February 24, 2017, despite the fact that the financial statements misleadingly failed to acknowledge that placement of the Nuclear Project into service prior to 2021 was not just "substantially uncertain," but in fact, highly unlikely.

ANSWER NO. 12:  Deloitte denies the allegations set forth in paragraph 12.

13.     As such, and unbeknownst to the investing public, Deloitte's clean audit reports lacked any reasonable basis. Had it not been for Deloitte's imprimatur on SCANA's materially

false and misleading financial statements, Lead Plaintiff and the Class would not have purchased their SCANA shares, and certainly not at the prices they paid.

ANSWER NO. 13:  Deloitte denies the allegations set forth in paragraph 13.

14.    Ultimately, the truth about the Nuclear Project and the risks of non-completion in time to obtain the nuclear tax credits began to be revealed in a series of partial disclosures beginning in late 2016. On December 26, 2016, Westinghouse's parent, Toshiba, announced an estimated impairment of "several billion dollars" due to "cost overruns and missed deadlines" on projects, including the Nuclear Project. On February 14, 2017, Toshiba announced the possibility that it would sell all or a part of its stake in Westinghouse and take a $6.3 billion write-down related to the Nuclear Project, further calling into question the viability of the Nuclear Project. In March 2017, news regarding Westinghouse's bankruptcy began to leak, and days later Westinghouse filed for Chapter 11 bankruptcy. Then, on July 31, 2017, SCANA issued a press release announcing that it was abandoning the Nuclear Project. Construction of the Nuclear Project was only approximately one-third complete at the time. It soon became clear that the abandonment was not the result of the Westinghouse bankruptcy or new construction issues, but rather the manifestation of issues that SCANA and Deloitte had known about—but deliberately or recklessly concealed—for many years.

ANSWER NO. 14:  Deloitte denies knowledge or information to form a belief as to the

truth of the allegations set forth in paragraph 14, except admits the allegations set forth in the

second, third, and fifth sentences of paragraph 14.

15.    The fall-out from SCANA's abandonment of the Nuclear Project was severe and is still ongoing more than three years later. In August 2017, special committees of the South Carolina General Assembly began conducting public hearings regarding the decision to abandon the Nuclear Project. In September 2017, SCANA was served with a subpoena from the United States Attorney's Office for the District of South Carolina, and South Carolina's Attorney General's Office and Speaker of the House of Representatives requested that the South Carolina Law Enforcement Division conduct a criminal investigation into the handling of the Nuclear Project by SCANA. One month later, on October 16, 2017, the SEC subpoenaed SCANA for information regarding the Nuclear Project, including Deloitte's audit work. Then, on February 27, 2020, the SEC filed a damning 416 paragraph complaint against SCANA and two of its senior officers. The SEC Complaint makes clear that SCANA's Class Period statements regarding the status and ultimate failure of the $9 billion Nuclear Project violated the securities laws, and that numerous reports and documents were available to any reasonably diligent auditor demonstrating that SCANA's financial statements were not in accordance with GAAP, despite Deloitte's "clean" audit reports to the contrary. While the SEC has tentatively settled its claims against SCANA for a $25 million penalty and $112.5 million in disgorgement, both civil and criminal investigations into various parties connected to the Nuclear Project are still ongoing, including an FBI investigation into alleged criminal wrongdoing. Notably, it was only the result of these regulatory investigations and the litigation that followed that Deloitte's involvement in the fraud was revealed.

ANSWER NO. 15: Deloitte denies the allegations set forth in paragraph 15, except denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first, second, and sixth sentences of paragraph 15, and admits that various regulators have subpoenaed SCANA and that on or about October 16, 2017, the SEC issued a subpoena to SCANA and that on or around February 27, 2020, the SEC filed a complaint against SCANA and two individuals.

16.    In total, SCANA's stock price declined from a Class Period high of $76.12 per share on July 6, 2016, to $37.39 per share, a decline of more than 50%, as the news about the fraud and its risks materialized, causing substantial losses to investors.

ANSWER NO. 16: Deloitte denies the allegations set forth in paragraph 16, except admits that SCANA's stock price declined from $76.12 per share on July 6, 2016.

## II.    **JURISDICTION AND VENUE**

17.    This Court has jurisdiction over the subject matter of this action under § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337. The claims asserted herein arise under §§ 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5 and 17 C.F.R. § 240.10b-5.

ANSWER NO. 17: Paragraph 17 sets forth conclusions of law to which no response is required. To the extent a response is required, Deloitte denies the allegations set forth in paragraph 17, except admits that Plaintiffs purport to assert claims under and pursuant to Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

18.    Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1391(b), (c), and (d). Many of the acts and omissions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in this District.

ANSWER NO. 18: Paragraph 18 sets forth conclusions of law to which no response is required. To the extent a response is required, Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 18.

19.     In connection with the acts and conduct alleged in this Consolidated Complaint, Defendant Deloitte, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of national securities markets.

ANSWER NO. 19:  Deloitte denies the allegations set forth in paragraph 19.

## III.     THE PARTIES

### A.     LEAD PLAINTIFF

20.     Lead Plaintiff International Brotherhood of Electrical Workers Local 98 is a multi-employer defined benefit retirement plan for approximately 5,000 employees. As set forth in its updated certification attached hereto as Exhibit A, IBEW 98 purchased SCANA securities during the Class Period and was damaged as a result of Defendants' wrongdoing as alleged in this Complaint. On February 18, 2020, this Court appointed IBEW 98 as the Lead Plaintiff for this litigation.

ANSWER NO. 20:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 20, except admits the allegations set forth in

the final sentence of paragraph 20.

### B.     DEFENDANTS

#### 1.     Deloitte & Touche, LLP

21.     Deloitte & Touche, LLP is the accounting arm of Deloitte, LLP, the United States affiliate of the "Big 4" international accounting firm Deloitte Touche Tohmatsu Limited, headquartered in the United Kingdom. Deloitte & Touche, LLP offers audit and enterprise risk services. As part of its business, the firm provides clients with audit and financial statement reviews. Other services include financial reporting, regulatory updates, employee benefit audits and venture capital services. Deloitte & Touche, LLP has more than 90 offices and 95,000 employees in the United States. Deloitte & Touche, LLP is Delaware limited liability partnership duly organized under the laws of the State of Delaware. It is registered with the PCAOB and Office of the South Carolina Secretary of State and is authorized to conduct business, and in fact does business, in South Carolina. The audit engagement partner on the SCANA audit during the Class Period was Sean Bird.

ANSWER NO. 21:  Deloitte admits that Deloitte & Touche LLP is a Delaware limited

liability partnership, organized and registered as set forth in the sixth and seventh sentences of

paragraph 21.  D&T admits that it provides audit, assurance, and risk and financial advisory

services to clients and is registered with the PCAOB to perform audits of US public companies.

Deloitte admits that Deloitte LLP is the US member firm of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee.  Deloitte denies the remaining allegations of paragraph 21.

### 2.    Deloitte, LLP

22.    Deloitte, LLP manages U.S. subsidiaries that offer tax, consulting, and financial advisory services. Deloitte, LLP is the largest professional service organization in the United States with U.S. revenue, in 2018, of $19.9 billion. Deloitte, LLP is a Delaware limited liability partnership duly organized under the laws of the State of Delaware. It is registered with the Office of the South Carolina Secretary of State and is authorized to conduct business, and in fact does business, in South Carolina.

ANSWER NO. 22:  Deloitte admits that Deloitte LLP is a Delaware limited liability partnership organized and registered as alleged in the third and fourth sentences of paragraph 22. Deloitte admits that Deloitte LLP has several subsidiaries, including Deloitte & Touche LLP; each of the subsidiaries is a separate and distinct legal entity.  The subsidiaries provide an array of distinct, complementary services including audit & assurance, advisory, tax, and consulting services.  Deloitte admits that Deloitte LLP and its subsidiaries reported revenue for fiscal year 2018 as alleged in the second sentence of paragraph 22.  Deloitte denies that Deloitte LLP performs any audits or provides any professional services to clients.  Deloitte denies the remaining allegations in paragraph 22 to the extent they are inconsistent with these responses.

### C.    RELEVANT NON-PARTIES

### 1.    SCANA

23.    SCANA is an energy-based holding company engaged, through subsidiaries, in electric and natural gas utility operations and other energy-related businesses. SCANA's principal and wholly owned subsidiary, South Carolina Electric & Gas ("SCE&G") is a regulated public utility engaged in the generation, transmission, distribution and sale of electricity primarily in South Carolina. SCANA's stock is traded on New York Stock Exchange ("NYSE") under the ticker symbol "SCG." In addition, SCANA Corporation was a regulated monopoly in South Carolina. In January 2019, SCANA Corporation was acquired by Dominion Energy, Inc. ("Dominion"), with SCANA Corporation continuing as a surviving corporation and a wholly owned subsidiary of Dominion.

ANSWER NO. 23:  Deloitte admits the allegations set forth in paragraph 23, except denies

that SCANA's stock is traded on the New York Stock Exchange under the ticker symbol "SCG".

24.    For purposes of this Complaint, references to SCANA refer to SCANA, SCE&G, or both companies, unless otherwise noted.

ANSWER NO. 24:  Paragraph 24 contains no factual allegations and requires no response.

### a.    Kevin Marsh

25.    Kevin B. Marsh ("Marsh") joined SCANA in 1984. Marsh became Vice President and Chief Financial Officer ("CFO") of SCANA in 1996, President of SCE&G in 2006, and President and Chief Operating Officer ("COO") of SCANA in January 2011. In December 2011, Marsh became Chairman of the SCANA Board of Directors and Chief Executive Officer ("CEO") of SCANA. On October 31, 2017, SCANA announced that Marsh was retiring as CEO, effective January 1, 2018. On December 21, 2017, SCANA announced that Marsh would resign as a director, effective December 31, 2017. As the CEO of SCANA, Marsh's responsibilities included overseeing the nuclear expansion project at V.C. Summer. Prior to joining SCANA, March [sic] worked at Deloitte in Columbia, South Carolina, for seven years. Marsh was charged with securities fraud in the SEC Complaint, and has pleaded the Fifth Amendment in civil depositions.

ANSWER NO. 25:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 25, except admits the allegations set forth in

the second through seventh sentences of paragraph 25, and further admits that Marsh was named

as a defendant in the SEC Complaint, and refers to that Complaint for its complete contents.

### b.    Jimmy Addison

26.    Jimmy E. Addison ("Addison") served as SCANA's CFO since April 2006 and its Executive Vice President since January 2012. On October 31, 2017, SCANA announced that Addison would become SCANA's CEO and relinquish his role as CFO, effective January 1, 2018. Prior to joining SCANA, Addison worked at Deloitte for seven years. Addison has pleaded the Fifth Amendment in civil depositions.

ANSWER NO. 26:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 26, except admits the allegations set forth in

the first, second, and third sentences of paragraph 26.

### c.     Stephen Byrne

27.     Stephen A. Byrne ("Byrne") joined SCANA in 1995. In 2009, Byrne became an Executive Vice President of SCANA, and in 2011, he became President, Generation and Transmission, and COO of SCE&G. On October 31, 2017, SCANA announced that Byrne was retiring from all of his positions, effective January 1, 2018. He joined SCE&G in 1995 as the Plant Manager at the V.C. Summer plant, and he later became the company's Chief Nuclear Officer. From 2012 until January 2018, Byrne was an Executive Vice President of SCANA and President of Generation and Transmissions and Chief Operating Officer of SCE&G. His responsibilities included overseeing all nuclear operations for SCANA, including construction of the two new nuclear units at V.C. Summer. Byrne was charged with securities fraud in the SEC Complaint, and has pleaded the Fifth Amendment in civil depositions.

ANSWER NO. 27:  Deloitte admits the allegations set forth in the first through sixth sentences of paragraph 27, admits that Byrne was named as a defendant in the SEC Complaint, and refers to that Complaint for its complete contents, and denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 27.

### 2.     **Westinghouse Electric Company LLC**

28.     Westinghouse is a nuclear power company headquartered in Pennsylvania, and wholly-owned by Toshiba Corporation ("Toshiba"). Westinghouse offers nuclear products and services to utilities, including the design of nuclear power plants. Westinghouse was the lead contractor for the Nuclear Project. In May 2008, Westinghouse and Stone & Webster, Inc. ("Stone & Webster"), a subsidiary of The Shaw Group Inc. (together with Stone & Webster, "The Shaw Group"), entered into an Engineering, Procurement, and Construction contract with SCANA and Santee Cooper for the design and construction of the nuclear electric-generating units at the site of the V.C. Summer Nuclear Station (the "EPC Contract"). On March 29, 2017, Westinghouse filed for Chapter 11 bankruptcy.

ANSWER NO. 28:  Deloitte admits allegations set forth in paragraph 28.

### 3.     **Stone & Webster, Inc.**

29.     Stone & Webster is an engineering services company headquartered in Massachusetts. In 2012, Chicago Bridge & Iron, Inc. ("CB&I"), a provider of technology and infrastructure for the energy industry, acquired the Stone & Webster nuclear construction business as part of its $3 billion acquisition of The Shaw Group, which resulted in the formation of a nuclear power subsidiary named CB&I Stone & Webster. In October 2015, Westinghouse agreed to purchase CB&I Stone & Webster from CB&I for $229 million in an effort to help contain the costs of the Nuclear Project by taking over the construction function. Westinghouse's acquisition of CB&I Stone & Webster was completed in January 2016.

ANSWER NO. 29:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 29.

### 4.      Toshiba Corporation

30.     Toshiba, a Japanese multinational conglomerate, was the parent company of
Westinghouse, the lead contractor for the Nuclear Project. Toshiba purchased Westinghouse in
October 2006. After Westinghouse filed for bankruptcy, Toshiba sold Westinghouse for $2.16
billion to a group of hedge funds led by the Baupost Group in January 2018.

ANSWER NO. 30:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 30, except admits the allegations set forth in

the first and second sentences of paragraph 30.

31.     The various parties to the EPC Contract who were the contractors on the Nuclear
Project retained by SCANA and Santee Cooper are sometimes herein referred to, collectively, as
the "Consortium." Because of the acquisitions described above, the identities of the members of
the Consortium changed over the course of the Class Period.

ANSWER NO. 31:  The first sentence of paragraph 31 contains no factual allegations and

requires no response.  Deloitte admits the allegations set forth in the second sentence of paragraph

31.

### 5.      South Carolina Public Service Authority

32.     The South Carolina Public Service Authority (a/k/a Santee Cooper) is a state-owned
public utility that provides electricity to more than two million customers in South Carolina. It co-
owned the Nuclear Project with SCANA.

ANSWER NO. 32:  Deloitte admits the allegations set forth in paragraph 32.

### 6.      The South Carolina Public Service Commission

33.     The South Carolina Public Service Commission ("PSC") is a publicly elected
executive board that regulates utility rates in South Carolina. The PSC regulated the rates that
SCANA charged its approximately 700,000 electricity customers in the state and also regulated
the fixed assets that were invested in SCANA's business so that utility service could be provided
to the company's customers. During the Class Period, the PSC held public hearings on SCANA's
rate petitions and also maintained a website where many of SCANA's false and misleading
statements to the regulatory body were accessible by the public and Deloitte.

ANSWER NO. 33:  Deloitte denies the allegations set forth in paragraph 33, except admits

the allegations set forth in the first and second sentences of paragraph 33, and further admits that

during the Class Period the PSC held public hearings on SCANA's rate petitions and maintained

a website.

## IV.    FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS OF THE FRAUD

### A.    SCANA AND ITS NUCLEAR BUSINESS

34.    SCANA was an electric and gas utility company engaging primarily in electric and natural gas utility operations and other energy-related business in South Carolina, North Carolina and Georgia. Its principal, wholly owned subsidiary was SCE&G. SCE&G generated, transmitted, distributed, and sold to approximately 700,000 electricity customers and 350,000 natural gas customers in South Carolina. Its electric service territory extended into 24 counties and its natural gas service territory encompassed all or part of 35 counties in South Carolina. More than 3.4 million people lived in the counties serviced by SCE&G.

ANSWER NO. 34:  Deloitte admits the allegations set forth in paragraph 34.

35.    SCE&G was the operator and two-thirds joint owner of the V.C. Summer Site. Santee Cooper, a South Carolina state-owned electric and water utility, owned the remaining one-third share. SCE&G and Santee Cooper split the operating costs and energy output of the plant according to their respective shares. The V.C. Summer Site initially was comprised only of V.C. Summer Unit 1, a nuclear reactor supplying a net output of 966-megawatts which first began commercial operation in 1984.

ANSWER NO. 35:  Deloitte admits the allegations set forth in paragraph 35, except denies

knowledge or information sufficient to form a belief as to the truth of the allegations regarding the

net output of the V.C. Summer Unit 1.

36.    In 2005, SCANA concluded that to meet the future energy demands of its customers it needed to generate more power. SCANA sought proposals from various nuclear generation construction firms on the best way to meet the energy needs of its customers over the coming decades. In December 2005, SCE&G and Santee Cooper notified the U.S. Nuclear Regulatory Commission ("NRC")—the federal agency that regulates commercial nuclear power plants and other uses of nuclear materials in the United States—of their intent to submit a joint application for a combined construction and operating license to build two new reactors in South Carolina. On February 10, 2006, SCE&G and Santee Cooper announced the selection of the V.C. Summer Site as the preferred site for potential new nuclear construction, and plans to build nuclear reactors using "AP1000," a new advanced light water reactor designed by Westinghouse. SCE&G and Santee Cooper aimed to build the new nuclear reactors by the mid-2010s, in time to meet an

anticipated increase in "base load" electricity demand—the minimum amount of electric power needed to be supplied.

ANSWER NO. 36:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 36, except admits the allegations contained

in the third sentence of paragraph 36, and further admits that on or around February 10, 2006,

SCE&G and Santee Cooper announced the selection of the V.C. Summer Site as the preferred site

for a potential new nuclear construction.

37.    In May 2008, SCE&G and Santee Cooper (together, the "Owners") agreed to build two new 1,117-megawatt AP1000 nuclear reactors at the V.C. Summer Site as joint owners (the "Nuclear Project"). SCE&G had a 55% ownership stake and Santee Cooper had a 45% ownership stake in the Nuclear Project. The Owners agreed to share operating costs and generation output of the two additional units ("Unit 2" and "Unit 3") according to their respective shares. Unit 2 and Unit 3 would have been among the first new nuclear plants to be built in the U.S. since the 1980s. The Owners also selected Westinghouse to be the lead contractor on the Nuclear Project and agreed to hire Westinghouse and Stone & Webster to build two Westinghouse AP1000 nuclear reactors at the V.C. Summer Site.

ANSWER NO. 37:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 37, except admits the allegations set forth in

the first, second, third, and final sentences in paragraph 37.

38.    On May 23, 2008, SCANA signed an Engineering, Procurement, and Construction agreement with Westinghouse and Stone & Webster. Under the EPC Contract, Westinghouse and Stone & Webster agreed to design, engineer, and construct the new nuclear units by contractually-defined Guaranteed Substantial Completion Dates ("GSCD")—April 1, 2016 for Unit 2 and January 1, 2019 for Unit 3. From the very beginning, SCANA made clear that the GSCDs had been set to ensure that that the Nuclear Project would be in service by the deadline for the production tax credits.

ANSWER NO. 38:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 38, except admits that the contract exists,

and refers to the contract for its complete and accurate contents.

39.    The Nuclear Project was the largest capital project undertaken in SCANA's history. The total cost for the Nuclear Project was originally estimated at approximately $9.8 billion, and SCANA's 55% share of the cost amounted to approximately $5.4 billion. The cost to build the

Nuclear Project thus amounted to more than two times SCANA's entire market capitalization at the time, which amounted to approximately $4.5 billion.[3]

ANSWER NO. 39:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 39 and including footnote 3, including the second sentence of paragraph 39, which does not attribute the estimate to any person or entity.

40.    Accordingly, it was essential to SCANA and its investors that the Nuclear Project succeed. On September 12, 2008, a Wachovia analyst remarked that "[m]anagement readily admits that it is 'betting the family farm' on the project."

ANSWER NO. 40:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 40.

41.    Construction of the Nuclear Project was financially feasible for SCANA due to two pieces of legislation passed in 2005 and 2007, respectively.

ANSWER NO. 41:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 41.

1.    **The 2005 Energy Policy Act Creates Billions of Dollars of Tax Credits Available for Nuclear Construction Completed by January 2021**

42.    In 2005, Congress passed the Energy Policy Act (the "Energy Policy Act"), which established a large nuclear production tax credit (the "Nuclear Tax Credits") to incentivize the construction of new nuclear facilities in the U.S.[4] 26 U.S.C. §45J. The Nuclear Tax Credits were available if (i) the nuclear reactor design was approved by the NRC after 1993; and (ii) the new nuclear plant was *placed in service* before January 1, 2021. In short, as SCANA told investors, in order to receive the Nuclear Tax Credits, the Nuclear Project had to be operational and producing power by the end of 2020.

ANSWER NO. 42:  Deloitte admits that the Energy Policy Act was enacted, refers to the statute for its complete contents, and denies any allegation or characterization inconsistent therewith.

---

[3] SCANA's primary competitors were significantly larger: Duke Energy and Southern Company had market capitalizations of $19 billion and $25 billion, respectively.

[4] 26 U.S.C. §45J.

43.     As SCANA repeatedly told investors in its Forms 10-K, if the Nuclear Project were placed in service prior to the January 1, 2021 deadline, it would qualify for production tax credits estimated to be "as much as" $85,937,500 annually per unit, or **$1.4 billion in total**, over 8 years.

ANSWER NO. 43:  Deloitte denies the allegations set forth in paragraph 43, except admits that SCANA filed Form 10-Ks, and refers to the Form 10-Ks for their complete contents.

44.     The Nuclear Project's eligibility for these Nuclear Tax Credits was critical to SCANA's ability to finance the project in a cost-effective manner and make the project financially viable. SCANA, describing the Nuclear Tax Credits as a "strategic imperative," repeatedly emphasized that receiving the production tax credits was essential in order to maintain regulatory and financial support for the nuclear expansion project. Indeed, not only would the Nuclear Tax Credits mitigate the costs that rate payers would bear for the project, but SCANA's ability to receive the Nuclear Tax Credits was also crucial to the PSC, who regulated the electricity rates that SCANA charged.

ANSWER NO. 44:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 44, including, but not limited to, the portions of paragraph 44 that appear to be quotations from an unidentified document.

## 2.     The BLRA Allows SCANA to Charge Increased Energy Rates to Recover "Prudent" Nuclear Project Construction Costs

45.     In 2007, the South Carolina legislature passed the Base Load Review Act, S.C. Code § 58-33-210 et seq. (2007), (the "BLRA"). The BLRA was designed to allow utility companies to recoup "prudently incurred" capital for a base load generating power plant during its construction, rather than waiting until it was built. Prior to the BLRA's passage, South Carolina required utilities to complete construction before charging ratepayers for the costs associated with that construction.

ANSWER NO. 45:  Deloitte admits that the BLRA was enacted, refers to the statute for its complete contents, and denies any allegation or characterization inconsistent therewith.

46.     In a November 21, 2017 legal filing before the PSC, South Carolina's Attorney General explained that, "as applied to SCE&G ratepayers, [the BLRA] requires a utility and its investors to be paid 'up front' by customers in order to finance the construction of exorbitantly expensive nuclear power plants." Similarly, a December 10, 2017 article in *The Post and Courier* titled "Power Failure: How utilities across the U.S. changed the rules to make big bets with your money" explained that the BLRA "shift[ed] risks of construction projects from power companies to their customers. . . . It was like paying a grocer as it builds its store — with the hope that groceries might be a little cheaper when it opens."

ANSWER NO. 46:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 46, except admits that the referenced article

was published and the South Carolina Attorney General submitted a brief as intervenor on

November 21, 2017, and refers to the cited documents for their complete contents.

47.     The BLRA allowed SCANA to apply to the PSC for permission to increase electric
rates charged to customers in order to recoup the cost of capital associated with the Nuclear
Project.[5] This "base load review application" required SCANA to submit, among other things, the
construction schedule, the capital costs and schedule for incurring them, the selection of principal
contractors and suppliers, the proposed rate design used in formulating revised rates, and the
revised rates that the utility intends to put in place after the issuance of a base load review order.[6]
The BLRA also required SCANA to file quarterly reports, or the "BLRA Quarterly Reports," that
detailed the progress of construction on the new nuclear units, the costs of the project, and the
scheduled completion dates for the new units.

ANSWER NO. 47:  Deloitte admits that the BLRA was enacted, refers to the statute for its

complete contents, and denies any allegation or characterization inconsistent therewith.

48.     Under the BLRA, SCANA could be held responsible for imprudently incurred
costs. Pursuant to section 55-33-275(E) of the Base Load Review Act:

> In cases where a party proves by a preponderance of the evidence
> that there has been a material and adverse deviation from the
> approved schedules, estimates, and projections set forth in Section
> 58-33-270(B)(1) and 58-33-270(B)(2), as adjusted by the inflation
> indices set forth in Section 58-33-270(B)(5), the commission may
> disallow the additional capital costs that result from the deviation,
> but only **to the extent that the failure by the utility to anticipate
> or avoid the deviation, or to minimize the resulting expense, was
> imprudent considering the information available at the time
> that the utility could have acted to avoid the deviation or
> minimize its effect.**

ANSWER NO. 48:  Deloitte admits that the BLRA was enacted, refers to the statute for its

complete contents, and denies any allegation or characterization inconsistent therewith.

49.     In addition, under the BLRA, a utility may recover costs from ratepayers for
abandoned nuclear construction projects only "to the extent that the failure by the utility to
anticipate or avoid the allegedly imprudent costs, or to minimize the magnitude of the costs, was

---

[5] S.C. Code § 58-33-230 (2007).
[6] S.C. Code § 58-33-250 (2007).

imprudent considering the information available at the time that the utility could have acted to avoid or minimize the costs."

ANSWER NO. 49:  Deloitte admits that the BLRA was enacted, refers to the statute for its complete contents, and denies any allegation or characterization inconsistent therewith.

### 3.    SCANA Petitions to Build Two New Nuclear Reactors at the V.C. Summer Site

50.    On March 31, 2008, SCANA submitted a combined construction and operating license application to the NRC to build the Nuclear Project.

ANSWER NO. 50:  Deloitte admits the allegations set forth in paragraph 50.

51.    On May 30, 2008, SCANA submitted to the PSC a "Combined Application For Certificate of Environmental Compatibility, Public Convenience and Necessity and For a Base Load Review Order to the PSC" (the "Combined Application").

ANSWER NO. 51:  Deloitte admits the allegations set forth in paragraph 51.

52.    The Combined Application detailed SCANA's request, under the BLRA, for an increase of 36% in customers' electric rates during the Nuclear Project's construction over the next 12 years based on the GSCD for unit 3—two years in advance of the January 1, 2021 deadline for the Nuclear Tax Credits.

ANSWER NO. 52:  Deloitte admits that SCANA submitted the Combined Application, refers to the document for its complete contents, and denies any allegation or characterization inconsistent therewith.

53.    The PSC held public hearings to consider the Combined Application. During a September 16, 2008 PSC hearing, Marsh and Byrne represented that SCANA would directly exercise close oversight over the Nuclear Project.

ANSWER NO. 53:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 53, except admits that a public hearing was held on September 16, 2008, and refers to the transcript thereof for its complete contents.

54.    For example, Marsh testified that:

> SCE&G is assembling a team of engineering and construction personnel, with accounting and administrative support, to monitor all aspects of the construction process and to ensure that the EPC

19

contract is administered as intended. . . . In all, we estimate more than 50 people will be assigned to this task. At the center of this structure will be a **dedicated group of SCE&G personnel that will monitor each aspect of the construction process on a day-to-day basis and will report progress, issues and variances to an executive steering committee that includes me as SCE&G's president, and a senior executive from Santee Cooper and to the SCANA board of directors**. **This project will be monitored on a sustained and continuous basis by all levels of the reporting chain** . . . .

ANSWER NO. 54:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 54, except admits that Marsh testified at the September 16, 2008 PSC hearing, and refers to the transcript of the testimony for its complete contents.

55.    In his testimony, Byrne described how this oversight team would "monitor each aspect of construction, []sit in on the construction meetings Westinghouse/Stone & Webster will conduct with its personnel and subcontractors, []participate in inspection and testing and acceptance protocols, and []review and monitor closely issues of cost, budget compliance and milestone progress." This team would then also provide monthly progress reports regarding the Nuclear Project to Byrne and to the Executive Steering Committee (which included Marsh), and meet in-person with the Executive Steering Committee to provide quarterly status updates.

ANSWER NO. 55:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 55, except admits that Byrne testified at the September 16, 2008 PSC hearing, and refers to the transcript of the testimony for its complete contents.

56.    On March 2, 2009, the PSC issued No. 2009-104(A), a comprehensive written order approving the Combined Application and the revised rate schedule. This order specifically noted that the "**definitive substantial completion deadlines for Unit 2 and 3 [were] April 1, 2016 and January 1, 2019**." The order estimated costs for the Nuclear Project to be $6.3 billion in future dollars. The order further permitted SCE&G to start charging increased rates, as long as it (a) remained on track to complete the new units for the approved costs, or (b) obtained the PSC's approval for a change in those costs.

ANSWER NO. 56: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 56, except admits that the PSC issued an order on March 2, 2009, and refers to the order for its complete contents.

57.     The PSC's order made clear that, given the enormous costs of constructing the Nuclear Project, it was essential that SCANA "prudently" manage the Nuclear Project.

ANSWER NO. 57: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 57, except admits that the PSC issued an order on March 2, 2009, and refers to the order for its complete contents.

58.     In May 2009—just two months after the PSC's approval—SCE&G filed its initial rate adjustment request for an overall electric rate increase of 1.1%, equivalent to an annual revenue increase of $22,533,000, to help finance its Nuclear Project costs. This increase was on top of the 36% increase already listed in the initial Combined Application.

ANSWER NO. 58: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 58, except admits the allegations set forth in the first sentence of paragraph 58.

59.     In March 2012, the NRC approved SCANA's plan to build the two new nuclear reactors at the V.C. Summer Site.

ANSWER NO. 59: Deloitte admits the allegations set forth in paragraph 59.

60.     On May 15, 2012, SCANA petitioned the PSC requesting approval of an updated construction and capital cost schedules for the Nuclear Project. SCANA's updated construction schedule delayed the completion of Unit 2 until March 15, 2017, from April 1, 2016, and accelerated Unit 3's completion to May 15, 2018, from January 1, 2019. The PSC approved the petition on November 15, 2012.

ANSWER NO. 60: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 60, except admits that SCANA filed a petition with the PSC on May 15, 2012 and the PSC issued an order on November 15, 2012, and refers to the petition and order for their complete contents.

61.     Ultimately, SCANA successfully petitioned the PSC for **nine rate hikes** under the BLRA:[7]

| Year-End | Action | Amount | Allowed Return on Common Equity ("ROE") |
|---|---|---|---|
| 2008 | 0.4% | $7.8 | 11.0% |
| 2009 | 1.1% | $22.5 | 11.0% |
| 2010 | 2.3% | $47.3 | 11.0% |
| 2011 | 2.4% | $52.8 | 11.0% |
| 2012 | 2.3% | $52.1 | 11.0% |
| 2013 | 2.9% | $67.2 | 11.0% |
| 2014 | 2.8% | $66.2 | 11.0% |
| 2015 | 2.8% | $64.5 | 11.0% |
| 2016 | 2.7% | $64.4 | 10.5% |

ANSWER NO. 61:  Deloitte denies the allegations set forth in paragraph 61, except admits that SCANA made multiple petitions to the PSC under the BLRA to raise rates, and refers to the orders issued by the PSC for their complete contents.

62.     These rate increases resulted in SCANA customers paying over $1.4 billion over time, as shown below:[8]

| Docket | Year | Approved Increase | Estimated Cumulative Impact | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| 2008-196-E | 2009 | 7,802,451 | 5,851,988 | 7,802,491 | 7,802,491 | 7,802,491 | 7,802,491 | 7,802,491 | 7,802,491 | 7,802,451 | 7,802,491 |
| 2009-696-E | 2009 | 22,531,000 | 3,755,500 | 22,531,000 | 22,531,000 | 22,531,000 | 22,531,000 | 22,531,000 | 22,531,000 | 22,531,000 | 22,531,000 |
| 2010-157-E | 2010 | 47,301,000 | | 7,883,506 | 47,301,000 | 47,301,000 | 47,301,000 | 47,301,000 | 47,301,000 | 47,301,000 | 47,301,000 |
| 2011-197-E | 2011 | 52,783,342 | | | 6,797,254 | 52,783,342 | 52,783,342 | 52,783,342 | 52,783,342 | 52,783,342 | 52,783,342 |
| 2012-186-E | 2012 | 52,348,913 | | | | 8,691,486 | 52,348,913 | 52,348,913 | 52,348,913 | 52,348,913 | 52,348,913 |
| 2013-150-E | 2013 | 67,246,232 | | | | | 11,236,705 | 67,246,232 | 67,246,232 | 67,246,232 | 67,246,232 |
| 2014-187-E | 2014 | 66,238,000 | | | | | | 11,859,567 | 66,238,000 | 66,238,000 | 66,238,000 |
| 2015-160-E | 2015 | 64,526,000 | | | | | | | 30,754,333 | 64,526,000 | 64,526,000 |
| 2016-224-E | 2016 | 64,428,000 | | | | | | | | 5,369,000 | 64,428,000 |
| Total | | | 8,607,988 | 38,258,991 | 86,433,715 | 139,111,159 | 193,775,451 | 260,848,645 | 326,801,313 | 385,543,904 | 445,080,576 |

Estimated Cumulative Impact of Approved Increases 2009-2016    1,648,740,779

Estimated Cumulative Impact of Approved Increases 2009-2017    1,885,741,772

ANSWER NO. 62:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 62, and denies that the information presented in paragraph 62 is available at the cited source, which appears to be an article written for law

---

[7] 2008 Annual Report on Form 10-K filed on February 27, 2009, Management's Discussion and Analysis; 2009 Annual Report on Form 10-K filed on March 1, 2010, p. 13; 2012 Annual Report on Form 10-K filed on February 28, 2013, p. 61; 2014 Annual Report on Form 10-K filed on February 27, 2015, p. 118; 2015 Annual Report on Form 10-K filed on February 26, 2016, p. 116; 2016 Annual Report on Form 10-K filed on February 24, 2017, p. 65.

[8] SCE&G Customers Have Paid $1.4B for Unfinished Nuclear Reactors (Apr. 7, 017), https://www.law.georgetown.edu/wp-content/uploads/2018/07/Rule-18-Handout-1.Secara-1.pdf.

students about how to conform to the Blue Book citation requirements and does not mention

SCANA at all.

63.    As a result, South Carolina residents are forced to pay some of the highest electricity bills in the country.

ANSWER NO. 63:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 63.

## B.    FINANCIAL    REPORTING    AND    GENERALLY    ACCEPTED ACCOUNTING PRINCIPLES

### 1.    Explanation of Financial Statements

64.    SCANA's annual financial statements filed with the SEC during the Class Period included the following, along with the referenced notes to those statements: (1) a Consolidated Balance Sheet, (2) a Consolidated Statements of Income and Comprehensive Income, (3) a Consolidated Statement of Cash Flows, and (4) a Consolidated Statement of Changes in Common (shareholders') Equity.

ANSWER NO. 64:  Deloitte admits the allegations set forth in paragraph 64.

65.    The balance sheet provides a useful snapshot of the liquidity of a company and its financial stability at a particular point in time, including its assets and liabilities, equity and capital.

ANSWER NO. 65:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 65, except admits that a balance sheet is one

type of financial statement, and that it presents information about a company's assets, liabilities,

equity, and capital, among other features, as of a specified point in time.

66.    The income statement provides information about a company's financial performance over a certain period of time. This includes information such as sales, cost of sales, overhead costs, net income, and trends in those numbers from period to period. This type of information helps investors to assess historical trends and future performance. It also helps investors to assess the likelihood of receiving adequate returns on their investments or loans.

ANSWER NO. 66:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 66, except admits the allegations set forth in

the first and second sentences of paragraph 66.

23

67.    The statement of cash flows details how much cash a company has at a point in time, the cash inflows and outflows that have taken place over a given period, the sources of the cash (*e.g.*, from business operations or from outside lenders or investors), and the uses of the cash (*e.g.*, to fund the company's operations, pay off financings, or make investments).

ANSWER NO. 67:  Deloitte admits the allegations set forth in paragraph 67.

68.    Each of SCANA's financial statements during the Class Period explicitly tell investors to "See Notes to Consolidated Financial Statements."[9] This is because financial statements must include certain required by disclosures in the notes to comply with GAAP. Accordingly, Deloitte's responsibility under PCAOB Standards and its audit reports in this matter applied to SCANA's notes to its financial statements and the referenced consolidated statements themselves.

ANSWER NO. 68:  Deloitte admits the allegations set forth in the first sentence of paragraph 68, and admits that generally accepted accounting standards, or GAAP, contain requirements about disclosure and refers to GAAP for a complete recitation of those requirements. Deloitte further admits that D&T's audit engagements at issue in this case, including the content of the opinions it issued, were governed by PCAOB Standards and refers to those standards for their complete contents.  Deloitte denies any remaining any allegation or characterization inconsistent with those principles and standards.

### 2.    **Generally Accepted Accounting Principles**

69.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures that define accepted accounting practice at a particular time. In the United States, GAAP is established through accounting standards issued by the Financial Accounting Standards Board ("FASB").

ANSWER NO. 69:  Deloitte admits that that the FASB issues standards that form the basis of GAAP in the Unitèd States, and that GAAP contains authoritative literature related to accounting standards and financial reporting, and refers to GAAP for a complete recitation of that information  and guidance, and denies anything in paragraph 69 inconsistent therewith.

---

[9] See Regulation S-X Rule 1-01(b), 17 CFR 210.1-01(b). PCAOB standards often refer to the notes as "disclosures".

70.    GAAP enhances the credibility of the information in the financial statements by making it relevant, comparable, complete, timely, neutral and unbiased, representative of the economic transactions entered into, and useful for decision-making purposes.

ANSWER NO. 70:    Deloitte denies the allegations set forth in paragraph 70, and affirmatively avers that that GAAP contains authoritative literature related to accounting standards and financial reporting, and refers to GAAP for a complete recitation of those statements and denies anything in paragraph 70 that is inconsistent with them.

71.    In deciding where to invest their capital, investors and lenders consider various factors, including the likelihood that they will receive a return on their capital in the form of interest, dividends, or an increase in value of the investment. Accordingly, one of the fundamental objectives of financial reporting is that it provides reliable and useful information concerning a company's financial performance during the period being presented. FASB, Statement of Financial Accounting Concepts No. 8 states:

> The objective of general purpose financial reporting[1] is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity. Those decisions involve buying, selling, or holding equity and debt instruments and providing or settling loans and other forms of credit.[10]

ANSWER NO. 71:    Paragraph 71 does not contain allegations of fact, but rather incomplete hypotheticals and argument, and, on that basis, Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 71, except admits that FASB, Statement of Financial Accounting Concepts No. 8, OB2 contains the excerpted language in paragraph 71, and refers to the statement for its complete contents.

72.    A lack of credible information significantly increases investment or lending risk, and also creates a need for commensurate higher returns to compensate for that risk. Financial statements thus provide the information necessary for making informed decisions. If financial statements filed with the SEC are not prepared in conformity with GAAP, they are presumed to be misleading and inaccurate.[11]

---

[10] FASB Statement of Financial Accounting Concepts No. 8 OB2, see also OB3 – OB11.
[11] Regulation S-X (17 C.F.R. §210.4-01(a)(1)).

ANSWER NO. 72:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 72, except admits that 17 C.F.R. § 210.4-

01(a)(1) states that "[f]inancial statements filed with the Commission which are not prepared in

accordance with generally accepted accounting principles will be presumed to be misleading or

inaccurate, despite footnote or other disclosures, unless the Commission has otherwise provided.

This article and other articles of Regulation S-X provide clarification of certain disclosures which

must be included in any event, in financial statements filed with the Commission."

### C.    THE ROLE OF THE INDEPENDENT EXTERNAL AUDITOR

73.    Management prepares and is responsible for a company's financial statements and disclosures. This necessarily raises questions regarding the reliability of those financial statements, which may reflect on the competence and stewardship of management, or affect management's compensation. To address this concern and enhance the credibility of the financial statements, companies often engage an independent certified public accountant to opine on whether its financial statements are prepared in accordance with GAAP. As such, the auditor has an important role as a "gatekeeper" for the capital markets. That is why publicly traded companies must obtain financial statement audits and provide those audited financial statements to the investing public.

ANSWER NO. 73:  Deloitte admits the allegations in the first sentence of paragraph 73.

The remaining allegations in Paragraph 73 do not contain allegations of fact, but rather incomplete

hypotheticals and argument, and, on that basis, Deloitte denies knowledge or information sufficient

to form a belief as to the truth of the allegations set forth in paragraph 73.

74.    An audit is conducted for the benefit of the stakeholders of a company. An independent auditor adds credibility to financial statements by verifying the numbers and disclosures. The goal and objective of the audit is to provide the users of the financial statements with reasonable assurance the financial statements are presented correctly. The audit reports issued by the auditor actually use the words "reasonable assurance." As a result, the departments at the public accounting firms that provide audits, such as SCANA's auditor, Deloitte, are commonly referred to as the "assurance line of practice."

ANSWER NO. 74:  Paragraph 74 does not contain allegations of fact, but rather incomplete

hypotheticals and argument, and, on that basis, Deloitte denies knowledge or information sufficient

to form a belief as to the truth of the allegations set forth in paragraph 74.

75. The auditing profession's Center for Audit Quality explains the gatekeeping role of the auditor this way:

> Independent audits are a core component of the U.S. financial system and help give investors, and the capital markets, the confidence to invest in public companies. Although clearly not a guarantee of the performance of such investments (which is affected by many factors), the close scrutiny provided by audits reduces "information risk"—the possibility that investment decisions will be based on inaccurate data. Without independent audits, investors would have to rely on management's word that its financial statements are accurate. Many investors likely would be less willing to risk their assets on data that has not withstood independent scrutiny.[12]

ANSWER NO. 75:  Deloitte admits that the referenced document exists, and refers to it for its complete contents.

76. An audit includes, for example, "examining, on a test basis, evidence supporting the amounts and disclosures in the company's financial statements, an assessment of the accounting principles used and significant estimates made by management, as well as evaluating whether the overall financial statements taken as a whole are free of material misstatement."[13]

ANSWER NO. 76:  Deloitte admits that the referenced document exists, and refers to it for its complete contents.

77. Auditors do this independently as a double check on the managers of the company. Auditors are not supposed to just take management's word for things. They are required to perform independent procedures and tests to verify the reported information so they can tell the company's board of directors or management committee—and investors—if there are inadvertent mistakes or intentional misstatements by management. Auditors also consider whether the financial statements reflect the substance of the company's economic activity, not just the form.[14]

ANSWER NO. 77:  Paragraph 77 does not contain allegations of fact, but rather incomplete hypotheticals, argument, and an incomplete description of the standards applicable to an audit.

---

[12] Center for Audit Quality, Guide to Public Company Auditing (2011).

[13] Center for Audit Quality, In-Depth Guide to Public Company Auditing: The Financial Statement Audit, at 3 (May 2011).

[14] PCAOB, AU § 411: The Meaning of Present Fairly in Conformity With Generally Accepted Accounting Principles ("AU § 411"), ¶ .06. PCAOB AS 2815, The Meaning of "Present Fairly in Conformity with Generally Accepted Accounting Principles" (AS 2815) (2016 Audit).

Deloitte admits that PCAOB standards apply to public company audits, refer to those standards

for their complete contents, and denies any allegations inconsistent therewith.

78.    Even if a certain accounting entry is technically accurate under GAAP, it could still be incomplete or misleading to readers of the financial statements, in which case the auditor will require additional explanation in the financial statements so that readers can understand the substance of the company's activities.

ANSWER NO. 78:  Paragraph 78 does not contain allegations of fact, but rather incomplete

hypotheticals, argument, and an incomplete description of the standards applicable to an audit.

Deloitte admits that PCAOB standards apply to public company audits, refer to those standards

for their complete contents, and denies any allegations inconsistent therewith .

79.    If the auditor finds the financial statements to be materially correct and presented fairly in accordance with GAAP, the auditor issues what is commonly referred to as an "unqualified" or "clean" report, and no exceptions are noted. However, when the auditor determines that the financial statements have a material deviation from GAAP, such as incorrect numbers or missing disclosures, the auditor is required to note the information in the auditor's report.[15] In doing so, the auditor alerts investors, lenders, and other users of the financial statements that the credibility of the financial statements is in question. Failure on the part of the auditor to state that GAAP has not been complied with by a company is a serious violation by the auditor of professional standards.

ANSWER NO. 79:  Paragraph 79 does not contain allegations of fact, but rather incomplete

hypotheticals, argument, and an incomplete description of the standards applicable to an audit.

Deloitte admits that PCAOB standards apply to public company audits, refer to those standards

for their complete contents, and denies any allegations inconsistent therewith.

### D.    DELOITTE'S RESPONSIBILITIES AS SCANA'S AUDITOR

80.    Deloitte and SCANA have a prolonged and intertwined relationship spanning decades. Deloitte served as SCANA's "independent auditor" for more than *70 years*, beginning in 1945 and continuing throughout the Class Period.

---

[15] PCAOB, AU § 508: *Reports on Audited Financial Statements* ("AU § 508"), ¶ .10. (2015 Audit); PCAOB AS 3105, *Departures from Unqualified Opinions and Other Reporting Circumstances* ("AS 3105") (2016 Audit).

ANSWER NO. 80:  Deloitte denies the allegations set forth in paragraph 80, except admits

the allegations set forth in the final sentence of paragraph 80.

81.    Deloitte acted as a "feeder" to SCANA senior management. For example, Kevin Marsh, SCANA's former CEO and Chairman, worked at Deloitte in Columbia, South Carolina, for seven years prior to joining SCANA. Jimmy Addison, SCANA's former CFO and latter CEO, also worked at Deloitte for seven years prior to joining SCANA. James E. Swan, SCANA's Vice President and Controller, worked at Deloitte for 18 years before joining SCANA. Finally, Gregory E. Aliff served worked at Deloitte for 28 years before retiring in May 2015—a mere five months before becoming a member of the SCANA Board of Directors and head of SCANA's Audit Committee—which is responsible for overseeing Deloitte—in October 2015.[16]

ANSWER NO. 81:  Deloitte denies the allegations set forth in paragraph 81, except denies

knowledge or information sufficient to form a belief as to the truth of the allegations set forth in

the footnote to paragraph 81, and admits that the individuals named in paragraph 81 held positions

at D&T during the stated times.

82.    Deloitte was paid nearly $10 million for its audit work for SCANA and SCE&G for the years 2015, 2016, and 2017.

ANSWER NO. 82:  Deloitte admits that D&T received a total of nearly $10 million for its

work in connection with SCANA and its subsidiaries during the years 2015 through 2017.

83.    As set forth below, Deloitte was responsible for auditing SCANA's 2015 and 2016 financial statements included in the Company's Forms 10-K, and also for conducting interim reviews of SCANA's quarterly financial information presented in the SCANA's Quarterly Reports on Form 10-Q filed with the SEC during the Class Period.

ANSWER NO. 83:  Deloitte admits the allegations set forth in paragraph 83 with respect

to D&T, and denies them with respect to Deloitte, LLP.

---

[16] Deloitte and Aliff continued to maintain close ties during the Class Period. For example, all 31 people mentioned in the Acknowledgements Section of his book, *Accounting for Public Utilities*, are current Partners, Principals, and Senior Managers at Deloitte. ROBERT L. HAHNE & GREGORY E. ALIFF, ACCOUNTING FOR PUBLIC UTILITIES (2020).

1.    **Deloitte was Responsible for Auditing SCANA's Financial Statements and Determining Whether they Were in Compliance with GAAP**

a.    **Deloitte Was Obligated to Follow Public Company Accounting Oversight Board Auditing Standards in Conducting its SCANA Audits**

84.    To oversee independent auditors, the Sarbanes-Oxley Act of 2002 established the Public Company Accounting Oversight Board ("PCAOB"). The PCAOB is responsible for establishing professional audit standards applicable to audits of publicly-traded companies, including SCANA (the "PCAOB Standards").

ANSWER NO. 84:  Deloitte admits that the Sarbanes-Oxley Act of 2002 established the

PCAOB and further admits the allegations set forth in the final sentence of paragraph 84, refers to

the statute for its complete contents, and denies any allegations or characterization inconsistent

therewith.

85.    The PCAOB Standards set the minimum level of ethical, performance and quality that auditors are expected to achieve. They are intended to "provide a measure of audit quality and the objectives to be achieved in an audit."[17] During Deloitte's 2015 Audit, PCAOB Standards consisted of, among other requirements, three general standards, three standards of fieldwork, and four standards of reporting. These standards were initially developed by the AICPA Auditing Standards Board prior to the formation of the PCAOB in 2002. Subsequent to the formation of the PCAOB, it adopted as auditing standards many of those of the ASB until such time as they were revised. PCAOB Standards during this period were referred to as either "AU" or "AS." As the independent auditor of SCANA, Deloitte is required by law and SEC regulations to follow the standards of the PCAOB.

ANSWER NO. 85:  Deloitte admits that PCAOB standards apply to public company audits,

refer to those standards for their complete contents, and deny any allegations inconsistent

therewith.

86.    Effective December 31, 2016, and therefore applicable to Deloitte's 2016 audit of SCANA, PCAOB Standards were reorganized and grouped into the following five categories:

•    General Auditing Standards—Standards on broad auditing principles, concepts, activities, and communications;

---

[17] PCAOB AU Section 150, *Generally Accepted Auditing Standards*, ("AU § 150"), AU § 150.01 (2015 Audit).

- Audit Procedures—Standards for planning and performing audit procedures and for obtaining audit evidence;

- Auditor Reporting—Standards for auditors' reports;

- Matters Relating to Filings Under Federal Securities Laws—Standards on certain auditor responsibilities relating to U.S. Securities and Exchange Commission filings for securities offerings and reviews of interim financial information; and

- Other Matters Associated with Audits—Standards for other work performed in conjunction with an audit of an issuer or of a broker or dealer.[18]

The various reorganized PCAOB Auditing Standards are referred to as "AS." Notably, the reorganization and amendments to PCAOB Standards as of December 31, 2016, did not impose new requirements on auditors or change the substance of the requirements for performing and reporting on audits under PCAOB standards.[19]

ANSWER NO. 86: Deloitte denies the allegations set forth in paragraph 86, except admits that the five points listed therein are partial quotations from Securities and Exchange Commission Release No. 34-75935, and refers to that document for its complete contents, and further admits the allegations set forth in the second and third sentences of paragraph 86.

    *i.    Deloitte was Responsible for Planning and Performing its SCANA Audits to Obtain Reasonable Assurance that SCANA's Financial Statements were Fairly Presented in Conformity with GAAP*

87.    The objective of a financial statement audit under PCAOB Standards is the expression of an opinion on the fairness with which the financial statements present, in all material respects, the financial position, results of operations, and the cash flows, in conformity with GAAP.[20] PCAOB Standards recognize that judgment concerning the "fairness" of financial

---

[18] Securities and Exchange Commission Release No. 34-75935; Filed No. PCAOB-2015-01; Reorganization of PCAOB Auditing Standards and Related Amendments to PCAOB Standards and Rules, PCAOB Release No. 2015-002, March 31, 2015.

[19] Reorganization of PCAOB Auditing Standards and Related Amendments to PCAOB Standards and Rules, PCAOB Release No. 2015-002, March 31, 2015.

[20] AU § 110.01 (2015 Audit); AS § 1001.01 (2016 Audit).

statements "should" [21] be applied within the framework of generally accepted accounting principles."[22]

ANSWER NO. 87:  Deloitte denies the allegations set forth in paragraph 87 because they fail to completely and accurately reflect the cited standards, refers to those standards for their complete and accurate contents, and denies any allegations set forth in paragraph 87 inconsistent therewith.

88.    Accordingly, Deloitte's audit reports during its 2015 and 2016 SCANA audits were to be based on its "judgment as to whether (a) the accounting principles selected and applied have general acceptance; (b) the accounting principles are appropriate in the circumstances; (c) **the financial statements, including the related notes, are informative of matters that may affect their use, understanding, and interpretation[23]**; (d) the information presented in the financial statements is classified and summarized in a reasonable manner, that is, neither too detailed nor too condensed (AS 2810.31); and (e) the financial statements reflect the underlying transactions and events in a manner that presents the financial position, results of operations, and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practicable to attain in financial statements."[24]

ANSWER NO. 88:  Deloitte denies the allegations set forth in paragraph 88 because they fail to completely and accurately reflect the cited standards, refers to those standards for their complete and accurate contents, and denies any allegations set forth in paragraph 88 inconsistent therewith.

89.    To achieve this objective, Deloitte was required to plan and perform audit procedures sufficient to obtain "reasonable assurance" about whether SCANA's 2015 and 2016 financial statements were free of material misstatement, whether caused by error or fraud.[25]

---

[21] The word "should" reflects that Deloitte's responsibility to comply with this requirement was "presumptively mandatory" under PCAOB Standards. To the extent that such a procedure was not performed, Deloitte was required to perform and document additional audit procedures that achieved the same result as well as document the reasons why alternative procedures met the objective of the presumptively mandatory procedure. Similarly, the words "must" or "is required" indicate an unconditional requirement. PCAOB Rule 3101, *Certain Terms Used in Auditing and Related Professional Practice Standards.*

[22] PCAOB AU Section 411, *The Meaning of "Present Fairly in Conformity with Generally Accepted Accounting Principles"* ("AU § 411"), AU § 411.03.

[23] PCAOB AS 2810, *Evaluating Audit Results* ("AS 2810"), AS 2810.31.

[24] AU § 411.04 (2015 Audit); PCAOB AS 2815, *The Meaning of "Present Fairly in Conformity with Generally Accepted Accounting Principles"* ("AS 2815"), AS 2815.04 (2016 Audit).

[25] AU § 110.02 (2015 Audit); AS 1001.02 (2016 Audit).

PCAOB Standards recognize that "reasonable assurance" generally means a "high level" of assurance.[26]

ANSWER NO. 89:  Deloitte denies the allegations set forth in paragraph 89 because they fail to completely and accurately reflect the cited standards, refers to those standards for their complete and accurate contents, and denies any allegations set forth in paragraph 89 inconsistent therewith.

ii.    *Deloitte was Required to Apply Due Professional Care and Exercise Professional Skepticism*

90.    PCAOB Standards require an auditor to obtain "reasonable assurance" by reducing audit risk[27] to an appropriately "low" level through the application of due professional care, including obtaining sufficient appropriate audit evidence.[28] Due professional care required that Deloitte utilize the "knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence" obtained during its audits.[29]

ANSWER NO. 90:  Deloitte denies the allegations set forth in paragraph 90 because they fail to completely and accurately reflect the cited standards, refers to those standards for their complete and accurate contents, and denies any allegations set forth in paragraph 90 inconsistent therewith.

91.    Due professional care also required that Deloitte apply "professional skepticism" during its 2015 and 2016 audits and reviews of the SCANA's interim financial information included in the Company's Forms 10-Q.[30] Professional skepticism is generally defined under PCAOB Standards as "an attitude that includes **a questioning mind and a critical assessment of audit evidence**." [31] Accordingly, Deloitte's "responses to the assessed risks of material

---

[26] PCAOB AU Section 230, *Due Professional Care in the Performance* ("AU § 230"), AU § 230.10 (2015 Audit); PCAOB AS 1015, *Due Professional Care in the Performance of Work* ("AS 1015"), 1015.10 (2016 Audit).

[27] Audit risk is the risk that the auditor expresses an inappropriate audit report when the financial statements are materially misstated, i.e., the financial statements are not presented fairly in conformity with the applicable financial reporting framework. Audit risk is a function of the risk of material misstatement and detection risk. PCAOB Auditing Standard No. 8, *Audit Risk* ("AS 8"), AS 8.4 (2015 Audit); PCAOB AS 1101, *Audit Risk* ("AS 1101"), 1101.04 (2016 Audit).

[28] AS 8.3, PCAOB Auditing Standard No. 13, *The Auditor's Responses to the Risks of Material Misstatement* ("AS 13"), AS 13.8 (2015 Audit); AS 1101.03, PCAOB AS 1105, *Audit Evidence* ("AS 1105"), PCAOB AS 2301, *The Auditor's Responses to the Risks of Material Misstatement* ("AS 2301"), 2301.08 (2016 Audit).

[29] AU § 230.07 (2015 Audit); AS 1015.07 (2016 Audit).

[30] AU § 230.07 to .09 (2015 Audit); AS 1015.07 to .09 (2016 Audit).

[31] AU § 230.07 to .09 (2015 Audit); AS 1015.07 to .09 (2016 Audit).

misstatement, particularly fraud risks, should involve the application of professional skepticism in gathering and evaluating audit evidence."[32] Risks of material misstatement refers to the risk that the financial statements, including disclosures in the notes to the financial statements, are materially misstated.[33]

ANSWER NO. 91: Deloitte denies the allegations set forth in paragraph 91 because they fail to completely and accurately reflect the cited standards, refers to those standards for their complete and accurate contents, and denies any allegations set forth in paragraph 91 inconsistent therewith.

      iii. *Deloitte was Responsible for Understanding SCANA's Business and Identifying and Responding to Risks of Material Misstatements Affecting SCANA's Financial Statements*

92.    Deloitte was required to perform risk assessment procedures that were "sufficient to provide a reasonable basis for identifying and assessing" the risks of material misstatement affecting SCANA's 2015 and 2016 Financial Statements, whether due to error or fraud.[34] In this regard, Deloitte was first required to obtain a sufficient understanding of SCANA, its environment and its internal control over financial reporting.[35] This included understanding the following:[36]

- Relevant industry, regulatory, and other external factors affecting SCANA. Obtaining an understanding of relevant industry, regulatory, and other external factors encompasses industry factors, including the competitive environment and technological developments; the regulatory environment, including the applicable financial reporting framework and the legal and political environment; and external factors, including general economic conditions.[37]

- The nature of the Company, including the organizational structure, management personnel, key personnel, key supplier and customer relationships, significant investments, joint ventures and the Company's operating characteristics, including its size and complexity;[38] and

- The Company's objectives and strategies and those related business risks that might reasonably be expected to result in risks of material misstatement. Examples of

---

[32] AS 13.7 (2015 Audit); AS 2301.07 (2016 Audit).

[33] AS 8.5 (2015 Audit); AS 1101.05 (2016 Audit).

[34] PCAOB Auditing Standard No. 12, *Identifying and Assessing Risks of Material Misstatement* ("AS 12"), AS 12.4 and AS 12.74 (2015 Audit); PCAOB AS 2110, *Identifying and Assessing Risks of Material Misstatement* ("AS 2110"), AS 2110.04 and AS 2110.74 (2016 Audit)

[35] AS 12.5 (2015 Audit); AS 2110.05 (2016 Audit).

[36] AS 12.7 (2015 Audit); AS 2110.07 (2016 Audit).

[37] AS 12.9 (2015 Audit); AS 2110.09; AS 1101; AS 2110; and AS 2301 (2016 Audit).

[38] AS 12.10 (2015 Audit); AS 2110.10 (2016 Audit).

situations in which business risks might result in material misstatement of the financial statements include industry developments, expansion of the business, current and prospective financing requirements and regulatory requirements (including increased legal exposure).[39]

ANSWER NO. 92:  Deloitte denies the allegations set forth in paragraph 92 because they fail to completely and accurately reflect the cited standards, refers to those standards for their complete and accurate contents, and denies any allegations set forth in paragraph 92 inconsistent therewith.

93.    Deloitte was also required to gain an understanding of the regulatory environment and the implications of illegal acts that had a material effect on the financial statements, including, for example, any misrepresentations made to regulators that would have implications for the financial statements such as:

- Noncompliance with tax laws providing tax credits if it was determined the project could not be completed with the time period the tax law provided;

- Misrepresentation to the regulator, such as the PSC, with respect to rate filing applications, where the auditor was aware of evidence that contradicted statements SCANA was making to the regulators; and

- Violations of U.S. Securities laws and regulations with respect to compliance with GAAP and SEC disclosure requirements.

ANSWER NO. 93:  Deloitte denies the allegations set forth in paragraph 93 because they fail to completely and accurately reflect the cited standards, refers to those standards for their complete and accurate contents, and denies any allegations set forth in paragraph 93 inconsistent therewith.

94.    In the Company's financial statements and notes thereto, SCANA's management made numerous assertions[40] regarding the Nuclear Project, including:

---

[39] AS 12.15 (2015 Audit); AS 2110.15 (2016 Audit).

[40] PCAOB standards recognize that those assertions can be classified into the following categories: (1) Existence or occurrence – Assets or liabilities of the company exist at a given date, and recorded transactions have occurred during a given period, (2) Completeness – All transactions and accounts that should be presented in the financial statements are so included, (3) Valuation or allocation – Asset, liability, equity, revenue, and expense components have been included in the financial statements at appropriate amounts, (4) Rights and obligations – The company holds or controls rights to the assets, and liabilities are obligations of the company at a given date, and (5) **Presentation and**

- Capitalized construction work in progress related to the Nuclear Project;

- Regulatory rate revisions and related pending, approved or denied regulatory orders regarding the Nuclear Project;

- Expected completion date of the Nuclear Project;

- Ongoing commitments and contingencies associated with the Nuclear Project; and

- Anticipated tax credits.

ANSWER NO. 94:  Deloitte denies the allegations set forth in paragraph 94, except admits that the Company made assertions in its financial statements and notes thereto, and refers to those documents for their complete contents.

95.    Given these assertions by SCANA management, Deloitte was also required to understand the following types of information:

- Key regulatory matters affecting the Nuclear Project, including SCANA rate applications and their implications for financial statement reporting including disclosures. In this regard, Deloitte should have obtained and reviewed the legislation passed at the beginning of the project (2007) that provided for among other things, the ability of SCANA to recover through rates, the financing costs for the units during their construction. This understanding would include, for example: the full implications of rate orders and any requirements or conditions the rate regulator place on SCANA.

- The tax law related to the tax credits SCANA was expected to receive for the Nuclear Project, including the criteria that had to be met in order to obtain the tax credits. This included the ability to bring the units online in time to meet the criteria and receive the tax credits;

- How construction project was to be overseen and managed from the initial beginning to the completion of the project. This would include the project and financial reporting controls over the recording of contingencies, costs, measurement of project historical performance, projected project completion dates, and the filing of the necessary annual rate application filings. In this regard, Deloitte should have also read the original construction contract and consider the implications of the contract with respect to the financial reporting by SCANA. This would have included any language related to project management, schedules, costs, claims, and changes;

---

disclosure – **The components of the financial statements are properly classified, described, and disclosed.** [AS 15.11 (2015 Audit); AS § 1105.11 (2016 Audit)].

- The Company's policies, processes, procedures and related internal controls for monitoring and supervising the construction of the Nuclear Project. This would include understanding: (1) significant reports from external consultants hired, as well as internal reports, issued in connection with Nuclear Project; (ii) who was conducting the monitoring and supervision at SCANA, how often reviews occurred, what the review entailed, what qualifications such reviewers had and how were such reviews were evidenced and documented; (iii) who had approval authority and at what levels for changes in either costs and/or schedules associated with the Nuclear Project; and (iv) how Nuclear Project-related claims were processed and approved, including the role of the Nuclear Project engineers, accounting, and legal departments;

- Internal audit reports [41] related to the Nuclear Project, including related findings, recommendations and remediation steps if any;

- The original timeline for the Nuclear Project, including each major milestone, the expected dates for completion of those milestones, and the expected costs;

- The "run rate" and percentage of completion on costs on an ongoing basis and as compared to the physical completion percentage of applicable milestones;

- Movement or changes (especially delays) in the expected (projected) completion dates, the quantified impact of delays and changes on costs, any construction claims that had been proposed/submitted, the response of the Company to those, and the new expected completion dates and costs. This would include: (i) the specific reasons for delays and the impact of those reasons on the timeline as well as on the costs, and (ii) whether or not there were any differences of opinion between those expressed by the engineers and project managers at Westinghouse, SCANA and outside retained consultants;

- Nuclear Project management related reports and or documented summaries provided to executives evident in the Company's Board of Director (including joint SCANA/Santee Cooper board meetings), Audit Committee, Risk Management Committee, and Disclosure Committee meetings and related minutes;

- Nuclear Project related matters and concerns evident in SCANA's Annual Director and Officer Questionnaire submitted in connection with Annual/Interim Reporting and D&O insurance submissions, whistleblower program submissions, and other internal representation letters applicable to SEC financial reporting and disclosures; and

- Communications between SCANA and its regulators, including for example, the ORS and SCPSC.

---

[41] *See* reference to SCANA's Internal Audit reviews of the project at Testimony of Carlette L. Walker, electronically filed November 2, 2018.

ANSWER NO. 95:  Deloitte denies the allegations set forth in paragraph 95.

96.    The purpose of gaining this understanding was so that Deloitte could "understand the events, conditions, and company activities that might reasonably be expected to have a significant effect on the risks of material misstatement" affecting SCANA's 2015 and 2016 financial statements.[42] With this understanding, Deloitte was then required to "assess" the risk of material misstatement at the following two levels: (1) SCANA's financial statement level[43], and (2) at SCANA's assertion level.[44]

ANSWER NO. 96:  Deloitte denies the allegations set forth in paragraph 96 because they fail to completely and accurately reflect the cited standards, refers to those standards for their complete and accurate contents, and denies any allegations set forth in paragraph 96 inconsistent therewith.

97.    SCANA's "ultimate recovery" of its investment in the Nuclear Project construction was also "subject to multiple uncertainties" and "risks."[45] First, "the potential impact of future decisions by [ORS], actions by the co-owners of the [Nuclear Project]," was a risk. Second, "litigation or other legal proceedings involving the [Nuclear Project]," was a risk. Third, SCANA's "ability to meet its cost and schedule forecasts could impact its capacity to fully recover its investment in the project" was a risk.

---

[42] AS 12.7 (2015 Audit); AS 2110.07 (2016 Audit).

[43] PCAOB Standards note, "Risks of material misstatement at the financial statement level relate pervasively to the financial statements as a whole and potentially affect many assertions. Risks of material misstatement at the financial statement level may be especially relevant to the auditor's consideration of the risk of material misstatement due to fraud. For example, an ineffective control environment, a lack of sufficient capital to continue operations, and declining conditions affecting the company's industry might create pressures or opportunities for management to manipulate the financial statements, leading to higher risk of material misstatement." [AS 8.6 (2015 Audit); AS § 1101.06 (2016 Audit)].

[44] AS 8.5 (2015 Audit); AS 1101.05 (2016 Audit). PCAOB Standards further note that the risks of material misstatement at the assertion level consists of the following components: (a) Inherent risk, which refers to the susceptibility of an assertion to a misstatement, due to error or fraud, that could be material, individually or in combination with other misstatements, before consideration of any related controls, and (b) Control risk, which is the risk that a misstatement due to error or fraud that could occur in an assertion and that could be material, individually or in combination with other misstatements, will not be prevented or detected on a timely basis by the company's internal control. Control risk is a function of the effectiveness of the design and operation of internal control. [AS 8.7 (2015 Audit); AS 1101.07 (2016 Audit)].

[45] Deloitte Audit Report, Southern Company, dated February 19, 2020. Pursuant to PCAOB auditing standards established after the Relevant Period, auditors are now required to make disclosures associated with Critical Audit Matters in connection with its audits. PCAOB AS 3101, *The Auditor's Report on an Audit of Financial Statements When the Auditor Expresses an Unqualified Opinion* ("AS 3101"), AS 3101.11. When releasing its new audit reporting standard, the PCAOB observed that "a critical audit matter is defined as a matter that was communicated or required to be communicated to the audit committee." [PCAOB Release No. 2017-001, June 1, 2017]. Importantly, the underlying audit standard that establishes specific audit committee communication requirements for Southern, was in substance, the same as the required audit committee communications applicable to Deloitte during its audits of SCANA. PCAOB AS 1301, *Communications with Audit Committees*.

ANSWER NO. 97:   Deloitte denies the allegations set forth in paragraph 97, which contains partial quotations from an audit report of another company, which was dissimilar for multiple reasons.

98.    As Deloitte acknowledged in the context of a similar-type of audit, "accounting for the economics of rate regulation impacts multiple financial statement line items and disclosures, including, but not limited to, property, plant, and equipment; other regulatory assets; other regulatory liabilities; other cost of removal obligations; deferred charges and credits related to income taxes; under and over recovered regulatory clause revenues; operating revenues; operations and maintenance expenses; and depreciation." [46] The PSC "sets [sic] the rates the regulated utility subsidiaries are permitted to charge customers based on allowable costs, including a reasonable return on equity. Rates are determined and approved in regulatory proceedings based on an analysis of the applicable regulated subsidiary's costs to provide utility service and a return on, and recovery of, its investment in the utility business. As a result, current and future regulatory decisions can have an impact on the recovery of costs, the rate of return earned on investments, and the timing and amount of assets to be recovered by rates. [PSC's] regulation of rates is premised on the full recovery of prudently incurred costs and a reasonable rate of return on invested capital."[47]

ANSWER NO. 98:   Deloitte denies the allegations set forth in paragraph 98, which contains partial quotations from an audit report of another company, which was dissimilar for multiple reasons.

99.    Accordingly, as Deloitte has also subsequently admitted in the context of a similar-type of audit, in conducting its audits of SCANA, Deloitte should have "identified the impact of rate regulation as a critical audit matter due to the significant judgments made by management to support its assertions about impacted account balances and disclosures (e.g., asset retirement costs, property damage reserves, and net book value of retired assets) and the high degree of subjectivity involved in assessing the potential impact of future regulatory orders on the financial statements."[48] These management judgments include "assessing the likelihood of (1) recovery in future rates of incurred costs, (2) a disallowance of part of the cost of recently completed plant or plant under construction, and/or (3) a refund to customers."[49]

---

[46] Deloitte Audit Report, Southern Company, dated February 19, 2020, at 2.

[47] Id.

[48] Id.

[49] Id.

ANSWER NO. 99:    Deloitte denies the allegations set forth in paragraph 99, which contains partial quotations from an audit report of another company, which was dissimilar for multiple reasons.

100.    As Deloitte recognizes, "[g]iven that management's accounting judgments are based on assumptions about the outcome of future decisions by [PSC], auditing these judgments required specialized knowledge of accounting for rate regulation and the rate setting process due to its inherent complexities and significant auditor judgment to evaluate management estimates and the subjectivity of audit evidence."[50] Accordingly, the audit procedures Deloitte should have employed relating to the uncertainty of future decisions by the PSC included the following, among other things:

- Testing the effectiveness of management's controls over the evaluation of the likelihood of (1) the recovery in future rates of costs incurred as property, plant, and equipment and deferred as regulatory assets, and (2) a refund or a future reduction in rates that should be reported as regulatory liabilities, as well as the effectiveness of management's controls over the initial recognition of amounts as property, plant, and equipment; regulatory assets or liabilities; and the monitoring and evaluation of regulatory developments that may have a material effect on the financial statements and accompanying disclosures. This would include a material affect arising from the likelihood of recovering costs in future rates or of a future reduction in rates.[51] *See, e.g.,* PCAOB AS 2201, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements* ("AS 2201").

- Reading the relevant regulatory orders issued by PSC and OSR, regulatory statutes, interpretations, procedural memorandums, filings made by intervenors, and other publicly available information to assess the likelihood of recovery in future rates or of a future reduction in rates based on precedence of the PSC and OSR's treatment of similar costs under similar circumstances.[52] *See, e.g.,* PCAOB AS 1105, *Audit Evidence* ("AS 1105"), AS 2101, AS 2110, AS 2301, PCAOB AS 2401, *Consideration of Fraud in a Financial Statement Audit* ("AS 2401"); PCAOB AS 2405, *Illegal Acts by Clients* ("AS 2405").

- Conducting a comparison of external information to management's recorded regulatory asset and liability balances for completeness.[53] *See, e.g.,* AS 1105, AS 2101, AS 2110, AS 2301, AS 2401, AS 2405.

- Inspection of filings with the PSC by both SCANA and other interested parties that could impact SCANA's future rates for any evidence that might contradict

[50] *Id.*

[51] *Id.* at 2-3.

[52] *Id.* at 3.

[53] *Id.*

management's assertions.[54] *See, e.g.,* AS 1015, AS 1105, AS 2101, AS 2110, AS 2301, AS 2401, AS 2405.

- Evaluation of regulatory filings for any evidence that intervenors are challenging full recovery of the cost of any capital projects.[55] *See, e.g.,* AS 1105, AS 2101, AS 2110, AS 2301, AS 2401, AS 2405.

- Testing selected costs included in the capitalized project costs for completeness and accuracy.[56] *See, e.g.,* AS 1105, AS 2301, AS 2401, AS 2405.

- Obtainment of representations from management regarding probability of recovery for regulatory assets or refund or future reduction in rates for regulatory liabilities to assess management's assertion that amounts are probable of recovery, refund, or a future reduction in rates.[57] *See, e.g.*, PCAOB AS 2805, *Management Representations* ("AS 2805").

- Evaluation of SCANA's disclosures related to the impacts of rate regulation, including the balances recorded and regulatory developments.[58] *See, e.g.,* AS 1105, AS 2101, AS 2110, AS 2301, AS 2401, AS 2405, AS 2815.

<u>ANSWER NO. 100</u>:  Paragraph 100 contains conclusions of law to which no response is required.  To the extent a response is required, Deloitte denies the allegations set forth in paragraph 100, which contains partial quotations from an audit report of another company, which was dissimilar for multiple reasons.

101.    SCANA's "cost and schedule forecasts" were also "subject to numerous uncertainties which could impact the Company's cost recovery," including:

> [C]hallenges with management of contractors and vendors; subcontractor performance; supervision of craft labor and related craft labor productivity, particularly in the installation of electrical and mechanical commodities, ability to attract and retain craft labor, and/or related cost escalation; procurement, fabrication, delivery, assembly, installation, system turnover, and the initial testing and start-up, including any required engineering changes or any remediation related thereto, of plant systems, structures, or components (some of which are based on new technology that only within the last few years began initial operation in the global nuclear

---

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.*

industry at this scale), or regional transmission upgrades, any of which may require additional labor and/or materials; or other issues that could arise and change the projected schedule and estimated cost.[59]

ANSWER NO. 101: Deloitte denies the allegations set forth in paragraph 101, which contains partial quotations from an audit report of another company, which was dissimilar for multiple reasons.

102.    Further, SCANA made disclosures regarding the status, risks, and uncertainties associated with the Nuclear Project, "including (1) the status of construction; (2) challenges to the achievement of [the] cost and schedule forecasts; (3) the status of regulatory proceedings; (4) the status of legal actions or issues involving the co-owners of the project; and (5) other matters which could impact the ultimate recoverability of [SCANA's] investment in the project."[60]

ANSWER NO. 102: Deloitte denies the allegations set forth in paragraph 102, which contains partial quotations from an audit report of another company, which was dissimilar for multiple reasons.

103.    As a result, as Deloitte also subsequently admitted in the context of a similar-type of audit, it should have "identified as a critical audit matter the evaluation of these disclosures which involved significant audit effort requiring specialized industry and construction expertise, extensive knowledge of rate regulation, and difficult and subjective judgments."[61] And, its' audit procedures should have included the following, among others:

- Testing of the effectiveness of internal controls over the on-going evaluation and monitoring of the construction schedule and capital cost forecast and over the disclosure of matters related to the construction and ultimate cost recovery of the Nuclear Project.[62] *See, e.g.*, AS 2201.

- Collaboration with construction specialists to assist in Deloitte's evaluation of SCANA's processes for on-going evaluation and monitoring of the construction schedule and cost forecast and to assess the disclosures of challenges to the achievement of such forecasts.[63] *See, e.g.*, AS 1105, PCAOB AS 1210, *Using the Work of a Specialist* ("AS 1210"), AS 2101, AS 2110, AS 2301, AS 2401, AS 2405.

---

[59] *Id.*

[60] *Id.* at 4.

[61] *Id.*

[62] *Id.*

[63] *Id.*

- Attendance at meetings with SCANA and Santee Cooper officials, project managers (including contractors), independent regulatory monitors, to evaluate and monitor construction status and identify cost and schedule challenges.[64] *See, e.g.,* AS 1105, AS 2101, AS 2110, AS 2301.

- Review of reports of external independent monitors employed by PSC to monitor the status of construction at the Nuclear Project and to evaluate the completeness of SCANA's disclosure of challenges to the achievement of cost and schedule forecasts.[65] *See, e.g.,* AS 1105, AS 2101, AS 2110, AS 2301.

- Inquiry of SCANA officials and project managers regarding the status of construction, the construction schedule, and cost forecasts to assess the financial statement disclosures with respect to project status and potential risks and uncertainties to the achievement of such forecasts.[66] *See, e.g.,* AS 1105, AS 2101, AS 2110, AS 2301.

- Inspection of regulatory filings and transcripts of PSC hearings regarding the construction of the Nuclear Project to identify potential challenges to the recovery of SCANA's construction costs and to evaluate the disclosures with respect to such uncertainties.[67] *See, e.g.,* AS 1105, AS 2101, AS 2110, AS 2301, AS 2401, AS 2405.

- Inquiry of SCANA and Santee Cooper management and internal and external legal counsel regarding any potential legal actions or issues arising from project construction or issues involving the co-owners of the project.[68] *See, e.g.,* AS 2401, AS 2405, AS 2805.

- Comparison of the financial statement disclosures relating to this matter to the information gathered through the conduct of all Deloitte's procedures to evaluate whether there were omissions relating to significant facts or uncertainties regarding the status of construction or other factors which could impact the ultimate cost recovery of the Nuclear Project.[69] *See, e.g.,* AS 1001, AS 1015, AS 1105, AS 2101, AS 2110, AS 2301, AS 2401, AS 2405.

- Obtain representations from management regarding disclosure of all matters related to the cost and/or status, including matters related to a co-owner or regulatory development, that could result in a potential disallowance of costs related to the construction of the Nuclear Project.[70] *See, e.g.,* AS 2401, AS 2405, AS 2805.

---

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] *Id.*

ANSWER NO. 103:  Deloitte denies the allegations set forth in paragraph 103, which contains partial quotations from an audit report of another company, which was dissimilar for multiple reasons.

104.     After obtaining an appropriate understanding of the Nuclear Project and identifying applicable risks of material misstatement, regulatory risks and legal risks, PCAOB Standards required Deloitte to "design and implement audit responses that address the [assessed] risks of material misstatement" and reduce "audit risk to an appropriately low level."[71] In simple terms, an "audit response" is the procedure, work step, or action the auditor performs to adequately address the identified risks of material misstatement so that the auditor can assess whether a material misstatement exists.[72]

ANSWER NO. 104:  Deloitte denies the allegations set forth in paragraph 104 because they fail to completely and accurately reflect the cited standards, refers the Court to those standards for their complete and accurate contents, and denies any allegations set forth in paragraph 104 inconsistent therewith.

105.     In doing so, Deloitte should have also considered if there was sufficient expertise on the audit engagement team to review and evaluate the progress on the Nuclear Project, and if appropriate and necessary to evaluate the project and related internal controls, identify audit areas where the use of a specialist was required.[73]

ANSWER NO. 105:  Paragraph 105 contains conclusions of law to which no response is required.  To the extent a response is required, Deloitte denies the allegations set forth in paragraph 105, and refers to the auditing standards in effect during the relevant period for their complete contents.

106.     Audit responses recognized by PCAOB Standards to address risks of material misstatement include: (1) "[r]esponses that have an overall effect on how the audit is conducted" (e.g., evaluating the company's "selection and application of significant accounting principles" and "[p]roviding the extent of supervision that is appropriate for the circumstances, including, in particular, the assessed risks of material misstatement"),[74] and (2) "responses involving the nature,

---

[71] AS 8.3 and AS 13.3 (2015 Audit); AS § 1101.03 and AS § 2301.03 (2016 Audit).

[72] AS 13.4, AS 13.5, AS 13.8-10 (2015 Audit); AS § 2301.04, AS § 2301.05, AS § 2301.08-.10 (2016 Audit).

[73] AS § 1210 (PCAOB AS 1210. See in particular paragraphs 1210.06-.07).

[74] AS 13.4 and AS 13.5 (2015 Audit); AS § 2301.04 and AS § 2301.05 (2016 Audit).

timing and extent of audit procedures to be performed."[75] For significant risks, including the risk that SCANA's revenue was overstated in violation of GAAP,[76] PCAOB Standards required Deloitte to "perform substantive procedures, including tests of details, that are specifically responsive to the assessed risks."[77] In this regard, PCAOB Standards recognize that as risk of material misstatement increases, "the amount of evidence that the auditor should obtain also increases. For example, more evidence is needed to respond to significant risks."[78]

ANSWER NO. 106:  Paragraph 106 contains conclusions of law to which no response is

required.  To the extent a response is required, Deloitte denies the allegations set forth in paragraph

106, and refers to the auditing standards in effect during the relevant period for their complete

contents.

iv.    *Deloitte was Responsible for Obtaining Sufficient Appropriate Evidence to Afford a Reasonable Basis for its Audit Report*

107.    Deloitte was required to "plan and perform audit procedures to obtain sufficient appropriate audit evidence to provide a reasonable basis" for its audit report during the 2015 and 2016 audits.[79]

ANSWER NO. 107:  Paragraph 107 contains conclusions of law to which no response is

required.  To the extent a response is required, Deloitte admits that the paragraph contains an

incomplete quotation from the referenced standard, refers to the auditing standards in effect during

the relevant period for their complete contents, and denies any allegation inconsistent therewith.

108.    Under PCAOB Standards, auditors "should not be satisfied with less than persuasive evidence because of a belief that management is honest."[80] In developing its audit report, Deloitte should have "take[n] into account all relevant audit evidence, regardless of whether it appears to corroborate or to contradict the assertions in the financial statements."[81]

ANSWER NO. 108:  Paragraph 108 contains conclusions of law to which no response is

required.  To the extent a response is required, Deloitte admits that the paragraph contains an

---

[75] AS 13.4 (2015 Audit); AS § 2301.04 (2016 Audit).

[76] AS 13.11 (2015 Audit); AS § 2301.11 (2016 Audit).

[77] AS 13.11 (2015 Audit); AS § 2301.11 (2016 Audit).

[78] AS 15.5 (2015 Audit); AS § 1105.05 (2016 Audit).

[79] AS 15.4 (2015 Audit); AS § 1105.04 (2016 Audit).

[80] AU § 230.09 (2015 Audit); AS § 1015.09 (2016 Audit).

[81] AS 14.3 (2015 Audit); AS § 2810.03 (2016 Audit).

incomplete quotation from the referenced standard, refers to the auditing standards in effect during the relevant period for their complete contents, and denies any allegation inconsistent therewith.

109.    When the auditor obtains audit evidence during the course of the audit that contradicts or is inconsistent with the audit evidence on which the auditor originally based his or her risk assessment, PCAOB Standards state that the auditor "should revise the related risk assessments and modify the planned nature, timing, or extent of substantive procedures covering the remaining period as necessary," in response to the revised risk assessments.[82] To the extent Deloitte obtained audit evidence from one source that was inconsistent with that obtained from another, or if Deloitte had doubts about the reliability of information to be used as audit evidence during the 2015 and 2016 audits, PCAOB Standards note that Deloitte "should perform the audit procedures necessary to resolve the matter and should determine the effect, if any, on other aspects of the audit."[83]

ANSWER NO. 109:  Paragraph 109 contains conclusions of law to which no response is required.  To the extent a response is required, Deloitte admits that the paragraph contains an incomplete quotation from one or more of the referenced standards, refers to the auditing standards in effect during the relevant period for their complete contents, and denies any allegation inconsistent therewith.

110.    Consistent with this understanding PCAOB Staff Practice Alert No. 8 states:

> **PCAOB standards require auditors to design and perform audit procedures in a manner that addresses the assessed risks of material misstatement and to obtain more persuasive evidence the higher the assessment of risk.[] The auditor is required to apply professional skepticism, which includes a critical assessment of the audit evidence.[]** Substantive procedures generally provide persuasive evidence when they are designed and performed to obtain evidence that is relevant and reliable.[] When discussing the characteristics of reliable audit evidence, PCAOB standards observe that generally, among other things, evidence obtained from a knowledgeable source independent of the company is more reliable than evidence obtained only from internal company sources and evidence obtained directly by the auditor is more

---

[82] AS 13.46 (2015 Audit); AS 2301.11 (2016 Audit). *See also,* AS 12.74 (2015 Audit); AS 2110.74 (2016 Audit) which states: "The auditor's assessment of the risks of material misstatement, including fraud risks, should continue throughout the audit. When the auditor obtains audit evidence during the course of the audit that contradicts the audit evidence on which the auditor originally based his or her risk assessment, the auditor should revise the risk assessment and modify planned audit procedures or perform additional procedures in response to the revised risk assessments."
[83] AS 15.29 (2015 Audit); AS 1105.29 (2016 Audit).

reliable than evidence obtained indirectly.[] Taken together, this means that in higher risk areas, **the auditor's appropriate application of professional skepticism should result in procedures that are focused on obtaining evidence that is more relevant and reliable, such as evidence obtained directly and evidence obtained from independent, knowledgeable sources.[] Further, if audit evidence obtained from one source is inconsistent with that obtained from another, the auditor should perform the audit procedures necessary to resolve the matter and should determine the effect, if any, on other aspects of the audit.**

ANSWER NO. 110:  Deloitte admits that paragraph 110 contains an incomplete quotation from a PCAOB Practice Alert, refers to that document for its complete contents, and denies any allegation inconsistent therewith.

111.    Here, Deloitte's evaluation of audit results was presumptively required to include an evaluation of several items, including the following:

- The presentation of the financial statements, including the disclosures;

- Misstatements accumulated during the audit, including, in particular, uncorrected misstatements;

- Conditions identified during the audit that relate to the assessment of the risk of material misstatement due to fraud ("fraud risk"); and

- The sufficiency and appropriateness of the audit evidence obtained.[84]

ANSWER NO. 111:  Paragraph 111 contains conclusions of law to which no response is required.  To the extent a response is required, Deloitte denies the allegations set forth in paragraph 111, and refers to the auditing standards in effect during the relevant period for their complete contents.

112.    Deloitte was also responsible for reading SCANA's financial statements and disclosures to (a) evaluate the auditor's conclusions formed regarding significant accounts and disclosures and (b) provide a report on whether the financial statements as a whole are free of material misstatement.[85]

---

[84] AS 14.4 (2015 Audit); AS 2810.04 (2016 Audit).
[85] AS 14.5 (2015 Audit); AS 2810.05 (2016 Audit).

ANSWER NO. 112:  Paragraph 112 contains conclusions of law to which no response is required.  To the extent a response is required, Deloitte denies the allegations set forth in paragraph 112, and refers to the auditing standards in effect during the relevant period for their complete contents.

113.    Importantly, PCAOB Standards recognize that management representations are "not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit."[86] PCAOB Standards further recognize that "if a representation made by management is contradicted by other audit evidence, the auditor should investigate the circumstances and consider the reliability of the representation made."[87]

ANSWER NO. 113:  Paragraph 113 contains conclusions of law to which no response is required.  To the extent a response is required, Deloitte denies the allegations set forth in paragraph 113, and refers to the auditing standards in effect during the relevant period for their complete contents.

2.    **Deloitte was Required to Respond to Information Demonstrating that SCANA's Interim Financial Information Did Not Comply with GAAP**

114.    During the Class Period, Deloitte also conducted interim reviews of SCANA's quarterly financial information presented in the Company's Quarterly Reports on Form 10-Q. The objective of a review of interim financial information differs from that of an audit. The purpose of such objective reviews was to provide Deloitte with a basis for communicating to SCANA's management and Audit Committee whether it was aware of any material modifications that should be made to the interim financial information for it to conform with GAAP.[88]

ANSWER NO. 114:  Deloitte denies the allegations set forth in paragraph 114, except admits that, during the Class Period, D&T conducted interim reviews of financial information in SCANA's reports on Form 10-Qs, and refers to the cited auditing standards for their complete contents.

115.    To satisfy this objective, PCAOB Standards required that Deloitte perform certain analytical procedures and make inquiries of persons responsible for financial and accounting

---

[86] AU § 333.02; AS 2805.02 (2016 Audit).
[87] AU § 333.04; AS 2805.04 (2016 Audit).
[88] AU 722.07 (2015 and 2016 Interim Reviews); AS 4105.07 (2017 Interim Reviews).

matters.[89] To the extent Deloitte became aware of information that led it to conclude that the interim financial information may not be presented in accordance with GAAP, it was required to make additional inquiries or perform other procedures to provide a basis for communicating whether it is aware of any material modifications that should be made to the interim financial information.[90]

ANSWER NO. 115:  Paragraph 115 contains conclusions of law to which no response is required.  To the extent a response is required, Deloitte denies the allegations set forth in paragraph 115, and refers to the auditing standards in effect during the relevant period for their complete contents.

E.    **THE NUCLEAR PROJECT CONSISTENTLY SUFFERS FROM SIGNIFICANT AND MATERIAL DELAYS AND COST OVERRUNS, THREATENING SCANA'S ABILITY TO OBTAIN $1.4 BILLION IN NUCLEAR TAX CREDITS**

1.    **From the Beginning, the Nuclear Project Suffers from Significant Delays**

116.    Construction began on Units 2 and 3 in March and November 2013, respectively. Within months, it became clear that there were flaws in the "modular" construction system and that the Nuclear Project was suffering from significant delays.

ANSWER NO. 116:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 116, except admits the allegations set forth in the first sentence of paragraph 116.

117.    Throughout 2013 and 2014, Marsh, and his counterpart at Santee Cooper, Lonnie Carter, and contractors Westinghouse and CB&I wrote to each other extensively, indicating that the Nuclear Project was "in danger" because of submodule shipment delays and design failures. For example, in an August 23, 2013 letter, Carter detailed to Marsh that Westinghouse and CB&I's were having "submodule delivery issues," which "has been **a major source of concern and risk for this project for a long time**" and which "plac[ed] the project schedule in jeopardy once again." Carter further stated that CB&I and Westinghouse "do not function well as a team to resolve critical project issues" and that, in Santee Cooper's view, "the Consortium's inability to fulfill their contractual commitments in a timely matter [sic] **places the project's future in danger**." Carter also noted that, "based on [their prior] discussion," Marsh "shares [Carter's] concern" about this "critical issue for the project and our companies," and asked Marsh to help "develop a plan

---

[89] AU 722.07 (2015 and 2016 Interim Reviews); AS 4105.07 (2017 Interim Reviews).
[90] AU 722.22 (2015 and 2016 Interim Reviews); AS 4105.22 (2017 Interim Reviews).

forward" and "insist on the Consortium providing a realistic plan . . . to fabricate and deliver the submodules in a timely manner to complete the project on schedule."

ANSWER NO. 117:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 117.

118.    In response, on September 5, 2013, Marsh sent an e-mail to Carter, Byrne and Addison, requesting a meeting with the Westinghouse and CB&I Nuclear Project heads, stating that they needed to meet "to discuss the status of our nuclear project" because SCANA and Santee Cooper "continue to have serious concerns about the consortium's ability to deliver modules from the Lake Charles facility" after three years "of unsuccessful attempts to resolve its manufacturing problems." Marsh emphasized that "missed deadlines put potentially **unrecoverable stress on the milestone schedule** approved by the SC Public Service Commission." At that time, the latest construction schedule approved by the PSC called for Nuclear Project completion by May 2018.

ANSWER NO. 118:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 118.

119.    But the Nuclear Project's delays and missed deadlines continued. The submodules that were delivered to the Nuclear Project site suffered from numerous design and construction flaws. In a joint letter, on May 6, 2014, Marsh and Carter wrote to the leaders of Westinghouse and CB&I to detail the history of the contractors' "**poor performance**" on delivery and design, "and their combined effect on the expected completion date and cost of the project." The letter described how the submodules that had been delivered were flawed and "required documentation processing and repairs" that were still not corrected by May 2014. Marsh and Carter identified numerous failures, each of which "tested our resolve," and informed the Consortium that "**[a]s a result of these events, our frustration continues to mount**" because "**[y]ou have made promise after promise, but fulfilled few of them**." They also noted that these "**unexcused delays will cause our project costs to increase greatly**."

ANSWER NO. 119:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 119.

120.    Further, according to Ken Browne, a former senior engineer with SCANA and later whistleblower to the PSC, by 2014, there was substantial doubt throughout SCANA that the Nuclear Project could be completed at all. As Browne testified in *Lightsey, et. al. v. South Carolina Electric & Gas Company, et. al.,* Case No. 2017-CP-25-0335, by 2014, "the absurdity of finishing the project on schedule at the current rates of performance" was so obvious that "even Ray Charles could have seen it,"[91] and it was "not possible" that "management was unaware of [the Nuclear

---

[91] Deposition of Ken Browne, *Lightsey, et. al. v. South Carolina Electric & Gas Company, et. al*., Case No. 2017-CP-25-0335, 63:10-14; 64:3-7.

Project's issues regarding] scheduling and productivity" because "there were internal reports and communications that provided the status of the project to management."[92]

ANSWER NO. 120:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 120.

121.    One of those internal reports was a cost estimate model, titled "Target Construction Productivity"—a report Deloitte did or should have reviewed and tested both in connection with its audits of SCANA's financial statements and its audits of project costs incurred—which analyzed the timeframe necessary to complete the Nuclear Project:[93]

**Target Construction Productivity (Direct Hire Labor)**

*(tabular data illegible in source image)*

This report demonstrated that based on the Nuclear Project's historical date-to-date performance, it would take **26.5 years** to complete the Nuclear Project.[94] According to Browne, "it just became unreasonable to think that a – the change required to finish on time could be implemented."[95]

[92] *Id*. 21:10-18.

[93] *See id*. at 23:21-25:3; *see also* Deposition of Ty Troutman, 242:2-243:6; Exhibit 8.

[94] Deposition of Ty Troutman, Exhibit 8; Deposition of Ken Browne, *Lightsey, et. al. v. South Carolina Electric & Gas Company, et. al*., Case No. 2017-CP-25-0335, 61:13-22.

[95] Deposition of Ken Browne, *Lightsey, et. al. v. South Carolina Electric & Gas Company, et. al*., Case No. 2017-CP-25-0335, 64:5-14.

ANSWER NO. 121:  Deloitte denies knowledge or information sufficient to form a belief

as to the allegations in paragraph 121, except denies the allegations set forth in the first sentence

of paragraph 121.

122.     Browne also testified that "the progress of [the Nuclear Project] was not correctly
represented in [the SEC] filings," noting that he "d[idn't] recall ever seeing a discussion of the
performance factors or the inefficiencies or anything of the sort occurring in the SEC filings."[96]

ANSWER NO. 122:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 122.

123.     As a result of these problems, by mid-2014 SCANA and Santee Cooper started
looking into an independent third-party assessment of the project. As alleged in the SEC
Complaint, [97] on August 7, 2014, SCANA executives, including Marsh and Byrne, and
representatives from Santee Cooper met with representatives from Westinghouse to discuss the
scheduling delays. At the meeting, Byrne notified Westinghouse that SCANA and Santee Cooper
doubted whether Westinghouse could complete the Nuclear Project by the revised dates approved
by the PSC, and therefore wanted an independent third-party assessment of the schedule
performed.

ANSWER NO. 123:  Deloitte denies the allegations set forth in paragraph 123, except

denies knowledge or information sufficient to form a belief as to the truth of the allegations set

forth in the first sentence of paragraph 123, and refers to the SEC Complaint for its complete

contents.

124.     Westinghouse acknowledged that it would not meet the 2018 completion date for
Unit 2, but represented that it could complete Unit 2 by June 2019 and Unit 3 by June 2020.
However, SCANA's senior management, including Marsh and Byrne, doubted Westinghouse's
claims regarding the construction schedule, noting in an earlier letter to Westinghouse that "[y]ou
have made promise after promise, but fulfilled few of them."

ANSWER NO. 124:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 124.

---

[96] *Id.* 278:15-20; 279:23-25.

[97] The allegations in the SEC Complaint were filed after the SEC served SCANA with an extensive subpoena on
October 16, 2017, with a return date of November 10, 2017, for information and documents regarding the Nuclear
Project, including Deloitte's audits of SCANA's financial statements. Lead Plaintiff believes that it will obtain further
and similar evidence to support its allegations after a reasonable opportunity for discovery.

125.    As alleged in the SEC Complaint, a few months later, on December 10, 2014, Marsh and Byrne met with representatives from Westinghouse. Byrne reiterated to Westinghouse that, based on the history of delays on the project, he did not have confidence in their schedule for completing the Nuclear Project.

ANSWER NO. 125:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 125, and refers to the SEC Complaint for its complete contents.

126.    Then, according to the SEC Complaint, on January 6, 2015, SCANA held an internal meeting to discuss how to move forward with Westinghouse on the Nuclear Project in light of the substantial delays in construction. Byrne's notes from that meeting reflect that Westinghouse was "not meeting critical milestones to achieve June 2019" completion for Unit 2.

ANSWER NO. 126:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 126, except admits that it sets forth a partial quotation from the SEC Complaint.

127.    Westinghouse's repeated failure to meet critical milestones and various performance metrics was well known, monitored closely and the subject of regular reports.

ANSWER NO. 127:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 127.

128.    For example, "overall construction complete" and the "monthly percent complete" metrics were regularly tracked and showed that the Nuclear Project not be completed in accordance with the stated schedule and in time for SCANA to receive the Nuclear Tax Credits. These metrics were generated by taking how much construction work had been completed on the project and then dividing the remaining balance of work to be done by the number of months outstanding prior to the scheduled completion date (or the production tax credit deadline of January 1, 2021). Under PCAOB Standards, Deloitte should have reviewed these metrics and reports on a regular, sample basis during the course of its audits.

ANSWER NO. 128:  Deloitte denies the allegations set forth in paragraph 128, except denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first and second sentences of paragraph 128.

129.    The performance factor, the ratio of actual time versus the planned amount of time labor spends doing a particular task, which measured construction site efficiency, was also regularly tracked and also showed that the Nuclear Project would not be completed in accordance

53

with the stated scheduled and in time for SCANA to receive the Nuclear Tax Credits. A performance factor of 1.0 means that it took as many labor hours to complete a task than was planned. A performance factor of 2.0 means that it took twice as many labor hours than was planned to complete a task. Thus, higher performance factor indicates less efficient labor. The deadlines for completion of the Nuclear Project assumed that Westinghouse would achieve a performance factor of 1.15, even though Westinghouse had never achieved an efficiency level that low during the years that it had been working on the project. Under PCAOB Standards, Deloitte should have also reviewed this metric on a regular, sample basis during the course of its audits.

ANSWER NO. 129:  Deloitte denies the allegations set forth in paragraph 129, except

denies knowledge or information sufficient to form a belief as to the truth of the allegations set

forth in the first through fifth sentences of paragraph 129.

130.    On January 7, 2015, SCANA executives, including Byrne, met again with representatives from Westinghouse. At this meeting, Westinghouse stated that June 2019 and June 2020 were the most "realistic" completion dates for Unit 2 and Unit 3, respectively. Westinghouse then asked whether SCANA believed the revised schedule for the new nuclear units was realistic, to which Byrne answered "No."

ANSWER NO. 130:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 130.

131.    Instead of improving, however, construction delays continued to worsen. The overall performance factor was around 1.8 for the last six months of 2014; however, by February 2015, the performance factor had increased to 2.37—meaning that it was taking more than twice as many labor hours to complete a task than planned.

ANSWER NO. 131:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 131.

132.    The overall construction complete percentages were equally dismal. In February 2015, only about 15% of the project was completed. At that rate of progress, only about 30% of the Nuclear Project would be completed by July 2019.

ANSWER NO. 132:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 132.

133.    These metrics were so poor that, according to the SEC Complaint, on March 6, 2015, SCANA and Santee Cooper executives attended a meeting regarding the Nuclear Project's lack of progress. The executives discussed the overall construction complete percentage and the performance factor at the meeting. Both metrics showed that the current construction schedule was not credible or achievable.

ANSWER NO. 133:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 133, and refers to the SEC Complaint for its

complete contents.

### 2.     SCANA Petitions PSC for Approval of Revised Delayed Schedules

134.    Due to the continued delays for the Nuclear Project, on March 12, 2015, SCANA
again petitioned the PSC for approval of an updated construction schedule which would delay the
substantial completion dates for Units 2 by 27 months, to June 2019, and Unit 3 by 25 months, to
June 2020. SCANA also sought approval for $698 million in additional costs, bringing its share of
the total costs up to $6.8 billion. Deloitte was aware of this petition.

ANSWER NO. 134:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 134, except admits that on or about March

12, 2015, SCANA petitioned the PSC for approval of an updated construction schedule and

additional costs.

135.    On September 10, 2015, the PSC approved SCANA's petition. The PSC concluded
that "the modified construction schedule and capital cost schedule presented in the Company's
petition were not the result of imprudence" under the terms of the BLRA. In reaching this
conclusion, the PSC cited Byrne's testimony that "**the construction schedule presented here
represents a reasonable and prudent schedule for completing the construction of the Units,**"
as well as SCANA's representation that "[t]he cause of the delay in the project to date has been
[the] delay in the production of submodules for the Units."

ANSWER NO. 135:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 135, except admits that it sets forth partial

quotations from the PSC order dated September 10, 2015, and refers to the order for its complete

contents.

136.    The PSC emphasized that the fact that the requested completion dates ensured that
SCANA would receive the expected billions of dollars of Nuclear Tax Credits was an important
factor in its approval, stating "[t]imely **completion of the Units is particularly important given
the narrow gap between the current substantial completion date for Unit 3 and the date by
which power must be generated by that Unit to earn the full $2.2 billion in special Federal
Production Tax Credits**, net of tax, that are potentially available for the Units."

ANSWER NO. 136:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 136, except admits that it sets forth partial

quotations from the PSC order dated September 10, 2015, and refers to the order for its complete

contents.

137.    The PSC further concluded that "the delay in the project schedule to date results
from delay in the submodule production," and that "there is no basis on this record to conclude
that the project delays reflected in the updated construction schedule are the result of imprudence
by SCE&G." The PSC also credited Byrne's testimony that, while additional delays could occur
in the future, "construction of the Units has proceeded to a point where **many of the initial risks
and challenges of new nuclear construction have been overcome**." The PSC found that the
proposed schedule "is a reasonable and prudent plan for completing construction of the Units given
the information available at this time."

ANSWER NO. 137:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 137, except admits that it sets forth partial

quotations from the PSC order dated September 10, 2015, and refers to the order for its complete

contents.

3.    **Further Evidence Demonstrates that the Nuclear Project Would Not
Be Complete in Time**

138.    By April 2015, just weeks after SCANA's March 2015 petition to delay the
completion date of the Nuclear Project to June 2020, internal communications between SCANA
and Santee Cooper make clear that a completion date in 2020 was unlikely, and that the project
was significantly over budget. On April 6, 2015, Santee Cooper's Senior Vice President for
Nuclear Energy, Michael Crosby ("Crosby"), emailed Byrne and SCANA's Jeff Archie a series of
charts regarding the schedule delays and cost overruns on the Nuclear Project "that were discussed
in the Executive Steering Committee meeting" with SCANA held on March 6, 2015. In this email,
Crosby noted that for one chart depicting the "total target cost impact of the Consortium's poor
management of productivity and labor ratios," "a total cost curve" using an "average of the actual
numbers recorded on the project" over the last five months "is not shown on the graph because it
would be off the chart." He further discussed that even in the positive scenarios represented in this
chart "still result in cumulative target costs that are significantly over budget."

ANSWER NO. 138:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 138.

139.    Given Deloitte's responsibility to track the actual performance on the Nuclear
Project to date compared to the original budgeted performance, such information should have been

reviewed and tested by Deloitte. Thus, both SCANA and Deloitte knew or should have known as early as April 2015 that the total costs for the Nuclear Project would substantially exceed the public cost estimates, even in the unlikely event that SCANA was able to improve construction productivity considerably.

ANSWER NO. 139:  Deloitte denies the allegations set forth in paragraph 139.

140.    The April 6, 2015 email to Byrne also attached another chart titled "Percent Complete – Direct Craft Work," (a metric Deloitte should have been reviewing and testing) which depicted the Nuclear Project's progress based on skilled labor hours:

ANSWER NO. 140:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 140.



141.    This chart showed the dramatic disparity between the Nuclear Project's "actual progress to date" and the percent of direct craft work (*i.e.*, skilled labor) that would be completed at the current rate of progress, represented by the blue dotted line, versus the progress "required to achieve [the] Jun[e] 2019/Jun[e] 2020 SCDs [substantial completion dates" for Units 2 and 3 (represented by the green dotted line). It also revealed that construction of the Nuclear Project was roughly 16% complete by January 2015, and had progressed only 8% in the prior 24 months—a rate of 0.33% progress completed per month. According to the chart, Unit 2 would not even reach

35% completion by its July 2019 purported completion date if progress continued at the same pace. As Deloitte knew or should have known, this chart demonstrated clearly that in order to complete the remaining 86% of construction over the remaining 42 months left in the schedule for Unit 2, the rate of construction progress would have to increase to at least 2% per month—over **six times** the current rate—and it would have to improve immediately.

ANSWER NO. 141:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 141, except denies the allegations set forth

in the last sentence of paragraph 141.

142.     Indeed, as alleged in the SEC Complaint, on April 21, 2015, Marsh attended a meeting with Santee Cooper during which it was discussed that the Nuclear Project would, in fact, not meet its deadline for completion. Marsh's notes from the meeting state that the "current pace won't achieve 2020," referring to the fact based on the current rate of progress, the Nuclear Project would not be completed in time for SCANA to qualify for the Nuclear Tax Credits.

ANSWER NO. 142:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 142, except admits that it sets forth a partial

quotation from the SEC Complaint.

143.     Just one week later, on April 28, 2015, Byrne's nuclear team emailed Byrne a "CEO Talking Points" memorandum in preparation for an upcoming joint SCANA – Santee Copper meeting, which listed numerous "schedule concerns" that SCANA and Santee Cooper had regarding the nuclear expansion project including that:

- Westinghouse "has no credibility for developing a realistic schedule";

- Westinghouse "continues to fail on executing critical work";

- "The cumulative direct craft productivity factor (PF) has gotten worse every month for the past two years";

- "In the last 2 years, less than 8% of direct work has been completed";

- "And despite the negative trend in craft productivity, in the next 4-1/2 years, 84% will need to be completed to meet the Jun 2019/Jun 2020 SCDs";

- SCANA and Santee Cooper have "no confidence in [Westinghouse's] ability to complete Unit 3 by the end of 2020 and suspect[] that production tax credits are in jeopardy for that unit"; and

- "The continued failure to meet schedule (Unit 2 now at least 39 months late, and Unit 3 at least 18 months late . . . ) has severely impacted credibility and has placed ongoing regulatory and financial support in jeopardy."

ANSWER NO. 143:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 143.

144.    The memorandum concluded that "Production Tax Credits are at risk"; "Financing Costs are at risk for increasing"; and "BLRA rate recovery is at risk."

ANSWER NO. 144:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 144.

145.    The SEC Complaint alleges that when asked by a SCANA executive how these conclusions could be reconciled with SCANA's recent petition to the PSC (a task Deloitte too was responsible for conducting), a member of SCANA's nuclear team responded "**[r]espectfully, there is no way to comment on these talking points and remain consistent with the recent PSC filing**. This is more like a tale of two projects."

ANSWER NO. 145:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 145, except admits that it sets forth a partial quotation from the SEC Complaint.

146.    In June 2015, SCANA's and Santee Cooper's nuclear teams prepared another "CEO Meeting Talking Points" memorandum for an upcoming meeting on June 5 with Westinghouse.

ANSWER NO. 146:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 146.

147.    The memorandum stated:

Completion of the [Westinghouse] AP1000 design has been a significant project challenge affecting procurement and construction. The incomplete design of the AP1000 has resulted in 3–4 years of inefficient (and very poor) site execution. As a result, **[Westinghouse] has not been able to achieve success on any schedule or cost estimate published to date. These issues have created a significant question of [Westinghouse's] credibility regarding the delivery of the project.**

ANSWER NO. 147:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 147.

148.    The memorandum also noted again that Westinghouse "has little credibility for developing a realistic cost estimate."

ANSWER NO. 148:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 148.

149.    The memorandum further noted that the continued failure to meet milestones has placed the "regulatory and financial support in jeopardy" and, for SCANA, put the "production tax credits in jeopardy." In short, SCANA and Santee Cooper had **"little confidence in [Westinghouse's] ability to complete Unit 3 by the end of 2020."**

ANSWER NO. 149:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 149.

150.    The SEC Complaint alleges that at that June 5, 2015 meeting, SCANA and Santee Cooper notified Westinghouse that, in light of these serious issues, they planned to have an independent third party evaluate the Nuclear Project.

ANSWER NO. 150:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 150, and refers to the SEC Complaint for its complete contents.

151.    These delays were so severe that, according to the SEC Complaint, on January 4, 2016, a member of SCANA's own nuclear team informed Marsh that she "did not want to be involved in any of the SEC reporting activities because she was scared of [SCANA's] disclosures," according to Marsh's notes from the meeting.

ANSWER NO. 151:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 151, except admits that it sets forth a partial quotation from the SEC Complaint.

152.    A few weeks later, on January 25, 2016, SCANA's Risk Management Committee held a quarterly meeting (minutes of which Deloitte should have reviewed). The SEC Complaint alleges that at the meeting, SCANA executives identified "schedule delays" and the receipt of "production tax credits" as "key risk[s]" and rated them "Red." SCANA defined "Red" risk areas as: "Higher area of management concern. Events related to this area have progressed or are

progressing in a manner that could be ultimately adverse to the accomplishment of SCANA's strategic plan. Requires very heightened management attention and activity in this area."

ANSWER NO. 152:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 152, except admits that it sets forth partial quotations from the SEC Complaint.

### 4.    SCANA Elects the Fixed Price Option

153.    As a result of the continuing construction delays and problems, just eight months after its last petition, on May 26, 2016, SCANA again petitioned the PSC for approval to update the capital cost schedule and construction milestone schedule for the Nuclear Project. Deloitte was again aware of this petition. In its petition, SCANA informed the PSC that it had "notified Westinghouse that it will elect the Fixed Price Option" under the EPC Amendment, subject to Santee Cooper's concurrence and PSC approval. The petition reflected an increase in total project costs of approximately $852 million over the cost approved by the PSC in September 2015, of which approximately $505 million was directly attributable to the fixed price option. The Nuclear Project's estimated gross construction cost was estimated to be approximately $7.7 billion.

ANSWER NO. 153:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 153, except admits the allegations set forth in the second sentence of paragraph 153 as they relate to D&T, and that SCANA filed a petition on May 26, 2016, and refers to the petition for its complete contents.

154.    On June 3, 2016, Santee Cooper's Board of Directors allowed SCANA to formally elect the fixed price option on both companies' behalf. The fixed price option amended the EPC Contract to fix substantially all of the costs to be paid for the remaining scope of the Nuclear Project, and thus was expected to limit the Nuclear Projects' construction cost.

ANSWER NO. 154:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 154, except admits that in 2016, SCANA elected to exercise an option under the EPC contract to fix the total amount to be paid under the contract for work performed after June 30, 2015, subject to certain exceptions.

155.    The market reacted favorably to SCANA's decision to elect the fixed price option. For example, on June 5, 2016, a Wells Fargo analyst report reiterated its outlook on SCANA as offering investors an "attractive risk/reward proposition." The Wells Fargo analyst report noted that SCANA "**expressed confidence in the target substantial completion dates of August 2019 (Unit 2) and August 2020 (Unit 3)**." Furthermore, regarding the BLRA's requirement that

SCANA must act prudently to recover costs, SCANA's statements left Wells Fargo to "believe SCG will be able to demonstrate the rationale, customer benefits, etc. of the FPO [Fixed Price Option]"—*i.e.* that it has acted **prudently** in managing the Nuclear Project. Specifically, the report stated as follows:

> **Prudency** - Importantly, the ORS stressed that their diligence efforts will be consistent with what is prescribed under the state's 2007 Base Load Review Act (BLRA). Specifically, **the BLRA allows SCG to recover higher costs** unless the ORS (or other parties) **can show that the company acted imprudently**. Thus, the burden of proof for disallowance of costs is on the intervenors, not the utility. The imprudence test does not extend to the actions/performance of other members of the Engineering, Procurement & Construction consortium (i.e. Westinghouse, CBI, etc.). **Ultimately, we believe SCG will be able to demonstrate the rationale, customer benefits, etc. of the FPO.**

ANSWER NO. 155:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 155.

156.    On July 1, 2016, SCANA executed the fixed price option, subject to PSC approval.

ANSWER NO. 156:  Deloitte admits the allegations set forth in paragraph 156.

157.    In a directive dated November 9, 2016, the PSC approved the revised schedule, costs and election of the fixed price option, and found that "the evidence of record justifies a finding that the changes are not the result of imprudence on the part of" SCANA.

ANSWER NO. 157:  Deloitte denies the allegations set forth in paragraph 157, except admits that in or about November 2016, the PSC approved the revised schedule and election of the fixed price option and refers to the directive for its complete contents.

158.    The election of fixed price option created the expectation that Westinghouse would be willing and able to pay for any costs that exceeded the $7.7 billion fixed price. In reality, SCANA and Deloitte knew or should have known that (i) costs would vastly exceed the $7.7 billion fixed price, and (ii) Westinghouse and its parent Toshiba would be unable to fund those excess costs.

ANSWER NO. 158:  Deloitte denies the allegations set forth in paragraph 158, except denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first sentence of paragraph 158.

### 5.    SCANA Retains Bechtel to Assess the Nuclear Project

159.    Meanwhile, given the dire construction delays and issues, SCANA also hired a third party, Bechtel—an internationally known engineering, procurement, construction, and project-management company based in Virginia[98] to assess the Nuclear Project. Bechtel was paid $1 million for its assessment.

ANSWER NO. 159:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 159.

160.    On February 10, 2015, Bechtel submitted an "Assessment Proposal" to SCANA and Santee Cooper. According to the proposal, Bechtel would provide an "assessment [] to assist the owners of the V.C. Summer Nuclear Generating Stations Units 2 & 3 in better understanding the current status and potential challenges of the project as a first step in helping to ensure the project is on the most cost-efficient trajectory to completion." Bechtel made clear in its Assessment Proposal that it "will not evaluate the ownership of past impacts or validity of pending or future claims"—in short, that its work would not be used in the context of current or anticipated litigation: No immediate action was taken on Bechtel's proposal.

ANSWER NO. 160:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 160.

161.    According to an internal Santee Cooper document dated November 28, 2016 that recounted the history of the Bechtel relationship (the "SC Nuclear Timeline"), on April 7, 2015, Marsh and other SCANA and Santee Cooper executives met with Bechtel's nuclear team to discuss their Assessment Proposal, and to decide whether to proceed with the engagement.

ANSWER NO. 161:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 161.

162.    Numerous internal emails show that both SCANA and Santee Cooper envisioned Bechtel's role as providing a "third party assessment or act[ing] as Owner's Engineer," —*i.e.* a qualified engineering expert to assess the project. SCANA and Santee Cooper agreed to Bechtel signing a non-disclosure agreement ("NDA") so that Bechtel could more quickly gain access to confidential documents related to the Nuclear Project for purposes of beginning its assessment.

ANSWER NO. 162:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 162.

163.    Further, Bechtel clearly conveyed that its work was not privileged as it was shared with—and even conducted on behalf of—the Consortium. On June 1, 2015, Bechtel executed the

---

[98] Bechtel has worked on mega-projects for over 80 years, including construction of the Hoover Dam in Nevada.

Proprietary Data Agreement and NDA with SCE&G that allowed Bechtel access to confidential "information in oral, written or physical form" related to the "AP1000 Nuclear Power Plant(s) and related facilities." Notably, Westinghouse and Stone & Webster were "expressly recognized as third party beneficiary(ies) to this Agreement" such that the Proprietary Data Agreement was enforceable by Westinghouse. Moreover, as evidenced in communications between counsel for Westinghouse, CB&I, SCANA and Santee Cooper on July 28, 2015 and July 30, 2015, Westinghouse and CB&I were active participants in providing edits to and then approving the language of the agreement retaining Bechtel and setting out the terms of Bechtel's assessment (the "Bechtel Agreement").

ANSWER NO. 163:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 163.

### 6.    The Bechtel Assessment and First Bechtel Report

164.    Bechtel performed a comprehensive, in-depth assessment of the Nuclear Project. In a span of three months, the Bechtel team (i) reviewed over 350 Nuclear Project documents; (ii) attended 70 meetings with personnel from Westinghouse, CB&I, SCANA and Santee Cooper; (iii) conducted 25 interviews with personnel from Westinghouse, CB&I, SCANA and Santee Cooper; (iv) completed 24 site walkdowns and real time observations; and (v) attended 7 presentations on various subjects. Bechtel interviewed high-level SCANA executives including Byrne; Ron Jones, SCANA's Project Director for the Nuclear Project and Vice President of New Nuclear Operations; Alan Torres, SCANA's General Manager of Nuclear Plant Construction; Jeff Archie, SCANA's Chief Nuclear Officer and Senior Vice President; and Carlette Walker, SCANA's Vice President of Nuclear Financial Administration, who reported directly to Addison. Bechtel also interviewed leaders of the Nuclear Project from the Consortium, including but not limited to Westinghouse's Nuclear Project Manager and Director of Licensing.

ANSWER NO. 164:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 164.

165.    Throughout its assessment, Bechtel provided regular updates to Marsh, including weekly update calls from August 10 to October 16, 2015 between the President of Bechtel Nuclear, Security & Environmental, Craig Albert, and Marsh and Santee Cooper CEO Carter. Bechtel also provided Weekly Reports to SCANA documenting the work completed by Bechtel each week, and the work planned for the next week.

ANSWER NO. 165:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 165.

166.    By October 2015, Bechtel was ready to discuss key observations from its assessment with SCANA and Santee Cooper. At that time, and as discussed above, the Nuclear Project was still significantly behind schedule, and had been falling further behind schedule each month. As alleged in the SEC Complaint, a SCANA nuclear construction manager stated that

"**[b]asically, not a single schedule mitigation has worked.**" Another SCANA nuclear finance manager stated that "**it would take 22 years to complete the plants**" at the current rate of progress. Accordingly, the Bechtel team determined there were "**significant issues**" facing the Nuclear Project that threatened its "successful completion."

ANSWER NO. 166:  Deloitte denies the allegations set forth in paragraph 166, except denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first and second sentences of paragraph 166, and admits that the paragraph sets forth partial quotations from the SEC Complaint.

167.    On October 13, 2015, Bechtel emailed Crosby, Santee Cooper's Senior Vice President, its "Preliminary Assessment" which "form[ed] the basis of [Bechtel's] presentation" to the SCANA and Santee Cooper executives. Bechtel noted that its recommendations were "still in development but will [also] be part of the exec review." This email indicated that the "Scope of the Assessment" was focused on "evaluat[ing] the status of the project to assess the Consortium's ability to complete the project on the forecasted schedule." On October 14, 2015, Crosby forwarded this email to Carter, explaining that after the "CEO meeting" with Marsh and Carter around October 22nd or 23rd was scheduled, Bechtel would "schedule a sit-down meeting with Byrne" and Crosby, "and also a separate meeting with [SCANA's] Jeff Archie's staff" before the Bechtel Assessment meeting with the CEOs. Thus, although Crosby noted that "SCE&G has not seen this [Preliminary Assessment] yet," the email clearly indicated that it would be discussed with SCANA even before the October 22, 2015 Bechtel Assessment meeting.

ANSWER NO. 167:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 167.

168.    Accordingly, on October 16, 2015, the Bechtel team met in person with Marsh to discuss the final results of their assessment. Then, on October 22, 2015, Bechtel presented its "project assessment, findings, and high-level recommendations" to SCANA's and Santee Cooper's executive management in SCANA's Cayce, South Carolina headquarters (the "Bechtel Assessment").

ANSWER NO. 168:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 168.

169.    Bechtel's findings did not take SCANA executives by surprise. In an October 14, 2015 email forwarding Bechtel's preliminary assessment to Carter, Crosby noted that although he did "**not see any real surprises . . . the Bechtel projection on commercial operation dates is sobering**." Bechtel's "preliminary assessment of the project schedule [was] that the **commercial operation dates will be extended**." Bechtel projected that Unit 2 would not be in operation until "**18-26 months beyond the current June 2019 commercial operation date**" and Unit 3 would

not be completed until "**24-32 months beyond the current June 2020 commercial operation date**."

ANSWER NO. 169:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 169.

170.    Bechtel's presentation thus included highly critical findings regarding the project schedule. Specifically, Bechtel found that "the current schedule is at risk" and that "[t]o-go scope quantities, installation rates, productivity, and staffing levels all point to completion later than current forecast." Bechtel also found that "[t]he Consortium's forecasts for schedule durations, productivity, forecasted manhour peaks, and percent complete **are unrealistic**." With respect to engineering, Bechtel found that "**the issued design is often not constructible** (currently averaging over 600 changes per month)." Bechtel also observed that Westinghouse's "forecasts for schedule durations, productivity, forecasted manpower peaks, and percent complete do not have a firm basis."

ANSWER NO. 170:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 170.

171.    Thus, Bechtel's preliminary results indicated that Unit 2, which was currently scheduled to be completed by June 2019, would not be in service until between December 2020 and August 2021 or *18 to 26 months later than scheduled*. Bechtel's preliminary results also indicated that Unit 3, which was scheduled to be completed by June 2020, would not be completed until between June 2022 and June 2023 or *24 to 36 months later than scheduled*. Unit 2 was left with a small, one month window for to qualify for the Nuclear Tax Credits under these revised dates, while Unit 3 would not be completed in time to qualify.

ANSWER NO. 171:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 171.

172.    Importantly, Bechtel's revised completion dates were projected under a best-case scenario for SCANA that assumed implementation of Bechtel's recommendations, and a significant improvement in the rate of construction.

ANSWER NO. 172:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 172.

173.    Bechtel's presentation also included several highly critical findings regarding SCANA's management of the project. Bechtel found that "[**t]he Owners do not have an appropriate project controls team to assess/validate Consortium reported progress and performance**." In addition, Bechtel's assessment found that the Nuclear Project suffered from a "lack of accountability," and "[**t]he current hands-off approach taken by the Owners towards management of the Consortium does not allow for real- time, appropriate cost and schedule**

**mitigation**." In its presentation, Bechtel made several recommendations on how SCANA could improve its oversight of the Nuclear Project.

ANSWER NO. 173:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 173.

174.    In conclusion, Bechtel found that "the V.C. Summer Units 2 and 3 project suffers from various fundamental EPC and major project management issues that must be resolved for project success."

ANSWER NO. 174:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 174.

175.    On October 27, 2015, a mere five days after Bechtel issued his initial findings that the Nuclear Project would be delayed by at least three years, SCANA announced in a press release and Form 8-K that it had amended the EPC Contract (the "EPC Amendment"), delaying the GSCDs by only two months—August 31, 2019 for Unit 2 and August 31, 2020 for Unit 3—along with another $300-800 million increase to SCANA's total construction costs.

ANSWER NO. 175:  Deloitte denies the allegations set forth in paragraph 175, except admits that SCANA issued a press release and Form 10-K on October 27, 2015, and refers to the cited materials for their complete contents.

176.    The October 22, 2015 Bechtel Assessment presented to SCANA's and Santee Cooper's executive management was then detailed in a 130-page Project Assessment Report, dated November 9, 2015 (the "First Bechtel Report").

ANSWER NO. 176:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 176, except admits that Bechtel prepared the First Bechtel Report, and refers to the First Bechtel Report for its complete contents.

177.    The First Bechtel Report consisted of five areas of assessment: (i) Project Management; (ii) Engineering and Licensing; (iii) Procurement; (iv) Construction and Project Controls, including an "Analysis of the Project Construction Schedule"; and (v) the Startup plans for the nuclear units once completed. The Weekly Reports attached to the First Bechtel Report indicate Bechtel's team spoke openly with SCANA, Santee Cooper, Westinghouse, and CB&I employees and officers without the attendance, participation, or input of any legal counsel. While the cover of the First Bechtel Report notes that it is "Strictly Confidential," there is no mention of the report being created in anticipation of litigation, being directed by attorneys, or otherwise being subject to attorney-client privilege.

ANSWER NO. 177:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 177, except admits that Bechtel prepared the First Bechtel Report, and refers to the First Bechtel Report for its complete contents.

178.    The First Bechtel Report was again highly critical of SCANA's management of the project, stating that "the current schedule is at risk" because "[t]he to-go scope quantities, installation rates, productivity, and staffing levels all point to project completion later than the current forecast." In sum, Bechtel concluded that the schedule that was approved by the PSC just weeks before, on September 10, 2015—with completion dates of June 2019 and June 2020, respectively—was impossible to achieve. The First Bechtel Report also concluded that the current approved schedule would be delayed up to three years, and included the following timeline:

| Impacts on Commercial Operation Dates | | |
|---|---|---|
| | Unit 2 | Unit 3 |
| Current COD | June 2019 | June 2020 |
| Adjustment | 18 to 26 months | 24 to 36 months |
| New COD | Dec 2020 to Aug 2021 | June 2022 to June 2023 |

ANSWER NO. 178:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 178, except admits that it contains partial quotations from the First Bechtel Report, and refers to the First Bechtel Report for its complete contents.

179.    Bechtel provided an objective performance metric that had to be met in order for the Nuclear Project to have even a chance of being completed by the end of 2020. Specifically, Bechtel's projections relied on the Nuclear Project reaching a rate of 3% monthly construction progress. However, at that time, the Nuclear Project reached only 0.5% construction progress per month on average, and was only 21% complete to date. SCANA would, therefore, somehow need to improve performance from 0.5% to 3%—or by 600%—and the improvement would have to happen immediately, in order for the Nuclear Project to be completed by the end of 2020. Such improvement would be impossible without addressing and correcting the numerous significant deficiencies in project management, engineering, licensing, procurement, and construction identified by Bechtel and addressed in over 80 separate "Observations" and "Recommendations" in the First Bechtel Report.

ANSWER NO. 179:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 179, except admits that it contains partial quotations from the First Bechtel Report, and refers to the First Bechtel Report for its complete contents.

180.    The First Bechtel Report provided an Executive Summary summarizing numerous reasons why the Nuclear Project's recently approved schedule was "at risk." In addition to the specific conclusions on the timing of the schedule, Bechtel concluded that:

- "While the Consortium's engineering, procurement, and construction (EPC) plans and schedules are integrated, **the plans and schedules are not reflective of actual project circumstances.**"

- "The Consortium lacks the project management integration needed for a successful project."

- "There is a lack of shared vision, goals, and accountability between the Owners and the Consortium."

- "The Contract does not appear to be serving the Owners or the Consortium particularly well."

- "The detailed engineering design is not yet completed which will subsequently affect the performance of procurement and construction."

- "The **issued design is often not constructible** resulting in a significant number of changes and causing delays."

- "The oversight approach taken by the Owners does not allow for real-time, appropriate cost and schedule mitigation."

- "The relationship between the Consortium partners . . . is strained, caused to a large extent by commercial issues."

- "The recently announced acquisition of CB&I and WEC and the hiring of another construction contractor" **could "caus[e] further delays in mitigating the resulting project impacts"** because "the issues at V.C. Summer rest with both engineering, procurement, and construction".

ANSWER NO. 180:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 180, except admits that it contains partial quotations from the First Bechtel Report, and refers to the First Bechtel Report for its complete contents.

181.    The First Bechtel Report also identified deficiencies related specifically to SCANA's management of the Nuclear Project including, but not limited to, the following:

- "As the Owners, SCE&G and Santee Cooper have the responsibility to manage their portion of the prime contract and ensure that the Consortium contractors are

fulfilling their contractual observations." Yet, Bechtel observed that "[t]here is **a lack of accountability**" in various SCANA departments, and [t]he approach [to project management] taken by [SCANA and Santee Cooper] **does not allow for real-time, appropriate cost and schedule mitigation.**"

- "The Owners' [SCANA and Santee Cooper] organization **lacks the appropriate personnel to provide the proper level of review and oversight required** to drive the project to successful completion."

- "The Owners' oversight organization does **not have a proper Project Controls staff**."

- "The Consortium does not appear to be commercially motivated to meet Owner goals."

- "[T]he V.C. Summer Units 2 & 3 project suffers from various fundamental EPC and major project management issues that must be resolved for project success."

ANSWER NO. 181:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 181, except admits that it contains partial quotations from the First Bechtel Report, and refers to the First Bechtel Report for its complete contents.

182.    Bechtel's stark conclusions were not a surprise to SCANA or to Deloitte. Indeed, Browne later testified that "[t]here were people in the project who knew everything that was in the Bechtel study before Bechtel ever showed up on site."[99] Further, Marsh admitted under oath in 2017 testimony that Bechtel's conclusions were "not news" because SCANA already knew "the majority" of the things contained within the Bechtel Report before October 2015. Byrne similarly testified in 2017 that "the issues that were raised by Bechtel had largely been raised by our folks before the Bechtel report."

ANSWER NO. 182:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 182.

183.    Despite receipt of the First Bechtel Report, in November 2015, SCANA told the PSC that the GSCD would be met well in advance of the January 1, 2020 tax credits deadline. For example, Marsh stated that SCANA "wanted to focus Westinghouse very keenly on meeting the deadlines for the production tax credits," and remarked that there was sufficient time between the GSCDs and tax credit deadline because the units would be substantially completed 6 to 12 months in advance of the tax credits deadline:

---

[99] *Id*. 64:20-23.

As you know, those tax credits expire at the end of 2020. We have to have our plants on line at the end of 2020 to qualify for those. The first plant is certainly more than a year ahead of that; the second plant is a little bit less than six months ahead of that, . . . so we wanted to make sure we kept them focused on trying to reach those goals so we could secure those benefits for customers that amount to about $2.3 billion on a pretax basis.

ANSWER NO. 183:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 183, except admits that Marsh testified before the PSC, and refers to the testimony for its complete contents.

### 7.    The Second Bechtel Report

184.    On or about February 5, 2016, Bechtel delivered a second Project Assessment Report (the "Second Bechtel Report") (together with the First Bechtel Report, the "Bechtel Reports"). No new assessment work had been performed by Bechtel since the First Bechtel Report, and no additional information had been added.

ANSWER NO. 184:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 184, except admits that Bechtel prepared the Second Bechtel Report, and refers to the Second Bechtel Report for its complete contents.  Deloitte affirmatively avers that it did not receive the Second Bechtel Report until after SCANA announced its abandonment of the Nuclear Project.

185.    The Second Bechtel Report listed many of the same problems identified in the First Bechtel Report. These problems made clear that it would be impossible for the Nuclear Project to be completed by the end of 2020. As *The Post and Courier* later reported, the Second Bechtel Report demonstrated that "SCANA and Santee Cooper knew the effort to construct two nuclear reactors was failing more than a year before the ambitious energy project was scrapped [in July 2017]."

ANSWER NO. 185:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 185, except admits that Bechtel prepared the Second Bechtel Report, and that the paragraph contains a partial quotation from the referenced article and refers to the article and Second Bechtel Report for their complete contents.

186.    Both the First and Second Bechtel Reports stated that the recently-revised schedule, approved by the PSC in September 2015, "has slipped significantly" and "continues to slip," and identified "**Major Issues Affecting Schedule and Performance**," including:

- "A large percentage of the personnel on the project" have been "working too many hours for an extended period," which is proven to "reduc[e] productivity" and "negatively affect[] morale, decision making, and safety";

- "Significant Non-Manual Turnover" of "greater than 17%, which is high for a typical nuclear plant" and is likely attributable to the Nuclear Project's "safety, cost, and schedule concerns" that were "compounded with the frustrations of design change" at the Units;

- A poor management process that minimized, rather than maximized, actual craftsmen time at the workface;

- "A large part of the schedule slip is related to late design changes, slow resolution of interference issues, and the time it takes to resolve construction errors and quality problems. . . . As long as there are late design changes occurring and there is not expeditious resolution of issues that arise, there will continue to be significant schedule slippages"; and

- The modular design strategies employed at the Units, "while a great concept, have proven to be an impediment to the construction and are more complicated to fabricate."

ANSWER NO. 186:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 186, except admits that it contains partial quotations from the First Bechtel Report and the Second Bechtel Report, and refers to those documents for their complete contents.

187.    The most important "**key schedule challenge**" identified by Bechtel in both the First and Second Bechtel Reports remained the Nuclear Project's dismal progress percentages. Without improving this key indicator, it would be impossible for SCANA to complete the Nuclear Project in time to qualify for the Nuclear Tax Credits. Indeed, as Bechtel repeated, "**[i]n order for the plant to complete on schedule, monthly construction progress must increase to close to 3%.**"

ANSWER NO. 187:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 187, except admits that it contains partial

quotations from the First Bechtel Report and the Second Bechtel Report, and refers to those documents for their complete contents.

188.    In the wake of the Second Bechtel Report, in February 2016, Santee Cooper authored a one-page memorandum titled the "Bechtel Report Action Plan," as later confirmed by Santee Cooper's General Counsel in a letter to South Carolina Governor McMaster on September 27, 2017. The Bechtel Report Action Plan is divided into three sections: (i) "SCE&G Concerns"; "Santee Cooper Proposal for Use of Report"; and (iii) "Santee Cooper Action Steps."

ANSWER NO. 188:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 188, except admits that Santee Cooper sent a letter to Governor McMaster on September 27, 2017, and refers to its complete contents.

189.    Santee Cooper wrote in the Bechtel Report Action Plan, in a section titled "SCE&G Concerns," "What mitigation effort is required to defend potential shareholder suit -- Now that SCE&G is specifically aware of problems in [the] report, failure to act may result in O&D [Officers' and Directors'] liability." The Bechtel Report Action Plan further described how SCANA and Santee Cooper colluded to ensure that any "disclosures" made to prospective buyers of each company's corporate debt—the primary source of funds used for the Nuclear Project— were "similar," given that they both knew the Nuclear Project was seriously troubled and they were concerned about how "to defend [a] potential shareholder suit." Thus, the Bechtel Report Action Plan demonstrates that SCANA (and by implication, Deloitte) was acutely aware of how its public statements since October 2015 differed materially from Bechtel's undisclosed Assessment and Reports.

ANSWER NO. 189:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 189.

### 8.    SCANA Files its 2015 Form 10-K and Deloitte Issues a Clean Audit Report

190.    On February 26, 2016, SCANA filed its annual report on Form 10-K for the year ended December 31, 2015. In it, SCANA represented that SCANA fully expected to complete the Nuclear Project in time to receive the $1.4 billion in tax credits, stating "**[b]ased on the guaranteed substantial completion dates provided above** [August 2019 and 2020]**, both New Units are expected to be operational and to qualify for the nuclear production tax credits**."

ANSWER NO. 190:  Deloitte denies the allegations set forth in paragraph 190, except admits that SCANA filed a Form 10-K on February 26, 2016, and refers to the Form 10-K for its complete contents.

191.    Further, despite its receipt of the Bechtel Report and all of the internal documents and metrics demonstrating that the Nuclear Project was besieged by significant delay, Deloitte gave its imprimatur to these representations, issuing an unqualified, clean audit report and stating that SCANA's financial statements "present fairly, in all material respects, the consolidated financial position" of SCANA "in conformity with accounting principles generally accepted in the United States."

ANSWER NO. 191:  Deloitte denies the allegations set forth in paragraph 191.

### 9.    SCANA Rejects the Recommendations in the Bechtel Action Plan

192.    As discussed above, Bechtel made numerous recommendations to SCANA in an effort to get the Nuclear Project on track in a manner that would allow it to reach completion. Following Bechtel's assessment, Santee Cooper repeatedly sought SCANA's cooperation in implementing them. SCANA ignored these recommendations.

ANSWER NO. 192:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 192.

193.    Specifically, one month after receipt of the Second Bechtel Report and one week after the 2016 Form 10-K was filed, on March 4, 2016, Santee Cooper sent Marsh a five-page memo titled "Santee Cooper Recommendations," in which Santee Cooper wrote: "Over the past seven years, the Consortium's inability to coordinate itself and complete the engineering, procurement, and construction work necessary to deliver this project on a schedule has come at a high cost to the Owners." Santee Cooper estimated its own share of the cost as "approximately $35 million" for each month of delay (SCANA's share of the costs would be larger in light of its majority interest in the Nuclear Project). Santee Cooper also conclusively stated that "[n]ew project management and leadership are needed to overcome these challenges," which have "significant impact upon the Owners."

ANSWER NO. 193:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 193.

194.    Santee Cooper impressed upon SCANA the need to act quickly due to the then-existing, significant "risk" that SCANA would "not receiv[e] the production tax credits" worth $1.4 billion to the Company: "Considering the Consortium's record, nearly three years of delays, and the risk associated with not receiving the production tax credits, it is incumbent upon the Owners to employ increased and magnified oversight to ensure that WEC and Fluor will properly coordinate efforts to resolve the challenges facing the Project."

ANSWER NO. 194:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 194.

195.　In this memorandum, Santee Cooper also emphasized the monthly progress percentage also set forth by Bechtel that had to be met for the Nuclear Project be completed by the end of 2020:

> **In 2015**, only 3.7% direct craft progress (**0.31% per month**) was earned towards completion of the combined units. The year closed with overall direct craft construction at 18.7% complete. With 81% of the work to go, **the monthly construction progress must increase to around 2.5% if contract dates are to be achieved. Failure to realize a significant and sustained increase on this metric over the next six months will invariably result in more project delay.**

ANSWER NO. 195:　Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 195.

196.　In order to increase the monthly progress percentage Santee Cooper recommended, among other things, that SCANA improve the "professional oversight of the EPC [Contract]" by choosing one of the two options described in the Bechtel Report Action Plan: (i) hire "a career professional with extensive experience in complex, new-build generation projects" who would report directly to Marsh and answer to Santee Cooper's CEO Carter; or (ii) retain an independent "qualified EPC firm, including executive leadership and support personnel" to provide the needed oversight services.

ANSWER NO. 196:　Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 196.

197.　On March 3, 2016, Santee Cooper drafted another four-page memorandum titled "V.C. Summer – United 2 & 3 – Concerns with Consortium and EPC Management," which was sent to Santee Cooper's Board of Directors in preparation for a March 21, 2016 joint meeting of SCANA and Santee Cooper's Boards of Directors. Given that such materials were shared with Santee Cooper's Board in advance of the March 21, 2016 joint Board meeting, it is likely that they were also shared with SCANA's Board, and therefore Deloitte as well. The memorandum stated that "[t]he SCE&G oversight staff lacks the experience, and in some cases, the support of upper management, to hold the Consortium accountable for the work sold under the EPC [Contract]." The memorandum also set forth (without specific attribution to Bechtel) Bechtel's opinion that (i) "SCE&G needs to on- board professional EPC management support for the V.C. Summer Project"; (ii) the changing members of the Consortium's inability to "fully complete[] and integrate[] the engineering, procurement and construction plans and schedules necessary to deliver the Project"; (iii) evidence that Westinghouse "is not properly funding Fluor to allow the addition of needed contractor employees"; (iv) a lack of transparency on the part of the Consortium; (v) the fact that Westinghouse's "design engineering has been a significant impediment to the Project from the outset"; and (vi) Westinghouse's design "is often not constructible requiring change modifications, impedes performance, and a source of numerous delays."

ANSWER NO. 197:  Deloitte denies the allegations set forth in paragraph 197, except

denies knowledge or information sufficient to form a belief as to the truth of the allegations set

forth in the first, third, and final sentences of paragraph 197.

198.    In the memorandum, Santee Cooper stated that "schedule adherence [was]
unrealistic" because the "[p]lans and schedules contain unreasonable assumptions and do not
reflect actual project circumstances." Santee Cooper also stated that the "project completion dates
[were] artificially constrained," "[c]ritical path material deliveries . . . do not support construction
need dates," and "[m]issed milestones push-out and are rarely recovered." Finally, Santee Cooper
specifically emphasized the urgent need for SCANA's oversight of the Nuclear Project's
"planning, scheduling and execution."

ANSWER NO. 198:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 198.

199.    Given the lack of progress on the Nuclear Project as well as its crucial role in
achieving completion of the project in time to obtain the Nuclear Tax Credits, Deloitte was
required to have inquired as to Santee Cooper's view of the Nuclear Project. Had it done so, it
would have learned Santee Cooper had continuously been conveying to SCANA the impossibility
of completing the Nuclear Project by the end of 2020, based on historical performance.

ANSWER NO. 199:  Deloitte denies the allegations set forth in paragraph 199.

200.    On March 7, 2016, shortly after receiving the Santee Cooper Recommendations,
Marsh and his team met with Carter and other Santee Cooper executives to discuss the concerns
laid out in the Santee Cooper Recommendations in advance of the joint Board of Directors'
meeting on March 21, 2016. A March 14, 2016 email from Carter to Santee Cooper's Board of
Directors attached the Santee Cooper Recommendations as preparatory "materials for our
Executive Section with the SCANA Board members on March 21, 2016," and referenced Marsh's
May 7, 2016 meeting. As stated above, the Santee Cooper Recommendations were likely also sent
to SCANA's Board (and therefore Deloitte) in advance of the joint Board of Directors' meeting,
particularly given SCANA's oversight responsibilities with respect to the Nuclear Project. The
email also stated that Carter "had a long and frank discussion [with Marsh] regarding item 5
[concerning getting additional oversight] and the need for management changes to the Project."
However, "Kevin [Marsh] noted that he supported changes in the management of the Project but
seemed to not want to go as far as we recommend." According to Carter, Marsh agreed to "think
about the issue and be ready to discuss on March 11" when Marsh met with Harold Stowe
(SCANA's Lead Director), Leighton Lord (Santee Cooper's Chairman of the Board) and Carter.

ANSWER NO. 200:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 200.

201.    Thus, on March 11, 2016, Carter and Lord met Marsh and Stowe to discuss Santee Cooper's concerns and recommendations before companies' joint Board Meeting. During this high-level meeting, Santee Cooper "emphasized the need to address item 5 and associated Project management changes." In addition, Carter "stressed the need for talent in the area of very large construction projects" who would "report to Kevin [Marsh] and I frequently."

ANSWER NO. 201:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 201.

202.    The November 2016 Santee Cooper Nuclear Timeline corroborates that on March 11, 2016 a CEO meeting took place in Columbia, South Carolina where "Marsh, Harold Stowe, Carter, Leighton Lord – meet to discuss Santee Cooper's formal recommendations and expectations of SCANA for the planned Mar 21 Joint Board meeting." Minutes from that meeting should have been reviewed by Deloitte.

ANSWER NO. 202:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 202.

203.    Ultimately, SCANA rejected many of Bechtel's and Santee Cooper's recommendations. SCANA refused to hire either "an executive EPC professional" or "a qualified EPC firm." According to the November 2016 SC Nuclear Timeline and other internal Santee Cooper documents, Marsh and Byrne pushed back against Bechtel's and Santee Cooper's recommendations. Specifically, on March 18, 2016, Marsh rejected hiring either an "owner's engineer" EPC firm or a dedicated SCANA EPC professional to report to him. Marsh's resistance was a recurring source of tension between SCANA and Santee Cooper.

ANSWER NO. 203:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 203.

204.    For example, the Boards of Directors of SCANA and Santee Cooper held a joint Board Meeting on March 21, 2016 (minutes of which should have been reviewed by Deloitte) where they "discussed Bechtel Report, Santee Cooper March 3 formal recommendations and SCANAs [sic] plan forward to address issues." At this meeting, nearly six months after Bechtel completed its disastrous assessment, Marsh finally "committed that SCANA and Santee Cooper would work to identify actionable Bechtel recommendations, SCANA would add EPC experts to its team, and that SCANA would charter a V.C. Summer Construction Oversight Review Board to help SCANA with project execution." However, SCANA still did not agree to retain the independent EPC professional or firm, as recommended by Bechtel and Santee Cooper.

ANSWER NO. 204:  Deloitte denies the allegations set forth in paragraph 204, except denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the second through final sentences of paragraph 204.

205.    As alleged in the SEC Complaint, at the meeting, a SCANA Board member noted that "for whatever reason progress isn't happening and that needs to change." Marsh did not disagree with this statement and, according to notes from the meeting, he acknowledged that "the ultimate problem is performance."

ANSWER NO. 205:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 205, except admits that it sets forth partial quotations from the SEC Complaint, and refers to the SEC Complaint for its complete contents.

206.    Marsh's March 21, 2016 commitment to effect change in the management of the Nuclear Project was illusory. According to the November 28, 2016 SC Nuclear Timeline, SCANA failed to even convene a Construction Oversight Review Board ("CORB") until July 2016, and this step was only taken after several months of inactivity and another joint meeting of the SCANA and Santee Cooper Boards, on June 20, 2016, where the issue of the CORB was raised once again (minutes of which Deloitte should have reviewed).

ANSWER NO. 206:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 206.

207.    After the joint Board meeting, on March 23, 2016, Carter sent Marsh a letter regarding the meeting, copying Stowe. Carter noted that the slide presentation at the March 21 joint Board meeting (which should have been reviewed by Deloitte) "was informative and fully consistent with information provided to us by Michael Crosby and our nuclear team." Carter indicated that the Nuclear Project's troubles were "open[ly]" discussed at the March 21, 2016 Joint Board meeting, and stated that the "[t]he discussion between our Boards was frank."

ANSWER NO. 207:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 207.

208.    As alleged in the SEC Complaint, on March 28, 2016, SCANA held a Risk Management Committee meeting. At the meeting, executives again identified "schedule delays" and the receipt of "production tax credits" as "key risk[s]" facing the Company. Deloitte was required to review project management related reports and/or documented summaries provided to executives from the Risk Management Committee meetings, as well as any minutes from the meetings, and thus would have reviewed the minutes from this meeting.

ANSWER NO. 208:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 208, except admits that it sets forth partial quotations from the SEC Complaint, and refers to the SEC Complaint for its complete contents.

## 10.    Cost Overruns and Schedule Delays Continue

209.    On April 15, 2016, SCANA's nuclear team sent the Company's senior management, including Marsh and Byrne, a document titled "SGE&G List." The SGE&G List demonstrated the nuclear team's agreement with many of Bechtel's observations and recommendations regarding the lack of progress on the expansion project. Specifically, the SGE&G List stated:

- "Work activities should be planned based on a realistic evaluation of the work, rather than optimistic projections due to schedule pressure from management";

- "Work was performed out of sequence to support fictitious milestone completion of Setting CA20 Module, knowing that a significant effort was required to complete the module";

- "Contractor needs to resource load the schedule based on reasonable unit rates and set performance goals and schedules based on realistic information. Overly aggressive and optimistic schedule dates are not the best way to encourage craft labor performance. This has been demonstrated by the repeated failure of the contractor to meet published schedule dates for project milestones"; and

- The Contractor has continually modified metrics and graphs to obscure the poor performance. Baselines have been repeatedly set and then re-set at a later date, thus making any performance measurement impossible. We should be looking at total project data instead of short-term 9–12 months[.]"

ANSWER NO. 209:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 209.

210.    SCANA's nuclear team also stated that "[i]t would be a good idea to encourage and recognize meaningful progress and successes. This is difficult to accomplish when the project is not seeing meaningful successes."

ANSWER NO. 210:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 210.

211.    The SEC Complaint then alleges that on May 19, 2016, Byrne attended a meeting with Westinghouse regarding the Nuclear Project. According to the minutes from the meeting (which Deloitte was required to review), a member of SCANA's nuclear team noted that Westinghouse was not achieving the schedule milestones that it needed to meet for Unit 2 to be completed by August 2019, and Unit 3 to be completed by August 2020 (Unit 3), and further noted that Westinghouse's mitigation efforts to date had not been successful in remedying these problems. Difficulties in other areas of the project that were affecting the schedule, such as procurement, were also discussed.

ANSWER NO. 211:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 211, and refers to the SEC Complaint for its complete contents.

212.    At this meeting, Westinghouse acknowledged that during the first four months of 2016 it had averaged a monthly percent complete rate of only 0.5%. The EPC Amendment assumed that Westinghouse could complete Unit 2 by August 2019 and Unit 3 by August 2020 by achieving a percent complete per month rate of 3%. At the current rate of progress of 0.5%, it would take an additional seven years to finish the project—well past the end of 2020.

ANSWER NO. 212:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 212.

213.    On or about June 30, 2016, the Executive Director of the ORS sent a letter to Marsh detailing the ORS's concerns regarding the validity of the schedules for the Nuclear Project.[100] Deloitte should have reviewed such regulatory correspondence. The letter explained that "[t]he ORS is currently in a heightened state of concern regarding the construction cost overruns and schedule delays for V.C. Summer (VCS) Nuclear Units 2 & 3. . . . In the case of Unit 2, ORS believes that, while the date in the filing of August 31, 2019 is unlikely to be met, it is possible that Unit 2 may still be able to qualify for the Federal Production Tax Credits that expire on December 31, 2020. However, completing Unit 2 in time to receive the Federal Production Tax Credits will require improvements to the current construction methodology." The ORS's letter further stated that the "**ORS has no confidence that Unit 3 can meet the Current Federal Production Tax Credit Deadline of December 31, 2020**. . . . This makes the validity of the current schedule highly suspect."

ANSWER NO. 213:  Deloitte denies the allegations set forth in paragraph 213, except denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in first, and third through final sentences of paragraph 213.

214.    The SEC Complaint alleges that the ORS also informed SCANA that it wanted to depose a Westinghouse representative regarding the project, and in particular the EPC Amendment and the project schedule. Finally, the ORS letter requested that SCANA "respond to the issues raised in the letter before they complete the final version."

---

[100] The ORS drafted the letter to be sent to the Public Utilities Review Committee ("PURC") and the governor of South Carolina.

ANSWER NO. 214: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 214, except admits that it sets forth a partial quotation from the SEC Complaint, and refers to the SEC Complaint for its complete contents.

215. On July 1, 2016, Marsh forwarded ORS's letter to Byrne and other SCANA executives, and tasked Byrne and another SCANA executive with drafting a response on behalf of SCANA that could be incorporated into ORS's letter.

ANSWER NO. 215: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 215.

216. The SEC Complaint further alleges that then, on June 29, 2016, Marsh and another SCANA executive met with the ORS's Executive Director to discuss the deposition of a Westinghouse representative. Marsh drafted his own "notes for discussion" to use in an upcoming conversation with the ORS's Executive Director. These notes clearly show that Marsh hoped that the ORS did not express its doubts about the project publicly, and would not depose a Westinghouse representative.

ANSWER NO. 216: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 216, except admits that it sets forth a partial quotation from the SEC Complaint, and refers to the SEC Complaint for its complete contents.

217. Marsh's notes also describe the impact such public statements by the ORS would have on SCANA's ability to sell securities at favorable rates, stating "[o]ur public disclosures to the SEC and investors will have to address this and address as a risk. The 'supportive regulatory environment' in SC is the foundation of our bond ratings and the support we receive from the financial community. Without that support, **we will have difficulty selling our securities at favorable prices**, which will raise prices for our customers."

ANSWER NO. 217: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 217, except admits that it sets forth a partial quotation from the SEC Complaint, and refers to the SEC Complaint for its complete contents.

218. Marsh also wrote that "[i]f you [ORS] go forward, it will be hard to put this genie back in the bottle. Potential for devastating results," and further stated:

> The financial markets see the ORS, and you specifically, as the face
> of regulation in SC.
>
> • Credit rating agencies

81

- Bond underwriters
- Investment analysts
- Shareholders
- Banks

Your planned actions will send shock waves to this group. You will be overrun with calls and inquiries. They will jump to conclusions and publish their thoughts and concerns.

ANSWER NO. 218:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 218, except admits that it sets forth partial quotations from the SEC Complaint, and refers to the SEC Complaint for its complete contents.

219.    In June 2016, Santee Cooper was also still urging SCANA to retain an external, independent EPC management firm to help address the continuing problems with the Nuclear Project. For example, on June 2, 2016, Santee Cooper's Senior Vice President for Nuclear Energy, Michael Crosby, emailed SCANA's Jeff Archie, copying Marsh and Byrne and Lonnie Carter, among others, commenting on "SCANA's Project Assessment Report," which Santee Cooper had received at a "May 19 meeting with Kevin [Marsh,] Steve [Byrne] and [Archie]," among other things. Crosby wrote that "we have reviewed and appreciate the SCE&G commentary relative to **the engineering challenges that continue to impede progress on the [Project]**– namely design debt, **design constructability**, change paper, complex work packages, and emergent issue management." Crosby also stated that "[u]nfortunately, five months after WEC has had complete control of the Project, **there is little evidence that (WEC) is taking the steps necessary to resolve these challenges and relieve pressure on the substantial completion dates**. Each meeting I attend we continue to report out and discuss **the same basic issues as progress on the critical path continues to slip**," emphasizing the continued absence of significant improvement in the Nuclear Project's progress to date. Accordingly, Carter reiterated that Santee Cooper "remain[ed] steadfast that at this juncture of the project, we could only benefit by adding outside EPC resources [*i.e.* the EPC management firm] to guide and assist with this effort on these challenges," explaining that this was necessary for Santee Cooper and SCANA, "[a]s Owners, . . . to ensure [] that we are doing all we can do to analyze project challenges . . . and hold WEC accountable for executing the project on the contract schedule."

ANSWER NO. 219:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 219.

220.    As alleged in the SEC Complaint, on June 17, 2016, Marsh received a "Project Assessment Report" and an "Executive Summary" from SCANA's nuclear team that addressed some of the issues raised by Bechtel. These documents recognized that Bechtel had raised "valid concerns" with the construction schedule. The nuclear team also listed the development of "a project schedule plan to achieve construction completion of at least 3% per month" as a "key issue." Given the serious discrepancy between the actual performance of construction and that

budgeted by the Company, such Project Assessment Reports should have been reviewed by Deloitte.

ANSWER NO. 220:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 220, except admits that it sets forth partial quotations from the SEC Complaint, and refers to the SEC Complaint for its complete contents.

221.    On July 13, 2016, Carter emailed Marsh regarding the lack of progress on the project since October 2015. In his email, Carter noted that the monthly construction progress rate remained at the same 0.5% rate observed by Bechtel—only **one sixth** of the necessary 3% monthly rate. Carter explicitly recognized that, contrary to SCANA's public representations, this ongoing lack of improvement meant made it impossible for the Nuclear Project to meet the 2020 completion date and thus to qualify for the $2.2 billion of Nuclear Tax Credits.

ANSWER NO. 221: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 221.

222.    Carter also expressed Santee Cooper's frustrations with Westinghouse's continued poor performance, and SCANA's role in allowing Westinghouse's poor performance to continue unchecked:

> What has particularly frustrated Santee Cooper from the date of the 2015 Amendment [October 27, 2015] is WEC's failure to seize an opportunity and significantly ramp up construction progress at the site. . . . **Through the last 6 months, while the Owners have paid $600 million dollars, construction progress has only been an aggregate of 3% [i.e., 0.5% per month]**. Moreover, for the June billing period, had the Owners accepted WEC's milestones and payment schedule, which contained twenty-seven milestones and requested payment of $156 million for the month, only four of the twenty-seven were completed, which would entitle WEC to payment of just $23.1 million. **This rate of progress will never meet the current completion schedule, impacting production tax credits, the availability of cheaper energy for our customers, and bringing the costs of construction to conclusion**.
>
> The DRB [Dispute Resolution Board] time crunch in which we find ourselves is unfortunate, but respectfully, was avoidable. **The Santee Cooper team has been requesting since the first of this year that we immediately engage an independent analysis of the project's progress and needs going forward in order to better inform the Owner's position in the construction milestone debate**. Our first suggestion as to a particular vendor was not satisfactory to the SCE&G team. We continued to persist in our request through various delays we did not understand, the actual engagement with another

vendor was not finalized until much later, and now we are in time constraints.

ANSWER NO. 222: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 222.

223.    That same day, Marsh received an email from a member of the Company's nuclear team stating that Westinghouse "completed 4 of the 27 projected milestones (14.8% complete 85.2% not complete)." Another SCANA nuclear team member noted that this was a "dismal performance." Given the serious discrepancy between the actual performance of construction and that budgeted by the Company, Deloitte should have reviewed how many of the projected milestones were being met.

ANSWER NO. 223:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 223, except admits that it sets forth partial quotations from the SEC Complaint, and refers to the SEC Complaint for its complete contents.

224.    As also alleged in the SEC Complaint, on July 21, 2016, Byrne attended a meeting with other members of SCANA's nuclear team and Westinghouse. At the meeting, Westinghouse reported that the monthly percent complete percentages for March through June 2016 were still far below the 3% needed to complete Unit 2 by August 2019 and Unit 3 by August 2020.

ANSWER NO. 224:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 224, and refers to the SEC Complaint for its complete contents.

225.    At this time, eight months after SCANA entered into the EPC Amendment, the pace of construction still lagged far behind where it needed to be for SCANA to complete the new units on schedule. More specifically, as Deloitte knew or should have known, for the first six months of 2016 the monthly percent complete percentages were as follows:

| MONTH | EXPECTED PERCENT COMPLETE | ACTUAL PERCENT COMPLETE |
|---|---|---|
| January 2016 | 3% | 0.3% |
| February 2016 | 3% | 0.5% |
| March 2016 | 3% | 0.6% |
| April 2016 | 3% | 0.6% |
| May 2016 | 3% | 0.7% |
| June 2016 | 3% | 0.8% |
| **TOTAL** | 18% | 3.5% |

ANSWER NO. 225: Deloitte denies the allegations set forth in paragraph 225, except denies knowledge or information sufficient to form a belief as to the allegations in the first sentence of paragraph 225.

226.    One week later, on July 26, 2016, Marsh and Byrne attended SCANA's quarterly Board of Directors meeting, minutes of which Deloitte was required to review.

ANSWER NO. 226: Deloitte denies the allegations set forth in paragraph 226.

227.    As alleged in the SEC Complaint, at the meeting Byrne presented a "New Nuclear Construction Update" (which Deloitte was required to review) that highlighted the unreliability of the construction schedule and raised serious doubts about SCANA's ability to complete the expansion project in time to receive the production tax credits. Bryne's presentation was based on a PowerPoint presentation that Westinghouse and its sub-contractor planned to present to the senior executives at SCANA and Santee Cooper. Although Westinghouse was going to present the information, SCANA's own nuclear team drafted slides regarding the five project focus areas for the presentation.

ANSWER NO. 227: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 227, except admits that it sets forth certain allegations in the SEC Complaint, and refers to the SEC Complaint for its complete contents.

228.    Byrne's presentation addressed the following "Five Project Focus Areas":

- "The project does not have equipment and commodities that meet requirements readily available to support construction work fronts. This impacts the ability of the project to reliably achieve schedule."

- "Modules are not being fabricated and delivered in accordance with the project execution plan. Modules are delivered later than the construction need date. A significant number of modules are delivered incomplete or with quality issues. This requires outfitting, rework or repair at the project site that is not part of the baseline schedule."

- "The project does not adequately address constructability issues requiring design changes or interpretations. All engineering design is not finalized in time to procure adequate material and plan work in advance of construction. This adversely impacts the ability to reliably achieve schedule."

- "The project does not have sufficient resources to support active construction work fronts. **This impacts the ability of the project to reliably achieve schedule** or mitigate issues from engineering, procurement or constructability delays."

- "The project performance factor (PF) is consistently above the goal (PF>2 each month in 2016) and trending in a negative direction. The majority of project milestones are not met on their scheduled dates. The percentage of schedule activities completed on time is well below the goal and does not allow for a reliable Integrated Project Schedule."

ANSWER NO 228:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 228, except admits that it sets forth partial quotations from the SEC Complaint, and refers to the SEC Complaint for its complete contents.

229.    The presentation made clear that the extensive problems in all of the focus areas affected the reliability of the construction schedule and raised doubts about Westinghouse's ability to complete Unit 2 and Unit 3 in time for SCANA to qualify for the $1.4 billion in production tax credits. On June 30, 2016, Westinghouse and its sub-contractor made the presentation at a meeting that included Santee Cooper's and SCANA's senior management, including Marsh and Byrne.

ANSWER NO. 229:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 229.

230.    The SEC Complaint alleges that on June 27, 2016, Marsh and Byrne attended a Risk Management Committee meeting, minutes of which Deloitte was required to review. At the meeting, SCANA executives again identified "schedule delays" and the receipt of "production tax credits" as "key risk[s]" facing the company, and rated these risks as "Red," indicating that there was significant risk that the company would not qualify for the tax credits.

ANSWER NO. 230:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 230, except admits that it sets forth partial quotations from the SEC Complaint, and refers to the SEC Complaint for its complete contents.

231.    On June 28, 2016, SCANA filed a revised rate petition with the PSC in which it sought to receive increased rates from its customers. The petition was made publicly available shortly after it was filed.

ANSWER NO. 231:  Deloitte denies the allegations set forth in paragraph 231, except admits that on or about June 27, 2016, SCANA filed a petition with the PSC.

**11.    SCANA Establishes a Construction Oversight Review Board, which Echoes  Bechtel's Concerns**

232.    The CORB was finally assembled in July 2016. The CORB conducted "initial site visits" in July and August 2016, provided an "executive debrief" on August 16, 2016, and

circulated a draft report on September 16, 2016, nearly a full year after the Bechtel Assessment (the "CORB Report"). Marsh & Byrne received copies of the draft report and Deloitte should have received and reviewed the draft report as well. The purpose of the CORB, as made clear in the First CORB Report, was "to offer insights and suggestions to enhance the execution of the V.C. Summer Unit 2 and Unit 3 Construction Project." Further, while "responses will be reviewed by the CORB during future visits" scheduled quarterly, the CORB was explicit that "[o]bservations do not necessitate responses by project management." Thus, it was clear from the face of the First CORB Report that the CORB's role was advisory only—nothing close to the dedicated EPC professional employee or firm recommended by Santee Cooper and Bechtel.

ANSWER NO. 232: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 232, except admits that a construction oversight review board was created in 2016.

233. The CORB came to many of the same conclusions Bechtel and Santee Cooper reached nearly one year earlier. In particular, the CORB highlighted the significant risks and impediments to completing the Nuclear Project on time, noting that "the Unit 2 & Unit 3 **project schedules include significant risks to achieve substantial completion**" and "**project schedule uncertainty is impacting the efficient assignment of oversight resources**." The CORB also noted that the schedule being used by SCANA did not even include "all work to complete the project that should be in the schedule," meaning that additional time would have to be added to account for the work identified by the CORB, including "subcontractor tasks," "engineering punch-lists," "test progress," and "licensing inspections, tests, analyses, and acceptance criteria."

ANSWER NO. 233: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 233, except admits that a construction oversight review board was created.

234. The CORB also concluded that **"[t]he current schedule for Unit 2 has slipped 5 months in a 6-month period**." This meant that the Nuclear Project was not progressing at all and in fact, for every month that passed the Nuclear Project schedule *lost* an additional month. According to the First CORB Report, by August 2016 even SCANA's own internal schedule (which was still unachievable based on Bechtel's contradictory findings) had moved Unit 2's completion date from August 2019 into **2020**. This fact was never disclosed to the public.

ANSWER NO. 234: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 234, except admits that a construction oversight review board was created.

235. Indeed, at this time SCANA was still publicly insisting that Unit 2 would be completed by August 31, 2019, in direct contrast to SCANA's own internal conclusions. For

example, on a July 28, 2016, earnings call, Byrne stressed that "**[t]he guaranteed [substantial] completion dates remain at August of 2019 for Unit 2 and August 2020 for Unit 3. We don't see anything to change those**." SCANA's August 5, 2016 Form 10-Q, which Deloitte was required to review for the purpose of obtaining a reasonable basis to report to the Company's Audit Committee whether it had identified any material modifications to or possible GAAP violations in the interim financial statements, similarly reiterated these completion dates.

ANSWER NO. 235:  Deloitte denies the allegations set forth in paragraph 235, except

denies knowledge or information sufficient to form a belief as to the truth of the allegations set

forth in the first and second sentences of paragraph 235, except admits that they set forth partial

quotations from the July 28, 2016 earnings call, and refers to the transcript thereof for its complete

contents, and admits that SCANA filed a Form 10-Q on August 5, 2016.

236.    The First CORB Report also highlighted many of the design and engineering problems identified by Bechtel, writing that **"[t]here is a growing backlog of constructability issues that are not getting the attention needed** to not impact constructability." In addition, the CORB warned that "[w]**ithout improved metrics, it will be difficult to ensure the Project is and remains on track** and to determine when recovery actions need to be identified."

ANSWER NO. 236:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 236.

237.    The CORB did not return to the Nuclear Project site between August and November 2016. Instead, it "debrief[ed]" SCANA executives on November 22, 2016. The SEC Complaint alleges that, according to Byrne's notes from the meeting, Santee Cooper's CEO asked a CORB member whether there was "a fully integrated proj schedule that takes proj to completion?" to which the CORB Chairman responded "No." Another executive from Santee Cooper then asked whether they have the "right people" in Westinghouse and Fluor, the new sub-contractor, to which the CORB Chairman answered "Probably Not." Finally, another CORB member succinctly stated: "Still don't have realistic sked," indicating that, even after several years of construction and the expenditure of several billion dollars, there still was not a realistic project schedule to complete the new nuclear units.

ANSWER NO. 237:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 237, except admits that it sets forth partial

quotations from the SEC Complaint, and refers to the SEC Complaint for its complete contents.

238.    Afterwards, the CORB issued a general draft six-page Report in December 2016 (the "December CORB Report"). This December CORB Report too, was or should have been reviewed by Deloitte. The December CORB Report highlighted a number of other continuing

deficiencies concerning the schedule and Nuclear Project management and oversight, noting that "oversight is insufficient for some project activities, including: the Project Execution Strategy, prioritization of project tasks, schedule performance, contract administration, and performance monitoring." The December CORB report further identified four recommendations that were all virtually identical to recommendations made by Bechtel in October 2015, November 2015, and February 2016, and by Santee Cooper in March 2016—all of which SCANA had had failed to implement.

ANSWER NO. 238:  Deloitte denies the allegations set forth in paragraph 238, except

denies knowledge or information sufficient to form a belief as to the truth of the allegations set

forth in the first, third, and fourth sentences of paragraph 238.

### 12.    The Nuclear Project's Problems Continue

239.    As alleged in the SEC Complaint, on October 20, 2016, SCANA's nuclear team, including Byrne, and Santee Cooper personnel attended another meeting with Westinghouse regarding the lack of progress on the Nuclear Project. At the meeting, an executive from Santee Cooper questioned whether achieving the required monthly progress necessary to complete Unit 2 and Unit 3 under the schedule was "a pipe dream" and if they will "ever get there." A member of SCANA's nuclear team noted that "there are so many loose ends" that he doesn't have "a high level of comfort that we will be successful," and another member of SCANA's nuclear team noted that construction progress was still lagging behind where it needed to be in order to complete the project on schedule. SCANA's nuclear team emphasized to Westinghouse that they need "more energy and commitment to meeting schedule dates" and that they need to "look at how they are managing schedule adherence."

ANSWER NO. 239:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations in paragraph 239, except admits that it sets forth partial quotations

from the SEC Complaint, and refers to the SEC Complaint for its complete contents.

240.    On November 28, 2016, Santee Cooper CEO Carter wrote Marsh an email in advance of a November 30, 2016 meeting for their "teams" to prepare for a December 5, 2016 joint meeting of the two companies' Boards of Directors. Byrne received a copy of this email as well. In this email, Carter attached the SC Nuclear Timeline and identified three "primary items" that Marsh, Carter, and their respective teams needed to discuss before the joint Board meeting. One primary item was "[i]ncreased project management expertise in large scale EPC construction." Carter noted that "[w]e need to be prepared to discuss with our board, after two years of requests and an affirmative commitment from you on more than one occasion," why there has not been an increase in "project management expertise" in response to the Bechtel Report. Carter stated that SCANA's formation of the CORB, discussed above, was entirely unsatisfactory and ineffective, and that he was "concerned that we learn critical information too late from an outside team that comes in quarterly for a few days, [information] which should have been brought to our attention by our teams."

ANSWER NO. 240:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 240.

241.    At the end of the SC Nuclear Timeline attached to this November 28, 2016 email, Santee Cooper stated that "SCANA's project management team . . . does not have the comprehensive skills and depth of experience necessary in engineering, scheduling, project controls and construction to manage a large new build project laced with complexities." Thus, Santee Cooper reiterated the need to add independent, qualified EPC managers to oversee the Nuclear Project:

> The Project would be greatly benefitted by infusing the current project management team with a framework of qualified EPC managers charged with working collaboratively with the Owner and Consortium to identify areas for improvement, suggest proven solutions, and to provide an independent perspective on actual progress – the effort aimed at increasing the accountability of the Consortium and the success of the Project.

ANSWER NO. 241:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 241.

242.    Then, according to the SEC Complaint, on December 15, 2016 Byrne attended yet another meeting with Santee Cooper and Westinghouse to discuss the expansion project. At the meeting, a Santee Cooper executive expressed concern about the lack of progress each month and stated: "**if you do the math it's hard to see that we are going to get there.**" Byrne's handwritten notes from the meeting echoed this belief: "Doesn't seem to be plan to improve % complete – Need 2x-3x." In short, Westinghouse would need to double or triple the rate of progress on the project to meet the deadlines in the schedule—something Westinghouse had been unable to do during the multi-year project.

ANSWER NO. 242:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations in paragraph 242, except admits that it sets forth partial quotations

from the SEC Complaint, and refers to the SEC Complaint for its complete contents.

243.    On December 27, 2016, Westinghouse's parent company, Toshiba Corporation, publicly announced that the cost to complete the nuclear expansion project would far surpass the original estimates.

ANSWER NO. 243:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 243.

244.    That same day, the SEC Complaint alleges that Marsh participated in a call with Westinghouse regarding the project. Marsh's notes from the call state: "Schedules unrealistic."

ANSWER NO. 244:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 244, except admits that it sets forth a partial quotation from the SEC Complaint, and refers to the SEC Complaint for its complete contents.

245.    Two days later on December 29, 2016, according to the SEC Complaint, Byrne and Santee Cooper's Senior Vice President for Nuclear Energy met with a representative from Westinghouse's sub-contractor (Fluor). According to the Santee Cooper executive's notes from the meeting, Fluor stated that Westinghouse would not allow Fluor to create a re-baselined schedule to determine when the new units would actually be completed, and was instead using mandatory constraints to hold the schedule to artificial completion dates. Bechtel had noted this issue more than a year earlier, and it had not been fixed. Marsh received a copy of the Santee Cooper executive's notes from the meeting a few days later.

ANSWER NO. 245:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 245, and refers to the SEC Complaint for its complete contents.

246.    On January 4, 2017, Marsh and Byrne received an e-mail from Santee Cooper's CEO including a list of "proposed issues" to raise at a planned meeting with Westinghouse in a couple days. With respect to the construction schedule, Santee Cooper's CEO wrote: "**Current production factors, which are in decline, render meeting the stated project schedule an impossibility.**"

ANSWER NO. 246:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 246.

247.    The SEC Complaint alleges that on January 6, 2017, SCANA's senior management, including Marsh and Byrne, attended the meeting with Santee Cooper and Westinghouse to discuss the deteriorating status of the expansion project. Byrne's notes from the meeting reflect that Marsh asked "How did we get here?" and went on to recognize that the schedule has "a lot more risk in it" than previously acknowledged publicly and that Westinghouse's sub-contractor estimates additional delays. Santee Cooper's CEO observed that it would be a "disaster" to send their regulator a schedule that "is unbelievable." Marsh's notes reflect that Westinghouse "did not confirm 2020." In short, at this meeting Westinghouse did not commit to completing the Nuclear Project in time for SCANA to qualify for the Nuclear Tax Credits.

ANSWER NO. 247:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 247, except admits that it sets forth partial

quotations from the SEC Complaint, and refers to the SEC Complaint for its complete contents.

248.    The Nuclear Project continued to fall further behind schedule as SCANA refused
to fix any of the repeatedly recognized deficiencies. An internal February 13, 2017 Santee Cooper
memorandum sent by CEO Carter to the Santee Cooper Board, showed that the **work productivity
factor remained at an abysmal 0.7% per month at the end of 2016, and that only 30.9% of
the project had been completed to date**. Per this memorandum, between October 2015 and
February 2017 just over 10% of the Nuclear Project was completed. Both the work productivity
factor and the percentage of the project that was complete were or should have been reviewed by
Deloitte on a regular, sample basis.

ANSWER NO. 248:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 248, except Deloitte denies the allegations

in the last sentence of paragraph 248.

249.    Carter further noted the recommendations made by CORB in late 2016, where the
CORB concluded "that **more Owner management was needed** in three specific areas of the
Project (infrastructure, execution, and schedule quality)." Unfortunately, no action had been taken
in the intervening three months. As Carter noted, the CORB's November 2016 conclusions and
recommendations were no different than the recommendations made sixteen months earlier by
Bechtel: **"[CORB's report] is consistent with Santee Cooper's position all along [and] the
Bechtel report delivered in October of 2015**."

ANSWER NO. 249:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 249.

250.    Lonnie Carter wrote in an internal June 14, 2017 email to Santee Cooper executives
and directors that SCANA and Santee Cooper estimated "**an additional cost of over $4.5B and
schedule delays in excess of 3 years**" to complete the Nuclear Project. Bechtel and Santee Cooper
ultimately proved to be completely accurate in their predictions.

ANSWER NO. 250:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 250.

### 13.    The Risk of the Westinghouse and Toshiba Bankruptcy Intensifies

251.    Westinghouse and Toshiba's financial condition—and the likelihood that the fixed
price option could force one or both of them into bankruptcy—was a constant topic of discussion
and concern between SCANA and Santee Cooper throughout the Class Period. On November 28,

2016, Santee Cooper's Carter sent Marsh a document titled "Nuclear Timeline – Project Bankruptcy Counsel" (the "Santee Cooper Bankruptcy Timeline"). According to the Santee Cooper Bankruptcy Timeline, by March 2016 Santee Cooper and SCANA were not only aware of financial hardships facing Westinghouse and Toshiba, but were even weighing the likelihood that Westinghouse would declare bankruptcy rather than pay the true costs of the Nuclear Project in excess of the fixed price. SCANA never disclosed these concerns to the public when it elected the fixed price option in May 2016.

ANSWER NO. 251:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 251.

252.    Santee Cooper tasked SCANA with securing bankruptcy counsel to consider a potential Westinghouse/Toshiba bankruptcy during a March 21, 2016 joint meeting of the companies' Boards of Directors (minutes of which Deloitte was required to review), "as a proactive measure given Toshiba's and potentially WEC's financial condition." SCANA never retained bankruptcy counsel, despite constant reminders and requests by Santee Cooper between March 2016 and November 2016.

ANSWER NO. 252:  Deloitte denies the allegations set forth in paragraph 252, except denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the final sentence of paragraph 252.

253.    For example, on June 7, 2016—less than two weeks after SCANA filed a petition with the PSC announcing its intention to elect the fixed price option—Crosby, Santee Cooper's Senior Vice President for Nuclear Energy, sent Byrne a proposed agenda for a joint Board meeting on June 20, 2016. In that agenda, listed under the discussion of the "Fixed Price Option" was "Potential Bankruptcy – outside legal opinion and plan to address."

ANSWER NO. 253:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 253.

254.    In a June 16, 2016 email to Carter, Marsh pushed back against discussing the potential bankruptcy with the companies' Boards. That same day, Carter replied insisting:

> [T]he possibility of [a Westinghouse or Toshiba] bankruptcy cannot be entirely divorced from our joint board discussions on Monday. For example, Item No. 2 on your agenda relating to the fixed price option obviously shifts risk away from the Owners and to Toshiba/Westinghouse, making their credit worthiness all the more important. Similarly, with respect to Item No. 3, getting the milestone payment schedule right will make it less likely that Westinghouse view as desirable a strategic Chapter 11 bankruptcy to rid itself of uneconomical executory contract.

ANSWER NO. 254: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 254.

255.     The impact of a Toshiba or Westinghouse bankruptcy was ultimately discussed at the June 20, 2016 joint meeting of the SCANA and Santee Cooper Boards of Directors, minutes of which Deloitte was required to review. According to a letter written by Carter to Marsh on October 25, 2016, "[d]uring the June 20 joint meeting, members of both our Boards expressed concern about the financial difficulties being faced by Toshiba Corporation and Westinghouse Electric Company and how those problems could possibly impact the timely and successful completion of the project." Thus, SCANA and Deloitte both knew there was significant "concern" regarding the likelihood and potential impact of a Toshiba and a Westinghouse bankruptcy on the continued viability of the Nuclear Project as early as June 2016. Carter's October 25, 2016 letter also reiterated that the "[o]ne action item that SCANA agreed to take on was securing Project Bankruptcy Counsel who would help us think through Toshiba/Westinghouse insolvency scenarios so that we might begin planning now on how [to] mitigate the impact of such an unfortunate possibility."

ANSWER NO. 255: Deloitte denies the allegations set forth in the paragraph 255, except denies knowledges or information sufficient to form a belief as to the truth of the allegations set forth in the second and final sentences of paragraph 255.

256.     By October 24, 2016, Santee Cooper's CEO, Lonnie Carter, and General Counsel J. Michael Baxley, traveled to New York and interviewed potential bankruptcy counsel. In Carter's October 25, 2016 letter referenced above, Carter also wrote to Marsh that the financial conditions of Toshiba and Westinghouse must be formally presented to the Boards of both companies:

> [I]n a June 16, 2016 email to me, you expressed the very same concerns describing "the potential bankruptcy of Toshiba or Westinghouse [as] critical" but expressing the "prefer[ence] to have some detailed discussions and debate within our project teams before making a formal presentation to either of our Boards." **The time for that formal presentation to the Board has arrived**.

ANSWER NO. 256: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 256.

257.     Marsh did not respond to Carter's email. On October 28, 2016, Santee Cooper sent an email to Marsh and SCANA's legal team informing SCANA that Santee Cooper had stepped in and retained a respected team of bankruptcy counsel for the Nuclear Project.

ANSWER NO. 257: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 257.

258.    According to the November 28, 2016 Santee Cooper Bankruptcy Timeline, as of November 28, Santee Cooper had received no reply from anyone at SCANA. On November 28, 2016 Carter wrote to Marsh again:

> Bankruptcy expertise would significantly inform our team as we negotiate with WEC going forward. Our separate, collective and independent analysis suggests that the fixed price option offered by WEC is likely significantly less than the cost WEC will incur to complete the Project. This is the very reason that we selected the fixed price. Regrettably, we must anticipate WEC having financial difficulty completing the Project, particularly in a timely manner.

ANSWER NO. 258:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 258.

259.    Carter further noted that Santee Cooper had been forced to retain bankruptcy counsel "[a]fter no action [was taken by SCANA] on our repeated requests on this topic."

ANSWER NO. 259:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 259.

260.    Instead of taking the steps repeatedly requested by Santee Cooper to mitigate, or prevent, a potential Westinghouse bankruptcy, SCANA began looking for an escape route. SCANA's own SEC filings reflect that in the wake of the Nuclear Project fiasco, SCANA sought to sell itself in "a potential strategic transaction" in December 2016. However, these initial steps toward a merger or other "strategic transaction" were put on hold following a late December 2016 announcement by Toshiba that, as discussed below, disclosed to the public for the first time the severity of the risks and issues facing the Nuclear Project.

ANSWER NO. 260:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 260.

261.    SCANA's internal concern about the likelihood and impact of a potential Westinghouse and/or Toshiba bankruptcy directly contradicted its public statements, including its Class Period Forms 10-K. For example, on a February 18, 2016 earnings call, Addison and Byrne discussed the supposed financial protections that the EPC Contract provided SCANA, including the fixed price option. Byrne further stated that "if there were to be a cessation of operations by the contractor [Westinghouse], that we could finish the plant on our own," thus falsely minimizing the risk of such a potential bankruptcy.

ANSWER NO. 261:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 261, except admits that it sets forth partial

quotations from the February 18, 2016 earnings call, and refers to the transcript thereof for its complete contents.

262.     Similarly, on an April 28, 2016 earnings call, in response to analysts' questions, Byrne again downplayed the negative impact of a potential bankruptcy by Toshiba or Westinghouse, stating "[i]f we elect the [F]ixed [P]rice [O]ption, there's an added cost that comes with taking [the risk of cost overruns] away." Byrne reiterated that in the event of a potential Westinghouse bankruptcy, "*we would look to finish the plant* [sic] *on our own*."

ANSWER NO. 262:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 262, except admits that it sets forth partial quotations from the April 28, 2016 earnings call, and refers to the transcript thereof for its complete contents.

## 14.     SCANA Files its 2016 Form 10-K and Deloitte Issues a Clean Audit Report

263.     On February 24, 2017, SCANA filed its annual report on Form 10-K for the year ended December 31, 2016. The 2016 financial statements again represented that SCANA fully expected to complete the Nuclear Project in time to receive the $1.4 billion in tax credits, stating "**[b]ased on current tax law and the contractual guaranteed substantial completion dates (and the recently revised forecasted dates of completion) provided above** [August 2019 and 2020]**, both New Units would be operational and would qualify for the nuclear production tax credits**."

ANSWER NO. 263:  Deloitte denies the allegations set forth in paragraph 263, except admits that SCANA filed a Form 10-K for the year ended December 31, 2016 on February 24, 2017, and refers to the Form 10-K for its complete contents.

264.     Deloitte issued another unqualified, clean audit report on these representations, stating that SCANA's financial statements "present fairly, in all material respects, the financial position" of SCANA "in conformity with accounting principles generally accepted in the United States of America."

ANSWER NO. 264:  Deloitte denies the allegations set forth in paragraph 264, except admits that Deloitte provided an opinion with respect to SCANA's financial statements, and refers to that opinion for its complete contents.

F.    **DELOITTE'S "NO AUDIT AT ALL" CONCEALS SCANA'S FRAUD FROM INVESTORS**

1.    **Deloitte Intentionally or Recklessly Fails to Conduct its Audits of SCANA's Financial Statements in Accordance with PCAOB Standards**

265.    Deloitte issued unqualified or "clean" audit opinions on SCANA's financial statement as of and for the years-ended December 31, 2015 and 2016 (the "2015 Audit" and "2016 Audit"), representing that they had audited SCANA's financial statements in accordance with PCAOB Standards and determined that those financial statements "present[ed] fairly, in all material respects, the financial position of the Company . . . in conformity with accounting principles generally accepted in the United States of America." [101]

ANSWER NO. 265:  Deloitte denies the allegations set forth in paragraph 265, except admits that D&T issued audit opinions for the years-ended December 31, 2015 and 2016, and refers to the audit opinions for their complete contents.

266.    As set forth in detail below, the 2015 Audit and the 2016 Audit were not conducted in accordance with PCAOB standards.

ANSWER NO. 266:  Deloitte denies the allegations set forth in paragraph 266.

a.    **Deloitte's Audit Response to Evidence that the Nuclear Project Would Not be Complete by 2021 and that SCANA Would Not Receive Nuclear Project Related Tax Credits Amounted to "No Audit At All"**

267.    SCANA told investors that it would be entitled to receive tax credits of up to $1.4 billion pursuant to the Nuclear Tax Production Credit provisions in the law, and that the Nuclear Project would be operational by 2021. Specifically, SCANA stated the following in its 2015 Financial Statements:[102]



---

[101] 2015 Annual Report on Form 10-K filed on February 26, 2016, p. 44; 2016 Annual Report on Form 10-K filed on February 24, 2017, p. 44.

[102] 2015 Annual Report on Form 10-K filed on February 26, 2016, p. 133-135. A nearly identical statement was made in the Company's 2016 Annual Report on Form 10-K, filed on February 24, 2017, p. 90.

ANSWER NO. 267:  Deloitte denies the allegations set forth in paragraph 267, except admits that it contains an excerpt of the notes to the financial statements included in SCANA's Form 10-K filed on February 26, 2016, and refers to the notes for their complete contents (and, with respect to the allegations set forth in footnote 102, refers to the notes in SCANA's Form 10-K filed on February 24, 2017).

268.    Further, in the notes to the 2015 financial statements, the Company stated that: the "**guaranteed** substantial completion dates of Units 2 and 3 [of the Nuclear Project]" were "**August 31, 2019 and 2020, respectively**."[103] In the notes to the 2016 financial statements, the Company similarly stated that the "**guaranteed** substantial completion dates" were "August 31, 2019 and August 31, 2020 for Units 2 and 3, respectively."[104]

ANSWER NO. 268:  Deloitte denies the allegations set forth in paragraph 268, except admits that it contains partial quotations from the notes to the financial statements included in SCANA's Form 10-Ks filed on February 26, 2016 and February 24, 2017, and refers to the notes for their complete contents.

269.    Deloitte was thus required to understand and obtain sufficient audit evidence in response to the risk that SCANA's related Nuclear Tax Production Credit disclosures could be materially misleading and/or misstated, in violation of GAAP. In addition, given the significance of the tax credits to the Company's financial condition and regulatory approval orders, Deloitte's was required to evaluate the likelihood that the Nuclear Protect would be complete by 2021.

ANSWER NO. 269:  Deloitte denies the allegations set forth in paragraph 269.

270.    Specifically, Deloitte needed to substantiate the existence of the disclosed tax credit (i.e., up to $1.4 billion) and its applicability to the Nuclear Project, as well as obtain audit support for SCANA's disclosed expectations with respect to such credits. This would have included, for example, obtaining and reviewing, support for the Company's asserted expected Nuclear Project completion date prior to 2021, including for example, the October 2015 Agreement, PSC approved orders, and other information demonstrating that the Company's disclosed expected unit completion date was likely to occur.

ANSWER NO. 270:  Deloitte denies the allegations set forth in paragraph 270.

271.    As set forth above in Section IV.E, evidence demonstrating that the Nuclear Project would be completed by the stated completion dates did not exist. To the contrary; there was

---

[103] 2015 Annual Report on Form 10-K filed on February 26, 2016, p. 133-135.

[104] 2016 Annual Report on Form 10-K, filed on February 24, 2017, p. 88.

significant evidence obtained by and available to Deloitte *in 2015* demonstrating that the Nuclear Project was unlikely to be complete by 2021 and that SCANA would be unable obtain the $1.4 billion in Nuclear Tax Credits.

ANSWER NO. 271:  Deloitte denies the allegations set forth in paragraph 271.

272.    First, Deloitte was repeatedly put on notice that the Nuclear Project suffered from recurring delays and revised cost estimates during the Relevant Period. For example, as described above, the recurring rate hikes required Deloitte to obtain evidence regarding changes, including projected dates of completion and related costs and, thus, Deloitte would have reviewed the nine rate hikes and related regulatory orders for purposes of conducting its tie-out procedures to SCANA's financial statements. Similarly, SCANA's construction work in progress metrics and the recurring delays and schedule extensions should have prompted Deloitte to review the following types of audit evidence, among other things, in connection with its audits: management project reports (including project status reports and presentations provided to SCANA's Board of Directors), Risk Management Committee meeting minutes, SCANA Board of Director meeting minutes, presentations and memorandum, SCANA/Santee Cooper Joint Board of Director meeting minutes, presentations and memorandum, key communications from SCANA's nuclear team to SCANA management regarding the Nuclear Project, and communications between SCANA and its regulators for the purpose of understanding the Nuclear Project and changes that may affect SCANA's financial statement disclosures. These recurring delays and cost estimate changes, and the documents concerning the delays and cost estimate changes, would have made clear to Deloitte that SCANA was not exercising appropriate oversight over, and did not have a robust process for, making cost estimates or estimating completion schedules. They would also have demonstrated that it was taking substantially longer and more money to build the Nuclear Project than previously estimated by SCANA. Most critically, they demonstrated that SCANA would be unable to meet the 2021 deadline necessary to obtain the $1.4 billion in tax credits.

ANSWER NO. 272:  Deloitte denies the allegations set forth in paragraph 272, except denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the third through final sentences of paragraph 272, and admits that D&T reviewed SCANA's submissions to the PSC and the PSC's orders regarding those submissions.

273.    Second, the Company's Nuclear Project job progress reports—which Deloitte was required to review—also made clear that the actual percentage of project completion deviated significantly from where the Nuclear Project was supposed to be. For example:[105]

| MONTH | EXPECTED PERCENT COMPLETE | ACTUAL PERCENT COMPLETE |
|---|---|---|
| January 2016 | 3% | 0.3% |
| February 2016 | 3% | 0.5% |

---

[105] United States Securities and Exchange Commission v. SCANA Corporation, et. al, February 27, 2020, p. 61.

| March 2016 | 3% | 0.6% |
| April 2016 | 3% | 0.6% |
| May 2016 | 3% | 0.7% |
| June 2016 | 3% | 0.8% |
| **TOTAL** | 18% | 3.5% |

ANSWER NO. 273:  Deloitte denies the allegations set forth in paragraph 273.

274.    The fact that SCANA's actual percent complete was significantly off from the estimated percent complete made clear that the Company would be unable to meet the 2021 deadline for the provision of the tax credits. Under the actual percent complete, it would have taken SCANA at least until 2023 to complete the Nuclear Project.

ANSWWER NO. 274:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 274.

275.    Third, Deloitte obtained and reviewed the Bechtel Report and presentations. Specifically, Jimmy Addison, CFO of SCANA testified to the following:

> Q.    You were signing your company's or certifying your company's SEC filings during the time of the Bechtel assessment, correct?
>
> A.    Correct.
>
> Q.    It doesn't disturb you at all that the company spent seven figures on assessment in 2015 regarding the status— regarding the project and you weren't made aware of the results of that assessment while you were certifying these SEC filings?
>
> A.    It does not. **And part of that conclusion is we've got an international accounting firm that's auditing our records, that has gone back and looked at it completely and said the(y) did not see any gaps in our disclosures.**
>
> Q.    **Is that Deloitte?**
>
> A.    **Yes.**
>
> Q.    You used to work there, right?
>
> A.    I did about three decades ago.
>
> Q.    So you trusted your accountants on that issue?

A.    **I have a great deal of confidence that they thoroughly vetted that issue especially with the political and regulatory ramifications of it.**

Q.    **Sitting here now, do you know that they did vet that issue?**

A.    **Yes.**

Q.    **How do you know that?**

A.    **They told me that. Q. When?**

A.    **I don't know specifically when, sometime obviously post abandonment.**

Q.    Did you have a conversation with them specifically about that issue?

A.    The conversation wasn't specific about that. It was conversation that—a topic that they offered in the middle of another—in the middle of another meeting.

Q.    What was the meeting about?

A.    A routine quarterly meeting where they meet with me before the financials are published.

Q.    **And how do they bring up the Bechtel report?**

A.    **I don't remember the details of it.**

Q.    **What did they tell you about it?**

A.    **That they had gone back with their local team and their national team and reviewed all the disclosures at the point in time that they were made, and read this document. They did not see any gaps in the disclosure at the time they were made.**

Q.    **And who from Deloitte told you that?**

A.    **The partner at Deloitte now, Sean Bird.[106]**

---

[106] Deposition of Jimmy Addison (rough transcript) dated October 3, 2018, 96:8-98:7.

ANSWER NO. 275:  Deloitte denies the allegations set forth in paragraph 275, except admits that it contains partial quotations from Addison's testimony, and refers to the testimony for its complete contents.

276.    As discussed more fully above in Section IV.E, the Bechtel Reports and the related preliminary presentation dated October 22, 2015, raised substantial questions regarding whether the Nuclear Project would be complete by 2021 and whether the Company would be able to receive the Nuclear Production Tax Credits of up to $1.4 billion, as it told investors.

ANSWER NO. 276:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 276.

277.    Specifically, the Bechtel Report found that "[t]he Consortium's forecasts for schedule durations, productivity, forecasted manpower peaks and percent complete do not have a firm basis and that a realistic forecast completion date for Unit 2 was not until "December 2020 to August 2021" and "June 2022 to June 2023 for Unit 3":



ANSWER NO. 277:  Deloitte denies the allegations set forth in paragraph 277, and refers to the Bechtel Report for its complete contents.

278.    This overwhelming evidence was materially inconsistent with—and, in fact, directly contradicted—assertions by SCANA and SCANA management in the Company's 2015 and 2016 financial statements included in the Company's 2015 and 2016 Forms 10-K, including that: (1) "substantial completion dates of Units 2 and 3" would be August 2019 and 2020, respectively in the 2015 Form 10-K,[107] and "August 31, 2019 and August 31, 2020" in the 2016

---

[107] 2015 Form 10-K, p. 133-135. Notably, these revised dates differed from the recently approved order by the PSC in September 2015.

Form 10-K.[108]; and (2) based off the revised "substantial completion dates of Units 2 and 3," the Company expected to receive nuclear production tax credits of as much as $1.4 billion. For example:[109]

> *Nuclear Production Tax Credit:*
>
> The IRS has notified SCE&G that, subject to a national megawatt capacity limitation, the electricity to be produced by each of the New Units (advanced nuclear units, as defined) would qualify for nuclear production tax credit under Section 45J of the Internal Revenue Code to the extent that each New Unit is operational before January 1, 2021 and other eligibility requirements are met. These nuclear production tax credits (related to SCE&G's 55% share of both New Units) could total as much as approximately $1.4 billion. Such credits would be earned over the first eight years of each New Unit's operations and would be realized by SCE&G over those years or during allowable carry-forward periods. Based on the guaranteed substantial completion dates provided above, both New Units are expected to be operational and to qualify for the nuclear production tax.

ANSWER NO. 278: Deloitte denies the allegations set forth in paragraph 278, and refers to SCANA's 2015 and 2016 Form 10-Ks for their complete contents.

279. In addition, according to internal documents, SCANA management made a number of representations to Deloitte in connection with Deloitte's 2016 audit that were inconsistent with the Company's financial statements and numerous internal documents, including the Bechtel Report and other information known or available to Deloitte. For example, SCANA management represented to Deloitte that:

- On February 14, 2017, Toshiba, the parent Company of WEC and the guarantor of its payment obligations under the EPC, announced that it will record a multi-billion dollar impairment loss associated with its nuclear construction projects, including NND, leaving Toshiba with negative shareholder's equity. As a result, WEC's and Toshiba's ability to fulfil their obligations under the EPC is uncertain. SCE&G is evaluating its potential alternatives in the event that WEC is unable or unwilling to complete the projects. At present, management lacks sufficient information to determine the likelihood of the possible alternatives, and therefore, remains committed to the construction of the project.

ANSWER NO. 279: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 279, except admits that paragraph 279 contains a partial quotation from a letter provided by SCANA management to D&T in connection with D&T's audit for the year ending December 31, 2016, and denies that the quoted portions of

---

[108] 2015 Form 10-K, p. 133-135. Notably, these revised dates differed from the recently approved order by the PSC in September 2015.

[109] 2015 Form 10-K, p. 135. See also 2016 Form 10-K, p. 90 ("Based on current tax law and the contractual guaranteed substantial completion dates (and the recently revised forecasted dates of completion) provided above, both New Units would be operational and would qualify for the nuclear production tax credits").

the letter are inconsistent with SCANA's financial statements for 2016. Deloitte affirmatively avers that under applicable standards, such representations are considered audit evidence.

280.    Deloitte knew, however, that this representation was inconsistent with the Bechtel Report and findings, and other information known or available to Deloitte. Nevertheless, SCANA's 2016 financial statements represented that the "substantial completion dates of Units 2 and 3" would be August 2019 and 2020, respectively, and thus the Company expected to receive the Nuclear Tax Credits.

ANSWER NO. 280:  Deloitte denies the allegations set forth in paragraph 280.

281.    Similarly, SCANA management represented to Deloitte that "SCE&G has received certain schedule information from WEC and has only just begun to evaluate it to, among other things, determine whether the revised completion dates are feasible." This information, particularly when coupled with the Bechtel Report and findings and other information known or available to Deloitte, was inconsistent with SCANA's 2016 financial statements statement that, "[b]ased on . . . the recently revised forecasted dates of completion...both New Units would be operational and would qualify for the NPTC . . . ."

ANSWER. NO. 281:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 281, except admits that paragraph 281 contains a partial quotation from a letter provided by SCANA management to D&T in connection with D&T's audit for the year ending December 31, 2016, and denies that the quoted portions of the letter are inconsistent with SCANA's financial statements for 2016. Deloitte affirmatively avers that under applicable standards, such representations are considered audit evidence.

282.    Indeed, Deloitte's own annual publication *Power and Utilities: Accounting, Financial Reporting, and Tax Update* circulated as early as January 2016 specifically recognized that "[t]here have been multiple delays with the construction of the reactors" for the Nuclear Project—confirming that Deloitte knew of the Nuclear Project's recurring delays.[110]

ANSWER NO. 282:  Deloitte denies the allegations set forth in paragraph 282, except admit that it contains a partial quotation from the referenced document, and refers to that document for its complete contents.

---

[110] Deloitte, *Power and Utilities: Accounting, Financial Reporting, and Tax Update*, January 2016, Accessible at: https://www2.deloitte.com/content/dam/Deloitte/us/Documents/energy-   resources/us-er-power-utilities-accounting-financial-reporting-and-tax-update.pdf.

283.    Given this inconsistent information, Deloitte did not have appropriate audit evidence to have a reasonable basis to conclude that SCANA's 2016 financial statements were free of material misstatement and should have resulted in Deloitte expressing a qualified report, or a disclaimer pursuant to AS 3105.

ANSWER NO. 283:  Deloitte denies the allegations set forth in paragraph 283.

284.    As indicated by the disclosure above, Deloitte failed to appropriately respond to these inconsistencies in violation of PCAOB Standards. As a result, it was false and misleading for Deloitte to issue a clean audit report on SCANA's 2015 and 2016 financial statements when, based on Bechtel's findings and other information known or available to Deloitte, it was unlikely that the Company would complete the nuclear units prior to 2021 to qualify for the disclosed $1.4 billion in possible tax credits.

ANSWER NO. 284:  Deloitte denies the allegations set forth in paragraph 284.

**b.    Deloitte's Audit Response to SCANA's Capitalized Project Construction Work in Progress Amounted to "No Audit At All"**

285.    As discussed above in Section IV.D., Deloitte was required to plan and perform audit procedures in response to the assessed risks of material misstatement relating to SCANA's capitalized construction work in progress, including amounts capitalized in connection with the Nuclear Project.

ANSWER NO. 285:  Deloitte denies the allegations set forth in paragraph 285, except

admits that D&T was required to plan and perform audit procedures in response to identified risks

that could result in a material misstatement in SCANA's financial statements, and avers that D&T

did so, refers to the auditing standards in effect during the relevant period for their complete

contents, and denies any allegation in paragraph 285 inconsistent therewith.

286.    As of December 31, 2015, SCANA's construction work in progress totaled approximately $4.1 billion, or 24% of SCANA's total reported assets. As of December 31, 2016, SCANA's construction work in progress totaled approximately $4.8 billion or 26% of SCANA's total reported assets. As a result, Deloitte's audit response should, at a minimum, have include the following audit procedures:

- Obtaining an understanding of the policies, processes and related internal controls over SCANA's recognition of construction work in progress associated with the Project. This understanding would be expected to provide Deloitte with an understanding of the risks of material misstatement affecting the Nuclear Project and the Company's related capitalization of work in progress;

- Examining supporting documentation necessary to understand the terms, conditions and the scope of the Project, including for example significant agreements in place between the primary parties, ownership structure detail, and relevant regulatory orders;

- On a sample basis, testing the effectiveness key internal controls relating to the project, including: (1) the Company's review and analysis of periodic job status reporting, (2) the review of capitalized amounts recorded within SCANA's general ledger, (3) the use of automated system functions that support the recording of construction work in progress, and (4) the Company's evaluation of recoverability of the amounts capitalized;

- On a sample basis, examining periodic job status reports, cost estimates and related forecasts, both current and at completion (*e.g.*, estimates at completion ("EAC")), productivity/performance factors, completion percentages, vendor invoices, time records, purchasing contracts, original (or substitute) canceled checks or ACH payments, and work orders to substantiate the existence, accuracy and completeness of amounts capitalized; and

- Testing the recoverability of the capitalized asset (*i.e.* the Nuclear Project), including approved regulatory filings and orders, and detailed support for changes to the construction subsequent the approved order. Such procedures also should have included a review of the critical assumptions and conditions set forth in the approved regulatory orders. To the extent that those assumptions or conditions were contradicted by other information obtained during its 2015 and 2016 audits, Deloitte was required to perform additional audit procedures necessary to resolve the matter and determine the effect, if any, on other aspects of the respective audit.

ANSWER NO. 286:  Paragraph 286 contains legal conclusions to which no response is required.  To the extent a response is required, Deloitte denies the allegations set forth in 286, except admits the allegations set forth in the first two sentences of paragraph 286.

287.    Had Deloitte performed these required audit functions, it would have learned that there were numerous, severe concerns regarding the schedule for the Nuclear Project. Specifically, Deloitte knew and/or would have discovered, among other things, (i) that the project performance/productivity factor was "consistently above the goal" and "trending in a negative direction"; (ii) that "[t]he majority of project milestones are not met on their scheduled dates"; (iii) that "[t]he percentage of schedule activities completed on time [was] well below the goal"; and that (iv) the monthly completion percentages were consistently far below the numbers required to complete the Nuclear Project in time to receive the tax credits.

ANSWER NO. 287:  Deloitte denies the allegations set forth in paragraph 287.

288.    Deloitte failed to appropriately plan for and perform audit procedures in response to this information in violation of PCAOB Standards. As a result, it was false and misleading for Deloitte to issue a clean audit report on SCANA's 2015 and 2016 financial statements.

ANSWER NO. 288:  Deloitte denies the allegations set forth in paragraph 288.

c.    **Deloitte's Audit Response to SCANA's Disclosed Rate Revisions Amounted to "No Audit At All"**

289.    Deloitte knew that SCANA's BLRA rate revisions, estimated project costs and related unit completion schedules were being reviewed and approved by the PSC. It also knew that SCANA had sought and received approval on nine separate occasions for rate increases due to the fact that it was continually having to make adjustments to the costs of, and substantial completion dates for, the Nuclear Project.[111]

ANSWER NO. 289:  Deloitte denies the allegations set forth in paragraph 289, except admits the allegations set forth in the first sentence of paragraph 289, and further admits that D&T knew that SCANA sought and received approval for rate increases at several points, refers to the content of those applications for their complete contents, and denies any allegations inconsistent therewith.

290.    As discussed above in Section IV.D., Deloitte was thus required to plan and perform audit procedures in response to the risk of material misstatements regarding SCANA's disclosed rate revisions, estimated project costs and related unit completion schedules. Such procedures should have included:

- Obtaining an understanding of the BLRA and related legislation and regulations supporting the revenue rates approved by the PSC and billed by SCANA;

- Examining SCANA's rate order applications and subsequent approved regulatory orders supporting each of the following disclosures: (1) regulatory filings and the approved rate revisions, (2) costs and rates challenged by intervenors, (3) denied claims associated with such orders, (4) pending approvals of rates or other related claims and cost changes, (5) rate orders approving or changing project construction schedules, and (6) information in the orders that may set forth applicable commitments or contingencies associated with the Nuclear Project.

---

[111] 2008 Annual Report on Form 10-K filed on February 27, 2009, Management's Discussion and Analysis; 2009 Annual Report on Form 10-K filed on March 1, 2010, p. 13; 2012 Annual Report on Form 10-K filed on February 28, 2013, p. 61; 2014 Annual Report on Form 10-K filed on February 27, 2015, p. 118; 2015 Annual Report on Form 10-K filed on February 26, 2016, p. 116; 2016 Annual Report on Form 10-K filed on February 24, 2017, p. 65.

ANSWER NO. 290:  Deloitte denies the allegations set forth in paragraph 290, except

admits that D&T was required to plan and perform audit procedures in response to identified risks

that could result in a material misstatement in SCANA's financial statements, and avers that D&T

did so, refers to the auditing standards in effect during the relevant period for their complete

contents, and denies any allegation in paragraph 290 inconsistent therewith.

291.    These audit procedures should have included a review of the critical assumptions
and conditions set forth in the approved regulatory orders. To the extent that those assumptions or
conditions were contradicted by other information obtained during its 2015 and 2016 audits,
Deloitte was required to perform additional audit procedures necessary to resolve the matter and
determine the effect, if any, on other aspects of the respective audit.

ANSWER NO. 291:  Deloitte denies the allegations set forth in paragraph 291, except

admits that D&T was required to plan and perform audit procedures in response to identified risks

that could result in a material misstatement in SCANA's financial statements, and avers that D&T

did so, refers to the auditing standards in effect during the relevant period for their complete

contents, and denies any allegation in paragraph 291 inconsistent therewith.

292.    Notably, the Company assumed that Deloitte would inquire about its BLRA
submissions and how such submissions were impacted by the constantly changing—and
increasing—project construction schedules and costs, and did not intend to mislead Deloitte
regarding these issues. For example, in a September 21, 2015 email, James Swan IV, SCANA's
Controller, states that Deloitte "may ask about whether we ought to say anything about the ORS'
engagement of a CPA firm to consider the value/cost of the BLRA [in the Company's SEC filings].
I don't know what we would say about that, and I do not advocate talking about it [in the
Company's SEC filings]. But it is public anyway, so if Deloitte presses and is willing to offer up
some idea [sic] on language, I am open to it, I guess."[112]

ANSWER NO. 292:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 292, except admits that it sets forth partial

quotations from the September 21, 2015 email, and refers to the email for its complete contents.

293.    Deloitte either did not perform its required audit functions or ignored what they
demonstrated. The Bechtel Report made abundantly clear that the Company's representations to
the PSC in support of its BLRA submissions were inaccurate. Since the Bechtel Report assessed

---

[112] Motion Exhibit A, Email from Alvis Bynum dated November 22, 2016, ORS_SCEG_01469466-9467.

delays of between 18 to 36 months for each of the unit's respective completion dates, the BLRA rate revisions, estimated project costs and related unit completion schedules submitted to and approved by the PSC were also inaccurate.

ANSWER NO. 293:  Deloitte denies the allegations set forth paragraph 293, except denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the second through final sentences of paragraph 293.

294.    The Company's false representations to the PSC significantly compromised the Company's ability to recover project costs and charge revised rates necessary to support the Company's construction work in progress, including because it significantly hampered the ability of Westinghouse to complete the Nuclear Project, ultimately contributing to its bankruptcy.

ANSWER NO. 294:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 294.

295.    This is particularly relevant considering SCANA's acknowledged risk factor, included in its 2015 and 2016 Forms 10-K, which explicitly recognized the regulatory and financial implications of schedule deviations of more than 18 months. For example, SCANA's 2015 Form 10-K stated:

> **Should the construction of the New Units adversely deviate from the schedules (by more than 18 months), estimates, and projections timely submitted to and approved by the SCPSC pursuant to the BLRA, the SCPSC could disallow the additional capital costs that result from the deviations to the extent that it is deemed that the Company's failure to anticipate or avoid the deviation, or to minimize the resulting expenses, was imprudent, considering the information available at the time. Depending upon the magnitude of any such disallowed capital costs, the Company could be moved to evaluate the prudency of continuation, adjustment to, or termination of the project.**

> Furthermore, jointly owned projects, such as the current construction of the New Units, are subject to the risk that one or more of the joint owners becomes either unable or unwilling to continue to fund project financial commitments, new joint owners cannot be secured at equivalent financial terms, or changes in the joint ownership make-up will increase project costs and/or delay the completion.

> **To the extent that delays occur,** costs **become unrecoverable, or we otherwise become unable to effectively manage and complete our capital projects, our results of operations, cash flows and financial condition, as well as our qualifications for applicable**

**governmental programs and benefits, such as production tax credits, may be adversely affected.**[113]

ANSWER NO. 295:  Deloitte denies the allegations set forth in paragraph 295, except

admits that it sets forth partial quotations from SCANA's 2015 Form 10-K, and refers to the Form

10-K for its complete contents.

296.    PCAOB Standards required Deloitte to read SCANA's regulatory submissions and orders (including those with PCS), and thus was aware or should have been aware of key assumptions from which the rate revisions approval orders appeared to be based (*e.g.*, completion of project by certain dates, assumed realization of tax credits totaling as much as $1.4B, realistic future cost and schedule estimates, etc.). Deloitte also had access to other critical information, including but not limited to, Project Management and Risk Management reports, accumulation of costs, and the budget to actual comparisons. Thus, Deloitte knew or should have identified the significant inconsistencies between the information provided to and being assumed by the PCS—inconsistencies which raised a risk of material misstatement associated with contingencies associated with regulatory issues/disclosures, including the information provided to the PCS to support approval of revised rates under the BLRA.

ANSWER NO. 296:  The first sentence of paragraph 296 contains a legal conclusion to

which no response is required.  To the extent a response is required, Deloitte denies the truth of

the allegations set forth in the first sentence in paragraph 296 and refers to the PCAOB Standards

for their complete contents.  Deloitte denies the allegations set forth in the remainder of paragraph

296.

297.    According to internal documents, during the Nuclear Project, Deloitte also was retained to conduct separate, regular "special audits" of the Nuclear Project's costs. Internal documents make clear that those "special audits" involved examination of "audit evidence about the amounts and disclosures in the [project] schedule." As part of those special audits, Deloitte tested whether the Nuclear Project's costs were presented fairly in accordance with GAAP. In conducting these tests, Deloitte would have been aware of the total costs incurred each year on the Nuclear Project, as well as the total costs incurred on a project to date basis. Through this audit work, as well as more generally through its audits of SCANA's financial statements, Deloitte was well aware that the Nuclear Project costs were well in excess of budgets given the level of completion, and as compared to budgeted amounts, as well as the lack of progress of the Nuclear Project—a red flag that SCANA would not be able to complete the Nuclear Project in time to receive the Nuclear Tax Credits.

---

[113] 2015 Form 10-K, pp. 11-12. See also, 2016 Form 10-K, p. 11.

ANSWER NO. 297: Deloitte denies the allegations set forth in paragraph 297, except denies knowledge or information sufficient to form a belief as to the allegations in the first and second sentences of paragraph 297, and admits that D&T was engaged to perform an audit of the Schedule of Nuclear Project Costs for the Company for the years ended December 31, 2016 and December 31, 2017, in accordance with GAAP and the allegations set forth in the third sentence of paragraph 297.

298.    As a result of the foregoing, it was knowingly or recklessly false and misleading for Deloitte to give a clean audit report on SCANA's financial statements. Deloitte's acceptance of SCANA's financial reporting, including disclosures regarding approved rate revisions, nuclear production tax credits, and risks and uncertainties, reflected Deloitte's repeated failure to appropriately respond to such inconsistencies and corresponding risks of material misstatement in violation of PCAOB Standards.

ANSWER NO. 298: Deloitte denies the allegations set forth in paragraph 298.

### d.    Deloitte Audits of SCANA's Internal Control Over Financial Reporting Amounts to "No Audit at All"

299.    The Sarbanes-Oxley Act of 2002 ("SOX") required Deloitte to audit and express an opinion on the effectiveness of the SCANA's internal control over financial reporting in order to bring information about any material weaknesses to public view.[114] A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility[115] that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.[116]

---

[114] SEC Release No. 33-8810, see II.B.3, at 38.

[115] There is a "reasonable possibility" of an event, as used in this standard, when the likelihood of the event is either "reasonably possible" or "probable," as those terms are used in ASC 450, Accounting for Contingencies. AS 5.A7 (2015 Audit); AS § 2201.A7 (2016 Audit).

[116] AS 5.A7 (2015 Audit); AS § 2201.A7 (2016 Audit). "An internal control over financial reporting deficiency exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis. A deficiency in internal control over financial reporting may pertain to either a deficiency in design or operation. As set forth under PCAOB AS 5.A3 (AS § 2201.A3 (2016 Audit)), a design deficiency "exists when "(a) a control necessary to meet the control objective is missing or (b) an existing control is not properly designed so that, even if the control operates as designed, the control objective would not be met." An operating deficiency "exists when a properly designed control does not operate as designed, or when the person performing the control does not possess the necessary authority or competence to perform the control effectively."

ANSWER NO. 299:  Paragraph 299 states conclusions of law to which no response is required.  To the extent a response is required, Deloitte denies the allegations set forth in paragraph 299, except admits that it contains a partial recitation of the cited documents, and refers to the cited statute and standards for their complete contents.  Deloitte affirmatively avers that D&T's engagement by SCANA's Board of Directors was governed by the terms of the engagement letters under which D&T performed its work, and the applicable professional standards.

300.    Because a company's internal controls cannot be considered effective if one or more material weaknesses exist, to form a basis for its report, Deloitte was required to obtain sufficient evidence to determine with reasonable assurance whether any material weaknesses existed as of December 31, 2015 and 2016.[117] This assessment "underlies the entire audit process," and should include a "determination of significant accounts and disclosures and relevant assertions, the selection of controls to test, and the determination of the evidence necessary for a given controls."[118]

ANSWER NO. 300:  Paragraph 300 contains conclusions of law to which no response is required.  To the extent a response is required, Deloitte denies admits that the allegations set forth in paragraph 300, except admits that it contains incomplete quotations from the referenced documents, and refers to the cited standards for their complete contents.

301.    A direct relationship exists between the degree of risk that a material weakness could exist and the amount of audit attention that should be devoted to that area.[119] As the risk associated with the internal control being tested increases, the evidence that the auditor must obtain also increases.[120] If deviations from a company's asserted controls exist, the auditor is required to "determine the effect of the deviations on his or her assessment of the risk associated with the control being tested and the evidence to be obtained, as well as on the operating effectiveness of the control."[121]

ANSWER NO. 301:  Deloitte denies the allegations set forth in paragraph 301, and refers to the cited standards for their complete contents.

---

[117] AS 5.3 (2015 Audit); AS § 2201.03 (2016 Audit).

[118] AS 5.10 (2015 Audit); AS § 2201.10 (2016 Audit).

[119] AS 5.11 (2015 Audit); AS § 2201.11 (2016 Audit).

[120] AS 5.46 (2015 Audit); AS § 2201.46 (2016 Audit).

[121] AS 5.48 (2015 Audit); AS § 2201.48 (2016 Audit).

302.    Because, as detailed above in Section IV.E., contradictory information was evident during the 2015 and 2016 audits, Deloitte was required to consider whether or not the inconsistencies indicated that the following types of internal controls, including disclosure controls, surrounding SCANA's Nuclear Project were deficient:

- Management's monitoring and supervising of the construction of the Nuclear Project, including its evaluation and monitoring of the construction schedule and capital cost forecast;

- Controls associated with the initial recognition of construction work in progress and the management's evaluation of the likelihood of (1) the recovery in future rates of costs incurred as property, plant, and equipment and deferred as regulatory assets, and (2) a refund or a future reduction in rates that should be reported as regulatory liabilities; and

- Management's monitoring and evaluation of regulatory developments that may affect disclosures relating to the likelihood of recovering costs through future tax credits.

ANSWER NO. 302:  Paragraph 302 contains conclusions of law to which no response is required.  To the extent a response is required, Deloitte denies the allegations set forth in paragraph 302, except admits that the standards governing D&T's integrated audit engagements required it to obtain and evaluate evidence relating to SCANA's internal controls over financial reporting, and avers that it complied with those standards, refers to the standards for a complete recitation of their requirements, and denies any allegations inconsistent therewith.

303.    Because, as detailed above in Section IV.E., Deloitte knew through evidence it was required to gather in its quest to obtain sufficient appropriate audit evidence—such as the Bechtel Report, Board of Directors Board minutes, internal project completion summaries, and analyses reflecting repeated schedule delays—that each of these areas was deficient, PCAOB Standards also required that Deloitte evaluate the severity of each control deficiency that came to its attention to determine whether the deficiencies, individually or in combination, are material weaknesses as of the date of management's assessment.[122]

ANSWER NO. 303:  Paragraph 303 contains conclusions of law to which no response is required.  To the extent a response is required, Deloitte denies the allegations set forth in paragraph 303, except admits that the standards governing D&T's integrated audit engagements required it

---

[122] AS 5.62 (2015 Audit); AS § 2201.62 (2016 Audit).

to obtain and evaluate evidence relating to SCANA's internal controls over financial reporting, and avers that it complied with those standards, refers to the standards for a complete recitation of their requirements, and denies any allegations inconsistent therewith.

304.    The severity of a deficiency depends on:

- Whether there is a reasonable possibility that the company's controls will fail to prevent or detect a misstatement of an account balance or disclosure; and

- The magnitude of the potential misstatement resulting from the deficiency or deficiencies.[123]

Importantly, the severity of a deficiency does not depend on whether a misstatement actually has occurred, but rather on whether there is a reasonable possibility that the company's controls will fail to prevent or detect a misstatement.[124]

ANSWER NO 304:  Deloitte refers to the cited standards for their complete contents, and denies any allegation in paragraph 304 to the extent they are inconsistent therewith.

305.    Here, as discussed above in Section IV.E., there can be no question that SCANA's internal control over financial reporting deficiencies were so severe that they were unlikely to prevent or detect a large and material misstatement. For example, the Bechtel Report made clear that there was an absence of a robust process and effective internal control associated with the Nuclear Project, stating that the "current schedule [for the Nuclear Project] is at risk" because, among other things, there were "significant issues" facing the Nuclear Project that threatened its "successful completion"; "installation rates, productivity, and staffing levels all point to project completion later than the current forecast"; "[t]he Consortium's forecasts for schedule durations, productivity, forecasted manhour peaks, and percent complete are unrealistic"; "[t]he Owners do not have an appropriate project controls team to assess/validate Consortium reported progress and performance"; and thus concluding the Nuclear Project "suffer[ed] from various fundamental [engineering, procurement, and construction] and major project management issues."

ANSWER NO. 305:  Deloitte denies the allegations set forth in paragraph 305, and refers to the First and Second Bechtel Reports for their complete contents.

306.    Notably, SCANA's own executives and internal accounting personnel recognized that Deloitte was required to inquire as to why Bechtel's ongoing work was not being disclosed to investors in the Company's SEC filings given that it identified numerous internal control deficiencies. For example, in a September 21, 2015 email, James Swan IV, SCANA's Controller, states that "FYI – Deloitte will be asking about whether (or why not) we mention the Bechtel

---

[123] AS 5.63 (2015 Audit); AS § 2201.63 (2016 Audit).
[124] AS 5.64 (2015 Audit); AS § 2201.64 (2016 Audit).

consulting engagement . . . in the next 10-Q. If Santee ends up mentioning it, they may feel strongly that we should too."[125] He went on to state that "[t]he initial thinking I believe is that we will not mention it [in the next 10-Q]. . . Stay tuned."[126]

ANSWER NO. 306:  Deloitte denies the allegations set forth in paragraph 306, except admits that it sets forth partial quotations from the September 21, 2015 email, and refers to the email for its complete contents.

307.    Accordingly, Deloitte's clean audit report on SCANA's internal control over financial reporting as of December 31, 2015 and 2016, respectively, were knowingly or recklessly false and misleading when made.

ANSWER NO. 307:  Deloitte denies the allegations set forth in paragraph 307.

## 2.    Deloitte Intentionally or Recklessly Fails to Conduct its Reviews of SCANA's Interim Reports

308.    The following statements and assertions were included in SCANA's Forms 10-Q for the first quarter of 2016, second quarter of 2016 and third quarter of 2016:

*Nuclear Production Tax Credits*

The IRS has notified SCE&G that, subject to a national megawatt capacity limitation, the electricity to be produced by each of the New Units (advanced nuclear units, as defined) would qualify for nuclear production tax credits under Section 45J of the Internal Revenue Code to the extent that such New Unit is operational before January 1, 2021 and other eligibility requirements are met. **These nuclear production tax credits (related to SCE&G's 55% share of both New Units) could total as much as approximately $1.4 billion.** Such credits would be earned over the first eight years of each New Unit's operations and would be realized by SCE&G over those years or during allowable carry-forward periods. **Based on the guaranteed substantial completion dates provided above** [August 2019 and 2020]**, both New Units are expected to be operational and to qualify for the nuclear production tax credits**; however, further delays in the schedule or changes in tax law could impact such conclusions. When and to the extent that production tax credits are realized, their benefits are expected to be provided directly to SCE&G's electric customers

---

[125] Motion Exhibit A, Email from Alvis Bynum dated November 22, 2016, ORS_SCEG_01469466-9467.

[126] Motion Exhibit A, Email from Alvis Bynum dated November 22, 2016, ORS_SCEG_01469466-9467.

ANSWER NO. 308:  Deloitte admits that paragraph 308 sets forth partial quotations from

SCANA's Form 10-Q for the referenced periods, and refers to the Forms 10-Q for their complete

contents.

309.    Pursuant to Rule 10-01(d) of Regulation S-X, Deloitte was required to conduct a review of SCANA's interim financial statements included in the Company's Quarterly Report on Form 10-Q prior to its filing with the SEC during the Class Period.[127] PCAOB Standard AU § 722, *Review of Interim Financial* Information (AS 4105: Reviews of Interim Financial Information (for 2017 interim reviews)) recognizes that the objective of a review of interim financial information is to provide the accountant with a basis for communicating whether he or she is aware of any material modifications that should be made to the interim financial information for it to conform with generally accepted accounting principles. [128] A review consists principally of performing analytical procedures and making inquiries of persons responsible for financial and accounting matters, and does not contemplate (a) tests of accounting records through inspection, observation, or confirmation; (b) tests of controls to evaluate their effectiveness; (c) obtaining corroborating evidence in response to inquiries; or (d) performing certain other procedures ordinarily performed in an audit. [129] However, a review may bring to the accountant's attention significant matters affecting the interim financial information.[130]

ANSWER NO. 309:    Deloitte admits the allegations set forth in the first sentence of

paragraph 309 with respect to D&T, and admits that the standards referenced in paragraph 309

governed D&T's interim reviews (among other standards that also applied), refers to the

referenced standards for their complete content, and denies any allegation or characterization

inconsistent therewith.

---

[127] SEC Regulation S-X, Rule 10-01(d) - "Interim review by independent public accountant. Prior to filing, interim financial statements included in quarterly reports on Form 10-Q (17 CFR 249.308(a)) must be reviewed by an independent public accountant using applicable professional standards and procedures for conducting such reviews, as may be modified or supplemented by the Commission. If, in any filing, the company states that interim financial statements have been reviewed by an independent public accountant, a report of the accountant on the review must be filed with the interim financial statements." Consistent with this understanding, PCAOB AU § 722.03 states: "The Securities and Exchange Commission (SEC) requires a registrant to engage an independent accountant to review the registrant's interim financial information, in accordance with this section, before the registrant files its quarterly report on Form 10-Q or Form 10-QSB. The SEC also requires management, with the participation of the principal executive and financial officers (the certifying officers) to make certain quarterly and annual certifications with respect to the company's internal control over financial reporting. Although this section does not require an accountant to issue a written report on a review of interim financial information, **the SEC requires that an accountant's review report be filed with the interim financial information if, in any filing, the entity states that the interim financial information has been reviewed by an independent public accountant."**

[128] AU § 722.07.

[129] AU § 722.07.

[130] AU § 722.07.

310.    If, in performing its review of SCANA's interim financial information, Deloitte became, or should have been, aware of information that lead it to believe that the interim financial information may not be in conformity with GAAP—as it did here—Deloitte was required to make additional inquiries or perform other procedures necessary to provide a basis for its communication as to whether any material modifications to the SCANA's interim financial information were required.[131] Based on the additional procedures, if material modification should be made to the interim financial information for it to conform with GAAP—as should have been made here— Deloitte was required to communicate such matters to management and the Audit Committee. If, in the accountant's judgment, the audit committee does not respond appropriately to the accountant's communication within a reasonable period of time, the accountant should evaluate whether to resign from the engagement to review the interim financial information and as the entity's auditor.[132]

ANSWER NO. 310:  Deloitte admits the allegations set forth in the first sentence of paragraph 310 with respect to D&T, and admits that the standards referenced in paragraph 310 governed D&T's interim reviews (among other standards that also applied), refers to the referenced standards for their complete content, and denies any allegation or characterization inconsistent therewith.

311.    In addition to understanding SCANA's processes, internal control and ongoing reporting related to the Nuclear Project, Deloitte had access to other critical information such as, among other things, actual Project Management and Risk Management reports, accumulation of costs, and the budget to actual comparisons in connection with its 2015 audit. This information reflected the unlikely operation of SCANA's nuclear units prior to 2021. In violation of PCAOB Standards, Deloitte failed to appropriately consider whether such information was materially inconsistent with SCANA's interim financial statement disclosures, including the above noted "expected" operation dates, related disclosures regarding the $1.4 billion of possible nuclear production tax credits and whether such contradictory information could affect regulatory disclosures, assumptions and orders associated with SCANA's electric rate increases under the BLRA. In fact, the audit evidence gathered in advance of its 2016 and 2017 interim should have demonstrated to Deloitte that material modifications to SCANA's interim financial statements were necessary to comply with GAAP. Nevertheless, and in violation of PCAOB Standards, Deloitte took no action to resign from the interim engagement. Nor did Deloitte notify the SEC or

---

[131] AU § 722.22.

[132] AU § 722.29-.31. 1. Similarly, when conducting a review of interim financial information, the accountant may become aware of matters relating to internal control that may be of interest to the audit committee. Matters that should be reported to the audit committee are referred to as significant deficiencies. A significant deficiency is a deficiency, or a combination of deficiencies, in internal control over financial reporting, that is less severe than a material weakness yet important enough to merit attention by those responsible for oversight of the company's financial reporting. Deloitte was generally required to communicate significant deficiencies or material weaknesses of which it became aware to the audit committee in a timely manner and prior to the registrant filing its periodic report with the SEC. [AU § 722.33]

SCANA's investors that the Company's interim financial statements filed on Forms 10-Q did not comply with GAAP, as it was required to do.

ANSWER NO. 311:  Deloitte denies the allegations set forth in paragraph 311.

## V.    PARTIAL DISCLOSURES AND THE GRADUAL EMERGENCE OF THE FULL IMPACT OF THE FRAUD

312.    Beginning on December 27, 2016 and continuing through the end of the Class Period in December 2017, the true facts concerning the Nuclear Project, including that (i) the Nuclear Project would not be completed by the end of 2020, or, at all; (ii) the true costs of the Nuclear Project were astronomically higher than projected; (iii) SCANA knew of and actively misrepresented these clear risks; (iv) SCANA's refusal to correct the clear deficiencies identified by Bechtel and SCANA's own partner ensured the failure of the Nuclear Project; and (v) election of the fixed price option agreed to in the EPC Amendment would likely lead to Westinghouse's bankruptcy.

ANSWER NO. 312:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 312.

### A.    THE FINANCIAL MELTDOWN OF TOSHIBA AND WESTINGHOUSE CALLS THE NUCLEAR PROJECT INTO QUESTION

313.    On December 26, 2016, a non-trading day, and just six weeks after the PSC approved SCANA's revised schedule and a fixed price of $7.7 billion, Westinghouse's parent Toshiba announced an estimated impairment of "several billion US dollars" in connection with Westinghouse's nuclear construction and integrated services business. Articles published in *Bloomberg Technology* and *The Wall Street Journal* connected Toshiba's anticipated write-down directly to the Nuclear Project and SCANA's recent schedule revision and cost increases, attributing Toshiba's financial distress to "cost overruns and missed deadlines on nuclear reactor projects," including the Nuclear Project. *The Wall Street Journal* reported that Toshiba had "discovered unexpected inefficiencies in the labor force . . . that along with other factors were driving up costs," and revealed that Toshiba's "disclosure suggests that the situation is worse than was previously understood." The article quoted a SCANA spokesperson as saying only that SCANA was "still evaluating the finances of its reactor projects and [would] have more to report soon."

ANSWER NO. 313:  Deloitte denies the allegations set forth in paragraph 313, except admits that the referenced articles were published, and refers to the articles for their complete contents.

314.    In response to this news, SCANA's shares declined by $1.51 per share, or 2.03%, to close at $72.92 per share on December 28, 2016.

ANSWER NO. 314:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 314, except admits that SCANA's stock

price declined from $74.61 per share to $72.92 per share on December 28, 2016.

315.    On February 14, 2017, Toshiba quantified its impairment and reported that it would take a $6.3 billion write-down related to its U.S. nuclear program—a figure reported by *The New York Times* to be "near the top of analysts' estimates." Toshiba also announced that it might sell all or part of its stake in Westinghouse, calling into question the viability of the Nuclear Project. The timeline and the costs of the Nuclear Project, affirmed just three months earlier, were now seriously in doubt. Mizuho Securities analyst James Von Riesemann opined in an article published on *Benzinga* that day that "SCANA's construction consortium with [] Westinghouse may not be economically viable any longer, leaving the construction of two new nuclear units to fall into [SCANA]'s lap." Von Riesemann further noted that SCANA might not have the funds needed to see the project through to completion.

ANSWER NO. 315:  Deloitte denies the allegations set forth in paragraph 315, except

admits that the referenced articles were published, and refers to the articles for their complete

contents.

316.    The market reacted swiftly to Toshiba's announcement, with SCANA shares declining $3.17 per share, or 4.53%, to close at $66.86 per share on February 14, 2017 on high trading volume.

ANSWER NO. 316:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 316, except admits that SCANA's stock

price declined from $68.19 per share to $66.86 per share on February 14, 2017.

317.    SCANA quickly acted to reassure its investors. In a press release issued after trading hours on February 14, 2017, SCANA communicated to investors that both Westinghouse and Toshiba provided SCANA with assurances that they were "committed to completing the two new Westinghouse AP 1000 nuclear units." While SCANA disclosed that Westinghouse had provided revised completion dates for the new units, the Company assured investors that "[t]he completion dates provided in the new schedule . . . would enable both units to qualify, under current law, for the federal production tax credits.*"*

ANSWER NO. 317:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 317, except admits that SCANA issued a

press release on February 14, 2017, and refers to the press release for its complete contents.

318.   SCANA's February 14, 2017 statement concerning the ability to qualify for the federal Nuclear Tax Credits was false and misleading. SCANA knew since the beginning of the Class Period the Nuclear Project could not have any hope of qualifying for the Nuclear Tax Credits unless the construction progress level rose immediately to 3% per month. Throughout the Class Period, SCANA was well aware that the Nuclear Project never came close to 3% monthly progress and, in fact, never topped a 1% monthly progress rate.

ANSWER NO. 318:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 318.

319.   SCANA succeeded in reassuring its investors, and analysts and the media expressed optimism in the wake of Toshiba's announcement. For example, in a February 14, 2017 report, Wells Fargo noted that "[w]hile Toshiba's financial woes create a degree of uncertainty and are concerning, we continue to remain of the opinion that SC's Baseload Review Act (BLRA) provides SCG with substantial protections in the event Toshiba is ultimately unable to honor the $7.8B Fixed Price Option contract due to solvency issues." Wells Fargo also commented that even "[i]n the event of additional cost overruns, the BLRA places the burden of proof on opposing parties, such as the Office of Ratepayer Staff, to show that such cost overruns are due to SCG's negligence (a high and challenging threshold to prove)."

ANSWER NO. 319:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 319, except admits that Wells Fargo

published a report, and refers to the report for its complete contents.

320.   Similarly, *The State* reported on February 15, 2017, that although "Toshiba's announcement initially raised concerns about the future of SCE&G's plants[, **t]hose concerns were alleviated some by Westinghouse's commitment**." *The State* also explained that **"[f]or shareholders, the key issue is that SCANA completes the project and produces the earnings growth that management is projecting**."

ANSWER NO. 320:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 320, except admits that the article was

published, and refers to the article for its complete contents.

321.   On SCANA's quarterly conference call, held before the close of trading on February 16, 2017, SCANA again attempted to reassure investors. Marsh reiterated SCANA's earlier statements that Westinghouse and Toshiba remained committed to the project, stating that "we continue to look for ways to mitigate project risk for our customers and shareholders. If for any reason, Westinghouse exits the project, we will evaluate the facts and circumstances at that time to determine the most prudent action for our Company and customers." In response to an analyst's question about what the "worst case scenario on the nuclear side might look like," Marsh explained that, among other things, SCANA could serve as the general contractor for the new

reactors or enter into a new EPC contract, or SCANA could consider the abandonment provisions under the BLRA, noting "[t]hat's not something that's high on our list." Byrne similarly reassured investors on the same call that Toshiba's financial difficulties would not derail the completion of the Nuclear Project, stating that "[a]lthough ideally Toshiba would be without these stresses, **we still anticipate completing our two new nuclear units."** Indeed, despite the substantial evidence that neither the GSDCs nor the tax credits deadline would be met, Byrne told investors that by January 1, 2021, the Nuclear Project would be "operating at or near 100% for a period of time where they can guarantee – where they can prove to us that the output guarantee has also been met."

ANSWER NO. 321:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 321, except admits that it sets forth partial quotations from the February 16, 2017 earnings call, and refers to the transcript thereof for its complete contents.

322.    Several analysts asked specifically about the BLRA abandonment provision and, specifically, whether SCANA could retain and secure BLRA funds in the event of abandonment. In response to a question about whether Marsh "f[elt] confident that given this type of situation that's happened, [the BLRA abandonment clause] would still be valid," Marsh reiterated that Westinghouse and Toshiba had committed to finishing the project. Another analyst asked whether, "[i]f . . . the budget and the cost overruns are really driven by . . . more ordinary course scheduling issues . . . and also the fact that Toshiba may not be able to meet its financial obligations, is that under the abandonment provision? Is that a cause for being able to get recovery for the money spent to date?" Marsh explained that "[t]here was not an effort to make a listing of the types of items that would qualify," but that "generally prudency is the rule that the Commission banks on at the end of the day."

ANSWER NO. 322:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 322, except admits that it sets forth partial quotations from the February 16, 2017 earnings call, and refers to the transcript thereof for its complete contents.

323.    Analysts credited SCANA's responses. Wells Fargo issued a report on February 16, 2017, stating that "we think the current valuation arguably overstates the risk, particularly considering the protections afforded SCG under the Baseload Review Act." On March 3, 2017, a UBS Research analyst report upgraded its rating on SCANA to "Buy" because "**SCG management appears quite confident** regarding contract completion and **won't see material delays** or more importantly, need contract reassignment."

ANSWER NO. 323:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 323, except admits that UBS published a

report, and refers to the report for its complete contents.

324.    Nonetheless, the next trading day, SCANA's shares slid $1.67 to close at $65.65, a
drop of 2.5%.

ANSWER NO. 324:  Deloitte denies knowledge or information to form a belief as to the

truth of the allegations set forth in paragraph 324, except admits that SCANA's share price closed

at $65.65 on February 17, 2017.

325.    On February 24, 2017, SCANA filed its annual report on Form 10-K for the year
ended December 31, 2016. The 2016 financial statements further alleviated the investors' concerns
and represented that SCANA fully expected to complete the Nuclear Project in time to receive the
$1.4 billion in tax credits, stating "**[b]ased on current tax law and the contractual guaranteed
substantial completion dates (and the recently revised forecasted dates of completion)
provided above** [August 2019 and 2020]**, both New Units would be operational and would
qualify for the nuclear production tax credits**."

ANSWER NO. 325:  Deloitte admits that SCANA filed its 2016 Form 10-K on February

24, 2017, admits that paragraph 325 contains partial quotes from it, and refers to the Form 10-K

for its complete contents.  Deloitte denies knowledge or information sufficient to form a belief as

to the truth of the remaining allegations set forth in paragraph 325.

326.    In March 2017, news of Westinghouse's pending bankruptcy began to leak. On
March 22, 2017, Morgan Stanley issued an analyst report titled, "Implications of Potential
Westinghouse Bankruptcy Filing" (the "March Morgan Stanley Report"). The March Morgan
Stanley Report called into question many of SCANA's and Deloitte's representations concerning
the Nuclear Project, concluding that "further cost overruns and delays will emerge" at the Nuclear
Project. The March Morgan Stanley Report further estimated that the cost for the Nuclear Project
would be $12.6 billion—108% above the original construction cost estimate of $6.05 billion, and
$5.2 billion greater than the latest cost estimate filed just weeks earlier. Morgan Stanley also
reported that there were no silver linings for SCANA that could result from Westinghouse's
bankruptcy, and predicted three possible negative scenarios: (1) nuclear contracts, such as the EPC
Amendment and its fixed price option, could be modified by a bankruptcy filing to the detriment
of shareholders; (2) SCANA could become embroiled in protracted litigation regarding liability
for cost overruns on the Nuclear Project; or (3) Toshiba might lack the assets necessary to satisfy
SCANA's claims. Finally, Morgan Stanley noted that, should SCANA choose to abandon the
Nuclear Project as a response to a Westinghouse bankruptcy, its "earnings could be at risk" if the

PSC can show that SCANA "should have anticipated or avoided costs considering information available at the time."

ANSWER NO. 326:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 326.

327.    The Morgan Stanley analyst report was widely covered in the press. Later that same day, after the close of trading hours, a *Reuters* article entitled "Exclusive: Westinghouse's clients gear up for bankruptcy fight – sources" reported that Westinghouse had secured bankruptcy counsel and SCANA had hired restructuring advisers in response, suggesting that a bankruptcy was imminent.

ANSWER NO. 327:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 327, except admits that the article was published, and refers to the article for its complete contents.

328.    In response to the Morgan Stanley Report and the *Reuters* article, SCANA's shares declined for two consecutive trading days, falling $0.53 or 0.78% on March 22, 2017 to close at $67.74, and another $1.03, or 1.52%, on March 23, 2017, to close at $66.71.

ANSWER NO. 328:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 328, except admits that SCANA's stock price closed at $67.74 on March 22, 2017, and $66.71 on March 23, 2017.

329.    As expected, on March 29, 2017 Westinghouse filed for Chapter 11 bankruptcy protection in the Southern District of New York. SCANA issued a press release and filed an 8-K that same day. In its press release, SCANA explained that:

> SCANA and Santee Cooper have been working with WEC in anticipation of the bankruptcy filing to reach an agreement, subject to bankruptcy court approval, that allows for work on the project to continue toward completion of the units. This agreement, which will be filed today with the court as part of WEC's bankruptcy filings, allows for a transition and evaluation period during which SCANA and Santee Cooper will assess information provided by WEC and determine the most prudent path forward for the project.

The press release quoted Marsh as stating that "[t]he agreement with Westinghouse allows progress to continue to be made on-site while we evaluate the most prudent path to take going forward."

ANSWER NO. 329: Deloitte denies knowledge or information sufficient to form a belief

as to the allegations set forth paragraph 329, except admits that SCANA issued a press release on

March 29, 2017, and refers to the press release for its complete contents.

330.     During a conference call held on March 29, 2017, SCANA executives sought to dispel concerns about the impact of the Westinghouse bankruptcy on the Nuclear Project by focusing on SCANA's "prudent" decision making and oversight. Marsh explained that SCANA was evaluating its options in light of the bankruptcy, and "if continuing the construction is not determined to be the most prudent path forward . . . we will look to exercise the abandonment clause" under the BLRA. In response to analysts' concern over SCANA's ability to recover costs in the event of abandonment, Marsh responded that "it's pretty clear that [if] it is deemed it's not prudent to continue the project, **that the prudently incurred cost to date can be recovered through the abandonment clause. I don't expect that to be changed**."

ANSWER NO. 330: Deloitte denies knowledge or information sufficient to form a belief

as to the allegations set forth paragraph 330, except admits that it sets forth partial quotations from

the March 29, 2017 conference call, and refers to the transcript thereof for its complete contents.

331.     SCANA also claimed that the cost estimates that would arise out of its review of Westinghouse's cost estimates was likely to be more reliable than previous estimates, which had been revised several times, because of access to new information that SCANA had not received previously. Byrne alluded to information "which [Westinghouse] would consider business-sensitive and proprietary." Byrne further stated that "[s]ince we got into this bankruptcy issue, [Westinghouse] has become much, much more open." Similarly, Marsh explained that "[w]e're going to have access to information we have not seen heretofore. And having access to that information . . . will help inform our evaluation."

ANSWER NO. 331: Deloitte denies knowledge or information sufficient to form a belief

as to the allegations set forth paragraph 331, except admits that it contains partial quotations from

the referenced transcript, and refers to the call transcript for its complete contents.

332.     At no point did SCANA or Defendants disclose that they knew the Nuclear Project would not be completed by the end of 2020 since at least November 2015, or that SCANA had considered retaining bankruptcy counsel more than a year earlier in recognition of Westinghouse's likely bankruptcy.

ANSWER NO. 332: Deloitte denies the allegations set forth in paragraph 332.

333.     Marsh downplayed the adverse impact of the Westinghouse bankruptcy and the possibility of SCANA abandoning the Nuclear Project, reassuring investors that "**[a]t this time, we expect that the resources available from Westinghouse and Toshiba, including its**

**parental guarantee, are adequate to compensate us for the Westinghouse estimate of additional costs**." Moreover, on this same call, Marsh again represented to investors that "**[we]'ve been transparanet [sic] on this project since day 1, and we're not going to change that**." This statement was demonstrably false given SCANA and Defendants' repeated concealment of the Bechtel Reports' adverse findings and related, substantial problems with the Nuclear Project throughout the Class Period.

ANSWER NO. 333: Deloitte denies knowledge or information sufficient to form a belief

as to the allegations set forth paragraph 333, except admits that it contains partial quotations from

the referenced transcript, and refers to the call transcript for its complete contents.

334.    On March 29, 2017, the *Associated Press State & Local* reported that SCANA and Santee Cooper were "committed to finishing the project despite the bankruptcy of builder Westinghouse Electric Co." The same day, the *Charlotte Business Journal* reported that Marsh had made comments playing down the likelihood of abandonment, stating that there was a "pretty high hurdle" to abandoning the project. And *The State* also reported on March 29 that Marsh had stated that SCANA's "commitment is still to try to finish these plants. That would be my preferred option. The least preferred option, I think realistically, is abandonment."

ANSWER NO. 334: Deloitte denies the allegations set forth in paragraph 334, except

admits that the reference articles were published, and refers to the articles for their complete

contents.

335.    In response to these statements, on March 30, 2017, Gabelli & Company published a report explaining that SCANA's agreement with Westinghouse "gives [SCANA] access to critical information and resources that it had not been previously provided necessary to plan for the future of the project," and that SCANA expected that resources available from Westinghouse and Toshiba would cover any cost overruns and that SCANA's investment was "largely protected" under the BLRA. Wells Fargo stated that SCANA had "kept regulators and other key parties in the loop" about the risks of a Westinghouse bankruptcy.

ANSWER NO. 335: Deloitte denies knowledge or information sufficient to form a belief

as to the allegations set forth paragraph 335.

336.    After Westinghouse announced its bankruptcy, SCANA continued to assure investors that Westinghouse's parent company Toshiba would honor the fixed price agreement. For example, during an April 27, 2017 earnings call, Byrne stated that SCANA was looking for up to an additional 60 days to finish its assessment, but that, based on the cost overrun estimates Westinghouse had provided, SCANA believed that the incremental cost increase would be "***captured***" by the Toshiba parental guarantee.

ANSWER NO. 336: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 336, except admits that it sets forth partial quotations from the April 27, 2017 earnings call, and refers to the transcript thereof for its complete contents.

337.    Analysts reacted positively to SCANA's assurances. For example, Gabelli & Company stated that:

> We believe the project moves forward to completion as $4.634 billion has been invested and SCG needs the capacity. In a worst case scenario, *we believe SCG's nuclear development investment is protected under SC's Baseload Review Act (BLRA)*, which provides for recovery even under the scenario of abandonment. In order for SCE&G investment to be imprudent, opposing parties would need to prove negligence on SCE&G.

ANSWER NO. 337: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 337.

338.    Similarly, on April 28, 2017, analysts from UBS published a report reiterating SCANA's statement that it expected the Toshiba parental guarantee to cover Westinghouse's cost estimate, as well as SCANA's message to the Commission on April 13, 2017 that "it [would] look to Westinghouse and Toshiba if required for the incremental costs associated with the project." UBS further explained that "we anticipate Toshiba will prove capable of paying off the obligations . . . . This adds to our relative comfort on an eventual payment." UBS further explained that "[o]ur downside case is now focused on the risk of eventually receiving no ROE recovery on project costs spend thus far. This would appear a downside case principally tied to immediate project abandonment as well as a punitive commission decision as well."

ANSWER NO. 338: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 338, except admits that UBS published a report, and refers to the report for its complete contents.

339.    On July 27, 2017, after the close of trading, SCANA and Santee Cooper announced an agreement with Toshiba whereby Toshiba would honor its $2.168 billion ($1.192 billion to SCANA; $0.976 billion to Santee Cooper) parental guarantee for bankrupt subsidiary Westinghouse's liabilities associated with the Nuclear Project. Under the agreement, Toshiba agreed to a series of installment payments from October 2017 through September 2022 whether one or two nuclear units were completed or the project was abandoned.

ANSWER NO. 339:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 339, except admits that on July 27, 2017, SCANA and Santee Cooper made an announcement regarding payments by Toshiba, refers to that announcement for its complete contents, and denies any allegation inconsistent therewith.

340.    This potentially positive news was tempered, however, by SCANA and Santee Cooper's joint statement that they expected that the cost of completing the Nuclear Project would "materially exceed" prior estimates by Westinghouse, and would not be covered by "the anticipated guaranty settlement payments from Toshiba," the reactors would not be complete in time to receive the planned tax credits, and there were "significant challenges" to even completing just one unit. As reported by *The State* on the same day as the joint statement, "[d]espite Toshiba's guarantee, questions continued to surface about whether the company could make good on the money." The article quoted Santee Cooper CEO Carter, who spoke to Santee Cooper's board that day, "Quite frankly, Toshiba's financial condition is a concern, no matter whether we accept this settlement today or not" because Toshiba could fail to make all of its payments through 2022. *The State* also reported that both SCANA and Santee Cooper disclosed that the Nuclear Project "**also likely won't be completed by 2021, the current deadline for SCE&G to gain production tax credits for completing the reactors**." The companies faced an August 10 deadline to decide whether they would complete the Nuclear Units, which were now "$2.5 billion to $3.5 billion over budget and several years behind schedule. Construction work is about one-third complete." *The State* noted that "the news release issued jointly by the utilities . . . raised questions about their commitment to building two reactors."

ANSWER NO. 340:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 340, except admits that the referenced article was published and that SCANA made an announcement regarding the subject matter of paragraph 340, and refers to the article and that announcement for their complete contents.

341.    Analysts reacted strongly to the news. For example, Guggenheim issued a report on July 28, 2017, downgrading SCANA from a "Buy" to a "Sell," and writing:

> **It's extremely rare for us to make such a rating change, especially on a regulated utility**, and especially during market hours, and especially during such a heavy earnings day, but with the news coming out this morning, we believe SCG should be under substantially more pressure for some time. At this point, **it is becoming more evident to us that the situation around VC Summer is materially deteriorated and a situation that is constructive for shareholders is becoming less evident**.

ANSWER NO. 341: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 341, except admits that Guggenheim issued a report, and refers to the report for its complete contents.

342.    In response to the news on July 27, 2017, SCANA shares fell on Friday, July 28, 2017 by $4.53 per share, or 6.63%, to close at $61.29, on heavy trading volume.

ANSWER NO. 342: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 342, except admits that SCANA's stock price declined from $65.22 per share to $61.29 per share on July 28, 2017.

343.    Some analysts saw a bright lining in SCANA's ability to rely on the rate protections afforded to SCANA under the BLRA. For example, a July 28, 2017 Gabelli & Company report explained that "SCG's nuclear development investment is protected under [the BLRA], which provides for recovery even under the scenario of abandonment." Wells Fargo also issued a report on July 28, 2017, and wrote that "we viewed the language in the press release as strongly suggesting that the companies are leaning toward project abandonment," and "[i]n the event of complete abandonment of the new nuclear project, **we believe relative downside is limited given . . . the protections afforded SCG under the BLRA**".

ANSWER NO. 343: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 343.

## B.    SCANA ABANDONS THE NUCLEAR PROJECT, CLAIMING IT WAS THE "PRUDENT" DECISION, AND RECOGNIZES IMPAIRMENT AND RELATED PROJECT LOSSES

344.    On Monday, July 31, 2017, SCANA issued a press release announcing that it would abandon the Nuclear Project and "promptly file a petition with the [PSC] seeking approval of its abandonment plan." SCANA explained that its considerations included the "additional costs" to complete the two new units and "uncertainty regarding the availability of production tax credits for the project," and explained that, after considering all the factors, it "concluded that it would not be in the best interest of its customers and other stakeholders to continue construction." SCANA further explained that it had concluded, based on its analysis following Westinghouse's bankruptcy, that "completion of both Units would be prohibitively expensive" and that the "Units could not be brought online until after" January 1, 2021, which would prevent SCANA from qualifying for production tax credits. In light of these and other factors, SCANA "concluded that the only remaining prudent course of action [was] to abandon the construction . . . under the terms of the [BLRA]." On a conference call held by SCANA the same day, Marsh claimed that the "Westinghouse bankruptcy removed the benefits and protection of the fixed price option," which caused "SCANA and our project co-owner, Santee Cooper, to reevaluate the entire new nuclear project from all perspectives."

ANSWER NO. 344:  Deloitte admits that SCANA issued a press release and held a conference call on July 31, 2017, and refers to the press release and call transcript for their complete contents, and denies any allegations inconsistent therewith.

345.    In light of the cancellation of the fixed price contract, abandonment meant that SCANA would not need to spend more money on the Nuclear Project, and could recoup abandonment costs from ratepayers under the BLRA. However, unknown to investors, SCANA's public justifications for abandonment consisted largely of facts that SCANA and Defendants had known from the first day of the Class Period, including, among other things, that (i) the Nuclear Project could not be completed for many years; (ii) "additional costs" to complete the Project would be needed because of the additional years needed to complete the Project; (iii) "uncertainty regarding the availability of production tax credits for the project"; and (iv) the likelihood that Westinghouse would declare bankruptcy rather than pay the skyrocketing costs in excess of the fixed price option. Marsh indicated that SCANA would soon "file a petition to seek recovery of the project costs under the abandonment provisions of the Baseload Review Act." Addison spoke about the BLRA, explaining that SCANA's supposed prudence the test that SCANA had to meet to seek the protections of the BLRA—had been affirmed by the PSC as of June 2016, and would seek a determination that the "decision to abandon is prudent" and that "the cost incurred after June of 2016 are prudent."

ANSWER NO. 345:  Deloitte denies the allegations set forth in the paragraph 345.

346.    In a conference call held on July 31, 2017, SCANA fielded numerous questions about what could happen should the PSC reject SCANA's abandonment proposal. SCANA affirmed that their actions met the test for prudency, and placed the blame for the Nuclear Project's demise on "the failure of Westinghouse to deliver on its fixed price contract."

ANSWER NO. 346:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 346, except admits that it sets forth partial quotations from the July 31, 2017 conference call, and refers to the transcript thereof for its complete contents.

347.    On July 31, 2017, Guggenheim published a report stating, "[w]e already noted SCG was tilting toward the abandonment route; what was really introduced this afternoon was share buy-backs, which management expects will allow SCG to maintain a 4-6% growth trajectory." Guggenheim further explained:

> At the end of the day, management described a relatively constructive path forward for recovery of (and return on) capital associated with V.C. Summer nuclear construction, premised upon SC's BLRA, which we acknowledge set the most constructive regulatory/policy back-drop in support of nuclear construction that

we've seen, although as the abandonment plan has yet to be filed with regulators (SCG plans to update regulators tomorrow), we look forward to reactions from regulators and policy-makers whom management acknowledged were disappointed with the decision to abandon construction. . . . **[W]e recognize the solid regulatory/legislative framework for cost recovery provided by the BLRA**.

ANSWER NO. 347:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 347, except admits that Guggenheim published a report, and refers to the report for its complete contents.

348.    The next day, on August 1, 2017, SCANA, represented by Marsh, Byrne and Addison, went before the PSC to petition for rate increases to cover costs beginning on June 30, 2016 and through abandonment that were not reflected in then-current rates. Before the PSC, SCANA made numerous false and misleading statements concerning their prior knowledge of the risks facing the Nuclear Project. For example, Marsh described how SCANA's decision to abandon the Nuclear Project was driven by the findings of SCANA's "evaluation team," who concluded that construction of Unit 2 would only be substantially complete by December 31, 2022, and construction of Unit 3 would only be substantially complete by March 31, 2024. These completion dates were no surprise to SCANA and Deloitte, though, as Bechtel had provided remarkably similar dates nearly two years earlier.

ANSWER NO. 348:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 348, except admits that Marsh testified at the August 1, 2017 PSC briefing, and refers to the testimony for its complete contents.

349.    Byrne testified that SCANA "thought – in October [2015], when we negotiated our fixed price option, that we had largely resolved the issues with costs," and that Toshiba's December 2016 announcement of its financial troubles was "the first time that they indicated that Toshiba had a huge financial liability issue on finishing the cost of the project." However, SCANA knew that it and Santee Cooper had identified Toshiba's financial condition as a serious concern in early 2016, and Santee Cooper had pressed SCANA to retain bankruptcy counsel in advance of its election of the fixed price option.

ANSWER NO. 349:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 349, except admits that Byrne testified at the August 1, 2017 PSC briefing, and refers to the testimony for its complete contents.

350.    At the hearing, the PSC Commissioners berated SCANA. Chairman Whitfield stated that "**it's a grim day**," and asked SCANA executives whether they were "aware that **this**

**Commission was blindsided yesterday by the news**." Commissioner Elam noted that "[o]ver the course of this project, **we've seen completion dates that seem to slip exponentially** – for lack of a better word. And when we were talking about increase of costs, they seemed to slip from . . . a couple hundred million more than we thought it would be. . . [to] billions." Elam then asked "**why it seemed to get worse as we went along**." In response, Byrne pointed the finger squarely at Westinghouse, including for its poor management of the supply chain, and also at design issues – all of which SCANA had been well aware of for years, but had not disclosed to the market. Indeed, contrary to Bechtel's findings, Byrne claimed that "*[t]he construction work at the site has been progressing well*."

ANSWER NO. 350:  Deloitte denies the allegations set forth in paragraph 350, except

admits that it contains partial quotations from the August 1, 2017 PSC briefing, and refers to the

transcript thereof for its complete contents.

351.    The following day, the prudence of SCANA's oversight over the Nuclear Project was called into serious question, as was SCANA's ability to walk away from the Nuclear Project and pin the costs of the failed Nuclear Reactors on South Carolina's ratepayers. During trading hours on August 2, 2017, news broke that a group of nearly thirty South Carolina lawmakers had formed the "South Carolina Energy Caucus" "to push for reforms that will . . . protect ratepayers." In an August 2, 2017 press release announcing the formation of the group, Representative James Smith stated that "[t]here should be safeguards in place for accountability and ratepayers should have total protection from paying for the failures of a few . . . **Those who dropped the ball here should be held accountable**." In an article published on the afternoon of August 2, 2017 entitled "S.C. lawmakers want SCANA stockholders to eat costs of two failed nuclear reactors," *The Post and Courier* reported that the goal of the South Carolina Energy Caucus was to force "**the shareholders of SCANA Corp. to eat any remaining costs tied to the high-profile cancellation of two multi-billion nuclear reactors in Fairfield County**."

> A bipartisan group of legislators met in the Statehouse on Wednesday to condemn utility regulators, the executives of SCANA and the board of the state-operated utility Santee Cooper, which partnered on the V.C. Summer expansion projects more than a decade ago.
>
> Many of the lawmakers went a step further, claiming they will investigate how to stop the executives and investors of SCANA — the parent company of South Carolina Electric & Gas — from charging customers between $2 billion to nearly $5 billion in costs over the next 60 years for the wasted concrete, steel and labor pumped into the unfinished reactors.
>
> The company's investors have seen a more than 10 percent profit on nearly $2 billion that has been collected from electric customers since 2008.

131

**"The bottom line, folks, is that it will cost additional money for us to get out of this problem, but the money should not come from the pockets of South Carolinians,"** Rep. Russell Ott, D-St. Matthews, said.

**"Whatever has to be paid for going forward should be paid for out of the pockets of these utilities that ultimately got us into this mess,"** he added.

The lawmakers said they plan to investigate the past year — before the bankruptcy announcement by Westinghouse, the lead contractor on the project — to determine if the decisions of the investor-owned utility were improper considering the circumstance at the time.

The elected officials said they expect "glaring examples" of improper management practices to arise, which is one of the only ways the company can be forced to cover the costs.

ANSWER NO. 351:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 351.

352.    On the following day, August 3, 2017, SCANA announced its results for the second quarter of 2017, and later that day, just before the close of trading, hosted an earnings conference call. The focus of the conference call was not, however, on SCANA's financial results, but rather, on the Company's decision to abandon the Nuclear Project and the public response to that announcement, including the creation of the South Carolina Energy Caucus.

ANSWER NO. 352:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 352, except admits that SCANA held an

earnings call on August 3, 2017, and refers to the transcript thereof for its complete contents.

353.    SCANA continued to falsely paint themselves as the victim of Westinghouse's financial meltdown. For example, in response to a question from a Morningstar analyst as to whether they were "confident that the BLRA will be upheld," Byrne responded:

It's clear that the law provides for it. We are following the procedures outlined in the law, which will require us to make sure we didn't do anything imprudent to put ourselves in this situation. **And we validated everything we had done on the project but the fixed price option that was approved in 2016, that validated everything we had done on the project is prudent at that point**. It was shortly thereafter that we learned of the news of the Toshiba financial distress, followed by the Westinghouse bankruptcy in March of 2017. So clearly from our perspective, we had an active project. **It was moving**

132

**forward, we were making progress and looking forward to hitting the targets but when Westinghouse withdrew from the project by declaring bankruptcy, that put us in a situation we had to do the analysis. So we believe we have -- we were prudent to the point we learned of the financial distress and bankruptcy of Westinghouse**.

ANSWER NO. 353:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 353, except admits that SCANA held an

earnings call on August 3, 2017, and refers to the transcript thereof for its complete contents.

354.    The impact of the newly-formed South Carolina Energy Caucus was also a topic of discussion. In response to a Morgan Stanley analyst question regarding the South Carolina Energy Caucus, Marsh responded that they had not yet spoken to the members, but intended to do so. Marsh then stated that, "[o]ur process at the commission is very open. . . . And I can understand their disappointment. I can understand their anger because the state wanted these 2 reactors. At the same time, **we just didn't feel like it was prudent to proceed with something that was too expensive for them in the long run and not cost-effective based on what we know today**." Marsh did not mention the fact that SCANA had concealed material information from the PSC for nearly two years, and just as the damaging information was "not news" to SCANA or Deloitte.

ANSWER NO. 354:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 354, except admits that SCANA held an

earnings call on August 3, 2017, and refers to the transcript thereof for its complete contents.

355.    On August 4, 2017, additional pressure was placed on SCANA's abandonment petition, which again called into question SCANA's management of the Nuclear Project. On that day, South Carolina Attorney General Alan Wilson announced that his office was initiating an investigation of SCANA "to ensure that all laws were complied with and all applicable procedures were followed. . . . The public needs to know any recourse the people have to protect those who were harmed by these actions." Wilson also urged legislators to "delay any rate increase while [the Attorney General's] investigation is ongoing." That same day, *The Post and Courier* reported on Wilson's decision, noting that "Wilson's pending investigation **could cause more worry among SCANA investors, who questioned the executives earlier this week after state lawmakers called for the shareholders to eat the remaining cost of the reactors**." It also reported that legislators were planning to closely investigate SCANA's abandonment request and had encouraged SCANA to walk back its request to recoup costs from ratepayers.

ANSWER NO. 355:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 355, except admits that the article and press

release were published, and refers to the cited materials for their complete contents.

356.    That same day, *The State* also reported on the Attorney General's investigation and legislators' calls for a special session to temporarily block rate increases. It explained that Senate Majority Leader Shane Massey and Minority Leader Nikki Setzler "want the General Assembly to return to pass a resolution that would prevent the [PSC] from approving further rate hikes until . . . next January," and quoted Setzler as saying that "**[t]here has got to be some responsibility taken for what's occurred here. It's not the ratepayers' responsibility**."

ANSWER NO. 356:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 356, except admits that the article was

published, and refers to the article for its complete contents.

357.    Also on that same day, SCANA publicly acknowledged for the first time that it would be unable to earn the $1.4 billion of tax credits previously relied upon to mitigate related consumer costs incurred as a result of the nuclear unit construction:

> These nuclear production tax credits (related to SCE&G's 55% share of both New Units) could have totaled as much as approximately $1.4 billion. **Due to the Company's determination to abandon the construction of the New Units, which determination was based in part on the expectation that the New Units would not be placed in service before January 2021, no such production tax credits will be earned**.[133]

ANSWER NO. 357:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 357, except admits that SCANA filed a Form

10-Q on August 4, 2017, and refers to the Form 10-Q for its complete contents.

358.    In response to, among other things, the (i) August 2, 2017 news of SCANA's ill-received testimony before the PSC and the resulting convocation of the South Carolina Energy Caucus; (ii) the August 3, 2017 conference call; (iii) the August 4, 2017 announcement of the Attorney General's investigation; and (iv) the August 4, 2017 announcement that SCANA would be unable to earn the $1.4 billion of tax credits—each of which called into serious doubt SCANA's prudent oversight and abandonment of the Nuclear Project—SCANA's common stock declined precipitously. On August 3, 2017, SCANA's shares fell $1.81, or nearly 3%, to close at $65.34, and fell another $1.55 on August 4, 2017, or 2.4%, to close at $63.79.

---

[133] Q2'2017 Quarterly Report on Form 10-Q filed on August 4, 2017, p. 36

ANSWER NO. 358:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 358, except admits that on August 3, 2017,

SCANA's share price closed at $65.34 and, on August 4, 2017, closed at $63.79.

### C. PUBLIC INVESTIGATIONS THREATEN TO STRIP SCANA OF BILLIONS OF DOLLARS OF BLRA FUNDS, AND REVEAL THE FATAL RISKS FACING THE NUCLEAR PROJECT

359.    The news continued to worsen for SCANA throughout August and September, as civil and criminal investigations and lawsuits were launched, and numerous internal documents evidencing SCANA's longstanding knowledge of the true risks of the Nuclear Project were reported in response to the production of internal Santee Cooper documents.

ANSWER NO. 359:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 359.

360.    On August 9, 2017, after the market closed, *The State* reported that the ORS "took legal action . . . against SCE&G's plan to charge customers for a nuclear expansion project the utility said had become too expensive to finish." Specifically, the ORS moved to dismiss SCANA's abandonment petition, reasoning, in the words of regulatory director Dukes Scott, that it would be "very difficult to challenge successfully the costs or rates" if SCANA's plan was not dismissed. *The State* also noted in its article that stopping SCANA's plan from moving forward "would give state officials time to study the fallout" arising from SCANA's abandonment decision. That same day, James Lucas, the Speaker of South Carolina's House of Representatives, filed a petition seeking to intervene in the PSC proceeding to support the ORS's motion to dismiss.

ANSWER NO. 360:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 360, except admits that the article was

published and James Lucas filed a petition seeking to intervene on August 9, 2017, and refers to

the referenced materials for their complete contents.

361.    On August 10, 2017, *The Post and Courier* published an article entitled "CEO: SCANA may not return to scuttled nuclear project — even if a new partner emerges." The article reported on the ORS motion to dismiss, noting that legislators had "urged SCE&G to pull its request" to charge ratepayers for the failed project, and quoted one as saying to Marsh, "[t]here's a lot of public trust and public money at stake here, and I think it would be the right thing for you guys to do. I fear that if you don't . . . you may force the General Assembly to be more rash than we may otherwise would want [sic] to be."

ANSWER NO. 361: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 361, except admits that the article was published, and refers to the referenced materials for their complete contents.

362.    In response to the ORS motion and *The Post and Courier* article and other news, SCANA's shares closed on August 10, 2017 at $62.01, a drop of nearly $0.70, or just over 1%, and dropped again on August 11, 2017, to close at $60.69, a drop of over 2%.

ANSWER NO. 362: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 362, except admits that SCANA's stock price closed at $62.01 per share on August 10, 2017 and closed at $60.69 per share on August 11, 2017.

363.    On August 15, 2017, in response to pressure from legislators and the public, SCANA announced that it would withdraw its abandonment petition before the PSC to seek rate increases under the BLRA. In the press release, Marsh defended SCANA's actions, reassured investors that SCANA had acted prudently, and once again, blamed the Nuclear Project's failures solely on Westinghouse and Santee Cooper:

> While ceasing construction was always our least desired option, **based on the impact of the bankruptcy of Westinghouse on our fixed price construction contract**, the results of our evaluation of the cost and time to complete the project, and Santee Cooper's decision to suspend construction, **abandonment was the prudent decision**.

ANSWER NO. 363: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 363, except admits that SCANA issued a press release, and refers to the press release for its complete contents.

364.    On August 22, 2017, Byrne and Addison, as well as Santee Cooper CEO Carter and Board Chair Leighton Lord, were summoned to testify before the newly- convened South Carolina Senate V.C. Summer Nuclear Project Review Committee. Chairman Lord revealed, for the first time, that, following concerns over the Nuclear Project raised in 2014, SCANA and Santee Cooper "eventually engaged a firm named – known as Bechtel in order to do [an] independent study and to try to help us better understand the problems that we were facing and better deal with those problems." Byrne confirmed the existence of a Bechtel report during the August 22, 2017 hearing, but immediately stated that he could not provide any testimony about the contents of the Report because it was "requested by counsel in preparation for potential litigation." At the close of testimony, the Senate Committee said it would subpoena Bechtel's report.

ANSWER NO. 364:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 364, except admits that Byrne, Addison, Carter, and Lord testified on August 22, 2017, and refers to the testimony for its complete contents.

365.    SCANA's belated assertion of privilege over Bechtel's work was bogus. As described in the internal June 1, 2015 email exchange involving Byrne and Bechtel, SCANA and Santee Cooper executives, Bechtel's assessment was already underway when SCANA brought in outside counsel because there was "an advantage in doing so." That "advantage" turned out to be SCANA's belief that it could bury Bechtel's conclusions to the extent they differed from SCANA's public representations concerning the status of the Nuclear Project and its completion by the end of 2020. Indeed, on multiple occasions Bechtel made it clear that the scope of the assessment excluded advising SCANA regarding potential claims against the Consortium. In its official assessment proposal, dated February 10, 2015, Bechtel stated "[f]or clarity, this team will not evaluate the ownership of past impacts or validity of pending or future claims." Bechtel re-emphasized in a July 13, 2015 email to Marsh and Santee Cooper CEO Carter that Bechtel's assessment of the Nuclear Project was "[n]ot claims consultancy," but was limited to <u>the work, the consortium,</u> and <u>SS [SCANA/Santee Cooper] oversight."</u> (Emphasis in original.) Furthermore, internal documents make clear that SCANA shared the Bechtel Report with Deloitte, so even if a claim of privilege existed at some point—which it did not—it was waived by that disclosure.

ANSWER NO. 365:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 365, except denies that SCANA shared the Bechtel Report with Deloitte, and denies that internal documents prove that SCANA did so.

366.    On Thursday, August 31, 2017, *The State* published an article titled "SCE&G has a report critical of nuke project, but won't hand it over, SC agency says." The article revealed that after SCANA "told the Office of Regulatory Staff at least eight months ago that the company did not have a report by the Bechtel Corp.," SCANA now says "it won't give the report to the ORS because the document is considered private information shared between an attorney and a client." The article quoted South Carolina Representative James Smith, who said the power company's conflicting stories "appear[] to be evidence of an effort to mislead." Smith added that SCANA "need[s] to be forthcoming with all that information. We've asked for this report. Where is it?" Later that day, *The State* reported that South Carolina Governor Henry McMaster, in a letter to Santee Cooper Chairman Lord, demanded that Santee Cooper "immediately" provide a report by Bechtel. *The State* reported that Chairman Lord wanted to provide the report, but was seeking legal advice as to whether Santee Cooper could produce the report over SCANA's objection.

ANSWER NO. 366:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 366, except admits that the article was published, and refers to the article for its complete contents.

367.    After refusing a request by Santee Cooper that the Governor allow for delay to allow for "a judicial determination . . . with respect to release of the Bechtel Report," the Governor again demanded the report on Saturday, September 2, 2017. On September 4, 2017, Santee Cooper presented Governor McMaster's office a single hard copy of the Second Bechtel Report, and requested that the Governor keep the report confidential. Governor McMaster, an attorney who served eight years as South Carolina's Attorney General and four years as the United States Attorney for South Carolina, was well-equipped to ascertain whether the Second Bechtel Report was a privileged communication. Governor McMaster's office stated on September 4: "Gov. McMaster has reviewed the document and believes **there is no basis for their 'assertion of privilege' or confidentiality**. Therefore, in the legitimate interest of the ratepayers, he has directed this information to be released to the public immediately."

ANSWER NO. 367:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 367.

368.    According to an article in *The State* on September 4, 2017, "lawmakers fumed after reviewing the report":

> I couldn't believe it when I first learned the utilities weren't going to release the report. Now I know why," said state Rep. Nathan Ballentine, a Richland Republican who is on a House committee investigating the project's failure. "**No part of this construction and planning appears 'prudent,' and as such, I think a strong case can be made that ratepayers and taxpayers shouldn't be stuck with the bill for what is now basically a hole in the ground**."
>
> State Rep. James Smith said the Bechtel report confirms to him that problems were not isolated to Westinghouse. SCE&G and Santee Cooper also share the blame, the Richland Democrat said.
>
> "It's what I suspected: that **the bankruptcy of Westinghouse had little to nothing to do with the project's failure**," Smith said. "**The reality is that it was built to fail. ... It was never going to produce any power**.

ANSWER NO. 368:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 368, except admits that the article was published, and refers to the article for its complete contents.

369.    A rash of news stories were published on September 6, 2017 and September 7, 2017, reporting on the fallout of the release of the Second Bechtel Report and the release of a number of internal documents and communications that revealed new information concerning SCANA's and the Defendants' longstanding knowledge of the risks facing the Nuclear Project,

and Westinghouse and Toshiba's ability to pay for the Nuclear Project once the fixed price option was elected.

ANSWER NO. 369: Deloitte denies the allegations set forth in paragraph 369.

370.    *The State* reported on September 7, 2017 that: "For parts of three years, the Santee Cooper power company urged partner SCE&G to address growing problems with the utilities' failing nuclear expansion project — but SCE&G was either slow to respond or failed to comply with the requests, records show." The article went on to reveal, for the first time, the November 28, 2016 email from Santee Cooper CEO Carter to Marsh, discussed at length above. The article also quoted from a June 18, 2016 email from Santee Cooper that "questions why SCANA wanted to continue studying problems with the nuclear project when action was needed" following the receipt of the $1 million Bechtel report.

ANSWER NO. 370: Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 370, except admits that the article was

published, and refers to the article for its complete contents.

371.    Also on September 7, 2017, *The Post and Courier* published an article entitled "Emails: Toshiba, Westinghouse accused of deceit, malfeasance in run-up to South Carolina nuclear plant failure," which reported on "newly obtained internal emails [that] reveal that Kevin Marsh, SCANA Corp.'s chief executive officer, earlier this year accused Toshiba Corp. of 'financial malfeasance' in the failed V.C. Summer nuclear project." The article quoted a Santee Cooper spokesperson, who said that transparency issues with Westinghouse "came up again and again" as the utilities "tried to figure out whether to complete or scrap the nuclear project." The newly-obtained emails and letters also:

> [S]uggest that SCANA and Santee Cooper quietly prepared more than a year ago for the possibility that Westinghouse and Toshiba might fall into bankruptcy and bring the nuclear project down in the process.
>
> In an October letter to Marsh, Lonnie Carter, Santee Cooper's chief executive officer, noted that SCANA had agreed in June 2016 to hire bankruptcy lawyers "to help us think through Toshiba/Westinghouse insolvency scenarios."
>
> But SCANA's public portrayal of the project was much different. During a hearing before state utility regulators that October, Bob Guild, an attorney for the Sierra Club, specifically asked SCANA officials about the possibility of Westinghouse's insolvency. SCANA officials shrugged off the question.

ANSWER NO. 371:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 371, except admits that the article was

published, and refers to the article for its complete contents.

372.    As a result of these articles revealing a host of newly-obtained documents that
revealed SCANA's years' long discussion of the potentially fatal risks facing completion of the
Nuclear Project, SCANA's shares declined significantly on September 7 and September 8, 2017.

ANSWER NO. 372:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 372.

373.    Following the forced release of the Second Bechtel Report, SCANA downplayed
its importance. On September 15, 2017, Marsh was questioned by a Committee of the South
Carolina House of Representative. During that questioning, South Carolina Representative Peter
McCoy rejected Marsh's attempt to justify SCANA's "active push to keep [Bechtel's assessment]
quiet" as "unbelievable," and noted that he viewed the Santee Cooper-authored Bechtel Report
Action Plan (which has been produced to the House Committee by this time) as indicating that
SCANA and Santee Cooper "got together" and "decided we're not turning this over at any cost."

ANSWER NO. 373:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 373, except admits that Marsh testified

before the Committee, and refers to the testimony for its complete contents.

374.    Three days later, in the September 18, 2017 Senate Hearing, Marsh claimed that
"**the Bechtel Report was not news**." He stated that "**[t]he majority of those issues, we had
identified**. We had put teams together to address those. Some of those issues had already been
addressed." Yet, as discussed below, SCANA actively refused to or failed to address Bechtel's
most fundamental concerns.

ANSWER NO 374:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 374, except admits that Marsh testified on

September 18, 2017, and refers to the testimony for its complete contents.

375.    During the Hearing, Senate Chairman Shane Massey pointed out one of the major
flaws in SCANA's decision to withhold the Bechtel Report and conceal its conclusions based on
an assertion of privilege. Specifically, through the October 27, 2015 EPC Amendment, SCANA
and Santee Cooper **resolved all outstanding litigation and disputes** with Westinghouse and
CB&I. Moreover, the EPC Amendment prevented the entities from bringing any litigation against
each other for the life of the Nuclear Project. As Chairman Massey noted, given that the Second
Bechtel Report (the only report known to exist as of September 2017) was dated February 5, 2016,

it could not have been issued in anticipation of litigation because "**that 2015 contract by its terms resolved every dispute that you had between – with the consortium**" and no disputes had arisen "between October 27, 2015 and February 2016 that would have led to litigation after the completion of the project."

ANSWER NO. 375:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 375, except admits that Marsh testified on

September 18, 2017, and refers to the testimony for its complete contents.

376.    Only the Second Bechtel Report was produced in September 2017. Information contained in the Second Bechtel Report, and the fact that the dates in the February 5, 2016 Second Bechtel Report stopped in October 2015, led to the belief that there was another Bechtel report that had not been turned over. On September 18, 2017, South Carolina Senator Luke Rankin questioned Marsh:

> SENATOR RANKIN: Mr. Marsh, apparently, and we heard, perhaps, again, the narrative world, maybe unreported, whispered, but **there's great belief that there are two reports**, and, in fact, there's some indication that there is a report issued on October the 15th, perhaps by Bechtel, perhaps by somebody else. If -- one, **is there another report that this committee does not have**, dated in October of 2015?

> MR. MARSH: We had a presentation. I believe it was on October 22nd, if I remember the date correctly, a preliminary presentation by Bechtel. I don't recall a report being issued because that was preliminary information. The report I have from Bechtel is the one I believe you've been provided. ***I'm not aware of a second report***.

ANSWER NO. 376:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 376, except admits that Marsh testified on

September 18, 2017, and refers to the testimony for its complete contents.

377.    Marsh's response was, of course, not true. Marsh was acutely aware of the existence of the First Bechtel Report. Indeed, he had been reminded directly of its existence when, on November 28, 2016, Santee Cooper CEO Carter emailed him the SC Nuclear Timeline that identified, in no uncertain terms, their receipt of the First Bechtel Report and efforts to sanitize its contents.

ANSWER NO. 377:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 377.

378.    On September 21, 2017, SCANA issued a press release announcing that the Company had been served with a subpoena issued by the U.S. Attorney's Office for the District of South Carolina related to the Nuclear Project. SCANA provided no further information concerning the substance of the subpoena, but indicated that it would cooperate with the investigation. Later that morning, sources reported in *The State* that a criminal "federal grand jury in South Carolina is looking at SCANA's actions concerning the company's failed nuclear construction project."

ANSWER NO. 378:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 378, except admits  that the article and press

release were published on September 21, 2017, and refers to the cited materials for their complete

contents, and denies any allegations inconsistent therewith.

379.    News reports later that day revealed broad public support for the federal investigation, and the belief that the U.S. Attorney could possibly "**get to the bottom of what went wrong,**" "**shine more light on what led to the project's failure**" and reveal evidence of securities fraud by "examin[ing] **whether SCANA misled investors, including its stockholders**, about the outlook for the nuclear project in federal securities filings":

> Some said news of the probe Thursday validated the efforts of S.C. Senate and House committees investigating the project's failure, which will cost S.C. power customers billions of dollars.
> Others complained SCANA executives had been evasive in legislative hearings into the $9 billion debacle. "The absolute arrogance of the leadership of that company and their response to their own conduct is outrageous," state Rep. James Smith, D-Richland, said Thursday.
>
> One lawmaker, a former prosecutor, predicted federal investigators **will look closely at what the shareholder-owned SCANA told its investors about the outlook for the two reactors it was building**.
>
> *****
>
> Speaker Jay Lucas, R-Darlington, said testimony during two House hearings on the project indicates "**the collapse of the V.C. Summer nuclear project was much more careless and fraudulent than initially believed**."

ANSWER NO. 379:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 379, except admits that it sets forth partial

quotations from a September 21, 2017 article by *The State* and refers to the article for its complete

contents.

380.    On the following day, September 22, 2017, *The State* reported that four SCANA insiders sold a cumulative $3.4 million in stock in the period from February 2016 through May 2017—after SCANA's receipt of the Bechtel Report and before its public disclosure. Wells Fargo issued a "Flash Comment" on September 22, 2017, in the wake of news concerning the U.S. Attorney subpoena and convening of a federal grand jury, and noted that: **Unfortunately, the news flow is not likely to get any better anytime soon** as early next week, per The State, the South Carolina Attorney General's (AG's) office is expected to opine on the constitutionality of the Base Load Review Act (BLRA) as well as the ability of the SC General Assembly to change the law. The BLRA affords SCG substantial legal protections in the event of project abandonment including recovery of and a return on the remaining balance. **We think it is likely that the AG will seek to attack the legality of the BLRA in one form or fashion**.

ANSWER NO. 380:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 380, except admits that the article and Flash

Comment were published on September 22, 2017, and refers to the cited materials for their

complete contents.

381.    In light of these revelations of, among other things, the federal subpoenas, the grand jury investigation, insider trading, and the likely actions of the South Carolina Attorney General, on September 22, 2017, SCANA's stock plummeted $1.96 per share, or 3.43%, to close at $55.22 on heavy volume.

ANSWER NO. 381:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 381, except admits that SCANA's stock

price declined from $57.18 per share to $55.22 per share on September 22, 2017.

382.    On September 25, 2017, *The State* reported that South Carolina House leaders had asked the South Carolina Law Enforcement Division ("SLED") to investigate SCANA for possible criminal fraud based on the Nuclear Project. Significantly, in a letter to SLED, the legislative panel that had been conducting the hearings on the matter wrote: "it has become our belief that the proximate cause of **the V.C. Summer collapse is a direct result of misrepresentation by SCANA and SCE&G. We also believe that criminal fraud through the concealment of material information is also a plausible cause for the project's disastrous collapse**." The next day, on September 26, 2017, SLED opened a criminal investigation.

ANSWER NO. 382:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 382, except admits that the article was published on September 25, 2017, and refers to the article for its complete contents.

383.    The bad news continued to accumulate. On September 26, 2017, as reported in *The Post and Courier* that same day, "the South Carolina AG issued an opinion, concluding that elements of the BLRA were 'constitutionally suspect.'" This opinion, as Wells Fargo noted in a September 27, 2017 analyst report, "present[ed] [a] potential legal avenue to pursue a challenge" to the BLRA. Later that same day, and in response to the AG's filing, the ORS filed a request with the PSC to (1) prevent SCANA from continuing to collect financing costs related to the Nuclear project in current rates and (2) asked the PSC to force SCANA to refund ratepayers for past BLRA-related costs collected in rates in the event the BLRA is ultimately deemed to be unconstitutional and/or the General Assembly revokes the BLRA.

ANSWER NO. 383:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 383, except admits that the article was published, and refers to the article for its complete contents.

384.    Then, again on September 27, 2017, *The State* published an article entitled "How much worse was the First Bechtel nuclear report?" In the article, *The State* reported on the existence of the First Bechtel Report for the first time:

> A timeline that Santee Cooper CEO Lonnie Carter sent to SCANA CEO Kevin Marsh complaining about delays includes this Nov. 12, 2015, entry: "Bechtel Assessment Report — Issued to George Wenick— Weeks go by with Wenick/Bechtel wrangling over Wenick's rejection of initial report, redactions, timeline removal, critique of project management."
>
> That's **one of the most disturbing details so far in an ever-growing pile of the disturbing details about the colossal failure of SCANA and Santee Cooper to stop years of bleeding that eventually killed the two unfinished nuclear reactors.**
>
> What that suggests is that **the damning report that has upended the whole conversation about that project was originally much worse**. What it suggests is that the version of the report that we've seen pulled some of its punches.

ANSWER NO. 384:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 384, except admits that the article was published, and refers to the article for its complete contents.

385.    In the wake of the revelations about the AG opinion, the ORS ratepayer action, and the news of the existence of the First Bechtel Report, SCANA's shares fell $4.35 on September 27, 2017, a drop of 7.8%, to close at $51.22.

ANSWER NO. 385:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 385, except admits that SCANA's share price closed at $51.22 on September 27, 2017.

386.    Two days later, on September 29, 2017, a further raft of bad news related to the Nuclear Project collapse came out for the Company. Credit rating agencies Fitch and Standard & Poor's both downgraded SCANA's credit ratings and placed SCANA on negative "watch" lists, indicating that further downgrades might be in store. As Fitch explained:

> Fitch is concerned with the sharp deterioration in the legislative and regulatory environment in South Carolina. There is a significant risk that SCE&G may have to cease collection of revenues related to the new nuclear units, as petitioned by the Office of the Regulatory Staff (ORS) to the SC Public Service Commission (PSC) until the legal issues regarding the BLRA are resolved. Fitch could consider additional negative rating actions if the BLRA were to be found unconstitutional and material refunds required. The Rating Watch Negative primarily reflects the risk that adverse regulatory orders could lead to restricted liquidity, constrained capital access and incremental debt issuance . . . .

ANSWER NO. 386:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 386, except admits that credit rating agencies Fitch and Standard & Poor issued statements regarding SCANA's credit ratings, and refers to the referenced materials for their complete contents.

387.    Standard & Poor's similarly explained that day that it had lowered SCANA's rating "due to adverse regulatory developments in South Carolina that have weakened the consolidated business risk profile," and that "[w]e could downgrade the ratings further if the SCPSC orders large rate refunds or credits, or if the South Carolina legislature retroactively changes the law that underpins our expectation of substantial recovery of the nuclear plant investment." Standard & Poor's further explained:

> The CreditWatch with negative implications on SCANA and its subsidiaries reflects our view that the political atmosphere in South Carolina following the company's decision to abandon [V.C.] Summer construction has worsened and could result in regulatory and legislative decisions that harm both the business and financial risk of SCANA. We could lower the ratings on SCANA and its subsidiaries if Summer-related rates are rescinded. We could further lower ratings if legal challenges to a rate decrease are unsuccessful, if the SCPSC orders cash refunds or rate credits for Summer-related costs, if the BLRA is repealed or changed by the legislature, or if the BLRA is deemed unconstitutional.

ANSWER NO. 387: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 387, except admits that Standard & Poor issued a credit rating report, and refers to the report for its complete contents.

388.    The same day, on September 29, 2017, *The Post and Courier* published an article titled "Letter shows S.C. utilities knew Westinghouse's reactor designs would lead to increased costs and schedule delays." This article discussed and attached a link to a "previously undisclosed" May 6, 2014 letter from Marsh and Lonnie Carter to the leaders at Westinghouse and CB&I concerning engineering problems with the Nuclear Project, discussed above in Section IV.E.1. According to *The Post and Courier*, South Carolina Representative Russell Ott stated that the letter was "'just **more proof, concrete proof, that these guys knew the project was in bad shape**.'" The article also explained that S.C. Attorney General Wilson had petitioned to intervene in the PSC case determining whether SCANA could continue to charge its customers in connection with the Nuclear Project, citing his "sworn duty to 'seek to protect the rights'" of ratepayers.

ANSWER NO. 388: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 388, except admits that the article was published, and refers to the article for its complete contents.

389.    On this news, SCANA's shares fell $2.50 on September 29, 2017, or nearly 5%, to close at $48.49 on extremely heavy trading.

ANSWER NO. 389: Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 389, except admits that SCANA's stock price closed at $48.49 per share on September 29, 2017.

390.    On October 17, 2017, SCANA disclosed that it had been subpoenaed by the SEC in connection with the abandoned Nuclear Project. Just two days later, on October 19, 2017,

Governor McMaster sent a letter to Marsh requesting that SCANA "immediately cease collecting approximately $37 million per month from ratepayers for its abandoned nuclear project." The Governor's letter further requested that SCANA use the Toshiba settlement to repay ratepayers rather than fund the costs of the Nuclear Project:

> **I also urge SCANA to use the Toshiba settlement funds to begin refunding to ratepayers money collected for the construction of the nuclear reactors in Fairfield County**. I believe this is the right thing to do under these circumstances. It is unreasonable and oppressive for SCANA to require its customers to bear the burden of actions and decisions in which customers played no part and over which they had no control. Moreover, as SCANA seeks to stabilize its future in the face of investigations and ratepayer lawsuits, it would be unwise to spend years litigating the constitutionality of the Base Load Review Act.

ANSWER NO. 390:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 390, except admits that SCANA disclosed that the SEC served a subpoena on SCANA and that Governor McMaster sent a letter.

391.    That same day, *The State* revealed that SCANA executives had substantial golden parachutes in place that could reward them handsomely in the event of a sale of the Company, and had received nearly $3 million in performance-related bonuses for their work on the Nuclear Project—including nearly $432,000 paid in 2016, after they had received the Bechtel Report.

ANSWER NO. 391:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 391, except admits that the article was published, and refers to the article for its complete contents.

392.    When these facts came to light, they revealed further regulatory and legal risk for the Company, and, in response, SCANA's stock closed at $48.65, a drop of $0.48, or 0.98%, on heavy trading.

ANSWER NO. 392:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 392, except admits that SCANA's stock price closed at $48.65 per share on October 19, 2017.

393.    On October 26, 2017, SCANA announced its third-quarter 2017 earnings. Earnings declined to $34 million, driven in large part by a $210 million impairment taken on grounds that "the public, political and regulatory response to the abandonment decision has been extremely contentious," with the result that cost recovery under the BLRA had been threatened. SCANA also

reiterated its 2017 GAAP-adjusted weather-normalized earnings guidance, but stated that "we are unable to provide long-term earnings guidance" on account of uncertainties surrounding "treatment of the abandoned new nuclear project."

ANSWER NO. 393:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 393, except admits that SCANA announced

its third quarter 2017 earnings, and refers to the press release for its complete contents.

394.    During a conference call held later in the afternoon on October 26, 2017, analysts peppered SCANA with questions concerning recent and expected regulatory developments. Marsh explained that the Company was pursuing settlement with the regulators, but that "[t]his is a very different situation, given the attention that's been given to it." Nonetheless, SCANA executives cast ongoing negotiations and the SCANA's prospects for reaching a settlement optimistically, with Marsh noting that "I look at it as a positive that we're having discussions, and that process is hopefully going to continue to increase," while Addison stated that the negotiations were "very professional." Marsh also minimized the risks associated with the ORS action seeking to suspend SCANA's rate collections as based on a South Carolina Attorney General opinion that "has no weight at this point, in our opinion, which is why we challenged the filing with the Office of Regulatory Staff at the commission." Marsh also stated, "**We believe what we have done and invested under law was appropriate and under the law to the extent we reach a settlement, or otherwise would be recoverable under the terms and conditions of the law.**"

ANSWER NO. 394:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 394, except admits that SCANA held a third

quarter earnings call on October 26, 2017, and refers to the transcript thereof for its complete

contents.

395.    Analysts had mixed reactions to the conference call. Analysts from Guggenheim, for example, reported on October 26, 2017 that they were buoyed by management's representations concerning the possibility of a settlement, calling it "a sight for sore eyes" and hoping that "'Professional' conversations could lead to bigger and better things" while "flagging a deteriorating political backdrop for a utility that will be carrying around a lot of regulatory/policy baggage for the foreseeable future." By contrast, on October 27, 2017, analysts from Morgan Stanley lowered its price target on the grounds that analysts were "growing increasingly concerned" about negative scenarios playing out for the company in light of (i) the Governor's letter; (ii) the ORS action to force SCANA to stop charging ratepayers for the project until the legislature could review the BLRA; (iii) the South Carolina AG's opinion; (iv) comments from legislators; and, critically, (v) media reports that SCANA management was aware of significant issues with the project "**at the same time that management was allegedly not fully disclosing such issues to key constituents.**"

ANSWER NO. 395:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 395.

396.    Investors reacted strongly to SCANA's results, conference call statements, and the Morgan Stanley report on October 27, when SCANA's shares dropped by $1.33, or 2.78%, on heavy trading volume.

ANSWER NO. 396:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 396, except admits that SCANA's stock price opened at $47.48 and closed at $46.50 per share on October 27, 2017.

397.    On October 28, 2017, news outlets reported that SCANA's Board of Directors had "ousted" Marsh and Byrne, while SCANA denied these reports. It soon became clear that these reports had merit when, on October 31, 2017, *The Post and Courier* reported that South Carolina House Speaker Jay Lucas "called for SCANA Chief Executive Officer Kevin Marsh to resign" during a special House Committee meeting on October 30, 2017. According to *The Post and Courier*, Speaker Lucas' demand was precipitated by SCANA's October 28 offer "to oust [Marsh] in exchange for concessions over the canceled $9 billion nuclear plant expansion." *The Post and Courier* reported that state lawmakers had rejected this inartful attempt to use Marsh's position as a bartering chip for concessions. Speaker Lucas then demanded Marsh's resignation, without any concessions:

> SCANA's mismanagement of the V.C. Summer nuclear facility has proven that the company cannot be trusted to promote or protect its consumers' interests . . . On behalf of the South Carolina ratepayer, I believe SCANA CEO Kevin Marsh should resign immediately. This measure should have occurred long before now and without pressure from elected officials.

ANSWER NO. 397:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 397, except admits that the article was published, and refers to the cited article.

398.    Just days after issuing strong denials of their departures, on October 31, 2017, SCANA announced that, effective January 1, 2018, its top executives, Marsh and Byrne, would be the first SCANA executives to depart as a result of the collapse of the Nuclear Project. It was reported later that Marsh and Byrne could receive up to $40 million in total severance compensation. In the wake of Marsh's departure, it was announced that Addison would step into the role of CEO. This news was met with some resistance. For example, on October 31, 2017, *The State* reported that an adviser to the Friends of the Earth environmental group "questioned why Addison had been retained and promoted to chief executive office" because "Addison is one of the ringleaders of the project," and "rewarding him is very unsettling."

ANSWER NO. 398:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first sentence in paragraph 398, except admits that the article was published on October 31, 2017, refers to the article for its complete contents, and denies any allegations inconsistent therewith.

399.    Also on October 31, 2017, *The Post and Courier* reported that the House committee "examining the nuclear project fiasco called for legislation Monday that would block SCE&G nuclear-related charges to ratepayers." The article noted that such action "could further hurt the utility's share price that already has lost nearly 25 percent of its value since the project was canceled in July."

ANSWER NO. 399:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first sentence in paragraph 399, except admits that the article was published, and refers to the article for its complete contents.

400.    In response to the news of Marsh's and Byrnes' departures and the Committee's proposed legislation limiting rate changes, on October 31, 2017, SCANA stock plummeted by $2.77, or 6.03%, on extremely heavy volume, to close at $45.93 per share.

ANSWER NO. 400:  Deloitte denies the allegations set forth in paragraph 400.

401.    In late November 2017, the First Bechtel Report—the existence of which was already known to the public through news reports dating back to late September 2017—was released. Public condemnation followed as it became clear that SCANA actively concealed and manipulated Bechtel's findings regarding the viability of the Nuclear Project just weeks earlier. For example, on November 22, 2017, *The Post and Courier* published an article in which it emphasized: "Newly disclosed documents show **critical information was scrubbed two years ago from a report about the V.C. Summer nuclear project — insight that would have alerted investors and regulators about some of the project's problems long before they came to light**." The article noted that after receiving the First Bechtel Report, SCANA "**didn't share Bechtel's findings then with investors, state leaders or utility regulators. Instead, they touted their progress and asked regulators for hundreds of millions of dollars to expand the project's budget**." The article also quoted Representative Russel Ott, who stated that SCANA's actions constituted a "cover up" that was "deception at its core":

> "If they would have brought this forward, they knew their investors would have gone crazy," said Rep. Russell Ott, a Democrat from St. Matthews who helped lead a special House committee that investigated the nuclear project. "**This is a cover up. This is deception at its core. The bottom line is they lied to everyone and they did it intentionally**."

ANSWER NO. 401:  Deloitte denies knowledge or information sufficient to form a belief

as to the allegations set forth in paragraph 401, except admits that the article was published, and

refers to the cited article for its complete contents.

402.    Representative Bill Sandifer echoed these sentiments during the September 15, 2017 House Committee Hearing:

> One of the focuses of our inquiry is to determine who knew what and when. **To that end the Bechtel report tells us an awful lot about what SCE&G knew dating back to 2015 and I have a number of questions to ask about why that information was not made available to the appropriate regulatory authorities**. I believe that if we along with the PSC and the ORS all had access to the information from the Bechtel report describing the true extent of the problems back in 2015, we all would have been pushing to make changes to correct the problem just as we're coming together now to try to correct the problem and move forward responsibly. Along the same lines, I believe **the concealment of that report led the PSC to approve schedules and cost changes that they otherwise would not have approved**.
>
> The results of the Bechtel report are highly concerning and I'll put it very clearly, the results seem to indicate that **the executive leadership of SCE&G intentionally misled the PCS, the ORS, the General Assembly, the SCE&G shareholders and investors and the ratepayers and the public at large as to the true extent of the delays, mismanagement, cost overruns at VC Summer and intentionally engaged in an effort to conceal that information at the same time**, all the while returning a hefty return to their shareholders and receiving millions in compensation and bonuses.

ANSWER NO. 402:  Deloitte denies knowledge or information sufficient to form a belief

as to the allegations set forth in paragraph 402, except refers to the record of the referenced hearing

for its complete contents.

403.    *The Post and Courier* also cited to Santee Cooper's internal records, which showed that SCANA "wanted Bechtel to ax criticisms about the utilities' oversight" and "to remove any mention of the reactors being finished after 2020, the deadline needed to receive the federal tax credits." The article noted that, in the end, "**more than 30 pages that analyzed the project's construction schedule disappeared from the audit**," "include[ing] **Bechtel's estimated completion dates**." The article quoted Jeff Nelson, the Chief Counsel for the ORS, as stating: "There was information that was withheld from us and the Public Service Commission." Indeed,

the article noted that "[a]fter receiving Bechtel's findings in the fall of 2015, SCANA continued to assure the state's seven member utility commission that the reactors would be finished before December 2020. . . The Public Service Commission, in turn, increased SCANA's nuclear budget by more than $800 million and approved a fixed-price agreement." Representative Ott was further quoted: "**I think it's clear evidence that the executives of** SCANA knew beyond a shadow of the doubt that the project was in peril," and **"[e]verything they were working for and working toward had come off the tracks**."

ANSWER NO. 403:  Deloitte denies knowledge or information sufficient to form a belief

as to the allegations set forth in paragraph 403, except admits that the article was published, and

refers to the cited article for its complete contents.

404.    On December 20, 2017, after the close of trading, the PSC issued a press release announcing that it had denied SCANA's motion to dismiss the ORS request for immediate relief for ratepayers, and ordered that a hearing be set. The press release further provided that the PSC had ordered the ORS to "perform a thorough inspection and audit . . . to determine the reasonableness of SCE&G's retail electric rates." It also explained that the PSC had consolidated the ORS request with proceedings initiated by Friends of the Earth and the Sierra Club, which included requests for review of SCANA's previous prudency determinations. That same day, *The Post and Courier* reported on the PSC's decision, noting that, "[b]y combining that action with another proposal, the utility commission will also consider whether SCANA should refund customers for the roughly $1.8 billion it has collected to finance its share of the nuclear project since 2009." The article further explained that Commissioner Elam had "ordered the Office of Regulatory Staff — the state's utility watchdog agency — to determine whether SCANA's bankruptcy warnings were accurate or whether the utility could absorb the lost revenue."

ANSWER NO. 404:  Deloitte denies knowledge or information sufficient to form a belief

as to the allegations set forth in paragraph 404, except admits that the article and press release were

published, and refers to the cited materials for its complete contents.

405.    The following day, Morgan Stanley issued an analyst report discussing the PSC's ruling. Among other things, the report explained that the PSC had permitted the two regulatory dockets to move forward, characterizing the Friends of the Earth and Sierra Club's proceeding as seeking to "re-examine past prudency decisions to charge customers for nuclear construction financing costs (and possibly refund past collections)." Morgan Stanley further explained that the petitioner success in either or both dockets would dramatically reduce SCANA's value:

> By our estimates, if the company were to receive no nuclear cost recovery (in addition to a lower 8% ROE at the core utilities) the stock would be worth $30/share, and if SCG were to also refund all revenue collected thus far the stock would be worth $18/share.

ANSWER NO. 405:  Deloitte denies knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 405.

406.    On the news, SCANA's stock dropped precipitously on December 21, 2017, falling $3.93, or 9.51%, on extremely heavy trading volume, to close at $37.39.

ANSWER NO. 406:  Deloitte denies the allegations set forth in paragraph 406, except admits that SCANA's stock price closed at $37.39 per share on December 21, 2017.

### D.    SCANA RECORDS $2.5 BILLION IN IMPAIRMENT LOSSES, ADMITTING THAT ITS PAST FINANCIAL STATEMENTS WERE NOT IN ACCORDANCE WITH GAAP

407.    In connection with the abandoned Nuclear Project, SCANA recorded impairment and related project losses totaling approximately $2.5 billion between the third quarter ended December 31, 2017 through December 31, 2018. SCANA first recorded impairment losses of approximately $210 million in its Form 10-Q for the third quarter of 2017:

> Uncovered [sic] nuclear project costs represents expenditures by SCE&G that have been reclassified from construction work in process as a result of the decision to stop construction of the New Units and to pursue recovery of costs under the abandonment provisions of the BLRA or through a general rate case or other regulatory means, net of an estimated loss of $210 million. . . . **This amount includes $210 million recorded in the third quarter of 2017, which represented costs of approximately $1.2 billion that had been expended on the project, exclusive of transmission costs, but which had not yet been determined to be prudent by the SCPSC in connection with revised rates proceedings under the BLRA, offset by the amount of approximately $1 billion, which amount represents the recovery of the Toshiba Settlement** proceeds that are in excess of amounts from that settlement that the Company and Consolidated SCE&G estimated may be necessary to satisfy certain project liens.

ANSWER NO. 407:  Deloitte denies the allegations set forth in paragraph 407, except admits that SCANA filed a Form 10-Q for the third quarter of 2017, and refers to the Form 10-Q for its complete contents.

408.    In its Form 10-Q for the fourth quarter of 2017, SCANA recorded an additional impairment loss of $908 million:

[Of this impairment amount] $180 million . . . arises from . . . an agreement in the fourth quarter of 2017 to purchase in 2018 an existing 540-MW combines cycle gas generating station **along with SCE&G's commitment to regulators and the public that the recovery of the initial capital investment in the facility would not be sought from customers.** . . . **$280 million of this impairment was recorded after consideration of the regulatory and political developments described in Form 10-K**

\*\*\*

A pre-tax impairment loss was recorded in the aggregate amount of **$361 million to write off costs which had been previously deferred primarily as regulatory assets, in connection with the Nuclear Project**.

\*\*\*

[A]n **$87 million pre-tax impairment loss was recorded in order to reduce the estimated fair value of the carrying** value **of nuclear fuel acquired for use in Unit 2 and Unit 3**.

ANSWER NO. 408:  Deloitte denies the allegations set forth in paragraph 408.

409.    In its Form 10-Q for the first quarter of 2018, SCANA recorded additional impairment losses of $3.6 million in order to "**further reduce to estimated fair value the carrying value of nuclear fuel which had been acquired for use in Unit 2 and Unit 3.**"

ANSWER NO. 409:  Deloitte denies the allegations set forth in paragraph 409, except admits that SCANA filed a Form 10-Q for the first quarter of 2018, and refers to the Form 10-Q for its complete contents.

410.    Finally, in its Form 10-Q for the fourth quarter of 2018, SCANA recorded additional impairment losses of $1.372 billion, reaching a total of approximately $2.5 billion:

[T]he Company and Consolidated SCE&G concluded that **Nuclear Project capital costs exceeding the amount established in the Merger Approval Order were probable of loss, regardless of whether the SCANA Combination was completed and recorded an impairment charge of approximately $1.372 billion (approximately $870.1 million net of tax) in the fourth quarter of 2018**.

ANSWER NO. 410:  Deloitte denies the allegations set forth in paragraph 410.

411.    SCANA also announced its expectation that additional, related losses of approximately $1.3 billion would be incurred subsequent to 2018. This amount included a regulatory liability for over $1.0 billion in customer refunds and restitution associated with the above noted nine utility rate increases implemented between 2008 and 2016:

> A pre-tax impairment charge of approximately $105 million . . . related to certain assets that had been constructed in connection with the Nuclear Project that were not abandoned but were instead transferred to Unit 1.
>
> **A regulatory liability for refunds and restitution to electric customers of approximately $1.007 billion**.
>
> ***
>
> A regulatory liability for refunds to natural gas customers totaling $2.45 million.
>
> ***
>
> A liability related to charitable contributions in South Carolina of approximately $22 million. A write-off of excess deferred taxes of approximately $145 million related to the regulatory liability for the monetization of guaranty settlement.

ANSWER NO. 411:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 411.

## VI.    POST-CLASS PERIOD EVENTS

### A.    AFTER FACING STRONG OPPOSITION, SCANA MERGES WITH DOMINION

412.    On January 3, 2018, the morning of which SCANA's stock was trading at $48 per share, Dominion Energy, Inc. ("Dominion") announced that it would buy SCANA for $7.9 billion in a stock-for-stock deal (the "Merger"). Under the terms of the Merger, SCANA's investors would receive 0.669 shares of Dominion for each share of SCANA that they owned, valuing the stock at about $55.35 per share. Dominion promised $1,000 payments and 5% rate cuts to the "average residential electric customer," who had been overcharged by SCANA to fund the Nuclear Project. As part of the Merger, Dominion would also acquire $6.7 billion of SCANA's debt and write off more than $1.7 billion in capital and assets related to the Nuclear Project.

ANSWER NO. 412:  Deloitte denies the allegations set forth in paragraph 412, except admits that Dominion and SCANA issued a joint press release on January 3, 2018, and refers to the content of that press release and the accompanying exhibits for their complete contents.

413.    According to the January 4, 2018 press release filed by SCANA and Dominion announcing the Merger, the transaction required the approval of SCANA's shareholders, the U.S. Federal Trade Commission, the U.S. Department of Justice under the Hart-Scott-Rodino Act, the Nuclear Regulatory Commission, the Federal Energy Regulatory Commission, and the public service commissions of South Carolina, North Carolina, and Georgia. The CEO of Dominion, Thomas Farrell, stated on January 29, 2018, that he was "optimistic" that the Merger would obtain all necessary regulatory, legislative, and shareholder approvals in order to complete the transaction before the end of the year. Almost immediately, lawsuits arose attempting to block the Merger. On March 15, 2018, however, Dominion's Vice President of Corporate Communications, Chet Wade, stated, "We have been very clear, we said if someone else comes in and offers something better, [SCANA] should take it."

ANSWER NO. 413:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 413, except admits that SCANA and Dominion jointly filed a press release, and refers to the press release for its complete contents.

414.    The Merger was also threatened by proposed legislation that would block SCANA —and any company that acquired SCANA—from charging customers inflated electricity rates to pay for the abandoned Nuclear Project. On January 31, 2018, the South Carolina House voted by a margin of 119 to 1 to approve House Bill 4375, which would block SCANA from continuing to charge customers approximately $37 million per month—$27 per household—for the abandoned Nuclear Project. Bill 4375 would also empower the PSC to nullify several of the rate increases that SCANA obtained to help fund the Nuclear Project.

ANSWER NO. 414:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 414.

415.    Speaker of the South Carolina House Jay Lucas spoke about the bill during debate, stating that the purpose of Bill 4375 was to ensure that "**fraud, concealment, omission, misrepresentation, non-disclosure of a material fact by a utility should never be rewarded**."

ANSWER NO. 415:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 415.

416.    While the South Carolina Senate expressed enthusiasm for Bill 4375, upon the House's vote on the bill, Dominion issued a statement arguing that the bill would compromise the Merger. Dominion stated that the bill, if it passed, would "put a standalone SCE&G in a precarious

financial position." Dominion claimed that the law "could offer temporary relief for SCE&G customers, [it] . . . unfortunately could threaten the permanent solution offered by Dominion," and that the "significant financial consequences" of the bill "would not allow us to provide $12 billion of relief to SCE&G's customers."

ANSWER NO. 416:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 416.

417.    On February 1, 2018, the House bill was introduced in the Senate and referred to the Senate Committee on the Judiciary. After multiple rounds of amendments in both the Senate and the House, a joint Senate and House conference committee reached a deal and Bill 4375 was adopted by both the Senate and the House on June 27, 2018 and on June 28, 2018 the Senate ratified House Bill 4375, which temporarily cut SCE&G's rates by almost 15%. However, a spokesperson from the governor's office stated that the Governor Henry McMaster would "veto any legislation that reaches his desk [that] doesn't completely eliminate the nuclear surcharge [of 18%] . . . because no South Carolinian should be forced to pay another dime for nuclear reactors they will never get" and accordingly, on June 28, 2017 Governor Henry McMaster vetoed Bill 4375. This veto was quickly overturned by the legislature that same day. On July 2, 2018, SCE&G asked the District of South Carolina for an injunction preventing the PSC from implementing the rate cuts, but this motion was denied on August 6, 2018, and the rate cut went into effect on August 7, 2018. SCE&G's appeal of the denial of the injunction was denied by the Fourth Circuit on September 21, 2018.

ANSWER NO. 417:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 417.

418.    On February 14, 2018, as the South Carolina Senate was taking up House Bill 4375, the Senate introduced an amendment to a separate resolution—Senate Bill 954—to establish a deadline of December 21, 2018, and no earlier, for the PSC to issue its final order on SCANA's abandonment petition and to allow the merger of SCANA and Dominion to proceed. Because Dominion has threatened to abandon its acquisition of SCANA in light of House Bill 4375, and SCANA has warned that the bill would throw it into financial distress, the Senate stated that it needed additional time to consider the consequences of House Bill 4375 and the Merger. The amendment passed unanimously the following day, and the Senate sent the bill back to the House for re-reading; the House approved the bill and referred it to the House Judiciary Committee, which approved the bill, and sent it back to the House for another reading, which the House approved again. On February 20, 2018, SCANA and Dominion wrote jointly to the Honorable Jocelyn G. Boyd, the Chief Clerk/Administrator of the PSC, to express their support for the amendment. On March 7 and 8, 2018, the House voted again to approve the bill and return it to the Senate. On March 28, 2018, the Senate adopted the amendment.

ANSWER NO. 418:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 418.

419.    On July 31, 2018, one year after SCANA abandoned the Nuclear Project, its shareholders voted to merge the Company with Dominion Energy. On December 14, 2018, the PSC voted to allow Dominion to purchase SCE&G for $15 billion, and the merger was finalized on January 2, 2019.

ANSWER NO. 419:  Deloitte admits the allegations set forth in paragraph 419.

## B.    MOODY'S DOWNGRADES SCANA'S CREDIT RATINGS TO "SPECULATIVE 'JUNK' GRADE"

420.    On February 5, 2018, Moody's Investors Service ("Moody's") downgraded its ratings of SCANA and SCE&G and continued its review of a potential further downgrade that began on November 1, 2017. Moody's stated in its announcement of the downgrade, "The review was originally initiated as a result of escalating political and regulatory contentiousness following the organization's decision to cease construction of the V.C. Summer new nuclear units 2 and 3." Moody's downgrade followed upon the South Carolina House's passage of Bill 4375, described above, which would repeal the rates that SCE&G is collecting under the BLRA for the abandoned Nuclear Project and impose "experimental" rates in their place. Moody's stated that "[t]he proposed immediate reduction in revenue would have a materially negative impact on SCE&G and SCANA's cash flow credit metrics." Recognizing that Bill 4375 had not yet become South Carolina law, but noting that (as of February 5, 2018) it had the full support of Governor McMaster and at least some of the Senate, Moody's stated that the downgrade was driven by "a political and regulatory environment that has become exceedingly contentious and uncertain," and a understanding that the state legislature has reacted negatively to "recent credit neutral proposals by SCANA and by SCANA and Dominion Energy, Inc. in conjunction with their proposed merger, that would better balance the cost of nuclear abandonment." As such, Moody's stated, SCANA will likely be forced to "absorb a greater portion of these costs, which would likely materially weaken their financial position."

ANSWER NO. 420:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 420.

421.    On February 6, 2018, SCANA confirmed that, "[w]ith the downgrade by Moody's, all of SCANA's current credit ratings . . . are now below investment grade, which is commonly referred to as 'speculative "junk" grade.'"

ANSWER NO. 421:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 421.

## C.    A SENIOR SCANA EXECUTIVE'S WHISTLEBLOWER COMPLAINT BECOMES PUBLIC

422.    On March 29, 2018, *The Post and Courier* published an article titled "Top SCANA accountant accused executives of mismanaging S.C. nuclear plant to prop up earnings." The article revealed that SCANA's former Vice President of Finance for Nuclear Construction, Carlette

Walker, had left a voicemail with Santee Cooper's Marion Cherry, one of Santee Cooper's three on-site employees at the Nuclear Project, sometime between January and May 2016—just months after Bechtel provided its assessment and recommendations to the two companies—imploring him to get Santee Cooper to stop paying SCANA any more money for the Nuclear Project.[134] In particular, Walker told Cherry that SCANA management had "broken every friggin' law you can break" and "**[t]hey're doing it because they want to make money and they're propping up earnings to be able to make their bonuses.**"

ANSWER NO. 422:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 422, except admits that the article was published, and refers to the article for its complete contents.

423.    As a high-level SCANA executive, Walker regularly interacted with SCANA officers and was in a position to know about the Nuclear Project and the inner workings at SCANA. Walker joined SCE&G's internal audit department in 1983 and later worked as an assistant controller, for SCE&G's Electric Generation division and then for all of SCE&G. In 2002, Walker's responsibilities as Assistant Controller were increased to include all SCANA-regulated subsidiaries. In 2006, she was promoted to Corporate Compliance and Ethics and Audit Officer and in 2009, she was promoted to Vice President for Nuclear Finance Administration. At some point thereafter, Walker assumed the role of Vice President of Finance for Nuclear Construction. According to *The Post and Courier*, "[f]or years, Walker headed SCANA's project finance team, overseeing the multi-million dollar payments the company made to its contractors. She was in close contact with SCANA's top echelon, internal emails show." Walker confirmed the same in her later testimony to the PSC. Walker reported to Addison during the Class Period until she left the Company in 2016.

ANSWER NO. 423:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 423, except admits that the article was published, and refers to the article for its complete contents.

424.    In the voicemail to Santee Cooper, Walker referred to what SCANA's management was telling Santee Cooper as "bullshit." Walker continued, noting that SCANA was "continu[ing] to mismanage" the Nuclear Project and were lying to Santee Cooper for their own financial gain:

> I just wanted to let you know that I know the truth now. And I don't want you and Santee [Cooper] to get screwed anymore by the executives of SCE&G and SCANA. Kevin Marsh is not the guy that everybody thinks he is. He is a liar. And he is just like Steve [Byrne] and Jeff [Archie] and Jimmy [Addison] and Marty, so they're all of the

---

[134] *The Post and Courier* posted Walker's voicemail on its website, and it can be accessed at the following link: https://www.postandcourier.com/business/top-scana-accountant-accused-executives-of-mismanaging-s-c-nuclear/article_743584d4-3295-11e8-8465-47a2cc905671.html.

same cloth. They all think they're the smartest guys in the room. But **they're all on the friggin' take**. Nobody knows this but I went to a lawyer yesterday and **they have broken every friggin' law that you can break**.

***

Michael [Crosby] and Lonnie [Carter] and you [Marion Cherry] need to push back and **don't let them continue to mismanage that project.** Just don't let them. Don't sign anything. Refuse to pay. Don't pay SCANA. Push back and just say, "No, we're not going to do it." **Because they are mismanaging that project** and it's at y'all's expense. They're doing it because they want to make money and **they're propping up earnings** to be able to make their bonuses. And it's going to be at your expense. So if y'all haven't signed that agreement on the purchase price, call whoever you need to call and tell them, "Don't sign anything with that management team."

ANSWER NO. 424:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 424, except admits that footnote 134 contains a link to a purported voicemail from Walker.

425.    According to the article, Walker "voluntarily retired from SCANA after more than three decades with the company" in May 2016. She did so, even though she received pay raises each year, eventually earning more than $565,000 in 2015. Walker later testified that she was "victim of a conspiracy of five senior executives to run me out of the company because of their fear **that I was not going to support their decision to lie and deceive both the Public Service Commission and the investing community**."

ANSWER NO. 425:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 425, except admits that the article was published, and refers to the cited materials for their complete contents.

426.    As discussed above, Deloitte was responsible for considering fraud or potential fraud in the course of its audits. This should have included identification and inquiry of individuals within the Company about their views regarding fraud risks, including, in particular, whether they have knowledge of fraud, alleged fraud, or suspected fraud.[135]

---

[135] AS 2110.

ANSWER NO. 426:  Paragraph 426 contains conclusions of law to which no response is

required.  To the extent a response is required, Deloitte denies the allegations set forth in paragraph

426, and refers to the cited standards for their complete contents.

427.    Given Walker's senior management position as the VP of Finance for Nuclear
Construction, and her role in the Nuclear Project, Deloitte should have spoken to Walker in the
course of its audit. Indeed, as discussed above at Section IV.E.6, Bechtel interviewed Walker
during the course of its assessment of the Nuclear Project due to her key role. Had Deloitte done
so, it would have learned of Walker's significant concerns regarding SCANA management's
fraudulent activity regarding the Nuclear Project, as well as her whistleblower complaint.

ANSWER NO. 427:  Paragraph 427 contains conclusions of law to which no response is

required.  To the extent a response is required, Deloitte denies the allegations set forth in paragraph

427.

## D.    DELOITTE'S KNOWLEDGE OF THE BECHTEL REPORTS BECOMES PUBLIC

428.    One of the Bechtel Reports was publicly released on September 4, 2017. [136]
However, Deloitte's knowledge of the Bechtel Reports was not known to the public until over a
year after the Bechtel Reports themselves were released. Both SCANA and Deloitte employees
remained silent on whether Deloitte had reviewed either of the Bechtel Reports, or any of the
communications or supporting materials relating to the Bechtel Reports, until October 3, 2018,
when Jimmy Addison, CFO of SCANA, conclusively testified that Deloitte had in fact reviewed
the Bechtel Reports prior to issuing its clean audit report.[137]

ANSWER NO. 428:  Deloitte denies the allegations set forth in paragraph 428, except

admits that one of the Bechtel Reports was publicly released on September 4, 2017.

429.    Indeed, Addison's testimony confirmed internal SCANA communications where
SCANA's executives and internal accounting personnel discuss that Deloitte would ask about why
Bechtel's ongoing work was not being disclosed in the Company's SEC filings. For example, in a
September 21, 2015 email, James Swan IV, SCANA's Controller, states: "FYI – Deloitte will be
asking about whether (or why not) we mention the Bechtel consulting engagement [...] in the next
10-Q. If Santee ends up mentioning it, they may feel strongly that we should too."[138] He went on

---

[136] Audit highlighted problems with South Carolina nuclear project a year before cancellation, Post and Courier, Sept. 4, 2017.

[137] It appears that the transcript of this deposition became available publicly sometime in the month of October 2018. See October 29, 2018 Letter from James H. Lucas, Speaker of the House, re VC Summer Nuclear Dockets (referencing that the ORS has "recently pre-filed testimony in this matter.")

[138] Motion Exhibit A, Email from Alvis Bynum dated November 22, 2016, ORS_SCEG_01469466-9467.

to state that "[t]he initial thinking I believe is that we will not mention it [in the next 10-Q]. . . Stay tuned."[139]

ANSWER NO. 429:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 429, except admits that it sets forth partial

quotations from the September 21, 2015 email, and refers to the email for its complete contents.

430.    Mr. Swan further observed in the same email that Deloitte "may ask about whether we ought to say anything about the ORS' engagement of a CPA firm to consider the value/cost of the BLRA. I don't know what we would say about that, and I do not advocate talking about it. But it is public anyway, so if Deloitte presses and is willing to offer up some idea [sic] on language, I am open to it, I guess."[140]

ANSWER NO. 430:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 430, except admits that it sets forth partial

quotations from the September 21, 2015 email, and refers to the email for its complete contents.

### E.    SCANA SETTLES CLASS ACTION ALLEGATIONS

431.    On November 24, 2018, SCANA and SCE&G announced it had reached a settlement in a consumer class action lawsuit alleging misconduct and mismanagement by SCANA regarding the Nuclear Project (*Lightsey, et. al. v. South Carolina Electric & Gas Company, et. al.,* Case No. 2017-CP-25-0335). The settlement included a $2 billion Common Benefit Fund, including $115 million that would have been paid to outgoing SCANA and SCE&G executives as bonus pay, to be distributed to the class members. Final approval for the settlement was granted on June 11, 2019.

ANSWER NO. 431:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 431, except admits that there was a lawsuit

as described in these allegations and refers to the docket and its content.

432.    On January 7, 2020, SCANA and the Court-appointed Lead Plaintiff in a securities fraud class action against SCANA and certain of its officers requested that the District of South Carolina approve of a $192.5 million settlement the parties had reached to resolve class action claims the investors had brought alleging SCANA and its executives concealed from the public the construction delays and cost overruns within the Nuclear Project (*In re: SCANA Corp. Securities Litigatio*n, 3:17-cv-02616, D.S.C.) The $192.5 million settlement includes $160 million

---

[139] Motion Exhibit A, Email from Alvis Bynum dated November 22, 2016, ORS_SCEG_01469466-9467.
[140] Motion Exhibit A, Email from Alvis Bynum dated November 22, 2016, ORS_SCEG_01469466-9467.

in cash, and $32.5 million in freely tradable Dominion common stock or cash at the option of SCANA. The settlement was preliminarily approved on February 11, 2020.

ANSWER NO. 432:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 432, except admits that there was a lawsuit

as described in these allegations and refers to the docket and its content.

## F.    SEC FILES A COMPLAINT ALLEGING SECURITIES FRAUD AND CIVIL AND CRIMINAL INVESTIGATIONS CONTINUE

433.    On February 27, 2020, the Securities and Exchange Commission filed a complaint against SCANA, Marsh, Byrne, and Dominion Energy (which acquired SCANA in January 2019), alleging that SCANA's Class Period statements regarding the status and ultimate failure of the $9 billion Nuclear Project violated the securities laws. Specifically, the SEC complaint alleges that SCANA knowingly made false and misleading statements in its regulatory filings, earnings calls, and press releases, stating that the Nuclear Project was on track to qualify for $1.4 billion of federal tax credits, even though they knew it was significantly delayed and would not be completed on time by January 1, 2021. The SEC complaint also alleges that SCANA's false and misleading statements artificially inflated the Company's stock price and helped SCANA sell $1 billion of corporate debt at favorable rates and obtain approval from utility regulators to charge its customers higher rates.

ANSWER NO. 433:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 433, except admits that the SEC filed a

complaint on February 27, 2020, and refers to the complaint for its complete contents.

434.    According to Dominion's Form 10-Q for the first quarter of 2020 filed with the SEC on May 5, 2020 ("Dominion 1Q 2020 10-Q"), Dominion has "reached an agreement in principle" to settle the SEC's claims against SCANA, which would require SCANA to pay a civil monetary penalty totaling $25 million, and for SCANA and Dominion to pay disgorgement and prejudgment interest totaling $112.5 million, with the latter amount deemed satisfied by the settlement in the securities class action against SCANA. *See supra* ¶ 430. This proposed settlement is contingent on the review and approval by the SEC and this Court. The SEC's claims against Marsh and Byrne, according to a May 6, 2020 news report by *Reuters*, remain pending.

ANSWER NO. 434:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 434, except admits that Dominion filed a

Form 10-Q on the referenced date, and refers to that document for its complete content.

435.    Other civil and criminal investigations into the fraud at SCANA are still ongoing. For example, according to Dominion's 1Q 2020 10-Q, Dominion has entered into a cooperation

agreement with the U.S. Attorney's Office and the South Carolina Attorney General's Office, which would provide that upon full cooperation with their investigations.

ANSWER NO. 435: Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 435.

## VII.    SUMMARY OF SCIENTER ALLEGATIONS

436.    As set forth above, PCAOB auditing standards required Deloitte to obtain sufficient audit evidence that is persuasive and provides a reasonable basis for the high level of assurance that the financial statements and notes are materially correct. Deloitte was also required to exercise due professional care and skepticism throughout its audits of SCANA. To meet these professional standards and comply with GAAS, Deloitte either received or should have requested and reviewed dozens of internal documents and metrics that make clear that SCANA's financial statements were not in accordance with GAAP, and that the Nuclear Project would not be in service in time to obtain the critical Nuclear Tax Credits. Internal communications also make clear that at no point did SCANA try to hide any documents or information relevant to the Nuclear Project from Deloitte. To the contrary; internal communications demonstrate that SCANA anticipated certain inquiries from Deloitte and intended to comply.

ANSWER NO. 436: Paragraph 436 contains conclusions of law to which no response is

required. To the extent a response is required, Deloitte denies the allegations set forth in paragraph

436, and refers to the auditing standards for their complete contents.

437.    Internal documents and testimony make clear that Deloitte received the following information directly contrary to SCANA's financial statements:

- ***Bechtel Reports and Presentations***: In October 2015, Bechtel found that SCANA's forecasts and schedules for the Nuclear Project were "unrealistic," that there was insufficient and inadequate oversight over all aspects of the Nuclear Project, and that Unit 2 would not be complete until "18-26 months" after the current June 2019 date— or at earliest, December 2020—and that Unit 3 would not be complete until "24-32 months" after the current June 2020 date—or at earliest, June 2022. Bechtel's First Report, issued on November 9, 2015, definitively concluded that "the current schedule is at risk" because "installation rates, productivity, and staffing levels all point to project completion later than the current forecast." Bechtel further concluded that the current schedule would be delayed up to three years, with the second reactor likely not coming on-line until June 2023, and June 2022 at the earliest—long after the critical deadline for the federal tax credits. Bechtel also advised that the Nuclear Project's monthly construction progress rate—which was averaging only 0.5% at the time—had to increase dramatically, by 500%, to 3%. According to testimony by SCANA's former CFO and internal emails, Deloitte was well-aware of—and in fact, reviewed and analyzed— Bechtel's findings and Reports as they were made.

- ***Special Audits of Project Costs***: As a result of its "special audits" of the Nuclear Projects costs, Deloitte knew that the Nuclear Project costs were well in excess of budgets given the level of completion, and that the Nuclear Project was not progressing as budgeted—significant evidence that SCANA would not be able to complete the Nuclear Project by 2021 in order to receive the Nuclear Tax Credits.

ANSWER NO. 437:  Deloitte denies the allegations set forth in paragraph 437.

438.    In addition to the Bechtel Reports and the information it obtained in connection with its special audits, a deluge of internal documents and performance metrics available to Deloitte that it should have reviewed pursuant to its obligations under PCAOB Standards also consistently documented significant red flags with the Nuclear Project, including that it was hopelessly delayed, plagued by excessive costs, and could not be in service by 2021, the drop-dead date essential to receiving the Nuclear Tax Credits. These documents included the following:

- ***SCANA Board and SCANA-Santee Cooper Joint Board Minutes and Presentations***: Complying with PCAOB Standards required Deloitte to review SCANA's Board of Director and SCANA-Santee Cooper Joint Board of Directors meeting minutes, presentations and materials. According to these minutes, presentations and materials, Deloitte knew or should have known:

    o    By March 3, 2016, that "schedule adherence [was] unrealistic," [p]lans and schedules contained unreasonable assumptions," and the project management failures "do not support construction need dates."

    o    By March 21, 2016, that "schedule adherence [was] unrealistic" because the "[p]lans and schedules contain unreasonable assumptions and do not reflect actual project circumstances," that "project completion dates [were] artificially constrained," that "[c]ritical path material deliveries . . . do not support construction need dates," and that "[m]issed milestones push-out and are rarely recovered.

    o    By June 20, 2016, that both the Santee Cooper and SCANA Boards "expressed concern about the financial difficulties being faced by Toshiba Corporation and Westinghouse Electric Company and how those problems could possibly impact the timely and successful completion of the project."

    o    By June 20, 2016, that SCANA had failed to even convene a CORB, despite the necessity of one being raised several times by Santee Cooper at joint board meetings over a period of several months.

    o    By July 26, 2016, that the "project performance factor" was "consistently above the goal" and "trending in a negative

direction," "[t]he majority of project milestones [had] not met on their scheduled dates," and "[t]he percentage of schedule activities completed on time [was] well below the goal and does not allow for a reliable Integrated Project Schedule."

o    By February 13, 2017, that the work productivity factor remained at an abysmal 0.7% per month at the end of 2016, that only 30.9% of the project had been completed to date, and that between October 2015 and February 2017, just over 10% of the Nuclear Project was completed.

- **Risk Management Committee Meeting Minutes and Presentations**: Complying with PCAOB Standards required Deloitte to review SCANA's Risk Management Committee meeting minutes, presentations and materials. According to these minutes, presentations and materials, including from meetings held on January 25, March 28, and June 27, 2016, Deloitte knew or should have known SCANA had identified "schedule delays" and the receipt of "production tax credits" as "key risk[s]" facing the Company, and rated them "Red," indicating that there was significant risk that the Company would not qualify for the tax credits.

- **Regulatory Correspondence**: In or around June 30, 2016, the Executive Director of the ORS sent a letter to SCANA, stating that the ORS was in "a heightened state of concern" due to "cost overruns and schedule delays," that "the validity of the current schedule" was "highly suspect," and that "ORS has no confidence that Unit 3 can meet the current Federal Production Tax Credit Deadline of December 31, 2020."

- **The CORB Report and Presentations:** After significant delay, SCANA finally established a Construction Oversight Review Board ("CORB") in July 2016. Complying with PCAOB Standards required Deloitte to review any CORB minutes, presentations and reports. After the CORB conducted "initial site visits" in July and August 2016, and provided an "executive debrief" on August 16, 2016, in September 16, 2016, the CORB issued its First Report, finding that, among other things that: (1) "the Unit 2 & Unit 3 project schedules include significant risks to achieve substantial completion"; (2) the schedule being used by SCANA did not even include "all work to complete the project that should be in the schedule"; (3) the timeline for completion of the project was continuing to slip; (4) there was a "growing backlog of constructability issues that are not getting the attention needed to not impact constructability"; (5) SCANA's project oversight was "insufficient"; and (6) "[w]ithout improved metrics, it will be difficult to ensure the Project is and remains on track." In December 2016, CORB issued a second report and presentation, during which the CORB made clear that SCANA still did not have a realistic schedule to complete the Nuclear Project.

- **Historical Date-to-Date Performance Metrics**: To comply with PCAOB Standards, Deloitte should have been reviewing and testing on a regular basis the

Nuclear Project's historical date-to-date performance metrics as compared to budgeted and forecasted amounts. According to internal documents discussing the Nuclear Project's historical date-to-date performance metric, Deloitte knew or should have known by at least January 2015, that under the current rate of performance, the Nuclear Project would not be complete in time to receive the Nuclear Tax Credits.

- *Current Rate of Progress Metrics*: Pursuant to PCAOB Standards, Deloitte should have been reviewing and testing on a regular basis the Nuclear Project's rate of progress metrics. According to internal documents discussing the Nuclear Project's rate of progress, Deloitte knew or should have known by at least February 2015, that the Nuclear Project would not be in service in time to receive the Nuclear Tax Credits. Indeed, throughout the Class Period, monthly progress on the Nuclear Project was stagnant, averaging 0.7% and never exceeding 0.8%, far below the 3% rate identified by Bechtel as critical to completing the Nuclear Project on time:

| January 2016 | 0.3% |
| February 2016 | 0.5% |
| March 2016 | 0.6% |
| April 2016 | 0.6% |
| May 2016 | 0.7% |
| June 2016 | 0.8% |

Further, in January 2015, SCANA's own internal calculations showed that the Nuclear Project was only approximately 16% complete, and had progressed only 8% in the prior 2 years—a rate of 0.33% progress completed per month. At that rate of progress, only about 30% of the Nuclear Project would be completed by July 2019.

- *Overall Performance Factor Metrics*: To comply with PCAOB Standards, Deloitte should have been reviewing and testing on a regular basis the Nuclear Project's overall performance factor metrics. According to internal documents, the overall performance factor for the Nuclear Project for the last six months of 2014 was around 1.8. By February 2015, the performance factor had increased to 2.37—meaning that it was taking more than twice as many labor hours to complete a task than planned. In contrast, the deadlines for completion of the Nuclear Project assumed a performance factor of 1.15. Thus, Deloitte knew or should have known that based on these metrics, Nuclear Project would not be in service in time to receive the Nuclear Tax Credits.

- *Toshiba's Public Announcements Calling into Question the Viability of the Nuclear Project*: On December 26, 2016, Toshiba announced an estimated impairment of "several billion dollars" due to "cost overruns and missed deadlines" on projects including the Nuclear Project. On February 14, 2017, Toshiba announced the possibility that it would sell all or a part of its stake in Westinghouse and take a $6.3 billion write-down related to the Nuclear Project. These public

announcements—both of which came prior to Deloitte's clean audit report on SCANA's 2016 Form 10-K financial statements—significantly heighted the possibility that the Nuclear Project would not be in service at all and that, at a minimum, made clear that the Nuclear Project was highly unlikely to be in service by 2021 in order to obtain the Nuclear Tax Credits.

- **Santee Cooper's Serious Concerns:** Santee Cooper repeatedly raised issues regarding the construction schedule and the fact that the Nuclear Project would not be complete in time to obtain the Nuclear Tax credits with SCANA. Given Santee Cooper's role as a co-owner of the Nuclear Project, pursuant to PCAOB Standards, Deloitte was required to speak to Santee Cooper. Had it done so, it would have learned of Santee Cooper's serious concerns regarding the status and management of the Nuclear Project.

- **The Nuclear Project Whistleblower:** Sometime during the first half of 2016, Charlette Walker—Vice President of Finance for Nuclear Construction responsible for overseeing the multi-million dollar payments SCANA made to its contractors— blew the whistle on SCANA's fraud. Given Ms. Walker's role and responsibilities with regard to the Nuclear Project, pursuant to PCAOB Standards, Deloitte was required to speak with Ms. Walker in connection with its audits. Had it done so, it would have learned of her allegations of fraud.

ANSWER NO. 438:  Paragraph 438 contains conclusions of law to which no response is required.  To the extent a response is required, Deloitte denies the allegations set forth in paragraph 438, and refers to the auditing standards for their complete contents.

439.    At a result of the foregoing, Deloitte's clean audit reports did not fairly align with information both in its possession and required to be reviewed by it at the time it issued its clean audit reports, and it did not believe its representations in its clean audit reports that SCANA's financial statements were presented in conformity with GAAP or that SCANA's interim reports were accurate and free from material misstatements.

ANSWER NO. 439:  Deloitte denies the allegations set forth in paragraph 439.

440.    In addition to its actual knowledge and the substantial red flags Deloitte was required to review in connection with its audits, other information demonstrates Deloitte's scienter, including:

- **The Timing of SCANA's Announcement of the Full Abandonment of the Nuclear Project:** Deloitte issued an unqualified, clean audit report on SCANA's 2016 Form 10K financial statements on February 24, 2017. Just 5 months later, on July 31, 2017, SCANA announced that it was abandoning the Nuclear Project, that it could not place any of the Units into service until after January 1, 2021, and that the Nuclear Project was "prohibitively expensive." Construction on the Nuclear Project was only approximately 30% complete at the time.

- ***Ongoing Criminal and Civil Investigations***: The Nuclear Project fraud has resulted in numerous, ongoing investigations and litigation, including investigations by the Department of Justice, the South Carolina Attorney General, the Federal Bureau of Investigations and the Securities Exchange Commission. Numerous SCANA executives have pleaded the Fifth Amendment in civil litigation as a result of those ongoing investigations, including by individuals not yet publicly named in the SEC Complaint. Subpoenas issued in connection with those investigations seek documents pertaining to Deloitte's audits of SCANA's financial statements.

- ***The Breadth and Length of Deloitte's PCAOB Violations:*** Deloitte's PCAOB violations were longstanding and broad in scope. They included a failure to conduct even the most basic of audit functions, including a failure to: (1) gain a sufficient understanding of SCANA's business and the Nuclear Project; (2) properly plan its audits; (3) obtain persuasive and sufficient audit evidence necessary to provide a reasonable basis for the high level of assurance they provided users of the financial statements; (4) resolve inconsistencies in available evidence, including information in the management representation letters, as required by GAAS; (5) consider the work of engineering and construction management experts; and (6) comply with PCAOB standards that require an auditor to evaluate whether "the financial statements, including the related notes, are informative of matters that may affect their use, understanding, and interpretation..."

- ***The Simplicity of the GAAP Implicated***: The risks of material misstatements in SCANA's financial statements were straight-forward and identified by Deloitte in its audit reports of a similarly situated company, and the accounting principles at issue are not complicated and do not implicate complex issues of accounting judgment.

- ***Critical Nature of the Nuclear Project to SCANA***: The Nuclear Project's success was essential to SCANA's financial health, with management admitting that it was "betting the family farm" on its success. It was the largest capital project undertaken in SCANA's history. When initiated, the cost to construct the Nuclear Project was more than two times SCANA's market capitalization at the time. Without completion of the Nuclear Project in time to receive the Nuclear Tax Credits, SCANA was unlikely to be able to continue to operate.

<u>ANSWER NO. 440</u>:  Deloitte denies the allegations set forth in paragraph 440.

## VIII.    <u>DELOITTE'S FALSE AND MISLEADING STATEMENTS AND OMISSIONS</u>

### A.    <u>SCANA'S 2015 FORM 10-K AND DELOITTE'S UNQUALIFIED 2015 AUDIT REPORT</u>

441.    SCANA filed its annual report on Form 10-K for the year ended December 31, 2015 with the SEC on February 26, 2016 ("2015 Form 10-K").

<u>ANSWER NO. 441</u>:  Deloitte admits the allegations set forth in paragraph 441.

442.    Deloitte issued an unqualified audit report on SCANA's financial statements included in the 2015 Form 10-K. In it, Deloitte represented that: (1) it had performed its audit of SCANA's 2015 financial statements "in accordance with the standards of the Public Company Accounting Oversight Board"; (2) it had planned and performed its audit "to obtain reasonable assurance about whether the financial statements are free of material misstatement"; and (3) its audit provided a "reasonable basis" for its reports. Deloitte further stated that SCANA's and SCE&G's financial statements "present fairly, in all material respects, the financial position" of SCANA and SCE&G "in conformity with accounting principles generally accepted in the United States of America."

ANSWER NO. 442:  Deloitte denies the allegations set forth in paragraph 442, except admits that D&T issued an audit opinion in the 2015 Form 10-K, and refers to the audit opinion for its complete contents.

443.    Specifically, Deloitte stated the following:

We have audited the accompanying consolidated balance sheets of SCANA Corporation and subsidiaries (the "Company") as of December 31, 2015 and 2014, and the related consolidated statements of income, comprehensive income, cash flows, and changes in common equity for each of the three years in the period ended December 31, 2015. Our audits also included the financial statement schedule listed in Part IV at Item 15. . . .

**We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial** statements. **An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.**

**In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2015 and 2014, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2015, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial**

**statements taken as a whole, presents fairly, in all material respects, the information set forth therein**.

ANSWER NO. 443:  Deloitte admits that D&T issued an audit opinion in the 2015 Form 10-K, which is partially quoted in paragraph 443, and refers to the audit opinion for its complete contents.

444.    Deloitte also issued an unqualified report as to the Company's internal control over financial reporting, stating that:

> We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2015, based on the criteria established in *Internal Control-Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 26, 2016 expressed an unqualified opinion on the Company's internal control over financial reporting.
>
> ***
>
> [PCAOB standards] require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.
>
> A company's internal control over financial reporting is a process designed . . . to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of

management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

***

**In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2015,** based on the criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

ANSWER NO. 444:  Deloitte admits that D&T issued an audit opinion in the 2015 Form 10-K, which is partially quoted in paragraph 444, refers to the audit opinion for its complete contents, and denies any allegations inconsistent therewith.

445.    These statements were materially false and misleading when made because Deloitte did not conduct its audit in accordance with the standards of the PCAOB (Section IV.F., *supra*). Specifically, Deloitte failed to: (1) obtain persuasive and sufficient evidence to provide reasonable assurance that the Nuclear Project would be in service by 2021 and that SCANA would receive the Nuclear Project Tax Credits—to the contrary, Deloitte obtained significant, material evidence that the Nuclear Project would <u>not</u> be in service on time in order to obtain the Nuclear Tax Credits; (2) plan and perform required audit procedures in response to the risk of material misstatement relating to SCANA's capitalized construction work in progress, including amounts capitalized in connection with the Nuclear Project; and (3) plan and perform required audit procedures in response to the risk that SCANA's disclosed rate revisions, estimated project costs and related unit completion schedules were unsupported or otherwise materially misstated. These statements were also materially false and misleading when made because SCANA did not maintain effective internal control over financial reporting and Deloitte failed to properly assess the risk that a material weakness existed in SCANA's financial reporting as a result (*see* Section IV.F., *supra*). Specifically, Deloitte was required to understand, identify and test those internal controls at SCANA that were in place to prevent, detect and/or correct material misstatements and omissions in SCANA's financial statements, including its accounting for and disclosures pertaining to, the Nuclear Project. Deloitte knew or should have known that significant inconsistencies existed between SCANA's Nuclear Project financial statement disclosures and other critical information Deloitte obtained, including the Project Management and Risk Management reports, accumulation of costs, the budget to actual comparisons, and the progress metrics. These inconsistencies indicated that SCANA's related disclosure controls were not properly designed or operating effectively. Further, in violation of PCAOB AS 2201, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements*, Deloitte failed to appropriately respond to these inconsistencies.

ANSWER NO. 445:  Paragraph 445 contains conclusions of law to which no response is required.  To the extent a response is required, Deloitte denies the allegations set forth in paragraph 445, and refers to the auditing standards for their complete contents.

446.    Finally, as set forth below, these statements were materially false and misleading when made because Deloitte knew information and recklessly ignored numerous red flags demonstrating that SCANA's annual report and financial statements therein were materially misstated and omitted material information regarding the status of the Nuclear Project and, therefore, were not presented in conformity with GAAP.

ANSWER NO. 446:  Deloitte denies the allegations set forth in paragraph 446.

1.    **False and Misleading Statements and Omissions Regarding the Nuclear Project Completion Date and SCANA's Eligibility to Receive $1.4 Billion in Nuclear Tax Credits**

447.    With regard to when the Nuclear Project would be in service to qualify for $1.4 billion in Nuclear Tax Credits, SCANA 2015 financial statements misleadingly stated:

> **As of December 31, 2015, SCE&G's investment in the New Units, including related transmission, totaled $3.6 billion, for which** the **financing costs on $3.2 billion have been reflected in rates under the BLRA.** . . .

> The Revised, Fully-Integrated Construction Schedule indicated that the substantial completion of Unit 2 was expected to occur in mid-June 2019 and that the substantial completion of Unit 3 was expected to be approximately 12 months later. The Consortium continues to refine and update the Revised, Fully-Integrated Construction Schedule as designs are finalized, as construction progresses, and as additional information is received.

> **In September 2015, the SCPSC approved an updated BLRA milestone schedule based on revised substantial completion** dates **for Units 2 and 3 of June 2019 and June 2020**, respectively, each subject to an 18-month contingency period. In addition, the SCPSC approved certain updated owner's costs ($245 million) and other capital costs ($453 million), of which $539 million were associated with the schedule delays and other contested costs**. In this proceeding, SCE&G's total projected capital costs (in 2007 dollars) and gross construction cost estimates (including escalation and AFC) were estimated to be $5.2 billion and $6.8 billion, respectively.** . . .

On October 27, 2015, SCE&G, Santee Cooper and the Consortium reached a settlement regarding the above mentioned disputes, and the EPC Contract was amended. The October 2015 Amendment became effective in December 2015, upon the consummation of the acquisition by WEC of the stock of Stone & Webster from CB&I. Following that acquisition, Stone & Webster continues to be a member of the Consortium as a subsidiary of WEC rather than CB&I, and WEC has engaged Fluor Corporation as a subcontracted construction manager.

**Among other things, the October 2015 Amendment:** . . . **revised the guaranteed substantial completion dates of Units 2 and 3 to August 31, 2019 and 2020, respectively . . . Under the October 2015 Amendment, SCE&G's total estimated project costs increased by approximately $286 million over the $6.8 billion approved by the SCPSC in September 2015, bringing its total estimated gross** construction **cost of the project (including escalation and AFC) to approximately $7.1 billion.**

ANSWER NO. 447:  Deloitte denies the allegations set forth in paragraph 447, except

admits that it sets forth a partial quotation from SCANA's 2015 Form 10-K, and refers to the Form

10-K.

448.    The foregoing statements concerning the guaranteed substantial completion date of August 2019 for Unit 2 and August 2020 for Unit 3, as well as the costs of completing the Nuclear Project were materially false and misleading because they were directly contrary to numerous pieces of reliable evidence in the possession of, or that should have been reviewed by, Deloitte, including: (i) the Bechtel Report, which found that SCANA's schedule for completing the Nuclear Project was unrealistic and that the Nuclear Project would not be in service in time to receive the $1.4 billion in tax credits; (ii) its own Special Audits of the Nuclear Project costs which provided evidence that the Nuclear Project was subject to significant cost overruns and construction delays; (iii) SCANA Board of Director meeting minutes, SCANA/Santee Cooper Joint Board of Director meeting minutes, and SCANA Risk Management Committee meeting minutes, which made clear the completion dates and costs were unachievable; (iv) internal SCANA projections, including projected dates of completion and related costs, construction productivity rates, overall construction complete rates, monthly percent complete rates, and performance factors, which demonstrated that with the current rate of progress, the Nuclear Project would not be in service in time to qualify for the production tax credits; (v) internal SCANA projections which demonstrated that the Nuclear Project would not be completed within budget; (vi) communications between SCANA and its regulators, including the ORS, which indicated severe doubts regarding the validity of the Nuclear Project's construction schedule; (vii) key communications and management project reports, including EAC and capital expenditure summaries and project status reports provided to the Board of Directors, relating to Board of Director-related communications and managements' internal reporting processes, which showed clear awareness that the Nuclear Project was severely beset with continuing delays; (viii) representations made by SCANA management to

174

Deloitte that were inconsistent with SCANA's financial statements and internal documents; and (ix) the fact that Ms. Walker believed that SCANA was acutely mismanaging the Nuclear Project and engaging in fraud.

ANSWER NO. 448:  Deloitte denies the allegations set forth in paragraph 448.

449.    SCANA's 2015 financial statements also stated the following regarding SCANA's eligibility for $1.4 billion in Nuclear Tax Credits:

> *Nuclear Production Tax Credits*
>
> The IRS has notified SCE&G that, subject to a national megawatt capacity limitation, the electricity to be produced by each of the New Units (advanced nuclear units, as defined) would qualify for nuclear production tax credits under Section 45J of the Internal Revenue Code to the extent that such New Unit is operational before January 1, 2021 and other eligibility requirements are met. **These nuclear production tax credits (related to SCE&G's 55% share of both New Units) could total as much as approximately $1.4 billion.** Such credits would be earned over the first eight years of each New Unit's operations and would be realized by SCE&G over those years or during allowable carry-forward periods. **Based on the guaranteed substantial completion dates provided above** [August 2019 and 2020]**, both New Units are expected to be operational and to qualify for the nuclear production tax credits**; however, further delays in the schedule or changes in tax law could impact such conclusions. When and to the extent that production tax credits are realized, their benefits are expected to be provided directly to SCE&G's electric customers.

ANSWER NO. 449:  Deloitte denies the allegations set forth in paragraph 449, except admits that it sets forth partial quotations from SCANA's 2015 financial statements, and refers to the financial statements for its complete contents.

450.    The foregoing statements concerning the guaranteed substantial completion date of August 2019 for Unit 2 and August 2020 for Unit 3, as well as the costs of completing the Nuclear Project were materially false and misleading because they were directly contrary to numerous pieces of reliable evidence in the possession of, or that should have been reviewed by, Deloitte, including: (i) the Bechtel Report, which found that SCANA's schedule for completing the Nuclear Project was unrealistic and that the Nuclear Project would not be in service in time to receive the $1.4 billion in tax credits; (ii) its own Special Audits of the Nuclear Project costs which provided evidence that the Nuclear Project was subject to significant cost overruns and construction delays; (iii) SCANA Board of Director meeting minutes, SCANA/Santee Cooper Joint Board of Director meeting minutes, and SCANA Risk Management Committee meeting minutes, which made clear the completion dates and costs were unachievable; (iv) internal SCANA projections, including

projected dates of completion and related costs, construction productivity rates, overall construction complete rates, monthly percent complete rates, and performance factors, which demonstrated that with the current rate of progress, the Nuclear Project would not be in service in time to qualify for the production tax credits; (v) internal SCANA projections which demonstrated that the Nuclear Project would not be completed within budget; (vi) communications between SCANA and its regulators, including the ORS, which indicated severe doubts regarding the validity of the Nuclear Project's construction schedule; (vii) key communications and management project reports, including EAC and capital expenditure summaries and project status reports provided to the Board of Directors, relating to Board of Directors-related communications and managements' internal reporting processes, which showed clear awareness that the Nuclear Project was severely beset with continuing delays; (viii) representations made by SCANA management to Deloitte that were inconsistent with SCANA's financial statements and internal documents; and (ix) the fact that Ms. Walker believed that SCANA was acutely mismanaging the Nuclear Project and engaging in fraud.

ANSWER NO. 450:  Deloitte denies the allegations set forth in paragraph 450.

### 2.  False and Misleading Statements and Omissions Concerning SCANA's Oversight of the Nuclear Project

451.    SCANA's 2015 Form 10-K also misrepresented the Company's purportedly "prudent" (*i.e.*, not reckless) oversight of the Nuclear Project:

> Under the BLRA, the SCPSC has approved, among other things, a milestone schedule and a capital costs estimates schedule for the New Units**. This approval constitutes a final and binding determination that the New Units are used and useful for utility purposes, and that the capital costs associated with the New Units are prudent utility costs and expenses and are properly included in rates,** so long as the New Units are constructed or are being constructed **within the parameters of the approved milestone schedule, including specified contingencies, and the approved capital costs estimates schedule**.

ANSWER NO. 451:  Deloitte denies the allegations set forth in paragraph 451.

452.    The foregoing statements were false and misleading because they were directly contrary to numerous pieces of reliable evidence that were, or should have been, in Deloitte's possession demonstrating that the Nuclear Project was not being "constructed within the approved milestone schedule" and that, therefore, SCANA was not "prudently" overseeing the Nuclear Project, including: (i) the Bechtel Report, which found that SCANA's schedule for completing the Nuclear Project was unrealistic and that the Nuclear Project would not be in service in time to receive the $1.4 billion in tax credits; (ii) its own Special Audits of the Nuclear Project costs which provided evidence that the Nuclear Project was subject to significant cost overruns and construction delays; (iii) SCANA Board of Director meeting minutes, SCANA/Santee Cooper Joint Board of Director meeting minutes, and SCANA Risk Management Committee meeting minutes, which made clear the completion dates and costs were unachievable; (iv) internal SCANA projections, including projected dates of completion and related costs, construction

productivity rates, overall construction complete rates, monthly percent complete rates, and performance factors, which demonstrated that with the current rate of progress, the Nuclear Project would not be in service in time to qualify for the production tax credits; (v) internal SCANA projections which demonstrated that the Nuclear Project would not be completed within budget; (vi) communications between SCANA and its regulators, including the ORS, which indicated severe doubts regarding the validity of the Nuclear Project's construction schedule; (vii) key communications and management project reports, including EAC and capital expenditure summaries and project status reports provided to the Board of Directors, relating to Board of Director-related communications and managements' internal reporting processes, which showed clear awareness that the Nuclear Project was severely beset with continuing delays; (viii) representations made by SCANA management to Deloitte that were inconsistent with SCANA's financial statements and internal documents; and (ix) the fact that Ms. Walker believed that SCANA was acutely mismanaging the Nuclear Project and engaging in fraud.

ANSWER NO. 452:  Deloitte denies the allegations set forth in paragraph 452.

### 3.    False and Misleading Statements and Omissions Concerning the Bond Obtained from Westinghouse

453.    SCANA's 2015 Form 10-K also misrepresented the utility of the bond obtained by SCANA from Westinghouse:

> The payment obligations under the EPC Contract are joint and several obligations of WEC and Stone & Webster, and in connection with the October 2015 Amendment, Toshiba Corporation, WEC's parent company, reaffirmed its guaranty of WEC's payment obligations. **Based on Toshiba's current credit ratings and pursuant to the terms of the EPC Contract, SCE&G has exercised its rights to demand a payment and performance bond from WEC**.

ANSWER NO. 453:  Deloitte denies the allegations set forth in paragraph 453.

454.    This statement was materially false and misleading because it omitted to disclose the fact that the bond was too small to cover the Nuclear Project's costs, increasing the risk that the Nuclear Project would be in service on time to obtain the Nuclear Tax Credits. Numerous internal documents, including Deloitte's own audits of the Nuclear Project's costs, make clear that the Nuclear Project's costs were well in excess of the Nuclear Project's budget, and far surpassed the bond obtained by SCANA from Westinghouse.

ANSWER NO. 454:  Deloitte denies the allegations set forth in paragraph 454.

### B.    SCANA'S 2016 FORMS 10-Q

455.    SCANA filed its Forms 10-Q for the first quarter of 2016, second quarter of 2016 and third quarter of 2016 with the SEC on May 6, 2016, August 5, 2016, and November 4, 2016, respectively (the "2016 Forms 10-Q"). SCANA represented in each of the 2016 Forms 10-Q, that:

*Nuclear Production Tax Credits*

The IRS has notified SCE&G that, subject to a national megawatt capacity limitation, the electricity to be produced by each of the New Units (advanced nuclear units, as defined) would qualify for nuclear production tax credits under Section 45J of the Internal Revenue Code to the extent that such New Unit is operational before January 1, 2021 and other eligibility requirements are met. **These nuclear production tax credits (related to SCE&G's 55% share of both New Units) could total as much as approximately $1.4 billion.** Such credits would be earned over the first eight years of each New Unit's operations and would be realized by SCE&G over those years or during allowable carry-forward periods. **Based on the guaranteed substantial completion dates provided above** [August 2019 and 2020]**, both New Units are expected to be operational and to qualify for the nuclear production tax credits**; however, further delays in the schedule or changes in tax law could impact such conclusions. When and to the extent that production tax credits are realized, their benefits are expected to be provided directly to SCE&G's electric customers.

ANSWER NO. 455:  Deloitte denies the allegations set forth in paragraph 455, except admits that it sets forth partial quotations from SCANA's Form 10-Qs that were filed on May 6, 2016, August 5, 2016, and November 4, 2016, and refers to the Form 10-Qs for their complete contents.

456.    The foregoing statements concerning the guaranteed substantial completion date of June 2019 for Unit 2 and June 2020 for Unit 3 and the availability of the Nuclear Tax Credits were materially false and misleading because they were directly contrary to numerous pieces of reliable evidence in the possession of, or that should have been reviewed by, Deloitte, including: (i) the Bechtel Report, which found that SCANA's schedule for completing the Nuclear Project was unrealistic and that the Nuclear Project would not be in service in time to receive the $1.4 billion in tax credits; (ii) its own Special Audits of the Nuclear Project costs, which provided evidence that the Nuclear Project was subject to significant cost overruns and construction delays; (iii) SCANA Board of Director minutes, SCANA/Santee Cooper Joint Board of Director Minutes, and SCANA Risk Management Committee meeting minutes, which made clear the completion dates and costs were unachievable; (iv) internal SCANA projections, including projected dates of completion and related costs, construction productivity rates, overall construction complete rates, monthly percent complete rates, and performance factors, which demonstrated that with the current rate of progress, the Nuclear Project would not be in service in time to qualify for the production tax credits; (v) internal SCANA projections which demonstrated that the Nuclear Project would

not be completed within budget; (vi) communications between SCANA and its regulators, including the ORS, which indicated severe doubts regarding the validity of the Nuclear Project's construction schedule; (vii) key communications and management project reports, including EAC and capital expenditure summaries and project status reports provided to the Board of Directors, relating to Board of Director-related communications and managements' internal reporting processes, which showed clear awareness that the Nuclear Project was severely beset with continuing delays; (viii) representations made by SCANA management to Deloitte that were inconsistent with SCANA's financial statements and internal documents; and (ix) the fact that Ms. Walker believed that SCANA was acutely mismanaging the Nuclear Project and engaging in fraud.

ANSWER NO. 456:  Deloitte denies the allegations set forth in paragraph 456.

457.    Despite its knowledge of numerous pieces of reliable evidence directly contradicting the foregoing statements, Deloitte failed to either require SCANA management to correct these representations, or withdraw as SCANA's auditor, in violation of PCAOB standards. Deloitte's failure to do so are omissions of material fact.

ANSWER NO. 457:  Deloitte denies the allegations set forth in paragraph 457.

## C.    SCANA'S 2016 FORM 10-K AND DELOITTE'S UNQUALIFIED 2016 AUDIT REPORT

458.    SCANA filed its annual report on Form 10-K for the year ended December 31, 2016 with the SEC on February 24, 2017 ("2016 Form 10-K").

ANSWER NO. 458:  Deloitte admits the allegations set forth in paragraph 458.

459.    Deloitte issued an unqualified audit report on SCANA's financial statements included in the 2016 Form 10-K. In it, Deloitte represented that: (1) it had performed its audit of SCANA's 2016 financial statements "in accordance with the standards of the Public Company Accounting Oversight Board"; (2) it had planned and performed its audit "to obtain reasonable assurance about whether the financial statements are free of material misstatement"; and (3) its audits provided a "reasonable basis" for Deloitte's reports. Deloitte further stated that SCANA's and SCE&G's financial statements "present fairly, in all material respects, the financial position" of SCANA and SCE&G "in conformity with accounting principles generally accepted in the United States."

ANSWER NO. 459:  Deloitte admits that D&T issued an audit opinion that SCANA included in its 2016 Form 10-K, which is partially quoted in paragraph 459, refers to the audit opinion for its complete contents, and denies any allegations inconsistent therewith.

460.    Specifically, Deloitte stated the following:

> We have audited the accompanying consolidated balance sheets of SCANA Corporation and subsidiaries (the "Company") as of

December 31, 2016 and 2015, and the related consolidated statements of income, comprehensive income, cash flows, and changes in common equity for each of the three years in the period ended December 31, 2016. Our audits also included the financial statement schedule listed in Part IV at Item 15 . . .

**We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.**

**In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2016 and 2015, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2016, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein**.

ANSWER NO. 460:  Deloitte admits that D&T issued an audit opinion in the 2016 Form 10-K, which is partially quoted in paragraph 460, refers to the audit opinion for its complete contents, and denies any allegations inconsistent therewith.

461.   Deloitte also issued an unqualified report as to the Company's internal control over financial reporting, stating that:

We have audited the internal control over financial reporting of SCANA Corporation and subsidiaries (the "Company") as of December 31, 2016, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

***

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed . . . to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

***

**In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2016**, based on the criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

ANSWER NO. 461: Deloitte admits that D&T issued an audit opinion in the 2016 Form 10-K, which is partially quoted in paragraph 461, refers to the audit opinion for its complete contents, and denies any allegations inconsistent therewith.

462.    These statements were materially false and misleading when made because Deloitte did not conduct its audit in accordance with the standards of the PCAOB (Section IV.F., *supra*).

Specifically, Deloitte failed to: (1) obtain persuasive and sufficient evidence to provide reasonable assurance that the Nuclear Project would be in service by 2021 and that SCANA would receive the Nuclear Project Tax Credits—to the contrary; Deloitte obtained significant, material evidence that the Nuclear Project would <u>not</u> be in service on time in order to obtain the Nuclear Tax Credits; (2) plan and perform required audit procedures in response to the risk of material misstatement relating to SCANA's capitalized construction work in progress, including amounts capitalized in connection with the Nuclear Project; and (3) plan and perform required audit procedures in response to the risk that SCANA's disclosed rate revisions, estimated project costs and related unit completion schedules were unsupported or otherwise materially misstated.

ANSWER NO 462:  Deloitte denies the allegations set forth in paragraph 462.

463.    These statements were also materially false and misleading when made because SCANA did not maintain effective internal control over financial reporting and Deloitte failed to properly assess the risk that a material weakness existed in SCANA's financial reporting as a result (Section IV.F., *supra*). Specifically, Deloitte was required to understand, identify and test those internal controls at SCANA that were in place to prevent, detect and/or correct material misstatements and omissions in SCANA's financial statements, including its accounting for and disclosures pertaining to, the Nuclear Project. Deloitte knew or should have known that significant inconsistencies existed between SCANA's Nuclear Project financial statement disclosures and other critical information Deloitte obtained, including the Project Management and Risk Management reports, accumulation of costs, the budget to actual comparisons, and the progress metrics. These inconsistencies indicated that SCANA's related disclosure controls were not properly designed or operating effectively. Further, in violation of PCAOB AS 2201, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements*, Deloitte failed to appropriately respond to these inconsistencies.

ANSWER NO. 463:  Paragraph 463 contains conclusions of law to which no response is

required.  To the extent a response is required, Deloitte denies the allegations set forth in paragraph

463.

464.    Finally, as set forth below, these statements were materially false and misleading when made because Deloitte knew information and recklessly ignored numerous red flags demonstrating that SCANA's annual report and financial statements therein were materially misstated and omitted material information regarding the status of the Nuclear Project and, therefore, were not presented in conformity with GAAP.

ANSWER NO. 464:  Deloitte denies the allegations set forth in paragraph 464.

1.    **False and Misleading Statements and Omissions Regarding the Nuclear Project Completion Date and SCANA's Eligibility to Receive $1.4 Billion in Nuclear Tax Credits**

465.    With regard to when the Nuclear Project would be in service and SCANA's eligibility to receive the $1.4 billion in Nuclear Tax Credits, SCANA's 2016 financial statements misleadingly stated:

> **The approved construction schedule designates contractual guaranteed substantial completion dates of August 31, 2019 and August 31, 2020 for Units 2 and 3, respectively, although recent communications from WEC indicate substantial completion dates of April 2020 and December 2020 for Units 2 and 3, respectively.**

ANSWER NO. 465:  Deloitte denies the allegations set forth in paragraph 465, except admits that it contains a partial quotation from SCANA's 2016 Form 10-K, and refers to the Form 10-K.

466.    The foregoing statements concerning the guaranteed substantial completion date of April 2020 for Unit 2 and December 2020 for Unit 3 were materially false and misleading because they were directly contrary to numerous pieces of reliable evidence in the possession of, or that should have been reviewed by, Deloitte, including: (i) the Bechtel Report, which found that SCANA's schedule for completing the Nuclear Project was unrealistic and that the Nuclear Project would not be in service in time to receive the $1.4 billion in tax credits; (ii) its own Special Audits of the Nuclear Project costs, which provided evidence that the Nuclear Project was subject to significant cost overruns and construction delays; (iii) SCANA Board of Director minutes, SCANA/Santee Cooper Joint Board of Director Minutes, and SCANA Risk Management Committee meeting minutes, which made clear the completion dates and costs were unachievable; (iv) internal SCANA projections, including projected dates of completion and related costs, construction productivity rates, overall construction complete rates, monthly percent complete rates, and performance factors, which demonstrated that with the current rate of progress, the Nuclear Project would not be in service in time to qualify for the production tax credits; (v) internal SCANA projections which demonstrated that the Nuclear Project would not be completed within budget; (vi) communications between SCANA and its regulators, including the ORS, which indicated severe doubts regarding the validity of the Nuclear Project's construction schedule; (vii) key communications and management project reports, including EAC and capital expenditure summaries and project status reports provided to the Board of Directors, relating to Board of Director-related communications and managements' internal reporting processes, which showed clear awareness that the Nuclear Project was severely beset with continuing delays; (viii) representations made by SCANA management to Deloitte that were inconsistent with SCANA's financial statements and internal documents; and (ix) the fact that Ms. Walker believed that SCANA was acutely mismanaging the Nuclear Project and engaging in fraud.

ANSWER NO. 466:  Deloitte denies the allegations set forth in paragraph 466.

467.    SCANA's 2016 financial statements also stated the following regarding SCANA's eligibility for $1.4 billion in Nuclear Tax Credits:

*Nuclear Production Tax Credits*

The IRS has notified SCE&G that, subject to a national megawatt capacity limitation, the electricity to be produced by each of the New Units (advanced nuclear units, as defined) would qualify for nuclear production tax credits under Section 45J of the IRC to the extent that such New Unit is operational before January 1, 2021 and other eligibility requirements are met. **These nuclear production tax credits (related to SCE&G's 55% share of both New Units) could total as much as approximately $1.4 billion.** Such credits would be earned over the first eight years of each New Unit's operations and would be realized by SCE&G over those years or during allowable carry-forward periods. **Based on current tax law and the contractual guaranteed substantial completion dates (and the recently revised forecasted dates of completion) provided above, both New Units would be operational and would qualify for the nuclear production tax credits**; however, any further delays in the schedule or changes in tax law could adversely impact these conclusions. . . . When and to the extent that production tax credits are realized, their benefits are expected to be provided directly to SCE&G's electric customers.

ANSWER NO. 467:  Deloitte denies the allegations set forth in paragraph 467, except admits that it sets forth partial quotations from SCANA's Form 10-K for 2016, and refers to the Form 10-K for its complete contents.

468.    The foregoing statements concerning the availability of the Nuclear Tax Credits for completion by the end of 2020 were materially false and misleading because they were directly contrary to numerous pieces of reliable evidence in the possession of, or that should have been reviewed by, Deloitte, including:

ANSWER NO 468:  Deloitte denies the allegations set forth in paragraph 468.

469.    The foregoing statements were false and misleading because they was directly contrary to numerous pieces of reliable evidence that was, or should have been, in Deloitte's possession demonstrating that the Nuclear Project was not being "constructed within the approved milestone schedule" and that, therefore, SCANA was not "prudently" overseeing the Nuclear Project, including: (i) the Bechtel Report, which found that SCANA's schedule for completing the Nuclear Project was unrealistic and that the Nuclear Project would not be in service in time to receive the $1.4 billion in tax credits; (ii) its own Special Audits of the Nuclear Project costs which provided evidence that the Nuclear Project was subject to significant cost overruns and construction delays; (iii) SCANA Board of Director minutes, SCANA/Santee Cooper Joint Board

of Director Minutes, and SCANA Risk Management Committee meeting minutes, which made clear the completion dates and costs were unachievable; (iv) internal SCANA projections, including projected dates of completion and related costs, construction productivity rates, overall construction complete rates, monthly percent complete rates, and performance factors, which demonstrated that with the current rate of progress, the Nuclear Project would not be in service in time to qualify for the production tax credits; (v) internal SCANA projections which demonstrated that the Nuclear Project would not be completed within budget; (vi) communications between SCANA and its regulators, including the ORS, which indicated severe doubts regarding the validity of the Nuclear Project's construction schedule; (vii) key communications and management project reports, including EAC and capital expenditure summaries and project status reports provided to the Board of Directors, relating to Board of Director-related communications and managements' internal reporting processes, which showed clear awareness that the Nuclear Project was severely beset with continuing delays; (viii) representations made by SCANA management to Deloitte that were inconsistent with SCANA's financial statements and internal documents; and (ix) the fact that Ms. Walker believed that SCANA was acutely mismanaging the Nuclear Project and engaging in fraud.

ANSWER NO. 469:  Deloitte denies the allegations set forth in paragraph 469.

### 2.    False and Misleading Statements and Omissions Concerning SCANA's Oversight of the Nuclear Project

470.    SCANA's 2016 Form 10-K also misrepresented the Company's purportedly "prudent" (*i.e.*, not reckless) oversight of the Nuclear Project:

> Under the BLRA, the SCPSC has approved, among other things, a milestone schedule and a capital costs estimates schedule for the New Units. **This approval constitutes a final and binding determination that the New Units are used and useful for utility purposes, and that the capital costs associated with the New Units are prudent utility costs and expenses and are properly included in rates,** so long as the New Units are constructed or are being constructed **within the parameters of the approved milestone schedule, including specified contingencies, and the approved capital costs estimates schedule**.

ANSWER NO. 470:  Deloitte denies the allegations set forth in paragraph 470, except admits that it sets forth partial quotations from SCANA's Form 10-K for 2016, and refers to the Form 10-K for its complete contents.

471.    The foregoing statements were false and misleading because they were directly contrary to numerous pieces of reliable evidence that was, or should have been, in Deloitte's possession demonstrating that the Nuclear Project was not being "constructed within the approved milestone schedule" and that, therefore, SCANA was not "prudently" overseeing the Nuclear Project, including:

ANSWER NO. 471: Deloitte denies the allegations set forth in paragraph 471.

472.     The foregoing statements were false and misleading because they was directly contrary to numerous pieces of reliable evidence that was, or should have been, in Deloitte's possession demonstrating that the Nuclear Project was not being "constructed within the approved milestone schedule" and that, therefore, SCANA was not "prudently" overseeing the Nuclear Project, including: (i) the Bechtel Report, which found that SCANA's schedule for completing the Nuclear Project was unrealistic and that the Nuclear Project would not be in service in time to receive the $1.4 billion in tax credits; (ii) its own Special Audits of the Nuclear Project costs which provided evidence that the Nuclear Project was subject to significant cost overruns and construction delays; (iii) SCANA Board of Director minutes, SCANA/Santee Cooper Joint Board of Director Minutes, and SCANA Risk Management Committee meeting minutes, which made clear the completion dates and costs were unachievable; (iv) internal SCANA projections, including projected dates of completion and related costs, construction productivity rates, overall construction complete rates, monthly percent complete rates, and performance factors, which demonstrated that with the current rate of progress, the Nuclear Project would not be in service in time to qualify for the production tax credits; (v) internal SCANA projections which demonstrated that the Nuclear Project would not be completed within budget; (vi) communications between SCANA and its regulators, including the ORS, which indicated severe doubts regarding the validity of the Nuclear Project's construction schedule; (vii) key communications and management project reports, including EAC and capital expenditure summaries and project status reports provided to the Board of Directors, relating to Board of Director-related communications and managements' internal reporting processes, which showed clear awareness that the Nuclear Project was severely beset with continuing delays; (viii) representations made by SCANA management to Deloitte that were inconsistent with SCANA's financial statements and internal documents; and (ix) the fact that Ms. Walker believed that SCANA was acutely mismanaging the Nuclear Project and engaging in fraud.

ANSWER NO. 472: Deloitte denies the allegations set forth in paragraph 472.

## IX.     LOSS CAUSATION

473.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused Lead Plaintiff and the Class to suffer substantial losses. During the Class Period, Plaintiff and the Class purchased SCANA securities at artificially inflated prices and were damaged thereby when the price of SCANA securities declined when the truth was revealed. The price of SCANA securities significantly declined (causing investors to suffer losses) when the Defendants' misrepresentations, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or when the risks and truths concealed by Deloitte's fraud materialized.

ANSWER NO. 473: Deloitte denies the allegations set forth in paragraph 473.

474.     Specifically, Defendants' misconduct concealed that, among other things, (i) the Nuclear Project would not be in service by 2021, and that the "guaranteed" substantial completion dates were highly unlikely based on historical performance; (ii) due to construction delays, it was clear that SCANA would not meet the 2020 deadline and, thus, would not receive tax credits of up

to $1.4 billion pursuant to the Nuclear Tax Production Credits; and (iii) SCANA's representations to the PSC in support of its BLRA submissions, including the BLRA rate revisions, estimated project costs, and related unit completion schedules, were inaccurate.

ANSWER NO. 474:  Deloitte denies the allegations set forth in paragraph 474.

475.    When those statements were corrected and the risks concealed by them materialized, investors suffered losses as the price of SCANA securities declined. Because of the disclosure of the truth of the Defendants' fraud, SCANA's common stock price declined over **50%**, from a high closing price of 76.12 per share on July 6, 2016, to a closing price of $37.39 per share on December 21, 2017.

ANSWER NO. 475:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 475.

476.    The disclosures that corrected the market prices of SCANA securities and/or revealed a previously concealed, materialized risk to reduce the artificial inflation caused by the Defendants' materially false and misleading statements and omissions are detailed below and summarized in the following chart. *See also* Section V., *supra* (discussing each alleged corrective disclosure and/or materialization of the risk event in greater depth). Specifically, the chart identifies each corrective disclosure and/or materialization of the risk event and the price declines in SCANA common stock resulting from the event:

| DATE (DATE OF STOCK PRICE DROP) | CLOSING STOCK PRICE | COMMON STOCK PRICE CHANGE | CORRECTIVE EVENT |
|---|---|---|---|
| 12/27/16 (12/28/16) | $72.92 | -2.03% | Toshiba announced estimated impairment of billions of dollars connected to Nuclear Project. |
| 2/14/17 | $66.86 | -4.53% | Toshiba announced $6.3 billion writedown related to nuclear program and that it may have to sell its stake in Westinghouse. |
| 2/16/17 (2/17/17) | $67.32 | -0.22% | SCANA holds conference call and discusses Toshiba announcement and possible impact on SCANA and Nuclear Project." Wells Fargo issued a report on February 16, 2017, stating that "we think the current valuation arguably overstates the risk, particularly considering the protections afforded SCG under the Baseload Review Act." |
| 3/22/17 | $67.74 | -0.78% | Morgan Stanley issues report predicting "further cost overruns and delays" at the Nuclear Project, and estimating that total costs would be 108% above the original cost estimate, and $5.2 billion greater than the most recent cost estimate. |
| 3/22/17 (3/23/17) | $66.71 | -1.52% | News coverage of Morgan Stanley report and publication of *Reuters* article reporting that Westinghouse had secured bankruptcy counsel and indicating that bankruptcy announcement was imminent. |

| DATE (DATE OF STOCK PRICE DROP) | CLOSING STOCK PRICE | COMMON STOCK PRICE CHANGE | CORRECTIVE EVENT |
|---|---|---|---|
| 7/27/17 (7/28/17) | $61.29 | -6.63% | SCANA and Santee Cooper announce that (i) Toshiba's agreement to honor its $2.168 billion parental guarantee will not be sufficient, as the costs of the two Units will "materially exceed" prior estimates, and (ii) the Nuclear Project will not be completed by 2021, "the current deadline for SCE&G to gain production tax credits for completing the reactors." |
| 8/2/17 (8/3/17) | $65.34 | -2.70% | Following news covering testimony by Marsh, Byrne and Addison before the PSC, which stated that it was "a grim day" and that the "Commission was blindsided," SC lawmakers form South Carolina Energy Caucus in response to SCANA's decision to abandon the Nuclear Project, with a goal to force "the shareholders of SCANA Corp. to eat any remaining costs tied to the high-profile cancellation of two multi-billion nuclear reactors." |
| 8/4/17 | $63.79 | -2.37% | SC Attorney General announces initiation of investigation into SCANA "to ensure that all laws were complied with and all applicable procedures were followed," and news that legislators were planning on closely investigating SCANA's abandonment petition. |
| 8/9/17 (8/10/17) | $62.01 | -1.10% | Reports that the ORS moved to dismiss SCANA's abandonment petition, and the Speaker of SC's House of Representatives intervened to join that motion. |
| 8/10/17 (8/11/17) | $60.69 | -2.13% | *Post and Courier* article reports that Marsh told lawmakers that he would not want to take on the Nuclear Project now "after it fell years behind schedule" and soared "billions of dollars over budget." Article also reported lawmaker statements that unless SCANA pulled its request to charge ratepayers for the failed project, "you may force the General Assembly to be more rash than we would otherwise want to be." |
| 9/7/17 | $59.58 | -0.75% | Reports on the fallout from the release of the Final Bechtel Report and internal documents and communications that reveal new information about SCANA executives' knowledge of the significant risks facing the Nuclear Project at least by February 2016, as well as knowledge of a significant risk of bankruptcy facing Toshiba and Westinghouse and the adverse impact on the viability of the Nuclear Project from early in 2016. |
| 9/21/17 (9/22/17) | $55.22 | -3.43% | SCANA announces that it had been served with a subpoena from the US Attorney; followed by news of a federal grand jury being convened to look into SCANA's role in the failed Nuclear Project. Lawmakers make public comments that the US Attorney could uncover securities fraud violations. On September 22, 2017, an article is published detailing the insider trading of certain SCANA executives. |
| 9/26/17 (9/27/17) | $51.22 | -7.83% | SC AG issues opinion that BLRA was "constitutionally suspect," calling into question its enforceability. ORS then files a request with the PSC to block SCANA from charging ratepayers going forward, and force SCANA to refund ratepayers for prior charges. On September 27, 2017, *The State* |

| DATE (DATE OF STOCK PRICE DROP) | CLOSING STOCK PRICE | COMMON STOCK PRICE CHANGE | CORRECTIVE EVENT |
|---|---|---|---|
| | | | reports on the existence of an earlier Bechtel Report, suggesting that the initial report was "originally much worse." |
| 9/29/17 | $48.49 | -4.90% | Credit rating agencies Fitch and Standard & Poor's both downgrade SCANA's credit ratings and place SCANA on negative "watch" lists, indicating that further downgrades might be in store. |
| 10/19/17 | $48.65 | -0.98% | Gov. McMaster asks SCANA to stop charging customers for Nuclear Project, and to use the $2 billion from Toshiba to repay those customers rather than fund the Nuclear Project. |
| 10/26/2017-10/27/2017 | $46.50 | -2.78% | Earnings decline to $34 million, driven in large part by a $210 million impairment taken on grounds that "the public, political and regulatory response to the abandonment decision has been extremely contentious." |
| | | | During a conference call held later in the afternoon on October 26, 2017, Marsh explains that the Company was pursuing settlement with the regulators, but that "[t]his is a very different situation, given the attention that's been given to it." |
| | | | On October 27, 2017, analysts from Morgan Stanley lower its price target on the grounds that analysts were "growing increasingly concerned" about negative scenarios playing out for the Company. |
| 10/31/17 | $43.14 | -6.03% | Marsh and Byrne resign, after news of their ouster. |
| 12/21/17 | $37.39 | -9.51% | The PSC denies request to dismiss rate relief suit; Morgan Stanley report on December 21 states that petitioner success in any of the pending cases before PSC would dramatically reduce SCANA value. |

ANSWER NO. 476:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 476.

477.    The timing and magnitude of the price declines in SCANA's common stock negate any inference that the losses suffered by Lead Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors or Company- specific facts unrelated to Defendants' fraudulent conduct. Indeed, analyst commentary after each corrective disclosure and/or materialization of the risk event attributed the large negative reaction in the stock specifically to the alleged disclosures. *See* Section V, *supra*.

ANSWER NO. 477:  Deloitte denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 477.

478.    Accordingly, as a result of their purchases of SCANA's publicly traded SCANA securities, during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss and damages.

ANSWER NO. 478:  Deloitte denies knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in paragraph 478.

## X.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

479.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. For example, many of the statements relate to the current or historical status of the Nuclear Project, including that the project is progressing well or that prior challenges have been resolved. To the extent that any of these statements might be construed to touch on future intent, they are mixed statements of present facts and future intent and are not entitled to safe harbor protection with respect to the part of the statement that refers to the present. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

ANSWER NO. 479:  Paragraph 479 sets forth conclusions of law to which no response is

required.  To the extent a response is required, Deloitte denies the allegations set forth in

paragraph 479.

480.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading.

ANSWER NO. 480:  Paragraph 480 sets forth conclusions of law to which no response is

required.  To the extent a response is required, Deloitte denies the allegations set forth in

paragraph 480.

## XI.    THE PRESUMPTION OF RELIANCE

481.    Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omission of material fact that there was a duty to disclose.

ANSWER NO. 481:  Paragraph 481 sets forth conclusions of law to which no response is

required.  To the extent a response is required, Deloitte denies the allegations in paragraph 481.

482. Lead Plaintiff and the Class are also entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period:

(a) SCANA's common stock was actively traded in an efficient market on the New York Stock Exchange, a highly efficient and liquid market;

(b) SCANA's common stock traded at high weekly volumes;

(c) As a regulated issuer, SCANA filed periodic public reports with the SEC;

(d) SCANA was eligible to file registration statements with the SEC on Form S-3;

(e) SCANA regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(f) The market reacted promptly to public information disseminated by SCANA;

(g) SCANA securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace;

(h) The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of SCANA securities; and

(i) Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased or acquired SCANA securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

ANSWER NO. 482: Paragraph 482 sets forth conclusions of law to which no response is required. To the extent a response is required, Deloitte denies the allegations set forth in paragraph 482.

483. Accordingly, Lead Plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for SCANA's securities, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

ANSWER NO. 483:  Paragraph 483 sets forth conclusions of law to which no response is required.  To the extent a response is required, Deloitte denies the allegations set forth in paragraph 483.

## XII.    CLASS ACTION ALLEGATIONS

484.    Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired SCANA publicly traded securities from February 26, 2016 through December 20, 2017, inclusive, and who were damaged thereby. Excluded from the Class are Defendants and their families, the officers and directors and affiliates of SCANA and Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, any entity in which Defendants or SCANA officers or directors have or had a controlling interest, SCANA's employee retirement and benefit plan(s), and the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity.

ANSWER NO. 484:  Paragraph 484 sets forth conclusions of law to which no response is required.  To the extent a response is required, Deloitte admits that Lead Plaintiff purports to bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class of persons who the paragraph defines, but Deloitte denies that certification of that class is appropriate.

485.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SCANA common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by SCANA or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

ANSWER NO. 485:  Paragraph 485 sets forth conclusions of law to which no response is required.  To the extent a response is required, Deloitte denies the allegations set forth in paragraph 485.

486.    The disposition of the claims in a class action will provide substantial benefits to the parties and the Court. As of October 31, 2017, SCANA had 142,616,254 shares of stock outstanding, which were owned publicly by at least hundreds of persons and entities.

ANSWER NO. 486: Deloitte denies the allegations set forth in paragraph 486, except denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the final sentence of paragraph 486.

487.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- Whether the federal securities laws were violated by Defendants' acts as alleged herein;

- Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about Deloitte's audits of SCANA and the business, operations, and management of SCANA;

- Whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- Whether the prices of SCANA securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

ANSWER NO. 487: Paragraph 487 sets forth conclusions of law to which no response is required.   To the extent a response is required, Deloitte denies the allegations set forth in paragraph 487.

488.    Lead Plaintiff's claims are typical of the claims of the other members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal law that is complained of herein.

ANSWER NO. 488: Paragraph 488 sets forth conclusions of law to which no response is required.   To the extent a response is required, Deloitte denies the allegations set forth in paragraph 488.

489.    Lead Plaintiff will adequately protect the interests of the Class and has retained competent counsel experienced in class action securities litigation. Lead Plaintiff has no interests which conflict with those of the Class.

ANSWER NO. 489:  Paragraph 489 sets forth conclusions of law to which no response is required.   To the extent a response is required, Deloitte denies the allegations set forth in paragraph 489.

490.    A class action is superior to other available method for the fair and efficient adjudication of this controversy.

ANSWER NO. 490:  Paragraph 490 sets forth conclusions of law to which no response is required.   To the extent a response is required, Deloitte denies the allegations set forth in paragraph 490.

**CAUSES OF ACTION**
**COUNT ONE:**
**For Violation of Section 10(b)**
**of the Exchange Act And Rule 10b-5**

491.    Lead Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

ANSWER NO. 491:  Deloitte incorporates by reference all preceding answers as though fully set forth herein.

492.    During the Class Period, Defendants disseminated or approved the false statements set forth above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

ANSWER NO. 492:  Deloitte denies the allegations set forth in paragraph 492.

493.    Defendants violated 10(b) of the Exchange Act and Rule 10b-5 in that they

(i)      Employed devices, schemes, and artifices to defraud;
(ii)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
(iii)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of SCANA securities during the class period.

ANSWER NO. 493:  Deloitte denies the allegations set forth in paragraph 493.

494.    By virtue of their positions, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

ANSWER NO. 494:  Deloitte denies the allegations set forth in paragraph 494.

495.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As SCANA's outside independent auditor throughout the Class Period, Defendants had knowledge of the details of SCANA's internal affairs. Deloitte knew, or was reckless in not knowing, that SCANA's reported annual financial results for the fiscal years ended December 31, 2015 and December 31, 2016, which were disseminated to the investing public, were not presented in accordance with GAAP; and that the audits they conducted were not performed in accordance with PCAOB Standards and, therefore, each of Deloitte's unqualified audit reports during the Class Period were materially false and misleading. As described above, Deloitte failed to perform audits and reviews in accordance with accepted auditing principles and procedures.

ANSWER NO. 495:  Deloitte denies the allegations set forth in paragraph 495.

496.    All quarterly and annual filings by SCANA with the SEC (on which the public relies) during the Class Period contained material misstatements and omissions. Deloitte, SCANA's outside independent auditor throughout the Class Period, failed to detect these discrepancies and irregularities, or to take reasonable actions to correct them. Had Deloitte not violated PCAOB Standards, it would have detected the fraudulent valuations and material misstatements in SCANA's financial statements during the Class Period.

ANSWER NO. 496:  Deloitte denies the allegations set forth in paragraph 496.

497.    As a result of Deloitte's clean reports of SCANA's misstated financial reports and Deloitte's own false and misleading statements and omissions in its unqualified audit reports, the market price of SCANA's securities were artificially-inflated throughout the Class Period.

ANSWER NO. 497:  Deloitte denies the allegations set forth in paragraph 497.

498.    Lead Plaintiff and the other members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for SCANA securities. Lead Plaintiff and the other members of the Class would not have purchased SCANA securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

ANSWER NO. 498:  Deloitte denies the allegations set forth in paragraph 498.

499.    By virtue of the foregoing, Deloitte violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

ANSWER NO. 499:  Deloitte denies the allegations set forth in paragraph 499.

500.    For the reasons set forth herein, Deloitte is liable in whole or in part for the damages suffered by Lead Plaintiff and to Section 10(b) Class members.

ANSWER NO. 500:  Deloitte denies the allegations set forth in paragraph 500.

## XIII.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.    Declaring that this action is a proper class action and certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and D. Awarding such other and further relief as the Court may deem just and proper.

ANSWER:  Deloitte denies that Plaintiffs are entitled to relief against them.  Deloitte requests that the Court dismiss all claims asserted against Deloitte with prejudice and that the Court award reasonable costs and expenses incurred in this action, including counsel fees and expert fees, and such other relief as the Court deems just and proper.

## XIV.    JURY TRIAL DEMAND

Lead Plaintiff hereby demands a trial by jury.

ANSWER:  Deloitte reserves its right to move to strike Lead Plaintiff's demand for a jury trial.

## DELOITTE'S AFFIRMATIVE DEFENSES

### First Affirmative Defense

Plaintiffs lack standing to raise the claims asserted in the Complaint.

### Second Affirmative Defense

Plaintiffs fail to state a claim upon which relief may be granted.

### Third Affirmative Defense

The Complaint fails to plead fraud with particularity.

### Fourth Affirmative Defense

The claims asserted in the Complaint are barred because Deloitte did not have the level of scienter required to impose liability for the conduct alleged in the Complaint.

### Fifth Affirmative Defense

The alleged misrepresentations or omissions by Deloitte were based on good faith, with the absence of fraudulent intent, and in reasonable reliance upon information provided by others upon whom Deloitte was entitled to rely.

### Sixth Affirmative Defense

Deloitte's conduct was not outside the accepted standards of practice for auditors. Deloitte complied with all applicable professional standards.

### Seventh Affirmative Defense

The claims are time-barred, in whole or in part, by the statute of limitations in 28 U.S.C. § 1658(b).

### Eighth Affirmative Defense

The alleged misstatements constitute inactionable statements of opinion. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015).

### Ninth Affirmative Defense

The claims asserted in the Complaint are barred, in whole or in part, by the bespeaks caution doctrine.

### Tenth Affirmative Defense

The claims asserted in the Complaint are barred, in whole or in part, by the safe harbor provisions for forward-looking statements in the Private Securities Litigation Reform Act of 1995 (15 U.S.C. §§ 77z-2, 78u-5).

### Eleventh Affirmative Defense

The claims asserted in the Complaint are barred, in whole or in part, for lack of causation and reliance. Specifically, Plaintiffs have sustained no legally cognizable damage by virtue of any alleged misrepresentations or omissions made by Deloitte because such alleged misrepresentations and omissions did not cause the drop in the price or value of the securities at issue in this case, and did not cause any alleged inflation of the price or value of the securities at issue in this case.

### Twelfth Affirmative Defense

Deloitte cannot be held liable for any alleged misstatements, omissions, actions, conduct or knowledge of any individual or entity other than Deloitte.

### Thirteenth Affirmative Defense

To the extent the Complaint purports to allege the fraud on the market doctrine, that doctrine is inapplicable including because the market for SCANA securities was not an efficient market.

### Fourteenth Affirmative Defense

Plaintiffs' claims are barred by the "truth on the market" corollary to the "fraud on the market" theory of reliance because the information allegedly misrepresented or omitted was known to the market, already in the public domain and/or reasonably available to shareholders.

### Fifteenth Affirmative Defense

Plaintiffs' action is not properly maintained as a class action because the requirements under federal law for class certification are not met.

### Sixteenth Affirmative Defense

Deloitte was the victim of fraud, deceit, misrepresentation, concealment, negligence and/or breach of contract practiced upon it by others, in that information was not provided to Deloitte, was misrepresented to Deloitte, and/or was concealed from Deloitte while Deloitte was rendering professional services, and any recovery against Deloitte shall be barred or diminished as a result.

### Seventeenth Affirmative Defense

Plaintiffs' damages, if any, were caused solely by the conduct of others and are not the result of any conduct of Deloitte.

### Eighteenth Affirmative Defense

Plaintiffs' damages, if any, were not proximately caused by any conduct of Deloitte, but were the result of superseding or intervening conduct for which Deloitte cannot be held liable.

### Nineteenth Affirmative Defense

Any damages must be reduced, diminished, and/or eliminated in proportion to the wrongful conduct of persons and/or entities other than Deloitte, such that any verdict or judgment against Deloitte does not exceed Deloitte's proportionate fault, if any.

### Twentieth Affirmative Defense

Any recovery is barred in whole or in part by any and all applicable offsets to any losses Plaintiffs may have suffered, including, without limitation, any settlement amounts that Plaintiffs receive from any other parties and any other recoveries obtained by Plaintiffs mitigating their alleged damages.

### Twenty-First Affirmative Defense

Deloitte is not jointly and severally liable for Plaintiffs' alleged damages because Deloitte did not knowingly commit a violation of the securities laws.

### Twenty-Second Affirmative Defense

Plaintiffs have failed to mitigate their alleged damages.

### Twenty-Third Affirmative Defense

Plaintiffs' claims are barred in whole or in part by the equitable doctrine of laches.

### Twenty-Fourth Affirmative Defense

Plaintiffs' claims were released pursuant to the settlement of the action captioned *In re SCANA Corporation Securities Litigation*, Civil Action No. 3:17-CV-2616-MBS (D.S.C.).

Respectfully submitted,

 s/ Christopher A. Ogiba
Christopher A. Ogiba, Fed. ID No. 9042
Lesley A. Firestone, Fed. ID No. 11719
Clinton T. Magill, Fed. ID No. 12459
Moore & Van Allen, PLLC
78 Wentworth Street

Charleston, South Carolina 29401
Telephone: 843-579-7066
Facsimile: 843-579-8749
Email: chrisogiba@mvalaw.com
   lesleyfirestone@mvalaw.com
   clintonmagill@mvalaw.com

Mark A. Nebrig
John A. Fagg, Jr.
Nader Raja
Kristen Kenley
Moore & Van Allen, PLLC
100 North Tryon Street
Suite 4700
Charlotte, North Carolina 28202-4003
Telephone: 704-331-3602
Facsimile: 704-339-5974
E-mails: marknebrig@mvalaw.com
   johnfagg@mvalaw.com
   naderraja@mvalaw.com
   kristenkenley@mvalaw.com

Scott A. Edelman
Jed M. Schwartz
Andrew B. Lichtenberg
Milbank LLP
55 Hudson Yards
New York, New York 10001-2163
Telephone: 212-530-5000
Facsimile: 212-530-5219
Email: sedelman@milbank.com
   jschwartz@milbank.com
   alichtenberg@milbank.com

*Attorneys for Defendants*
*Deloitte & Touche LLP and Deloitte LLP*

Charleston, South Carolina
December 22, 2020