## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS LOCAL 98
PENSION FUND on behalf of itself and all
others similarly situated,

        Plaintiffs,

vs.

DELOITTE & TOUCHE LLP;
DELOITTE LLP,

        Defendants.

Case No. 3:19-cv-3304

**DEFENDANTS' RESPONSE TO LEAD PLAINTIFF'S MOTION FOR PROTECTIVE
ORDER REGARDING TOPICS 30-34 OF DEFENDANTS' RULE 30(B)(6) DEPOSITION
NOTICE AND MOTION TO QUASH THE SUBPOENAS OF
BRIAN BURROWS AND TODD NEILSON**

Defendants Deloitte & Touche LLP and Deloitte LLP ("<u>Defendants</u>"), by and through their undersigned counsel, submit this Response to Lead Plaintiff International Brotherhood of Electrical Workers Local 98 Pension Fund's ("<u>Lead Plaintiff</u>" or the "<u>Fund</u>") Motion for Protective Order Regarding Topics 30-34 of Defendants' Rule 30(b)(6) Deposition Notice and to Quash the Subpoenas of Brian Burrows and Todd Neilson (the "<u>Motion</u>").

## <u>INTRODUCTION</u>

The Fund's Motion seeks to foreclose highly relevant and reasonably tailored class discovery because it touches on issues that the Fund finds uncomfortable and wishes would simply go away. As the Court will recall, the Fund failed to disclose at the time of its initial appointment that its President and chosen representative, Mr. Brian Burrows—who is also the President of the International Brotherhood of Electrical Workers Local 98 union (the "<u>Union</u>")—was named in a 116-count indictment by the U.S. Attorney's Office for the Eastern District of Pennsylvania, alleging conspiracy, fraud, embezzlement, and a litany of other financial and related crimes. (*See United States v. Dougherty et al.*, No. 2:19-cr-64 (E.D.P.A. Jan. 29, 2019) ("<u>Criminal Action</u>"), ECF No. 1 ("<u>Indictment</u>").) This issue was brought to light through the efforts of a rival plaintiff, Mr. Samuel Floyd, who also disclosed that the Fund was placed on "Endangered Status" for the year beginning January 1, 2020, because the Fund had a funded percentage of less than 80%. It has now become clear that the Fund and its counsel also failed to disclose to the Court that the U.S. Department of Labor ("<u>DOL</u>") had filed a complaint against the Union, alleging that the Union's leadership—which overlaps in significant measure with the leadership of the Fund itself— intimidated and retaliated against Union members and pressured several members from seeking office and challenging incumbent Union leadership. (*See Scalia v. Local 98, Int'l Bhd. of Elec. Workers*, No. 2:21-cv-96 (Jan. 8, 2021) ("<u>Labor Action</u>"), ECF No. 1 (the "<u>Labor Complaint</u>").)

The issues raised by Mr. Floyd's counsel triggered a months-long dispute between Mr. Floyd and the Fund and their respective counsel concerning whether the Fund could still serve as Lead Plaintiff and whether its counsel could still serve as Lead Counsel. Following a hearing on June 10, 2021, and a subsequent agreement between the competing plaintiffs' counsel, which included the removal of Mr. Burrows as the Fund's representative, the Court ordered on July 14, 2021 that, for the time being, pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the Fund could remain Lead Plaintiff in the case and that its counsel could remain Lead Counsel.

The Fund's Motion now urges the Court, at the class certification stage, that the very issues that nearly dislodged it altogether from its stewardship of the case, along with certain other troubling issues related to the Fund and its management that are now known to Defendants, are somehow "not relevant" and that discovery into those issues by Defendants is somehow "disproportionate" to the needs of the case. The Fund is wrong. Its efforts to evade Defendants' inquiries on these highly relevant topics have less to do with the permissible scope of class discovery under the Federal Rules of Civil Procedure and more to do with avoiding scrutiny and burying uncomfortable facts. Unfortunately for the Fund, class discovery is *precisely* the moment at which Defendants are afforded the opportunity to explore the adequacy of Lead Plaintiff as a proposed representative of the putative class. If Lead Plaintiff wishes to try to persuade the Court that the 116-count criminal Indictment and the significant DOL issues that belatedly came to light in this case should not impugn class certification, its argument should be made on the class certification motion itself. It is improper, to say the least, for Lead Plaintiff to try to foreclose

mere *discovery* on those topics, seeing as they clearly bear on the Fund's adequacy as a class representative.

There appear to be several areas that merit serious inquiry here.  Among other facts not previously disclosed and which the Fund conveniently declares "not relevant" are the following:

- *Mr. Neilson, the new representative of the Fund in this case, also serves, Defendants understand, as Treasurer of the Union*.  Lead Plaintiff has insisted multiple times that the Fund and the Union are separate entities but, in point of fact, several Union leaders, including both Mr. Neilson and Mr. Burrows, are also leaders of the Fund.  And as the Court knows, several Union leaders are the subject of the 116-count Indictment which alleges myriad serious financial improprieties.  There is simply no basis for precluding Defendants from exploring Mr. Neilson's nexus to those alleged crimes, if any, especially seeing as he seeks to make decisions on behalf of the Fund as a fiduciary for the putative class;

- *Despite sworn assurances filed with the Court to the effect that Mr. Burrows would be recused from all decision-making in the case, Mr. Neilson still reports directly to Mr. Burrows* at the Union, since Mr. Neilson serves as Union Treasurer and Mr. Burrows serves as Union President.  Especially in light of prior events in this case, Defendants are entitled to explore the continuing relationship between Mr. Neilson and Mr. Burrows;

- *For over six years, and during Mr. Neilson's tenure as Union Treasurer, Mr. Burrows allegedly conspired with others to embezzle and steal hundreds of thousands of dollars from the Union and a related fund for his and others' personal benefit*.  Additionally, among many other charges, Mr. Burrows (who continues to hold a leadership position at the Fund) is charged with falsifying financial records required to be kept by the Union and filing false federal income tax returns.  Since Mr. Burrows was in charge of this action on behalf of the Fund for over sixteen months and submitted multiple sworn statements in this action during that period, Defendants are entitled to explore his personal knowledge pertaining to key filings made under his supervision and to test the credibility of the individual who made those sworn statements on behalf of Lead Plaintiff;

- *The Union is also the subject of claims brought by the DOL related to inappropriate intimidation and retaliation by Union leadership—leadership that includes both Mr. Burrows and Mr. Neilson—against Union members*.  There is no reason Defendants should be precluded from exploring the impact of those allegations on Mr. Neilson's and the Fund's ability to serve as a representative of the putative class; and

- *The Fund had been placed on "Endangered Status" for a majority of the past thirteen years because for those years the Fund had a funded percentage of less*

*than 80%*.  Defendants are entitled to explore whether the Fund's recurring financial shortfalls result from embezzlement or financial misconduct like that alleged with respect to the Union.

