# **EXHIBIT B**

Page 1

1

2           IN THE UNITED STATES DISTRICT COURT

3            FOR THE DISTRICT OF SOUTH CAROLINA

4                 Case No. 3:19-cv-3304

5    --------------------------------------------x

6    INTERNATIONAL BROTHERHOOD OF ELECTRICAL

7    WORKERS LOCAL 98 PENSION FUND, on behalf of

8    itself and all others similarly situated,

9                        Plaintiffs,

10        vs.

11   DELOITTE & TOUCHE LLP, DELOITTE LLP,

12                       Defendants.

13   --------------------------------------------x

14      REMOTE VIDEOTAPED DEPOSITION OF TODD NEILSON

15           Friday, September 10, 2021

16

17

18

19

20

21

22   Reported by:

23   Amy A. Rivera, CSR, RPR, CLR

24   JOB NO. 198395

25

1

2                           September 10, 2021

3                           10:05 a.m.

4

5              REMOTE videotaped deposition of

6    TODD NEILSON held pursuant to Notice, before Amy

7    A. Rivera, Certified Shorthand Reporter,

8    Registered Professional Reporter, Certified

9    LiveNote Reporter, and a Notary Public of the

10   States of New York, New Jersey and Delaware.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2    R E M O T E   A P P E A R A N C E S:

 3    COHEN MILSTEIN SELLERS & TOLL

 4    Attorneys for Plaintiffs

 5         1100 New York Avenue, NW

 6         Washington, DC 20005

 7    BY:  MOLLY BOWEN, ESQ.

 8         LAURA POSNER, ESQ.

 9

10

11

12

13    MILBANK

14    Attorneys for Defendants

15         55 Hudson Yards

16         New York, New York  10001

17    BY:  JED SCHWARTZ, ESQ.

18         KINGDAR PRUSSIEN, ESQ.

19

20    A L S O   P R E S E N T:

21         Chassity Bobbitt - Milbank

22         Matthew Chin-Quee, Legal Video Specialist

23         Eli Wykell

24

25
```

```
 1                    TODD NEILSON

 2          VIDEOGRAPHER:  We're now on the

 3   record.

 4          This is the start of Tape No. 1 of the

 5   videotaped deposition of Todd Neilson in the

 6   matter International Brotherhood of

 7   Electrical Workers Local 98, et al., v.

 8   Deloitte & Touche LLP, et al., in the United

 9   States District Court for the District of

10   South Carolina, No. 3:19-cv-3304.

11          All parties have agreed to appear

12   remotely on September 10, 2021, at

13   approximately 10:05 a.m.

14          My name is Matthew Chin-Quee from TSG

15   Reporting, and I'm the legal video

16   specialist.

17          The court reporter is Amy Rivera in

18   association with TSG Reporting.

19          Will counsel please introduce

20   yourself.

21          MR. SCHWARTZ:  I think we noted all

22   appearances on the record.

23          VIDEOGRAPHER:  Right.  All appearances

24   are noted on the record.

25          Will the court reporter please swear
```

Page 5

```
 1                      TODD NEILSON

 2          in the witness.

 3     T O D D    N E I L S O N, having been duly sworn

 4     by the Notary Public, testified as follows:

 5                    MR. SCHWARTZ:  Thank you.

 6     EXAMINATION

 7       BY MR. SCHWARTZ:

 8          Q.    Mr. Neilson, thank you for your

 9     patience with the technology issues this morning.

10                    Mr. Neilson, have you been deposed

11     before?

12          A.    Never.

13          Q.    Okay.  So this is going to proceed in

14     a series of questions and answers.  I will be

15     asking questions.  You'll be giving answers.  And

16     it's very important that, particularly given the

17     platform in which we're doing this, that you let

18     me finish my question even if you know what I'm

19     going to ask and then provide your answer, and I

20     will do my best to let you finish your answer

21     before I move on.

22                    Do you understand?

23          A.    Yes.  Thank you.

24          Q.    And as you've just done, it's very

25     important that you have to answer orally because
```

```
1                    TODD NEILSON

2    the court reporter can't pick up a shake or nod of

3    the head.

4              Do you understand?

5         A.    Yes.

6         Q.    If you need clarification on a

7    question or if you don't understand a question,

8    please feel free to let me know that.  If you

9    don't, I'll assume you understood the question.

10             Do you understand?

11        A.    Yes.  Thank you.

12        Q.    And your counsel can confirm this,

13   from time to time, your counsel may object to my

14   questions, but unless your counsel instructs you

15   not to answer, you're still required to answer my

16   questions.

17             Do you understand that?

18        A.    Yes.

19        Q.    We will probably be showing some

20   documents to you on the screen as we proceed

21   today.  There are likely to be multipage

22   documents, and we will be giving you the ability

23   to flip through them so that you have the ability

24   to take whatever time you need to review a

25   document before I ask you questions about it.
```

```
 1                    TODD NEILSON

 2           Do you understand?

 3      A.   Yes.  Thank you.

 4      Q.   You also you should feel free to ask

 5  for a break whenever you need it.  I'll try to

 6  remind all of us after we've been going for about

 7  an hour, but if you need a break before then, you

 8  let me know.

 9           Do you understand?

10      A.   I will, yes.

11      Q.   Is there any reason that you're aware

12  of that you can't give truthful and accurate

13  testimony today?

14      A.   No.

15      Q.   Mr. Neilson, I'll start with some

16  background.

17           Who is your current employer?

18      A.   IBEW Local Union 98.

19      Q.   And how long have you -- well,

20  withdrawn.

21           What is your current position with

22  IBEW Local Union 98?

23      A.   My job title is business

24  representative, and I am also a member of Local

25  Union 98's executive board.  That's an elected
```

```
 1                    TODD NEILSON

 2   position, unpaid.

 3        Q.    Have you -- if I referred to IBEW

 4   Local Union 98 as "the Union," will you understand

 5   what I mean?

 6        A.    Yes.

 7        Q.    Have you ever been treasurer of the

 8   Union?

 9        A.    Yes.

10        Q.    When were you treasurer?

11        A.    I was appointed to treasurer in the

12   year 2003.  There was a vacancy.  Someone had

13   left.  Then I was asked to fill that vacancy, and

14   I held that position up until December of 2020,

15   when I was asked to fill an additional vacancy as

16   an executive board member.

17        Q.    And who replaced you as treasurer of

18   the Union?

19        A.    A gentleman named Michael Magee.

20        Q.    So you currently hold two positions

21   with the Union, business representative and

22   executive board member?

23        A.    Yes.

24        Q.    Is there any other title besides

25   executive board member or is it just executive
```

```
 1                    TODD NEILSON

 2   board member?

 3        A.    No, that's all.

 4        Q.    What are your responsibilities as a --

 5   withdrawn.

 6              How long have you been a business

 7   representative for the Union?

 8        A.    I became a business representative in

 9   June of 2016.

10        Q.    What are your responsibilities

11   generally speaking as business representative for

12   the Union?

13        A.    As a business representative, I am

14   assigned to a geographical area to oversee the

15   jobs going in there -- going on in that area and

16   to make sure that upcoming projects, as they come

17   to fruition, that we have a significant amount of

18   our signatory contractor submit on that project --

19   submit pricing on that project and oversee that to

20   make sure that all of the Union rules are enforced

21   and protect the rights of our members and the

22   safety aspect of the job site so that our folks on

23   the job sites are represented and that their

24   safety and their issues -- you know, their

25   personal issues are protected.
```

```
 1                    TODD NEILSON
 2        Q.    Generally speaking, what are your
 3   responsibilities as an executive board member?
 4        A.    As an executive board member, we
 5   review all of the standing and non-standing bills
 6   and approvals in between meetings in order to pay
 7   the bills and make sure that all of the -- the
 8   funds and as well as the members have -- are
 9   enforced and just to make sure that the day-to-day
10   stuff goes through as it applies to the funds and
11   making sure that all the bills get paid in a
12   timely fashion.
13        Q.    How many people are on the executive
14   board?
15        A.    There are seven.  President,
16   vice-president have seats on the executive board,
17   as well as five executive board members.
18        Q.    Who is the president?
19        A.    Brian Burrows.
20        Q.    Who's the vice-president?
21        A.    Timothy Browne.
22        Q.    And are all of the other executive
23   board members employees of the Union?
24        A.    Yes.  In some way, shape, or form,
25   they're all union members.
```

```
 1                    TODD NEILSON
 2        Q.    Does the Union itself employ
 3   individuals?
 4             MS. POSNER:  Objection.
 5             Jed, which one of the 30(b)(6) topics
 6        are you referring to here?  'Cause it's not
 7        about his employment and it's not about the
 8        lead plaintiff here.
 9             MR. SCHWARTZ:  Well, I'm just trying
10        to get some background on the witness.  I
11        think it's totally within the ability of me
12        to get an understanding of the witness'
13        background and responsibilities at the
14        Union.
15             MS. POSNER:  You certainly can ask him
16        about his background and responsibilities,
17        but you're asking about other personnel at
18        the Union and what their responsibilities
19        are.
20             MR. SCHWARTZ:  Well, that's not what I
21        was asking.  I asked:  Does the Union itself
22        employ individuals?
23             MS. POSNER:  Right.  But, again --
24             MR. SCHWARTZ:  We're talking about --
25        the witness has said he holds a position
```

```
 1                    TODD NEILSON

 2         with the Union.  I'm trying to understand

 3         what his position is.

 4              Let me rephrase that.

 5    BY MR. SCHWARTZ:

 6         Q.    Mr. Neilson, are you an employee of

 7   the Union?

 8         A.    Yes.  I am an employed -- I am

 9   appointed -- appointed business agent by the

10   business manager, as he -- as he deems necessary,

11   yes, but at-will.

12         Q.    And so you are paid by the Union,

13   correct?

14         A.    Correct.

15         Q.    What were your responsibilities as

16   treasurer of the Union when you held that

17   position?

18         A.    When I was treasurer, the treasurer

19   position has little to -- it was -- it's

20   essentially a dual signature on the checks.

21              I didn't approve any expenditures or

22   anything.  Those are done at the executive board

23   level.  A treasurer is merely a secondary

24   signature on any kind of financial documents and

25   the checks.
```

1                          TODD NEILSON

2          Q.    You said that you were currently an

3    at-will employee at the Union.  Is that correct?

4          A.    Yes.

5          Q.    And who can make the decision to fire

6    you as an employee?

7          A.    The business manager.

8          Q.    And who is that?

9          A.    John J. Dougherty.

10         Q.    Mr. Neilson, are you familiar with

11   something called the "International Brotherhood of

12   Electrical Workers Local 98 Pension Fund"?

13         A.    I am.

14         Q.    And if I refer to that as "the Fund,"

15   you'll know what I mean?

16         A.    Yes.

17         Q.    Do you hold any positions at the Fund?

18         A.    I am Union trustee on the Fund.

19         Q.    How many trustees are there at the

20   Fund?

21         A.    There are eight available positions as

22   trustees.  There are currently seven trustees,

23   three representing the Union and four representing

24   management, with one open seat on the Union end

25   that we had a retirement in the last couple of

```
 1                      TODD NEILSON
 2   years and it just hasn't been fulfilled yet.
 3        Q.    Does the Union -- sorry -- withdrawn.
 4              Does the Fund have any employees?
 5        A.    No.
 6        Q.    Are there any other managers of the
 7   Fund besides the Board of Trustees?
 8        A.    We have Fund managers, if that's your
 9   question.
10        Q.    Would those be outside investment
11   advisers?
12        A.    We have outside investment advisers.
13   We also have a Fund administrator, which is Frank
14   M. Vaccaro & Associates, and they're a Fund
15   administrator for most of our funds.
16        Q.    And what function does the Fund
17   administrator perform?
18        A.    When our contractors send in the money
19   for the benefits, they disburse the money into the
20   appropriate funds and oversee it, track it, and
21   everything else.
22        Q.    How did you come to be appointed as a
23   trustee of the Fund?
24        A.    They had asked me.  They had an
25   opening, and they had asked me if I were to be
```

1           TODD NEILSON

2    interested in fulfilling the vacancy on -- on the

3    trust.

4           Q.    And who's the "they" that asked you?

5           A.    They being -- well, Brian Burrows is

6    the chairman of all funds.  By virtue of this

7    position as treasurer of the Fund -- of the -- as

8    president -- excuse me -- of the Union, he

9    oversees all of the funds, and he and I guess the

10   executive board decide about filling vacancies on

11   all of our committees, which is essentially what

12   this is.  It's a committee appointment.

13          Q.    And when you say, "executive board,"

14   you mean executive board of the Union?

15          A.    Yes.

16          Q.    And I think you said there is somebody

17   named Mr. Dougherty.  Is that correct?

18          A.    He's not on the executive board.  He's

19   the business manager.

20          Q.    Okay.  All right.  Which entity --

21                MR. SCHWARTZ:  Can we bring up Tab 1?

22                (Exhibit 15, Amended Notice of

23          Deposition of the Fund, was marked for

24          identification at this time.)

25

```
 1                    TODD NEILSON

 2    BY MR. SCHWARTZ:

 3        Q.    Mr. Neilson, this is -- we're going to

 4    be bringing up some documents on the screen as we

 5    go today, as I mentioned before, and marking them

 6    with exhibit numbers.  And you'll have -- you

 7    should have the ability to scroll through and zoom

 8    in because they can be small.

 9              We've marked as Exhibit 15, a document

10    that's titled "Amended Notice of Deposition of the

11    Fund."

12              Have you seen this before?

13        A.    Yes.

14              MR. SCHWARTZ:  I'm not sure if

15        somebody just went off of mute.  I'm going

16        to want -- that's better.  Thank you.

17        Q.    And, Mr. Neilson, if you page through,

18    you'll see there is a section that's labeled

19    "Topics."

20              Let me know when you've reached that.

21        A.    Yes.

22        Q.    And then -- actually, it's, I think,

23    two pages in, there's a section labeled "Topics"

24    that begins 1, and it goes on for several pages.

25        A.    Yes.
```

1                          TODD NEILSON

2          Q.    Take whatever time you need to review

3     the topics.  They go 1 through 34.

4                And my question is:  Are you prepared

5     to testify as to each of these topics today?

6                MS. POSNER:  Objection as to the --

7          pursuant to the objections and the pending

8          protective order with regard to certain of

9          the topics in this document.

10               MR. SCHWARTZ:  I'm not really sure

11         what that means.  I don't understand.  There

12         have been objections, and there's a

13         protective order, but I'm asking the witness

14         what he's prepared to testify on.

15               MS. POSNER:  Right.  And I'm saying,

16         he's prepared to testify subject to our

17         objections and the pending motion for a

18         protective order.

19               MR. SCHWARTZ:  Well, I'd just like to

20         hear from the witness what he's prepared to

21         testify on.

22         A.    I am.

23         Q.    Mr. Neilson, did you prepare for your

24    deposition today?

25         A.    Yes.

```
 1                    TODD NEILSON
 2       Q.    How did you prepare for today's
 3  deposition?
 4       A.    I went through with my attorney just
 5  to -- being as I've never done one of these
 6  before, I didn't know what to expect -- just to
 7  try to calm me down and make sure that I was
 8  comfortable -- as comfortable as possibility.
 9       Q.    Did you review any documents in
10  preparing for today's deposition?
11       A.    Yes.
12       Q.    Approximately how many documents?
13       A.    A lot.  I don't know.
14       Q.    Did any --
15       A.    It's a pretty thick binder.
16       Q.    Sorry.  Go ahead.
17       A.    It's a pretty thick binder.
18       Q.    Did any of those documents refresh
19  your recollection about the things they related
20  to?
21       A.    Yes.
22       Q.    Do you recall which documents
23  specifically refreshed your recollection about the
24  things to which they related?
25       A.    No, not that stands out to me over
```

1                    TODD NEILSON

2   another.

3        Q.    Did you meet with anyone else other

4   than counsel in preparing for your deposition

5   today?

6        A.    No, just counsel and Molly, her

7   assistant.

8        Q.    Did you speak with anyone other than

9   counsel in preparing for your deposition today?

10       A.    No.

11       Q.    So you didn't make any attempt to

12  speak to anyone at the Fund or the Union about any

13  of the topics listed in Exhibit 15?

14       A.    No.

15       Q.    About how long did you spend with

16  counsel preparing for your deposition today?

17       A.    Several hours.

18       Q.    Was it in the course of several

19  meetings or just one meeting?

20       A.    One continuous meeting yesterday and

21  then prior.

22       Q.    So the meeting yesterday was several

23  hours.  Is that right?

24       A.    Yes.

25       Q.    And then you said you had prior

1          TODD NEILSON

2    meetings with counsel.  Is that correct?

3          A.    Yes, just to familiarize myself with

4    the case.

5          Q.    And when did that prior meeting occur?

6          A.    I don't know off the top of my head.

7    I don't have an exact date.  There's been phone

8    calls -- numerous phone calls over the course of

9    the last few months.

10         Q.    And were those phone calls

11   specifically in preparation for the deposition

12   today or for other reasons?

13         A.    I guess everything was leading up to

14   today.  It was just to familiarize myself and make

15   sure I had a good understanding of what was going

16   on.

17         Q.    Were there any topics that you were

18   not familiar with that you had to educate yourself

19   on for today's deposition?

20         A.    A lot of the stuff, actually, you

21   know, understanding what happened here, being that

22   I'm an electrician and not an attorney or an

23   investment manager, so I needed to get myself up

24   to speed as to what the issue was at hand.

25         Q.    You see Topic 1 says, "The claims

1               TODD NEILSON

2    asserted and allegations in the complaint"?

3         A.    Yes.

4         Q.    Well, before we get to that, do you

5    understand that you are testifying today as the

6    corporate representative of the Fund?

7         A.    I do.

8         Q.    And what do you understand that to

9    mean?

10        A.    I understand that to mean that

11   whatever this -- that it's my duty and fiduciary

12   responsibility to the Fund to -- to oversee this

13   case, make sure that the attorneys are doing what

14   they need to do, and to try to get us a most

15   favorable settlement for all the class holders in

16   this case.

17        Q.    Do you understand that as the

18   corporate representative here today, I'm entitled

19   to understand the knowledge and information of the

20   Fund and not just your personal knowledge about

21   this case?

22        A.    Sure.  I get that.

23        Q.    And you're prepared to testify as to

24   the knowledge of the Fund on the topics in

25   Exhibit 15.  Is that correct?

```
 1                     TODD NEILSON

 2          A.    I am.

 3          Q.    Topic 1 says, "The claims asserted and

 4     allegations in the complaint."

 5                Do you see that?

 6          A.    I do.

 7          Q.    What are the claims that have been

 8     asserted in the complaint?

