UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 98 PENSION FUND on behalf of itself and all others similarly situated,<br><br>    Plaintiff,<br><br>vs.<br><br>DELOITTE & TOUCHE LLP; DELOITTE LLP,<br><br>    Defendants. | Case No. 3:19-cv-3304 |

**<u>DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AND SUPPORTING MEMORANDUM OF LAW</u>**

Defendants Deloitte & Touche LLP and Deloitte LLP (collectively, "Deloitte" or "Defendants"), pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, by and through their undersigned counsel, hereby move to dismiss this action for lack of subject matter jurisdiction.[1]

**PRELIMINARY STATEMENT**

This case must be dismissed because recent discovery—the very same discovery that the International Brotherhood of Electrical Workers Local 98 Pension Fund ("Plaintiff" or the "Fund") resisted and twice asked this Court to prevent—has revealed that the Fund has never been authorized to participate in this action. The statements made under penalty of perjury by Brian Burrows and Todd Neilson that they were "authorized to make legal decisions on behalf of" the Fund in this litigation were false. Neither Burrows nor Neilson has ever had the authority to prosecute this litigation on behalf of the Fund, and they are acting in violation of the Fund's governing Trust Agreement. Indeed, they have gone out of their ways to hide the Fund's involvement in this case from six of the eight Trustees who run and oversee the Fund, including all four of the "Management Trustees," who are required under the Taft-Hartley Act to ensure that "union representatives" like Burrows and Neilson, "may not be permitted to dominate the administration of any trust fund." *Union de Empleados de Muelles de P.R., AFL-CIO, Loc. 1901, ILA v. Int'l Shipping Agency, Inc.*, 2014 WL 12726555, at *3 (D.P.R. Feb. 19, 2014) *report and recommendation adopted sub nom. Union de Empeados de Muelles de Puerto Rico, AFL-CIO, Loc. 1901, ILA v. Int'l Shipping Agency, Inc.*, 2014 WL 12726556 (D.P.R. Mar. 31, 2014).

---

[1] All exhibits referenced in this Memorandum are exhibits to the Declaration of Andrew B. Lichtenberg submitted herewith ("Lichtenberg Decl."). "Ex." herein refers to the exhibits to the Lichtenberg Declaration.

Under Supreme Court precedent, the Fund lacks standing because it never authorized its participation in this action, and this action must therefore be dismissed for lack of subject matter jurisdiction. *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951, 1956 (2019) (dismissing case for lack of jurisdiction where the plaintiff lacked standing because it did not possess the "[a]uthority and responsibility" to litigate). Courts consistently dismiss claims purportedly brought by labor union pension or benefit funds for lack of standing where those actions were commenced in violation of the requirements of the applicable trust agreement or the Taft-Hartley Act. *See, e.g., Kilkenny v. Guy C. Long, Inc*. 288 F.3d 116, 121, 124 (3d Cir. 2002) (explaining that the Taft-Hartley Act "requires that employee benefit funds receiving employer contributions be jointly administered by an equal number of employee and employer representatives" and holding that "plaintiffs here were not authorized under the trust agreements to bring suit without either receiving the approval of a majority of the trustees or employing the arbitration procedures . . . Nonetheless, plaintiffs instituted suit on their own without majority approval and . . . they lack standing to sue at this time"); *Alfarone v. Bernie Wolff Const. Corp*., 788 F.2d 76, 79 (2d Cir. 1986) ("Plaintiffs' filing of this suit without either receiving the approval of a majority of the trustees or employing the arbitration procedure contravenes both the Taft-Hartley Act and the trust agreements."); *Union de Empleados*, 2014 WL 12726555, at *4 (dismissing claims by a labor union fund that filed suit without the requisite trustee consent under the applicable trust agreement and the Taft-Hartley Act).

