## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 98 PENSION FUND on behalf of itself and all others similarly situated,<br><br>       Plaintiffs,<br><br>vs.<br><br>DELOITTE & TOUCHE, LLP; DELOITTE LLP,<br><br>       Defendants. | Case No. 3:19-cv-3304 |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVE, AND <u>APPOINTMENT OF CLASS COUNSEL</u>

\

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

PROCEDURAL BACKGROUND...........................................................................................9

LEGAL STANDARDS ........................................................................................................10

ARGUMENT ......................................................................................................................13

I.    PLAINTIFF HAS FAILED TO SHOW THAT COMMON ISSUES OF FACT
      OR LAW PREDOMINATE AND THUS HAS FAILED TO SATISFY RULE
      23(B)(3)....................................................................................................................13

      A.    Plaintiff Has Failed to Present a Damages Methodology Capable of
            Measuring Damages Attributable to Its Theory of Liability and Thus Has
            Failed to Satisfy Rule 23(b)(3) ....................................................................13

            1.    Plaintiff Provides No Damages Model Regarding a
                  "Materialization of Risk" Theory ...............................................15

            2.    Plaintiff's "Corrective Disclosure" Damages Model Fails to
                  Measure Damages Attributable Only to Plaintiff's Theory of
                  Liability......................................................................................18

      B.    The *Basic* Presumption Has Been Rebutted and Thus Plaintiff Cannot
            Prove Reliance on Class-Wide Basis .............................................................22

II.   THE CLASS PERIOD MUST BE SHORTENED BECAUSE THE "TRUTH"
      WAS DISCLOSED BEFORE DECEMBER 20, 2017 ......................................26

III.  PLAINTIFF IS ATYPICAL AND INADEQUATE BECAUSE IT
      PURCHASED SCANA STOCK AFTER THE "TRUTH" WAS DISCLOSED.............29

IV.   PLAINTIFF'S CLAIM IS BARRED BY THE STATUTE OF REPOSE ........................32

V.    THE COURT SHOULD DENY CLASS CERTIFICATION BECAUSE
      PLAINTIFF LACKS STANDING .....................................................................34

CONCLUSION...................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1126 Baltimore Blvd., Inc. v. Prince George's Cnty.*,
    58 F.3d 988 (4th Cir. 1995) ......................................................12

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972).................................................................26

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997).................................................................11

*American Pipe & Construction Co. v. Utah*,
    414 U.S. 538 (1974).................................................................33

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    77 F.4th 74 (2d Cir. 2023) ...................................................24, 25

*Ballan v. Upjohn Co.*,
    159 F.R.D. 473 (W.D. Mich. 1994) .......................................31, 32

*Basic v. Levinson*,
    485 U.S. 224 (1988)......................................................... *passim*

*Behrend v. Comcast Corp.*,
    655 F.3d 182 (3d Cir. 2011)....................................................20

*Brown v. Nucor Corp.*,
    785 F.3d 895 (4th Cir. 2015) ...............................................3, 11

*Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*,
    582 U.S. 497 (2017).........................................................9, 32, 33

*City of Bristol Pension Fund v. Vertex Pharms. Inc.*,
    12 F. Supp. 3d 225 (D. Mass. 2014) ......................................8, 30

*Clark v. Thompson*,
    2014 WL 1234347 (D.S.C. Mar. 25, 2014) ...............................12

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)......................................................... *passim*

*In re ConAgra Foods, Inc.*,
    302 F.R.D. 537 (C.D. Cal. 2014) ............................................21

*Converse v. Vizio, Inc.*,
 2020 WL 2922490 (W.D. Wash. June 3, 2020)........................................................19

*Cox v. Collins*,
 7 F.3d 394 (4th Cir. 1993) ........................................................................................26

*Doyle v. Chrysler Grp., LLC*,
 663 F. App'x 576 (9th Cir. 2016) .............................................................................14

*Ealy v. Pinkerton Gov't Servs., Inc.*,
 514 F. App'x 299 (4th Cir. 2013) ..........................................................................3, 11

*Edens v. Goodyear Tire & Rubber Co.*,
 858 F.2d 198 (4th Cir. 1988) ....................................................................................26

*George v. China Auto. Sys., Inc.*,
 2013 WL 3357170 (S.D.N.Y. 2013)..........................................................................30

*Goldman Sachs Grp.. v. Ark. Tchr. Ret. Sys.*,
 141 S. Ct. 1951 (2021) ..................................................................................13, 22, 23

*Good v. Am. Water Works Co.*,
 310 F.R.D. 274 (S.D. W. Va. 2015)...........................................................................29

*Gunnells v. Healthplan Servs., Inc.*,
 348 F.3d 417 (4th Cir. 2003) ...............................................................................12, 29

*Halliburton Co. v. Erica P. John Fund, Inc.*,
 573 U.S. 258 (2014)...........................................................................................3, 10, 13

*Janus Capital Grp., Inc. v. First Derivative Traders*,
 564 U.S. 135 (2011)....................................................................................................1

*Karth v. Keryx Biopharmaceuticals, Inc.*,
 334 F.R.D. 7 (D. Mass. 2019)....................................................................................30

*In re Kirschner Med. Corp. Sec. Litig.*,
 139 F.R.D. 74 (D. Md. 1991)..........................................................................6, 26, 28

*Lattanzio v. Deloitte & Touche LLP*,
 476 F.3d 147 (2d Cir. 2007).................................................................................21, 22

*In re Lehman Bros. Sec. & ERISA Litig.*,
 655 F. App'x 13 (2d Cir. 2016), *aff'd sub nom. Cal. Pub. Emps.' Ret. Sys. v.*
 *ANZ Sec., Inc.*, 582 U.S. 497 (2017)........................................................................33

iv

*Lerch v. Citizens First Bancorp, Inc.*,
144 F.R.D. 247 (D.N.J. 1992) .................................................................................27

*Ludlow v. BP, P.L.C.*,
800 F.3d 674 (5th Cir. 2015) .................................................................16, 17, 18

*In re Marriott Int'l Inc., Customer Data Sec. Breach*,
78 F.4th 677 (4th Cir. 2023) .................................................................................14

*Merck & Co. v. Reynolds*,
599 U.S. 633 (2010).................................................................................................32

*In re Montano*,
493 B.R. 852 (Bankr. D.N.M. 2013) ...................................................................14

*Morlan v. Universal Guar. Life Ins. Co.*,
298 F.3d 609 (7th Cir. 2002) ................................................................................32

*Munday v. Beaufort Cnty.*,
2022 WL 2751626 (D.S.C. July 14, 2022) ..........................................................12

*N. Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc.*,
2023 WL 8936389 (D. Utah Dec. 27, 2023).......................................................21

*In re Omnicom Grp., Inc. Sec. Litig.*,
541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) ............................19

*Passman v. Peloton Interactive, Inc.*,
2023 WL 3195941 (S.D.N.Y. May 2, 2023) ........................................................21

*Pelletier v. Endo Int'l PLC*,
2021 WL 398495 (E.D. Pa. Feb. 4, 2021) ...........................................................31

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013) ..............................................................................22

*Rocco v. Nam Tai Elecs.*,
245 F.R.D. 131 (S.D.N.Y. 2007) ....................................................................29, 30

*Shiring v. Tier Tech., Inc.*,
244 F.R.D. 307 (E.D. Va. 2007) .............................................................................8

*Simpson v. Specialty Retail Concepts*,
149 F.R.D. 94 (M.D.N.C. 1993) ...........................................................................26

*Smith v. Bayer Corp.*,
564 U.S. 299 (2011)................................................................................................32

*In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*,
    325 F.R.D. 136 (D.S.C. 2018) ...................................................................14

*In re U.S. Foodservice, Inc. Pricing Litig.*,
    729 F.3d 108 (2d Cir. 2013) ......................................................................11

*United States v. Lavabit, LLC* (*In re Under Seal*),
    749 F.3d 276 (4th Cir. 2014) .....................................................................12

*Va. House of Delegates v. Bethune-Hill*,
    139 S. Ct. 1945 (2019) ...............................................................................34

*In re Vivendi Universal, S.A. Sec. Litig.*,
    634 F. Supp. 2d 352 (S.D.N.Y. 2009) ......................................................15

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
    325 F.R.D. 280 (D. Minn. 2018) ..............................................................27

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ........................................................................3, 10, 11

*Wu v. MAMSI Life & Health Ins. Co.*,
    256 F.R.D. 158 (D. Md. 2008) ..................................................................12

## Statutes

15 U.S.C. § 78j(b) ("Section 10(b)") ...........................................1, 14, 22, 30

15 U.S.C. § 78u-4(a)(3)(B) .............................................................................9

## Other Authorities

17 C.F.R. § 240.10b-5 ("Rule 10b-5") .........................................................14

Federal Rules of Civil Procedure Rule 23 ............................................ *passim*

Defendants Deloitte & Touche LLP ("D&T") and Deloitte LLP (collectively, "Deloitte" or "Defendants"), by and through their undersigned counsel, submit this Opposition to Plaintiff International Brotherhood of Electrical Workers Local 98 Pension Fund's ("Plaintiff" or the "Fund") Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel (ECF 185; ECF 185-1) (the "Motion" or "Mot.").

