IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| International Brotherhood of Electrical Workers Local 98 Pension Fund *on behalf of itself and all others similarly situated*, | ) ) ) ) ) | Case No. 3:19-cv-03304-JDA |
| Plaintiff, | ) ) | |
| v. | ) ) | **OPINION AND ORDER** |
| Deloitte & Touche LLP, Deloitte LLP, | ) ) | |
| Defendants. | ) ) ) | |

This matter is before the Court on a motion for class certification, appointment of class representative, and appointment of class counsel (the "Class Certification Motion") filed by Plaintiff International Brotherhood of Electrical Workers Local 98 Pension Fund ("IBEW") and a motion to exclude damages-related expert opinion of Dr. Matthew D. Cain (the "Motion to Exclude") filed by Defendants Deloitte & Touche LLP and Deloitte LLP (collectively, "Deloitte"). [Docs. 185; 188.]

On November 22, 2019, Samuel R. Floyd, III, on behalf of himself and all others similarly situated, brought this securities class action against Deloitte, alleging a violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5. [Doc. 1.] On January 24, 2020, IBEW moved pursuant to Section 21D(a)(3)(B) of the Exchange Act, as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA")[1], for an order

---

[1] The PSRLA provides that the investor who has the largest financial interest in the case, files a motion within the prescribed deadlines, and otherwise satisfies the requirements

appointing IBEW as lead plaintiff, on behalf of itself and all others similarly situated who purchased securities of SCANA Corporation ("SCANA") between February 26, 2016, and December 20, 2017 (the "Class"), both dates inclusive (the "Class Period").[2]  [Doc. 22.] IBEW also moved for approval of Cohen Milstein as lead counsel and Tinkler Law as liaison counsel.  [*Id*.]  The Court granted IBEW's motion on February 18, 2020.  [Doc. 37.] On May 19, 2020, IBEW filed a Consolidated Complaint on behalf of itself and all others similarly situated, asserting a claim for violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.  [Doc. 44.]

On January 15, 2024, IBEW filed the Class Certification Motion.  [Doc. 185.] Deloitte filed a response in opposition to the Class Certification Motion on February 5, 2024 [Doc. 189], and IBEW filed a reply on March 7, 2024 [Doc. 203].  On February 5, 2024, Deloitte filed the Motion to Exclude.  [Doc. 188.]  IBEW filed a response in opposition to the Motion to Exclude on March 7, 2024 [Doc. 204], and Deloitte filed a reply on March 21, 2024 [Doc. 211].  On April 23, 2024, IBEW filed a notice of supplemental authority in support of the Class Certification Motion and in opposition to the Motion to

---

of Rule 23 of the Federal Rules of Civil Procedure should be appointed as lead plaintiff. *See* 15 U.S.C. § 78u-4(a)(3).

[2] IBEW's January 2020 motion defined the class period as February 27, 2015, through December 20, 2017 [Doc. 22 at 1], as did the original Complaint in this case [Doc. 1 ¶ 20]. However, the subsequent Consolidated Complaint amended the class period to begin on February 26, 2016 [Doc. 44 at 6], as did the Class Certification Motion [Doc. 185-1 at 8 n.1].  Accordingly, the Court uses the 2016 date for the beginning of the class period.

Exclude.  [Doc. 216.]  Deloitte filed a response to the notice of supplemental authority on April 29, 2024.  [Doc. 217.]  The motions are ripe for consideration.[3]

## BACKGROUND[4]

In 2007, SCANA received legislative approval to construct two nuclear reactors at the V.C. Summer Nuclear Generating Station in Fairfield County, South Carolina" (the "Nuclear Project").  [Doc. 44 ¶ 1; *see* Doc. 169 at 1.]  Deloitte served as SCANA's external auditor for over 70 years.  [Doc. 44 ¶ 3.]  IBEW alleges that, "[t]hroughout the Class Period, Deloitte repeatedly violated its professional responsibilities, failed in its role of gatekeeper and deceived investors about SCANA's accounting for, and expected completion of" the Nuclear Project.  [*Id.* ¶ 1.]  Deloitte allegedly "gave unqualified, 'clean' audit reports on SCANA's financial statements and internal control over financial reporting, misleading investors into believing that SCANA would complete the Nuclear Project in time to obtain $1.4 billion in nuclear tax credits[,] despite voluminous evidence that SCANA could not possibly achieve this goal."  [*Id.* (emphasis omitted).]

The Consolidated Complaint alleges that SCANA, its investors, government regulators, and Deloitte understood that the success of the Nuclear Project depended on SCANA obtaining $1.4 billion in federal production tax credits and being able to raise energy rates on consumers to cover construction costs.  [*Id.* ¶ 2.]  To qualify for the federal tax credits, SCANA was required to have the Nuclear Project operational and placed into service by January 1, 2021.  [*Id.*]  And, SCANA could apply to raise energy rates only

---

[3] The case was reassigned to the undersigned on February 14, 2024.  [Doc. 201.]

[4] The information in this Background section is taken primarily from the Introduction section of the Consolidated Complaint.  [*See* Doc. 44 ¶¶ 1–16.]

after submitting detailed construction schedules, capital costs, projections, and other information to the South Carolina Public Service Commission ("PSC") to demonstrate that it was prudently managing the Nuclear Project and that the Nuclear Project would be in service by January 1, 2021.  [*Id*.]  IBEW alleges that Deloitte was responsible for:

> understanding SCANA's business, identifying and responding to risks of material misstatements, and obtaining sufficient, appropriate audit evidence in response to such risks so that it could provide a high level of assurance that SCANA's financial statements—including those portions discussing the expected completion date of the Nuclear Project and the expectation of nuclear tax credits—were done in accordance with Generally Accepted Accounting Principles ("GAAP").

[*Id*. ¶ 3.]

When construction began in 2013, the Nuclear Project immediately experienced significant delays and substantial cost overruns.  [*Id*. ¶ 4.]  "Throughout 2015, it was clear to both SCANA and Deloitte that the Nuclear Project would not be in service in time for SCANA to obtain the nuclear tax credits."  [*Id*.]  In January 2015, a SCANA senior engineer projected that it would take 26.5 years to complete the Nuclear Project.  [*Id*.] Internal SCANA documents from February 2015 showed that, at the then-current rate of progress, only 30% of the Nuclear Project would be completed by 2020.  [*Id*.]  An April 2015 internal memorandum stated that the Nuclear Project's lead contractor had no credibility for developing a realistic schedule and that the production tax credits, as well as ongoing regulatory and financial support, were in jeopardy.  [*Id*.]  The construction issues and delays were so severe that SCANA hired an engineering, construction, and project management company, Bechtel Corporation ("Bechtel"), to conduct an analysis of the Nuclear Project.  [*Id*. ¶ 5.]  Bechtel's initial findings showed that SCANA's forecasts and schedules for the Nuclear Project were unrealistic.  [*Id*.]  On November 9, 2015,

Bechtel issued its formal assessment report, concluding that the schedule would be delayed by up to three years, with the second reactor likely not being completed until June 2023, and June 2022 was the earliest possible completion date.  [*Id*. ¶ 6.]

