## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 98 PENSION FUND on behalf of itself and all others similarly situated, | |
| Plaintiff, | Case No. 3:19-cv-3304 |
| vs. | |
| DELOITTE & TOUCHE, LLP and DELOITTE LLP, | |
| Defendants. | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ................................................................................... 10

I.      SCANA AND THE NUCLEAR PROJECT .................................................. 10

II.     SCANA'S 2015 AND 2016 FINANCIAL STATEMENTS ........................... 12

III.    DELOITTE'S AUDITS OF SCANA ............................................................ 15

LEGAL STANDARD ............................................................................................. 18

ARGUMENT .......................................................................................................... 18

I.      THE FINANCIAL STATEMENTS DELOITTE AUDITED WERE FAIRLY
      PRESENTED, SO THERE WAS NO MATERIALLY FALSE
      MISSTATEMENT BY DELOITTE .............................................................. 18

         A.     The Financial Statements Never Represented that a FRLIS Existed, and
                the Market Was Well Aware It Did Not Exist ...................................... 20

         B.     The Evidence Does Not Support Plaintiff's Contention that the Financial
                Statements Were False Due to the Supposed Impossibility of Completing
                the Project by WEC's Completion Dates .............................................. 22

         C.     Plaintiff Cannot Prove That Deloitte Had No Reasonable Basis for Its
                Audit Opinions .................................................................................... 27

II.     THERE IS NO EVIDENCE THAT DELOITTE ACTED WITH SCIENTER ............. 28

         A.     Plaintiff's Position that SCANA Management Committed No Fraud in
                SCANA's Financial Statements Dooms Its Case Against Deloitte ..................... 28

         B.     Under Any View of the Facts, Deloitte's Audits Cannot Be Considered
                "No Audit At All" ................................................................................ 29

              1. Deloitte's Audits .............................................................................. 30
              2. Deloitte Did Not Ignore Red Flags of Fraud ..................................... 34

III.    PLAINTIFF CANNOT ESTABLISH LOSS CAUSATION ........................... 39

         A.     Plaintiff Cannot Prove Loss Causation Because Its Expert Conceded
                That No Disclosure Corrected Deloitte's Audit Opinion ...................... 40

          B.     Plaintiff Cannot Prove Loss Causation Because There Was No
                "Correction" of SCANA's Audited Financial Statements ..................... 41

          C.     In Any Event, None of the Disclosures Is Corrective of the Purported
                Misstatements or Omissions ................................................................ 41

1. The WEC/Toshiba Events Are Not Corrective ................................................... 43

2. The Post-Abandonment Events Are Not Corrective ........................................ 45

CONCLUSION ............................................................................................................ 45

Defendants Deloitte & Touche LLP ("Deloitte") and Deloitte LLP (collectively, "Defendants"), by and through their undersigned counsel, submit this Memorandum of Law in Support of Defendants' Motion for Summary Judgment.[1]

## PRELIMINARY STATEMENT

Plaintiff survived a motion to dismiss and obtained class certification based on allegations that Deloitte, an independent audit firm, violated Securities Exchange Act Section 10(b) by fraudulently rendering false audit opinions on two sets of financial statements issued by its audit client, SCANA Corporation ("SCANA").[2] Plaintiff claimed that those financial statements failed to disclose construction challenges at the Virgil C. Summer nuclear expansion project (the "Nuclear Project" or "Project"). At the heart of Plaintiff's Complaint were allegations that SCANA received, and purposely ignored, reports regarding those construction challenges that were prepared by an outside contractor, Bechtel Power Corporation ("Bechtel")—and that Deloitte was in cahoots with SCANA management and purportedly received, reviewed, and ignored the Bechtel reports as it issued its audit opinions on SCANA's 2015 and 2016 financial statements.

Up until now, the Court has had to credit Plaintiff's mere allegations, assuming, for example, that "Deloitte knew about Bechtel's findings, and its auditors reviewed and analyzed Bechtel's reports as they were made." *See, e.g.*, Class Certification Order (ECF 241) at 5. But discovery exposed that these and other allegations were baseless. SOMF ¶ 46. As a result, Plaintiff

---

[1] All internal citations are omitted and all emphases are added, unless otherwise stated. Numbered exhibits cited herein ("Ex. [number]") refer to exhibits to Defendants' Statement of Material Facts ("SOMF"); "JF-Ex." citations herein refer to exhibits to the Joint Statement of Stipulated Material Facts ("JSOMF"); and lettered exhibits ("Ex. [letter]") refer to exhibits to the Declaration of Katrin Cassidy-Ginsberg in support of Defendants' Motion for Summary Judgment.

[2] For ease of exposition, references to SCANA herein refer to SCANA and/or its subsidiary South Carolina Electric & Gas Company ("SCE&G").

has been forced to abandon its Bechtel theory altogether, and has spent much of discovery trying to cobble together a new theory of liability under Section 10(b).

Plaintiff's efforts to come up with a new—and unpled—theory of liability have been truly stunning considering what Plaintiff promised the Court it would prove at class certification. Not only has Plaintiff abandoned its core theory regarding Bechtel, but in a desperate attempt to keep its case alive, Plaintiff has abandoned another core component of its Complaint. Instead of arguing that SCANA management committed a fraud in which Deloitte was somehow complicit, Plaintiff now seeks to make Deloitte **solely responsible** for the harm it allegedly suffered, taking the remarkable position that SCANA's financial statements—the very financial statements that were the subject of Deloitte's audits—were not themselves fraudulent at all. Indeed, Plaintiff has now averred in its interrogatory responses that it "does not allege that any statement and omission in the SCANA 10-Ks made by SCANA or its officers and directors was 'misleading in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.'" *See* Ex. A at 10. Plaintiff now urges that an independent auditor, Deloitte, is responsible for an alleged fraud concerning financial statements prepared by its client, SCANA, that Plaintiff itself says were not fraudulent to begin with.

Plaintiff's backtracking on this core issue is astonishing. If, as Plaintiff now urges, there was no fraud at **SCANA**, then Plaintiff's claim against **Deloitte** is baseless because, under binding Fourth Circuit precedent, Plaintiff's Section 10(b) claim against Deloitte cannot survive without a finding that **SCANA** itself committed securities fraud; that is, an auditor cannot be held liable for securities fraud **absent an underlying fraud in the financial statements it is auditing**. *Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 314 (4th Cir. 2009) (requiring a

showing that an auditor was "either knowingly complicit in the [company's] fraud, or so reckless in [its] duties as to be oblivious to malfeasance that was readily apparent").

Plaintiff nonetheless presses this fraud claim against Deloitte by contending that SCANA's financial statements were false in some respect, albeit without any fraud by SCANA itself. But the evidence has never supported Plaintiff's claim, requiring Plaintiff to continually redefine what that alleged falsehood is. Initially, Plaintiff misleadingly claimed—including to the Court in prior motions—that SCANA's financial statements assured investors that the Nuclear Project would be completed by the dates contractually committed to by the primary contractor building the Project, Westinghouse Energy Company ("Westinghouse" or "WEC"). But review of the relevant disclosures makes clear that the financial statements made no such guarantees.

Specifically, in SCANA's 2015 financial statements, SCANA explained that the Project had "continued to experience delays in the schedule" and that WEC had contractually committed itself—under penalty of hundreds of millions of dollars in liquidated damages—to revised "guaranteed substantial completion dates[3] [for] Units 2 and 3 [of] August 31, 2019 and 2020, respectively." JF-Ex. 9 at 78-79. At the same time, the financial statements expressly cautioned that WEC's dates might not be achieved—stating that WEC was "continu[ing] to refine and update" the schedule; "[a]dditional mitigation will be required . . . to support the updated substantial completion dates" (beyond the mitigation WEC had already planned); and "further delays in the schedule" could impact SCANA's ability to receive nuclear energy production tax credits ("PTCs"). JF-Ex. 9 at 79-81. SCANA's 2015 financial statements provided no assurances about completion of the Project by a date certain.

---

[3] The "guaranteed substantial completion dates" ("GSCDs") were defined in the contract governing the Project, reflecting the date on which *the contractors agreed* the Project would be completed.

The same is true of the 2016 financial statements, where SCANA reported WEC's latest "revised estimated completion dates . . . of April 2020 and December 2020." JF-Ex. 10 at 88. But in language that Plaintiff has tried to wish away by ignoring it, SCANA also cautioned that "***there is substantial uncertainty as to WEC's ability to meet these dates given its historical inability to achieve forecasted productivity and work force efficiency levels***," and that "***significant risks and uncertainties remain concerning WEC's ability to improve work force efficiency and productivity performance and to continue to fulfill its performance and financial commitments***." *Id.* at 88, 90. Faced with these cautionary disclosures, no investor could have understood SCANA to be making any representation that WEC's completion dates would be met.

As SCANA's 2015 and 2016 financial statements plainly make no guarantees as to the completion dates for the Project, Plaintiff shifted its approach yet again. Now, recognizing that SCANA clearly disclosed that the timing of the Project's completion was subject to "substantial uncertainty," Plaintiff claims the disclosures were false because SCANA should have disclosed instead that it was a ***certainty*** that WEC's dates would not be met at the time of issuance of SCANA's 2015 and 2016 10-Ks.

Unfortunately for Plaintiff, it once again can find no evidence to support its theory. Indeed, ***Plaintiff does not have a single witness who will support that position***. Among all of SCANA's employees, Plaintiff chose to depose the three who were most critical of the Project: Carlette Walker, Kenneth Browne, and Skip Smith.[4] But none of these witnesses—nor any other fact witness—support Plaintiff's position that the completion dates were impossible to meet. To the contrary, Walker, Browne, and Smith all undermined Plaintiff's theory. While all of them had

---

[4] Walker was referenced approximately 30 times in Plaintiff's complaint because she was skeptical about the Project and raised concerns in 2015 about SCANA's transparency with the regulator overseeing the Project, the South Carolina Public Service Commission ("PSC").

serious concerns about the status of the Project, **none** of them testified that it was certain that the Project would not be completed on schedule or in time to qualify for the PTCs. For example, Browne testified that there was "uncertainty" about whether "the [P]roject would be completed by the substantial completion deadlines"—a view that is completely consistent with the 2016 financial statement disclosures that Plaintiff urges were false.

Without a single fact witness to support its position that SCANA should have disclosed that it was **certain** that WEC would not meet its projected schedule, Plaintiff now seeks to build its case around its proffered construction expert, Alberto Ferrer. In support of Plaintiff's new theory, Ferrer urges that (1) no schedule other than a "fully resource-loaded integrated schedule" ("FRLIS") can reliably predict construction project completion dates; and (2) WEC's completion dates were not "realistic or achievable." But Ferrer conceded at his deposition that it was public knowledge—both from the financial statements themselves and from other publicly available information—that WEC did not have a FRLIS (and instead had an "integrated schedule" that was not "fully" loaded with resources, a difference that Ferrer quibbles with). Ferrer also admitted at deposition that SCANA's disclosures about the "substantial uncertainty" surrounding the completion dates were appropriate, testifying that SCANA's financial statement disclosures in 2016 about the "substantial uncertainty" surrounding the Project "sa[id] it very well"—an admission so bad for Plaintiff's case that Plaintiff's counsel violated the Local Civil Rules in an effort to undo it. *See* Ex. 42 at 383:2; ECF 249.