Suffice it to say that a lead plaintiff's efforts to foreclose discovery into serious issues of this kind would be troubling in any case; they are especially troubling here given the Fund's previous failure to bring any of this information to the attention of the Court.  This is especially so after the Court's very clear admonishment that such information should have been affirmatively disclosed.  Indeed, it is hard to escape the conclusion that the Fund's Motion is simply another attempt to divert attention from these serious questions and keep this highly relevant information from being considered in connection with its class certification motion.  The Fund's efforts notwithstanding, Defendants are entitled to explore these issues in connection with the Fund's class certification motion and, specifically, in connection with the question of the Fund's adequacy to serve as a class representative.  The Fund's Motion to preclude discovery into these relevant issues should be denied in its entirety.

## STATEMENT OF FACTS

On November 22, 2019, Plaintiff Samuel Floyd commenced this action (*see* ECF No. 1), and consistent with the procedure prescribed by the PSLRA, on January 24, 2020, the Fund moved to be appointed as Lead Plaintiff, arguing that it was presumptively best suited to act as a fiduciary in prosecuting this case.  (*See* ECF No. 22.)  That motion was supported by the certification of Brian Burrows, who stated under oath that, as "President" of the Fund, he was "authorized to make legal decisions on behalf of" the Fund in this action.  (ECF No. 22-44 ¶ 1.)  On February 18, 2020, pursuant to Section 21D(a)(3)(B) of the Exchange Act, as amended by the PSLRA, the Court issued an order appointing the Fund as Lead Plaintiff.  (ECF No. 37.)  On March 19, 2020, Mr. Burrows submitted an updated PSLRA certification supporting the Fund's Consolidated Complaint.  (*See* ECF No. 44-1.)

On April 30, 2021, the Fund moved to certify this action as a class action. (ECF Nos. 71-72.) In doing so, the Fund correctly recognized that it would need to establish that the Fund was an adequate class representative. (*See* ECF No. 72 at 18-19 (Federal Rule of Civil Procedure "23(a)(4) requires that the class representative will fairly and adequately represent the Class.").) Thus, there is no dispute that the Fund's adequacy is a relevant issue in connection with its pending motion for class certification.

Separately, on April 27, 2021, counsel for the original plaintiff, Mr. Floyd, sent a letter to the Court, bringing to the Court's and Defendants' attention that Mr. Burrows had been indicted, and the nature of the charges in the Indictment. (*See* Exhibit A.) For example, the Indictment charges, among multiple other crimes, that Mr. Burrows, the person who signed the Fund's PSLRA certifications and serves as the President of the Fund and the Union, and Mr. John Dougherty, the business manager of the Union since approximately 1993, conspired to embezzle and steal hundreds of thousands of dollars from the Union and a related fund for their personal benefit from approximately April 2010 through August 2016. (*See* Indictment ¶¶ 6, 42.) Mr. Burrows was also charged with hiring other defendants to perform construction work and other services at his personal property, including his home and a pub he owns with other defendants, knowing that the work was not related to any business purpose of the Union or the related fund, yet nevertheless charging the Union and related fund hundreds of thousands of dollars for those costs. (*See id.* ¶ 45; *see also id.* at 94 ¶¶ 2, 97 (charging Mr. Burrows with falsifying financial records required to be kept by the Union and filing false federal income tax returns).)

Notably, the misconduct alleged is not limited to the individuals charged in the Indictment. Rather, the Indictment also describes illegal acts committed by numerous other unnamed employees and so-called consultants of the Union. (*Id.* ¶¶ 26-40.) For example, the Indictment

describes "Individual No. 4" as a long-time employee of the Union and member of its executive committee. (*Id.* ¶ 35.) It goes on to allege that this individual bought dinner for himself/herself and others "at Local 98's expense . . . while they were on a gambling trip to Atlantic City, New Jersey," and then later "falsely reported" to the Union that the expense for this meal was a "Political Strategy Dinner Meeting." (*Id.* at 45.) In other words, individuals beyond those actually indicted may also have been involved in misconduct.

And as if its failure to disclose the Indictment were not significant enough, it is now clear that the Fund and its counsel also failed to disclose to the Court that the DOL filed a complaint against the Union, alleging the Union's leadership—leadership that includes both Mr. Burrows and Mr. Neilson—intimidated and retaliated against Union members and pressured several members from seeking office and challenging incumbent Union leadership. (*See* Labor Complaint.) Nor did the Fund disclose that it had been placed on "Endangered Status" for the year beginning January 1, 2020—which is common for the Fund—because the Fund had a funded percentage of less than 80%. (*See* Exhibits B – K (since 2008 the Fund has been on "Endangered Status" most years).)

Defendants have rightfully pursued discovery of these issues. The day after Mr. Floyd's counsel sent the letter to the Court exposing the alleged acts of malfeasance and other issues related to the Fund and the Union, on April 28, 2021, Defendants served the Fund with requests for production related to this newly learned information. (*See* Exhibit L, the "Requests for Production"). Defendants thereafter served their notices of deposition of Mr. Burrows and the Fund on May 20, 2021. (ECF No. 94-1.) The "Topics," which substantially overlap with the Requests for Production, are as follows:

- Topic 30:  "The claims asserted and allegations in the Indictment."
- Topic 31:  "Your knowledge of the Criminal Action."

- **Topic 32**:  "The claims asserted and allegations in the Labor Complaint."

- **Topic 33**:  "Your knowledge of the Labor Action."

- **Topic 34**:  "Your knowledge of any other action, proceeding, litigation, investigation, or inquiry in which any director, officer, manager, business manager, or person holding similar managerial positions with [Lead] Plaintiff who was a defendant, target, person of interest, or respondent, or charged with or accused of any crime, illegal conduct, or unlawful conduct."[1]

(ECF No. 94-1 at 5.)