 9          A.    The claims that have been asserted is

10     that Deloitte & Touche as the auditors for SCANA

11     and, you know, their negligence in reporting to

12     the -- the class holders, the stakeholders, the

13     people that have stock, that they didn't

14     divulge -- that they didn't do their due diligence

15     in overseeing it as the auditors of that project

16     and their funds, seeing that they weren't going to

17     be able to deliver as promised for their

18     investors.

19          Q.    That who wasn't going to be able to

20     deliver as promised?

21          A.    That the SCANA project wasn't going to

22     be done in time to successfully get over a billion

23     dollars' worth of incentives to have that project

24     done on time in tax credits.

25          Q.    What's your -- what's the Fund's
```

1                    TODD NEILSON

2    understanding of what Deloitte is accused of doing

3    wrong?

4         A.    Could you rephrase that question?  I'm

5    not sure I understand it.

6         Q.    You're testifying on behalf of the

7    Fund, correct?

8         A.    Yes.

9         Q.    So what is the Fund's understanding as

10   to what Deloitte has done wrong?

11             MS. POSNER:  Objection, asked and

12        answered.

13             You can answer.

14        A.    That, as a result of their negligence,

15   that that investment lost money because they

16   didn't report it back to this -- stockholders.

17        Q.    Are you aware that the Fund has

18   accused the defendants here of committing a fraud?

19        A.    Yes.

20        Q.    And so what's the basis for the Fund's

21   belief that Deloitte committed a fraud?

22             MS. POSNER:  Objection, asked and

23        answered and calls for a legal conclusion.

24             You can answer, if you can.

25        A.    As auditors, they should have been

```
 1                      TODD NEILSON
 2   able to foresee that this project wasn't going to
 3   be able to be completed on time in order to
 4   achieve those 1-point-some billion dollars in tax
 5   credits, which is what they were selling to the
 6   stockholders.  They should have been able to
 7   foresee that that wasn't going to -- that time
 8   frame wasn't going to be met.
 9        Q.    What's the Fund's basis for its belief
10   that, as auditors, the defendant should have been
11   able to foresee that the project wasn't going to
12   be completed on time?
13             MS. POSNER:  Objection, asks for a
14        legal conclusion.
15             If you know the answer, you can.
16        A.    If they were doing their due
17   diligence, they should have been able to see that
18   the project wasn't progressing in a timely fashion
19   in order to meet those deadlines, and that, first
20   and foremost, is fraudulent by not reporting it to
21   the stakeholders.
22        Q.    What's the basis for the Fund's belief
23   that if Deloitte had been doing its due diligence,
24   it would have been able to see that the project
25   wasn't progressing in a timely fashion?
```

```
1                    TODD NEILSON

2              MS. POSNER:  Objection.  Again, calls

3         for a legal conclusion.  It's beyond the

4         scope.

5         A.    I -- I thought I kind of answered that

6    question already.

7         Q.    No, I don't think you did, so --

8              MS. POSNER:  He's answered the

9         question four separate times, and you're

10        essentially asking him a contention

11        interrogatory.

12              If you want to keep asking it, he can

13        keep giving you the same answer, but I think

14        you've gotten the answer.

15              MR. SCHWARTZ:  I haven't, and the

16        record's clear you didn't object on an

17        asked-and-answered basis, so I'll ask the

18        question again.

19        Q.    What is the basis for the Fund's

20   belief that if Deloitte had been doing its due

21   diligence, it would have been able to see that the

22   project wasn't progressing in a timely fashion?

23              MS. POSNER:  Again, asked and

24        answered, calls for a legal conclusion and

25        is an improper contention interrogatory
```

```
 1                    TODD NEILSON

 2        prior to the completion of discovery.

 3              But if you can answer again, feel

 4        free.

 5              THE WITNESS:  I believe I've already

 6        answered that, Laura.

 7    BY MR. SCHWARTZ:

 8        Q.    What was that answer?

 9        A.    That they should have been able to

10    foresee that the -- that the building wasn't

11    getting completed and wouldn't be complete in that

12    same timely fashion in order to achieve those --

13    there was $1.2 billion worth of tax incentives to

14    have this project done.

15              I think anybody that walked by a

16    project could see if the building was moving

17    forward, stalled.  Anyone with limited to no

18    construction experience, walk a site of a

19    building, could see where they're at in the

20    construction stages, whether or not it was done or

21    not, whether it be a building or the nuclear

22    reactors, which is what this case did in SCANA.

23        Q.    Would you include yourself in that

24    group of anyone who could walk by a construction

25    site could judge the progress?
```

1              TODD NEILSON

2         MS. POSNER:  Objection.

3         Are you asking him as a representative

4     of the Fund what the Fund could do or him

5     personally?

6   BY MR. SCHWARTZ:

7     Q.    In any capacity, do you include

8   yourself as one of those people?

9         MS. POSNER:  Objection.

10         The deposition here is of the Fund.

11     So if you want to know about the Fund's

12     knowledge is, you're free to ask that.

13     Q.    Well, you're an employee -- you're a

14   trustee of the Fund, right?

15     A.    I am.

16     Q.    So do you think that if the Fund had

17   sent you down to the construction site in South

18   Carolina, you would have been able to accurately

19   judge the progress of the nuclear site?

20         MS. POSNER:  Objection, beyond the

21     scope.

22     Q.    You can answer.

23     A.    Just by walking by it, no.  But

24   reviewing their financials and seeing what

25   everything else is in the grand scheme of things,

1                    TODD NEILSON

2    probably, yes.

3            But I don't know for sure, because

4    it's rhetorical, the question you're asking me.  I

5    didn't walk the site, so ...

6        Q.    Right.  But you said anybody could do

7    it, and I'm just trying to figure out if you

8    actually believe that or not.

9            You actually believe that anybody

10   could walk to the site and judge accurately the

11   progress of two nuclear power plant construction

12   projects?

13           MS. POSNER:  Objection, misstates his

14       testimony.

15       Q.    You can answer.

16       A.    If that's what their responsibility is

17   as an employee of Deloitte, to know where they're

18   at, if they're the auditor, they should be

19   educated into what is going on with that project

20   before reporting it to its stockholders.

21       Q.    But is it the Fund's testimony that

22   Deloitte had the obligation to monitor the

23   schedule for the construction project?

24           MS. POSNER:  Objection.

25           If you can answer.

```
 1                    TODD NEILSON

 2            It calls for a legal conclusion.

 3       A.    I don't know what their responsibility

 4  was, but as the auditor, I think that they should

 5  have done their due diligence a little bit better

 6  reporting it to the stakeholders.

 7       Q.    Okay.  What's your basis for that

 8  statement?

 9       A.    You asked me my opinion, and I gave it

10  to you.

11            MS. POSNER:  Hold on.  Hold on,

12       Mr. Neilson.

13            Objection, calls for a legal

14       conclusion.

15       Q.    What's your basis for your -- the

16  Fund's belief that Deloitte didn't do its due

17  diligence?

18            MS. POSNER:  Objection, calls for a

19       legal conclusion.

20       A.    Asked and answered, I believe, several

21  times.

22       Q.    Well, your counsel can make the

23  objections.  You're required to answer the

24  question.

25            So what is your basis for your
```

```
1                    TODD NEILSON

2   testimony on behalf of the Fund that Deloitte did

3   not do its due diligence?

4            MS. POSNER:  Objection, calls for a

5        legal conclusion and has been asked and

6        answered at least a dozen times at this

7        point.

8            If you can answer again, feel free.

9        A.    I believe I've already answered that

10  numerous times.

11       Q.    I don't think you have.  So why don't

12  you explain to me where in your prior testimony

13  you answered your basis for your belief that

14  Deloitte has not done its due diligence?

15           MS. POSNER:  Objection, calls for a

16       legal conclusion, asked and answered

17       multiple times now.

18           Mr. Neilson, if you want to repeat

19       your answer again, this will be the last

20       time.

21       A.    As auditors of the project, they

22  should have done their due diligence and not made

23  false or -- excuse me -- they should have done

24  their due diligence in reporting to the

25  stakeholders where this project was, and knowing
```

1            TODD NEILSON

2    that it couldn't be completed on time, as stated,

3    in order to get that $1.2 billion worth of tax

4    credits, in my opinion, they dropped the ball and

5    didn't do their due diligence.

6        Q.    Right.  It's that last part that I'm

7    asking about.

8              What's your basis for your testimony

9    that Deloitte didn't do its due diligence?

10             MS. POSNER:  Objection, asked and

11        answered, calls for a legal conclusion, and

12        seeks information that is available through

13        discovery that has not been completed yet.

14             Jed, move it along.

15             MR. SCHWARTZ:  He hasn't answered the

16        question.

17             He's said several times now, on behalf

18        of the Fund, that it's the Fund's view that

19        Deloitte didn't do its due diligence.  It's

20        perfectly within my rights to understand the

21        basis for that testimony.

22             And if the witness doesn't have a

23        factual basis for that testimony, he can say

24        so, and that's fine, and we can move on.

25             MS. POSNER:  He has provided to you

1                    TODD NEILSON

2        his answer on multiple occasions.  You don't

3        like the answer, that's fine, but you don't

4        get to sit here and harass him and ask the

5        same question over and over and over again.

6              MR. SCHWARTZ:  I haven't done that.

7    BY MR. SCHWARTZ:

8        Q.    Mr. Neilson, what facts are you

9    relying on when you testify under oath that

10   Deloitte didn't do its due diligence?

11             MS. POSNER:  Objection, calls for

12       attorney-client privileged communications

13       now, asked and answered, and is an improper

14       contention interrogatory prior to the

15       completion of discovery.

16             MR. SCHWARTZ:  Are you instructing him

17       not to answer?

18             MS. POSNER:  I'm instructing him not

19       to convey any information provided to him

20       through counsel.  If he knows anything

21       further than what he's already testified to,

22       he's welcome to provide that.

23             THE WITNESS:  I believe I've already

24       gave him my answer several times to that

25       question.

1                    TODD NEILSON

2        Q.    What facts am I forgetting -- what

3    facts did you identify in response to -- that

4    would answer that question?

5              MS. POSNER:  Same objection.

6              If you have anything further to add,

7         feel free.  If not, you can say so as well.

8        A.    I have nothing further to add to that.

9        Q.    Well, I want to make sure I

10   understand.  When I go back through the

11   transcript, if you've pointed to -- if you've

12   identified a fact that supports the Fund's belief

13   that Deloitte didn't do its due diligence, I want

14   to understand what that fact is.

15             I don't think you have, so if there's

16   a fact that supports that belief, I want to know

17   what it is.

18             Can you point me to the fact that

19   you've identified?

20             MS. POSNER:  Same objection.

21             Jed, move on.

22             MR. SCHWARTZ:  I will as soon as he

23        answers the question.

24             MS. POSNER:  He's literally answered

25        the question to the best of his ability at

1                    TODD NEILSON

2        least 12 times now.

3              Move on.

4    BY MR. SCHWARTZ:

5        Q.    Mr. Neilson, will you agree with me

6    that you have not pointed to a single fact to

7    support the Fund's opinion that Deloitte didn't do

8    its due diligence?

9              MS. POSNER:  Objection, misstates his

10        testimony.

11       Q.    You can answer.

12       A.    I believe I have.  I've given you my

13   answers.

14       Q.    Okay.  So what fact did you point to

15   that I'm just not remembering?

16             MS. POSNER:  Objection.  Same

17        objections.

18             Please, move on.  You are harassing

19        the witness.

20       Q.    You can answer.

21             MR. SCHWARTZ:  This shouldn't be

22        difficult.  I want to know what the facts

23        are.

24             If he has no facts, say he has no

25        facts, but I want to know what facts are.

```
 1                    TODD NEILSON
 2        Q.    I'm entitled to understand what facts
 3   you're relying on.
 4              So, Mr. Neilson, what facts have you
 5   testified to that supports the Fund's opinion that
 6   Deloitte did not do its due diligence?
 7              MS. POSNER:  Objection, same as prior.
 8              If you have anything further to add,
 9         feel free to do so.  If not, you can tell
10         Mr. Schwartz that as well.
11        A.    I have nothing further to add to that,
12   Mr. Schwartz.  I think I've answered that question
13   at least a dozen times, as Laura has kindly said,
14   so can we move on to the next question, please?
15        Q.    No.  We'll move on when you point me
16   to the fact that I'm not -- that I'm not
17   understanding.
18              If I'm wrong, then we can move on,
19   I'll apologize.
20              What fact?
21        A.    I just testified to.
22              MS. POSNER:  Okay.  Jed, I am going to
23         instruct the witness not to answer this
24         question for the 15th time now.
25              You've asked and answered it many,
```

```
 1                        TODD NEILSON

 2          many times.  He's given you a response.  You

 3          don't like it, that's fine.  But we're not

 4          going to sit here all day and ask the same

 5          question over and over again.  You are

 6          harassing the witness.

 7     BY MR. SCHWARTZ:

 8          Q.    Are you going to follow your counsel's

 9     instruction not to answer that question?

10          A.    I am.

11                MR. SCHWARTZ:  I'm going to ask the

12          court reporter to mark that portion of the

13          transcript, please.

14          Q.    Mr. Neilson, have you read the

15     complaint in this case?

16          A.    I have.

17          Q.    When did you read it for the first

18     time?

19          A.    I've read the complaint for the first

20     time when I became involved in the case.

21          Q.    When was that?

22          A.    I don't know the exact date.

23                You have that in front of you, right?

24          Q.    Was it within the past month or so?

25          A.    Month or -- about two months.
```

```
1                    TODD NEILSON

2        Q.    Who at the Fund, if anyone, reviewed

3   the complaint before it was filed?

4        A.    Tara Chupka, who was our counsel,

5   in-house.

6        Q.    And how do you know that Ms. Chupka

7   reviewed the complaint before it was filed?

8        A.    'Cause she was the one that provided

9   all the documents for discovery.

10       Q.    Did you ask Ms. Chupka if she read the

11  complaint before it was filed?

12       A.    I didn't ask her, no.

13       Q.    How do you know that she did?

14       A.    I don't know if she did.  I assume she

15  did, but I don't know what she did.  You would

16  have to ask her that.

17       Q.    As the representative of the Fund, are

18  you aware of any anyone at the Fund reviewing the

19  complaint before it was filed?

20       A.    Yes.  Ms. Chupka and, of course,

21  Mr. Burrows, who was in there prior to me as the

22  plaintiff.

23       Q.    Okay.  Now, how are you aware that

24  Ms. Chupka reviewed the complaint before it was

25  filed?
```

```
 1                    TODD NEILSON

 2            I thought you said you weren't aware

 3    of that.

 4       A.   I didn't say that at all.  I said she

 5    was on it.  I don't know if they read it for sure

 6    or not.

 7            You're twisting my words, Counsel.

 8       Q.   Maybe there's a miscommunication.

 9            As a representative of the Fund, are

10    you aware of anyone at the Fund reviewing the

11    complaint before it was filed?

12       A.   Yes.

13       Q.   Okay.  Who at the Fund reviewed the

14    complaint before it was filed?

15       A.   Tara Chupka and Brian Burrows.

16       Q.   And how do you know that Ms. Chupka

17    reviewed the complaint before it was filed?

18       A.   Well, because she was responsible for

19    getting the stuff together, and she also was on

20    calls with Laura and myself to try to get me up to

21    speed with what was going on.

22            So I misspoke earlier with that.  So,

23    of course, she read it.

24       Q.   And Ms. Chupka has told you that she

25    reviewed the complaint before it was filed?
```

1                         TODD NEILSON

2        A.    I didn't have conversation with her to

3    that specific -- excuse me.

4        Q.    So as you sit here today as the

5    representative of the Fund, you don't know one way

6    or the other whether Ms. Chupka reviewed the

7    complaint before it was filed.  Is that fair to

8    say?

9              MS. POSNER:  Objection, misstates his

10        testimony.

11       Q.    You can answer.

12       A.    She didn't tell me she reviewed it.  I

13   just assumed based on her knowledge of the case

14   that she read it.

15       Q.    Okay.  Without assuming --

16       A.    Excuse me -- and being an attorney

17   working inside, I would assume that she read that

18   and that's ...

19       Q.    Were you finished?

20       A.    Yes.

21       Q.    So you're assuming that Ms. Chupka

22   read the complaint before it was filed, but you

23   don't know that, correct?

24       A.    I never came out and asked her if she

25   read it, but that would be correct then, yes.

```
 1                    TODD NEILSON
 2        Q.    And how do you know that Mr. Burrows
 3   reviewed the complaint before it was filed?
 4        A.    Again, I don't know, I never had a
 5   conversation with him on it, but he had the
 6   documentation on it that he was the original
 7   plaintiff.
 8             So just before I became -- I read it
 9   first, too, before I put mine, so I just assumed,
10   so I didn't have any prior knowledge to that.
11        Q.    Okay.  So assumptions aside, you
12   don't -- sitting here as the representative of the
13   Fund, you don't know that anybody at the Fund
14   reviewed the complaint before it was filed.  Is
15   that fair?
16             MS. POSNER:  Objection, misstates the
17        testimony, and also calls for
18        attorney-client privileged communications
19        with counsel to the Fund.
20        Q.    You can answer, unless your counsel
21   instructs you otherwise.
22             MS. POSNER:  You can answer, just
23        don't reveal your communications with me or
24        with Ms. Chupka.
25        A.    Then could you restate that question,
```

1                      TODD NEILSON

2    Jed, please?

3         Q.    Sure.   Sure.

4              So putting assumptions aside, because

5    I'm just asking about facts, is it fair to say

6    that, as the representative of the Fund, you don't

7    know if anyone at the Fund reviewed the complaint

8    before it was filed?

9              MS. POSNER:   Objection, misstates his

10        testimony.

11        A.    Yes.

12        Q.    What's the class period for the

13   complaint?

14        A.    February 2016 through December 2017.

15        Q.    I should have asked this before, but

16   are you looking at a document other than

17   Exhibit 15?

18        A.    No.

19        Q.    And who are the members of the class

20   that the Fund seeks to represent?

21             MS. POSNER:   Objection.

22             Are you asking for the names?

23             MR. SCHWARTZ:   I'm asking for the

24        Fund's understanding of the members of the

25        class.

```
 1                    TODD NEILSON

 2            MS. POSNER:  If you understand that --

 3        I don't even understand that question.

 4        A.    I don't understand the question

 5   either.

 6        Q.    Okay.  What is the class that the Fund

 7   seeks to represent?

 8        A.    I don't understand what you mean by

 9   "what is the class."

10        Q.    Do you understand that this action

11   that you're testifying in is what's called a

12   "putative class action"?

13        A.    Yes, I guess.

14        Q.    What's your understanding of what --

15        A.    I'm not an attorney.  I'm an

16   electrician by trade, so ...