Where, as here, a plaintiff seeks to pursue a claim without standing, there cannot be subject matter jurisdiction, and where a court lacks subject matter jurisdiction, the action must be dismissed. Fed. R. Civ. P. 12(b)(1) (empowering a defendant to move a court to dismiss for lack

of subject matter jurisdiction); Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

## BACKGROUND

### I. NEITHER BURROWS NOR NEILSON EITHER SOUGHT OR OBTAINED THE CONSENT REQUIRED BEFORE THE FUND COULD PARTICIPATE IN THIS ACTION

The Fund is a trust that is established and governed by the Taft-Hartley Act. ECF No. 86-1 at 2 ("The Local 98 Pension Fund, the entity that is serving as the Court-appointed Lead Plaintiff here, is a Taft-Hartley defined-benefit plan, also known as a multiemployer pension plan ('Taft-Hartley plan')"); Ex. A (Excerpted Transcript of May 12, 2022 Deposition of Brian Burrows ("Burrows Dep. Tr.")) at 29:3-15 (affirming that "the pension fund is a Taft-Hartley fund" and acknowledging that "[t]here are certain rules that the pension fund has to follow under the Taft-Hartley" Act).

The Taft-Hartley Act contains a number of provisions regarding the relationship between employers and employees. For example, it requires that "employees and employers are equally represented in the administration of" Taft-Hartley funds. 29 U.S.C. § 186(c)(5)(B).[2] The purpose of the Taft-Hartley Act's equal representation requirement is to ensure that "union representatives

---

[2] The Taft-Hartley Act makes it "unlawful for any employer . . . who acts in the interest of an employer to pay, lend, or deliver . . . any money or other thing of value (1) to any representative of any of his employees who are employed in an industry affecting commerce," with certain exceptions. 29 U.S.C. § 186(a). One of those exceptions is the payment of money "to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents," **so long as** "the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement provides that the two groups shall agree on an impartial umpire to decide such dispute . . . ." 29 U.S.C. § 186(c)(5).

may not be permitted to dominate the administration of any trust fund." *Union de Empleados*, 2014 WL 12726555 at *3.

In keeping with these requirements, the Fund was established by a trust agreement (the "<u>Trust Agreement</u>") that at all relevant times provided for a Board of Trustees with four Trustees representing members of the union (the "<u>Employee Trustees</u>") and four Trustees representing members of the employers who make contributions to the Fund (the "<u>Management Trustees</u>" or "<u>Employer Trustees</u>").[3]

To prevent the union affiliated with the Fund from dominating the administration of the Fund, the Trust Agreement vests supervision of the Fund in the Trustees. Section 5.1 of the Trust Agreement, titled "Conduct of Trust Business," states that the "Trustees shall have general supervision of the operation and administration of this Pension Fund and Pension Plan and shall conduct the business and activities of the Trust in accordance with this Trust Agreement." Ex. B (<u>Trust Agreement</u>) at Pltf-Local 98-0000067. The Trust Agreement also makes clear that the Trustees are required to act ***as a group*** in conducting the Trust's business and activities.[4] For

---

[3] Ex. B (Trust Agreement) at Pltf-Local 98-0000054-Pltf-Local 98-0000055 ("The Pension Fund shall jointly be administered by six (6) Trustees, three (3) of whom shall be appointed by the President of the Union and shall act as Employee Trustees, and three (3) of whom shall be appointed by the Association and shall act as Employer Trustees."); Ex C (I.B.E.W. Local Union No. 98 Pension Fund Minutes of Trustees' Meeting of November 22, 2019) at Pltf-Local 98-000151 (increasing the total number of Trustees to eight); Ex A (Burrows Dep. Tr.) at 30:5-8 (confirming that "[o]n the management and labor side, there's four trustees per side").

[4] Among other things, the Trustees, *collectively*, are vested with "Title to and possession of all monies which are contributions to be paid into the Fund" (Ex. D (2008 Amendment to Amended and Restated Agreement and Declaration of Trust for the Local Union No. 98 IBEW Pension Plan) at Pltf-Local 98-000106), and are empowered to "receive, hold and administer the Trust Fund" (Ex. B (Trust Agreement) at Pltf-Local 98-0000054) and to make decisions regarding "Controversies and Disputes" (Ex. B (Trust Agreement) at Pltf-Local 98-0000082-Pltf-Local 98-0000083). While the Trustees may delegate certain fiduciary responsibilities, they are only empowered to do so ***as a collective entity*** "by resolution or by-law or by provisions of this Trust Agreement," which they have never done here. Ex. B (Trust Agreement) at Pltf-Local 98-0000070.