## INTRODUCTION

Plaintiff alleges that SCANA Corporation ("SCANA") and its management fraudulently deceived investors about the timing of SCANA's expected completion of a nuclear energy project in Fairfield County, South Carolina (the "Nuclear Project"). Specifically, Plaintiff contends that SCANA and its officers made false and misleading statements to state regulators overseeing the Nuclear Project, such as the South Carolina Public Service Commission ("PSC") and Office of Regulatory Staff ("ORS"), as well as the general public about the completion schedule of the Nuclear Project and its consequent eligibility for federal tax credits.

Under well-settled law, only the maker of a statement can be held liable for the statement under Section 10(b) of the Exchange Act of 1934. *See Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011) ("To be liable" under Section 10(b), one "must have 'made' the material misstatements."). Deloitte did not make the vast majority of the statements that Plaintiff contends resulted in losses to investors. As Plaintiff knows, the only statements made by Deloitte are two audit opinions in which D&T opined that the financial statements included as part of SCANA's Form 10-Ks (for the years ended December 31, 2015 and 2016) were not materially misstated. Importantly, although D&T served as the external, independent auditor of SCANA's financial statements and issued opinions thereon, the financial statements themselves, as well as the rest of the 2015 and 2016 10-Ks, were the statements of SCANA and its management. D&T

was *not* the auditor of, and made no statements regarding, any statement by SCANA or its management outside of SCANA's financial statements. This includes, for example, SCANA management's statements on earnings calls about the expected completion date of the Nuclear Project that are so critical to Plaintiff's theory.

As independent auditor, D&T's role was to perform audit procedures and issue opinions in connection with SCANA's financial statements for the years ended December 31, 2015 and 2016—not to evaluate operational issues such as SCANA's compliance with its planned schedule for constructing nuclear reactors. Importantly, SCANA's financial statements included factually accurate and cautionary disclosures about the Nuclear Project. For example, SCANA's 2016 financial statements disclosed that the PSC had approved a settlement agreement resolving disputes about delays and costs, which "revised the contractual guaranteed substantial completion dates of Units 2 and 3 to August 31, 2019 and 2020, respectively[.]" (Ex. 2 (2016 10-K) at 87-88.) That was a fact. Nonetheless, SCANA clearly warned investors in the 2016 10-K more broadly that there was "*substantial uncertainty*" as to the ability of the lead contractor on the Nuclear Project, Westinghouse, "to meet these [Nuclear Project completion] dates given its historical inability to achieve forecasted productivity and work force efficiency levels." (*Id.* at 88.) And SCANA further warned that there were "*significant risks and uncertainties*" regarding Westinghouse's ability to fulfill its performance and financial commitments on the Nuclear Project. (*Id.* at 90.)

Despite extensive investigations by federal regulators and others which resulted in criminal prosecutions of members of SCANA's management, *SCANA's 2015 and 2016 financial statements have never been restated*. In other words, the financial statements at issue have never been found to contain an error requiring that they be corrected and presented a second time. The

absence of any restatement of SCANA's financial statements is a major obstacle for Plaintiff in this case, since Plaintiff must ultimately prove, among other things, that D&T's *opinions* that SCANA's financial statements were fairly presented in accordance with Generally Accepted Accounting Principles were not only false, but *knowingly or recklessly false*.

The serious problems Plaintiff faces in this case are more even more immediate, and require denial of its motion for class certification. The Supreme Court has held that, to certify a class, Plaintiff must **prove**—not simply plead—that it has satisfied each requirement of Rule 23 of the Federal Rules of Civil Procedure. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 263 (2014) ("*Halliburton II*").[1] To assess whether Plaintiff has carried its burden, this Court must conduct a "**rigorous analysis**" of the evidence presented. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011); *see Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 306 (4th Cir. 2013) (district courts commit legal error "by failing to [conduct] a rigorous analysis"). Contrary to Plaintiff's blithe assertions, these standards do not simply fade away whenever a stock trades in an allegedly efficient market and the price declines. Rather, when assessing Rule 23's requirements, this Court must assess and resolve material factual disputes relevant to each requirement and must affirmatively determine whether Plaintiff has met its burden of establishing each requirement by at least a preponderance of the evidence. *See Brown v. Nucor Corp.*, 785 F.3d 895, 931 (4th Cir. 2015). Plaintiff has failed to meet these standards and its motion should be denied.

***First***, Plaintiff has failed to satisfy the Supreme Court's requirement that Plaintiff proffer admissible evidence that a damages methodology exists that could measure damages attributable

---

[1] Unless otherwise noted, case citations herein omit internal quotation marks, citations, emphases, and alterations.

to Plaintiff's particular theories of liability—a showing that Plaintiff tries, but fails, to make through its expert, Dr. Matthew Cain. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

Plaintiff here proceeds under two theories of liability:  (1) a "materialization of risk" theory; and (2) a "corrective disclosures" theory, each of which is explained in more detail below. (*See* ECF 44 (Consolidated Complaint ("Complaint" or "Compl.")) ¶ 473.)  Plaintiff succeeds on neither.  Cain's opinion does not even address the "materialization of risk" theory.  There is therefore nothing at all in the record to support a finding that Plaintiff has met its burden on that theory.  And as to Plaintiff's "corrective disclosure" theory, Plaintiff has not carried its burden of setting forth a damages methodology that measures only alleged damages ***attributable to Deloitte's conduct***, as required by *Comcast*, as opposed to damages attributable to the conduct of others, such as SCANA and its management.  As explained earlier, D&T's statements consisted only of its audit opinions on SCANA's 2015 and 2016 financial statements, which stated in relevant part:

> "In our opinion, [SCANA's] consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2016 and 2015, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2016, in conformity with accounting principles generally accepted in the United States of America."  (Ex. 2 (SCANA 2016 10-K at 44; *see also* Ex. 1 (SCANA 2015 10-K) at 44.)[2]

D&T's opinions contained no representations concerning the expected completion of the Nuclear Project or the availability of tax credits.  In an effort to glide past this serious problem, Plaintiff—and its expert—repeatedly rely on statements that ***SCANA and its officers made*** regarding the expected completion of the Nuclear Project and resulting availability of tax credits.

---

[2] For each year, D&T's audit opinion also included an opinion on SCANA's internal controls:  "In our opinion, [SCANA] maintained, in all material respects, effective internal control over financial reporting as of December 31, 2016[.]"  (Ex. 2 (SCANA 2016 10-K) at 99; *see also* Ex. 1 (SCANA 2015 10-K) at 142.).  To the extent Plaintiff is relying on D&T's opinions regarding internal controls, all arguments contained herein regarding D&T's financial statement opinions apply equally to D&T's opinions regarding internal controls.

***But, as even Plaintiff itself must admit, those were not Deloitte's statements***. Even if ***SCANA's or its management's*** statements were false, neither Plaintiff nor a putative class may recover from ***Deloitte*** for damages those statements caused.

Simply put, to satisfy its burden under *Comcast*, Plaintiff needed to proffer a damages methodology capable of measuring "only those damages attributable to" Plaintiff's "corrective disclosure" theory of liability—*i.e.*, damages only attributable to ***Deloitte's***, not SCANA's, alleged misrepresentations and subsequent disclosures "correcting" those misrepresentations. 569 U.S. at 35. The record leaves no doubt that Plaintiff's purported expert failed to do what *Comcast* requires—he ***admitted*** during his deposition that he has made ***no attempt*** to isolate damages attributable to Deloitte's statements. Consequently, Plaintiff has offered no evidence or even proposed a methodology that would allow the Court—upon a rigorous or any other analysis—to find that Plaintiff has carried this burden. Where, as here, a Plaintiff "does not even attempt to" proffer a damages model to support its claim, "it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* at 35. Though the problems run deeper, as explained below, Plaintiff's motion should be denied on this ground alone.

***Second***, Plaintiff has failed to show, as it must, that reliance can be proven on a class-wide basis such that issues of common proof predominate over individualized issues. Plaintiff has made no attempt to plead actual reliance. As a result, this case can only proceed as a class action under the "fraud-on-the-market" presumption of reliance under *Basic v. Levinson*, 485 U.S. 224 (1988), which permits reliance to be presumed in an efficient trading market. But a defendant like D&T can rebut that presumption by demonstrating that its alleged misrepresentations did not result in the negative stock price impact of which the plaintiff complains. As explained in more detail

below, there is no evidence showing that D&T's audit opinions regarding SCANA's financial statements (the only alleged misstatements by D&T) led to the stock price drop of which Plaintiff complains concerning the timing of SCANA's Nuclear Project.  This glaring problem also requires denial of Plaintiff's motion because, shorn of *Basic*'s presumption, the individualized reliance inquiry (*i.e.*, Plaintiff needing to prove actual reliance by each putative class member individually) would overwhelm all other issues in the case.