The Consolidated Complaint alleges that Deloitte knew about Bechtel's findings, and its auditors reviewed and analyzed Bechtel's reports as they were made.  [*Id*. ¶ 7.] Even though Deloitte knew by November 2015 that the Nuclear Project could not possibly be in service by 2021, IBEW alleges that Deloitte violated Public Company Accounting Oversight Board standards ("PCAOB Standards") and misleadingly told investors "that SCANA's financial statements confirming that the Nuclear Project was on schedule were present[ed] fairly, in all material respects and in accordance with GAAP, and that SCANA's related internal control over financial reporting was effective."  [*Id*. ¶ 8 (alteration in original) (internal quotation marks omitted).]  Throughout 2016 and early 2017, Deloitte continued to receive documents that warned and raised substantial doubts about the feasibility of the Nuclear Project and SCANA's ability to meet the deadline to qualify for the federal tax credits.  [*Id*. ¶ 9.]  For example,

> Despite . . . continuing, mounting evidence, and the fact that the available information also contradicted assertions made by SCANA to the PSC—thereby heightening the risk that the capitalized costs associated with the Nuclear Project would not be fully recoverable and/or previously approved electric rate increases could subject SCANA to related refunds[—] Deloitte permitted SCANA to represent in its quarterly, interim financial statements on Forms 10-Q that the Nuclear Project, at an estimated total gross construction cost of no more than $7.7 billion, would be placed into service prior to 2021, and would qualify for nuclear tax credits of "as much as approximately $1.4 billion," in violation of PCAOB Standards and without either withdrawing as SCANA's auditor or notifying the SEC.

[*Id*. ¶ 11.]

IBEW alleges that, unbeknownst to the investing public, Deloitte's clean audit reports lacked any reasonable basis.  [*Id*. ¶ 13.]  If not for Deloitte's approval of SCANA's materially false and misleading financial statements, IBEW contends that it and the Class would not have purchased their SCANA shares at the prices they paid.  [*Id*.]  "[O]n July 31, 2017, SCANA issued a press release announcing that it was abandoning the Nuclear Project," allegedly because of "the manifestation of issues that SCANA and Deloitte had known about—but deliberately or recklessly concealed—for many years."  [*Id*. ¶ 14.]

On February 27, 2020, the SEC filed a 416-paragraph complaint against SCANA and two of its senior officers alleging that SCANA's statements about the status and ultimate failure of the $9 billion Nuclear Project violated securities laws and that reports and documents were available to any reasonably diligent auditor, which showed that SCANA's financial statements were not in accordance with GAAP, despite Deloitte's audit reports to the contrary.  [*Id*. ¶ 15.]  As the news about the fraud and its risks materialized, SCANA's stock price declined from a Class Period high of $76.12 per share on July 6, 2016, to $37.39 per share, causing substantial losses to investors.  [*Id*. ¶ 16.]

In this action, IBEW asserts a single cause of action for violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.  [*Id.* ¶¶ 491–500.]  For relief, IBEW seeks class certification, compensatory damages and interest, costs and expenses, and any further relief the Court deems just and proper.  [*Id.* at 207–08.]

## DISCUSSION

**The Motion to Exclude**

Deloitte moves to exclude the damages-related opinion offered in Dr. Cain's expert report.  [Doc. 188.]  Having reviewed the record and the applicable law, the Court

concludes that Dr. Cain's damages-related opinion should not be excluded at the class-certification stage.

### *Applicable Law*

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony.[5]  It provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;
>
> (c)  the testimony is the product of reliable principles and methods; and

---

[5] Although Rule 702 governs trial testimony, the Supreme Court has suggested that it is appropriate to engage in a Rule 702 reliability analysis when evaluating expert testimony at the class certification stage.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 354 (2011) ("The parties dispute whether [an expert's] testimony even met the standards for the admission of expert testimony under [Rule] 702 and [*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)].  The District Court concluded that *Daubert* did not apply to expert testimony at the certification stage of class-action proceedings.  We doubt that is so . . . ." (internal citations and footnote omitted)).  The Third, Seventh, and Eleventh Circuits have held that a plaintiff cannot rely on challenged expert testimony that is deemed critical to the class certification determination to demonstrate conformity with Rule 23 until the court concludes that the expert testimony satisfies the standard set forth in *Daubert*.  *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187–88; (3d Cir. 2015); *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815–17 (7th Cir. 2010); *Sher v. Raytheon Co.*, 419 F. App'x 887, 890–91 (11th Cir. 2011).  Additionally, "[c]ourts in the Fourth Circuit typically conduct full *Daubert* analyses, especially where expert opinion is critical to the issue of class certification."  *Gov't Emps. Health Ass'n v. Actelion Pharms. Ltd.*, No. GLR-18-3560, 2024 WL 4122123, at *4 (D. Md. Sept. 6, 2024).  Here, Dr. Cain's opinion is central and critical to the class certification motion, and the Court therefore engages in the Rule 702/*Daubert* analysis at this stage of the proceedings.

(d)  the expert's opinion reflects a reliable application of the
principles and methods to the facts of the case.

Fed. R. Evid. 702.  Accordingly, Rule 702 requires a court to conduct a two-part analysis:

first, the court must determine whether an expert is qualified to offer an opinion on the

subject matter at issue by virtue of "knowledge, skill, experience, training, or education";

second, the court must determine whether the particular opinion offered satisfies the four

requirements in subsections (a) through (d) of Rule 702.