Even if Plaintiff could somehow avoid the Fourth Circuit's requirement that it prove securities fraud by SCANA **and** establish material falsity in SCANA's financial statements as a predicate for proving liability of the outside auditor (which it clearly cannot), Plaintiff still has no evidence to prove that Deloitte acted with scienter when it audited SCANA's financial statements.

Under controlling Fourth Circuit precedent, the standard for proving a Section 10(b) claim against an outside auditor is extremely high.  To prevail on such a claim, Plaintiff must have evidence to show that Deloitte had "been complicit in the fraud, or . . . so reckless in [its] duties that [its] audit 'amounted to no audit at all.'"  *Public Emps.'*, 551 F.3d at 314.

Plaintiff has not come anywhere close to meeting that that standard.  There is literally no evidence that any Deloitte employee knowingly engaged in any fraudulent conduct.  Even Plaintiff does not appear to be urging that theory.  And any effort to establish scienter through recklessness, whether through proof of "no audit at all" or ignoring so-called "red flags," is belied by the evidence.  The record overwhelmingly establishes that Deloitte did *extensive* work in auditing SCANA's financial statements and the accompanying disclosures, including the disclosures regarding the Project.  In each of the challenged audit years—2015 and 2016—it is undisputed that Deloitte spent over *ten thousand hours* performing the audits, and *hundreds of hours* on the Nuclear Project financial statement disclosures themselves, gathering evidence from numerous sources—including SCANA; SCANA's attorneys; WEC; the PSC, the primary regulator of the Project; and the South Carolina Office of Regulatory Staff ("ORS"), the entity responsible for overseeing the Project under State law.  Deloitte drafted detailed memoranda about the Nuclear Project disclosures and the evidence Deloitte obtained.  Deloitte's audit team also suggested that SCANA revise its disclosures to make them even more transparent about the risks to the Nuclear Project—many of which SCANA adopted and incorporated.  Further, Deloitte identified and tested at least 130 internal controls in each of the 2015 and 2016 SCANA audits, including controls related to the Project, such as SCANA's Disclosure Committee.  There is not a shred of evidence supporting the theory that Deloitte conducted "no audit at all."

Indeed, Plaintiff's own accounting/auditing expert, Lynn Turner, **admitted at his deposition that Plaintiff does not even come close to meeting the "no audit at all" standard articulated by the Fourth Circuit to establish scienter for an auditor**.  When asked if it was his opinion that Deloitte "did no audit at all", he expressly disagreed, saying, "**[t]hat would be incorrect to say I think**."  Ex. 34 at 250:2-251.

Nor can Plaintiff prove that Deloitte acted with scienter because it ignored purported "red flags"—*i.e.*, "indicators of **fraud** that would put an auditor on notice of illegal activity."  *Iowa Pub. Emp.'s Ret. Sys. v. Deloitte & Touche LLP*, 919 F. Supp. 2d 321, 331 (S.D.N.Y. 2013).  For starters, Plaintiff can hardly claim that Deloitte missed "red flags" about SCANA's supposed fraud when Plaintiff itself disavows that SCANA perpetrated any fraud with respect to its financial statements.  But even setting aside this glaring and dispositive problem, the only purported "red flag" indicative of potential fraud was a complaint made by Walker regarding the transparency of SCANA's reporting to the PSC (which was not audited by Deloitte).  But the record shows that Deloitte did not ignore Walker or her complaint.  Deloitte met with SCANA's management and Audit Committee to ensure that Walker's allegations had been raised to the highest level of SCANA (its Audit Committee) and appropriately investigated.  The senior-most audit team members then personally evaluated SCANA's investigation of Walker's allegations, which ultimately found them to be unsubstantiated.  While Plaintiff and its expert try to impugn the quality of Deloitte's work in this regard, the law is clear that proof of scienter under Section 10(b) requires much more than mere assertions that something ought to have been done differently or better.  *See Dannenberg v. Blitz* (*In re Software Toolworks Inc.*), 50 F.3d 615, 627 (9th Cir. 1994) ("Plaintiffs' contention . . . that Deloitte should have performed further inquiries and

investigations, arguing with the benefit of hindsight, does not establish that the [] audit was reckless.").

Finally, Plaintiff has no evidence to prove loss causation, another required element of a Section 10(b) claim. It is undisputed that the only "statements" Deloitte "made" for purposes of Section 10(b) are the audit opinions it issued concerning SCANA's 2015 and 2016 financial statements (and its related audit opinions on the same dates concerning SCANA's internal controls over financial reporting). *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011) ("To be liable" under Section 10(b), one "must have 'made' the material misstatements[.]"). And to hold an auditor liable, a plaintiff must demonstrate that "the market reacted negatively to some disclosure correcting the falsity in the . . . auditor's statements (and not simply the underlying fraud)." *Amorosa v. Ernst & Young LLP*, 682 F. Supp. 2d 351, 363 (S.D.N.Y. 2010). But here, ***Plaintiff's own expert conceded that none of the putative "corrective disclosures" revealed that Deloitte had signed a false audit opinion***. Ex. 53 at 278:12-279:2. Indeed, Deloitte's audit opinions have never been challenged outside of this litigation—even though the U.S. Attorney's Office and Securities Exchange Commission extensively examined SCANA's 2015 and 2016 financial statements. Plaintiff's expert's concession that none of the putative "corrective disclosures" revealed any falsity in Deloitte's audit opinions should also end this case.

Even if the Court were to take a broader view of the connection needed between a putative "corrective disclosure" and the original alleged misstatement, Plaintiff still fails because none of the purported "corrective disclosures" even ***reference*** SCANA's financial statements (let alone Deloitte's audit opinions thereon), and no market analysts interpreted them as correcting SCANA's financial statements—which have never been restated. For this reason, too, Plaintiff cannot establish loss causation. *See, e.g.*, *In re Witness Sys., Inc. Sec. Litig.*, 2008 WL 9020538, at *7-8

(N.D. Ga. Mar. 31, 2008) (disclosures that did not reference company's financial statements, "much less KPMG's audit reports on those financial statements," were not "curative disclosures with respect to KPMG's 2004 and 2005 audit reports for purposes of establishing loss causation").

And even if one were to accept Plaintiff's expert's theories about what SCANA's financial statements purportedly "hid"—the lack of a FRLIS, and that completion of the Project by WEC's completion dates and in time to obtain the PTCs was not "realistic" or "achievable"—at least eighteen of the nineteen putative "corrective" disclosures were not "corrective" of these matters at all. Rather, with one possible exception,[5] which itself is only arguable, all of Plaintiff's claimed "corrective" disclosures related to (1) the financial troubles and eventual bankruptcy of WEC, the contractor that was doing the job at a fixed price (six disclosures resulting in stock declines of $8.61 per share—23% of Plaintiff's total "artificial inflation"); and (2) the regulatory fallout ***after*** SCANA abandoned the Project once WEC went bankrupt (twelve disclosures resulting in stock declines of $22.68 per share—64% of Plaintiff's total "artificial inflation"). ***None*** of these eighteen "corrective" disclosures driving 87% of Plaintiff's claimed damages corrected the claimed misrepresentations in SCANA's financial statements. *See, e.g.*, *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011) (corrective disclosures must "*relate back to the misrepresentation* and not to some other negative information about the company") (emphasis in original).

---

[5] The other disclosure Cain identifies relates to an announcement made by SCANA five months after Deloitte's last relevant audit opinion, four months after WEC's bankruptcy, and one business day before SCANA abandoned the Project. SCANA announced that it had reassessed the likely costs and schedule following the bankruptcy of its contractor that had agreed to complete the Project at a fixed price, and based on that analysis, it came to the conclusion that the previously estimated cost and schedule estimates now would not be met.

At bottom, after years of discovery and every opportunity to substantiate a claim, Plaintiff has **no evidence** to prove at least three key elements of its securities fraud claim under Section 10(b).  Accordingly, judgment should be entered for Deloitte and the case should be dismissed.

## FACTUAL BACKGROUND

### I.    SCANA AND THE NUCLEAR PROJECT

SCANA was a publicly traded South Carolina power company during the Relevant Period.[6] *See* JF-Ex. 9 at 5.  In 2008, SCANA, through its wholly owned subsidiary SCE&G, partnered with the state-owned utility the South Carolina Public Service Authority ("Santee Cooper"; together, the "Owners"), to build two new nuclear reactor units at the V.C. Summer site in South Carolina. JSOMF ¶ 1.  The Owners entered into an Engineering, Procurement, and Construction contract ("EPC Contract") with WEC and Stone & Webster, Inc. (collectively, the "Consortium") for the design and construction of the Project.  *Id.*

The Owners pursued the construction of the Nuclear Project in a regulatory environment designed to encourage the development of nuclear power plants, including the federal government's offer of production tax credits—PTCs—if the new units were brought online by a particular date.[7]  During the Relevant Period, that date was January 1, 2021, although there were ongoing efforts to extend that deadline, and it was ultimately extended in 2018 to remove any date restriction.  SOMF ¶ 4.  SCANA had agreed to pass on any PTCs it recovered to its *customers*, such that SCANA *shareholders* (like Plaintiff) would not have received the value of the PTCs even if SCANA obtained them.  *Id.* ¶ 5.

---

[6] The "Relevant Period" is the period from January 1, 2015, the start date of the year-end audit in connection with SCANA's fiscal year ended December 31, 2015, to December 20, 2017.
[7] *See* SOMF ¶¶ 2-3; Ex. B at CRS 3-4; *see also* Ex. 3 ¶¶ 67, 71.

SCANA's involvement with the Nuclear Project was overseen and regulated by South Carolina authorities pursuant to the Base Load Review Act ("BLRA"), which was enacted in 2007 to, among other things, incentivize new nuclear development in South Carolina. *Id.* ¶ 2. The BLRA framework included pre-construction "prudence reviews" by the PSC (South Carolina's public utilities regulator), pursuant to which construction costs could be deemed prudent ***before*** they were incurred and therefore subject to recovery from utility customers' rates. *Id.* ¶ 6.

The BLRA charged the ORS, the statutory body responsible for overseeing the Nuclear Project, with conducting "on-going monitoring of the construction of the plant and the expenditure of capital," *id.* ¶ 7—a task that Plaintiff's expert described as "see[ing] that the work in the Nuclear Project . . . met the cost and schedule goals . . . approved by the PSC." Ex. 7 ¶ 81. The BLRA also gave the ORS "full audit rights" to "review the reasonableness and necessity of all costs to be recovered[.]" SOMF ¶ 7. The ORS would, *inter alia*, review capital cost expenditures, perform on-site observations of construction progress, examine construction documents, and hold regular meetings with the owners and builders of the plant. *Id.* ¶ 8. ORS also developed a tracking mechanism to monitor schedule slippage and detailed the results of its construction and schedule monitoring in publicly available reports. *Id.* ¶ 9.