On June 10, 2021, the Court held a hearing to address the issues raised by Mr. Floyd's counsel.  Following that hearing, after negotiation between counsel for Mr. Floyd and the Fund, the Fund proposed to remove Mr. Burrows from his role overseeing this matter and substitute in Mr. Neilson.  (ECF No. 86 at 2.)  On July 14, 2021, the Court confirmed that the Fund would remain in its position as Lead Plaintiff (*see* ECF No. 88), and the parties negotiated a revised scheduling order (*see* ECF No. 92).  Appropriately, nothing in the Court's July 14, 2021 order addressed Defendants' ability to explore the significance of these issues in connection with the Fund's class certification motion.  Indeed, in opposing the efforts of Mr. Floyd and arguing that it was inappropriate for Mr. Floyd to challenge the Fund in the manner that he selected, Lead Plaintiff expressly acknowledged that Defendants could raise these issues in connection with the Fund's class certification motion.  (*See* ECF No. 76-1 at 7 (the Fund stating that "the Floyd Opposition purports to challenge the appointment of Lead Plaintiff as Class Representative and its counsel as Class Counsel, and thus overlaps with ***issues that may be raised in Defendants' opposition to Lead Plaintiff's Motion for Class Certification***.") (emphasis added); *id.* at 9 ("Responding to the Floyd Opposition will require arguments from Lead Plaintiff and Defendants about ***Lead***

---

[1] During the meet-and-confer process, Defendants agreed to narrow Topic 34 to focus on any director, officer, manager, business manager, or person holding similar managerial positions with the Fund or the Union who was named as a defendant or received a subpoena related to alleged illegal conduct.  (*See* Mot. at 13; ECF No. 94-4 ¶ 6.)

*Plaintiff's typicality and adequacy – even though the deadlines will be weeks before their class certification discovery is complete* and before the Court-ordered schedule for class certification opposition and reply briefing. The Court will thus end up with two tracks of *briefing on fundamentally the same issues*.") (emphasis added).) The Fund has done an about-face, urging now that discovery into the issues identified by Defendants is "not relevant" and "disproportionate" to the needs of the case.

The Fund's position is as remarkable as it is indefensible. The Fund concedes, as it must, that discovery into its ability to adequately serve as a class representative is relevant to its class certification motion, Defendant's opposition to which is currently due on October 1, 2021. (*See* Mot. at 8 (Fund recognizing that Defendants may ask about "the allegations in the Complaint, or *Lead Plaintiff's oversight of this case on behalf of the putative Class*.") (emphasis added).) But the Fund nonetheless asserts that discovery into alleged criminal and other unlawful conduct by some of its leadership—including criminal allegations that the President of the Fund embezzled hundreds of thousands of dollars from a labor union and its members, and a related fund, all to which he owed fiduciary duties—is not relevant to determining whether the Fund can act in a similar fiduciary capacity here. The Fund's position is simply untenable. In order to test the adequacy of the Fund to serve as class representative, Defendants are plainly entitled to discovery into whether any member of the Fund's leadership has committed, sanctioned, or benefited from the illegal acts and breaches of fiduciary duty alleged in the Indictment and Labor Complaint.

To avoid this result, the Fund urges that the replacement of Mr. Burrows with his subordinate at the Union, Mr. Neilson, should completely eliminate concerns about the Fund's adequacy as a representative. In point of fact, however, Mr. Neilson's substitution itself raises a

host of additional questions that bear directly on the ability of the Fund to serve as a representative

of the putative class.  To give only some examples:

- Despite his assurances to the contrary, what role may Mr. Burrows continue to play in the litigation given that he remains President of the Fund?

- Given that Mr. Neilson is Mr. Burrows's long-time subordinate at the Union, what influence or control does Mr. Burrows have over Mr. Neilson?

- What role, if any, did Mr. Neilson play in the conduct alleged in the Indictment and the Labor Complaint?  The Indictment itself alleges that numerous unnamed individuals at the Union were involved in the charged conduct and benefitted from it.  Should not Defendants and the Court understand if Mr. Neilson was one of those individuals?  Shouldn't Defendants and the Court understand if Mr. Neilson has been or will be a witness in the criminal proceeding?

- Was Mr. Neilson—who acted as the Treasurer for the Union during the entire time that the charged criminal activity occurred—aware of the criminal conduct?  And if not, how could the ***Treasurer***, who now seeks to make decisions on behalf of Lead Plaintiff (and possibly the putative class), remain unaware of a sweeping, years-long scheme to embezzle hundreds of thousands of dollars from the organization and falsify financial records?

- The Fund's Board of Trustees currently includes three employee-side representatives who work for the Union and four management-side representatives who come from the management of companies where Union employees work.  (*See* ECF No. 86-1 ¶ 6; Tr. of June 10, 2021 Status Conf. Hr'g at 13:11-16.)[2]  If the Fund wished to avoid the appearance of impropriety, in lieu of someone who reports to Mr. Burrows, why could the Fund not have selected one of the four management-side Trustees to replace Mr. Burrows?  Why did the Fund not do so?  Relatedly, given that management-side Trustees rely on Union employees for labor, to what extent are management-side Trustees influenced or controlled by Mr. Burrows and/or Mr. Neilson such that the Fund's leadership is essentially an extension of the Union's leadership?

Defendants are entitled to obtain this discovery and, if it raises concerns about the Fund's

adequacy, to present it to the Court in opposing class certification.  The place for the Fund to

challenge the import of any such discovery is on the class certification motion itself, not through

a motion to foreclose the discovery altogether.  Indeed, among other sound reasons for allowing

---

[2] Mr. Neilson and Lead Plaintiff's counsel have each stated that the Board of Trustees has eight seats, and that there should be four employee-side representatives but one employee seat is currently open.  (ECF No. 86-1 ¶ 6; Tr. of June 10, 2021 Status Conf. Hr'g at 13:11-16.)

the proposed discovery to proceed, Defendants (and the Court) must be assured that any judgment that they obtain in this action in their favor, or settlement between the parties, will not be subject to an attack from an objecting member of the proposed class on the basis that the Fund was an inadequate representative.  This is not a mere theoretical possibility:  it has happened in this case once already.  And without discovery to fully vet and address this issue, the Fund may well be an inadequate representative of the class under Rule 23 and Defendants may be exposed to similar objections down the line.[3]

## ARGUMENT

"Discovery under the Federal Rules of Civil Procedure is broad in scope and freely permitted."  *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 402 (4th Cir. 2003) (citation omitted).  Accordingly, Federal Rule of Civil Procedure 26 is construed liberally. *See Little v. Brown & Williamson Tobacco Corp.*, No. 2:98-cv-1879, 2000 WL 33957171, at *1 (D.S.C. May 22, 2000) ("The Fourth Circuit Court of Appeals has interpreted the language, 'reasonably calculated to lead to the discovery of admissible evidence,' liberally as a requirement merely that information sought be germane to the subject matter of the action.") (citations omitted).