17        Q.    What's your understanding of what a

18   class action is -- withdrawn.

19              I should be clearer.  I'm asking about

20   the Fund's knowledge.

21              What's the Fund's understanding of

22   what a class action is?

23              MS. POSNER:  Are you asking about a

24        securities class action or just class

25        actions in general?
```

1           TODD NEILSON

2           MR. SCHWARTZ:  Whatever the Fund

3       understands a class action to be.

4           MS. POSNER:  It's beyond the scope of

5       the 30(b)(6).

6           If you understand the question, you

7       can answer.

8       A.    I -- I don't know what counsel -- a

9   class action is just a broad suit against a

10  company or an entity.

11      Q.    And do you understand that the Fund

12  has sought to have this action certified as a

13  class action?

14      A.    I am.

15      Q.    What is the Fund's understanding of

16  what that means?

17      A.    The Fund's understanding is that we

18  are seeking to get a judgment for everyone

19  involved that -- the class holders at this current

20  time, and everyone benefits from that, if, in

21  fact, it's successful.

22      Q.    Who is the everyone that you referred

23  to in your prior testimony?

24      A.    The class holders.

25      Q.    And what's your understanding of --

1                        TODD NEILSON

2   what are the -- how are the class holders defined?

3            MS. POSNER:  Objection, calls for a

4        legal conclusion.

5        A.    Anyone that were shareholders of that

6   particular investment during the time that's in

7   question.

8        Q.    You see Topic 4 says your role and

9   participation --

10       A.    I'm sorry, I'm having difficulty

11  hearing you.

12            Could you repeat that, please?

13       Q.    Sure.

14            Can you hear me now?

15       A.    Yes.  You're a little bit farther from

16  the mic.  It was better when you were closer, that

17  was all.

18       Q.    Is this better?

19       A.    Yes.  Thank you.

20       Q.    Topic 4 says your role and

21  participation in the class action.

22            Do you see that?

23       A.    I do see that, yes.

24       Q.    What is the Fund's understanding of

25  its role in this class action?

```
 1                    TODD NEILSON

 2       A.    Our role is to represent the class and

 3  to try to do what's best and get the best return

 4  and settlement for all the class and stakeholders,

 5  not just us.

 6       Q.    And how has the Fund gone about doing

 7  that to date?

 8             MS. POSNER:  Objection.

 9             Do you understand the question?

10             THE WITNESS:  I do not.

11       Q.    Well, how has the Fund attempted to

12  satisfy its role in this class action so far?

13             MS. POSNER:  Objection.

14             If you understand.

15       A.    I guess by applying to be the lead

16  plaintiff in the case.

17       Q.    Anything else?

18       A.    Not that I can think of.

19             MR. SCHWARTZ:  Okay.

20             Chassity, we can bring that document

21       down.  We'll probably go back to it later.

22             MS. POSNER:  Jed, do you want to --

23       are you moving on to a new topic?  Do you

24       want to take a quick break?

25             MR. SCHWARTZ:  Sure.  That's fine.
```

1                    TODD NEILSON

2              We can go off the record.

3              VIDEOGRAPHER:  We're going off the

4         record at 10:55 a.m.

5              (Recess.)

6              VIDEOGRAPHER:  We're back on the

7         record at 11:08 a.m.

8    BY MR. SCHWARTZ:

9         Q.    Mr. Neilson, is there anyone in the

10   room with you as you're testifying?

11        A.    No.

12        Q.    Are you looking at anything other than

13   the screen that has the litigation --

14   LiveLitigation app?

15        A.    I am not.

16        Q.    Do you have any documents with you?

17        A.    No, sir.

18        Q.    Are you able to see your testimony as

19   it's being given?

20        A.    Am I able to see it?  What do you

21   mean?  I don't -- you mean, on a video, on video

22   here?

23        Q.    Well, are you able to see a transcript

24   of your testimony?

25        A.    No.

1                    TODD NEILSON

2              THE WITNESS:  Laura, you're on mute.

3              MS. POSNER:  Oh, sorry.

4              He would have to hit that scroll thing

5         if you want him to look at it.

6              MR. SCHWARTZ:  No, I don't.  I just

7         wanted to know if he was looking at it.

8              THE WITNESS:  To that point, I would

9         like to amend my previous testimony.

10              I talked to my attorney during the

11         break, if possible, and, you know, it was

12         brought to my attention, because Tara Chupka

13         is an in-house attorney, I had conversation

14         with her about the complaint and about

15         reading the document, and at that time, in

16         preparation for today's deposition, she did,

17         in fact, read those -- all of the documents,

18         and she was responsible for putting together

19         all of the discovery evidence.

20              So she did, in fact, read the

21         complaint, as did Brian Burrows, according

22         to Tara, as previously stated.  So I was ...

23    BY MR. SCHWARTZ:

24         Q.    Okay.  What did Ms. -- what else did

25    Ms. Chupka tell you during this conversation?

Page 48

```
 1                      TODD NEILSON

 2           MS. POSNER:  Objection.

 3           He's -- the reason he's having a

 4      difficult time answering these questions is

 5      she has attorney-client communications with

 6      him as general counsel to the Fund.

 7           So if you want to ask general

 8      questions, he can answer, but he can't talk

 9      about the substance of their questions -- of

10      their conversations.

11           MR. SCHWARTZ:  Well, he just disclosed

12      the substance of the conversation, so I want

13      to know everything else that was discussed

14      during that conversation.

15           MS. POSNER:  No, he did not disclose

16      the substance of the conversation.

17           You had asked him whether he knew, and

18      he was explaining why he couldn't get into

19      the substance of that conversation but what

20      she had confirmed for him in preparation for

21      today's deposition.

22      Q.    Mr. Neilson, you jest testified about

23   a conversation with Ms. Chupka, right?

24      A.    I did.

25      Q.    When did that conversation take place?
```

```
 1                   TODD NEILSON

 2        A.    That was -- that took place a few

 3   weeks ago prior to me taking over and for seeing

 4   this stuff moving forward to make sure I was fully

 5   aware of all that had been done up until that

 6   point.

 7        Q.    What else did Ms. Chupka tell you

 8   during that conversation?

 9             MS. POSNER:  Don't disclose any

10        privileged communications.

11             If you're asking him about his

12        communications with regard to preparing for

13        the -- for today's deposition, that's a

14        different story, so if you could clarify,

15        please.

16             MR. SCHWARTZ:  No, I don't -- I'm not

17        going to change the question.

18             If you're going to instruct him not to

19        answer, you can do that, but I want to make

20        sure I have a clear record.

21             I'm asking the witness to tell me

22        everything else that he discussed with

23        Ms. Chupka during this conversation that

24        he's already testified to.

25             MS. POSNER:  Objection.
```

1              TODD NEILSON

2          If you can testify as to the topics

3      you discussed with Tara but not the

4      substance, that is fine.

5      A.    Essentially, what my responsibilities

6  would be with communicating with Cohen Milstein,

7  Laura, making sure that I reviewed all the

8  documents and what has to happen moving forward in

9  the event that my interaction would be required to

10 review documents to make sure that Laura and her

11 firm were doing everything they needed to do on

12 their end as it applies to this case.

13     Q.    What other topics were discussed?

14     A.    No other topics other than those that

15 we've just mentioned as far as the filings, the

16 discovery, and everything else.

17     Q.    So was -- this was the conversation

18 you had with Ms. Chupka where you learned about

19 your responsibilities and your role in this

20 litigation going forward?

21     A.    Yes, what I would be responsible to do

22 and what was being asked of me.

23     Q.    Were you aware of this litigation

24 before that conversation with Ms. Chupka?

25     A.    No.

```
 1                      TODD NEILSON

 2        Q.    So did you ask Ms. Chupka what the

 3   litigation was about?

 4        A.    Yes.

 5        Q.    Okay.  And what did she say?

 6        A.    That we're filing to be lead plaintiff

 7   in a class action suit based on the SCANA

 8   investment against Deloitte & Touche.

 9        Q.    Were you aware of the SCANA investment

10   at the time?

11        A.    I was not.

12        Q.    Did you ask her what the SCANA

13   investment was?

14        A.    Yes.  After we got into that, yes.

15        Q.    And what did she say?

16        A.    I read the documents.  I was given the

17   documents at that point to go through and try to

18   get a better understanding of what it was.

19        Q.    Did you know who Deloitte & Touche was

20   at that time?

21        A.    No.

22        Q.    Did you ask who they were?

23        A.    At that point, I read the complaint --

24   some of the complaint.  I had it in front of me,

25   so I kind of knew who it was at that point.
```

1                     TODD NEILSON

2              I don't recall if she said who they

3     were, and given the brief synopsis, I'm kind of

4     remiss as far as the time frame with that.

5          Q.    Did you have the complaint in front of

6     you when you had this conversation with

7     Ms. Chupka?

8          A.    I don't recall.

9          Q.    So did you ask Ms. Chupka what

10    Deloitte had done wrong?

11         A.    I did not.

12         Q.    So this is the conversation in which

13    Ms. Chupka told you you were going to have

14    significant responsibilities in connection with

15    the litigation, right?

16         A.    Yes.

17         Q.    And she told you that the claims were

18    going to be asserted against Deloitte & Touche,

19    right?

20         A.    Yes.

21         Q.    And you didn't ask any question as to

22    what those claims were or what Deloitte was

23    accused of doing wrong?

24              MS. POSNER:   Objection, misstates his

25         testimony.

```
 1                      TODD NEILSON
 2        A.    At that point, not to Ms. Chupka, no.
 3   I was handling that stuff directly with Laura and
 4   my counsel.
 5        Q.    So at what point did you become aware
 6   of what the Fund's claims were against Deloitte?
 7        A.    When I read the complaint.
 8        Q.    How long after this conversation with
 9   Ms. Chupka did you read the complaint?
10        A.    I -- I can't honestly answer that.  I
11   don't know.
12              Right around the same time.  There
13   wasn't a lot of time that lapsed.
14        Q.    What's the Fund's understanding of
15   what Deloitte's role was with respect to SCANA
16   during the class period?
17        A.    Could you repeat that question,
18   please?
19        Q.    Sure.
20              What's the Fund's understanding of
21   what Deloitte's role was with respect to SCANA
22   during the class period?
23        A.    They were the auditor of the project
24   and all of the financials for SCANA.
25        Q.    And when you say the "project," what
```

```
 1                    TODD NEILSON
 2   do you mean?
 3        A.    The building of the nuclear power
 4   plant in South Carolina.
 5        Q.    What's your basis for your statement
 6   that Deloitte was the auditor of the nuclear power
 7   plant project?
 8        A.    'Cause they're listed as the auditor
 9   for the project in the documentation that I've
10   read.
11        Q.    What documentation are you referring
12   to?
13        A.    All of the brief, the binder put
14   together stating all the stuff that -- all the
15   discovery and everything and the nature of the
16   complaint against Deloitte.
17        Q.    So the documentation you're referring
18   to is the complaint, correct?
19        A.    The complaint and everything else that
20   was put together and given to me for my review to
21   familiarize myself.
22        Q.    Okay.  What were those documents that
23   were given to you for your review?
24        A.    It was a copy of the complaint and all
25   the exhibits and the list of questions that you
```

1                    TODD NEILSON

2    were going to be going through and asking me

3    today.

4         Q.    Were there any other documents that

5    you're aware of that identified Deloitte as the

6    auditor of the nuclear power plant construction

7    project?

8         A.    Not that I'm aware of, no, not that

9    I've seen.

10        Q.    Has the Fund -- withdrawn.

11              What is the Fund's understanding of

12   what Deloitte's responsibilities were as the

13   purported auditor of the nuclear project?

14        A.    To accurately --

15              MS. POSNER:  Objection.

16              THE WITNESS:  I'm sorry, Laura?

17              MS. POSNER:  Objection.

18              If you can answer, go ahead.

19        A.    Just to report back to the

20   stakeholders the status of the investment project,

21   the construction, as previously stated.

22        Q.    Who are the stakeholders?

23        A.    Everybody -- all the class holders,

24   the people that own common stock in the company

25   that were defrauded because of this.

```
1                        TODD NEILSON
2          Q.    Is it the Fund's understanding that
3    Deloitte did, in fact, report on the status of the
4    construction project?
5          A.    Can you repeat that question, please?
6          Q.    Is it the Fund's understanding that
7    Deloitte did, in fact, report on the status of the
8    construction project?
9          A.    It is our understanding, yes.
10         Q.    And what document contains that report
11   that you just referred to?
12         A.    I haven't seen a document saying that
13   they reported on it.
14         Q.    What is the Fund's basis for its
15   testimony that Deloitte did, in fact, report on
16   the status of the construction project?
17              MS. POSNER:  Objection, calls for a
18         legal conclusion and is an improper
19         contention interrogatory.
20              But if you can answer.  Go ahead.
21         A.    As the auditors of this project, no
22   different than what my obligation is as a trustee,
23   you have a fiduciary responsibility to report to
24   the class holders where this -- what the status of
25   this project is.
```

```
 1                    TODD NEILSON

 2              And I don't -- and we don't feel that

 3    that has happened, and hence, it's where we're at

 4    in this case.

 5        Q.    So I'm confused.  You just said you

 6    don't feel that that has happened.

 7              You don't feel that what has happened?

 8              Because I thought you testified that

 9    the Fund did, in fact, believe that Deloitte

10    reported on the status of the project.

11              MS. POSNER:  Objection.

12              You can answer.

13        A.    I don't believe that they did their

14    due diligence in reporting it back to everyone.

15        Q.    Okay.  So look, I want to make sure

16    that I understand your testimony.

17              You testified that it's the Fund's

18    understanding that Deloitte did, in fact, report

19    on the status of the construction project.

20              Do you recall testifying to that a

21    minute ago?

22        A.    Yes.

23        Q.    Now, do you want to change that

24    testimony or is that still your testimony?

25        A.    No, it's still my testimony.
```

1                    TODD NEILSON

2              I guess you're reading it right from

3    there, so, yes.

4         Q.    And then I asked you:  Is there a

5    document that contains that report?

6              And you said you haven't seen any

7    document that they reported on it.

8              Do you recall that?

9         A.    I do.

10        Q.    So now I'm asking, since it apparently

11   is not in a document, what is the Fund's basis for

12   the testimony that Deloitte did, in fact, report

13   on the status of the construction project?

14             MS. POSNER:  Objection, misstates his

15        testimony.

16             He didn't say he -- that there are no

17        such document existing.  He said he hasn't

18        seen any documents.

19        Q.    Are you aware of a document that

20   exists that you haven't seen?

21        A.    I am aware that there have been

22   several judgments against SCANA, the managers of

23   SCANA defrauding people out of -- you know, lying

24   under testimony, you know, there's -- the list

25   goes on and on.  There's a whole -- this is just

1                    TODD NEILSON

2    another in the long line of things that went on

3    with -- as it applies to the SCANA project.

4         Q.    Is SCANA Corporation a defendant in

5    this case?

6         A.    No.

7         Q.    Is any officer or director of SCANA a

8    defendant in this case?

9         A.    No, not to my knowledge.

10        Q.    So you're aware, apparently, of some

11   judgment against SCANA.  Is that correct?

12        A.    Multiple, I believe, yes.

13        Q.    And is it your testimony that these

14   judgments are, in fact, the documents in which

15   Deloitte reported on the status of the

16   construction project?

17             MS. POSNER:  Objection, misstates his

18        testimony.

19        A.    I don't know.  I'm not certain of

20   that.

21        Q.    Okay.  So I just want to understand,

22   what is the fact or facts that the Fund is relying

23   on to support the testimony that Deloitte did, in

24   fact, report on the status of the construction

25   project?

```
1                    TODD NEILSON
2              MS. POSNER:  Objection, improper
3         contention interrogatory.
4              If you can answer, feel free.
5         A.   I -- I have no -- I have not seen any
6    documents included in my binder stating that fact.
7         Q.   I'm just asking as broad as can be, is
8    the Fund aware of any fact that supports the
9    testimony that you just gave?
10             MS. POSNER:  Objection, other than
11        what he's testified to.
12             If you can answer, feel free.
13             MR. SCHWARTZ:  I don't know what that
14        means.
15        Q.   I'm just asking as broad as a question
16   as possible, because I don't think you've
17   identified a single fact.
18             So is the Fund aware of any fact that
19   supports your under-oath testimony that it is the
20   Fund's understanding that Deloitte did, in fact,
21   report on the status of the construction project?
22             MS. POSNER:  Objection.  It's an
23        improper contention interrogatory.
24             But if you can answer, go ahead.
25        A.   Yeah, I don't have an answer for that.
```

1                    TODD NEILSON

2    I don't know.

3         Q.    Now, you mentioned -- withdrawn.

4              You testified earlier about fiduciary

5    responsibilities to report to class holders.

6              You recall that testimony?

7         A.    Yes.

8         Q.    Is it the Fund's testimony that

9    Deloitte has some sort of fiduciary responsibility

10   to the class members?

11             MS. POSNER:  Objection, calls for a

12        legal conclusion.

13        A.    I would just think, as an auditor,

14   that they were no different than an IRS audit that

15   they would do, go dig deep to make sure that

16   everything was on the up and up, just as what my

17   understanding is of what an auditor does, but

18   that's just from a electrician's perspective.

19             Somebody that audits is somebody that

20   goes through and looks at every last detail to

21   make sure everything is in order, and it appears

22   that that wasn't the case here.

23        Q.    I just want to understand.

24             Is it the Fund's position that

25   Deloitte owes a fiduciary duty to any of the class

Page 62

1                    TODD NEILSON

2    members?

3              MS. POSNER:  Objection, calls for a

4         legal conclusion.

5              But if you can answer, go ahead.

6         A.    In the Fund's opinion, yes.

7         Q.    Okay.  And what's the basis for the

8    Fund's opinion that Deloitte owes a fiduciary duty

9    to the class members?

10             MS. POSNER:  Objection, calls for a

11        legal conclusion.

12        A.    As somebody who's an auditor, they

13   should be able to go through and see if there's

14   any kind of indiscretions, if there's any kind of

15   things that don't add up, deadlines that aren't

16   going to be met.  That's the whole purpose of

17   somebody performing an audit.

18        Q.    And if it turns out that the Fund is

19   wrong and Deloitte doesn't, in fact, owe a

20   fiduciary duty to the class members, does that

21   change your view as to the claims asserted?

22        A.    No, not at all.

23             MS. POSNER:  Objection.

24        Q.    Why not?

25        A.    Just as I previously stated what my

```
 1                      TODD NEILSON
 2   understanding is an auditor's job to do.
 3       Q.    Now, is it your -- withdrawn.
 4            Is it the Fund's understanding that
 5   Deloitte was specifically retained to audit the
 6   schedule of the nuclear project?
 7       A.    Specifically scheduled, no.  To audit
 8   everything, the financials, everything as its --
 9   as a whole, not just the schedule.
10       Q.    When you say the "financials," what do
11   you mean?
12       A.    Making sure they had enough money to
13   complete the project, making sure that everything
14   was going as planned and everything was getting
15   reported back to the investors, you know, the
16   stakeholders, honestly and timely.
17       Q.    And so when you're referring to
18   financials, you're referring to the financials of
19   the construction project.  Is that right?
20            MS. POSNER:  Objection, misstates his
21       testimony.
22       A.    Not just the construction project, as
23   per the whole investment.  A lot of it was tied --
24   a lot of the profits, what they were hoping for,
25   was tied to the construction of the reactors based
```

```
1                    TODD NEILSON
2   on the need -- the demand for power -- additional
3   power in that area, and the over a billion
4   dollars' worth of tax credits that were tied into
5   it being completed in a timely fashion, which
6   would have, in turn, been more profitable for all
7   the stakeholders and class holders.
8        Q.    What's the investment that you have
9   referred to several times?
10       A.    What's the investment?
11       Q.    Yeah.  You referred to, for example,
12  in your last question -- in your last answer, you
13  said, "Not just the construction project, as per
14  the whole investment."
15            What do you mean by the "whole
16  investment"?
17       A.    Everything that's part of the SCANA
18  investment in that portfolio from LSV.
19       Q.    So is it your testimony that the
20  Fund's understanding is that Deloitte was
21  responsible for auditing everything with respect
22  to SCANA?
23            MS. POSNER:  Objection, calls for
24       expert testimony.
25            But if you can answer, go ahead.
```

```
1                    TODD NEILSON

2         A.    I -- I'm not an expert on that.  Like

3    I said, I would just think that -- yes, as part of

4    that, yes.