example, the Trust Agreement provides that the Fund must take or authorize actions and make decisions either "by unanimous consent . . . in writing" or at meetings decided by a majority vote of the Trustees, so long as a quorum—defined as at least two Management Trustees *and* at least two Employee Trustees—is present. Ex. B (Trust Agreement) at Pltf-Local 98-0000061-Pltf-Local 98-0000062. Neilson confirmed this in his deposition, testifying that "the trustees of the fund direct the transaction of the fund's business either through votes at . . . meetings or through written resolutions." Ex. E (Excerpted Transcript of April 27, 2022 Deposition of Todd Neilson ("Neilson Dep. Tr.")) at 89:16-20. Neilson explained that the Trustees follow this formal approval process even in connection with paying bills "down to the hundreds of dollars." *Id.* at 80:15-20 ("Q. [E]ven these bills that are down to the hundreds of dollars, they're reviewed by the trustees and approved by the trustees; is that right? A. Correct. And they go through in our quarterly meetings, yes.").

When the Trust Agreement allows the Trustees to act without a quorum, it still prevents the employee trustees from acting alone. For example, Section 5.1 states that, once an action has been authorized, "Trustees may, in the course of conducting the business of the Trust, execute all instruments in the name" of the Fund, "which instruments *shall be signed by at least one (1) Employer Trustee and one (1) Employee Trustee*." Ex. B (Trust Agreement) at Pltf-Local 98-0000067 (emphasis added).[5]

---

[5] The only exception to this requirement is that "any one duly authorized Trustee may execute legal documents to commence and process law suits [sic] to enforce trust collections on behalf of the Trustees." Ex. B (Trust Agreement) at Pltf-Local 98-0000067. As Neilson conceded at his deposition, that exception does not apply here because this is not a collection action (*i.e.*, an action to collect contributions from employers). Ex. E (Neilson Dep. Tr.) at 93:25-94:20 (affirming that the provision allowing one Trustee to initiate "law suits [sic] to enforce trust collections" "does not apply to this case"). And in any event as discussed below, neither Burrows nor Neilson was "authorized."

In short, at a minimum, a majority of the Board of Trustees must authorize an action such as the Fund's lawsuit against Deloitte, and, thereafter, legal instruments must be signed by at least one Management Trustee and one Employee Trustee. Although Burrows and Neilson purport to act in the name of the Fund, neither followed any of these procedures, and neither sought nor obtained the requisite authorization to pursue this litigation.

## II.  BURROWS AND NEILSON ACTED WITHOUT THE FUND'S AUTHORIZATION

On January 24, 2020, Burrows and Plaintiff's counsel, Cohen Milstein, sought to have the Fund appointed as Lead Plaintiff in this action. In connection with that request, Burrows submitted a certification in which he represented that he was the "President"[6] of the Fund and "declare[d] under penalty of perjury" that he was "authorized to make legal decisions on behalf of IBEW Local 98 [Pension Fund] with regard to this action." ECF No. 22-4 at 1, 2. He repeated that statement in an updated certification in May 2020. ECF No. 55-4 at 1. Those statements were false.

In reality, Burrows—and Burrows alone—instructed Cohen Milstein to seek to have the Fund appointed as Lead Plaintiff. Although there were at least six other Trustees at the time,[7]

---

[6] Although Burrows certified that he was the "President" of the Fund, ECF No 22-4 at 1, he purported at his deposition to be the Chairman of the Fund, even though he also admitted that he has held this position for over four consecutive years and in direct violation of Trust Agreement, which requires that position to rotate every year between an Employee Trustee, like Burrows, and a Management Trustee. Ex. B (Trust Agreement) at Pltf-Local 98-0000059; Ex. A (Burrows Dep. Tr.) at 21:17-18, 56:18-57:11. Burrows, of course, must know what his position is (or purports to be) but simply signed his certification when Tara Chupka, in-house counsel to the IBEW Union, presented the document to him for his signature. Ex. A (Burrows Dep. Tr.) at 50:8-12 ("[Chupka] goes through these documents and then tells me whether to sign, and I review them and then sign them."). Chupka testified that she holds no position with the Fund and that she serves as in-house counsel only to the Union. Ex. F (Excerpted Transcript of May 2, 2022 Deposition of Tara Chupka ("Chupka Dep. Tr.")) at 19:9-14, 31:24-32:12. Their actions further confirm the union's improper attempt to dominate the Fund.