*Third*, even if the Court were to look past the first two problems with Plaintiff's motion, Plaintiff's motion still cannot be granted as framed because the proposed Class Period is, on its own terms, improperly long and inconsistent with the facts.  In securities class actions, the class period must end when information that "corrects" the alleged misstatements "is publicly announced or otherwise effectively disseminated to the market."  *In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 82 (D. Md. 1991).  Here, by contrast, Plaintiff's proposed Class Period— February 26, 2016, through December 20, 2017 (the "Class Period")—runs far beyond the point when the alleged "truth" was disclosed to the market, presumably in an effort to impermissibly make the putative class as large as possible.  But since Plaintiff's (flawed) theory is that D&T's audit opinions somehow concealed and/or failed to disclose the "truth" about the risk that the Nuclear Project would not be completed in time to qualify for tax credits, then *according to Plaintiff's own allegations*, these risks were disclosed to the market far before the end of the proposed Class Period.  Indeed, SCANA's 2016 10-K, filed on February 24, 2017, disclosed that there were "*significant risks and uncertainties*" regarding Westinghouse's ability to fulfill its performance and financial commitments and "*substantial uncertainty*" as to whether Westinghouse could complete the Nuclear Project on schedule.  That same 10-K warned investors that SCANA was evaluating alternatives, including the abandonment of the Nuclear Project.  These

disclosures should mark the end of any putative class. But even if the 2016 10-K disclosures were somehow found to be insufficiently corrective, there can be no question that on the date that the Nuclear Project was **actually abandoned**, July 31, 2017, it was crystal clear to the market that the Nuclear Project would not be completed at all and, therefore, that no one who invested in SCANA after that event should be part of Plaintiff's putative class. No reasonable Plaintiff could possibly have acquired SCANA stock in reliance on alleged misinformation about the timing of the Nuclear Project after the 2016 10-K disclosure or, failing that, the actual abandonment of the Nuclear Project.

Notably, the post-abandonment "corrective disclosures" Plaintiff alleges (*i.e.*, those running from July 31, 2017 through December 20, 2017) have nothing to do with the timing of the Nuclear Project and instead concern *inter alia* the announcement of a regulatory investigation into SCANA (not D&T), reports that the ORS moved to dismiss SCANA's abandonment petition, and the issuance of an opinion that called into question the constitutionality of the relevant South Carolina regulatory scheme. Thus, if the Court certifies a class at all in this case (it should not), the applicable class period must end on February 24, 2017 (2016 10-K), or at the very latest, on July 31, 2017 (actual abandonment of the project), and Plaintiff's obvious overreach in seeking a class period stretching all the way to December 20, 2017, must be rejected.

**Fourth**, Plaintiff's trading history in SCANA stock subjects it to unique defenses and raises conflicts of interest that render its claims atypical of the putative class members' claims—another independent reason to deny certification. As explained above, if the Court permits a class to be certified at all, it must end the Class Period on the date on which a corrective disclosure made the truth known concerning the likelihood that the Nuclear Project would not be completed timely. If that date is found to be February 24, 2017, the date on which the 2016 10-K disclosures concerning

"significant risks and uncertainties" with the Nuclear Project was made public, then Plaintiff has no claim at all. This is because Plaintiff did not purchase any SCANA stock until April 2017, which came after SCANA's 2016 10-K was made public.[3] Accordingly, Plaintiff's trading makes it an atypical and inadequate class representative because it is subject to a unique defense "which [will] threaten to become the focus of the litigation," *Shiring v. Tier Tech., Inc.*, 244 F.R.D. 307, 313 (E.D. Va. 2007)—namely, that it has "no standing, because relying on the earlier misrepresentation would no longer be reasonable in light of the new information," *City of Bristol Pension Fund v. Vertex Pharms. Inc.*, 12 F. Supp. 3d 225, 235 (D. Mass. 2014).

In any event, Plaintiff's trading history gives rise to an inherent conflict of interest between it and other putative class members given the timing of the alleged corrective disclosures. Since Plaintiff did not purchase SCANA stock until April 2017—after the 2016 10-K—it is incentivized to argue that any disclosure predating its purchase (such as the 2016 10-K) was not "corrective," lest it be excluded from recovery altogether. That is directly adverse to the interests of investors who purchased prior to the issuance of SCANA's 2016 10-K (*i.e.*, before February 24, 2017) who would be incentivized to recognize the disclosures contained in it as "corrective" because this could increase their alleged damages and their claims would, in theory, still be viable with a February 24, 2017 Class Period end date. Where, as here, a plaintiff has an incentive to argue for a different "crucial disclosure date" than other putative class members, a conflict arises that renders the lead plaintiff's claim atypical and is grounds for denying class certification.

---

[3] Notably, Plaintiff's stock purchases also came after news of Westinghouse's bankruptcy on March 29, 2017, (Compl. ¶ 12; ECF 41-1 at 5), which is a further reason this Plaintiff should have been aware before its purchase of SCANA stock that the Nuclear Project was not likely to be completed on time and is therefore differently situated from other members of the putative class.

*Fifth*, the class cannot be certified because the five-year statute of repose has expired.  *See Cal. Pub. Emps.' Ret. Sys. V. ANZ Sec., Inc.*, 582 U.S. 497, 504, 516 (2017) ("*CalPERS*").  D&T's last alleged misstatement was made on February 24, 2017—the date SCANA's 2016 10-K was issued.  The statute of repose, therefore, expired on February 24, 2022.  As absent class members' claims are not "brought" until class certification, those claims have been extinguished by the running of the statute of repose and, accordingly, the class may not be certified.  To do so would thwart Congress's determination that—as a matter of policy—a defendant should be free from liability after a legislatively-determined period of time.

## PROCEDURAL BACKGROUND

On November 22, 2019, Plaintiff Samuel Floyd commenced this action.  (*See* ECF 1.) Consistent with the procedure prescribed by Section 21D(a)(3)(B) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u-4(a)(3)(B), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), on January 24, 2020, Plaintiff moved to be appointed as Lead Plaintiff, arguing that it was presumptively best suited to act as a fiduciary in prosecuting this case.  (*See* ECF 22.)  That motion was supported by the certification of Brian Burrows, who stated that he was President of the Fund and was "authorized to make legal decisions on behalf of" Plaintiff in this action.  (ECF 22-4 ¶ 1.)  On February 18, 2020, pursuant to Section 21D(a)(3)(B) of the Exchange Act, as amended by the PSLRA, this Court issued an order appointing the Plaintiff as Lead Plaintiff.  (ECF 37.)  Plaintiff, its counsel, and Burrows all chose at the time not to inform the Court that Burrows was under indictment.

On April 27, 2021, counsel for the original plaintiff, Floyd, sent a letter to the Court revealing that Burrows had been indicted, and the nature of the charges in the indictment.  (*See* ECF 95-1.)  Following a hearing, Plaintiff and its counsel sought to avoid appearances of

impropriety by replacing Burrows with the Union's Treasurer, Todd Neilson. (*See* ECF No. 86.) Nielsen had worked directly for Burrows for decades. After a lengthy and very public trial involving allegations of fraud, embezzlement, and other federal crimes, Burrows was convicted by a jury on twenty counts on December 7, 2023.[4]

On April 30, 2021, Plaintiff moved to certify this case as a class action. (ECF 71-72.) On March 8, 2022, the Court denied that motion without prejudice with leave to refile. (ECF 110.) Following additional proceedings, on January 15, 2024, Plaintiff again moved to certify a class of all persons or entities who purchased or otherwise acquired SCANA common stock during the Class Period. (ECF 185-1 at 1 n.1.)

## **LEGAL STANDARDS**

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast*, 569 U.S. at 33. "Rule 23 does not set forth a mere pleading standard." *Wal-Mart*, 564 U.S. at 350. Instead, to certify a class, a plaintiff "must actually ***prove***—not simply plead—that their proposed class satisfies each requirement of Rule 23 . . . ." *Halliburton II*, 573 U.S. at 275. Thus, a plaintiff seeking to certify a class must prove that it satisfies the Rule 23(a) requirements of (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy. *Comcast*, 569 U.S. at 33; *see also Wal-Mart*, 564 U.S. at 350 ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are ***in fact*** sufficiently numerous parties, common questions of law

---

[4] (*See* Federal Jury Convicts Former IBEW Local 98 Business Manager John Dougherty and Former Local 98 President Brian Burrows of Conspiracy, Embezzlement of Union Funds, and Tax Fraud, Department of Justice (Dec. 7, 2023), available at https://www.justice.gov/usao-edpa/pr/federal-jury-convicts-former-ibew-local-98-business-manager-john-dougherty-and-former#:~:text=The%20jury%20convicted%20Burrows%20of,false%20federal%20income%20tax%20returns.)

or fact, etc.").  A plaintiff seeking class certification "must [also] show that the action is maintainable under Rule 23(b)(1), (2), or (3)."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).  A party invoking Rule 23(b)(3)—as Plaintiff does here—must show that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and that (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

In assessing whether Plaintiff has carried its burden, this Court must conduct a "rigorous analysis" of the evidence presented.  *Wal-Mart*, 564 U.S. at 351; *see also Ealy*, 514 F. App'x at 306.  Specifically, this Court must resolve material factual disputes relevant to each Rule 23 requirement and must find that each requirement is established by at least a preponderance of the evidence.  *Brown*, 785 F.3d at 931; *see In re U.S. Foodservice, Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013) ("To certify a class, a district court must make a definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues, must resolve material factual disputes relevant to each Rule 23 requirement, and must find that each requirement is established by at least a preponderance of the evidence.").  This "rigorous analysis" of Rule 23's requirements "will frequently entail overlap with the merits of the plaintiffs' underlying claim," but it is improper to "refus[e] to entertain arguments . . . simply because those arguments would also be pertinent to the merits determination."  *Comcast*, 569 U.S. at 33-34.  Failure to proffer sufficient evidence on any Rule 23 requirement means Plaintiff's motion must be denied.