"Implicit in the text of Rule 702 . . . is a district court's gatekeeping responsibility to

'ensur[e] that an expert's testimony both rests on a *reliable* foundation and is *relevant* to

the task at hand.'"  *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (quoting

*Daubert*, 509 U.S. at 597).  To conduct this gatekeeping function, a court must conduct

"a preliminary assessment of whether the reasoning or methodology underlying the

testimony is scientifically valid and of whether that reasoning or methodology properly

can be applied to the facts in issue."  *Daubert*, 509 U.S. at 592–93.  *Daubert* offers

"several guidepost factors that the court *may* consider in assessing an expert's

evidentiary reliability," including "whether a theory or technique can be (and has been)

tested; whether the theory or technique has been subjected to peer review and

publication; whether a given technique has a high known or potential rate of error and

whether there are standards controlling the technique's operation; and whether the theory

or technique enjoys general acceptance within a relevant scientific community."  *McKiver*

*v. Murphy-Brown, LLC*, 980 F.3d 937, 959 (4th Cir. 2020) (alterations and internal

quotation marks omitted).  The Supreme Court's "emphasis on the word 'may' . . . reflects

*Daubert's* description of the Rule 702 inquiry as 'a flexible one.'"  *Kumho Tire Co. v.*

*Carmichael*, 526 U.S. 137, 150 (1999) (quoting *Daubert*, 509 U.S. at 594).  The party

offering the expert opinion evidence bears the burden of establishing its admissibility by a preponderance of proof. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d. 194, 199 (4th Cir. 2001).

### *Analysis*

Deloitte does not challenge Dr. Cain's qualifications, and the Court concludes that Dr. Cain is qualified to opine on the matters discussed in his reports.[6] Deloitte's challenge goes to the second part of the Rule 702 analysis: whether Dr. Cain's opinion regarding damages satisfies the four requirements in subsections (a) through (d) of Rule 702.

### Dr. Cain's Opinion

IBEW asked Dr. Cain to determine whether the market for SCANA common stock was efficient during the Class Period and "to opine on whether the calculation of damages on a class-wide basis in this matter is subject to a common methodology." [Doc. 185-2 at 3–4 ¶ 7.] Based on his analysis, Dr. Cain "formed the opinions that the market for shares of SCANA's Common Stock was efficient during the Class Period" and that "damages in this matter can be calculated on a class-wide basis subject to a common

---

[6] Dr. Cain is a Ph.D in Finance, a Senior Fellow at the Berkeley Center for Law and Business, and a Senior Visiting Scholar at Berkeley Law School, University of California. [Doc. 185-2 at 4 ¶ 1.] He teaches courses, delivers guest lectures, participates in academic seminars, and conducts research in various topic areas related to finance, economics, accounting, law, and business. [*Id.*] His research is focused on topics including empirical corporate finance, corporate governance, board independence, mergers and acquisitions, hostile takeovers, shareholder lawsuits, negotiations, financial contracting, disclosures of financial information, and shareholder activism. [*Id.*] Dr. Cain worked at the SEC between 2014 and 2018 as a Financial Economist. [*Id.* at 4 ¶ 2.] Before working at the SEC, he was an Assistant Professor of Finance at the University of Notre Dame. [*Id.* at 4–5 ¶ 3.] Dr. Cain has also published research in leading peer-reviewed finance, accounting, law, and economics journals. [*Id.* at 5 ¶ 6.]

methodology." [*Id.* at 6 ¶¶ 9–10.] Deloitte challenges only Dr. Cain's opinion regarding damages and, thus, the Court limits its discussion to Dr. Cain's damages-related opinion.

Dr. Cain's first report, dated April 30, 2021 (the "First Report"), explains that "[t]he 'out-of-pocket' method of calculating damages represents a standard and well-accepted methodology under Section 10(b) of the Exchange Act" and that the "approach calculates damages formulaically as the artificial inflation in the share price at the time of purchase minus the artificial inflation in the share price at the time of sale." [Doc. 185-2 at 33 ¶ 70.] It further explains that "[i]f shares are not sold prior to the full revelation of the fraud, then the difference is relative to a 90-day lookback period under the" PSLRA. [*Id.*] The First Report opines that this methodology can be applied class-wide and clarifies that Dr. Cain had not been asked to perform a loss causation analysis at the time of the First Report because "such analysis often incorporates information produced during discovery." [*Id.* at 33–34 ¶¶ 70–72.] The report further states that event studies are widely employed to calculate artificial inflation and explains that these "studies measure stock price reactions to corrective disclosures which reveal[] the relevant truth that was concealed by alleged material omissions and/or misrepresentations." [*Id.* at 34 ¶ 73.] As part of this process, if reliable evidence shows "that a material portion of the difference in the artificial inflation between the purchase and sale of the securities may be attributed to non-fraud related factors, the impact of such 'confounding information' on the price of SCANA securities can be determined on a common, class-wide basis" and "[t]he value of any confounding information can then be subtracted from the price impact of corrective disclosures in calculating the inflation." [*Id.*] Ultimately, Dr. Cain "conclude[d] that damages in this case

can . . . be calculated using a standard and well-established methodology, and can be applied on a class-wide basis."[7]  [*Id.* at 34 ¶ 75.]

### The Parties' Positions

Deloitte challenges Dr. Cain's damages-related opinion on two bases.  First, Deloitte argues that IBEW asserts two damages theories—a materialization of risk theory and a corrective disclosure theory—but that Dr. Cain's report ignores the materialization of risk theory.  [Doc. 188 at 8, 13.]  Thus, Deloitte contends that IBEW "has failed both to offer a damages model consistent with its liability case and to demonstrate that its damages are attributable to that theory of liability as required by" the Supreme Court's decision in *Comcast Corporation v. Behrend*, 569 U.S. 27, 35 (2013).  [*Id.* at 13 (internal quotation marks omitted).]  Second, Deloitte contends that Dr. Cain fails to offer or identify "any methodology by which damages attributable to SCANA, its officers, or others could be separated from damages attributable to Deloitte."  [*Id.* at 14.]  Accordingly, Deloitte

---

[7] Dr. Cain also submitted a rebuttal report (the "Rebuttal Report").  [Doc. 203-1.]  Deloitte contends that the Rebuttal Report should be disregarded because it was improperly filed "only after Deloitte moved to exclude Cain's expert opinions and purports to rebut legal arguments in Deloitte's briefs rather than any expert report offered by Deloitte."  [Doc. 211 at 1 & n.2.]  The Court notes that the Federal Rules of Civil Procedure provide for both rebuttal expert reports and supplemental expert reports in specific circumstances.  Fed. R. Civ. P. 26(a)(2)(D)(ii), 26(a)(2)(E).  Given the timing of IBEW's filing of the Rebuttal Report—on the date it filed its reply to the Class Certification Motion and its response in opposition to the Motion to Exclude—and the timing of Deloitte's objection to it as improper—in its reply to the Motion to Exclude—the Court does not have the benefit of the parties' positions related to whether the Rebuttal Report is a proper rebuttal report, supplemental report, or both.  However, because, as discussed below, the Court concludes that the Class Certification Motion should be granted even without considering the Rebuttal Report, the Court will not consider the Rebuttal Report for purposes of ruling on the present motions.

contends that Dr. Cain's opinion that damages are calculable on a class-wide basis fails to meet the requirements of Rule 702 of the Federal Rules of Evidence.  [*Id.* at 14–16.]