Pursuant to the BLRA's prudence review process, in addition to obtaining pre-approval for cost recovery, the Nuclear Project's Owners could submit petitions to modify the construction schedule and cost estimates previously deemed prudent by the PSC. *Id.* ¶ 6. The ORS would participate in the PSC's prudence review proceedings, and in that context, bring its expertise as auditor of the Project to bear.[8] The BLRA also required the PSC to set a contingency period for the Project construction deadlines to "reflect the fact that there are inevitable risks and uncertainties

---

[8] *See* SOMF ¶ 10; Ex. 5 § 58-33-230(F); Ex 49 at 10-12.

surrounding a construction project as complex as that envisioned here." SOMF ¶ 6. The PSC set the contingency period at 18 months. *Id.*

From the start of construction, the Nuclear Project suffered from cost overruns and delays that were the subject of extensive public disclosure and discourse. *Id.* ¶¶ 11, 14.[9] During the life of the Project, the Owners publicly filed five petitions with the PSC seeking approval for increased costs and updates to the construction schedule, and nine petitions seeking revised rates to recoup costs incurred. JSOMF ¶ 2. Despite the frequency of SCANA's requests, the PSC uniformly approved each of SCANA's petitions before and during the Relevant Period. *See id.*

## II.     SCANA'S 2015 AND 2016 FINANCIAL STATEMENTS

As a public company, SCANA filed Form 10-Ks annually with the U.S. Securities and Exchange Commission ("SEC"), which are intended to provide a comprehensive overview of the company's operations, risk factors, and financial results.[10] A 10-K has two primary components: (1) narratives in which management discusses the company's performance and activities; and (2) the audited financial statements— including the balance sheet, income statement, cash flow statement, and accompanying footnote disclosures.[11] As SCANA's outside auditor, the only part of the Form 10-Ks on which Deloitte expressed any opinion was SCANA's financial statements. SOMF ¶ 15. Deloitte did not, and had no duty to, express an opinion about management's narratives in the 10-K or about financial statements appearing elsewhere, such as in SCANA's 10-Q quarterly reports. *See id.* ¶¶ 15, 18.

Neither Plaintiff nor its accounting/auditing expert disputes a single number or balance in SCANA's 2015 or 2016 financial statements audited by Deloitte. *Id.* ¶ 20. Instead, Plaintiff takes

---

[9] Ex. 22 at 81; Ex. 23 at 80; Exs. 36-37; Ex. 54 at 21-22; Exs. 55-57; Ex. 59 at 28-29; Ex. 60 at 7; Ex. 61.
[10] Ex. C at 1.
[11] *See* Ex. D at 3, 6.

issue only with certain non-numerical disclosures in a single footnote (Footnote 10) to SCANA's 2015 and 2016 financial statements regarding the Project. *Id.* ¶ 20. As explained below, these disclosures contained clear, factually accurate, and cautionary statements regarding the status of the Project.

SCANA had contracted with a Consortium led by WEC that was responsible for building the Nuclear Project. *Id.* ¶ 1. WEC had ultimate responsibility over, and control of, the schedule for the Project. *Id.* SCANA's 2015 financial statements disclosed that "the Consortium has continued to experience delays in the schedule" and that "[a]dditional mitigation will be required … to support the updated substantial completion dates." *Id.* ¶ 22. SCANA also reported that pursuant to the October 2015 contract amendment between the Owners and WEC (the "<u>EPC Amendment</u>"), WEC had agreed to several key provisions designed to mitigate cost and schedule risk—including liquidated damages if WEC did not timely deliver the Project—as well as new, delayed completion dates of August 31, 2019 for Unit 2 and August 31, 2020 for Unit 3. *Id.* ¶ 12; JF-Ex. 9 at 79.

SCANA's financial statements went on to explain that WEC's contractually-guaranteed completion dates were before the (then-existing and later-extended) January 1, 2021 deadline to receive the PTCs, but cautioned that there was a risk that the PTCs would not be achieved due to "further delays in the schedule" or changes in tax law.[12] With respect to WEC's schedule, the financial statements disclosed that it was fluid, and a work-in-progress: the Consortium was "continu[ing] to refine and update the Revised, Fully-Integrated Construction Schedule as designs are finalized, as construction progresses, and as additional information is received." JF-Ex. 9 at 79. The 2015 financial statements did not represent that the disclosed completion dates would be

---

[12] *See* SOMF ¶ 22; JF-Ex. 9 at 80-81.

achieved, or that WEC had a FRLIS, which Ferrer insists is necessary to reliably estimate projected completion dates. SOMF ¶ 24. And Ferrer himself testified it was clear to him upon reading the phrase "Revised, Fully-Integrated Construction Schedule" in SCANA's 2015 financial statements that SCANA was not suggesting that WEC had a *fully resource-loaded* integrated construction schedule. Ex. 42 at 369:6-12.

SCANA's 2016 financial statements contained even more cautionary disclosures about the Project. They disclosed the most recent contractual completion dates committed to by WEC, which had been approved by the PSC, and even further delayed projected completion dates that WEC had provided SCANA days before the 10-K was filed, of April 2020 and December 2020. *See* SOMF ¶¶ 23, 65. But SCANA cautioned that there had been perennial delays on the project and that there was "***substantial uncertainty as to WEC's ability to meet these dates given its historical inability to achieve forecasted productivity and work force efficiency levels***." *Id.* ¶ 23. The 2016 financial statements further warned that "***significant risks and uncertainties remain concerning WEC's ability to improve work force efficiency and productivity performance*** and to continue to fulfill its performance and financial commitments[.]" *Id.* The 2016 financial statements never represented that the PSC-approved contractual completion dates or WEC's revised estimated completion dates would be achieved, or that WEC had a FRLIS. *Id.* ¶ 24.

SCANA's 2015 and 2016 financial statements have never been restated—even after they were subject to review by multiple regulators. JSOMF ¶ 3; ECF 189 (Defs.' Opp. to Mot. For Class Cert.) at 2. And even today, Plaintiff does not contend that any of the balances in the financial statements were misstated, or that anything outside of Footnote 10 was incorrect. SOMF ¶ 20. Moreover, as a result of its evolving efforts to identify a viable theory of the case, Plaintiff does not even contend that SCANA or its officers or directors committed securities fraud in

connection with SCANA's 2015 or 2016 10-K filings that contained the financial statements Deloitte audited. *Id.* ¶ 19.

### III.     DELOITTE'S AUDITS OF SCANA

Before and during the Relevant Period, Deloitte served as SCANA's outside financial statement auditor, performing "integrated audits" of SCANA's year-end financial statements and internal controls over financial reporting ("ICFR").  SOMF ¶ 15.  Deloitte's audits were governed by professional standards promulgated by the Public Company Accounting Oversight Board ("PCAOB"), which regulates auditors of public companies in the United States. *Id.*  PCAOB standards recognize that it is the responsibility of company management—not the auditor—to prepare a company's financial statements and implement ICFR. *Id.* ¶ 18.  Under PCAOB standards, the role of a financial statement auditor is to "express an opinion on the fairness" of the company's financial statements and the "effectiveness" of ICFR. *Id.* ¶ 15.  PCAOB standards dictate that "[t]he auditor must plan and perform the audit to obtain sufficient appropriate audit evidence to provide a reasonable basis for his or her opinion."[13]  That evidence must provide "reasonable"—not absolute—"assurance about whether the financial statements are free of material misstatement due to error or fraud."[14]

Deloitte's audit team was comprised of experienced auditors, many of whom had substantial experience in the power and utilities industries. *See* SOMF ¶ 29.  The lead partner, Eileen Little, had over 20 years of audit experience, and Tarah Schulz, who worked directly under

---

[13] Ex. E at .04; Ex. F at .04; Ex. G at .03; Ex. H at .03; *see also* SOMF ¶ 18.
[14] Ex. G at .03; Ex. H at .03; Ex. I at .12;  Ex. J at .12.

Little in the Relevant Period and is now partner at Deloitte Canada, had over 10 years of audit experience; both had significant experience within the power and utilities industries.[15]

The audit team recorded over **10,000 hours** of work on each of the 2015 and 2016 SCANA audits. SOMF ¶ 32. The audit team planned and performed the audits by identifying risks of material misstatement and designing responsive procedures to address those risks, among other things. *See id.* ¶¶ 33-35, 38. The team also obtained and reviewed audit evidence for consistency with the financial statement disclosures and tested the disclosures.[16] The audit team's work and audit procedures, as well as the audit evidence obtained, was documented in hundreds of "audit workpapers." *See* SOMF ¶ 30.

Deloitte performed extensive procedures with respect to the financial statements as a whole and with respect to the Nuclear Project disclosures specifically—much more than "no audit at all." *See id.* ¶¶ 33-35. Plaintiff's own accounting/auditing expert, Mr. Turner, expressly conceded as much when he testified that it would be "***incorrect to say" that Deloitte did "no audit at all" with respect to the Nuclear Project disclosures***. *Id.* ¶ 35. Indeed, although Deloitte's responsibility was to obtain "reasonable assurance" as to SCANA's presentation of the financial statements taken as a whole, Deloitte planned and performed numerous audit procedures to test SCANA's disclosures about the Nuclear Project and test SCANA's related internal controls over financial

---

[15] SOMF ¶ 29; Ex. 65 at 5848 (explaining that Little was in year four of her association with the SCANA engagement team); Ex. 66 at 0432; Ex. 67 at 3834 (specialized in utility industry for over 20 years [prior to the 2015 audit]); Ex. 69 at 15:20-24 (explaining that she had been on the SCANA audit team since 2009), 19:1-20:13 (describing her audits of other public utility companies).

[16] *See* SOMF ¶ 31; Ex. 69 at 294:4-295:10 ("You start with what balance is, what disclosures are relevant to your audit. Then you determine a risk for each of those balances and disclosures you've determined is relevant to the audit, and then you respond and develop procedures specific to each of those risks, so it's just responsive to the risk . . . such that you can ultimately form an opinion that says, We have reasonable assurance that the financial statements are free of material misstatement. . . . Each team was using their professional judgment to develop procedures [responsive] to the risks and the facts in question.").

reporting, including SCANA's Disclosure Committee control, in which SCANA personnel from across the organization with information relevant to the Nuclear Project (among other areas of disclosure) commented on SCANA's draft financial statement disclosures to promote their accuracy and transparency.[17]  Plaintiff's own accounting/auditing expert expressly acknowledged that Deloitte performed this planning, risk assessment, and testing work.[18]

Notably, Deloitte obtained and reviewed audit evidence from many sources, including third-party confirmations from WEC regarding WEC's intent to perform under the EPC Contract and milestone schedule dates; third-party confirmations from SCANA's outside counsel regarding outstanding contingencies associated with the Project; ORS reports on the Project's status; minutes/materials from SCANA's meetings with the Consortium; and information obtained through regular meetings with SCANA management and Project employees. *See* SOMF ¶ 33. Deloitte also obtained and evaluated updates from SCANA personnel regarding SCANA's investigation of Carlette Walker's "whistleblower" allegations.[19]  In response to those allegations, Deloitte took steps to assess SCANA's investigation and expanded its audit procedures in response to Ms. Walker's concerns.  *See* SOMF ¶¶ 41-42.