"Conversely, limitations on discovery are to be construed narrowly."  *Hege v. Aegon USA, LLC*, No. 8:10-cv-1578, 2011 WL 1791883, at *3 (D.S.C. May 10, 2011) (citation omitted).  "The burden is on the party seeking protection to show 'good cause' by making a specific demonstration of facts in support of the request as opposed to conclusory or speculative statements about the need

---

[3] For example, in *Pelletier v. Endo Int'l PLC*, because of concerns about that lead plaintiff's adequacy, among other things, the court appointed a different set of plaintiffs as co-lead plaintiffs more than three years into the litigation, and the parties were forced to revisit class certification issues and related discovery, causing additional expense and delays in the resolution of the case.  (*See* Order, *Pelletier*, No. 2:17-cv-05114 (E.D.PA. Feb. 4, 2021), Dkt. No. 273 ¶¶ 8-11 & 300.)

for a protective order and the harm which will be suffered without one." *White v. McHugh*, No. 3:09-cv-1559, 2010 WL 4340399, at *2 (D.S.C. Sept. 3, 2010) (citation omitted).

The Fund concedes, as it must, that Defendants may take discovery into the adequacy of the Fund's ability to represent absent class members. (*See* Mot. at 8 (conceding that Defendants may ask about "the allegations in the Complaint, or **Lead Plaintiff's oversight of this case on behalf of the putative Class**.") (emphasis added).) The requested discovery, in turn, is appropriate because it bears on whether the Fund is an adequate plaintiff within the meaning of Rule 23. Among other things, the requested discovery will allow Defendants, and the Court, to evaluate (1) the extent to which the Fund was involved in, impacted by, or had any knowledge of the matters described in the Indictment and Labor Complaint; (2) whether Mr. Neilson is an appropriate replacement for Mr. Burrows to act on the Fund's behalf, and the extent, if any, of Mr. Neilson's involvement in and knowledge of the matters described in the Indictment and Labor Complaint; and (3) the extent to which Mr. Neilson is independent of Mr. Burrows, or whether Mr. Burrows can still influence or control Mr. Neilson and the conduct of this litigation.

The burden of the requested discovery is minimal and entirely proportionate to the needs of the case. As to Mr. Neilson, Defendants intend to depose him in his personal capacity at the same time as his Federal Rule of Civil Procedure 30(b)(6) deposition and are not asking him to sit for two separate depositions. The burden on the Fund of educating a witness on Topics 30-33 should also be negligible, particularly given that the Fund has already designated Mr. Neilson as its Rule 30(b)(6) representative. As a long-time officer of the Union, Mr. Neilson presumably has already reviewed the Indictment and Labor Complaint to appropriately educate himself and allow him to suitably perform his duties. In the event Mr. Neilson has not yet reviewed these materials, Defendants nevertheless submit that this task is proportional to the needs of the case given the

importance of the adequacy inquiry on class certification and the fact that Mr. Neilson has voluntarily agreed to serve as the Fund's representative for purposes of the litigation.

The burden on Mr. Burrows is minimal as well. Defendants seek his deposition in his personal capacity; he is not obligated to educate himself on topics as he would if he were deposed under Rule 30(b)(6). And Defendants have agreed to take his deposition remotely, so there is no need for him to travel. This minimal burden is proportional to the needs of the case, again, given the importance of the adequacy inquiry concerning the proposed class representative, Mr. Burrows's prior involvement in (and presumed knowledge of) the case, and his continuing relationship with Mr. Neilson.

### A. The Topics Are Relevant to the Fund's Rule 30(b)(6) Deposition Because the Fund's Involvement and Knowledge of the Matters in the Indictment and Labor Complaint Are Relevant to Whether It Can Adequately Represent the Proposed Class

As the Court knows, Mr. Burrows, along with several other individuals associated with the Union, is charged with multiple felonies in the 116-count Indictment. ***Mr. Burrows also remains the President and Trustee of the Fund***. Defendants must be free to test through discovery whether the Fund, as Lead Plaintiff in this action and proposed class representative with fiduciary responsibilities on behalf of the proposed class, is controlled by an individual whose trustworthiness has been seriously questioned in an indictment by federal prosecutors. *See Smyth v. Carter*, 168 F.R.D. 28, 33 (W.D. Va. 1996) ("[I]f the named plaintiffs are evasive, untruthful, or lack credibility, this weighs heavily against them as adequate class representatives.") (citation omitted); *Kilpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987) ("[A] principal factor in determining the appropriateness of class certification is the ***forthrightness*** and vigor with which the representative party can be expected to assert and defend the interests of the members of the class.") (citation and internal quotations omitted) (emphasis added); *id.* ("[N]amed plaintiffs

might not qualify as adequate class representatives because they do not possess the personal characteristics and ***integrity*** necessary to fulfill the fiduciary role of class representative.") (emphasis added).

The deposition Topics as to which the Fund seeks to preclude discovery are directly relevant and narrowly tailored to this issue. For example, Topics 30 and 31 concern the factual basis for the charges in the Indictment and the Fund's knowledge thereof. These issues are directly relevant to assessing whether the Fund can adequately represent the proposed class. If the Fund was aware that Mr. Burrows engaged in the charged conduct—a massive and longstanding criminal enterprise that, among other things, allegedly stole and embezzled funds, falsified financial records and tax returns, and engaged in wire fraud—and nevertheless initially selected Mr. Burrows to lead this litigation, the Fund's trustworthiness and credibility is open to serious question.[4] There is simply no sound reason to foreclose Defendants from exploring those issues in connection with the Fund's class certification motion.

The issue of the Fund's trustworthiness and reliability, which is central to the adequacy inquiry on class certification, is hardly a theoretical concern. In his sworn statement, Mr. Neilson has averred that the Fund's "Board of Trustees is aware of the Indictment and Labor Case and has not taken any action to remove Mr. Burrows from his role." (ECF No. 86-1 ¶ 10.) In other words, Mr. Neilson has ***acknowledged*** that the Fund is fully aware of the serious allegations against Mr. Burrows and nonetheless chose to leave Mr. Burrows in place as President and Trustee of the Fund. There is no reason Defendants should have to take the Fund's word in terms of the soundness of that decision, given that the Fund seeks to be named as class representative in a

---

[4] Respectfully, the forthrightness of the Fund and its counsel has already been called into question in this litigation (both by Mr. Floyd and by the Court) because of its failure to disclose the allegations set forth in the Indictment.

litigation against Defendants. Indeed, Defendants are entitled to know the reasons why the Fund's Board of Trustees has not removed Mr. Burrows, as it bears directly on the integrity and credibility of the Fund itself which, in turn, is directly relevant to its adequacy. Is the Fund's Board aware of the full scope of the allegations? How thorough an investigation did it conduct? Does the Board believe the allegations have no merit? Why or why not? Is the Board controlled by Mr. Burrows himself? What concrete steps, if any, have been taken to limit or curtail Mr. Burrows's role at the Fund generally, or in respect of this litigation more specifically? Defendants, and ultimately the Court, should understand what, exactly, the Fund is "aware" of concerning the indictment of Mr. Burrows, why it has not taken steps to remove Mr. Burrows from his role, and what measures have been taken, if any, to ensure that Mr. Burrows can be trusted going forward not to abuse his position as it relates to the Fund or to this litigation.