5         Q.    Now, you said it was the Fund's

6    understanding that these tax credits would have

7    made things more profitable for all stakeholders

8    and class holders.

9               What did you mean by that?

10        A.    According -- according to all the

11   information that I've read in the complaint, that

12   there was $1.2 billion, somewhere in the

13   neighborhood of that, in tax credits available

14   if -- if the project was completed and deadlines

15   were met and it was up and running in the given

16   amount of time, that there was federal tax credits

17   involved, and that wasn't met.  Those dates

18   weren't met.

19        Q.    What's the Fund's understanding as to

20   who would receive the benefit of those tax

21   credits?

22        A.    The Fund's understanding is anyone

23   that was a stakeholder in that investment and all

24   the people that held that investment in their

25   portfolios, not just us --
```

1                      TODD NEILSON

2          Q.    So when you say "stakeholder" --

3          A.    -- as a Fund.

4          Q.    -- you mean investors in SCANA stock?

5          A.    Yes.

6          Q.    So it's the Fund's understanding that

7     the investors in SCANA stock would have received

8     the benefit of those tax credits?

9          A.    No, that they would -- their stock

10    would become more valuable because of those tax

11    credits.

12         Q.    What's the Fund's understanding as to

13    whether the economic benefit of those tax credits

14    would have been passed on to SCANA's rate payors?

15              MS. POSNER:  Objection.

16              If you can answer, go ahead.

17         A.    I'm not an expert in that category, so

18    I don't really know.  I would just -- it would

19    just be more valuable.  You know, just from my

20    perspective, it would seem it would be more

21    valuable from the Fund's perspective because it

22    would be more profitable, and that profit

23    generally gets passed on to its stakeholder.

24         Q.    What's the basis for the Fund's

25    understanding that these tax credits would allow

```
1                    TODD NEILSON

2    SCANA to be more profitable?

3              MS. POSNER:  Objection, asked and

4         answered.

5         A.    Asked and answered, right, that it

6    would make that stock more valuable because you're

7    getting $1.2 billion tax credit on the initial

8    investment to credit, so it would be -- it would

9    help fund it -- self-fund it.

10             MR. SCHWARTZ:  Okay.  Let's move to

11        Tab 2, Chassity, and we'll mark it as

12        Exhibit 16.

13             THE WITNESS:  I heard somebody's dogs

14        barking.

15             MR. SCHWARTZ:  That's mine.

16             THE WITNESS:  There must be another

17        dog walking by.

18             (Exhibit 16, Declaration of Todd

19        Neilson in Support of Supplemental Motion

20        for Class Certification, Appointment of

21        Class Representative, and Appointment of

22        Class Counsel, was marked for identification

23        at this time.)

24   BY MR. SCHWARTZ:

25        Q.    Okay.  Mr. Neilson, you should have
```

```
 1                      TODD NEILSON

 2   before you a document that's been marked as

 3   Exhibit 16.  It's titled, "Declaration of Todd

 4   Neilson in Support of Supplemental Motion for

 5   Class Certification, Appointment of Class

 6   Representative, and Appointment of Class Counsel."

 7           Do you see that?

 8       A.   I do.

 9       Q.   Have you seen this document before?

10       A.   I have.

11       Q.   And is that your signature on the

12   fourth page of the document?

13       A.   It is.

14       Q.   Okay.

15           When you or -- when you signed this,

16   did you understand that you were signing it under

17   oath?

18       A.   I did.

19       Q.   And you believed then that all the

20   statements in here were true and accurate?

21       A.   I did.

22       Q.   Okay.  Who wrote this declaration?

23       A.   Who wrote it?

24           Somebody from Cohen Milstein, I

25   believe.
```

```
1                      TODD NEILSON

2         Q.    Did you review it before you signed

3    it?

4         A.    I read through it, yes.

5         Q.    And you were comfortable that

6    everything was -- was true and accurate when you

7    signed on it?

8         A.    Yes.

9         Q.    I'm going to go back to page 1.

10              Are you at page 1?

11        A.    I am now, yes.

12        Q.    Okay.  And do you see that paragraph 1

13   refers to the Local 98 Pension Fund?

14        A.    I do.

15        Q.    And that's the Fund that we've been

16   talking about today, right?

17        A.    Yes.

18        Q.    And then paragraph 3 refers to the

19   Local 98 Union.

20              Do you see that?

21        A.    Yes.

22        Q.    And that's the Union that we've been

23   discussing, right?

24        A.    Yes.

25        Q.    Now, paragraph 3 says that the Union
```

```
1                    TODD NEILSON
2    and the Fund are two distinct legal and corporate
3    entities with different governing structures.
4            Do you see that?
5        A.   I do.
6        Q.   What is the governing structure of the
7    Fund?
8        A.   The Fund is made up of eight trustees,
9    four management trustees.  One is a management
10   chairman, along with three trustees.
11           And on the Union side, we currently
12   have one chairman and two trustees with one
13   vacancy.
14       Q.   And what is the difference --
15       A.   Due to a recent retirement -- sorry --
16   due to a recent retirement last year, that last
17   seat hasn't been filled yet.
18       Q.   What is the difference between a
19   management trustee and a Union trustee?
20       A.   A Union trustee is -- they're members
21   of the Union that are sitting on the Fund, and the
22   management trustees are members of our
23   contractors' association, which is NECA.  It's the
24   National Electrical Contractors Association.
25           The Penn, Jersey, Delaware chapter,
```

```
 1                    TODD NEILSON

 2   which is our regional chapter, they have four

 3   contractor trustees that sit on that board as

 4   well.  They weigh in equally on any kind of

 5   changes to the formats and stuff that we do.

 6        Q.    Who are the four management trustees?

 7        A.    Jeff Scarpello, Jerry Rothstein, Tom

 8   Moore, and the fourth one off the top of my head,

 9   I'm just -- I can't think of the fourth one off

10   the top of my head.

11        Q.    Is it Charles McDonald?

12        A.    Charlie McDonald, yes.  Thank you,

13   yes.  Thank you.

14              Apologize.  I'm a little nervous.

15   I've never done this before.

16              Thank you.

17        Q.    What role have any of the four

18   individuals that you just mentioned played with

19   respect to this litigation?

20        A.    None.

21        Q.    Why?

22        A.    Because I took over for -- as the lead

23   plaintiff -- as the representation of the Fund in

24   this litigation.

25        Q.    Who asked you to do that?
```

```
 1                     TODD NEILSON

 2         A.    Tara Chupka, who's the attorney for

 3    the Fund, in-house counsel.

 4         Q.    And did she do this -- do that in the

 5    same conversation that we talked about before?

 6         A.    I don't recall if it was the same

 7    conversation, but it was a conversation about

 8    this.

 9         Q.    What did Ms. Chupka tell you as to why

10    you were being asked to take over as the

11    representative?

12         A.    They asked me to take over this

13    because Brian was stepping away from it.

14         Q.    Did you ask why Mr. Burrows was

15    stepping away from it?

16              MS. POSNER:  Objection.

17              Are you asking if he asked Tara?

18         A.    I didn't ask her why.  They asked me

19    to do it, if I would mind doing it, and I just did

20    it.

21         Q.    Did anybody tell you why Mr. Burrows

22    was stepping away from this litigation?

23              MS. POSNER:  Objection, asking for

24         attorney-client privileged communications.

25              If you can answer without disclosing
```

1                          TODD NEILSON

2          attorney-client privileged communications.

3          A.    I cannot answer without violating

4    attorney-client privilege.

5          Q.    Who are the three Union trustees for

6    the Fund?

7          A.    Brian Burrows, Michael Masculli, and

8    Mike Hnatkowsky.

9          Q.    And you testified that Mr. Burrows is

10   the president of the Union.  Is that correct?

11         A.    He is, yes.

12         Q.    And who is Mr. Masculli?

13         A.    Mr. Masculli is recording secretary

14   for the Union and the trustee.

15         Q.    As the president of the Fund, does

16   Mr. Burrows have the ability to fire you from your

17   position -- withdrawn.

18               As the president of the Union, does

19   Mr. Burrows have the ability to fire you from your

20   position at the Union?

21         A.    No.

22         Q.    Does Mr. Burrows have the ability to

23   fire Mr. Masculli?

24         A.    No.

25         Q.    Is it -- is it the case that only

```
1                    TODD NEILSON
2   Mr. Dougherty has the ability to fire you and
3   Mr. Masculli?
4        A.    No.  He can only -- I can only be
5   fired as a business agent by Business Manager
6   Dougherty.  I'm an elected officer of the Union,
7   as is Michael Masculli, so his position as
8   recording secretary, he holds that until he is
9   voted out of office by the membership.  And
10  Mr. Masculli is not a full-time employee of Local
11  Union 98, so he cannot be fired.  He is an elected
12  officer, as am I in my secondary role.
13       Q.    Do you or Mr. Masculli receive any
14  compensation in your roles as elected officers of
15  the Union?
16       A.    Me being an elected officer, I don't
17  get compensated because I am a full-time officer;
18  however, Mr. Masculli does get minor compensation
19  for attending meetings as such.
20       Q.    Okay --
21       A.    It's on a per diem basis, to add to
22  that, and he gets $20 per meeting attended, and I
23  believe he gets -- and don't quote me on it --
24  about $150 per quarter, something along those
25  lines, is what his compensation is for being the
```

1                      TODD NEILSON

2    recording secretary.

3         Q.    Okay.  And so focusing on your --

4    sorry, withdrawn.

5              You are a business manager.  That's

6    the position for which you get paid, correct?

7         A.    No.  I am a business representative.

8         Q.    So you're -- as a business

9    representative, that's the position for which you

10   get paid, correct?

11        A.    Correct.  And by virtue of that, I'm

12   not allowed to be duly compensated for my role --

13   my position as executive board because I am a

14   full-time personnel getting -- receiving full-time

15   pay.

16        Q.    And is it -- is it the case that only

17   Mr. Dougherty is able to fire you from your

18   position as the business representative?

19        A.    Yes.

20        Q.    Does Mr. Dougherty have any role with

21   respect to the Fund?

22        A.    No.

23        Q.    Do you know someone named Michael

24   Neill?

25        A.    Yes.

```
 1                     TODD NEILSON

 2        Q.   Does he have any role with respect to

 3   the Fund?

 4        A.   No.

 5        Q.   Do you know someone named Marita

 6   Crawford?

 7        A.   Yes.

 8        Q.   Does she have any role with respect to

 9   the Fund?

10        A.   No.

11        Q.   Do you know someone named Niko

12   Rodriguez?

13        A.   Yes.

14        Q.   Does he have any role with respect to

15   the Fund?

16        A.   No.

17        Q.   Do you know someone named Brian

18   Viacca?

19        A.   Yes.

20        Q.   Does he have any role with respect to

21   the Fund?

22        A.   No.

23        Q.   Does the Fund have an auditor?

24        A.   Yes.

25        Q.   Who is the auditor?
```

1                    TODD NEILSON

2         A.    I'm not sure who it is.  It's one of

3    the -- one of the big ones.

4         Q.    Is it Deloitte?

5         A.    It is not.

6         Q.    Does the Board of Trustees on which

7    you sit oversee the Fund's auditor?

8         A.    Yes.  They report to us orally.  They

9    come to our quarterly meetings.

10        Q.    And what is the responsibilities of

11   the Fund's auditor?

12        A.    To audit the Fund and the financials,

13   to make sure everything is in order financially,

14   and that the -- that the numbers match.

15   Everything at the end of the day is what it

16   appears to be.

17        Q.    Does the Fund execute an engagement

18   letter with its auditor?

19             MS. POSNER:  Objection, beyond the

20        scope of the 30(b)(6).

21             Can you identify what -- what topic

22        this is in reference to -- not you, Todd --

23        Mr. Schwartz.

24             MR. SCHWARTZ:  Well, are you going to

25        direct him not to answer?

1                    TODD NEILSON

2          MS. POSNER:  I'm asking you to

3    identify for me which topic in your notice

4    this question goes to.

5          MR. SCHWARTZ:  I'm not going to do

6    that.  I'm just going to ask him the

7    question, and if you're going to direct him

8    not to answer, then that will be what it is.

9          MS. POSNER:  You're refusing to

10   identify which topic in the 30(b)(6) notice

11   your question goes to?

12         MR. SCHWARTZ:  Yeah, I'm not going to

13   go through and justify every question I ask

14   based on the topics.

15         If you want to instruct him not to

16   answer, it's your position that it's outside

17   the scope, you're entitled to do that.

18   You're entitled to instruct him not to

19   answer, and I'll ask him if he's going to

20   follow his counsel's instruction.

21         MS. POSNER:  I haven't asked you do

22   that with regard to every question.  I've

23   asked you with regard to this question to

24   please identify which one of the topics of

25   the 30(b)(6) the question pertains to, and

```
 1                    TODD NEILSON
 2        quite frankly, this whole line of
 3        questioning.
 4     BY MR. SCHWARTZ:
 5        Q.    Are you going to answer the question?
 6        A.    What was the question again?
 7              MS. POSNER:  Just to be clear, before
 8        you go on, you're refusing to identify the
 9        topic that your question goes to?
10        Q.    Does the Fund execute an engagement
11   letter with its auditor?
12              MS. POSNER:  Objection.
13              Please identify the topic in the
14        30(b)(6) this question goes to.
15              MR. SCHWARTZ:  Just -- if you're going
16        to instruct him not to answer, do that.
17        Let's not bog this down.
18              MS. POSNER:  I'm going to ask the
19        court reporter to mark this portion of the
20        transcript.
21              If you can answer the question, you
22        can go ahead, but I'm going to stop this
23        line of questioning if it goes any further.
24        A.    I'm not certain.  I don't know.
25        Q.    Turning to page 2 of Exhibit 16, do
```

1                      TODD NEILSON

2    you see paragraph 5?

3        A.    I do.

4        Q.    Here it states that the Fund is a

5    Taft-Hartley-defined benefit plan.

6              Do you see that?

7        A.    I do.

8        Q.    What does that mean?

9        A.    That it's a defined -- defined --

10   defined benefit plan, and it's a pension fund that

11   is under scrutiny of the rules of the Department

12   of labor and can only be invested in -- certain

13   types of investments are allowed.

14       Q.    Now, in that same paragraph, you

15   write:  "The Department of Labor can file a

16   complaint to enjoin acts and practices that

17   constitute a breach of fiduciary duty, including

18   removal of a fiduciary."

19              Do you see that?

20       A.    I do see that, yes.

21       Q.    Has that happened?

22              MS. POSNER:  Ever?

23              Can you clarify your question?  Are

24        you asking with regard to this Fund and at

25        any point in time?

1                    TODD NEILSON

2            MR. SCHWARTZ:  Yes.

3        A.    Not to my -- not since I've been the

4    trustee on the plan.

5        Q.    Do you see paragraph 6?

6        A.    I do.

7        Q.    The last sentence says, "Pursuant to

8    Section 3.15 of the Local Pension Plan Trust Plan,

9    the Board of Trustees is authorized to take action

10   to remove any trustee by a majority vote in the

11   event that a trustee violates ERISA."

12            Is that accurate?

13       A.    Yes.

14       Q.    Is that the only ground on which a

15   trustee may be removed?

16       A.    I don't have any --

17            MS. POSNER:  Objection, calls for a

18       legal conclusion.

19       A.    I don't have any knowledge of any

20   trustee being removed, so I'm sure there were --

21   if something were to come up and we would take

22   a -- if somebody -- there was any wrongdoing

23   involved, as trustees, we have a fiduciary

24   responsibility to all the people in there to make

25   sure that we protect the assets of the Fund and

1                    TODD NEILSON

2    our members.

3              So if somebody was doing something

4    detrimental to the Fund and to the members, then

5    we would have to do our due diligence to have that

6    person removed, if that were the case.

7         Q.    In your time as trustee of the Fund,

8    are you aware of anyone that has taken action that

9    was detrimental to the Fund or its members?

10        A.    No.

11              Not as it applies to the current

12   trustees, no.

13        Q.    What about as it applies to people who

14   are not the current trustees?

15        A.    I -- I don't have any reason to

16   believe that.  I don't know who, about past

17   trustees.  I only know who's on there since I've

18   been on there.  That's all I can speak to.

19        Q.    Do you see paragraph 7?

20        A.    I do.

21        Q.    The second sentence says, "The

22   indictment involves criminal allegations against

23   certain individuals for conduct that allegedly

24   occurred in their employment with the leadership

25   of the Local 98 Union."

1              TODD NEILSON

2          Do you see that?

3    A.    I do.

4    Q.    What is your understanding of the

5  indictment's allegations?

6          MS. POSNER:  Objection, beyond the

7      scope of the 30(b)(6), and the pending

8      motion for a protective order.

9          And I'm going to instruct the witness

10     not to answer.

11         MR. SCHWARTZ:  So, Laura, just so we

12     cannot burden the record, will it be your

13     instruction that Mr. Neilson is not -- will

14     not be answering any questions related to

15     the indictment or the allegations in the

16     indictment or the labor complaint or the

17     allegations in the labor complaint?

18         MS. POSNER:  That is correct, and

19     consistent with our e-mail to you from a few

20     days ago --

21         MR. SCHWARTZ:  Okay.

22         MS. POSNER:  -- and as is set forth in

23     our pending motion for a protective order.

24         MR. SCHWARTZ:  Okay.  So look, I don't

25     want to go through the litany of questions

1                    TODD NEILSON

2          just to have you instruct him not to answer.

3              So that I can preserve the record, can

4          we have an agreement that, you know,

5          whatever the outcome of that motion for a

6          protective order, that, if we were to

7          prevail, I don't need to have asked every

8          single question here so that we can avoid

9          that?

10              MS. POSNER:  Agreed.

11              MR. SCHWARTZ:  Okay.

12      BY MR. SCHWARTZ:

13          Q.    Okay.  Mr. Neilson, do you see

14      paragraph 10 on page 3 of your declaration?

15          A.    I'm sorry?

16          Q.    Yes.  Do you see paragraph 10 of your

17      declaration?

18          A.    I do.

19          Q.    It says, "The Local 98 Pension Fund

20      Board of Trustees is aware of the indictment and

21      labor case and has not taken any action to remove

22      Mr. Burrows from his role."

23              Do you see that?

24          A.    I do see that, yes.

25          Q.    What was the basis for the board's

1                      TODD NEILSON

2    decision not to remove Mr. Burrows from his role?

3        A.    Those are allegations.  Those are not

4    convictions.  No reason to remove him.

5        Q.    Did the board of the Fund undertake

6    any investigation of the allegations?

7             MS. POSNER:  Objection.

8             If you can -- if you can testify to

9        that without disclosing attorney-client

10       privileged communications, that's fine.  But

11       if not, please don't disclose

12       attorney-client privileged communications.

13       A.    We were made aware of it, and we were

14   reassured by counsel that it wouldn't affect the

15   Fund and the Fund was not under scrutiny, and we

16   left it at that.

17       Q.    Paragraph 11 says, "The Department of

18   Labor is also aware of the indictment and labor

19   case and has not taken any action to remove

20   Mr. Burrows from his role."

21             Do you see that?

22       A.    I do see that.

23       Q.    Do you understand that to still be the

24   case as you sit here today?

25       A.    I have no reason to believe it not to

Page 86

```
 1                    TODD NEILSON

 2    be.   It's what's stated in your -- to my

 3    knowledge, no, there's been no other action taken,

 4    to the Fund's knowledge.