[7] At his first deposition in September of 2021, Neilson testified that there were seven total Trustees at that time, but he since confirmed in his second deposition in April 2022 that a fourth Employee Trustee was added, such that the Board now has four Employee Trustees and four Management

Burrows did not tell any of them about the case, did not seek their approval, and did not obtain their authorization to pursue this action or to make legal decisions with respect to it. Indeed, Burrows confirmed in his deposition that he never even "had a discussion with the trustees about [his] ability to prosecute [this] litigation on behalf of the fund." Ex. A (Burrows Dep. Tr.) at 38:19-22.

Nor did Burrows actually obtain authority from any of the other Trustees to engage Cohen Milstein as counsel to the Fund. This stands in marked contrast to the way the Fund operates in other contexts. For example, Burrows and the Union's counsel Chupka (who observes the Fund's Board meetings) testified that Trustee approval is required when the Fund engages other outside advisors. Ex. A (Burrows Dep. Tr.) at 32:19-33:2 (describing how the Trustees "have to vote on" retaining investment advisors); Ex. F (Chupka Dep. Tr.) at 69:18-24 (affirming that "the trustees are required to approve" retention of "professionals such as outside advisors").

Burrows rationalized his certification that he was "authorized to make legal decisions on behalf of IBEW Local 98 [Pension Fund] with regard to this action," ECF No. 22-4 at 1, on the basis that, years before, he asked for and received permission from the trustees of *a different trust, run by different trustees*, to pursue claims on behalf of that trust *in an entirely separate securities litigation*. Ex. A (Burrows Dep. Tr.) at 9:8-11:16, 45:2-46:15. But that is not what the Fund's Trust Agreement requires nor what Burrows certified. The reality is that Burrows has never bothered to seek—and has never received—any such permission from the Trustees of *this* Fund to litigate *this* lawsuit. Moreover, that Burrows sought authorization to pursue securities claims on

---

Trustees. Ex. E (Neilson Dep. Tr.) at 40:4-9 ("Q. In your last deposition, didn't you testify that only seven of those trustee seats were filled? A. I did, and since then, we had filled the fourth union trustee in our February meeting, I believe, of this year.").

behalf of that other fund further underscores that, for whatever reason, he simply chose not to seek authorization here, his certification notwithstanding.

Neilson's story is much the same. Following the revelation that Burrows had been named in a 116-count federal indictment (ECF No. 74 at 1), Cohen Milstein represented to this Court that Burrows' "authority to oversee and make decisions regarding this litigation" was revoked and that Neilson was substituted in Burrows' place (ECF No. 86 at 2). The Fund notified the Court of this change and filed Neilson's declaration and certification on July 2, 2021, representing "under penalty of perjury" that "I, Todd Neilson, Trustee of IBEW Local 98 [Pension Fund], am the sole individual authorized to make legal decisions on behalf of IBEW Local 98 [Pension Fund] with regard to this action." ECF No. 86-1 at 6. Like Burrows' similar statements from the year before, this was false. The Fund had still never authorized this lawsuit. Neither Neilson nor Burrows ever sought permission from the Trustees, and neither ever informed any of the other Trustees of the existence of this action.

Specifically, Neilson testified that the case was not "ever discussed among the trustees of the fund," and that even he "knew nothing about this [lawsuit] until [he] was asked to take over." Ex. E (Neilson Dep. Tr.) at 91:20-92:4. Indeed, the decision to substitute Neilson for Burrows—and the purported revocation of Burrows' authority and authorization of Neilson—was done in the proverbial "backroom," and consisted of nothing more than Burrows tapping Neilson on the shoulder and telling him to step in. Ex. A (Burrows Dep. Tr.) 66:20-23, 67:22-68:4 (acknowledging that the decision to substitute Neilson for Burrows was not "documented in any way" and instead was simply orally communicated by Burrows to Neilson). Neilson confirmed that other than himself and Burrows, no other Trustee is "aware" that the Fund's action against Deloitte even exists. Ex. E (Neilson Dep. Tr.) at 73:6-9. Neilson further confirmed that "in