In an attempt to prevent the Court from conducting the "rigorous analysis" required by the Supreme Court, and to try smooth its path for what it hopes will be a quick grant of class certification, Plaintiff argues that D&T somehow "waived" or "abandoned" arguments not raised

in its initial opposition to class certification and is precluded from raising such arguments in response to Plaintiff's new motion. (Mot. at 12-14.) That argument is meritless.

*First*, the prior motion was denied without prejudice. That means this is a new motion, to which Deloitte is free to respond however it sees fit. Plaintiff cites no authority—and Deloitte is aware of no authority—holding that a party waives an argument when opposing a party's renewed motion following a denial without prejudice. The authorities Plaintiff does cite are wholly inapposite. *See 1126 Baltimore Blvd., Inc. v. Prince George's Cnty.*, 58 F.3d 988, 993 n. 7 (4th Cir. 1995) (argument not raised below is waived **on appeal**); *United States v. Lavabit, LLC* (*In re Under Seal*), 749 F.3d 276, 292 (4th Cir. 2014) (same); *Munday v. Beaufort Cnty.*, 2022 WL 2751626, at *3-4 (D.S.C. July 14, 2022) (new argument could not be raised for first time in **objecting to magistrate ruling**); *Clark v. Thompson*, 2014 WL 1234347, at *11 (D.S.C. Mar. 25, 2014) (same).

*Second*, imposing any such implied waiver theory is contrary to the Court's ongoing duty to assess whether class treatment is appropriate—a duty that applies **even after** an action is certified. *See, e.g.*, *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 433 (4th Cir. 2003) (if it becomes apparent that a court's assessment of Rule 23 requirements "turns out to be inaccurate," the court has the responsibility to decertify the class); *Wu v. MAMSI Life & Health Ins. Co.*, 256 F.R.D. 158, 162-63 (D. Md. 2008) ("[A] federal district court judge has an affirmative obligation to ensure that the class membership remains at all times consistent with the underlying facts and procedural posture of the case."). If a district court has an obligation to continuously reassess the propriety of a class even after a decision, it follows *a fortiori* that a court has an obligation to consider all arguments advanced in response to a plaintiff's renewed motion for class certification after the initial motion has been denied. Plaintiffs' arguments to the contrary should be rejected

and this Court should entertain, and rule on, all arguments that Deloitte sets forth in response to the instant motion.

## **ARGUMENT**

### I.    **PLAINTIFF HAS FAILED TO SHOW THAT COMMON ISSUES OF FACT OR LAW PREDOMINATE AND THUS HAS FAILED TO SATISFY RULE 23(B)(3)**

The Supreme Court has recognized that in "securities class action cases, the crucial requirement for class certification will usually be the predominance requirement of Rule 23(b)(3)." *Halliburton II*, 573 U.S. at 276.  For a class to be certified, a plaintiff must demonstrate by a preponderance of the evidence that common issues of law or fact predominate over individualized issues.  *See Goldman Sachs Grp. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1961 (2021) ("*Goldman I*").

Here, Plaintiff fails to show that common issues of law or fact predominate for at least two reasons.  *First*, contrary to Supreme Court precedent, Plaintiff has failed to present a damages methodology that matches its theories of liability.  *Second*, Plaintiff cannot establish reliance through evidence common to the class, as it cannot rely on the presumption of reliance based on the "fraud-on-the-market" theory (also known as the "*Basic* presumption").  Accordingly, Plaintiff has failed to satisfy the requirements of Rule 23(b)(3) and the class may not be certified.

#### A.    **Plaintiff Has Failed to Present a Damages Methodology Capable of Measuring Damages Attributable to Its Theory of Liability and Thus Has Failed to Satisfy Rule 23(b)(3)**

*A Damages Model Must Measure the Specific Alleged Injury.*  Although Plaintiff is not required to calculate or prove the *extent* of its damages at the class certification stage to satisfy Rule 23(b)(3)'s predominance requirement, the Supreme Court held in *Comcast* that plaintiffs are required to put forward a damages *methodology* capable of measuring the damages specifically *attributable to the plaintiff's theory of injury*.  *Comcast*, 569 U.S. at 35 ("[A] model purporting

to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory."); *see In re Marriott Int'l Inc., Customer Data Sec. Breach*, 78 F.4th 677, 683 (4th Cir. 2023) (the predominance requirement "means that damages must be capable of measurement on a classwide basis" and plaintiffs must demonstrate there is a "common, classwide *method* for determining individual damages"); *In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 325 F.R.D. 136, 172 (D.S.C. 2018) ("At the certification stage, plaintiffs must demonstrate their ability to prove liability on a class-wide basis, including that each member suffered injury and that the amount of damages is readily calculable for each class member. . . . The damages in question must be measurable class-wide through use of a common methodology."). In the absence of a sufficiently detailed proposed model for determining alleged damages, there is "no way to determine whether the proposed damages model measures damages that are solely attributable to the theory of liability." *Doyle v. Chrysler Grp., LLC*, 663 F. App'x 576, 579 (9th Cir. 2016). Importantly, "*Comcast* does not allow [plaintiffs] the luxury of waiting until trial" to satisfy this obligation. *In re Montano*, 493 B.R. 852, 860 (Bankr. D.N.M. 2013). It must be done at the class certification stage.

**Plaintiff's Theory of Liability.** This is a highly unusual class action because a member of the same class previously sued SCANA and a number of its officers and settled its claim against those defendants. In this action, Plaintiff asserts only a single claim under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Deloitte (which was never sued in the prior action against SCANA). Plaintiff's "theory of liability" is that Plaintiff and the putative class were damaged by the decline in SCANA's stock price when the risks concealed by D&T's alleged fraud materialized, and/or when D&T's misrepresentations were corrected and the "truth" was revealed to the market. (*See* Compl. ¶ 473.) Thus, Plaintiff's claim is premised on two

theories of liability:  (1) a "materialization of risk" theory; and (2) a "corrective disclosures" theory.[5]  (*See, e.g.*, *id.* at ¶ 476 (referencing "[t]he disclosures that corrected the market prices of SCANA securities and/or revealed a previously concealed, materialized risk").

 ***Plaintiff's Expert's Deficient Opinion.***  Plaintiff relies solely on the opinion of Dr. Matthew Cain to satisfy its burden of demonstrating that damages allegedly caused by Deloitte are measurable on a class-wide basis such that Rule 23(b)(3) is satisfied.  (ECF 185-1 at 32-33; ECF 185-2.)  As discussed in Deloitte's *Daubert* Motion (filed contemporaneously herewith), the Court should exclude Cain's opinion because he has not even attempted to account for Plaintiff's materialization of risk theory or explain how, under the corrective disclosure theory, he would measure damages attributable to Deloitte, and Deloitte alone.  (Daubert Mot. at 8-12.)  If the Court grants the *Daubert* Motion, as it should, the Court must also deny class certification, because Plaintiff will have offered ***no evidence*** to satisfy its burden to demonstrate predominance under *Comcast*.  But, even if the Court considers Cain's deficient opinions, Plaintiff still has not satisfied its burden to show by a preponderance of evidence that common issues predominate, as described below.

   **1.**  **Plaintiff Provides No Damages Model Regarding a "Materialization of Risk" Theory**

 Plaintiff's "materialization of risk" theory appears to be that D&T's audit opinions concealed the true risk of how likely it was that the Nuclear Project would not be completed and, when the materialization of that allegedly concealed risk occurred through abandonment of the

---

[5] A "materialization of risk" theory rests on allegations that an undisclosed (or concealed) risk of a negative event "materialized" and caused a stock price decline.  *See In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 363-64 (S.D.N.Y. 2009).  A "corrective disclosure" theory, on the other hand, is premised on allegations that a public correction of a prior false or misleading statement caused a stock price drop.  *See id.*

Nuclear Project, investors in SCANA were damaged. (*See, e.g.*, Compl. ¶¶ 14, 473-74, 476.) Cain's report, however, does not address this theory at all. Rather, Cain focuses exclusively on a methodology using "[e]vent studies [to] measure stock price reactions to ***corrective disclosures*** which revealed the relevant truth that was concealed by alleged material omissions and/or misrepresentations." (ECF 185-2 ¶ 73.) As such, Plaintiff has failed to come forward with any evidence to carry its burden to prove predominance on a "materialization of risk" theory and this theory therefore cannot be the basis for the damages methodology it is required to proffer on this motion.