In response, IBEW argues that the "standard out-of-pocket damages methodology described in Dr. Cain's report is undoubtedly scientific and reliable as well, as it is routinely employed by experts and uniformly credited by courts, including by the courts in the Fourth Circuit, to certify securities class actions around the country."  [Doc. 204 at 9 (citing cases).]  IBEW contends that the admissibility inquiry under *Daubert* turns on the reliability of Dr. Cain's principles and methodology rather than the conclusions that they generate, and that Deloitte does not argue that Dr. Cain's opinions rest on unreliable methods or principles.  [*Id.* at 18–21.]  IBEW also asserts that Deloitte concedes that Dr. Cain's background and experience is relevant and unimpeachable.  [*Id.* at 21–22.]  Finally, IBEW argues that the "out-of-pocket" damages methodology proposed by Dr. Cain is admissible.  [*Id.* at 22–34.]

In reply, Deloitte first addresses IBEW's procedural and/or technical arguments, arguing that the technical requirements raised in IBEW's response are without merit and an effort to avoid the requirements of Rule 702.  [Doc. 211 at 3–5.]  Deloitte next argues that Dr. Cain's "bare promise" that damages attributable to Deloitte can at some point be calculated on a class-wide basis is unsupported and must be excluded.  [*Id.* at 5–15.]

<u>Deloitte's Challenge Regarding the Materialization of Risk Theory</u>

As stated, Deloitte first contends that IBEW alleges two theories of damages—materialization of risk and corrective disclosure—and that Dr. Cain fails to address the

materialization of risk theory.[8]  [Doc. 188 at 13.]  Thus, Deloitte argues that Dr. Cain "has failed both to offer a damages model consistent with its liability case and to demonstrate that its damages are attributable to that theory of liability as required by *Comcast*."  [*Id.* (internal quotation marks omitted).]

*Comcast* requires district courts to ensure that "a model purporting to serve as evidence of damages in [a] class action . . . measure[s] only those damages attributable to [the plaintiff's] theory."  *Comcast Corp.*, 569 U.S. at 35.  "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  *Id.*  Calculations at the class certification stage "need not be exact" but "any model supporting a plaintiff's damages case must be consistent with its liability case."  *Id.* (internal quotation marks omitted).

The Consolidated Complaint in this action alleges that "[t]he price of SCANA securities significantly declined (causing investors to suffer losses) when [Deloitte's] misrepresentations, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or when the risks and truths concealed by Deloitte's fraud materialized."  [Doc. 44 ¶ 473.]  Based on this and similar allegations, Deloitte contends that IBEW alleges two theories—materialization of risk and corrective disclosure—and that Dr. Cain's report "ignores the materialization of risk theory

---

[8] Under a materialization of risk theory, a plaintiff alleges causation "on the ground that negative investor inferences, drawn from a particular event or disclosure, caused the loss and were a foreseeable materialization of the risk concealed by the fraudulent statement." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384–85 (6th Cir. 2016) (internal quotation marks omitted).  Under a corrective disclosure theory, a plaintiff alleges causation "on the ground that the market reacted negatively to a corrective disclosure of fraud."  *Id.* (internal quotation marks omitted).

and, instead, appears to be referencing corrective disclosures rather than risk." [Doc. 188 at 13 (internal quotation marks omitted).] However, as the Fourth Circuit has explained, "the ultimate loss causation inquiry under either the corrective disclosure theory or the materialization of a concealed risk theory is the same: whether a misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Singer v. Reali*, 883 F.3d 425, 446–47 (4th Cir. 2018) (internal quotation marks omitted) (concluding that "pursuant to an amalgam of the corrective disclosure and materialization of the concealed risk theories, the facts revealed in the [defendant company's filing with the SEC] and the [outside] analyst report were sufficient to establish exposure for purposes of the loss causation element, because those facts collectively suggest the Company perpetrated a fraud on the market" (alterations and internal quotation marks omitted)); *cf. In re Vale S.A. Sec. Litig.*, No. 19-CV-526-RJD-SJB, 2022 WL 122593, at *19 (E.D.N.Y. Jan. 11, 2022) ("Defendants argue that the [damages] model must address the distinctions between corrective disclosures and materializations of the risk, which require a determination on the difference between the perceived probability of risk and the true probability. Not so. This argument, akin to a loss causation argument in disguise, need not be resolved at class certification." (internal quotation marks and citation omitted)), *Report and Recommendation adopted by* 2022 WL 969724 (E.D.N.Y. Mar. 31, 2022).

The First Report states that Dr. Cain will use the out-of-pocket method for calculating damages on a class-wide basis. [Doc. 185-2 at 33 ¶ 70.] It explains that "[t]his approach calculates damages formulaically as the artificial inflation in the share price at

the time of purchase minus the artificial inflation in the share price at the time of sale"[9] and that, "[i]f shares are not sold prior to the full revelation of the fraud, then the difference is relative to a 90-day lookback period under the" PSLRA.  [*Id.*]  Stated differently, "the out-of-pocket method calculates the difference between the price at which the stock sold and the price at which the stock would have sold absent any artificial inflation cause by a defendant's alleged misrepresentations or omissions."  *KBC Asset Mgmt. NV v. 3D Sys. Corp.*, No. 0:15-2392-MGL, 2017 WL 4297450, at *7 (D.S.C. Sept. 28, 2017).   "The Supreme Court long ago agreed with this approach when it held 'the correct measure of damages . . . is the difference between the fair value of all [the plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct."  *Id*. (alterations in original) (quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972)).   Accordingly, the Court concludes that Dr. Cain has offered a reliable damages model consistent with IBEW's liability case and has demonstrated that IBEW's damages are attributable to that theory of liability.  *See Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 692 (D. Md. 2018) (noting that "out-of-pocket damages calculations through an event study analysis . . . have been

---

[9] The Court notes that the Consolidated Complaint alleges that "[d]uring the Class Period, [IBEW] and the Class purchased SCANA securities at artificially inflated prices and were damaged thereby when the price of SCANA securities declined when the truth was revealed."  [Doc. 44 ¶ 473; *see also, e.g., id.* ¶ 497 ("As a result of Deloitte's clean reports of SCANA's misstated financial reports and Deloitte's own false and misleading statements and omissions in its unqualified audit reports, the market price of SCANA's securities were artificially-inflated throughout the Class Period.").]

recognized by courts as an accepted method for the evaluation of damages in securities fraud cases based on" fraud-on-the-market allegations).