Based on its auditing work, Deloitte issued unqualified audit opinions regarding SCANA's and SCE&G's financial statements and ICFR for fiscal years 2015 and 2016, respectively. *Id.* ¶ 45.   Deloitte opined that, based on the audit procedures it performed, it believed that SCANA's and SCE&G's financial statements for the fiscal years ended December 31, 2015 and

---

[17] *See* SOMF ¶¶ 31, 33-34; Ex. 96; Ex. 124.  In total, the audit team tested the operating efficiency of over 130 controls in each of the 2015 and 2016 audit years through interviews and control walk-throughs.

[18] Ex. 34 at 250:8-25 ("They did their planning . . .  They did their risk assessment.  They looked at [audit evidence] . . . . So did they do audit work?  Yeah.  They did.").

[19] *See* SOMF ¶¶ 41; Ex. 94 at 7953-54, 7956.

December 31, 2016 "present fairly, in all material respects, the financial position of the Company . . . and the results of its operations and cash flows" in accordance with Generally Accepted Accounting Principles ("GAAP"). *Id.* Deloitte's audit opinions are the only statements Deloitte made that are relevant to this litigation. Those audit opinions have not been challenged in any other forum, whether by any regulator or in a private civil action. ECF 189 (Defs.' Opp. to Mot. For Class Cert.) at 2.

## LEGAL STANDARD

Summary judgment is appropriate against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To prevail under Section 10(b), Plaintiff must establish, among other things, (i) a materially false or misleading statement, (ii) made with scienter, (iii) that caused the class's alleged losses. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Plaintiff's inability to prove any one of these elements entitles Deloitte to judgment as a matter of law. *See Celotex*, 477 U.S. at 323. Here, summary judgment should be entered in Deloitte's favor because there is no triable issue of fact on any of them.

## ARGUMENT

## I.    THE FINANCIAL STATEMENTS DELOITTE AUDITED WERE FAIRLY PRESENTED, SO THERE WAS NO MATERIALLY FALSE MISSTATEMENT BY DELOITTE

Plaintiff must prove there was a materially false statement in SCANA's financial statements to succeed on its claim. "Without a materially false statement in the company's financial statements, the quality of the audit performed by [an outside auditor] is immaterial. . . . If the financial statements accurately disclose the financial condition when measured against GAAP, then the investing public has received all that it is entitled to receive from the auditor

certifying its audit of those financial statements." *Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 454 (S.D.N.Y. 2008).[20]

To date, Plaintiff has represented to the Court that it will prove that SCANA's financial statements "***represented that the [Project] unit[s] <u>would be</u> operational*** and qualify for the nuclear production tax credits" by a date certain. ECF 185-1 (Mot. for Class Cert.) at 31. And up until now, the Court has had to credit these allegations. But, as explained above, SCANA's financial statements never made any such guarantee. To the contrary, both SCANA's 2015 and 2016 financial statements disclosed factual information regarding the status of the Nuclear Project and repeatedly warned investors about the risks, uncertainties, and challenges facing the Project. Disclosing "substantial uncertainty" about whether something gets done on time is anything but a representation that it "would be" done on time.

Unable to prove its theory that SCANA guaranteed completion of the Project by a date certain, Plaintiff has pivoted to a new theory of why SCANA's financial statements were false or misleading. Plaintiff's new post-fact discovery theory of the case, articulated by Plaintiff's accounting/auditing expert Lynn Turner, is based on opinions offered by Plaintiff's proffered construction expert, Ferrer.[21] This new theory is that SCANA's financial statements were not fairly presented because they did not disclose that: (1) "no reliable, fully resource loaded integrated construction schedule [FRLIS] existed," (2) the contractual GSCDs and other projected completion dates provided to the company by WEC "were not supported or documented by a [FRLIS]," and that (3) "completion of the Nuclear Project by the disclosed GSCDs, and in time to

---

[20] *See also Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 924, 927-28 (N.D. Cal. 2015) (same); *In re Colonial Bancgroup, Inc. Sec. Litig.*, 9 F. Supp. 3d 1258, 1266-67 (M.D. Ala. 2014) (same); *In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395, 413 (S.D.N.Y. 2013) (same); *In re Ramp Corp. Sec. Litig.*, 2006 WL 2037913, at *8 (S.D.N.Y. July 21, 2006) (same).
[21] Ex. 34 at 135:13-138:4 (confirming reliance on Ferrer for these opinions).

earn the [PTCs], was not realistic or achievable." Ex. 3 ¶¶ 29, 286, 807. Turner testified that SCANA's financial statements would have been fairly presented if they made these three statements, Ex. 34 at 154:25-156:7—which really boil down to two: there was no FRLIS (Turner Items #1 and #2), and WEC's schedule was not "realistic or achievable" (Turner Item #3), *id.* at 154:25-156:7. But as explained further below, Turner's purported misstatements were not misstatements at all because, as the record makes clear, the market knew full well that WEC did not have a FRLIS and the financial statements did not say otherwise, and it would have been incorrect, based on the evidence available at the time, for SCANA to disclose with certainty that the Project was "not going to get done" by WEC's completion dates, as Turner claims was required. *Id.* at 163:4-8.

Plaintiff's argument that the financial statements were not fairly presented ignores the facts and piles one flawed expert opinion on top of another. It rests, at bottom, on the specious opinions of Plaintiff's proffered construction expert, Ferrer, that without a FRLIS, there could be no sound basis for projecting completion dates for a construction project and that WEC's Project completion dates were not "realistic or achievable." For reasons set forth in Deloitte's *Daubert* motion, that opinion is entirely unsupported (and even contradicted by Ferrer himself) and should be excluded. Without it, Plaintiff's case collapses completely. But even if Ferrer's opinions—and Turner's opinions based on them—are not excluded, Plaintiff cannot prove falsity in SCANA's financial statements.

### A.     The Financial Statements Never Represented that a FRLIS Existed, and the Market Was Well Aware It Did Not Exist

Even if Ferrer were correct, Plaintiff still cannot identify any misrepresentation in the financial statements regarding the existence of a FRLIS. That is because SCANA's financial statements never represented that such a schedule existed. SCANA's 2015 financial statements

20

referred only to a "revised, Fully-Integrated Construction Schedule," which was described as a work-in-progress that the Consortium was "continu[ing] to refine and update."[22] Likewise, SCANA's 2016 financial statements disclosed that Fluor, WEC's subcontractor, had "assisted in the development of an updated integrated project schedule," with no indication that the schedule was resource-loaded or complete. JF-Ex. 10 at 88. An "integrated schedule" is different than a "fully resource-loaded integrated schedule" (FRLIS) and Ferrer himself agreed that anyone with construction expertise who read SCANA's financial statements would have understood based on those disclosures that no FRLIS existed. Ex. 42 at 373:4-22. Moreover, Plaintiff's damages expert, Matthew Cain, agreed that sophisticated market participants like those who traded SCANA stock would utilize subject matter experts (like Ferrer purports to be) in making investment decisions. Ex. 53 at 309:14-310:10. Thus, by Plaintiff's experts' own admissions, the market understood from the financial statements themselves that there was no FRLIS.

Furthermore, the market was well aware from numerous other public statements that WEC did not have a FRLIS. Indeed, by no later than September 1, 2016, the lack of a FRLIS was (i) discussed in PSC filings and testimony, including by the ORS, and (ii) reported in the news. SOMF ¶ 25. For example, an ORS witness testified on September 1, 2016 that a "fully resource-loaded construction schedule [was] still outstanding." Ex. 49 at 10; *see also* Ex. 6 at 9 ("Prior to the completion and approval of the fully resource loaded integrated schedule . . . ."). Therefore, by September 1, 2016 at the latest—before any of the alleged "corrective disclosures"—investors were affirmatively apprised that such a schedule did not exist. *Id.* ¶¶ 25, 55.

Put simply, Plaintiff cannot claim a material omission in SCANA's financial statements concerning the existence of a FRLIS when the market clearly was told, and knew full well, there

---

[22] JF-Ex. 9 at 79.

was no FRLIS. *See, e.g.*, *Longman v. Food Lion, Inc.*, 197 F.3d 675, 684 (4th Cir. 1999) (affirming summary judgment because, despite a misrepresentation, the nature of defendant's misconduct was "well known to the market" before the misrepresentation, and "therefore [defendant's] omissions were not material"); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) ("Where allegedly undisclosed material information is in fact readily accessible in the public domain, . . . a defendant may not be held liable for failing to disclose this information."); *Diabat v. Credit Suisse Grp. AG,* 2024 WL 4252502, at *39 (S.D.N.Y. Sept. 19, 2024) (holding that the defendant could not be liable for a failure to disclose information that had already been discussed in the press and was known to the market).[23] Given the public disclosures of the absence of a FRLIS, together with Ferrer's concession that the financial statements could not have been read to imply the existence of a FRLIS, there is simply no basis in the record for a claim of falsity based on the absence of a FRLIS.

B.    **The Evidence Does Not Support Plaintiff's Contention that the Financial Statements Were False Due to the Supposed Impossibility of Completing the Project by WEC's Completion Dates**

Building off of Ferrer's flawed opinions, Turner urges that SCANA's financial statements were materially misstated because they did not state that "completion of the Nuclear Project by the disclosed GSCDs, and in time to earn the [PTCs], was not realistic or achievable." Ex. 3 ¶ 29(c). In turn, Cain's loss causation and damages methodology is explicitly based on the assumption that Plaintiff can prove SCANA and Deloitte knew ***as of the date of the 2015 10-K*** "that [the Project] would not be in service by the GSCDs, that SCANA would not meet the deadline

---

[23] This deficiency in Plaintiff's case undermines not only falsity but also loss causation. *See Katyle*, 637 F.3d at 462 (rejecting allegations of securities fraud where "[t]he alleged [corrective] disclosures told the market nothing factually . . . that it had not already heard, repeatedly"); *Dalberth v. Xerox Corp.*, 766 F.3d 172, 186-87 (2d Cir. 2014) (holding that plaintiff failed to prove loss causation at the summary judgment stage when all alleged "corrective" disclosures did not introduce material information not already known to the market).

to receive credits pursuant to the Nuclear Tax Credits, and that SCANA would be unable to recoup losses from the Nuclear Project through the BLRA." Ex. 38 ¶ 150.  But **Plaintiff does not have a single fact witness supporting any of these propositions.**

Plaintiff elected to depose only three former SCANA employees, all of whom had been critical, during their tenure at SCANA, of WEC and its progress on the Project.  *See* SOMF ¶ 28. But none of those employees believed that meeting the schedule was impossible.  *See id.*  Instead, each believed that timely completion of the Project was uncertain and agreed that SCANA's disclosure of "substantial uncertainty" was fair and accurate.  For example, Carlette Walker—who Plaintiff undoubtedly expected to be its star witness in this litigation given that it referred to Walker approximately thirty times in its Complaint—testified that "nobody could" be sure whether the Project would succeed—and expressly agreed that there was "substantial uncertainty" about whether the Project would get done.  Ex. 43 at 346:9-19 ("Q. So in your view, there was substantial uncertainty about whether it would get done? . . . A. Yes.").