Likewise, Topics 32 and 33—concerning the claims asserted and allegations in the Labor Complaint and knowledge thereof—are directly relevant to class certification, and to adequacy in particular, because Defendants and the Court are entitled to understand the extent to which the Fund was involved in or knows of the intimidation that certain officers and employees of the Union engaged in for their own benefit. Specifically, Defendants are entitled to understand whether the references to "leadership" in the Labor Complaint are references to Mr. Burrows and/or Mr. Neilson. Again, Mr. Neilson has stated under penalty of perjury that the Fund's Board of Trustees is aware of the Labor Action and has not taken any action to remove Mr. Burrows from his role as a result. (ECF No. 86-1 ¶ 10.)

Topic 34, as narrowed by Defendants' compromise, is likewise relevant because Defendants and the Court are entitled to understand the extent to which other senior individuals within the Fund have been accused of breaching their positions of trust and confidence or otherwise

committing crimes or other unlawful acts. Notably, the Fund's Motion ignores the obvious reason why Topic 34 is as broad as it is; namely, the Fund and its counsel have already demonstrated that they cannot be relied on to disclose such conduct on their own. And, ironically, this Topic should only be burdensome to the Fund if there are, in fact, many instances in which individuals holding managerial positions with the Fund have been charged with or accused of misconduct. But if that is the case, the issue becomes all the more relevant. Defendants and the Court should be aware of all such instances in connection with the Fund's request that the Court find the Fund to be an adequate class representative in this case.

In seeking to preclude these inquiries and to avoid the bright spotlight of discovery, the Fund argues that actions of individuals employed by an entity are irrelevant to the entity's adequacy under Rule 23. (Mot. at 10-11.) Apart from the obvious fact that an entity's adequacy, especially its integrity and trustworthiness, cannot be assessed in any way *other* than through the action of the individuals who control it, the caselaw the Fund relies upon is simply unavailing. For example, the Fund claims that *Police and Fire Retirement System of City of Detroit v. Crane*, is a case in which the court appointed a lead plaintiff even though the lead plaintiff's general counsel and former trustee were under indictment for bribery and conspiracy. *See* No. 3:13-cv-945, 2013 WL 12218318, at *1 (N.D. Cal. Aug. 9, 2013). However, there is no evidence that the *Crane* court even knew about the criminal charges and the order appointing the lead plaintiff is silent on the indictments. *See id.* (explaining that no other entity filed a motion for appointment nor were there any objections to the appointment). Indeed, a review of the briefing before the *Crane* court shows that the issue was apparently never disclosed to that court, much as it had not been disclosed to this Court until Mr. Floyd's April 27, 2021 letter. (*See* Exhibit A.) That the lead plaintiff in *Crane*

appears to have withheld its principals' malfeasance from the court is hardly a sound basis for this Court to ignore relevant information regarding ***this*** Lead Plaintiff's principals.

*Holden v. Triangle Capital Corp.*, involved the appointment of lead plaintiff at the outset of the action pursuant to the PSLRA, not the adequacy of a proposed class representative at the class certification stage case. *See* No. 5:18-cv-10, 2018 WL 1277735, at *1 (E.D.N.C. Mar. 12, 2018). As the Supreme Court has held, class certification (including issues of adequacy) under Rule 23 requires a "rigorous analysis" not required at the earlier stage of the litigation under the PSLRA. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) (class certification is "proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied") (citation and internal quotations omitted). Moreover, in *Holden*, the alleged conduct was "roughly two decades" old, an obvious distinction from the facts in issue here. 2018 WL 1277735, at *3.

*Pirelli Armstrong Tire Corp. Ret. Med. Benefits Tr. v. LaBranche & Co., Inc.*, involved a twelve-year-old censure for a violation of the rules of the Chicago Mercantile Exchange issued pursuant to a settlement in which the principal neither admitted to nor denied violating the rules. 229 F.R.D. 395, 416 (S.D.N.Y. 2004). Thus, the court held that, given (1) the age of the censure and (2) the absence of any specific connection between the types of violations claimed and the fraud alleged, the violations did "not appear to represent the degree of serious misconduct that would require [the proposed lead plaintiff's] candidacy to be rejected at this stage." *Id.* at 417.[5]

---

[5] The Fund relies upon two cases in footnote 7 of its Motion that are easily distinguishable from this litigation. First, *Spinner v. City of New York* involved a challenge to the adequacy of the proposed class representative based on "their tax-filing practices, reading skills, psychological disabilities, immigration status, and criminal history." No. 1-cv-2715, 2003 WL 23648356, at *4 (E.D.N.Y. Oct. 10, 2003). The *Spinner* court held that those attempts to attack their credibility were "not character deficiencies 'arising out of or touching upon' the alleged strip-search policy" at the booking facility at issue. *Id.* Second, *Jane B. ex rel Martin v. New York City Department of Social Services* involved a challenge based on the proposed class representatives' conduct as juveniles. *See* 117 F.R.D. 64, 71 (S.D.N.Y. 1987). Moreover, in both

Beyond the fact that the cases cited by the Fund do not support its argument, it is in fact well-established that the conduct of individuals employed by and/or managing an entity can disqualify the entity from serving as a class representative.  Indeed, this has even been held to be the case in connection with *indicted* (as opposed to convicted) individuals.  *See Pines Nursing Home (77), Inc. v. Rehabcare Grp.*, No. 1:14-cv-20039, 2014 WL 12531512, at *3 (S.D. Fla. June 20, 2014) (denying class certification in part because the two individuals who owned the company "are currently defendants in criminal prosecutions for Medicaid fraud that was allegedly perpetrated by Plaintiff at their direction").  The *Pines* court specifically refused to appoint an entity as the class representative in part because "[t]here is a significant risk that [one individual associated with the entity] will have been convicted of serious fraud offenses before this case goes to trial and, therefore, his credibility will either be subject to impeachment or otherwise undermined if he invokes his Fifth Amendment rights in response to questioning."  *Id.*  The Indictment here presents exactly the same issues and Defendants should be permitted to explore the impact of the Indictment, and the Labor Action, on the adequacy of the Fund as proposed class representative.