 5          Q.    Can you turn to the next page?

 6                Are you there?

 7          A.    Yes.

 8          Q.    And do you see paragraph 13?

 9          A.    I do.

10          Q.    That states, in part, "The sole

11    authority to make all decisions with regard to

12    this action on behalf of the Local 98 Pension Fund

13    has been delegated to me."

14                Do you see that?

15          A.    I do.

16          Q.    Why were you chosen as the person to

17    whom sole authority to make decisions was

18    delegated?

19                MS. POSNER:  Objection.

20                If you can answer that without

21          disclosing attorney-client privileged

22          communications, you can go ahead.

23          A.    I believe that I was asked because I'm

24    a full-time person for the Union.

25                The only other Union trustee works in
```

1                         TODD NEILSON

2     the field, and if they would have had to take time

3     off, it would have -- they would have had to be

4     compensated for their time off, and that would

5     have put additional strain on the Fund because

6     they would have had to have done that, and that

7     would have come out of the Fund's money, to

8     reimburse for his salary.

9               So I believe that was why I was asked

10    instead of him.

11         Q.    Did the Fund consider having one of

12    the management trustees oversee the litigation?

13         A.    No.

14         Q.    Why not?

15         A.    Because it's a Union Pension Fund

16    which we're participants in, and the management

17    trustees are not.

18               So these -- also, these management

19    trustees, they run contracting businesses.

20    They're electrical contractors.  They may not

21    necessarily have the time to put forth the effort

22    that this took, and to ask them to do that

23    undertaking would be a burden on some of those

24    folks.

25         Q.    Was there any discussion at the --

1                        TODD NEILSON

2    among the trustees as to who would be given sole

3    authority to make all decisions with respect to

4    this litigation?

5         A.    No.

6         Q.    Was the decision to have you take on

7    that responsibility documented by the Fund in any

8    way?

9         A.    No, not to my knowledge.

10        Q.    Has there been any vote or resolution

11   by the trustees of the Fund to have you take over?

12        A.    No.

13        Q.    Do the management trustees know that

14   you've taken over this litigation?

15        A.    I don't know what counsel has advised

16   them of, so I don't know.

17        Q.    Sitting here testifying on behalf of

18   the Fund, are you aware of whether or not the

19   management trustees know that you have taken over

20   for Mr. Burrows?

21        A.    I do not know that.

22        Q.    Now, Mr. Burrows is the president of

23   the Fund, correct?

24        A.    No, incorrect.  He's president of the

25   Union, not president of the Fund.

```
1                    TODD NEILSON

2          He is a cochairman of the Fund.  He

3    and Jeff Scarpello are cochairmen.  One management

4    side, one Union side.

5          Q.   And I believe you testified before, as

6    cochairman of the Fund, he oversees all of the

7    funds that the Pension Fund has.  Is that correct?

8          A.   I don't know.

9               MS. POSNER:  I'm sorry, I just -- can

10         you repeat that, Jed?  I didn't get it.

11              MR. SCHWARTZ:  Yeah, let me just try

12         to get your testimony.

13              All right.  Well, we will -- my

14         LiveNote isn't working, so I'll try to find

15         that later.

16         Q.   What is Mr. Burrows' role as

17    cochairman of the Fund?

18         A.   That means he and Jeff usually are the

19    top signers on things.

20              We all sign off on different things,

21    changes in the Fund and what have you, changes in

22    rules of the Fund, but just to have somebody as a

23    spokesperson from management and from the Union

24    side.

25              No more of a vote or it doesn't carry
```

1                           TODD NEILSON

2    much more weight than -- it's just a point person.

3    If they have smaller meetings, it would be the

4    chairman on both sides to where you can't --

5    everyone can't get together in between meetings,

6    so you have a person to -- point person on each

7    side to talk to without getting the entire group

8    together all the time.

9         Q.    Your paragraph 13 says, "Mr. Burrows

10   will have no role in overseeing this litigation,

11   its resolution, or distribution of any settlement

12   proceeds or judgment, if any."

13             Do you see that?

14        A.    I do.

15        Q.    What steps has the Fund taken to make

16   sure that that is the case?

17        A.    They replaced him as lead plaintiff

18   for the Fund with me.

19        Q.    Well, has the Fund made any attempt to

20   prevent Mr. Burrows from participating in any

21   decisions related to the litigation?

22             MS. POSNER:  Objection.

23             I'm not sure I understand that

24        question.

25        A.    He is no longer in communication with

1                        TODD NEILSON

2    anything with this case.  Everything now is going

3    through me as it applies to this case, and Laura,

4    of course, as my counsel for the Fund.

5            Q.    Has the Fund passed any resolution or

6    enacted any rule that would take authority from

7    Mr. Burrows -- take authority away from

8    Mr. Burrows with respect to this litigation?

9            A.    No, other than the filings.  The

10   filings have all been -- everything has been

11   refiled and everything has been legally switched

12   over to me as the plaintiff -- as a representative

13   of the Fund in this case.

14           Q.    But Mr. Burrows still retains the

15   ability to vote on all relevant Fund matters,

16   right?

17           A.    Yes.

18           Q.    And if the Fund decides to take an

19   action with respect to this litigation, if

20   Mr. Burrows's -- isn't Mr. Burrows entitled to

21   provide his input into that?

22           A.    I'm not sure I understand the

23   question.

24           Q.    Sure.

25                 So your -- your statement here says

```
 1                    TODD NEILSON

 2   Mr. Burrows will have no role in, for example, the

 3   resolution of this action.

 4            Do you see that?

 5       A.   I do see that, yes.

 6       Q.   How has the Fund -- when has --

 7   withdrawn.

 8            What has the fund done to prevent

 9   Mr. Burrows from participating in the resolution

10   of this action?

11            MS. POSNER:  Objection, asked and

12       answered.

13            But you can answer again.

14       A.   They have removed him as the plaintiff

15   representing the Fund in this case with me, and

16   all communication and anything as it applies to

17   this action will go through me and my counsel.

18       Q.   If the Fund decides to resolve this

19   matter, will all of the trustees have to vote on

20   that?

21       A.   If, in fact -- if, in fact, it comes

22   to that point, then, you know, if something needs

23   to be made aware of it based on this, then if a

24   vote needs to be taken, then he will be asked to

25   take himself out of it and abstain, if that's
```

```
 1                     TODD NEILSON

 2   necessary to adhere to this, the documentation

 3   that he won't be involved in the litigation or the

 4   resolution.

 5              We'll cross that bridge when we come

 6   to it.

 7        Q.    Have you spoken to Mr. Burrows to

 8   confirm that he would do that?

 9        A.    I did not.  I haven't spoken to him at

10   all about this case.

11        Q.    Now, paragraph 13 says that you

12   prepared a new certification attached as

13   Exhibit A.

14              Do you see that?

15        A.    I do.

16        Q.    And that's the document that's behind

17   this listed as Exhibit A, correct?

18              It begins on page 6?

19        A.    I don't have it in front of me, you

20   have it, so you can -- yeah, I guess that's it.  I

21   do now, yes.

22        Q.    Did you prepare this document?

23        A.    I did not.

24        Q.    Did you -- did you sign this document?

25        A.    Yes.
```

```
1                      TODD NEILSON
2         Q.    Did you understand you were signing
3   this under oath?
4         A.    I did.
5         Q.    And you reviewed it to make sure it
6   was accurate?
7         A.    Yes, I did.
8         Q.    Now, paragraph 2 says, "IBEW Local
9   98" -- which is the Fund, correct?
10        A.    No, it's not correct.  IBEW 98 we said
11  is the Union.
12              The Fund is the Fund.  Those are two
13  separate entities.
14        Q.    Yeah.  So if you look, it's a
15  little -- it's a little different with this
16  document.
17              So if you look at the very first
18  paragraph --
19        A.    I'm sorry, yes, I see it at the top in
20  parentheses.
21              As it applies to this document, yes.
22  I apologize.
23        Q.    No problem.
24              So paragraph 2 is referring to the
25  Fund, correct?
```

1                          TODD NEILSON

2          A.    Correct.

3          Q.    And it says, "The Fund didn't purchase

4     the security that's the subject of this action at

5     the direction of counsel or to participate in any

6     private action."

7                Do you see that?

8          A.    I do see that, yes.

9          Q.    What did you do to make sure that you

10    were comfortable that was accurate?

11         A.    I'm not sure I understand your

12    question.

13         Q.    Well, how did you know that was true

14    when you signed this document?

15         A.    Because we went through all the

16    documents.  I had our counsel go through all the

17    documents, and nothing was done after this at that

18    time.

19                I'm just -- I'm not understanding the

20    line of questioning.  Can you rephrase that,

21    please?

22         Q.    Well, you -- when you reviewed this

23    document, you wanted to make sure that that

24    statement was true, correct?

25         A.    Yes.

1                    TODD NEILSON

2        Q.    How did you make sure that that

3    statement was true?

4        A.    How did I make sure?

5              I didn't make sure it was true.   I

6    reviewed it with counsel prior to signing it to

7    make sure that all that stuff was done prior to me

8    doing so.

9        Q.    Now, paragraph 4 refers to a -- an

10   attached Schedule A.

11             Do you see that?

12       A.    I do.

13       Q.    Now, the version of this document that

14   we have did not include a Schedule A.

15             Did you see a Schedule A when you

16   signed this?

17       A.    I saw it as part of the binder.   I

18   didn't see it as part of the document.   I was made

19   aware of it, though.

20             And it has since been amended, it's my

21   understanding.

22       Q.    What has been amended?

23       A.    The filing.

24       Q.    To include a Schedule A?

25       A.    Yes.

```
 1                     TODD NEILSON

 2        Q.    Paragraph 6 says, "IBEW Local 98 has

 3   fully reviewed the facts and allegations of the

 4   consolidated complaint filed in this action."

 5             Do you see that?

 6        A.    Yes.

 7        Q.    And who is that referring to at

 8   Local 98 that did that?

 9        A.    The Pension Fund.

10        Q.    Who at the Pension Fund?

11        A.    The attorneys for the Fund and myself.

12        Q.    How much time did you spend reviewing

13   the complaint before you signed this document?

14        A.    I don't know.  I read it over numerous

15   times, had several discussions with my attorney

16   about it.  I don't -- I didn't really time myself,

17   to be honest with you.

18        Q.    And all of that was done before you

19   signed this document?

20        A.    Yes.

21        Q.    Now, paragraph 9 says that IBEW

22   Local 98 will not accept any payment for serving

23   as class representative beyond certain things,

24   including lost wages.

25             Do you see that?
```

```
 1                    TODD NEILSON

 2        A.    I do.

 3        Q.    Does the Fund pay any wages to any of

 4   its trustees?

 5        A.    No.

 6        Q.    Does the Fund pay any wages to

 7   anybody?

 8        A.    No.

 9             MR. SCHWARTZ:  All right.  Chassity,

10        can you bring that down, and please bring up

11        Tab 13, which was previously marked as

12        Exhibit 7.

13             MS. POSNER:  Jed, we've been going

14        over an hour now.  Do you want to take a

15        break or break for lunch?

16             I'm not sure how the witness is doing

17        either.

18             MR. SCHWARTZ:  That's totally up to

19        the witness.

20             THE WITNESS:  I'm fine to keep going.

21        Maybe let's take 5 minute, 10 minutes?  It's

22        up to you guys, if you want to take lunch,

23        go ahead.  But if not, just 5 or 10 minutes

24        to just wash face, use the restroom and

25        regroup and get this done.  You know, this
```

1            TODD NEILSON

2    way we're not going into the wee hours of

3    the evening.

4         MR. SCHWARTZ:  You know, let's go off

5    the record.

6         VIDEOGRAPHER:  We're going off the

7    record at 12:19 p.m.

8         (Luncheon recess.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    TODD NEILSON

 2        A F T E R N O O N   S E S S I O N

 3              VIDEOGRAPHER:  We're back on the

 4        record at 12:50 p.m.

 5     BY MR. SCHWARTZ:

 6        Q.    Mr. Neilson, we've put on the screen

 7     before you a document that's been previously

 8     marked as Exhibit 7.

 9              (Exhibit 7, document, was previously

10        marked for identification and shown at this

11        time.)

12              MR. SCHWARTZ:  And, Chassity, if you

13        could give the witness and myself control,

14        I'd appreciate it.

15     BY MR. SCHWARTZ:

16        Q.    Mr. Neilson, you should have control

17     of the document.

18              Take whatever time you need, but

19     please take a look through this and let me know if

20     you've seen this before.

21        A.    Yes, I've seen this.

22        Q.    Okay.

23              MR. SCHWARTZ:  I think we're getting

24        some feedback from someone, so if you'd go

25        on mute, I'd appreciate it.
```

1                    TODD NEILSON

2        Q.    Now, you've turned to page 2 of the

3   document.  I wanted to ask you a question.

4              Do you see the first paragraph says,

5   "I, Brian Burrows, President at IBEW Local 98"?

6        A.    I do see that.

7        Q.    And IBEW Local 98 is in the paragraph

8   before defined as the Pension Fund.

9              Do you see that?

10       A.    It's in the parentheses here, yeah, I

11  see that.

12       Q.    So I was confused before, but is it --

13  is it incorrect to say that Mr. Burrows is the

14  president of the Pension Fund?

15       A.    He is the president of the Union.

16       Q.    Okay.  He's -- just to confirm, he's

17  the president of the Union and cochairman of the

18  Fund, correct?

19       A.    But as -- as president of the Union,

20  yes, that is correct, yeah.

21       Q.    Okay.  And now, if you could turn to

22  page 4 of this document, do you see it's labeled

23  "Schedule A"?

24       A.    Yeah, I did something -- I don't know,

25  something going on here.  Here we are.  Oh.

```
 1                  TODD NEILSON

 2           All right.  So what am I looking for

 3    now?  I'm sorry.

 4           Q.    Page 4 of this document, Exhibit 7,

 5    which is labeled "Schedule A"?

 6           A.    Yes.

 7           Q.    Do you recognize Schedule A?

 8           A.    I do.

 9           Q.    And what is it?

10           A.    That's just a synopsis of the

11    purchases made and the prices that we bought at

12    different times and sold at different times of the

13    holdings that LSV had done for us.  It's a

14    synopsis of the shares that we bought and sold

15    throughout the course of this case.

16           Q.    And these are shares of SCANA,

17    correct?

18           A.    Correct.

19           Q.    And is it your understanding that this

20    document reflects all of the purchases and sales

21    of SCANA stock on behalf of the Fund from July of

22    2015 through April of 2017?

23           A.    Yeah, I believe that to be the case.

24           Q.    Okay.  How did the Fund decide when to

25    purchase or sell the shares of SCANA stock?
```

```
 1                    TODD NEILSON
 2        A.    The Fund didn't decide.  We have
 3   investment managers that make those decisions.
 4        Q.    And with respect to the SCANA stock,
 5   who or what was the investment manager?
 6        A.    That would be LSV.
 7        Q.    And does LSV have complete discretion
 8   as to which stocks to purchase and sell?
 9        A.    LSV has a pool of money that they're
10   allowed to invest on our behalf within certain
11   parameters of what they're allowed to invest in
12   based on the rules and the regulations of the
13   Fund.
14        Q.    And so within those parameters that
15   you mentioned, does LSV then have the total
16   discretion as to which stocks to purchase?
17        A.    Yes.
18        Q.    And does it -- does LSV have --
19   withdrawn.
20              Again, within those parameters, does
21   LSV have total discretion as to when to make a
22   purchase or sale of a particular stock?
23        A.    Yes.
24        Q.    And, again, within the parameters that
25   you mentioned, does LSV have total discretion as
```

```
1                     TODD NEILSON

2    to how much of a particular stock to purchase or

3    sell?

4         A.    Yes.

5         Q.    Okay.  Other than setting the

6    parameters for the investments in which LSV is

7    authorized to make an investment, did the Fund

8    have any role in determining to make the purchases

9    or sales that are listed on Schedule A, Exhibit 7?

10        A.    No, we did not.

11        Q.    Did anyone at the Fund talk to LSV in

12   connection with the trades that are listed here on

13   Schedule A?

14        A.    Not to my knowledge.  That's not

15   something typically that we do.

16        Q.    Since the commencement of this case

17   has the Fund had any discussion with LSV about the

18   Fund's investment in SCANA?

19        A.    No, not to my knowledge.

20        Q.    Does the Fund receive periodic reports

21   from LSV as to the Fund's investments?

22        A.    Yes.

23        Q.    And does the Fund periodically have

24   discussions with LSV as to its investments?

25        A.    No.  Most of those discussions are
```

1                     TODD NEILSON

2    handled via our investment consultants.