- 8 -

connection with the fund's decision to begin pursuing this litigation, there was no instrument executed and no approval sought or received from the trustees"; and he was aware of "no instrument executed by the fund and no trustee approval sought or obtained" "to make Burrows the initial signatory of the fund's declaration in this case" or "in connection with [Neilson's] [re]placement of Mr. Burrows in that role." *Id*. at 97:20-98:25.

## ARGUMENT

### I. JURISDICTION DEPENDS ON THE FUND'S STANDING

Federal courts are courts of limited subject matter jurisdiction. U.S. Const. art. III, § 2 (limiting the jurisdiction of federal courts to decide only "Cases" or "Controversies"). Standing is a core requirement of Article III, as there can be no case or controversy unless a plaintiff has standing to litigate a suit. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (describing "the doctrine of standing" as "[o]ne of those landmarks, setting apart the 'Cases' and 'Controversies' that are of the justiciable sort referred to in Article III"); *Hollingsworth v. Perry*, 570 U.S. 693, 700 (2013) ("For there to be such a case or controversy, it is not enough that the party invoking the power of the court have a keen interest in the issue. That party must also have 'standing[.]'").

Jurisdiction must exist at each stage of the case, and the Court has an independent obligation to assess and re-assess its own jurisdiction throughout a case. Fed. R. Civ. P. 12(h)(3) ("If the court determines *at any time* that it lacks subject-matter jurisdiction, the court *must* dismiss the action.") (emphasis added); *U.S. ex rel. Black v. Health & Hosp. Corp. of Marion Cnty*, 494 F. App'x 285, 292 (4th Cir. 2012) ("A federal court has an independent obligation to assess its subject-matter jurisdiction.") (internal quotation marks, citation, and alterations omitted). Subject matter jurisdiction arguments, therefore, including "standing to litigate[,] cannot be waived or forfeited." *Virginia House of Delegates*, 139 S. Ct. at 1951; *Ashcroft v. Iqbal*, 556 U.S. 662, 671 (2009) ("Subject-matter jurisdiction cannot be forfeited or waived and should be considered when

fairly in doubt."). Thus, a party may make a motion under Federal Rule of Civil Procedure 12(b)(1) such as this at any point during an action. *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 571 (2004) ("Challenges to subject-matter jurisdiction can of course be raised at any time prior to final judgment.").

## II. THE FUND CANNOT MEET ITS BURDEN TO ESTABLISH ITS STANDING

As the "party invoking federal jurisdiction," the Fund "bears the burden of establishing," by a preponderance of the evidence, that it has standing to bring the suit. *Lujan*, 504 U.S. at 561; *U.S. ex rel. Black*, 494 F. App'x at 292 ("When a defendant challenges the existence of subject matter jurisdiction in fact, the plaintiff bears the burden of proving the truth of such facts by a preponderance of the evidence.") (internal quotation marks and citation omitted).

The Fund cannot satisfy its burden of establishing that it has standing. The Fund has "provided no evidence that . . . [the Trustees] authorized the initial" participation in this lawsuit, *First Telebanc Corp. v. First Union Corp.*, 2007 WL 9702557 (S.D. Fla. Aug. 6, 2007), at *6, and the Fund cannot "identif[y] any legal basis for [Burrows' or Neilson's] claimed authority to litigate on the [Fund's] behalf," *Virginia House of Delegates*, 139 S. Ct. at 1951. Indeed, both Burrows and Neilson admit to the contrary that the Trustees did not approve, or even know about, this litigation or the Fund's participation in it. Where, as here, a party lacks authority to bring a claim, that party lacks standing to litigate, and the Court must dismiss the case for lack of subject matter jurisdiction.