The Fifth Circuit's decision in *Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015) explains the likely reason why Cain ignored this part of Plaintiff's theory. Simply put, Plaintiff's allegations here make it clear that any damages arising from a "materialization of the risk" theory of liability would require individualized inquiry into, among other things, each investor's risk tolerance. *See id.* at 689-691. In *Ludlow*, investors in BP (also known as British Petroleum) alleged that BP's statements about safety and process improvements concealed the risk that an event like the Deepwater Horizon oilrig disaster might occur, and so investors were damaged when the materialization of that allegedly concealed risk occurred when the Deepwater Horizon explosion and oil spill happened. *See id.* at 680.

In considering whether the plaintiff there had satisfied *Comcast* through an expert opinion very similar to Cain's, the Fifth Circuit explained:

> Consider the following scenario: The true risk of a major spill was 2%, but BP's statements had improperly represented the risk as 0.5%. Further imagine two different plaintiff-investors. The first is a low-risk pension fund, whose investment policy forbids investing in companies for whom the risk of a catastrophic event is greater than 1%. The second is a high-risk fund whose risk threshold is higher than 2%. Both plaintiffs invested in BP based on BP's statements representing the risk as 0.5%. In this hypothetical, BP's misstatements caused the low risk pension fund to make an investment forbidden under its policy. It would not have bought BP

16

stock ***at all*** had it known the true risk of a catastrophe. . . .  By contrast, the high-risk fund still might have purchased the stock, even had it known the "true" risk, though presumably at a lower price that accounted for the increased risk.

*Id.* at 690.  The Fifth Circuit then went on to explain how the damages that each of these two hypothetical investors might have incurred ***were different from each other***:

> For the first plaintiff, who would not have purchased the stock absent the misrepresented risk, the decline in the stock's value when the risk actually materialized may well be causally linked to the misrepresentation, in which case that full stock price decline following the materialization of the catastrophic event could constitute a valid economic loss.  The second plaintiff, by contrast, might have purchased the stock even assuming the true risk.  Although she would be entitled to damages based on the inflated price she paid, she cannot be compensated for the materialization of a risk she may have been willing to take.

*Id.*  In other words, these two investors, while both relying on the same alleged misstatements, would not have been damaged in the same way.  The first investor might be able to recover the full amount of the stock price decline because it would not have purchased the stock in the first place, while the second investor would only be able to recover the difference between what it paid and what it would have paid.  Importantly, the second investor could not recover the decline that occurred when the risk actually materialized because that was a risk the second investor was willing to take.  The problem for the plaintiff in *Ludlow* was that "the [expert] model here does not provide any mechanism for separating these two classes of plaintiffs.  And because it lacks the ability to do so, it cannot provide an adequate measure of class-wide damages under *Comcast*." *Id.*

The same is true here.  Plaintiff contends that D&T's audit opinions somehow concealed how risky it was that the Nuclear Project would not be completed in time to qualify for tax credits.  For example, Plaintiff claims that SCANA's 2016 10-K should have disclosed that it was "not just 'substantially uncertain,' but in fact, highly unlikely" (a hair-splitting distinction if there ever was one) that the Nuclear Project would be completed prior to 2021.  (Compl. ¶ 12; *see also id.* at ¶ 14

("Ultimately, the truth about the Nuclear Project and the ***risks of non-completion*** in time to obtain the nuclear tax credits began to be revealed . . . .").)  But Cain offers no way to separate out damages incurred by an investor who would have taken that risk at some price from an investor who would not have taken the risk at any price, or how such investors would even be identified. Accordingly, just like in *Ludlow*, the Plaintiff has not satisfied its *Comcast* burden on a "materialization of risk" theory.

### 2.    Plaintiff's "Corrective Disclosure" Damages Model Fails to Measure Damages Attributable Only to Plaintiff's Theory of Liability

Plaintiff's "corrective disclosure" theory fares no better.  That theory posits that ***D&T*** allegedly made misstatements concealing the fact that SCANA would not complete the Nuclear Project in time to achieve certain income tax credits, and that Plaintiff and putative class members were damaged when the "truth" came out through various public statements.  (Compl. ¶¶ 474-78.) As explained earlier, D&T's statements are limited to two audit opinions concerning SCANA's 2015 and 2016 financial statements.  Plaintiff's Complaint, on the other hand, relies on allegedly false and misleading *statements by SCANA and its management* concerning the timing of the Nuclear Project that purportedly damaged members of the proposed class.  To take just a few examples, Plaintiff alleges that SCANA:

- "[M]isrepresented the Company's purportedly 'prudent' (*i.e.*, not reckless) oversight of the Nuclear Project" in SCANA's 2015 and 2016 10-Ks (*see, e.g.,* Compl. ¶¶ 451, 470);

- Made false and misleading statements about the guaranteed substantial completion date of the Nuclear Project and the availability of the nuclear tax credits in each of its 2016 10-Qs (*id.* ¶¶ 455-56);

- "[R]eassured investors" through press releases and earnings calls that "they were 'committed to completing'" the Nuclear Project (*id.* ¶¶ 317-21; *see also id.* ¶ 235 ("on a July 28, 2016, earnings call, [former SCANA Executive President and now convicted felon Stephen] Byrne stressed that '[t]he guaranteed [substantial] completion dates remain at August of 2019 for Unit 2 and August 2020 for Unit 3. We don't see anything to change those.'"));

- Made misrepresentations to the PSC in support of its Base Load Review Act submissions seeking regulatory approval for schedule and cost changes (*id.* ¶¶ 293-94);

- Falsely told the ORS that SCANA "did not have a report by the Bechtel Corp." (*id.* ¶ 366);

- Falsely painted itself as a victim of Westinghouse's financial meltdown (*id.* ¶ 353);

- "[C]ontinued to assure investors that Westinghouse's parent company Toshiba would honor the fixed price agreement" after the Westinghouse bankruptcy (*id.* ¶ 336); and

- Made "numerous false and misleading statements concerning their prior knowledge of the risks facing the Nuclear Project" to the PSC (*id.* ¶ 348).

The problem for Plaintiff is that ***no class member can recover from Deloitte for false statements made by SCANA or its management***.

*Comcast* makes clear that Plaintiff was required to come forward with evidence showing that it can separate out the alleged damages caused by Deloitte from the alleged damages caused by SCANA and its management. *See, e.g., Comcast*, 569 U.S. at 33, 35 ("[A] model purporting to serve as evidence of damages in [a] class action must measure ***only those damages attributable to that theory***. If the model does ***not even attempt to do that***, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."); *Converse v. Vizio, Inc.*, 2020 WL 2922490, at *4 (W.D. Wash. June 3, 2020) (denying reconsideration of decision not to certify a class because "[i]t was not manifest error for the Court to conclude . . . certification [was] not warranted due to failure to establish predominance when the plaintiff does not put forward a proposed calculation that would show the misrepresentation alleged, rather than other factors, drove the price/demand inflation"); *see also In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) ("the law requires the disaggregation of confounding factors," *i.e.*, things other than the alleged misstatements or omissions that caused a plaintiff's alleged loss), *aff'd*, 597 F.3d 501 (2d Cir. 2010).

In *Comcast*, class certification was denied because the named plaintiffs' damages model calculated damages based on the four theories of liability that the plaintiffs had originally asserted, even though only one of those theories remained in the case after the district court rejected the other three. *See Comcast*, 569 U.S. at 31; *Behrend v. Comcast Corp.*, 655 F.3d 182, 188, 195 (3d Cir. 2011). Accordingly, the Supreme Court held that the proffered "model failed to measure damages resulting from the particular . . . injury on which [defendants'] liability in this action is premised." *Comcast*, 569 U.S. at 36.

Here, Plaintiff's critical failing is that it has not even attempted to propose a damages methodology that separates out losses allegedly caused by D&T's audit opinions from losses allegedly arising from misstatements by SCANA and its management—which have already been addressed by SCANA's $192.5 million class settlement. Indeed, when Plaintiff's expert, Cain, was asked whether there was anything in his report that Deloitte could look at to understand how to identify alleged price inflation solely ***attributable to misstatements by D&T***, he admitted that this was,

> "***not a detail that I've drilled down to at this point in time***."

(Ex. 3 (Cain Tr.) 30:5-23; *see also* Daubert Mot. at 5.) Moreover, Cain was unable to articulate with any specificity how he would come up with such a model in the future, admitting that,

> "***I cannot lay out the actual analysis or the steps that I would take***."

(Ex. 3 (Cain Tr.) 146:13-147:13.) Thus, contrary to Plaintiff's assertions, Cain has not "describe[d]" how his methodology will quantify the "artificial inflation caused by Deloitte's"— and Deloitte's alone—alleged "false and misleading statements and omissions." (Mot. 32.)