<u>Deloitte's Challenge Regarding Damages Attributable Only to Deloitte</u>

Deloitte next argues that Dr. Cain fails to identify or offer a "methodology by which damages attributable to SCANA, its officers, or others could be separated from damages attributable to Deloitte." [Doc. 188 at 14.] However, at the class certification stage in a securities fraud class action, a methodology is not required "to make an allowance for any damages caused by things other than [the defendants'] alleged fraud." *KBC Asset Mgmt. NV*, 2017 WL 4297450, at *7. Moreover, Dr. Cain has explained that "[e]vent studies are widely-employed to calculate artificial inflation [and] measure stock price reactions to corrective disclosures which reveal[] the relevant truth that was concealed by alleged material omissions and/or misrepresentations." [Doc. 185-2 at 34 ¶ 73.] Additionally, Dr. Cain opines, "[t]o the extent that reliable evidence is introduced to show that a material portion of the difference in the artificial inflation between the purchase and sale of the securities may be attributed to non-fraud related factors, the impact of such 'confounding information' on the price of SCANA securities can be determined on a common, class-wide basis using various accepted methodologies." [*Id.*] Indeed, courts have "reject[ed] the suggestion that an event study is incapable of disaggregating the effects of confounding information" because if that were the case, "nearly every securities fraud class action would fail." *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728 (CM) (RWL), 2019 WL 3001084, at *20 (S.D.N.Y. July 10, 2019); *see also Smilovits v. First Solar, Inc.*, No. CV12-0555-PHX-DGC, 2019 WL 7282026, at *9 (D. Ariz. Dec. 27, 2019)

(concluding that an expert's proposed methodology of conducting an event study that purports to account for confounding information meets Rule 702's admissibility threshold). Accordingly, the Court concludes that Dr. Cain's damages-related opinion should not be excluded.

**The Class Certification Motion**

IBEW asks the Court to "(i) certify this action as a class action pursuant to Federal Rule of Civil Procedure 23[10]; (ii) appoint [IBEW] as Class Representative; and (iii) appoint Cohen Milstein Sellers & Toll PLLC ('Cohen Milstein') as Class Counsel and Tinkler Law Firm LLC ('Tinkler Law Firm') as Liaison Counsel." [Doc. 185-1 at 8 (footnote added).] In support of its motion, IBEW argues that class treatment of securities fraud actions is favored; that Deloitte has conceded most of the Rule 23 requirements and the Court has previously found the Class Representative to be adequate; that the proposed class satisfies the requirements of Rule 23(a) of the Federal Rules of Civil Procedure; that the proposed class meets the requirements of Rule 23(b)(3); and that the Court should appoint IBEW's choice of counsel as Lead Counsel under Rule 23(g). [*Id.* at 19–42.]

In response, Deloitte contends that the class period is too long because the truth was disclosed well before December 20, 2017; that IBEW is atypical and inadequate under Rule 23(a)(3) because it purchased SCANA stock after the truth was disclosed; that IBEW has failed to show that common issues of fact or law predominate and, thus, has failed to satisfy Rule 23(b)(3); that IBEW's claim is barred by the statute of repose;

---

[10] IBEW seeks to certify as the Class "all persons or entities who purchased or otherwise acquired SCANA publicly traded common stock from February 26, 2016 through December 20, 2017, inclusive, and who were damaged thereby." [Doc. 185-1 at 8 n.1 (internal quotation marks omitted).]

and that IBEW lacks standing.  [Doc. 189 at 19–40.]  In reply, IBEW argues that the class period appropriately ends on December 20, 2017; that IBEW is both adequate and typical; that common issues predominate; that its claim is not barred by the statute of repose; and that the Court has already rejected Deloitte's standing argument.[11]  [Doc. 203 at 9–21.]

### Applicable Law

Rule 23 of the Federal Rules of Civil Procedure provides the requirements for class certification.  The Rule "does not set forth a mere pleading standard."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  A class action can be certified only if, "after a rigorous analysis," a court is satisfied that the prerequisites of Rule 23(a) have been met and that the action falls within one of the categories under Rule 23(b).  *Id.* at 345, 350–51 (internal quotation marks omitted).  "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim."  *Id.* at 351.

A class action must first meet the prerequisites of Rule 23(a), which provides:

> (a)     One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> > (1)     the class is so numerous that joinder of all members is impracticable;
> >
> > (2)     there are questions of law or fact common to the class;
> >
> > (3)     the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> >
> > (4)     the representative parties will fairly and adequately protect the interests of the class.

---

[11] The Court agrees with IBEW that it has already analyzed and rejected Deloitte's argument that IBEW lacks standing and finds no basis for revisiting the prior ruling on this issue.  *See United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999).

18

Fed. R. Civ. P. 23(a).  These prerequisites are "commonly referred to as numerosity, commonality, typicality, and adequacy" of representation.  *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654 (4th Cir. 2019) (internal quotation marks omitted).  Additionally, the Fourth Circuit Court of Appeals has recognized that "Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable." *Id.* at 654–55 (internal quotation marks omitted).

In addition to these threshold requirements, a class action must fit into one of the categories in Rule 23(b).  *Id.* at 655.  Here, IBEW seeks to obtain class certification under Rule 23(b)(3), which provides that a class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

### *Analysis*

#### Class Period

As an initial matter, the Court addresses Deloitte's argument that the Class Period should be shortened because the "truth" was disclosed before December 20, 2017.  [Doc. 189 at 32–35.]  More specifically, Deloitte contends that the "truth" that IBEW "alleges was kept hidden from investors was . . . publicly announced or otherwise effectively disseminated to the market no later than the date that the 2016 10-K was issued— February 24, 2017" and, therefore, the Class Period should terminate on February 24, 2017.  [*Id.* at 34 (internal quotation marks omitted).]  Further, Deloitte asserts that even if the Court were to conclude that the 2016 10-K did not fully correct the market's

understanding regarding the status of the Nuclear Project, the abandonment of the Nuclear Project on July 31, 2017, unquestionably corrected the market's understanding. [*Id.* at 34–35.]  In reply, IBEW contends that Deloitte's argument rests on a flawed and incomplete recitation of IBEW's allegations because, in addition to alleging that Deloitte's audit reports hid the truth about the risk of non-completion in time to obtain the nuclear tax credits, IBEW "also alleges, among other things, that [Deloitte's] misleading audit reports hid the risks of regulatory investigations and actions due to their misleading representations to their regulators, and that SCANA would be unable to recover its costs under the [Base Load Review Act ('BLRA')][12]—news that even [Deloitte does] not claim was fully disclosed prior to December 20, 2017."  [Doc. 203 at 18 (internal citations omitted) (footnote added).]