The other two SCANA witnesses agreed with this view.  Indeed, one of Plaintiff's would-be key witnesses, SCANA's Business Manager for the Nuclear Project team, Skip Smith, expressly agreed that "based on the information that [SCANA] had available, based on what the [C]onsortium was providing us . . . *it wasn't impossible" for WEC to achieve its planned completion dates and for SCANA to obtain the PTCs*.  Ex. 29 at 241:18-24; *see also* Ex. 30 at 248:1-6 ("Q. Do you think it would be fair to say that there was uncertainty that the project would be completed by the substantial completion deadlines? A. Uncertainty, that's a good way of putting it, yes."); Ex. 29 at 240:21-242:6 ("Q. It says both new units are expected to be operational and to qualify for the nuclear production tax credits; however, further delays in the schedule or changes in tax law could impact such conclusions.  […] A. […] I'm okay with that wording based on the

information we had at the time and based on the contract conditions that we were under due to the EPC contract revision."). Thus, Smith and Browne agreed that SCANA's disclosure as to "substantial uncertainty" reflected their own beliefs as to the possibility of completing the Project in accordance with the schedule.

In addition to the testimony of these three SCANA witnesses, the former chair of the Audit Committee of SCANA's Board of Directors and SCANA's former Director of Accounting and Financial Reporting have signed declarations, and would testify at trial, to the effect that the Nuclear Project-related disclosures in SCANA's 2015 and 2016 10-Ks "fairly and accurately represented" SCANA's understanding of the status of the Project based on the information known to SCANA at the time. SOMF ¶ 26.[24] Similarly, members of WEC leadership would testify at trial that, despite ongoing delays to the schedule during the Relevant Period, the Consortium adopted mitigation strategies it believed to be sufficient to meet the revised GSCDs, and that WEC "would not have entered into the EPC Amendment if it did not believe that that it would be able to meet the revised GSCDs." SOMF ¶ 27; Ex. 26 ¶ 29.

Moreover, WEC—an independent third party and internationally known contractor—was ultimately in control of the schedule for the Project. SOMF ¶ 1. SCANA could not have been expected to make declaratory statements about whether it was "certain" that the Project schedule could or could not be met when the contractor itself was affirmatively representing that it would be met, when WEC was actively taking steps to meet those dates, and when the CEO of WEC

---

[24] Ex. 24 ¶¶ 33, 40; Ex. 25 ¶ 21 ("Based on information available to me I understood generally at the time of the disclosures in the 2015 10-K that the NND project [*i.e.*, the Project] was experiencing delays, and that mitigation efforts were necessary to complete the NND project in a timely manner, ***consistent with the disclosures in footnote 10 to the Financial Statements in SCANA's 2015 10-K***."), ¶ 22 (similar), ¶ 35 (similar).

personally committed to SCANA that WEC would do everything in its power to achieve the revised completion dates agreed to under the EPC amendment. *See* Ex. 9 at 7365.

Neither SCANA nor Deloitte was required to disregard the views of the people most knowledgeable about the Nuclear Project. *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2024 WL 4711185, at *16 (S.D.N.Y. Nov. 7, 2024) (defendant was "not required to credit the views of the less optimistic" timetable for construction where the most optimistic timetable was consistent with the projections of those "with the greatest responsibility for the project"). Nor was SCANA required to reflect the worst-case-scenario in its financial statements or to assume that the Consortium's mitigation efforts would not work. *See id.* ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.").

Given the uniform views expressed by these witnesses and other contemporaneous evidence,[25] it would have been wrong and inappropriate for SCANA to disclose that it was a ***certainty*** that the completion dates would not be met (and particularly inappropriate for Deloitte, as SCANA's external auditor, to insist that SCANA make such disclosures). By contrast, Plaintiff has no fact witness—***not a single one***—who will support its claim that meeting the schedule was impossible, or that SCANA's statement of "substantial uncertainty" was materially misleading. SOMF ¶ 28.

---

[25] Including, among other things, WEC agreeing to be subject to hundreds of millions of dollars in liquidated damages if it did not meet the GSCDs, WEC's affirmative representation that the schedule would be met, evidence that WEC was actively taking steps to meet those dates, and WEC's CEO's personal commitment to SCANA that WEC would do everything in its power to achieve the revised GSCDs agreed to under the EPC amendment. *See* Ex. 9 at 7365.

In a last-ditch effort to survive summary judgment and save its case, Plaintiff now seeks to offer evidence of such impossibility through its expert witness, Ferrer, who would testify (with the benefit of hindsight) that it was impossible to achieve the Project completion dates based upon his own purported review of the "current project status, productivity, to-go commodity quantities, and installation rates." *See* Ex. 7 ¶ 254. But Ferrer's opinions are totally unsupported. When asked to provide the basis for his opinion, Ferrer could offer no explanation, other than to say that it was a "***back-of-the-envelope***" calculation that was "***purely a judgment*** based on [] experience" and could not be replicated.[26]

In any event, SCANA's financial statements accurately and transparently disclosed the status of the Project. SCANA did not say that WEC's GSCDs were "realistic or achievable" but rather cautioned expressly that there was "substantial uncertainty" as to whether the revised (and further delayed) completion dates could be met in light of WEC's historical performance issues. *See* SOMF ¶¶ 22-24. That is not even a GAAP violation—let alone a fraud. As six fact witnesses have made clear, SCANA's disclosures were consistent with the contemporaneous views of its own personnel and those of WEC, as the builder of the Project.

Notably, even if Ferrer had been consulted by SCANA or Deloitte at the time and provided the same "back-of-the-envelope" views he provides in his report, that would not have required a

---

[26] Ex. 42 at 343:18-24 ("Q. But I'm asking is there a paper or document where you sat down and calculated out 27 to 37 months, or is this another pure judgment? A. It may have been a back-of-the-envelope calculation that I don't have here available with me."), 346:21-347:3, 351:17-352:19; *see also* Defendants' Motion to Exclude Opinions of Alberto Ferrer and Derivative Opinions of Lynn Turner, filed herewith, at 14-18. Further, Ferrer conceded that he did not take into account mitigation efforts that were being undertaken by WEC because he did not even know that such efforts were underway. *Compare* Ex. 42 at 307:6-13 (testifying that "[t]here were no clear mitigation efforts [by WEC] identified in the various reports that were viewed") *with, e.g.,* Ex. 86 at 3807 ("WEC/CB&I and NNI have developed a mitigation strategy to increase the rate of Shield Building panel production by increasing the fabrication capabilities at the NND site."); *see also* SOMF ¶ 13.

different disclosure because he would have been just one voice of many, and his views are not inconsistent with the "substantial uncertainty" disclosure, as he made clear in his deposition.[27]  As the Supreme Court has recognized, GAAP leaves room for management to choose between a range of reasonable accounting choices—it does not prescribe particular words that management must use.  *See Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544 (1979) ("[GAAP] are far from . . . a canonical set of rules that will ensure identical accounting treatment of identical transactions. [GAAP], rather, tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management."); *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1229 (S.D.N.Y. 1992) (where a "calculation  . . . require[d] a subjective analysis of various factors" and therefore was "clearly an area in which reasonable accountants could differ, [] such reasonable disagreements cannot support an inference of recklessness or fraud").

### C.     Plaintiff Cannot Prove That Deloitte Had No Reasonable Basis for Its Audit Opinions

As explained earlier, the only statements made by Deloitte at issue in this litigation are its audit *opinions* regarding SCANA's 2015 and 2016 financial statements (and its related opinions on SCANA's internal controls over financial reporting).  In order for Deloitte to be liable for its statements of opinion, Plaintiff must prove either that Deloitte genuinely did not believe its opinions to be true or that Deloitte had no reasonable basis for issuing them. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015).  But there is no evidence that Deloitte "either did not in fact hold that opinion or knew that it had no reasonable

---

[27] *See, e.g.*, Ex. 42 at 385:1-7 ("[A]. . . . If I read this is an airport out of the blue, 'However, the substantial uncertainty as to WEC's ability to meet these dates, given its historical inability to achieve forecasted productivity and workforce efficiency levels,' I would agree with that."), 385:12-21 ("Q. But based on everything you know, you would agree with that statement?  A. As I indicated to you, if I were in an airport and you were asking me whether this project would meet those dates, I would agree with that statement.").

basis for it." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 580 (S.D.N.Y. 2012). To the contrary, Deloitte performed extensive audit procedures, including by obtaining and reviewing audit evidence from a wide variety of sources and testing a significant number of SCANA's internal controls over financial reporting. As described in Section II *infra*, those procedures ultimately provided Deloitte with reasonable assurance that the financial statements were free from material misstatement. For this reason, too, Plaintiff cannot prove falsity with respect to Deloitte's audit opinions.

## II.     THERE IS NO EVIDENCE THAT DELOITTE ACTED WITH SCIENTER

Plaintiff has no evidence to establish that Deloitte acted with scienter. First, in a striking turn of events, Plaintiff ***has abandoned its allegation that SCANA management committed a securities fraud***. *See* SOMF ¶ 19. It therefore cannot demonstrate, ***as required by the Fourth Circuit*** to establish scienter for an auditor, that Deloitte was "knowingly complicit in the ***fraud***" or reckless in not discovering the company's "malfeasance." *Pub. Emps.'*, 551 F.3d at 314. Second, even if Plaintiff somehow could prove a fraud in SCANA's financial statements despite its assertions to the contrary, Plaintiff has no evidence of knowing complicity, and the record forecloses any finding that Deloitte's audits amounted to "no audit at all," as would be necessary to establish recklessness approximating an intent to defraud.

### A.     Plaintiff's Position that SCANA Management Committed No Fraud in SCANA's Financial Statements Dooms Its Case Against Deloitte

The central thesis of Plaintiff's Complaint was that Deloitte's audit opinions "[c]onceal[ed] SCANA's [f]raud from [i]nvestors." Compl. at 96. But Plaintiff has failed to adduce any evidence from SCANA personnel or otherwise to bear out this allegation—forcing Plaintiff to abandon its allegations that SCANA's management committed a securities fraud in connection with the financial statements that were the subject of Deloitte's audits. *See, e.g.*, SOMF ¶ 19. But this

stunning turnabout has the attendant consequence of ***preventing Plaintiff from proving Deloitte acted with scienter under binding Fourth Circuit precedent***—as Plaintiff can no longer even try to prove that Deloitte was "either knowingly complicit in the [company's] ***fraud***, or so reckless in [its] duties as to be oblivious to ***malfeasance*** that was readily apparent." *Pub. Emps.'*, 551 F.3d at 314; *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000) ("For recklessness on the part of a non-fiduciary accountant to satisfy securities fraud scienter, such recklessness . . . must, in fact, ***approximate an actual intent to aid in the fraud being perpetrated by the audited company***.").[28] Indeed, Deloitte could not be "knowingly complicit" in a fraud or "oblivious to malfeasance" in SCANA's audited financial statements that Plaintiff does not even contend existed.[29] Accordingly, Plaintiff cannot demonstrate Deloitte acted with scienter and its claim against Deloitte must be dismissed for this reason alone.