The Fund further seeks to avoid the relevance of the alleged criminal and otherwise unlawful conduct of the Fund's management, and the Fund's knowledge of that conduct, by arguing narrowly that the conduct in issue does not bear on the Fund's investments or stock purchases.  Specifically, the Fund urges that Defendants "do not claim that [the] Fund's representations regarding its stock trading are inaccurate or that [the] Fund has been in any way derelict in overseeing the litigation or acting on behalf of the putative Class" and therefore

---

cases, the court had the full facts and circumstances of the issues before them.  Here, in contrast, the Fund seeks to foreclose discovery and to withhold the pertinent facts and circumstances from Defendants and the Court.

discovery into the issues discussed herein is purportedly not relevant and should be precluded. (Mot. at 5.) But not only is that argument premature because discovery is ongoing and Defendants have not had a chance to test those assertions, but it is also far too narrow. The issue on class certification is not whether the Fund's conduct is suspect in connection with specific activities but whether it can be trusted to adequately represent the interests of the putative class—questions that implicate its integrity and trustworthiness generally. That is particularly true where, as here, the alleged crimes at issue are financial in nature.

Similarly, the Fund also argues that "unproven allegations are not proof of inadequacy." (Mot. at 12.) That position, too, misses the point and inverts the relevant considerations. The whole point of class discovery is to better understand whether the issues identified impact class certification, including as to adequacy. Not surprisingly, none of the cases the Fund cites suggest that Defendants should not even be allowed *to take discovery* on the Topics or of Mr. Burrows and Mr. Neilson, which is the relevant inquiry for this motion for a protective order. In particular, the Fund's reliance on *Woburn Retirement System v. Salix Pharmaceuticals, Ltd.*, is misguided. *See* No. 14-cv-8925, 2015 WL 1311073 (S.D.N.Y. Mar. 23, 2015). *Woburn* involved an adequacy challenge in the context of appointing a lead plaintiff under the PSLRA, an earlier stage of the litigation at which there is a presumption of adequacy. *Id.* at *1, 5-6. And, because of the presumption, there is only limited discovery at the lead plaintiff appointment stage. *See id.* at *9, n.5 ("The PSLRA allows such discovery only if a movant 'first demonstrates a reasonable basis for a finding that the presumptively most adequate plaintiff is incapable of adequately representing the class.' 15 U .S.C. § 78u–4(a)(3)(B)(iv).").

For purposes of class certification, however, there is no presumption of adequacy. Instead, Rule 26's broad and liberal discovery standard applies. Indeed, in both *In re Diamond Foods, Inc.,*

*Securities Litigation*, and *In re Countrywide Financial Corporation Securities Litigation*, there was comprehensive discovery into "unproven allegations" to assess their merit and determine whether such allegations could disqualify the lead plaintiffs.[6]  295 F.R.D. 240, 255-56 (N.D. Cal. 2013); 273 F.R.D. 586, 603-04 (C.D. Cal. 2009).  *First*, in *In re Diamond Foods*, the court specifically inquired into the unproven allegation that lead plaintiff improperly selected its counsel based on political contributions, and the court required lead plaintiff to submit evidence reflecting its due diligence in selecting lead counsel.  *See* 295 F.R.D. at 255-56.  *Second*, in *In re Countrywide*, the defendants alleged that certain lead plaintiffs accepted improper payments from placement agents, and during discovery several Rule 30(b)(6) witnesses were deposed on this issue.  *See* 273 F.R.D. at 603-04.  This is exactly what Defendants argue should happen here— discovery into serious allegations and questions bearing on the Fund's adequacy.

Finally, the Fund's Motion faults Defendants for not moving to compel on the Fund's refusal to comply with the Requests for Production, arguing that "[t]he fact that Defendants did not move to compel production of documents related to the Indictment or Labor Case" is somehow a concession that "these topics have no relevance."  (Mot. at 9.)  This argument is strikingly self-serving and ignores the circumstances and history of this case.  As the Court knows, for over two months the Fund's status as the Lead Plaintiff was unclear due to its failure to disclose the

---

[6] The Fund also relies upon *In re Cendant Corporation Litigation*, which involved, among other issues, an appeal of an appointment of lead plaintiff.  *See* 264 F.3d 201, 219 (3d Cir. 2001).  There, the Third Circuit found that the district court properly rejected the adequacy challenge because there was no evidence in support of the allegations that the proposed lead plaintiff had improperly selected its lead counsel based on lead counsel's substantial campaign contributions to the trustee of the funds in the proposed lead plaintiff group and engaged in a "pay-to-play" scheme.  *Id.* at 269.  The Third Circuit stated that "actual ***proof*** of pay-to-play would constitute strong (and, quite probably, dispositive) evidence that the presumption had been rebutted. . . .  Thus, had [the objectors to the proposed lead plaintiff] backed up their claims, the District Court would have likely been justified in holding that the presumption had been rebutted and disqualifying the [lead plaintiff group] from serving as lead plaintiff."  *Id.*  Here, Defendants are seeking discovery to test whether the Fund is adequate to serve as a fiduciary to the putative class.  Whether that evidence will support a challenge to the adequacy of the Fund to serve as lead plaintiff remains to be seen.

Indictment of Mr. Burrows and the other Union officials. Moving to compel production of documents from the Fund when it was not clear if it would even have a role in the case going forward would have wasted the resources of both the parties and the Court. And while the dispute between the Fund and Mr. Floyd was ongoing, activity on the class certification motion was stayed. (*See* ECF No. 82 ("The Court orders the class certification briefing be held in abeyance pending a resolution of the lead plaintiff issue.").) Likewise, Defendants can hardly be faulted for not moving to compel after the Court confirmed that the Fund would continue to serve as Lead Plaintiff because the Fund informed Defendants on July 19, 2021—a mere *five days* after the Court's Order approving the substitution of Mr. Neilson in place of Mr. Burrows—that it intended to move for a protective order on these very topics. Again, it would have been a waste of time and effort for Defendants to move to compel when the Fund had already communicated its intent to move for a protective order on the very same issues. Suffice it to say that, in the event the Court denies the Fund's motion for a protective order, as it should, and the Fund nonetheless continues to refuse to provide the full scope of relevant discovery, Defendants would then move to compel production on the issues then presented.