3              We have a consultant that deals

4    directly with the asset managers, so we don't have

5    multiple people contacting the Fund

6    administrators.

7              We have -- our investment consultant

8    does all of the communication to the individual

9    investors, and he, in turn, reports back to the

10   trustees on a quarterly basis at our quarterly

11   meetings.

12        Q.    Does the investment consultant speak

13   with the Fund's asset managers, like LSV?

14        A.    I don't know.  That would be a

15   question for the investment consultant.

16              I would assume so.

17        Q.    And who is the investment consultant?

18        A.    Michael Joyce.

19        Q.    Does he work for a company or is he on

20   his own?

21        A.    He works for Marco.

22        Q.    How do you spell that?

23        A.    M-A-R-C-O.

24        Q.    Is Mr. Joyce's consulting arrangement

25   with the Fund documented in any way, like through

```
 1                    TODD NEILSON
 2   an agreement?
 3        A.    I think, yeah, we have a contract with
 4   him, and it's reviewed periodically based on
 5   investment performance, whether or not he's
 6   retained or whether or not we're in the market for
 7   someone else based on performance.
 8        Q.    And is it your understanding that
 9   Mr. Joyce may have had conversations with LSV
10   about the Fund's investments during the class
11   period?
12        A.    I don't know.
13              I think my understanding would be just
14   based on the overall performance, not based on the
15   individual -- each individual investment.  I don't
16   know that there's enough time in the day for all
17   of that.
18        Q.    Did the Fund have any conversations
19   with LSV about its investments in SCANA stock at
20   any time?
21        A.    Not to my knowledge.
22        Q.    Do you know why the Fund started
23   investing in SCANA in July 2015?
24        A.    That would be a question for LSV.  We
25   don't review their investments.  They make the
```

```
 1                    TODD NEILSON

 2   investments.  They're the investment

 3   professionals.

 4          So we -- we rely on their judgment as

 5   far as what's investable and what's not for the

 6   benefit of our members.  It's based on return --

 7   rate of return, risk, and everything else is all

 8   factored.

 9      Q.    Did the Fund have any discussion with

10   LSV about investing in electric or natural gas

11   utility companies?

12      A.    Not to my knowledge, no.  We don't

13   discuss individual investments.  We leave it up to

14   the professionals.

15      Q.    And I'm just trying to do this in as

16   efficient a way as possible.

17          MR. SCHWARTZ:  We lost the witness.

18          MS. POSNER:  Todd, are you still

19      there?

20          THE WITNESS:  I lost you there for a

21      second.  Here we go.  Sorry about that.

22      Q.    So I'm going to try to do this in as

23   efficient a way as possible.  So I'm going to ask

24   a broad question.  If you need me to break it into

25   pieces, let me know.
```

```
 1                    TODD NEILSON

 2              But my question is:  With respect to

 3    any of the purchase and sales listed on

 4    Schedule A, did the Fund have any communication,

 5    whether written or otherwise, with LSV as to the

 6    reason for the purchase or sale?

 7         A.    Not to my knowledge, no.

 8         Q.    And you said not to your knowledge,

 9    but I just want to make sure you're not limiting

10    it just to your knowledge personally.

11              You're testifying as the

12    representative of the Fund, right?

13         A.    I have no knowledge of them -- anybody

14    being in contact with LSV regarding these

15    transactions.  Nothing has been brought to my

16    attention as such.

17              So I guess the answer to your question

18    is "no."

19              MR. SCHWARTZ:  Chassity, we can take

20         that document down.

21              Chassity, can you bring up Tab 15,

22         please.

23              (Exhibit 17, document, Bates stamped

24         PLTF-LOCAL98-0000037, was marked for

25         identification at this time.)
```

```
1                    TODD NEILSON
2              MR. SCHWARTZ:  This is a document --
3        multipage document that we've marked as
4        Exhibit 17.  It begins at Bates
5        No. PLTF-LOCAL98-0000037.
6              Take a look, and my first question is:
7        Have you seen this document before?
8        A.    It's blank on my screen.
9        Q.    Okay.
10             MR. SCHWARTZ:  Give it a minute to
11       reload, otherwise you might have to take it
12       done and reload it.
13       Q.    Can you see it now?
14       A.    No, blank screen.
15             MR. SCHWARTZ:  Chassity, can you take
16       the document down and try to reload it?
17             Thank you.
18             THE WITNESS:  I see it now.
19       Q.    Okay.  Now, to refresh you, my
20  question was:  Have you seen this document before?
21       A.    Yeah, that's just a fee schedule and
22  an agreement with LSV, it looks like.
23       Q.    And is it your understanding that this
24  forms part of the agreement that governs the
25  purchase of the SCANA stock that are at issue in
```

1          TODD NEILSON

2    this case?

3          A.    No.   This is just my understanding

4    that this is just a fee schedule for anything that

5    they -- any -- anything they do with us, how their

6    fee structure is.

7          Q.    Okay.  Who signed this on behalf of

8    the Fund?

9          A.    I don't know.  I can't see page 2 or

10   3.  I can only see page 1.

11         Q.    Okay.  Can you see page 2 now?

12         A.    No.   It's blank.

13         Q.    All right.  Do you know someone named

14   Donald Reis, R-E-I-S?

15         A.    Do I know him?

16               I know of him, yes.  I know of him.

17   He's a former trustee -- former management

18   trustee, no longer sits on the Fund.  He's retired

19   now.

20         Q.    Okay.  So Mr. Reis was a management

21   trustee of the Fund.

22               Do you recall when?

23         A.    He was on there when I first got on.

24   He's been off for a few years now.

25         Q.    Okay.

1                        TODD NEILSON

2        A.    At least two or three years he's been

3    gone, I believe.  Don't quote me on that, but at

4    least a couple of years he's been retired.

5        Q.    Okay.

6              MR. SCHWARTZ:  We can take that

7        document down.

8              And then can you bring up Tab 16,

9        please.

10             (Exhibit 18, PNC statement, Bates

11       stamped PLTF-LOCAL98-0000001, was marked for

12       identification at this time.)

13             MR. SCHWARTZ:  We've marked as

14       Exhibit 18, a multipage document beginning

15       at Bates No. PLTF-LOCAL98-0000001.

16    BY MR. SCHWARTZ:

17       Q.    Mr. Neilson, do you see that document?

18       A.    I see Exhibit 18, but there's no

19    other -- I can't see anything else other than a

20    blank page.

21             I see the Exhibit 18 in the bottom

22    right-hand corner, I don't see anything else

23    there.

24             MR. SCHWARTZ:  Okay.

25       A.    And as I scroll through, just more

1              TODD NEILSON

2    blanks.

3              Oh, could we take that down -- there.

4    I tried to make it a little bit bigger and it's

5    not -- it's all messed up again.  A blank screen.

6              MR. SCHWARTZ:  Okay.  Chassity, can

7         you take that down and try bringing it back

8         up again?

9              THE WITNESS:  There we go.  Okay.

10             MR. SCHWARTZ:  Okay.

11        Q.    Mr. Neilson, do you know what this

12   document is?

13        A.    Yeah, it's a PNC statement.

14        Q.    And what service does PNC serve or

15   provide to the Fund?

16        A.    It's our bank account.  They do a lot

17   of -- they did a lot of -- they're our main bank

18   account, the bank that we deal with with all our

19   funds.

20        Q.    And do you -- do you know whether PNC

21   is the custodian for the Fund's securities?

22             MS. POSNER:  Objection.

23        A.    I'm not a hundred percent certain of

24   that.  I believe they -- I believe they disburse

25   all the money as -- all the funds are given to PNC

```
 1                    TODD NEILSON

 2   to disburse, I believe, and then they get

 3   something accordingly, they're able to see it.

 4        Q.    So I'm turning to page 3 of this

 5   document.

 6             Are you at page 3?

 7        A.    Blank.

 8        Q.    All right.  Did it show up?

 9        A.    No.

10        Q.    Okay.

11             MR. SCHWARTZ:  Chassity, are you able

12        to share your screen, or just this document?

13        A.    I can see it now.

14        Q.    Okay.

15             MR. SCHWARTZ:  Chassity, can you go to

16        page 3?

17        Q.    Mr. Neilson, can you read that?

18        A.    Yes.

19        Q.    And you see it says, "Corporate

20   Stock - Common," up at the top?

21        A.    Yes.

22        Q.    And then there's a number of

23   redactions, but the unredacted portion refers to

24   SCANA Corp.

25             Do you see that?
```

1                    TODD NEILSON

2        A.    Okay.  Yeah.

3        Q.    Do you know why PNC is providing the

4   Fund with a document that lists holdings in common

5   stock?

6              MS. POSNER:  Objection.

7              I don't understand that question.

8        A.    Now, I don't -- I don't understand it

9   either.

10             What -- can you rephrase that in some

11  other way?

12       Q.    Well, so you said PNC -- I thought you

13  said it was the bank account for the Fund.  Is

14  that right?

15       A.    I said -- I said -- I said, most of

16  our accounts are with PNC, is what I said, I

17  believe.

18       Q.    Would that include accounts that hold

19  securities?

20       A.    I don't -- I don't know the answer to

21  that question.

22             We have the financial professionals

23  that oversee all that stuff, as well as -- as well

24  as Frank Vaccaro, our Fund administrator, they

25  take care of all the -- putting together the

1              TODD NEILSON

2    paperwork and presenting it to the trustees.

3              We don't look at every individual bank

4    statement, holding statement.  They memorialize

5    all that stuff and put it together for us.  We

6    don't do the day-to-day stuff with -- as it

7    applies to the Fund.

8         Q.    Have you ever seen a statement from

9    PNC with respect to any of the Fund's accounts?

10        A.    Only as it applies to this case.

11        Q.    Okay.  So you had never seen this

12   document before you were involved in this case?

13        A.    No, I have not.

14        Q.    And do you know why the PNC is

15   providing this document to the Fund?

16              MS. POSNER:  Objection.

17        A.    No.  I think you would have to ask PNC

18   that.

19              MS. POSNER:  Sorry.

20              Objection, assumes facts not in

21        evidence.

22        Q.    Did this document come from the Fund's

23   files?

24        A.    Yes.

25        Q.    Do you know how the Fund received this

1                    TODD NEILSON

2    document?

3        A.    How they received it?  Yeah.

4              Tara Chupka, the legal counsel for the

5    Fund, got everything related to the Fund, anything

6    that had came up under SCANA, to put together as

7    part of the discovery for this case, submitted it

8    so that that way anything that came up, SCANA or

9    its ticker symbol, put into the file as part of

10   this case and sent it on as part of the discovery

11   for this litigation.

12       Q.    Okay.  There may be some confusion.

13             In order for Ms. Chupka to have done

14   that, this document would have had to have been in

15   the Fund's files, correct?

16             MS. POSNER:  Objection, assumes facts

17        not in evidence.

18       A.    Yeah, that -- it must have came up

19   through her fact-finding mission with everything

20   that came about.

21             It would be something you would have

22   to ask her.  I can't speak for her other than all

23   these documents were put together by her, and how

24   she came about getting them, it's -- I can't

25   answer to that firsthand, only that she did

1                        TODD NEILSON

2    receive them and shared them with everybody as

3    part of this case.

4              MS. POSNER:  Jed, do you want to go

5         off the record for one minute?

6              MR. SCHWARTZ:  Sure.

7              VIDEOGRAPHER:  We're going off the

8         record at 1:17 p.m.

9              (Recess.)

10             VIDEOGRAPHER:  We're back on the

11        record at 1:18 p.m.

12             MR. SCHWARTZ:  Can we stipulate that

13        this document, which is Exhibit -- Chassity,

14        what exhibit is this?  Eighteen?

15             Can we stipulate that this document,

16        Exhibit 18, is a record of the Fund and that

17        it was accessible to the fund at or about

18        the time that it was created?

19             MS. POSNER:  So stipulated.

20             MR. SCHWARTZ:  Okay.  Chassity, I

21        think we're done with that document.

22    BY MR. SCHWARTZ:

23        Q.    What is the Fund's understanding of

24   what SCANA was during the class period?

25        A.    I'm not sure I understand the

1                   TODD NEILSON

2   question.

3      Q.   What did -- did the Fund have any

4   understanding of what the company SCANA did during

5   the class period?

6      A.   Again, prior to the -- we didn't know

7   we were investing in SCANA per se.

8          You had LSV, who had a pool of money

9   at the time, that was just doing investments.  We

10  weren't -- we were not up to speed as far as every

11  individual investment, every individual

12  transaction.

13        We just rate our investment managers

14  based on their overall performance, and LSV has

15  been a well-performing investment manager for us

16  for a long, long time.  What holdings they have

17  from time to time to us is irrelevant.

18        Usually, the bottom line is that they

19  have a good track record as far as what they do

20  and as far as based on the rate of returns that

21  they get for our folks.

22     Q.   Did anyone at the Fund have any

23  discussions with SCANA personnel during the class

24  period?

25     A.   No.

1                       TODD NEILSON

2        Q.    Did anyone at the Fund review any

3    analyst reports related to SCANA securities?

4        A.    No.

5        Q.    Did anyone at the Fund -- withdrawn.

6              Was anyone at the Fund aware during

7    the class period that SCANA was developing a

8    nuclear project?

9        A.    No.  Not to my knowledge, no.

10       Q.    Has anyone at the Fund ever spoken

11   with someone at Deloitte & Touche or Deloitte LLP

12   relating to SCANA?

13       A.    Not to my knowledge, no.

14       Q.    You understand that in approximately

15   January of 2020, the Fund moved to be appointed as

16   lead plaintiff in this case, right?

17       A.    Yes.

18       Q.    Did the Fund review any of the filings

19   made in connection with that request before they

20   were filed?

21       A.    Yes, I believe they did through our --

22   Fund counsel did.

23       Q.    Why didn't the Fund disclose in those

24   filings that Mr. Burrows had been indicted?

25              MS. POSNER:  Objection, beyond the

TODD NEILSON

1

2          scope of the 30(b)(6) and part of a pending

3          motion for protective order.

4          A.    I don't think it has any relevancy to

5    us filing the case.  It's an allegation at this

6    point.  It has nothing to do with this.  It has

7    nothing to do with the Fund.

8          Q.    So just so I understand, your

9    testimony is that the Fund considered the issue at

10   the time and decided that it did not need to be

11   disclosed?

12              MS. POSNER:  Objection, misstates his

13          testimony.

14         A.    I definitely didn't say that.  I

15   didn't say anything of the sort.

16         Q.    Okay.  So --

17         A.    It has nothing to do with the Pension

18   Fund.  The Pension Fund is something that's

19   separate from the case that you're speaking of.

20         Q.    So I'm asking, as a representative

21   here of the Fund, why didn't the Fund disclose in

22   those lead plaintiff filings that Mr. Burrows had

23   been indicted?

24              MS. POSNER:  Same objections, and

25          asked and answered.

```
 1              TODD NEILSON

 2        A.    As previously stated when you brought

 3   it up earlier, that when the indictment came down,

 4   the attorneys for the Fund let everybody on the

 5   Fund know what was going on and assured us that

 6   nothing -- the Fund was not in jeopardy, the Fund

 7   was not under investigation at any way, shape, or

 8   time, so thereafter, they didn't need to worry

 9   about anything as it applies to the Fund and the

10   business that the funds were doing as it applies

11   to the 98 Pension Trust Fund.

12        Q.    And so what I want to know is:  Is

13   that the decision that the Fund made in connection

14   with the filings as to why this issue did not need

15   to be disclosed?

16             MS. POSNER:  Same objections, and

17        also, I don't understand the question.

18        A.    Based on what we handled, we didn't

19   see any reason to handle anything and change the

20   way we do business as far as the Fund is concerned

21   based on the advice of our attorneys.

22        Q.    When did you receive that advice that

23   you're referring to?

24        A.    I don't recall exactly when, but it

25   was probably when the indictments came down in the
```

1                        TODD NEILSON

2    very beginning, two years back.

3         Q.    And that was approximately January of

4    2019, right?

5         A.    I don't know.  I don't know the

6    details of when the indictments came down, so I'd

7    be -- I'd be doing a disservice if I threw that

8    date out.

9              I'm not sure when -- when all the

10   allegations became public and the indictments came

11   down, the next trust meeting that we had, we were

12   advised where we stood as a Fund and to make sure

13   that our fiduciary responsibility was to the

14   members and to the Fund, to make sure that we

15   don't put the Fund or its investments at risk in

16   any way, shape, or form.

17        Q.    And then, in connection with the lead

18   plaintiff process, did the Fund actually make a

19   consideration of whether the indictment needed to

20   be disclosed or is it something that was not

21   considered?

22             MS. POSNER:  Objection, asks for

23        attorney-client privileged communication and

24        beyond the scope of the 30(b)(6) and pending

25        the motion for a protective order.

TODD NEILSON

1

2        MR. SCHWARTZ:  Well, you and I

3    disagree.

4        Are you instructing the witness not to

5    answer?

6        MS. POSNER:  If you can answer that

7    without disclosing attorney-client

8    privileged communications, I'll allow you to

9    answer.

10    A.    I don't believe I can at this time.

11    Q.    You mean you're not able to answer

12 that without disclosing attorney-client

13 communication?

14    A.    That is correct.

15        MR. SCHWARTZ:  Chassity, can we bring

16    up Tab 12?

17        (Exhibit 19, Amended and Restated

18    Agreement and Declaration of Trust, Bates

19    stamped PLTF-LOCAL98-0000049, was marked for

20    identification at this time.)