The Supreme Court's decision in *Virginia House of Delegates,* is on point and requires dismissal of this case. There, the Supreme Court held that the Virginia House of Delegates had no "standing to represent the State's interests" in civil litigation where Virginia law prescribed that "[a]uthority and responsibility for representing the State's interests in civil litigation . . . rest exclusively with the State's Attorney General." *Id*. at 1951. Because the House of Delegates

"ha[d] not identified any legal basis for its claimed authority to litigate on the State's behalf," the Supreme Court dismissed for lack of jurisdiction. *Id*. at 1951, 1956. So too here the Trust Agreement similarly prescribes that authority and responsibility for actions such as this lawsuit rest exclusively with the Trustees—not with Burrows or Neilson acting independently. *Id*. at 1951. And just as in *Virginia House of Delegates,* neither Burrows nor Neilson can point to "any legal basis for [their] claimed authority to litigate on the [Fund's] behalf." *Id.* at 1951.

*First Telebanc Corp.* is directly on point. In that case, the district court held that a plaintiff-corporation lacked standing because its CEO and president "acted without authority in his initiation of th[e] lawsuit." 2007 WL 9702557 at *6. The plaintiff "provided no evidence that the Board of Directors authorized the initial filing of the lawsuit," as was required under the bank's bylaws. *Id*. at *5. The plaintiff, "therefore had no standing to bring the action." *Id*. at *12. In short, the court held, "[i]n order for there to be a real case or controversy, the plaintiff must have legal authority to initiate the action." *Id*.; *see also Oil & Gas Co. v. Duryee*, 9 F.3d 771, 773 (9th Cir. 1993) ("The only person, then, who could go to court on behalf of Oil & Gas was Fabe. And he not only failed to authorize these actions; he opposed them. Therefore, when Becker-Jones purported to file the bankruptcy petition on behalf of Oil & Gas, ***he was an impostor; his action is null and void***.") (emphasis added).

A "trustee derives his authority from the instrument creating the trust, and each case involving a question as to authority of the trustee must be decided in the light of the provisions of the particular trust instrument." *Cont'l Bank, N.A. v. Caton*, 1990 WL 129452, at *6 (D. Kan. Aug. 6, 1990) (holding that a plaintiff lacked standing because it was not authorized by the trust indenture, bonds or other documents to bring tort claims or securities law claims on behalf of bondholders). In conformity with the Taft-Hartley Act, the Trust Agreement here sets forth

specific procedures that must be followed to authorize a suit like this. Burrows and Neilson admit that they followed none of these procedures. The Trustees never voted to initiate this action against Deloitte and never approved this action through a unanimous written resolution or any other means. The majority of the Fund's Trustees—and all of the Management Trustees—have never even *discussed* this lawsuit, in any meeting or otherwise.

Instead, one Employee Trustee—Burrows—instructed Cohen Milstein to act, and when he was discovered to be under federal indictment, he told another Employee Trustee—Neilson—to take his place. In short, Burrows or Neilson had no authority to pursue this action for the Fund.

Where, as here, a fund fails to satisfy the requirements of the applicable trust agreement and the Taft-Hartley Act to authorize an action in its name, the fund lacks standing, and dismissal is required. *See, e.g., Kilkenny*, 288 F.3d at 124 (Taft-Hartley fund did not have standing because the case was initiated without the requisite approval from the trustees); *Alfarone*, 788 F.2d at 79 (same); *Union de Empleados*, 2014 WL 12726555 at *4 (same). Without standing, there is no actual case or controversy between the Fund and Deloitte, the Court lacks subject matter jurisdiction, and the action must be dismissed.

### III.   THE FUND CANNOT CURE ITS LACK OF STANDING

The Fund's lack of standing is fatal to its claims and cannot be cured. Even if the Trustees were now to approve and ratify what Burrows and Neilson did without authority, that would be ineffective because the applicable statutes of limitations and repose have run.

The claim the Fund would seek to assert is subject to a two-year statute of limitations and a five-year statute of repose. 28 U.S.C. § 1658(b) (establishing a two-year statute of limitations and a five-year statute of repose). Accordingly, a securities fraud claim must be brought no later than the earlier of two years after discovery of the facts constituting the violation or five years after the violation itself. "Discovery" in this context "encompasses not only those facts the plaintiff

actually knew, but also those facts a reasonably diligent plaintiff would have known." *Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010).