Plaintiff's damages model therefore runs afoul of *Comcast*—and is insufficient to satisfy Plaintiff's burden to demonstrate by a preponderance of the evidence that common damages issues

predominate.  *See In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 550-52 (C.D. Cal. 2014) (finding

lack of predominance where expert described "techniques that purportedly allow" him to calculate

damages, but had "not actually perform[ed] either analysis or describe[d] in any detail their

specific application to this case," leaving the court "with only [his] assurance that he can build a

model to calculate damages"); *Passman v. Peloton Interactive, Inc.*, 2023 WL 3195941, at *28

(S.D.N.Y. May 2, 2023) (damages model "[ran] afoul of the dictates of *Comcast*" where it did not

isolate the "price premium" for the specific misstatement at issue); *N. Brevard Cnty. Hosp. Dist.

v. C.R. Bard, Inc.*, 2023 WL 8936389, at *13 (D. Utah Dec. 27, 2023) (expert's methodology did

not satisfy *Comcast* where model failed to distinguish between lawful and unlawful overcharges

and thus was unable to "bridge the differences between supracompetitive prices in general and

supracompetitive prices attributable" to plaintiff's theory of harm).

Plaintiff simply ignores the critical distinction between D&T's audit opinions on the one

hand, and myriad statements by SCANA and its officers on the other.  But that is impermissible

as a matter of law.  For example, in *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir.

2007), the plaintiffs alleged that Deloitte made misstatements about the financial condition of a

company called Warnaco.  Unlike SCANA's audited financial statements here, Warnaco's audited

financial statements had been restated after they were issued.  *Id.* at 151.  Still, as the Second

Circuit recognized in affirming the dismissal of claims against Deloitte, the alleged misstatements

"attributed to Deloitte [we]re fewer (two), more sporadic (over fifteen months) and less egregious

than Warnaco's misstatements to the same or similar effect."  *Id.* at 157.  Because both Deloitte

and Warnaco were accused of making misstatements on the same subject matter, the plaintiff was

required to allege facts "that would allow a factfinder to ascribe some rough proportion of the

whole loss to Deloitte's misstatements." *Id.* at 158.  And because they had not done so, the Second

Circuit held that the plaintiffs there had not pled loss causation.  *Id.*

Thus, even a failure to sufficiently ***plead*** the ability to disentangle statements made by a

company and its auditor was a dispositive hurdle in *Lattanzio*, even when the audited financial

statements had been restated.  Here, at the class certification stage, Plaintiff had to ***prove*** that such

a feat is possible, yet Plaintiff and its expert do not even attempt to do so.[6]  Plaintiff has failed to

present a damages methodology that is consistent with its theory of liability against Deloitte, and

therefore it has failed to satisfy the predominance requirement of Rule 23(b)(3), and thus the class

cannot be certified.  As the D.C. Circuit succinctly put it:  "No damages model, no predominance,

no class certification."  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C.

Cir. 2013).

### B.     The *Basic* Presumption Has Been Rebutted and Thus Plaintiff Cannot Prove Reliance on Class-Wide Basis

Reliance is an element of Plaintiff's Section 10(b) claim.  *See, e.g.*, *Goldman I*, 141 S. Ct.

at 1958.  Because Plaintiff has made no attempt to plead actual reliance, this case cannot proceed

as a class action without the presumption of reliance under *Basic v. Levinson*, 485 U.S. 224 (1988).

The "fundamental premise of the fraud-on-the-market theory underlying *Basic*'s presumption is

that an investor presumptively relies on a misrepresentation so long as it was reflected in the market

price at the time of his transaction."  *Goldman I*, 141 S. Ct. at 1958 (internal quotations and citation

---

[6] To be clear, Defendants are not asserting a loss causation argument at this stage.  Instead, Defendants submit that *Lattanzio*'s holding is relevant to understanding and applying *Comcast*'s requirement that Plaintiff put forward a damages methodology capable of measuring the damages only attributable to Plaintiff's theory of liability, and the inherent challenges of even alleging so— let alone proving so—under these facts.  *See Comcast*, 569 U.S. at 35 ("[A] model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory.").

omitted).    To invoke the *Basic* presumption, Plaintiff must prove that (1) the alleged misrepresentation was publicly known; (2) it was material; (3) the stock traded in an efficient market; and (4) the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed.  *Id.*  But even if Plaintiff is able to satisfy each of these requirements, Deloitte "may rebut the *Basic* presumption at class certification by showing that an alleged misrepresentation ***did not actually affect the market price of the stock***"—*i.e.*, that there was no "price impact" from the alleged misstatement.  *Id.* at 1959 (internal quotations omitted).

Here, Plaintiff has not alleged that D&T's audit opinions had an impact on SCANA's stock price at the time the audit opinions were issued, *i.e.*, "front-end price impact."  Rather, Plaintiff proceeds on a "back-end price impact" theory, *i.e.*, that when the alleged "truth" about SCANA's financial statements came out, SCANA's stock price dropped.  (*See* Compl. ¶ 476.)

The problem for Plaintiff is that to proceed on a "back-end price impact" theory, there needs to be a match (although not necessarily a perfect match) between the alleged misstatement and the alleged "correction."  As explained by the Supreme Court in *Goldman I*, when the mismatch between the alleged misstatement and alleged corrective disclosure is too great, the assumption that one can use the back-end price drop as a proxy for the price impact from the misstatement breaks down.  *Id.* at 1961 (assumption that back-end drop equals front-end price impact "starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure").  Under such circumstances, "it is less likely that the [] disclosure actually corrected the [] misrepresentation, which means that there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop."  *Id.*; *see*

*also Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 102 (2d Cir. 2023) ("*Goldman II*").

Here, there is a considerable mismatch between the contents of Deloitte's purported misrepresentations and the alleged corrective disclosures. The alleged misrepresentations are D&T's statements that:

> "In our opinion, [SCANA's] consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2016 and 2015, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2016, in conformity with accounting principles generally accepted in the United States of America." (Ex. 2 (SCANA 2016 10-K) at 44; *see also* Ex. 1 (SCANA 2015 10-K) at 44.)

D&T's two opinions have never been withdrawn or corrected because there has never been any need to do so since SCANA's financial statements (which are the statements of SCANA management) were never restated or corrected.

Additionally, ***none*** of the alleged corrective disclosures on which Plaintiff relies even referenced D&T's audit opinions. Rather, the corrective disclosures on which Plaintiff's claim turns include statements regarding *inter alia* Toshiba's announcement of a $6.3 billion write down related to its nuclear program, news articles reporting Westinghouse's decision to secure bankruptcy counsel, and predictions about further cost overruns and delays at the Nuclear Project. (*See, e.g.*, Compl. ¶ 476.) D&T's audit opinions contained no representations about any of those matters. Thus, none of the purported back-end corrective disclosures ever "corrected"—or were even connected to—the alleged misstatements made by D&T in its opinions.[7]

---

[7] This alone makes it inappropriate to infer that any back-end price drop is equivalent to front-end inflation purportedly caused by D&T's audit opinions. As there were never any disclosures that "corrected" D&T's alleged misstatements, there was never any back-end price drop associated with D&T's alleged misstatements from which to infer front-end inflation.

When confronted with such a mismatch, the Court must then consider other evidence of price impact—such as market commentary—to assess the alleged misrepresentations' inflation-maintaining capacity.  *See Goldman II*, 77 F.4th at 102 (explaining that "courts should consider other indirect evidence of price impact" where there is a considerable mismatch, the corrective disclosure did not directly refer to the alleged misstatement, and plaintiffs allege that a general disclosure was misleading).  But here, market commentary only bears out the conclusion that SCANA's stock did not decline in value on the basis of allegedly false or misleading audit opinions.  Analyst reports issued around the time of the corrective disclosures made no mention of Deloitte, let alone D&T's audits opinions regarding SCANA's financial statements.  (*See* Decl. ¶ 83; *see also* Exs. 9-24, 28-33, 42-49.)[8]  The same is true for analyst reports issued around the time of the 2016 10-K, the announcement of Westinghouse filing for bankruptcy, and even the abandonment of the Nuclear Project.  (*See* Decl. ¶ 83; *see also* Exs. 22-23, 31-41, 50-78.)[9]  Not even the general **topics** of Deloitte's audits opinions were discussed as SCANA's stock price dropped in conjunction with the disclosures of the allegedly "corrective" information to the

---

[8] Analyst reports which were obtained from S&P are subject to the following terms: "Data obtained from S&P Global Market Intelligence (and/or its affiliates, as applicable) (individually and collectively, "S&P").  This data is only for use in the instant litigation.  S&P reserves all rights with respect to the S&P information.  No further distribution or reproduction is permitted without S&P's prior written permission.  A reference to or any observation concerning a particular investment, security or credit rating in the S&P information is not a recommendation to buy, sell, or hold such investment or security or make any other investment decisions.  S&P, its affiliates, and its third party licensors:  (1) do not guarantee the accuracy, completeness, timeliness or availability of any information and are not responsible for any errors or omissions or for the results obtained from the use of such content and (2) give no express or implied warranties of any kind.  In no event shall S&P, its affiliates, or its third party licensors be liable for any damages, including, without limitation, direct and indirect damages in connection with any use of the S&P information."