Courts "have held that in a securities class action based on material misrepresentations and omissions to the investing public the class period should end when curative information is publicly announced or otherwise effectively disseminated to the market."  *In re Under Armour Sec. Litig.*, 719 F. Supp. 3d 438, 464–65 (D. Md. 2024) (internal quotation marks omitted).  "At the class certification stage, courts must not inquire into the merits to determine the adequacy of a class period."  *Deluca v. Instadose Pharma Corp.*, No. 2:21-cv-675, 2023 WL 5489032, at *3 (E.D. Va. Aug. 24, 2023) (internal quotation marks omitted).  Instead, at this stage, "a class period should not be cut off if questions of fact remain as to whether the disclosures completely cured the market."  *Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 477 (E.D. Pa. 2021) (internal

---

[12] The BLRA would have allowed SCANA to charge increased energy rates to recover "prudently incurred" costs from the Nuclear Project.  [Doc. 44 ¶¶ 45–48.]

quotation marks omitted) (citing cases); *see also City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 270 F.R.D. 247, 258 (D.S.C. 2010) (concluding, at the class certification stage, that a question of fact existed regarding whether a specific disclosure effectively cured the alleged misrepresentations and certifying the broader class period).

Here, questions of fact remain as to whether any disclosure before December 20, 2017, completely cured the market.  The Consolidated Complaint alleges that Deloitte's audit reports not only concealed the risk that the Nuclear Project would not be completed in time for SCANA to obtain the tax credits, but also concealed regulatory investigations and actions due to their misleading representations to their regulators and concealed that SCANA would be unable to recover its costs under the BLRA.  [Doc. 44 ¶¶ 11, 289–96, 311, 345, 444–45, 447, 451, 461–63, 470–72, 474.]  It also alleges that the truth was revealed through a series of partial disclosures ending with the alleged fully corrective disclosure on December 20, 2017.  [*Id.* ¶¶ 14–15, 312–406, 476.]  Additionally, the exhibits to the First Report show that SCANA's stock price decreased significantly between February 2017 and December 2017.  [Doc. 185-2 at 44.]  Thus, because questions of fact exist as to whether the February 24, 2017, or July 31, 2017, disclosures completely cured the alleged misrepresentations, the Court declines to shorten the Class Period.[13]

Rule 23(a)

The Court first concludes that IBEW has satisfied all of Rule 23(a)'s requirements. Because Deloitte's opposition to the Class Certification Motion challenges only whether

---

[13] The Court notes that its decision at the class certification stage "does not preclude it from revisiting this issue in the future."  *City of Ann Arbor Emps.' Ret. Sys.*, 270 F.R.D. at 258 n.2.

IBEW is a typical and adequate representative, the Court focuses its analysis on these requirements.[14]

"The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) (quoting *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998)). This requirement "goes to the heart of a representative parties' ability to represent a class" and "tends to merge with the commonality and adequacy-of-representation requirements." *Id.*

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). The inquiry has two components: (1) the interests of the proposed class representatives and class members must align; and (2) the plaintiffs'

---

[14] Although Deloitte challenges only the typicality and adequacy prerequisites, the Court nevertheless finds that IBEW has satisfied the numerosity and commonality requirements. *See In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 104–05 (E.D. Va. 2009) ("The numerosity requirement is seldom disputed in securities fraud cases given the large quantity of shareholders who purchase stock in reliance upon a company's public statements."); [Doc. 185-2 ¶¶ 35, 58 (noting that "SCANA's Common Stock traded on the New York Stock Exchange throughout the Class Period" and that its "number of shares outstanding ranged from 142.62 million shares to 142.92 million shares during the Class Period")]; *City of Ann Arbor Emps.' Ret. Sys.*, 270 F.R.D. at 251 (concluding that the commonality requirement was satisfied where "the plaintiff allege[d] that the same misrepresentations or omissions were made to all members of the proposed class through press releases, conference calls, and filings with the SEC"); [Doc. 44 ¶¶ 482, 483, 487 (alleging that investors were defrauded by the same misrepresentations and omissions, over the same period of time, and suffered losses as a result)]. Additionally, regarding Rule 23's implicit requirement that the class be ascertainable, members of the proposed class are readily identifiable because, as in other securities fraud actions, "objective data about who bought and sold [SCANA] stock during the class period provides an administratively feasible way to ascertain the class." *In re Jeld-wen Holding, Inc. Sec. Litig.*, No. 3:20-cv-112-JAG, 2021 WL 1186326, at *9 (E.D. Va. Mar. 29, 2021).

attorneys must be qualified, experienced, and able to conduct the litigation. *Cuthie v. Fleet Rsrv. Ass'n,* 743 F. Supp. 2d 486, 499 (D. Md. 2010).

IBEW argues that its claims are typical of the claims of the putative class because it and the putative class members "all purchased SCANA common stock during the Class Period and all allege that Deloitte misled and omitted the same facts, that their shares of SCANA common stock were purchased at artificially inflated prices, and that they were damaged when the truth was revealed and artificial inflation came out of the common stock price." [Doc. 185-1 at 24–25.] With respect to adequate representation, IBEW notes that this Court has previously held that Deloitte has not shown that IBEW would not fairly and adequately represent the interests of the putative class. [*Id.* at 25.] It argues that its interests are aligned with those of the putative class, that it has actively supervised and monitored this litigation to date, that it will continue to actively participate and fulfill its fiduciary duties, and that it has selected qualified and experienced counsel who has and will continue to vigorously protect this action. [*Id.* at 25–26.]