### B. Under Any View of the Facts, Deloitte's Audits Cannot Be Considered "No Audit At All"

Plaintiff has offered not even a shred of evidence to suggest that Deloitte knowingly participated in a fraud of any sort. Instead, Plaintiff has focused its efforts on trying to show that Deloitte was reckless. But courts, including the Fourth Circuit, have made clear that plaintiffs may not use "recklessness" as a buzzword to convert mere differences of opinion, judgment or even negligence (which is not what occurred here) into a fraud case under Section 10(b). To the

---

[28] Deloitte reserves all rights to argue that recklessness is insufficient to demonstrate scienter, as the Supreme Court of the United States has not yet clarified what mental state suffices to be liable for a violation of Section 10(b). *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976) ("We need not address here the question whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b-5."); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011) ("We have not decided whether recklessness suffices to fulfill the scienter requirement.").

[29] Indeed, Plaintiff's own audit expert rejected the notion that an auditor could be solely culpable for an alleged misstatement in the financials. Ex. 34 at 60:17-20 ("If there's something incorrect in those financial statements that's the responsibility of management.").

29

contrary, the Fourth Circuit has held that a recklessness case against an auditor requires a plaintiff to establish that the audit was so deficient that it amounted to "***no audit at all***." *Pub. Emps.'*, 551 F.3d at 314-15. Here, the undisputed facts show that Deloitte did far more than "no audit at all"— ***as Plaintiff's own expert conceded***. SOMF ¶ 35.

### 1. Deloitte's Audits

Under applicable professional standards, Deloitte's role as the external auditor of SCANA's financial statements was to obtain "reasonable assurance" that SCANA's financial statements were free from material misstatement.[30] It was not responsible for preparing SCANA's financial statements or for drafting the company's financial statement disclosures.[31] Nor was Deloitte's job to oversee WEC's compliance with the construction schedule or its plans to improve efficiencies in the construction of the Nuclear Project, or to otherwise audit the construction schedule for the Project.[32] Rather, Deloitte was tasked with planning and performing audit procedures and obtaining and evaluating sufficient, appropriate audit evidence to obtain reasonable assurance that SCANA's financial statements (based on information available to SCANA) were free from material misstatement and consistent with information known to SCANA at the time.[33]

Planning and performing audits requires professional judgment. Ex. 34 at 86:5-24, 96:11-16. Here, as described in Section III, *supra*, the audit team exercised its professional judgment in identifying risks of material misstatement and designing audit procedures to mitigate those risks. To address the risk with respect to the Nuclear Project disclosures, Deloitte performed numerous procedures and obtained significant audit evidence from a wide variety of sources. Within

---

[30] Ex. G at .03 (2015); Ex. H at .03 (2016).
[31] SOMF ¶¶ 15, 18; Ex. 34 at 60:14-16 ("[M]anagement is responsible for the preparation of the financial statements unequivocally.")
[32] Ex. 69 at 115:19-116:10.
[33] SOMF ¶ 15; Ex. 39 at .01 (2015); Ex. 40 at .01 (2016).

SCANA, this included members of SCANA's finance, legal, and financial reporting departments, members of SCANA management, members of Project management, as well as accounting personnel, regulatory affairs personnel, and SCANA's in-house counsel. SOMF ¶¶ 33-34.

Notably, these procedures included obtaining confirmations from third parties, such as WEC and SCANA's outside legal counsel, regarding various aspects of the Project—including confirmation that WEC intended to comply with its obligations under the EPC Contract. SOMF ¶ 33. Third-party evidence is regarded as the strongest type of audit evidence. *See, e.g.*, Ex. E at .8; Ex. F at .08; Ex. 34 at 95:4-9 ("Q. . . . You would agree that third-party evidence is the most persuasive form of audit evidence; correct? A. I think the standards are clear that that's true."). The audit team was entitled to credit this evidence—including WEC's representation in February 2017 that WEC was committed to completing the Nuclear Project (a statement that Plaintiff cannot challenge given the unrebutted WEC witness testimony that it was so committed as of that date).[34]

The procedures the audit team performed in assessing the Nuclear Project disclosures, included, but were not limited to:

- Testing controls over the Project balances and disclosures;
- Receiving management representations, including representations (i) that SCANA believed the costs of construction for the Nuclear Project would be recoverable through rates, and that all such costs had been prudently incurred; and (ii) that the disclosures included in Note 10 to SCANA's financial statements completely and accurately described the risks, uncertainties, concentrations, and vulnerabilities associated with the Project;
- Obtaining and reviewing the EPC Contract and the Amendment to the EPC Contract ("EPC Amendment"), agreed to in October 2015, and considering the impact of the EPC Amendment on the Project;
- Assessing how interested parties viewed the effect of the EPC Amendment on the future of the Project;
- Testing construction work-in-progress costs associated with the Project;
- Reviewing filings and testimony provided to the PSC and ORS related to the Project;

---

[34] Ex. 78 at 7382; Ex. K, Ex. 99.1; Ex. 9 at 7365.

- Reviewing minutes from various meetings related to the Project, including Project Review Meetings, which included detailed information regarding the Project construction schedule, among other things;

- Considering how WEC's and Toshiba Corporation's ("Toshiba") financial difficulties might impact the disclosures; and

- Conducting interviews with SCANA management and personnel to inquire as to awareness of any actual or potential fraud.[35]

The audit team assessed all this information and evaluated whether it was consistent with the financial statement disclosures relating to the Nuclear Project. *See* Ex. 69 at 265:12-14 (explaining that the audit team's focus was on assessing whether "what is being disclosed to the public [is] consistent with what is known internally" at the time). In light of this information, Deloitte proposed revisions to financial statement disclosures to make clearer the risks facing the Project—many of which SCANA incorporated.[36] For instance, on February 10, 2017, the audit team sent SCANA comments on the 2016 financial statements, including suggestions on the Nuclear Project disclosures.[37] One comment suggested clarifying that, should SCE&G seek to recover costs under the BLRA, any recovery would be subject to review and approval by the PSC, such that the "ultimate outcome [of such requests] can't be determined."[38] SCANA incorporated this suggestion in its final 10-K filing, disclosing that "[t]here can be no assurance that recovery would be granted." JF-Ex. 10 at 90. Plaintiff's accounting/auditing expert Turner acknowledged that these suggestions were "in the right direction." Ex. 34 at 332:23.

---

[35] SOMF ¶¶ 33-34; Ex. 20 at 2740; Ex. 35 at 7332; Ex. 9 at 7340.
[36] *See, e.g.*, Ex. 9 at 7366 (discussing meeting between Eileen Little, Tarah Schulz and SCANA management to evaluate additional information regarding Toshiba's commitment to the Project and edits made to 2016 financial statement disclosures); Ex. L (revisions to draft 2016 financial statement disclosures regarding the Project); Ex. M (revisions/comments on draft 2016 financial statement disclosures); Ex. N (Deloitte audit team providing comments and revisions to draft disclosures regarding the Nuclear Project); Ex. O (Deloitte audit team sharing comments on the draft disclosures regarding the Project internally); Ex. P (same).
[37] Ex. Q at 7125.
[38] Ex. R at 7225.

Far from conducting "no audit at all," the audit team spent over **ten thousand hours** planning and performing each of its audits to obtain reasonable assurance that SCANA's financial statements were free from material misstatement. *See* SOMF ¶ 32. Thus, the record demonstrates that Deloitte's audits were nowhere close to the type of "pretend" audit that courts have found sufficient to demonstrate recklessness. *See In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 230, 248 (S.D.N.Y. 2014) ("To support an inference of scienter by a non-fiduciary accountant . . . the audit must have been so shoddy that it was a 'pretend' audit—an audit that in effect was not performed at all.").

Indeed, Plaintiff's own accounting/auditing expert, Turner, expressly conceded that it would be "***incorrect" to say that Deloitte performed "no audit at all."*** SOMF ¶ 35. Likewise, Turner admitted that he did not reach the conclusion that Deloitte's actions were indicative of fraud, *id.* ¶ 36, or that "Deloitte intended to deceive the readers of the SCANA financial statements," *id.* ¶ 37. In other words, ***Turner simply did not—and could not—offer any opinion that would be consistent with a finding that Deloitte acted with scienter***.

Instead, Turner acknowledged that the audit team had performed significant work on the audits with respect to the Nuclear Project disclosures—including correctly identifying risks, performing relevant audit procedures, and reviewing the Project disclosures and making suggestions to SCANA regarding additional disclosures.[39] Thus, Turner's opinions regarding Deloitte's audits boil down to his view that Deloitte made "incorrect decisions" in a few areas of

---

[39] *See* Ex. 34 at 250:2-251:6 (acknowledging that the audit team planned the audit, performed risk assessments, and reviewed evidence related to the Project), 205:11-206:23 (giving the audit team credit for correctly identifying significant risks, performing the planned procedures, and reviewing the Project disclosures and making suggestions to SCANA regarding additional disclosures), 248:6-14 (agreeing the audit team gave consideration to the disclosures regarding the Project).

the audit, which he says he would have handled differently.  Ex. 34 at 251:7-252:6.[40]  Turner's primary criticism appears to be that Deloitte did not utilize a construction specialist to assist the audit team to the degree that he would have if he were the auditor.[41]  But under the applicable PCAOB standards, whether and how a specialist should be used in connection with an audit is explicitly a matter of professional "judgment"—as Turner himself conceded.[42]

In any event, these types of disagreements are not even close to what is required to prove that Deloitte's conduct ***"approximate[d] an actual intent" to defraud***.  *Rothman*, 220 F.3d at 98. A "plaintiff[] must do more than merely demonstrate that defendants should or could have done more"—"the[] failure to demand more evidence" may have been "improper under accounting guidelines, ***but that is not the standard, which requires more than a misapplication of accounting principles***."  *Public Emps.'*, 551 F.3d at 314; *see In re Puda Coal*, 30 F. Supp. 3d at 248 ("Facts merely supporting an inference that an audit could have been done better constitute 'fraud by hindsight' and do not support the requisite scienter."); *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1289 (N.D. Okla. 2007) (granting summary judgment because evidence that a different accountant would have handled the audit differently did not show that "E&Y's accounting practices were so deficient that the audit amounted to no audit at all").

### 2.     Deloitte Did Not Ignore Red Flags of Fraud

Plaintiff may attempt to argue that Deloitte was reckless concerning the Project disclosures because Deloitte purportedly ignored "red flags" of a fraud at SCANA.  Red flags are "indicators of fraud that would put an auditor on notice of illegal activity."  *Iowa Pub. Emp.'s Ret. Sys. v.*

---

[40] *See also* Ex. 34 at 173:24-175:19 (opining that he would have followed a different approach taken on another audit), 182:21-183:25 (identifying things he would have done differently had he been SCANA's auditor).

[41] *See, e.g.*, Ex. 34 at 194:12-23; 211:12-14; 251:20-22.