    **B.**    **Mr. Neilson's Deposition in His Individual Capacity is Relevant Because Defendants Are Entitled to Test Whether Mr. Neilson Was Personally Involved in the Conduct Alleged in the Indictment and Labor Complaint, as Part of the Adequacy Inquiry Into the Fund**

Defendants rightfully seek Mr. Neilson's personal knowledge on issues relevant to the question of whether the Fund can adequately serve as the class representative. This deposition is not duplicative of Mr. Neilson's anticipated testimony as the Fund's Rule 30(b)(6) deponent because, as an officer of the Union, Mr. Neilson is uniquely positioned to have personal knowledge of key issues, including his role at both the Fund and the Union, and the facts underlying the Indictment and Labor Complaint, and the nature of his relationship to the alleged crimes and other

unlawful conduct and to Mr. Burrows.  In particular, Defendants understand that Mr. Neilson, as Mr. Burrows's subordinate, served as the Union's Treasurer in the years before and during the period in which the Indictment purports the criminal conduct occurred.  As such, there is every reason to believe that Mr. Neilson could have personal knowledge of facts alleged in the Indictment and Labor Complaint that is distinct from the Fund's institutional knowledge of those matters, all of which could bear on the Fund's adequacy to serve as a class representative.

Hypothetically, for example, if Mr. Neilson understands that he is, in fact, one of the unnamed employees referenced in the Indictment, Defendants and the Court would be entitled to know this and understand how that might impact the adequacy of the Fund as a class representative, even if Mr. Neilson has not so informed the Fund.  Conversely, if Mr. Neilson was not involved in, or aware of, the relevant misconduct, there could be significant questions regarding his oversight and management as Union Treasurer, particularly given that the Indictment focuses on financial crimes and alleges that many officers and employees of the Union embezzled funds and other assets from the Union and a related fund and that they falsified certain financial records, all during Mr. Neilson's tenure as Treasurer.  Relatedly, whether Mr. Neilson was complicit or actively involved in the alleged scheme to intimidate Union members outlined in the Labor Complaint (or negligently enabled the wrongdoing) is directly relevant to whether Mr. Neilson can adequately direct decisions of the Fund as a fiduciary for the proposed class.  Lastly, whether Mr. Neilson chooses to invoke his Fifth Amendment right against self-incrimination in the context of a deposition in this civil case is directly relevant to his credibility and that of the Fund.  It is information that Defendants and the Court are entitled to know because it relates to whether Mr. Neilson should in fact be "the sole authority to make all decisions with regard to this action"

for the putative class, as he already stated in his declaration.[7]  (ECF No. 86-1 ¶ 13.)  Pursuant to the PSLRA, and as promised in Mr. Neilson's previously submitted declaration, he should be willing to "serve as a representative party on behalf of the Class . . . including providing testimony at deposition and trial, if necessary."  (ECF No. 86-1, Ex. A ¶ 3.)  If absent class members were to be deprived of their legal right to a class representative that can offer meaningful testimony, the Court should know that now, in the context of the class certification motion.

Furthermore, given that ***Mr. Neilson reports to and has worked for Mr. Burrows for decades***, Defendants are also entitled to explore the nature of Mr. Neilson's relationship with Mr. Burrows in order to determine whether Mr. Neilson is wholly independent of Mr. Burrows's influence, supervision, and control.  Indeed, if as the Fund claims, it truly wanted to eliminate all appearances of impropriety stemming from its failure to disclose Mr. Burrows's Indictment, then it is unclear why the Fund did not select one of its four management-side trustees as the replacement for Mr. Burrows, instead of one of Mr. Burrows's subordinates at the Union and the Fund.  (*See* ECF No. 86-1 ¶ 6.)[8]  Mr. Neilson has voluntarily submitted a sworn declaration on the very issues discussed herein as a basis for serving as the Fund's representative, and yet the Fund now seeks to prohibit Defendants from testing Mr. Neilson's credibility or even the

---

[7] The Fund asserts that "Defendants hope a witness will refuse to respond to a question on the basis of the Fifth Amendment, which they will then argue warrants an adverse inference cutting against class certification."  (Mot. at 9.)  But this argument is irrelevant and premature at this stage of the action.  The Fund can make such an argument in its reply brief in further support of class certification if and after its witnesses refuse to respond to questions at deposition.  The mere possibility that certain witness might invoke their Fifth Amendment right against self-incrimination is no basis to preemptively prohibit Defendants from inquiring into relevant avenues of information.

[8] Indeed, Mr. Neilson's declaration did not explain that the management-side Trustees "come from the management of companies where Local 98 members worked," as stated by the Fund's counsel to the Court.  (Tr. of June 10, 2021 Status Conf. Hr'g at 13:11-16.)  Defendants and the Court are entitled to understand the true dynamic of the Fund's Board of Trustees, including the extent to which the management-side Trustees work at companies that are reliant upon Union labor.

underlying factual bases for his statements. If anything, the juxtaposition of these key facts accentuates the need for discovery into them.

Indeed, the need to explore these issues through the discovery process is clear; it is heightened by the Fund's and its counsel's prior decisions not to disclose the Indictment, which is information that they clearly should have disclosed at the outset of the case and well before being called out on their failure by Mr. Floyd. (Tr. of June 10, 2021 Status Conf. Hr'g at 52:12-16 (The Court to the Fund's counsel: "But you don't think it has a bearing, but you didn't let anybody else take that into consideration. You don't get to make that decision, do you? That's my decision. So I would have appreciated having that information before I made a decision.").) Indeed, in the wake of the Court's prior statements and after moving the Court to conduct a rigorous analysis of the Fund's adequacy in connection with class certification, it is surprising and concerning, to say the least, that the Fund and its counsel would persist in their efforts to suppress pertinent information bearing on the Fund's adequacy.

Finally, as to burden, deposing Mr. Neilson in his individual capacity is proportional to the needs of this case, especially in light of his agreement to serve as the Fund's representative.[9] Defendants intend to depose Mr. Neilson only once, in both his personal and Rule 30(b)(6) capacities. Further, Defendants are seeking information from Mr. Neilson concerning what he already knows or does not know (*e.g.*, whether he conspired with Mr. Burrows and Mr. Daugherty to embezzle monies from the Union and related fund or whether he has ever falsified financial records), and so there should be no need to educate him on these topics.

---

[9] The Fund provides a chart of example topics that overlap between Mr. Neilson's deposition and the Fund's Rule 30(b)(6) deposition. But Defendants are seeking Mr. Neilson's ***personal*** knowledge, which is distinct from the Fund's knowledge, of the issues addressed herein.