21  BY MR. SCHWARTZ:

22    Q.    Do you have a document in front of you

23 that's titled "Amended and Restated -- Restated

24 Agreement and Declaration of Trust"?

25    A.    No, I have another blank document.

```
 1                     TODD NEILSON
 2              MR. SCHWARTZ:  Okay.
 3              All right.  Let's go off the record.
 4              VIDEOGRAPHER:  We're going off the
 5         record at 1:30 p.m.
 6              (Recess.)
 7              VIDEOGRAPHER:  We are back on the
 8         record at 1:32 p.m.
 9              MR. SCHWARTZ:  Okay.
10      BY MR. SCHWARTZ:
11         Q.    Mr. Neilson, you have before you a
12    document that's been marked as Exhibit 19, and
13    it's a 56-page document that begins with Bates
14    No. PLTF-LOCAL-98, ending in 49.
15              Do you see that?
16         A.    I do.
17         Q.    Have you seen this document before?
18         A.    Way back, yes, when I became -- first
19    became a trustee on the Fund.
20         Q.    And what is this?
21         A.    That's a copy of -- an old copy of our
22    Pension Trust document.
23         Q.    And is this the most recent version of
24    the Pension Trust document?
25         A.    I'm not sure.  There have been updates
```

```
 1                    TODD NEILSON

 2   since then.  I don't -- I can't honestly say.

 3               That's from 1975, according to that.

 4   I know it's been amended since then.  I don't know

 5   if all the amendments are included in this, so ...

 6       Q.   I don't believe that they're -- that

 7   they are.

 8               Your understanding -- your best

 9   understanding is that there have been amendments

10   to this document since 1975?

11       A.   I wasn't on there in '75, but I know

12   there's been little rules changes.  I'd be remiss

13   to say what's been changed, if anything.

14               I'm sure it's been updated in some

15   way, shape, or form.

16       Q.   Okay.  Yeah, I'm going to go to

17   page 6.

18       A.   Okay.

19       Q.   And do you see there, there's a

20   section -- I'm go that blow it up here -- that

21   3.1A that starts at the bottom?

22               And it says, "The Pension Fund shall

23   jointly be administered," and then it continues,

24   and I'll keep reading, "by six trustees, three of

25   whom shall be appointed by the president of the
```

1                    TODD NEILSON

2    Union and shall act as employee trustees, and

3    three of whom shall be appointed by the

4    association and shall act as employer trustees."

5              Do you see that?

6         A.    Okay, yeah.

7         Q.    Now, you had testified before that

8    there are actually four and four.  Is that

9    correct?

10        A.    We have three Union trustees.  There

11   are currently four management trustees.

12        Q.    But there's the ability to have eight

13   in total, correct?

14        A.    I guess, yeah.  But I'm not -- I'm not

15   certain of that.  I just don't -- there's four

16   trustees right now.

17        Q.    My question is:  Given what this says,

18   does that -- does that indicate to you that this

19   document is not the most recent version of the

20   trust agreement?

21        A.    It doesn't indicate to me at all.  It

22   just means that this is a document from 1975.  I

23   don't know if it's updated since then or not.

24        Q.    Okay.

25              MR. SCHWARTZ:  All right.  We can

1                      TODD NEILSON

2          bring that down.

3                  And then can we bring up Tab 17,

4          please?

5                  (Exhibit 20, Form 10-K for South

6          Carolina Electric & Gas, filed February 24,

7          2017, was marked for identification at this

8          time)

9                  MR. SCHWARTZ:  This document is titled

10         "Form 10-K for South Carolina Electric &

11         Gas," filed February 24, 2017.

12     BY MR. SCHWARTZ:

13         Q.    Do you see that?

14         A.    Yeah, I see it.

15         Q.    Have you ever seen this document

16     before?

17         A.    No, I haven't seen this.

18         Q.    Has anyone at the Fund, to your

19     knowledge, ever seen this document?

20         A.    Not to -- not to my knowledge.

21         Q.    Do you know if anyone at the Fund

22     reviewed any SEC filings related to SCANA during

23     the class period?

24         A.    To my knowledge, no.

25         Q.    Do you know if anyone at the Fund

```
 1                    TODD NEILSON

 2   reviewed any of the financial statements for SCANA

 3   at any time?

 4        A.    Not to my knowledge.

 5        Q.    I'm going to turn to page 15 of this.

 6   I'm going to blow it up.

 7              Can you -- can you see page 15?

 8        A.    Yes.

 9        Q.    Okay.  Do you see the --

10              MS. POSNER:  Sorry.  Jed, I see 12 up.

11        A.    It says 15 up top, but 12 at the

12   bottom.

13        Q.    Okay.  Yes, that's correct.  Page 12

14   of the document, page 15 of the PDF.

15        A.    Okay.

16        Q.    The top paragraph says, "In addition

17   to the project risks."

18              Do you see that?

19        A.    Yes.

20        Q.    And you see the second paragraph

21   begins "SCE&G."

22              Do you see that?

23        A.    I do.

24        Q.    It says, "SCE&G and Sandy Cooper, the

25   co-owner of the new units, continue to evaluate
```

```
 1                    TODD NEILSON

 2   various actions which might be taken in the event

 3   that Toshiba and WEC are unable or unwilling to

 4   complete the project.  These include completing

 5   the work under any of several arrangements with

 6   other contractors or, where it determined to be

 7   prudent, halting the project, leaving SCE&G to

 8   pursue cost recovery under abandonment provisions

 9   of the BLRA."

10            Do you see that?

11       A.   I do.

12       Q.   Was the Fund aware of that statement

13   at any point during the class period?

14       A.   No.

15       Q.   Do you know if LSV was aware that in

16   February of 2017, it was disclosed that the

17   nuclear project might be abandoned?

18            MS. POSNER:  Objection, misstates the

19            document.

20       A.   Yeah, I can't speak for LSV, what they

21   saw and what they know.

22       Q.   Was the Fund aware that in February of

23   2017, it was disclosed that the nuclear project

24   might be abandoned?

25            MS. POSNER:  Objection, misstates the
```

1                    TODD NEILSON

2       document.

3       A.    No, we weren't made aware.  No, we

4  weren't made aware of any of that.

5       Q.    Now, do you know if the Fund had the

6  ability to access this document?

7       A.    No, I don't.

8       Q.    Do you know whether this is a publicly

9  filed document?

10      A.    I have no idea, no.

11      Q.    Did the Fund make any attempt to

12  access the public filings of SCANA?

13      A.    No.

14      Q.    You would agree with me that if the

15  Fund had read what I just read to you, it would

16  have become aware no later than February of 2017

17  that the nuclear projects might be abandoned,

18  right?

19            MS. POSNER:  Objection, misstates the

20       document, and also, as a hypothetical, it's

21       not appropriate for a 30(b)(6).

22      Q.    You can answer.

23      A.    I don't know what to -- I can't speak

24  to that.  I don't -- I don't know.

25      Q.    Well, you would agree that it's pretty

```
1                    TODD NEILSON

2    clear that this says that the project might be

3    abandoned, right?

4              MS. POSNER:  Objection, misstates the

5         document.

6         A.    According to what you're saying, like

7    I said, I don't know.  I've never seen this

8    document before, so I can't speak to it.

9         Q.    Well, you would agree that the

10   document makes it pretty clear that the project

11   might be abandoned?

12             MS. POSNER:  Objection, misstates the

13        document.

14        A.    Yeah, I don't know what the intent of

15   the document is, so I really can't honestly answer

16   that.

17             MR. SCHWARTZ:  Let's go off the

18        record.

19             VIDEOGRAPHER:  We're going off the

20        record at 1:43 p.m.

21             (Recess.)

22             VIDEOGRAPHER:  We are back on the

23        record at 2:07 p.m.

24     BY MR. SCHWARTZ:

25        Q.    Mr. Neilson, you should have before
```

1                    TODD NEILSON

2    you the document we were looking at before,

3    Exhibit 20.

4              Do you?

5        A.    Yes.

6        Q.    Okay.  I'm going to go to page 14 of

7    the PDF, which is labeled page 11, and I'll zoom

8    in, if I can.

9              Are you there?

10       A.    Yes.

11       Q.    And do you see that there's some bold

12   writing in the middle?  It begins, "Recent

13   announcements"?

14       A.    Yes.

15       Q.    And it says, "Recent announcements by

16   Toshiba, the parent company of WEC, and the

17   guarantor of WEC's payment obligations with

18   respect to the above construction project for new

19   units at SCE&G's summer station related to

20   deterioration in its financial position and

21   liquidity, indicate heightened risk and

22   substantial uncertainty with respect to the cost,

23   timing, construction, and/or completion of the new

24   units."

25              Do you see that?

1                    TODD NEILSON

2         A.    Yeah, that disclaimer, yes, I see

3    that.

4         Q.    Did anybody at the Fund read that in

5    or around February of 2017?

6         A.    Not to my knowledge, no.

7         Q.    Do you know if anybody at LSV read

8    that in February of 2017?

9         A.    You'd have to ask somebody from LSV.

10    I can't speak for them.

11         Q.    Would you agree with me that anyone

12    who is reading that would understand that as of at

13    least late February 2017, there were substantial

14    risks that the so-called "new units" would not be

15    complete?

16         A.    Substantial?

17              No.  That's a 156-page document.

18    That's one little blurb in a big, giant document,

19    right?

20              MS. POSNER:  Objection, misstates the

21         document as well.

22         Q.    So your testimony is that -- that

23    someone who read that portion of the document

24    would not understand that there were substantial

25    risks that the new units wouldn't be complete?

```
1                      TODD NEILSON

2           MS. POSNER:  Same objection.

3      A.    I can't speak to this document.  I've

4  only read one little blurb.  It's 156 pages.

5  There's probably a lot of stuff that's in there

6  that's relevant to this investment.

7           And this is early.  When was this?

8  February 2017?  And this time frame goes all the

9  way to December 2017.  So a lot could have

10  happened between then and now when this document

11  was put out.

12           So I don't know what to speak to it or

13  what to assume.

14      Q.    Well, I'm not asking you to assume.

15  But as you sit here and read that sentence, you

16  understand that it says that there's substantial

17  risk to the completion of the new units, right?

18           MS. POSNER:  Objection, misstates the

19           document.

20      A.    Yeah, I don't know.  It's a big

21  document.

22           To that line, maybe, but there's a

23  whole lot of other stuff there that I haven't had

24  the opportunity to read, so it's difficult to say.

25      Q.    Okay.
```

1                    TODD NEILSON

2            MR. SCHWARTZ:  You could take that

3       document down.

4       Q.    Has the Fund submitted a claim in

5  connection with any other litigation related to

6  SCANA?

7       A.    No, not to my knowledge.

8       Q.    And that would include the securities

9  litigation, correct, in which SCANA itself was

10 named as a defendant?

11      A.    No, not to my knowledge.

12      Q.    So your understanding is that the Fund

13 has not attempted to recover any amounts of its

14 alleged loss from SCANA?

15           MS. POSNER:  Objection, misstates the

16      testimony.

17      A.    Yeah, I don't -- I don't know.  I

18 don't know what -- understand the line of

19 questioning because, as far as I know, no, there's

20 no other litigation as it refers to SCANA.

21      Q.    What are the damages that the Fund is

22 claiming in this case?

23           MS. POSNER:  Objection, not in

24      accordance with the schedule.

25      Q.    You can answer.

```
 1                    TODD NEILSON

 2        A.    This isn't just about our loss.  This

 3   is about the loss of all the stakeholders.  Us

 4   stepping up as a lead plaintiff, you know, we're

 5   willing to share in whatever each stakeholder is

 6   entitled to based on what the decision is at the

 7   end of the day.

 8             We're not looking to get anything

 9   individually.  This is something that's broad

10   based, and all the stakeholders are entitled to

11   the same amount of equity into the case if, in

12   fact, it's ruled in our favor.

13        Q.    Well, has the -- withdrawn.

14             One of the topics that you are

15   prepared to testify about is the Fund's actual or

16   claimed damages in this class action, correct?

17             MS. POSNER:  Objection.

18             We have stated objections in response

19        to that topic.  So subject to those

20        objections, he is prepared.

21        Q.    So you are not prepared to testify as

22   to that topic?

23        A.    I'm only prepared to testify as to the

24   stuff that I'm aware of as it applies to this

25   case.
```

```
1                    TODD NEILSON

2        Q.    So as the representative of the Fund,

3   are you prepared to testify today as to what the

4   Fund's damages are in this action?

5             MS. POSNER:  Same objection.

6        A.    Yeah, I am not.  I don't know.  I

7   don't have the monetary number.

8             Everything's on there.  We -- it's not

9   just about us.  It's about all the class holders,

10  as I previously stated.

11       Q.    Has the Fund made any attempt to

12  quantify its damages?

13       A.    No, other than the stuff that we

14  submitted into discovery.

15       Q.    And what specifically are you

16  referring to?

17       A.    That schedule that you had that shows

18  our -- the one that you included in your documents

19  earlier.

20       Q.    The one that shows the purchases and

21  sales?

22       A.    Yes.

23       Q.    So other than that, you're not aware

24  of the Fund making any attempt to quantify its

25  damages?
```

```
 1                    TODD NEILSON

 2        A.    Not that I'm -- not that I'm aware of,

 3   no.

 4              MR. SCHWARTZ:  Chassity, can you bring

 5        up the interrogatory responses?

 6              I think it's Tab 14.

 7              (Exhibit 21, Plaintiffs' Responses and

 8        Objections to Defendants' First Set of

 9        Interrogatories, was marked for

10        identification at this time.)

11              MR. SCHWARTZ:  Exhibit 21 is

12        Plaintiffs' Responses and Objections to

13        Defendants' First Set of Interrogatories.

14    BY MR. SCHWARTZ:

15        Q.    Have you seen this before?

16        A.    Yes.

17        Q.    When did you see it?

18        A.    When I went through it with counsel.

19        Q.    And did you review this to make sure

20   that everything in here was accurate?

21        A.    I read through it.  It was done

22   previously.  Counsel went through it ahead of time

23   making sure everything was accurate.

24        Q.    And do you believe that all of the --

25   do you -- as the representative of the Fund, do
```

```
1                    TODD NEILSON
2    you believe that all of the responses contained in
3    this document are accurate as of today?
4         A.    Yes.
5         Q.    Is there anything in here that you
6    would change?
7         A.    Without going through it and reading
8    through the entire document, no.
9              And like I said, as of right now, I
10   say no, but ...
11        Q.    Well, take whatever time you need.
12   I'd like to know if there's anything in here that
13   you would change as you sit here today.
14             MS. POSNER:  Absent communications
15        with counsel, you want him to sit here and
16        read a 20-something page document?
17             MR. SCHWARTZ:  It's significantly
18        shorter than that.
19             He's the one who qualified his
20        response.  So, yeah, he can read this and
21        tell me if there is anything that would
22        change.
23        A.    Okay.  Good.
24             No, I don't think I need to change
25   anything.  I think it's great.
```

1                          TODD NEILSON

2              Thanks.

3         Q.    Okay.  Why did Ms. Chupka sign this?

4         A.    Because she prepared everything,

5    prepared all the documents in order to file and

6    reviewed it with counsel.

7         Q.    Is Ms. Chupka -- is she employed by

8    the Fund?

9         A.    No, she's not employed by the Fund.

10   She's not paid by the Fund.  She's an attorney for

11   the Fund.

12        Q.    Does she have some kind of an

13   engagement letter with the Fund?

14        A.    Not to my knowledge, no.

15              She's in-house counsel.

16        Q.    For the -- for the Union, correct?

17        A.    Correct.

18              MS. POSNER:  Objection.

19        Q.    Does Ms. Chupka hold any position with

20   the Fund?

21              MS. POSNER:  Objection.

22        A.    Advisory counsel.

23        Q.    Well, what does that mean?  Is she --

24   does she receive any payment?

25        A.    No, she doesn't receive payment.

1                         TODD NEILSON

2            I said, she's an attorney on the Fund.

3       Q.    And what do you mean by that?

4       A.    Pretty self-explanatory.

5       Q.    Well, she doesn't work for the Fund,

6   right?

7       A.    No, she doesn't work for the Fund.

8   No.

9       Q.    And she doesn't get paid by the Fund?

10      A.    Nobody gets paid by the Fund.  There's

11  no employees.

12            You asked that the question earlier.

13      Q.    And she doesn't have an engagement

14  letter with the Fund?

15      A.    No.

16      Q.    So what do you -- how do you

17  understand that she is the lawyer for the Fund?

18      A.    She's an adviser -- a legal adviser to

19  the Fund.

20            Not for the Fund, to the Fund.

21      Q.    Mr. Neilson, you understand that there

22  is a pending motion for a protective order that

23  relates to the scope of the testimony that has

24  been noticed for -- for the Fund, correct?

25      A.    I don't understand your question, no.

```
 1                    TODD NEILSON

 2        Q.    Do you understand that -- well, do you

 3   understand that there is a pending motion for a

 4   protective order that would -- that relates to

 5   certain of the topics that we looked at in the

 6   first exhibit?

 7        A.    Yes.

 8        Q.    Are you available for -- to sit for

 9   another deposition before October 1st depending on

10   the outcome of that motion?

11             MS. POSNER:  Objection.

12        A.    I'll do whatever I have to do.  You

13   know, I'm here to represent the Fund and make sure

14   that I do my fiduciary responsibility to the

15   people of the asset class and my members.

16             So, yeah, whatever we've got to do.

17        Q.    Okay.  Mr. Neilson, aside from the --

18   the indictment and the labor complaint, are you

19   aware of any trustee of the Fund being named in a

20   criminal action or under criminal investigation?

21             MS. POSNER:  Objection.

22             It's subject to the motion for

23        protective order.

24             MR. SCHWARTZ:  All right.  So you're

25        instructing him not to answer?
```

```
 1                    TODD NEILSON

 2            MS. POSNER:  Yes, he's not answering

 3        questions regarding the subject of the

 4        protective order, nor has he prepared for

 5        that question.

 6        Q.    Mr. Neilson, you're following your

 7    counsel's instruction?

 8        A.    Of course, I am.

 9            MR. SCHWARTZ:  Then I have nothing

10        further, obviously reserving rights

11        depending on what happens with the pending

12        motion.

13            MS. POSNER:  I just have a few short

14        redirect.

15    EXAMINATION

16      BY MS. POSNER:

17        Q.    Mr. Neilson, earlier today,

18    Mr. Schwartz was asking you some questions

19    regarding your preparation for today's deposition.

20            Do you remember that?

21        A.    I do.

22        Q.    And I believe you testified that you

23    spoke to counsel in preparation for the

24    deposition, right?

25        A.    Yes.
```

```
 1                    TODD NEILSON

 2        Q.    And when you were referring to

 3   counsel, were you also including Ms. Chupka, the

 4   in-house counsel to the Fund, in your response?

 5        A.    Yes, I was.

 6        Q.    And when you spoke with Ms. Chupka --

 7              MR. SCHWARTZ:  Objection to that last

 8        question.  Misstates the testimony.

 9              MS. POSNER:  I wasn't stating any

10        testimony, but okay.

11        Q.    When you spoke with Ms. Chupka, did

12   she tell you whether, prior to you taking over

13   oversight of this case, she reviewed the

14   pleadings -- or what are called "pleadings" or

15   "filings" in this case before they were made?

16        A.    Yes, she did.

17        Q.    And did she confirm whether she

18   reviewed those pleadings or filings for accuracy

19   before they were made?

20        A.    Yes, she did.

21        Q.    And did she confirm whether she ever

22   had comments or questions regarding those filings

23   before they were made?

24        A.    Yes, she did.

25        Q.    Did she also confirm for you whether
```

```
 1                    TODD NEILSON
 2    Mr. Burrows reviewed the complaints filed in this
 3    case?
 4         A.    Yes, she did.
 5         Q.    And did she confirm for you whether
 6    she spoke regularly to me as counsel regarding the
 7    litigation?
 8         A.    Yes.
 9         Q.    And did Ms. Chupka tell you what she
10    did to gather documents in response to defendants'
11    request for documents in this case?
12         A.    Yes, she did.
13         Q.    What did she tell you she did?
14         A.    She told me she went through all the
15    files that we had.  She went and did searches
16    through e-mails using keywords with SCANA, the
17    ticker symbol.  Anything that came up in any of
18    our documents, e-mails, and what have you, and
19    gathered all that information and put it together
20    and sent it as part of her discovery for the case.
21         Q.    Okay.  Earlier today, you also were
22    asked some questions regarding the -- how the Fund
23    has participated in this class action.
24               Do you remember that?
25         A.    I do.
```

1                       TODD NEILSON

2          Q.    In your answer, you stated that the

3    Fund moved for a lead plaintiff, correct?

4          A.    Yes.

5          Q.    Has the Fund also reviewed filings

6    before they were made as part of its participation

7    in this class action?