This action was commenced in 2019, meaning that the discovery of any potential claim against Deloitte indisputably happened more than two years ago. Thus, any claim is barred by the applicable statute of limitations. Importantly, it is also barred by the five-year statute of repose, which runs from the date of any alleged violation. Here, the last statement that Deloitte made that is alleged to have violated Section 10(b) of the Exchange Act was on February 24, 2017 (ECF No. ¶ 12), meaning that the statute of repose for the very last alleged violation of Section 10(b) expired on February 24, 2022.

Thus, even if the Trustees were now to approve and ratify what Burrows and Neilson did without authority, any such ratification would not resurrect the Fund's case because the Fund could not now bring a case that is already barred by the statutes of limitations and repose. It is blackletter law that "***[i]f an act*** to be effective in creating a right against another or to deprive him of a right ***must be performed before a specific time, an affirmance is not effective against the other unless made before such time.***" *Fed. Election Comm'n v. NRA Pol. Victory Fund*, 513 U.S. 88, 98 (1994) (quoting Restatement (Second) of Agency § 90 (1958)) (emphasis added). Therefore, "it is essential that the party ratifying should be able not merely to do the act ratified at the time the act was done, ***but also at the time the ratification was made***." *Fed. Election Comm'n*, 513 U.S. at 98 (holding that the Solicitor General could not remedy the Federal Election Commission's lack of statutory authority to litigate a case in front of the Supreme Court because the Solicitor General's "after-the-fact authorization" was too late, as it came after the date the Solicitor General could have filed a petition) (emphasis in original; quotation and citation omitted). Here, the Trustees would not be able to "do the act ratified," *i.e.*, bring a claim against Deloitte, and so any attempted

ratification would not cure the Fund's lack of standing.  As the court in *First Telebanc* put it, "[*t*]*o permit ratification after a statute of limitations has expired would be to render the limitations periods meaningless*."  2007 WL 9702557 at *10 (emphasis added).  That is because "ratification will only relate back if the rights of third parties have not been affected in the interim."  *Id.*   In *First Telebanc*, the court determined that the defendant's "right to be free from suit under the statute of limitations" would be affected by an attempted ratification, and, therefore, ratification was not permitted.  *Id.*; *see Fed. Election Comm'n*, 513 U.S. at 98 ("The bringing of an action, or of an appeal, by a purported agent can not be ratified after the cause of action or right to appeal has been terminated by lapse of time") (quoting Restatement (Second) of Agency § 90, Comment A (1958)).

Here, any attempted ratification could not relate back to the filing of the Complaint because the statutes of limitations and repose have already run.  As a result, the lack of authorization cannot now be cured and thus "the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3).

## CONCLUSION

For the foregoing reasons, Deloitte respectfully requests that the Court dismiss the action.

 */s/ Christopher A. Ogiba*
Christopher A. Ogiba, Fed. ID No. 9042
Moore & Van Allen, PLLC
78 Wentworth Street
Charleston, South Carolina 29401
Telephone:  843-579-7066
Facsimile:   843-579-8749
Email: chrisogiba@mvalaw.com
      lesleyfirestone@mvalaw.com
      clintonmagill@mvalaw.com

        Mark A. Nebrig
        John A. Fagg, Jr.
        Nader Raja
        Kristen Kenley
        Moore & Van Allen, PLLC
        100 North Tryon Street
        Suite 4700
        Charlotte, North Carolina 28202-4003
        Telephone: 704-331-3602
        Facsimile:  704-339-5974
        E-mails:  marknebrig@mvalaw.com
                  johnfagg@mvalaw.com
                  naderraja@mvalaw.com
                  kristenkenley@mvalaw.com

        Scott A. Edelman
        Jed M. Schwartz
        Andrew B. Lichtenberg
        Milbank LLP
        55 Hudson Yards
        New York, New York 10001-2163
        Telephone: 212-530-5000
        Facsimile:  212-530-5219
        Email:  sedelman@milbank.com
                jschwartz@milbank.com
                alichtenberg@milbank.com

        *Attorneys for Defendants*
        *Deloitte & Touche LLP and Deloitte LLP*

Charleston, South Carolina
May 26, 2022