[9] As described *infra*, although Plaintiff does not identify these three events as corrective disclosures, there is no question that the 2016 10-K and, at the very least, the abandonment of the Nuclear Project were corrective events that revealed the "truth" that Plaintiff alleges was concealed from the market.

market.  (*See* Exs. 4-78.)   Accordingly, the evidence before the Court shows that the price of

SCANA's stock was not impacted by any alleged misstatements regarding Deloitte's belief that

SCANA's financial statements presented fairly, in all material respects, SCANA's financial

position as of December 31, 2016, in conformity with GAAP.[10]   For this reason, too, class

certification must be denied.

## II.    THE CLASS PERIOD MUST BE SHORTENED BECAUSE THE "TRUTH" WAS DISCLOSED WELL BEFORE DECEMBER 20, 2017

If allegedly concealed information is revealed to the market, no one who purchased after

the information was publicly known can claim to have been harmed by the original concealment.

*In re Kirschner*, 139 F.R.D. at 82.  In other words, any class period must end when the "truth" is

revealed.  *Id.*  In making a determination regarding when a class period should end, the court must

focus on "whether the facts which underlie the gravamen of plaintiff's complaint continue to

represent a reasonable basis on which the individual purchaser [i]n the market would rely."

*Simpson v. Specialty Retail Concepts*, 149 F.R.D. 94, 103 (M.D.N.C. 1993).  This inquiry "strikes

---

[10] Plaintiffs asserts that, in the alternative, the *Affiliated Ute* presumption of reliance applies.  *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  Plaintiff is wrong.  As the Supreme Court and the Fourth Circuit have recognized, the *Affiliated Ute* presumption provides that "positive proof of reliance is not a prerequisite to recovery" where the allegedly fraudulent conduct "involve[es] primarily a failure to disclose."  *Affiliated Ute*, 406 U.S. at 153–54; *see also Edens v. Goodyear Tire & Rubber Co.*, 858 F.2d 198, 207 (4th Cir. 1988) (same).  Where, as here, a plaintiff is challenging the express attestations of an auditor, those attestations are alleged affirmative misstatements—to which the *Affiliated Ute* presumption of reliance does not apply.  *See In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 215, 219–21 (D.C. Cir. 2010).  Indeed, the "gravamen of [Plaintiff's] complaint is that, by certifying [SCANA's] materially false financial statements," D&T "affirmatively misrepresented" SCANA's financial statements and the sufficiency of its internal controls (and/or concealed the "risks" that later materialized).  *See id.* at 215.  Even if the Court were to conclude that Plaintiff was alleging a mixture of affirmative misrepresentations and omissions, the *Affiliated Ute* presumption remains inapplicable.  *Cox v. Collins*, 7 F.3d 394, 395-396 (4th Cir. 1993) ("*Affiliated Ute* presumption is not warranted in a Rule 10b-5 case" where a complaint alleged both affirmative misstatements and omissions, "instead of only nondisclosure as in *Affiliated Ute*").

a balance between avoiding a decision on the merits of plaintiff's claim and providing a reasonable ending date for claims of fraud against the defendants." *Lerch v. Citizens First Bancorp, Inc.*, 144 F.R.D. 247, 253 (D.N.J. 1992). Such an inquiry is necessary where, as here, Plaintiff's own allegations make clear that the "truth" was disclosed to the market far before the end of the Class Period—and, accordingly, are insufficient to sustain the proffered class period. *See, e.g.*, *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 293 (D. Minn. 2018) ("If a plaintiff's allegations are sufficient to satisfy Rule 23 but insufficient to sustain the class period or class definition as pled, it is then appropriate for a court to limit the class period.") (quoting McLaughlin on Class Action § 4:3 (14th ed. 2017)).

Here, Plaintiff's theory is that D&T made false or misleading statements in issuing unqualified audit opinions that somehow failed to disclose the "truth about the Nuclear Project and the risks of non-completion in time to obtain [] nuclear tax credits." (Compl. ¶ 14.) Specifically, Plaintiff alleges that D&T should have required SCANA to disclose in its financial statements that it was "highly unlikely" that the Nuclear Project would be in "service prior to 2021." (*Id.* at ¶ 12.)[11] But Plaintiff's proposed Class Period—which runs through December 20, 2017—goes well beyond the point when it was indisputably clear to the market that the Nuclear Project would not be completed on schedule, or at all.

Indeed, Plaintiff itself alleges that even before SCANA issued its 2016 10-K on February 24, 2017—and D&T issued its corresponding audit opinions—public announcements by Toshiba,

---

[11] Plaintiff's rather flimsy contention that the disclosure should have said "highly likely" not to be completed rather than "substantial[ly] uncertain" lays bare the extreme weakness of its position. Had the disclosure read "highly likely," Plaintiff may well have argued that it should have said "virtually impossible" or words to that effect. The reality, of course, is that Plaintiff wishes to brush past the 2016 10-K disclosure because of the significant impact to its case of having the Class Period end in February, rather than December, of 2017.

Westinghouse's parent company, "made clear that the Nuclear Project was highly unlikely to be in service by 2021 in order to obtain the Nuclear Tax Credits" given Toshiba's financial troubles. (Compl. ¶ 438.)  SCANA's 2016 10-K then disclosed that "***significant risks and uncertainties remain concerning [Westinghouse's] ability*** to improve work force efficiency and productivity performance and ***to continue to fulfill its performance and financial commitments*** and Toshiba's ability to perform its payment guaranty with respect to the project."  (Ex. 2 (2016 10-K) at 90.) And that same 10-K also disclosed that there was "***substantial uncertainty***" as to Westinghouse's ability to complete the Nuclear Project on schedule "given [Westinghouse's] historical inability to meet forecasted productivity and work force efficiency levels."  (*Id.* at 25.)

Disclosures as to the likelihood (or lack thereof) that the Nuclear Project would be completed by the scheduled date in 2021 hardly get clearer than this.  Thus, the "truth" that Plaintiff alleges was kept hidden from investors was, according to Plaintiff's very own allegations, "publicly announced or otherwise effectively disseminated to the market" no later than the date that the 2016 10-K was issued—February 24, 2017.  *See In re Kirschner*, 139 F.R.D. at 82.  The Class Period should therefore terminate on this date.

The disclosures in the 2016 10-K should resolve the question of when any putative class period must end because by that point, investors had all the information they needed to know the "truth."  But even if the Court were somehow to conclude that the robust disclosures in the 2016 10-K did not fully "correct" the market's understanding of the status of the Nuclear Project, there can be no question that the ***public announcement of the abandonment*** of the Nuclear Project did so.  Indeed, when the Nuclear Project was abandoned on July 31, 2017, investors knew not only that it was "highly unlikely" that the Nuclear Project would be completed on time, but that it was ***certain*** that the Nuclear Project would not be completed at all.  And with the announcement of

abandonment of the Nuclear Project, in addition to all of the *other* information that had been previously disseminated to the market, the "truth" that Plaintiff alleges was concealed had, in fact, been "publicly announced or [] effectively disseminated to the market." *Id.* Thus, the Class Period should end on February 24, 2017, the date of the 2016 10-K, but in no event can extend past the date of abandonment. It cannot possibly stretch to December 20, 2017—the end date urged by Plaintiff—since the market was fully aware, well before that date, that the Nuclear Project would not be completed on schedule.

## III. PLAINTIFF IS ATYPICAL AND INADEQUATE BECAUSE IT PURCHASED SCANA STOCK AFTER THE "TRUTH" WAS DISCLOSED

The issues just discussed concerning the end of the class period also affect the "typicality" and "adequacy" requirements under Rule 23. To obtain class certification, Plaintiff must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" *Good v. Am. Water Works Co.*, 310 F.R.D. 274, 295 (S.D. W. Va. 2015) (quoting *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006)). In addition, Rule 23(a)(4) requires that the class representative "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). But "where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation[,] certification for the class is improper because he or she can no longer act in the best interest of the class." *Rocco v. Nam Tai Elecs.*, 245 F.R.D. 131, 135 (S.D.N.Y. 2007). Likewise, conflicts between class members that are "fundamental" and "go to the heart of the litigation" are sufficient to defeat the adequacy requirement of Rule 23. *See Gunnells*, 348 F.3d at 430.

Here, Plaintiff's trading history makes it subject to unique defenses that "threaten to become the focus of the litigation," thereby rendering Plaintiff's claim atypical and Plaintiff inadequate. *Rocco*, 245 F.R.D. at 135. As explained above, the Class Period should end on February 24, 2017, the date of the 2016 10-K, because that filing made clear the "substantial uncertainty" that the Nuclear Project would be completed on schedule. Since Plaintiff purchased SCANA stock only ***after*** this disclosure, and not before, Plaintiff is subject to a unique defense not applicable to investors who purchased throughout much of the Class Period; namely, that it is not even part of the putative class, and has no standing to pursue its claim, because it could not have relied on the alleged false statements that are the basis of the Complaint. *City of Bristol Pension Fund v. Vertex Pharms. Inc.*, 12 F. Supp. 3d 225, 235 (D. Mass. 2014) ("[A] plaintiff who purchased after a corrective disclosure was made would have no standing, because relying on the earlier misrepresentation would no longer be reasonable in light of the new information[.]"). This "disparity creates a conflict between [Plaintiff] and prospective class members . . . that threatens to overbalance the common interests of the class members as a whole"—thereby making Plaintiff an unsuitable class representative "for reasons of atypicality and inadequacy." *Karth v. Keryx Biopharmaceuticals, Inc.*, 334 F.R.D. 7, 18 (D. Mass. 2019). This is "precisely the situation the case law does not condone." *George v. China Auto. Sys., Inc.*, 2013 WL 3357170, at *6 (S.D.N.Y. 2013).