In response, Deloitte argues that IBEW's "trading history makes it subject to unique defenses that threaten to become the focus of the litigation, thereby rendering [IBEW's] claim atypical and [IBEW] inadequate." [Doc. 189 at 36 (internal quotation marks omitted).] Specifically, Deloitte argues that because IBEW purchased SCANA stock only after February 24, 2017, when the 2016 10-K was issued, IBEW "is subject a unique defense not applicable to investors who purchased throughout much of the Class Period."[15] [*Id.*] Deloitte contends it is affirmatively against IBEW's interest to argue that

---

[15] Deloitte specifically argues that IBEW "is not even part of the putative class, and has no standing to pursue its claim, because it could not have relied on the alleged false statements that are the basis of the Complaint." [Doc. 189 at 36.] However, these

23

SCANA's 2016 10-K is a corrective disclosure because that would undermine IBEW's claim, but any putative class member who purchased the stock before February 24, 2017, would want to argue that the 2016 10-K and other events were corrective disclosures. [*Id*. at 37.]   Deloitte further argues that a similar conflict exists between IBEW and investors who purchased SCANA stock after July 31, 2017.  [*Id*. at 37–38.]

In reply, IBEW argues that it is "adequate and typical because it is pursuing the same claims arising from the same course of conduct as all absent Class members," that "courts are clear that a class representative's post-partial disclosure purchases do not render it atypical because presumably other class members also purchased at that time," and that there is no conflict "because the early disclosures prior to [IBEW's] second round of purchases of SCANA stock were only partially corrective, not fully."  [Doc. 203 at 15–17.]

Multiple courts have held that "a stock purchase after a partial corrective disclosure is not *per se* evidence that a class representative is atypical and did not rely on the alleged fraudulent representations."  *In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 304 (D. Md. 2022) (internal quotation marks omitted).   In *In re Under Armour*, the plaintiffs purchased a large volume of shares after all but two of the alleged partial corrective disclosures were made.  *Id.* at 303.  The court agreed with "the majority approach" and concluded that purchasing the shares after some partial corrective disclosures did not make the plaintiffs atypical.  *Id.* at 304–05.  The court emphasized that the plaintiffs had alleged they purchased the shares in an efficient marketplace, which suggested that the

---

arguments are based on Deloitte's position that the Class Period should be shortened, which the Court has rejected.

price they paid reflected their reliance on the defendants' alleged misrepresentations and omissions, and that the defendants alleged the plaintiffs purchased shares after only partial disclosures rather than the final corrective disclosure, cited no evidence suggesting that the plaintiffs were the only class members who made such purchases, and failed to show that these purchases would become a major focus of the litigation.  *Id.* at 304–05.

Similarly, here, IBEW alleges that it relied on Deloitte's material misrepresentations and omissions when purchasing SCANA's common stock in an efficient market on the New York Stock Exchange.  [Doc. 44 ¶ 482.]  Additionally, IBEW contends that the 2016 10-K was only partially corrective.  [*Id.* ¶¶ 14–15, 312–406, 476 (outlining the partial disclosures leading up to the purportedly fully corrective disclosure on December 20, 2017); *see In re: Under Armour*, 631 F. Supp. 3d at 305 n.5 ("The distinction between a partial corrective disclosure and a full corrective disclosure is essential: Partial disclosures do not charge the market with notice of the putative fraud, and do not necessarily preclude reliance.").  Further, as IBEW points out, there is no suggestion that it is the only class member who bought stock after the partial disclosures.  Accordingly, the Court concludes that IBEW has satisfied the typicality requirement and, for the same reasons, has satisfied the first component of the adequacy inquiry—that the interests of IBEW and the putative class members align.  Additionally, Deloitte has not challenged IBEW's counsel's qualifications, experience, or ability to conduct the litigation, and the Court concludes that IBEW has satisfied the second component of the adequacy inquiry.  *See Cuthie*, 743 F. Supp. 2d at 499 ("Absent contrary proof, class counsel are presumed competent and sufficiently experienced to prosecute the action on behalf of the class.").

Rule 23(b)

The Court concludes that IBEW has also satisfied the Rule 23(b)(3) requirements. Because Deloitte's opposition to the Class Certification Motion challenges only whether questions of law or fact common to class members predominate over any questions affecting only individual members, the Court focuses its analysis on this requirement.[16]

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "For this reason, courts must concentrate on the issue of liability rather than damages, and if the liability issue is common to the class, common questions are held to predominate over individual ones; however, if resolution of the liability issue turns on a consideration of the individual circumstances of each class member, certification under Rule 23(b)(3) is inappropriate." *In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 408 (E.D. Va. 2015) (internal quotation marks and citation omitted). "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (internal quotation marks omitted); *see also Krakauer,* 925 F.3d at 658 ("The entire notion of predominance implies that the plaintiffs' claims need not be identical."). Accordingly, predominance may be satisfied "even when some individualized

---

[16] Although Deloitte challenges only the predominance requirement under Rule 23(b)(3), the Court also finds that a class action is superior to other available methods of fairly and efficiently adjudicating this controversy. *See In re Willis Towers Watson PLC Proxy Litig.*, No. 1:17-cv-1338 (AJT/JFA), 2020 WL 5361582, at *11 (E.D. Va. Sept. 4, 2020) (applying the Rule 23(b)(3) factors and "find[ing] that proceeding as a class action in this action, as in public traded securities claims generally, is the superior mechanism to adjudicate the Class's claims").

26

inquiry is required." *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 305 (4th Cir. 2013). "Securities fraud cases are thought to be particularly appropriate for treatment under Rule 23(b)(3) because the elements of the claim tend to relate to the conduct of the defendants, not to the individual plaintiffs." *Cape Coral Mun. Firefighters' Ret. Plan*, 322 F. Supp. 3d at 685–86.

IBEW argues that common questions of law and fact predominate because the proposed class is entitled to the fraud-on-the-market presumption under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988); the proposed class is entitled to the reliance presumption under *Affiliated Ute*, 406 U.S. 128; and damages are measurable on a class-wide basis. [Doc. 185-1 at 27–40.]  In response, Deloitte contends that IBEW has failed to satisfy Rule 23(b)(3) because it has failed to present a damages methodology that matches its theories of liability and because IBEW cannot rely on the *Basic* presumption of reliance. [Doc. 189 at 19–32.]  In reply, IBEW argues that the out-of-pocket damages methodology is universally accepted by courts and is appropriate in this case; that Deloitte has not rebutted the *Basic* presumption; and that IBEW is also entitled to the *Affiliated Ute* presumption.  [Doc. 203 at 9–15.]