[42] SOMF ¶ 16; *see also* Ex. 34 at 96:11-16 ("Q.  Determining whether and how a specialist should be used in connection with an audit is also an exercise of professional judgment, right?  A.  Yes.").

*Deloitte & Touche LLP*, 919 F. Supp. 2d 321, 331 (S.D.N.Y. 2013); *Sanchez v. Crocs, Inc.*, 667 F. App'x 710, 722 (10th Cir. 2016) ("[T]he red flags identified by Plaintiffs are not so patently indicative of fraud that Deloitte's failure to perceive them as such constituted 'an egregious refusal to see the obvious.'"); *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1268 (11th Cir. 2006) ("Red flags are 'those facts which come to the attention of an auditor which would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors.'").

Unfortunately for Plaintiff, this theory is also foreclosed by the record. For one thing, Plaintiff's disavowal of any fraud in SCANA's financial statements is dispositive on this issue— as Plaintiff concedes there was no fraud in the financial statements Deloitte was auditing, it cannot prove that Deloitte ignored "red flags" indicative of such a (non-existent) fraud.

Moreover, the only fact Plaintiff can point to that comes anywhere close to a "red flag" is the complaint made by Walker in early 2016 regarding SCANA's transparency with regulators. Specifically, Walker raised concerns that SCANA had not been appropriately transparent in its filings and other testimony with the PSC, because SCANA had based its schedule estimates to the PSC on information provided by WEC, which Walker considered aggressive. *See* SOMF ¶ 39. From Walker's perspective, information received in late 2014 and early 2015 indicated a historical productivity factor[43] of 1.5—which was higher than WEC's projected go-forward productivity factor of 1.15 that was provided to the PSC. *Id.* ¶ 39. Walker expressed concerns that regulators were not informed about the historical productivity factors. *Id.* ¶ 39.

---

[43] "Productivity factors" refer to the "efficiency with which direct craft laborers are working to complete tasks. A [productivity factor] of 1.00 means that the actual number of hours required for a task was the exact number of hours budgeted for that task." Ex. 60 at 5.

The problem for Plaintiff, however, is that neither the Company nor Deloitte ignored Walker's complaint. To the contrary, SCANA planned and performed an investigation to determine whether the concerns had merit and engaged outside counsel to assist the Company in that investigation. *Id.* ¶ 40. SCANA's CEO also informed the Chair of the Audit Committee and the Lead Independent Director of the concerns raised and management's intended actions. *See* Ex. 94 at 7954. In conducting the internal investigation, SCANA conducted investigative interviews of: (i) all of Walker's direct reports at the Project; (ii) other employees at the Project with substantial involvement in the review of information from the Consortium on the Project schedule, status and costs; (iii) other employees involved in the BLRA filing process; and (iv) members of senior management, including those involved in providing testimony to the PSC and in responding to interrogatories from ORS. *See id.* at 7955. The investigation team also reviewed that PSC testimony and the responses to ORS's interrogatories. *Id.* Ultimately, SCANA concluded that Walker's concerns were unsubstantiated, in part based on testimony that had been given to the PSC, which emphasized the major challenges facing the Project, including that "the possibility that [WEC] will fail to meet current productivity assumptions for the project represents an important risk to both the cost forecasts and the construction schedule for the project."[44]

SCANA's investigation was reviewed and considered by Deloitte pursuant to applicable professional auditing standards.[45] Specifically, Deloitte evaluated SCANA's investigative procedures, processes, and conclusions to determine whether they were sufficient for purposes of Deloitte's audit. SOMF ¶ 41. As part of this assessment, Deloitte, among other things, (i)

---

[44] SOMF ¶ 40; Ex 54 at 21–22.
[45] As SCANA's outside auditor, Deloitte does not conduct its own investigation. Rather, it must evaluate the actions that its audit client takes in response to allegations. *See* Ex. S; Ex. T; Ex. 3 ¶¶ 477; Ex. 68 at 249:2-6.

consulted with a Deloitte fraud specialist and Professional Practice Director;[46] (ii) analyzed the scope of the investigation team's work plan to assess the sufficiency of the procedures; (iii) reviewed and evaluated the competency of the investigation team; (iv) discussed the nature and results of the interviews performed; and (v) considered whether the scope of the investigation would have identified any potential indications of fraud or intentional withholding of information. *See* SOMF ¶ 41. Deloitte also communicated with the SCANA Audit Committee regarding the investigation, including regarding the Audit Committee's conclusion that the procedures undertaken by management were sufficient and appropriate under the circumstances. *Id.* Ultimately, Deloitte concluded that, in its professional judgment, management's process to evaluate Walker's concerns was sufficient. SOMF ¶ 41; Ex. 94 at 7960.

In addition, Deloitte expanded its own audit procedures in response to Walker's concerns. SOMF ¶ 42. For example, Deloitte broadened its fraud-related inquiries to include additional individuals associated with the Project. *Id.* The audit team also made direct inquiries of Betty Best—Walker's replacement after Walker went on medical leave—regarding her awareness of the concerns raised by Walker and whether she was aware of known or suspected fraud or intentional acts by management to withhold or conceal information from the ORS or PSC. *See* SOMF ¶ 42; Ex. 94 at 7959. Best confirmed that she was not aware of any known or suspected fraud. Ex. 94 at 7959. In evaluating Walker's concerns and SCANA's investigation, Deloitte also considered other evidence obtained throughout the course of the fiscal year 2015 audit, including BLRA filings and testimony under oath, and the EPC Contract amendment. SOMF ¶ 43.

---

[46] A "Professional Practice Director" serves as an initial consultation resource for audit teams on accounting and auditing matters that may arise in a business unit or industry. Ex. U at 65:2-9, 67:12-17.

Thus, even if Walker's concerns could be considered a "red flag," the record indisputably shows that Deloitte did not ignore them. Rather, Deloitte took meaningful steps to not only evaluate whether the Company had conducted a sufficient investigation, but also to evaluate any potential impact on the financial statements. This alone defeats a claim of recklessness. *See, e.g.*, *Danis v. USN Commc'ns, Inc.*, 121 F. Supp. 2d 1183, 1194-95 (N.D. Ill. 2000) (finding auditor was not reckless where auditor took steps to ensure the accuracy of the financial statements despite company's operational deficiencies). In the face of these uncontroverted facts, Plaintiff is left to argue only that Deloitte could or should have done more. But such assertions are simply insufficient to prove scienter under Section 10(b). *See Software Toolworks*, 50 F.3d at 627 ("Plaintiffs' contention . . . that Deloitte should have performed further inquiries and investigations, arguing with the benefit of hindsight, does not establish that the [] audit was reckless.").[47]

In any event, there is no causal link between Walker's concerns and any alleged falsity in SCANA's 2015 and 2016 financial statements. To the contrary, Walker's concerns were about reporting to the PSC (not investors), ***and*** Walker agreed during her deposition that the very projections about which she complained were "reasonable." Ex. 43 at 44:25-45:3. Moreover, by September 2016, SCANA had informed the PSC that the likely productivity factors going forward would be between 1.5 to 2, mooting the issue well before the first alleged "corrective disclosure" in this case. SOMF ¶ 44.

---

[47] For example, Plaintiff may criticize the Deloitte audit team for not speaking with Walker directly while she was on medical leave. Yet Walker testified that she would not have agreed to speak with Deloitte had they reached out to her at the time. *See* Ex. 43 at 308:19-309:3.

38

### III.   PLAINTIFF CANNOT ESTABLISH LOSS CAUSATION

To establish loss causation and recover damages in a securities fraud class action, a plaintiff must "prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Dura Pharms.*, 544 U.S. at 346.  The corrective disclosures must "*relate back to the misrepresentation* and not to some other negative information about the company." *Katyle*, 637 F.3d at 473 (emphasis in original).

Here, Plaintiff cannot prove loss causation, for three related but independently sufficient reasons.  First, to hold an auditor liable, Plaintiff must demonstrate that the "market reacted negatively to some disclosure correcting the falsity *in the . . . auditor's statements*." *Amorosa*, 682 F. Supp. 2d at 363.  But Plaintiff's proffered damages and loss causation expert conceded that *none* of the purported "corrective" disclosures corrected Deloitte's audit opinions. *See* Ex. 53 at 151:7-14, 277:7-278:16; SOMF ¶¶ 60, 67.  Second, there was never any "correction" of SCANA's financial statements.  Those financial statements were never restated, and not a single one of Plaintiff's "corrective disclosures" references SCANA's financial statements or was interpreted by financial analysts to correct them. *See, e.g.*, Ex. 19 ¶ 148; SOMF ¶¶ 49-51.  Third, even assuming *arguendo* that SCANA's financial statements concealed that there was no FRLIS and the Project completion dates were "not realistic or achievable," Plaintiff cannot prove that Deloitte's purported misstatements proximately caused Plaintiff's losses because at least eighteen of the nineteen supposed "corrective disclosures" are *not at all corrective* on these points. SOMF ¶¶ 57, 64. Rather, the putative "corrective disclosures" relate primarily to the deteriorating financial condition and ultimate bankruptcy of WEC, and regulatory actions taken against SCANA after the Project had been abandoned, at which point it was crystal-clear that no operative schedule existed, and that no Project completion dates were "realistic or achievable" (because construction

had stopped).[48]   Plaintiff proposes to do exactly what the law forbids—assume negative information about the Project caused the losses that Plaintiff claims to have suffered, even though that negative information was not corrective of Deloitte's statements.

### A.      Plaintiff Cannot Prove Loss Causation Because Its Expert Conceded That No Disclosure Corrected Deloitte's Audit Opinion

Where a "plaintiff seeks to hold a[n] . . . auditor responsible for primary violations of the securities laws, the plaintiff must plead that the ***market reacted negatively to some disclosure correcting the falsity in the . . . auditor's statements*** (and not simply the underlying fraud)." *Amorosa*, 682 F. Supp. 2d at 363.  There is no question that Plaintiff cannot make this showing. Indeed, Plaintiff's own damages expert conceded at his deposition that none of the "corrective disclosures" corrected Deloitte's audit opinions:

> Q. Are you claiming that the corrective disclosures disclosed to the investing public that Deloitte had signed a false audit opinion?
>
> A. ***That's not an opinion that I've offered***.

Ex. 53 at 278:12-279:2; *see id.* at 152:20-25 (similar).

This alone should end the case.  Because Plaintiff has no proof that any "corrective" disclosure corrected Deloitte's audit opinions, Plaintiff cannot establish loss causation against Deloitte—an essential element of its claim.   *See Amorosa*, 682 F. Supp. 2d at 363; *New Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 54 (2d Cir. 2024) (loss causation established only where the corrective disclosure "***revealed the [] falsity of [the auditor's] audit certification***"); *WM High Yield Fund v. O'Hanlon*, 2013 WL 3230667, at *10 (E.D. Pa. June 27, 2013) (granting summary judgment to defendants because the "market could not have learned from [the corrective disclosure]—either in whole or in part—that Deloitte's audits

---

[48] In addition, if Cain's unreliable expert model is excluded pursuant to Deloitte's *Daubert* motion filed herewith, Plaintiff will be unable to prove loss causation or damages.

might have falsely or misleadingly certified previous misstatements of [defendant's] loan loss reserves"); *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 678 (S.D.N.Y. 2007) (dismissing case against auditors where no corrective disclosure revealed falsity of audit opinion).