C.     **Mr. Burrows's Deposition is Relevant Because Whether Mr. Burrows Has Any Influence Over Mr. Neilson and How He Oversaw the Litigation Until He Was Formally Removed are Significant to the Adequacy Inquiry**

Mr. Burrows's testimony is relevant to the question of the Fund's adequacy to serve as the proposed class representative and is proportional to the needs of the case.  The Fund fails to identity any specific facts in support of its Motion as to Mr. Burrows, and instead offers conclusory statements—such as "the clear goal is to harass or embarrass witnesses and create a sideshow"—that are plainly insufficient to show "good cause" for a protective order.  (Mot. at 1.)  Thus, the Fund and Mr. Burrows have not met their burden.

In any event, harassment and embarrassment are not at all the purpose for taking Mr. Burrows's deposition.   Rather, Mr. Burrows's testimony is relevant to the Fund's class certification motion, for several reasons.  First, Mr. Burrows has relevant information regarding the Criminal Action and the Labor Action, all of which, as explained above, bear on whether the Fund is an adequate representative.  As a defendant in the Criminal Action, Mr. Burrows may be uniquely suited to address these issues.

Second, Defendants are entitled to test whether Mr. Burrows in fact "no longer has any role in this litigation and has no unique information relevant to this case."  (Mot. at 4.)  Mr. Neilson's declaration states that "the sole authority to make all decisions with regard to this action on behalf of the Local 98 Pension Fund has been delegated to [him]" and "Mr. Burrows will have no role in overseeing this litigation, its resolution or distribution of any settlement proceeds or judgment, if any."  (ECF No. 86-1 ¶ 13.)  Yet, Mr. Burrows continues to be Mr. Neilson's supervisor and the two men have had a decades-long, intertwined work history.  Mr. Burrows's supervision and his ability to control Mr. Neilson's livelihood could well influence Mr. Neilson in his oversight of this

litigation. Defendants and the Court are entitled to understand this dynamic and their relationship before any order is issued naming the Fund as class representative.

Third, contrary to the Fund's assertion, Mr. Burrows filed two PSLRA certifications in this litigation. (*See* ECF Nos. 22-4, 44-1.)[10] Defendants should be able test the credibility of Mr. Burrows and the veracity of those prior statements, which pertain directly to the Fund and which were made under oath. Defendants are unaware of any legal basis on which a party may shield its declarant from discovery and Lead Plaintiff has provided no sound rationale for being able to offer Mr. Burrows proactively as a declarant on behalf of the Fund at one point and then to deny Defendants the ability to depose him. This concern is very real here, in that Mr. Burrows's sworn PSLRA certifications made several statements implicating him personally in the control of the Fund, contrary to the more recent statements filed by Mr. Neilson. Indeed, Mr. Burrows said, under penalty of perjury, that he was "authorized to make legal decisions on behalf of IBEW Local 98 with regard to this action" and that the Fund, under his watch, was going to employ "good faith and meritorious judgment" in this action. (ECF Nos. 22-4, 44-1.) Defendants are entitled to test those statements and to test the mechanism, if any, by which management authority over this case that was apparently once vested in Mr. Burrows was formally transferred to Mr. Neilson.

Fourth, even though the Fund maintains that Mr. Burrows has now been removed from the case, the fact remains that Mr. Burrows oversaw this litigation until approximately June of this year—over sixteen months into the case. (ECF No. 44-1.) Until then, according to his sworn certification, he was "authorized to make legal decisions on behalf of [the Fund] with regard to this action." (ECF No. 44-1 ¶ 1.) During that time, the Fund filed its Motion for Appointment as

---

[10] Mr. Burrows's certification has not been fully superseded as the Fund suggests. Mr. Neilson's declaration and certification did not even attach a schedule identifying the securities purchased and/or sold subject to the consolidated complaint in this litigation, leaving Schedule A of Mr. Burrows's certifications as the only such statement in the record. (*See* ECF 86-1, Ex. A.)

Lead Plaintiff, its Consolidated Complaint, and its Motion for Class Certification.  Accordingly, Mr. Burrows should have personal knowledge pertaining to those key filings and the information therein, including the Fund's selection of counsel and the decision not to disclose the Indictment in its Motion for Appointment as Lead Plaintiff.

Finally, the Motion does not even attempt to identify any burden on Mr. Burrows, perhaps because such a burden would be minimal—sitting for a remote deposition to answer questions about his personal knowledge on a handful of highly relevant topics.[11]  Burden, in short, is not a reason to foreclose a deposition of the President of the Fund and its representative in this litigation for the first year and a half of the case.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court deny Lead Plaintiff's Motion.

---

[11] The Fund's argument that Defendants should have identified Mr. Burrows in the Joint Federal Rule of Civil Procedure 26(f) Proposed Discovery Plan and Additional Information Required by Local Civil Rule 26.03 ignores, among other things, that because the Fund failed to disclose the relevant information regarding the Indictment and the Labor Complaint, Defendants were not aware that Mr. Burrows's testimony would be relevant to the extent it is now.

_/s/ Christopher A. Ogiba_
Christopher A. Ogiba, Fed. ID No. 9042
Lesley A. Firestone, Fed. ID No. 11719
Clinton T. Magill, Fed. ID No. 12459
Moore & Van Allen, PLLC
78 Wentworth Street
Charleston, South Carolina 29401
Telephone:  843-579-7066
Facsimile:   843-579-8749
Email: chrisogiba@mvalaw.com
        lesleyfirestone@mvalaw.com
        clintonmagill@mvalaw.com

Mark A. Nebrig
John A. Fagg, Jr.
Nader Raja
Kristen Kenley
Moore & Van Allen, PLLC
100 North Tryon Street
Suite 4700
Charlotte, North Carolina 28202-4003
Telephone: 704-331-3602
Facsimile:   704-339-5974
E-mails:  marknebrig@mvalaw.com
        johnfagg@mvalaw.com
        naderraja@mvalaw.com
        kristenkenley@mvalaw.com

Scott A. Edelman
Jed M. Schwartz
Andrew B. Lichtenberg
Milbank LLP
55 Hudson Yards
New York, New York 10001-2163
Telephone: 212-530-5000
Facsimile:  212-530-5219
Email:  sedelman@milbank.com
        jschwartz@milbank.com
        alichtenberg@milbank.com

_Attorneys for Defendants_
_Deloitte & Touche LLP and Deloitte LLP_

Charleston, South Carolina
August 24, 2021

- 27 -