8          A.    Yes, they did.

9          Q.    Did the Fund also provide documents in

10   discovery as part of its participation in this

11   class action?

12         A.    Yes, we did.

13         Q.    Are you also sitting here today for a

14   deposition as part of your participation in this

15   class action?

16         A.    Yes, I am.

17         Q.    And did the Fund, whether that was

18   Mr. Burrows or Ms. Chupka, and now you, regularly

19   have conversations with counsel regarding the

20   litigation to understand what was happening in the

21   case as the case went on?

22         A.    Yes, we have.

23         Q.    And since you've taken over oversight

24   of this case, have you personally been the person

25   responsible for reviewing filings before they are

1                           TODD NEILSON

2    made?

3         A.    Yes, I am.

4         Q.    And have you been taking on that

5    responsibility since you took over?

6         A.    I have.

7         Q.    And have you regularly spoken to me

8    regarding the case and what is happening in the

9    case?

10        A.    Yes, I have.

11        Q.    You were also asked earlier today some

12   questions regarding Mr. Burrows' role in this

13   litigation since you took over.

14              Do you remember that?

15        A.    I do.

16        Q.    And has Mr. Burrows been involved in

17   this case in any way since you took over for him?

18        A.    No, not at all.

19        Q.    Will Mr. Burrows have any involvement

20   in this case moving forward?

21        A.    Absolutely not.

22        Q.    Was -- is it your understanding that

23   Mr. Burrows was informed by Ms. Chupka that he

24   would have no role in this case going forward?

25        A.    Yes, he was.

1                           TODD NEILSON

2          Q.    And did he accept that without any

3     issue?

4          A.    Yes.

5          Q.    Did he have any issue with stepping

6     away from the case?

7          A.    No.

8          Q.    Is there any need for a Board of

9     Trustees' vote on anything pertaining to this

10    litigation at any time?

11                MR. SCHWARTZ:   Objection.

12         A.    No, I don't see any reason for that.

13         Q.    Will there at any point be a need for

14    a Board of Trustees' vote on whether to settle

15    this case?

16         A.    No.

17         Q.    Will there be a need for a Board of

18    Trustees' vote on the amount this case should

19    settle for, if there is a settlement to be had?

20         A.    No.

21         Q.    And do you have the full, exclusive

22    authority to act on behalf of the Fund in this

23    action?

24         A.    I do.

25         Q.    Do the Fund's bylaws require any sort

```
 1                   TODD NEILSON

 2   of board resolution or any sort of documentation

 3   for you to have that authority?

 4        A.    No, not to my knowledge.

 5        Q.    Can you alone, in consultation with

 6   counsel -- and, by "counsel," I mean me, Cohen

 7   Milstein -- decide litigation strategy in this

 8   case on behalf of the Fund?

 9        A.    Yes.

10        Q.    And will you exclusively do that

11   moving forward in this case?

12        A.    I will.

13        Q.    And can you alone, in consultation

14   with Cohen Milstein, decide whether to settle this

15   case and for what amount to settle this case on

16   behalf of the Fund, if appropriate?

17        A.    Yes, I can.

18        Q.    And will you do so?

19        A.    I certainly will.

20             MS. POSNER:  I have no further

21        questions, pending any redirect.

22             MR. SCHWARTZ:  Yeah, I have a few

23        questions.

24   EXAMINATION (continued)

25     BY MR. SCHWARTZ:
```

```
 1                    TODD NEILSON
 2        Q.    First, in the beginning of
 3   Ms. Posner's examination, she referred to
 4   Ms. Chupka as the in-house counsel to the Fund,
 5   and you agreed with that.
 6              Did you misspeak or is Ms. Chupka, in
 7   fact, the in-house counsel to the Fund?
 8        A.    Yes.
 9        Q.    Yes, you misspoke?
10        A.    No -- yes, she's the in-house counsel
11   to the Fund.
12        Q.    What is your understanding of what it
13   means to be in-house counsel?
14        A.    That she's a lawyer that advises us on
15   things as it applies to the Fund, pretty
16   self-explanatory.
17        Q.    So your understanding is that any
18   lawyer who advises the Fund is in-house counsel?
19              MS. POSNER:  Objection, misstates his
20        testimony.
21        A.    No, but any kind of decisions we make,
22   we like to run it by counsel because they're much
23   more verse in the ways and the laws to make sure
24   we don't make a mistake.  So we always run
25   anything by counsel for that reason, to see the
```

```
1                    TODD NEILSON

2   legalities of it.

3        Q.    Now, you were asked a number of

4   questions about conversations you had with

5   Ms. Chupka, right?

6        A.    Yes.

7        Q.    And one of the questions Ms. Posner

8   asked you is whether Ms. Chupka confirmed for you

9   whether she spoke regularly to Ms. Posner as

10  counsel regarding the litigation, and you answered

11  yes.

12            Do you recall that?

13       A.    Yes.

14       Q.    So tell me everything that Ms. Chupka

15  told you about those conversations with

16  Ms. Posner.

17            MS. POSNER:  Objection.

18            If you can answer that without getting

19        into attorney-client privileged

20        communication.

21            THE WITNESS:  He knows that.

22            MR. SCHWARTZ:  Whoa, whoa, whoa, whoa,

23        whoa.  You were the one who opened the door

24        asking about conversations that you had with

25        this person, so I'm not accepting that
```

```
 1                      TODD NEILSON

 2         limitation.

 3              MS. POSNER:  No, I do not waive

 4         attorney-client privilege.  He -- I should

 5         say, the Fund did not waive attorney-client

 6         privilege.

 7              What he was testifying to was that she

 8         said she spoke, not the substance of the

 9         conversations.

10    BY MR. SCHWARTZ:

11         Q.    Are you going to refuse to answer that

12    question?

13         A.    On advice of counsel, yes, I am.

14    That's privileged.

15         Q.    Now, Ms. Posner asked you:  Will there

16    at any point be a need for a Board of Trustees'

17    vote on whether on settle this case?

18              And you said, no.

19              Do you recall that?

20         A.    I do.

21         Q.    What's your basis for that testimony?

22         A.    Basis for that is I have the ability

23    to make that decision for the Fund without having

24    to get the other trustees involved.

25         Q.    And how do you know that?
```

1                    TODD NEILSON

2        A.      'Cause that's how it's written in the

3    document.

4        Q.      What document?

5        A.      The rules of the Pension Trust Board.

6        Q.      What rule are you specifically

7    referring to?

8        A.      I don't know -- I don't know the

9    document inside and out, but based on what counsel

10   has told me, I'm well within the parameters of

11   what I'm doing based on the benefit of the Fund,

12   not of myself personally.

13               I'm acting on behalf of the Fund, not

14   on behalf of myself.

15       Q.      And who's "counsel" in that answer?

16       A.      The attorneys for the Fund.

17       Q.      Who specifically?

18       A.      I don't actually know what you're

19   getting at.

20       Q.      Well, I'm asking for the name of the

21   person that you were just referring to.

22       A.      I just -- just per the rules of what

23   I'm allowed -- I don't understand.

24               No one person in particular, it's what

25   I'm allowed to do as it's based on a trust

```
1                      TODD NEILSON
2    document, what we're allowed to do as far as it
3    goes, what we're -- what's within the parameters
4    of what we're allowed to do.
5         Q.    Right.  So in your prior answer, I
6    asked you:  When you referred to "counsel," who
7    was that?
8              And you said, the attorneys for the
9    Fund.
10             And my question is:  Who are you
11   referring to?
12        A.    I guess the -- you have me at bay
13   because you have the luxury of what I said
14   earlier.  I don't know what you're talking about,
15   so I'm not looking at what you're looking at,
16   so ...
17        Q.    It's a pretty simple question.  You
18   said that somebody --
19        A.    Maybe I'm pretty stupid here, I don't
20   know.  You know, you're talking to me.  I don't
21   appreciate the way you're speaking here, very,
22   very cocky.
23             But anyway, moving on.
24        Q.    You said that somebody told you that
25   you were able to function on your own?
```

Page 155

TODD NEILSON

1

2          A.    Maybe I misspoke.

3          Q.    Okay.  If you want to change your

4    testimony, that's fine, I just want to make sure I

5    understand.

6          A.    Okay.

7          Q.    Are you testifying that nobody has, in

8    fact, told you that you have the ability to make

9    all the decisions for this litigation?

10         A.    I was advised by Ms. Chupka that I was

11   acting on behalf of the Fund, and based on how

12   that's worked, yes.

13         Q.    And earlier, you were asked the

14   question:  Will there at any point be a need for a

15   Board of Trustees' vote on whether to settle this

16   case?

17               And you said, no.

18               What is your basis for that testimony?

19         A.    Because prior to going into this, the

20   Fund wasn't getting anything in return.

21               Any kind of return we're going to get

22   based on the losses we've incurred, I think that

23   the trustees -- my fellow trustees would be quite

24   happy to see that we're getting compensated for

25   the indiscretion that was done by Deloitte.

1              TODD NEILSON

2              Any recoup of funds for the members

3    and for the fellow stakeholders is a bonus.  It's

4    not costing them anything.  So if we can bring

5    back our folks a little bit of return for the

6    money they lost, I think everybody would be quite

7    happy.

8              It's my fiduciary responsibility by

9    being a trustee on this Fund.

10        Q.    Was your testimony based on your

11   understanding of the trust document?

12        A.    Yes, I guess so.

13        Q.    When is the last time you reviewed the

14   trust document?

15        A.    It's been a while.

16        Q.    Like, how long?

17        A.    Like, I don't know, a while.

18        Q.    More 10 years?

19        A.    Probably when I first got on.  It's

20   not something that you -- it's not easy reading,

21   which you well know.

22        Q.    Has anybody told you that there's not

23   going to be a need for a trustees' vote if the

24   case settles?

25        A.    Yeah, that's what I -- that's what

```
 1                  TODD NEILSON
 2   I'm -- it's my understanding, yes.
 3        Q.    But what's that understanding based
 4   on, just your understanding of the trust document?
 5        A.    Yes.
 6        Q.    You were also asked:  And do you have
 7   the full exclusive authority to act on behalf of
 8   the Fund in this action?
 9              And you said, I do.
10              Do you recall that?
11        A.    I do.
12        Q.    And what was the basis for that
13   testimony?
14        A.    I'm not sure I understand the
15   question.
16        Q.    Well, when you said, "I do," what made
17   you agree to that question?
18        A.    I was asked the question, and I
19   answered it.
20        Q.    Right.  Why did you answer it?
21        A.    The answer was, yes, that I have the
22   full ability to act on behalf of the Fund.
23        Q.    Right.  So what's your basis for your
24   understanding that you have that full ability?
25        A.    Based on my fiduciary responsibility
```

```
 1                    TODD NEILSON
 2   to the Fund, I have the right to pursue and recoup
 3   some of the losses based on the misgivings of
 4   Deloitte and the fraud that they committed here.
 5        Q.    Has anybody told you that you have the
 6   full exclusive authority to act on behalf of the
 7   Fund for this action?
 8        A.    No.  I guess I just assumed we do.
 9              Yes, they did.  Of course, they did.
10   That's why we're here.
11        Q.    So who told you that?
12        A.    The legal team that got us involved up
13   to this point.
14        Q.    And they said that you, Mr. Neilson,
15   had the full and exclusive authority to act on
16   behalf of the Fund in this action?
17        A.    Just me as a representative of the
18   fund, yes.
19        Q.    And who specifically told you that?
20        A.    I don't recall.
21        Q.    Was it Ms. Chupka?
22        A.    I don't recall.
23        Q.    Do you recall when you were told that?
24        A.    Once, when I got involved in this
25   case.  So it was in the beginning.
```

```
 1                    TODD NEILSON

 2            When we did the refile with my name on

 3    it, yes, in June I believe it was.

 4        Q.   Ms. Posner asked you:  Do the Fund's

 5    bylaws require any sort of board resolution or any

 6    sort of documentation for you to have that

 7    authority?

 8            And you said, no, not to my knowledge.

 9            Do you recall that?

10        A.   Yes, I do.

11        Q.   And what was the basis for your

12    testimony there?

13        A.   I just said it was not to my

14    knowledge.  I had no knowledge of that, so that's

15    the basis of my testimony.

16        Q.   So it could very well be the case that

17    the bylaws do require that, you just don't know

18    one way or the other?

19            MS. POSNER:  Objection, misstates the

20        testimony.

21        A.   Yeah, to my knowledge, we're not in

22    violation of the bylaws based on what the

23    attorneys are telling me.

24        Q.   So who told you that you're not --

25    that this wasn't required?
```

1                    TODD NEILSON

2          A.    Nobody told me.  I said, based on

3    counsel's advice, it doesn't appear to be in

4    violation of any of our rules or bylaws.

5                (Continued on next page for jurat.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2          MR. SCHWARTZ:  All right.  Nothing

3     further.

4          MS. POSNER:  I have nothing.

5          VIDEOGRAPHER:  This marks the end of

6     the deposition.

7          We're going off the record at

8     2:38 p.m.

9          (Whereupon the proceedings were

10    concluded at 2:38 p.m.)

11                    oOo

12          I, TODD NEILSON, the witness herein,

13    do hereby certify that the foregoing

14    testimony of the pages of this deposition to

15    be a true and correct transcript, subject to

16    the corrections, if any, shown on the

17    attached page.

18                         _____

19                         TODD NEILSON

20    Subscribed and sworn to before me this

21    _____day of _____,_____.

22

23    _____

24

25

Page 162

1

2                        CERTIFICATE

3           I, AMY A. RIVERA, a Certified Shorthand

4    Reporter, Registered Professional Reporter,

5    Certified LiveNote Reporter, and Notary Public of

6    the State of New York, do hereby certify that prior

7    to the commencement of the examination TODD NEILSON,

8    was duly sworn by me to testify the truth, the whole

9    truth and nothing but the truth.

10          I DO FURTHER CERTIFY that the foregoing is

11   a true and accurate transcript of the testimony as

12   taken stenographically by and before me at the time,

13   place and on the date hereinbefore set forth.

14          I DO FURTHER CERTIFY that I am neither a

15   relative nor employee nor attorney nor counsel of

16   any of the parties to this action, and that I am

17   neither a relative nor employee of such attorney or

18   counsel, and that I am not financially interested in

19   the action. Dated: September 14th, 2021

20

21                  *Amy A. Rivera*

22   _____

23          Notary Public of the State of New York

24          My commission expires December 6, 2021

25          License No. XI00939

```
 1
 2                        INDEX
 3    WITNESS                                 PAGE
 4    TODD NEILSON
 5    By Mr. Schwartz                         5, 149
 6    By Ms. Posner                           143
 7
 8
 9                       EXHIBITS
10    NUMBER              DESCRIPTION          PAGE
11    Exhibit 15          Amended Notice of      15
12                        Deposition of the Fund
13    Exhibit 16          Declaration of Todd    67
14                        Neilson in Support of
15                        Supplemental Motion for
16                        Class Certification,
17                        Appointment of Class
18                        Representative, and
19                        Appointment of Class
20                        Counsel
21    Exhibit 17          Document, Bates stamped 108
22                        PLTF-LOCAL98-0000037
23    Exhibit 18          PNC statement, Bates    111
24                        stamped
25                        PLTF-LOCAL98-0000001
```

```
 1

 2                   EXHIBITS (Continued)

 3    NUMBER                 DESCRIPTION              PAGE

 4    Exhibit 19             Amended and Restated     123

 5                           Agreement and

 6                           Declaration of Trust,

 7                           Bates stamped

 8                           PLTF-LOCAL98-0000049

 9    Exhibit 20             Form 10-K for South      127

10                           Carolina Electric &

11                           Gas, filed February 24,

12                           2017

13    Exhibit 21             Plaintiffs' Responses    138

14                           and Objections to

15                           Defendants' First Set

16                           of Interrogatories

17

18                   PREVIOUSLY MARKED EXHIBITS

19    NUMBER                 DESCRIPTION              PAGE

20    Exhibit 7              Document                 100

21

22

23

24

25
```

```
 1
 2                      MARKED FOR RULING
 3   PAGE/LINE          DESCRIPTION
 4    36    11          Mr. Neilson, what facts have
 5                      you testified to that supports
 6                      the Fund's opinion that
 7                      Deloitte did not do its due
 8                      diligence?
 9    79    18          Does the Fund execute an
10                      engagement letter with its
11                      auditor?
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 166

```
 1                    ERRATA SHEET

 2   Case Name:

 3   Deposition Date:

 4   Deponent:

 5   Pg.  No. Now Reads     Should Read   Reason

 6   ___  ___  _____    _____    _____

 7   ___  ___  _____    _____    _____

 8   ___  ___  _____    _____    _____

 9   ___  ___  _____    _____    _____

10   ___  ___  _____    _____    _____

11   ___  ___  _____    _____    _____

12   ___  ___  _____    _____    _____

13   ___  ___  _____    _____    _____

14   ___  ___  _____    _____    _____

15   ___  ___  _____    _____    _____

16   ___  ___  _____    _____    _____

17   ___  ___  _____    _____    _____

18   ___  ___  _____    _____    _____

19   ___  ___  _____    _____    _____

20

21                         _____

22                         Signature of Deponent

     SUBSCRIBED AND SWORN BEFORE ME
23   THIS ____ DAY OF _____, 2021.

24   _____

25   (Notary Public)   MY COMMISSION EXPIRES:_____
```