This intractable problem with Plaintiff's proposed Class Period can also be viewed a different way. It is blackletter law that an investor cannot recover under Section 10(b) of the Exchange Act if the truth of an alleged fraud was revealed before that investor purchased its stock. *See Basic*, 485 U.S. at 248-49 (explaining that if truth was disseminated to the market, those who trade on the "shares after the corrective statements would have no direct or indirect connection

with the [alleged] fraud").  Consequently, it is affirmatively against this Plaintiff's interest to argue that SCANA's 2016 10-K is a corrective disclosure, because that will completely undermine its claim.  But any putative class member who purchased before that date would want to argue that SCANA's 2016 10-K and other events predating Plaintiff's purchases were corrective disclosures. *See Ballan v. Upjohn Co.*, 159 F.R.D. 473, 485-86 (W.D. Mich. 1994) (plaintiff found to be inadequate class representative because it was in his interest to argue for a different "crucial disclosure date" than other members of the putative class).  Thus, a party in Plaintiff's uncomfortable position is likely to have "perverse incentives to downplay the effects" of pre-purchase disclosures to "maximize recovery on its own later-bought shares"—thereby creating a conflict between Plaintiff and other class members. *Pelletier v. Endo Int'l PLC*, 2021 WL 398495, at *12 (E.D. Pa. Feb. 4, 2021) (holding that a lead plaintiff that made its initial stock purchase after the first of several corrective disclosures had a conflict with members of the class it sought to represent).

Notably, even if the Court were somehow to look past the 2016 10-K as the appropriate end date and focus instead on the date the Nuclear Project was abandoned (July 31, 2017), Plaintiff's inherent conflict remains.  Plaintiff apparently purchased SCANA stock in April 2017, which preceded the abandonment announcement.  In that sense, Plaintiff is similarly situated to other investors who purchased SCANA stock before that date.  But Plaintiff urges in this very motion (albeit wrongly) that a class should be certified that stretches all the way to December 20, 2017.  In that regard, Plaintiff's position conflicts with any investor who purchased after the July 31 abandonment date because while Plaintiff itself should be willing to argue for July 31 as a corrective disclosure, any investor who acquired after that date would not be so willing because that end date (when the "truth" was disclosed) would render their claims non-viable. *See Ballan*,

31

159 F.R.D. at 485-86 (conflicts arise where lead plaintiff is incentivized to argue for a different "crucial disclosure date" than other members of the putative class). Simply put, Plaintiffs trading history creates a glaring and fundamental conflict of interest that makes Plaintiff both atypical and inadequate to serve as a class representative under Rule 23. The class certification motion should be denied for this reason as well.

## IV.    PLAINTIFF'S CLAIM IS BARRED BY THE STATUTE OF REPOSE

In addition to Plaintiff's inability to satisfy its burden of demonstrating that class certification is appropriate, no class can be certified because the statute of repose has expired. Exchange Act claims are subject to a five-year statute of repose that "begin[s] to run on the date of the last culpable act or omission of the defendant." *CalPERS*, 582 U.S. at 505; *see also Merck & Co. v. Reynolds*, 599 U.S. 633, 646–47, 650 (2010) ("Congress' inclusion in the statute of an unqualified bar on actions instituted '5 years after such violation,' § 1658(b)(2), giving defendants total repose after five years[.]").

Here, Plaintiff alleges that Deloitte's last false or misleading statement was made on February 24, 2017 (the date of the 2016 10-K). Accordingly, the repose period for the alleged misrepresentations or omissions expired on February 24, 2022. For repose purposes, however, absent class members' claims are not "brought" until class certification. *See Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011) (it is "surely erroneous" to suggest "that a nonnamed class member is a party to the class-action litigation before the class is certified"). Until a class has been certified, "there is no class action but merely the prospect of one; the only action is the suit by the named plaintiffs." *Morlan v. Universal Guar. Life Ins. Co.*, 298 F.3d 609, 616 (7th Cir. 2002).

Accordingly, none of the absent putative class members have timely claims.  *See CalPERS*, 582 U.S. at 504, 516.[12]

Nor is the statute of repose subject to any equitable tolling under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), such that absent class members' claims have been preserved.  *See CalPERS*, 582 U.S. at 516 (explaining that a statute of repose "displaces the traditional power of courts to modify statutory time limits in the name of equity" and "[b]ecause the *American Pipe* tolling rule is rooted in those equitable powers, it cannot extend the [repose] period").  To the contrary, under *American Pipe*, only statutes of **limitation** are tolled during putative class actions.  *See id.*  And the very existence of the *American Pipe* doctrine confirms that absent class members' claims are not "brought" when a putative class action is filed:  "if it were true that a putative class member's claims were essentially 'filed' in the putative class complaint, there would be no need for *American Pipe* tolling at all; any putative class complaint would count as a legitimate 'filing' of all putative class members' claims within the limitations period."  *In re Lehman Bros. Sec. & ERISA Litig.*, 655 F. App'x 13, 15 (2d Cir. 2016), *aff'd sub nom. CalPERS*, 582 U.S. 497 (2017).

In contrast to statutes of limitation, "statutes of repose are enacted to give more explicit and certain protection to defendants."  *CalPERS*, 582 U.S. at 505.  These statutes "effect a legislative judgment that a defendant should be free from liability after the legislatively determined period of time."  *Id.*  Indeed, the "purpose of a statute of repose is to create an absolute bar on a defendant's temporal liability."  *Id.* at 507.  Certifying a class after the repose period has expired

---

[12] Plaintiff's counsel has itself recognized the "significant challenges" that the statute of repose can present in securities class actions.  (*See* Cohen Milstein, *For Plaintiffs Alleging Long-Running Securities Frauds, Recent Statute of Repose Rulings Highlight Potential Obstacles, Potential Paths Forward* (Apr. 27, 2021), available at https://www.cohenmilstein.com/plaintiffs-alleging-long-running-securities-frauds-recent-statute-repose-rulings-highlight/.)

would therefore thwart Congress's determination that, "as a matter of policy," a defendant should be free from liability after the legislatively determined period of time. *Id.* at 508. Accordingly, as the statute of repose has expired here, no class may be certified without impeding upon Congress's determination that Deloitte must be free from liability for new claims after five years from the alleged violation.

## V.    THE COURT SHOULD DENY CLASS CERTIFICATION BECAUSE PLAINTIFF LACKS STANDING

As the Court knows, Deloitte has challenged the Fund's standing to pursue this suit, and thus the Court's subject matter jurisdiction, because the Fund's trustees never authorized the Fund's participation in this suit as required by the Fund's governing trust agreement (at least within the statute of repose period). *See, e.g.*, *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951, 1956 (2019) (dismissing for lack of jurisdiction where plaintiff "ha[d] not identified any legal basis for its claimed authority to litigate"). Given the Court's denial of Deloitte's motion to dismiss on this basis, Deloitte will not repeat these arguments in full here, but for preservation purposes incorporates them herein by reference to its prior briefing on the subject. (*See* ECF 132; ECF 142.)

## <u>CONCLUSION</u>

For the reasons discussed herein, Defendants respectfully request that the Court deny Plaintiff's Motion for Class Certification or, in the alternative, hold that any class certified must end by February 24, 2017.

34

Respectfully submitted,

*/s/ Christopher A. Ogiba*
Christopher A. Ogiba, Fed. ID No. 9042
Lesley A. Firestone, Fed. ID No. 11719
Moore & Van Allen, PLLC
78 Wentworth Street
Charleston, South Carolina 29401
Telephone:  843-579-7066
Facsimile:  843-579-8749
Email: chrisogiba@mvalaw.com
         lesleyfirestone@mvalaw.com


Mark A. Nebrig
John A. Fagg, Jr.
Nader Raja
Kristen Kenley
Moore & Van Allen, PLLC
100 North Tryon Street
Suite 4700
Charlotte, North Carolina 28202-4003
Telephone: 704-331-3602
Facsimile:  704-339-5974
E-mails: marknebrig@mvalaw.com
          johnfagg@mvalaw.com
          naderraja@mvalaw.com
          kristenkenley@mvalaw.com


Scott A. Edelman
Jed M. Schwartz
Andrew B. Lichtenberg
Milbank LLP
55 Hudson Yards
New York, New York 10001-2163
Telephone: 212-530-5000
Facsimile:  212-530-5219
Email: sedelman@milbank.com
          jschwartz@milbank.com
          alichtenberg@milbank.com

*Attorneys for Defendants*
*Deloitte & Touche LLP and Deloitte LLP*

Charleston, South Carolina
February 5, 2024

35