Deloitte's first challenge to class certification—regarding IBEW's damages methodology—is based on the same arguments Deloitte made in the Motion to Exclude. The Court has already rejected Deloitte's arguments that IBEW must provide a different damages model regarding its materialization of risk theory and that IBEW must show at the class-certification stage that it can separate the damages from Deloitte's alleged fraud.  For those same reasons, Deloitte's arguments fail under the Rule 23(b)(3) predominance analysis.  *See Singer*, 883 F.3d at 446; *In re Vale S.A. Sec. Litig.*, 2022

WL 122593, at *19; *Cape Coral Mun. Firefighters' Ret. Plan*, 322 F. Supp. 3d at 692; *KBC Asset Mgmt. NV*, 2017 WL 4297450, at *7; *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *20; *Smilovits*, 2019 WL 7282026, at *9.

Turning to Deloitte's second challenge to class certification—that IBEW cannot prove reliance on a class-wide basis—the Court begins by setting out the elements of a securities fraud claim.  To prevail on a securities fraud claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5, a plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (internal quotations omitted).  Here, IBEW invokes a presumption of reliance on a class-wide basis through a theory of fraud on the market.

The fraud-on-the-market theory for litigating securities fraud cases was recognized in *Basic*, where the Supreme Court held that "a person who traded a corporation's shares on a securities exchange after the issuance of a materially misleading statement by the corporation may invoke a rebuttable presumption that, in trading, he relied on the integrity of the price set by the market."  485 U.S. at 226.  To invoke the fraud-on-the-market presumption of reliance, a plaintiff must prove "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed."  *Halliburton*, 573 U.S. at 268.  The presumption of reliance may be rebutted at the class certification stage if the defendant

shows "that the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock." *Id.* at 279–80. "To do this, [the defendant] must show by a preponderance of the evidence that the alleged misstatements caused *no* price impact whatsoever." *Cape Coral Mun. Firefighters' Ret. Plan*, 322 F. Supp. 3d at 687; *see Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 127 (2021) (holding that the defendant must prove a lack of price impact by a preponderance of the evidence).

Here, Deloitte does not argue that IBEW has not proven the elements required to invoke the *Basic* presumption. Instead, Deloitte argues that the presumption has been rebutted because there is considerable mismatch between Deloitte's alleged misstatements and the alleged corrective disclosures. [Doc. 189 at 28–32.] Deloitte's argument primarily rests on the assertion that none of the alleged corrective disclosures referenced Deloitte or its audit opinions. [*Id.* at 30–32.] Although Deloitte is correct that a price impact inference "starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure," *Goldman Sachs Grp.*, 594 U.S. at 123, the Court concludes that Deloitte has not met its burden of proving a lack of price impact by a preponderance of the evidence.

Courts addressing mismatch between misstatements and corrective disclosures have consistently held that *Goldman* does not require a "mirror image" disclosure and instead requires only that the misstatement and corrective disclosures be related or relevant to one another. *See, e.g.*, *Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, No. H-21-2045, 2023 WL 6300569, at *7, 10 (S.D. Tex. Sept. 27, 2023); *In re Mattel, Inc. Sec. Litig.*, No. 2:19-cv-10860-MCS-PLA, 2021 WL 4704578, at *5 (C.D. Cal. Oct. 6, 2021). Deloitte has not established that the alleged misstatements in its audit reports—

that SCANA's financial statements confirmed that the Nuclear Project was "expected to be operational and to qualify for the nuclear production tax credits" and were "present[ed] fairly, in all material respects" and "in conformity with accounting principles generally accepted in the United States"; that SCANA "maintained, in all material respects, effective internal control over financial reporting"; and that Deloitte had performed its audits in accordance with PCAOB Standards [Doc. 44 ¶¶ 8, 90–91, 191, 264–65, 442–44, 459–61]—are not related or relevant to the alleged corrective disclosures, which revealed that the Nuclear Project would not be completed on time or at all; that the costs of the Nuclear Project were significantly higher than projected; that SCANA knew of and actively misrepresented clear risks to regulators; and that the BLRA rate recovery was at risk [*id.* ¶¶ 14–15, 312–406, 476].  Thus, Deloitte has failed to rebut the *Basic* presumption of reliance, and the Court concludes that IBEW has satisfied the Rule 23(b)(3)'s predominance requirement.

<u>Statute of Repose</u>

Deloitte further argues that no class can be certified because the statute of repose has expired.  [Doc. 189 at 38–40.]  Private actions under Section 10(b) of the Exchange Act are subject to a five-year statute of repose.  28 U.S.C. § 1658(b)(2).  Deloitte contends that the last alleged false or misleading statement was made on February 24, 2017, the date the 2016 10-K was issued, and, thus, the statute of repose expired on February 24, 2022.  [*Id*.]  Deloitte contends that because "absent class members' claims are not 'brought' until class certification, those claims have been extinguished by the running of the statute of repose and, accordingly, the class may not be certified."  [*Id*.]

"[T]he filing of a timely class action complaint commences the action for all members of the class as subsequently determined." *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 550 (1974). Courts have rejected the argument that a class cannot be certified after the expiration of the statute of repose. *In re NIO, Inc. Sec. Litig.*, No. 19-CV-1424 (NGG) (JRC), 2023 WL 5048615, at *3–5 (E.D.N.Y. Aug. 8, 2023) (citing cases and concluding that a statute of repose did not bar class certification where the case was filed within the statute of repose and continued uninterrupted until the class certification motion). There is no dispute in this case that the original Complaint was filed within the statute of repose and has continued uninterrupted. Accordingly, class certification is not barred by the statute of repose.

### Appointment of Counsel

After certifying a class, a court must also appoint class counsel who will "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4). Courts must consider the following factors when appointing class counsel:

> (i) the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii) counsel's knowledge of the applicable law; and
>
> (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A). Courts may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

IBEW requests that the Court appoint the law firm Cohen Milstein, who represents that it is well qualified to represent the Class in this action, as Class Counsel. IBEW also seeks to have the Tinkler Law Firm appointed as Liaison Counsel. Deloitte does not challenge the appointment of Cohen Milstein as Lead Counsel or Tinkler Law Firm as Liaison Counsel. Accordingly, the Court appoints Cohen Milstein as Class Counsel and the Tinkler Law Firm as Liaison Counsel.

## **CONCLUSION**

Based on the above, IBEW's motion for class certification, appointment of class representative, and appointment of class counsel is GRANTED, and Deloitte's motion to exclude damages-related expert opinion of Dr. Matthew D. Cain is DENIED. IBEW is appointed as Class Representative, Cohen Milstein is appointed as Class Counsel, and the Tinkler Law Firm is appointed as Liaison Counsel.

IT IS SO ORDERED.

s/Jacquelyn D. Austin
United States District Judge

November 12, 2024
Columbia, South Carolina