## B.    Plaintiff Cannot Prove Loss Causation Because There Was No "Correction" of SCANA's Audited Financial Statements

Plaintiff's inability to prove loss causation is further underscored by the fact that SCANA's audited financial statements have never been restated.  Moreover, none of Plaintiff's putative "corrective disclosures" pertains to or even references SCANA's financial statements, and no market analysts interpreted Plaintiff's "corrective disclosures" as "correcting" SCANA's financial statements.  *See* Ex. 19 ¶ 148.  Thus, Plaintiff cannot establish loss causation.  *See, e.g., In re Witness Sys.*, 2008 WL 9020538, at *7-8 (disclosures that did not reference company's financial statements at all, "much less KPMG's audit reports on those financial statements," were not "curative disclosures with respect to KPMG's 2004 and 2005 audit reports for purposes of establishing loss causation"); *Durham v. Whitney Info. Network, Inc.*, 2009 WL 3783375, at *23 (M.D. Fla. Nov. 10, 2009) (granting motion to dismiss on loss causation because the corrective disclosures had "nothing to do with Plaintiffs' claims that they were deceived into buying [defendant company's] common stock based on false or misleading financial information in the financial statements audited by the Auditor Defendant").

## C.    In Any Event, None of the Disclosures Is Corrective of the Purported Misstatements or Omissions

Plaintiff's accounting/auditing expert, Turner, claims that the Nuclear Project disclosures in SCANA's 2015 and 2016 financial statements were not fairly presented because they did not state that a FRLIS did not exist and that completion of the Project in time to earn the PTCs was not realistic or achievable.  Ex. 3 ¶ 29; *see also* Ex. 34 at 154:25-156:7 (testifying that he is not offering an opinion that there was any misstatement or omission in the financials beyond these

items).  That is wrong, as set forth in Section I, *supra*.  Regardless, at least eighteen of Plaintiff's nineteen putative "corrective disclosures"—supporting 87% of Plaintiff's claimed damages—are not at all corrective with respective to Turner's claimed misstatements.  These "disclosures" fall into two categories:  (1) stock declines when the market learned about financial problems at WEC and Toshiba before WEC declared bankruptcy (six disclosures resulting in stock declines of $8.61 per share—23% of Cain's total "artificial inflation") (the "WEC/Toshiba Events"); and (2) stock declines when regulators were investigating SCANA or opposing its rate requests after the market had already learned on July 31, 2017 that SCANA was abandoning the Project following the bankruptcy of WEC—its contractor that had agreed to do the job at a fixed price (twelve disclosures resulting in stock declines of $22.68 per share—64% of Cain's total "artificial inflation") (the "Post-Abandonment Events").  *See* Ex. 52 ¶ 14; Ex. 19 ¶ 144.

None of these putative "corrective disclosures" "relate back to the misrepresentation" as required in the Fourth Circuit.  *Katyle*, 637 F.3d at 473.  Rather, they relate "to some other negative information about the company"—which is insufficient as a matter of law.  *Id.*  And the only remaining "corrective disclosure" relates to SCANA's July 28, 2017 announcement—five months after Deloitte's last relevant audit opinion—that the previously estimated schedule and cost estimates could no longer be achieved following the bankruptcy of its contractor, WEC.[49]

---

[49] SCANA's stock price declined on July 28, 2017 when SCANA announced that it had reassessed the likely costs and schedule for the Nuclear Project following the bankruptcy of WEC; SCANA stated that based on that analysis, "the project owners anticipate that the additional cost to complete both units . . . will materially exceed prior WEC estimates" and "[a]t this point, the project owners believe that the units could not be brought online" by the then-existing PTC deadline of January 1, 2021 (which was later extended indefinitely). Ex. 45.  Although this disclosure informed the market that WEC's schedule now would not be met, it is not corrective of SCANA's financial statements (or Deloitte's audit opinion thereon) which cautioned "substantial uncertainty as to WEC's ability to meet these dates given its historical inability to meet forecasted productivity and work force efficiency levels." JF-Ex. 10 at 88.  Equity analysts focused on this announcement as signaling that SCANA intended to abandon the Project, rather than correcting anything in

1. **The WEC/Toshiba Events Are Not Corrective**

The first category of "corrective disclosures"[50] relates to the financial difficulties faced by WEC and Toshiba—not SCANA, the company whose financial statements Deloitte was auditing. *See* SOMF ¶ 56. These disclosures cannot possibly be corrective of Deloitte's audit opinion or SCANA's financial statements. *See id.* ¶ 57. In fact, Cain concedes that "[t]here is nothing in Plaintiff's claims to suggest that information regarding WEC and Toshiba should have been explicitly mentioned in the 2015 and 2016 financial statements." Ex. 38 ¶ 81; *see also* SOMF ¶ 59.

Notwithstanding this admission, Cain treats the WEC/Toshiba Events as corrective. For example, he states that on January 19, 2017, "Japanese media reported that Toshiba had asked the Development Bank of Japan for financial support and reported that the write-down associated with its nuclear business could reach 700 billion yen (approximately $6.1 billion)." Ex. 52 ¶ 105. Cain opines that this disclosure has a "logical connection" to Plaintiff's allegations that "Deloitte's clean audit reports concealed from investors the true status of the Nuclear Project" and was "corrective of the alleged misstatements and omissions because it revealed the true size of the write-down associated with Toshiba's U.S. nuclear business and its impact on the Nuclear Project." *Id.* ¶ 110.

***But Cain cannot explain what the "logical connection" is to Plaintiff's claim.*** None of the disclosures has any proximate connection to the matters that Turner opines were concealed by Deloitte's audit opinions—whether WEC had a FRLIS or could complete the Project by the

---

[50] SCANA's financial statements or Deloitte's audit opinions. Ex. V. The facts had changed materially since SCANA issued its financial statements and Deloitte issued its audit opinions. WEC had gone bankrupt and SCANA had undertaken a new "assessment of how long and how much it would take for the Company to complete the Nuclear Project." Ex. 38 ¶ 106.

[50] According to Cain, these "corrective disclosures" occurred on December 27, 2016 to December 28, 2016; January 19, 2017; January 31, 2017; February 14, 2017; February 17, 2017; and March 22, 2017 to March 23, 2017.

existing PTC deadline.  Indeed, ***Cain cannot even identify what purported misstatements in SCANA's financials these disclosures corrected***—as he conceded during his deposition.  *See, e.g.*, Ex. 53 at 238:3-17 (explaining that he was "not offering any opinions about the falsity of the alleged misstatements and, as a result," was "not allocating particular portions of the "corrective disclosures to particular portions of the alleged false and misleading statements"); *see also* SOMF ¶ 53.

Cain instead asserts that any information vaguely bearing on what he calls "the true status of the Nuclear Project" can be considered corrective.  *See* Ex. 38 ¶ 83 ("the market learned about the true status of the Nuclear Project, in part, through the revelation of Westinghouse's troubled financial situation").  But "the standard cannot be so lax that every announcement of negative news becomes a potential 'corrective disclosure.'"  *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 546 (N.D. Ill. 2007).  At the time of issuance of SCANA's 2015 financial statements that Cain claims were corrected by these announcements, Toshiba had not even started the analysis that led to the writedowns,[51] highlighting that Cain is impermissibly treating "negative information" related to the Project as corrective, without regard to whether it should have or even could have been disclosed in the financial statements.  *Katyle*, 637 F.3d at 473.  Thus, Plaintiff cannot prove loss causation with respect to the WEC/Toshiba Events.  *See id.*; *In re Ikon Office Sols., Inc. Sec. Litig.*, 131 F. Supp. 2d 680, 688 (E.D. Pa. 2001) (granting summary judgment on loss causation grounds where plaintiffs' expert "assert[ed] that a link exists between the loss and the alleged misstatements" but failed to support such conclusions with "any evidence").

---

[51] *See* Ex. W at 14 (showing that analysis began in March 2016).

## 2. The Post-Abandonment Events Are Not Corrective

Most of Cain's "corrective disclosures" relate to events following abandonment, in which SCANA faced the negative responses of politicians and regulators after abandoning the Project. But these disclosures clearly do not "correct" what Turner opines was concealed by Deloitte's audit opinions. *See* Ex. 3 ¶ 29; SOMF ¶ 64.[52] No later than the abandonment of the Project on July 31, 2017, investors knew—*with certainty*—that the Project schedule would not be met in time to obtain PTCs because the Project had been pronounced dead—and that there was no longer *any* operative schedule. SOMF ¶ 61-63. There can be no damages after everything Turner claims was omitted from the financial statements was known to the market. *See Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1262 (4th Cir. 1993) (granting summary judgment as to all claims arising after a certain date when "the market was fully apprised of the failing financial condition of [the defendant]"); *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 188 (4th Cir. 2007) (no loss causation where relevant facts already disclosed, even though follow-on lawsuit "portended a period of instability and discord that could disrupt the corporation's operations"). Thus, none of the Post-Abandonment Events can constitute "corrective" disclosures pursuant to which Plaintiff is owed damages.

## CONCLUSION

For the reasons discussed herein, Defendants respectfully request that the Court grant Defendants' Motion for Summary Judgment.

---

[52] Cain's assumptions that Plaintiff will prove that Deloitte *knew* from the date of the 2015 10-K forward that SCANA *would be* unable to recoup its costs under the BLRA, and that SCANA would not have been subject to regulatory investigation if the "truth" had been disclosed on that date, Ex. 38 ¶ 188, are irrelevant because they are unsupported by anything in the factual or expert record.

Respectfully submitted,

Charleston, South Carolina
January 31, 2025

*/s/ Christopher A. Ogiba*
Christopher A. Ogiba, Fed. ID No. 9042
Daniel Fuerst, Fed. ID No. 12616
Moore & Van Allen, PLLC
78 Wentworth Street
Charleston, South Carolina 29401
Telephone:  843-579-7066
Email: chrisogiba@mvalaw.com
          danielfuerst@mvalaw.com

John A. Fagg, Jr.
Nader Raja
Moore & Van Allen, PLLC
100 North Tryon Street
Suite 4700
Charlotte, North Carolina 28202-4003
Telephone: 704-331-3602
E-mails: johnfagg@mvalaw.com
          naderraja@mvalaw.com

Scott A. Edelman
Atara Miller
Jed M. Schwartz
Andrew B. Lichtenberg
Katrin Cassidy-Ginsberg
Milbank LLP
55 Hudson Yards
New York, New York 10001-2163
Telephone: 212-530-5000
Email: sedelman@milbank.com
          amiller@milbank.com
          jschwartz@milbank.com
          alichtenberg@milbank.com
          kcassidy-ginsberg@milbank.com

*Attorneys for Defendants*
*Deloitte & Touche LLP and Deloitte LLP*