## IN THE DISTRICT COURT OF THE UNITED STATES
### FOR THE DISTRICT OF SOUTH CAROLINA
### COLUMBIA DIVISION

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 98 PENSION FUND on behalf of itself and all others similarly situated, <br><br> *Plaintiff*, <br> vs. <br><br> DELOITTE & TOUCHE LLP, DELOITTE LLP, <br><br> *Defendants*. | Case No. 3:19-cv-03304-JDA |

## PLAINTIFF-OPPONENT'S STATEMENT OF MATERIAL FACTS

Pursuant to Judge Austin Rule 56 and in support of its Opposition to Defendant Deloitte & Touche, LLP and Deloitte, LLP's ("Deloitte") Motion for Summary Judgment (ECF No. 259), Lead Plaintiff and Class Representative International Brotherhood of Electrical Workers Local 98 Pension Fund ("Plaintiff") on behalf of itself and the certified Class submits the following Opponent's Statement of Material Facts, which includes: (I) Plaintiff's responses to Deloitte's Statement of Material Facts (ECF No. 265-1) (beginning on page 2); and (II) "additional material facts that [Plaintiff] contends serve[s] to defeat the motion for summary judgment" (beginning on page 29.[1]

---

[1] For the court's convenience, Plaintiff refers to the documents cited herein as follows: Plaintiff's Statement of Undisputed Facts (ECF No. 262) ("SUF"); Section I of this document, Plaintiff's Opposition Statement of Fact ("OSOF"); Section II of this document, Plaintiff's Statement of Additional Facts, filed herewith ("SOAF").

## I.     PLAINTIFF'S RESPONSES TO DELOITTE'S STATEMENT OF MATERIAL FACTS

1.     **Disputed.** In 2008, SCANA and Santee Cooper entered into an EPC Contract with Westinghouse and Stone & Webster, together known as the Consortium, to build two new nuclear reactor units (known as Unit 2 and Unit 3) at the V.C. Summer site in Jenkinsville, South Carolina, which were to be the first nuclear power plants built in thirty years. Ex. 1 at 156:6–9; Ex. 2 at 173:23–174:8.

Under the EPC Contract, while the Consortium was responsible for developing and maintaining a construction schedule, SCANA had "the ultimate responsibility for the proper execution of the EPC contract and the construction of the units, including appropriate quality control and quality assurance," which was central to the PSC's approval of SCANA's petitions. Ex. 3 at 75, 78; *see* Ex. 4 at 682; Ex. 5 at 182; Ex. 6 at 128; Ex. 7 at 8207; Ex. 8 at 212.

The EPC Contract was amended in October 2015 to reflect, among other things, the transfer of construction management duties to Fluor Corporation, which was tasked with completing "an updated integrated project schedule," including "resource allocations." Ex. 9 88; Ex. 10 at 78; Ex.11 at 265:13–19. The PSC approved revised construction and capital cost schedules resulting from the October 2015 Amendment in a 2016 Settlement Agreement dated September 1, 2016, pursuant to which SCANA was required to "provide a report based on this [Fluor-completed 2016 Revised] schedule to ORS and the Commission." Ex. 5 at 0182; SUF ¶¶ 10, 13.

2.     **Disputed.** The BLRA was one of the statutory frameworks that applied to the regulation of SCANA's construction and recovery of costs for the Nuclear Project. While the BLRA provided for certain responsibilities for "State authorities" such as the PSC and ORS, it did not include any "oversight" provisions. *See* Ex. 12.

To cover the massive costs of the project, SCANA petitioned the PSC for approval of the project under the BLRA, which would allow for SCANA to recover the construction costs by raising rates for electricity customers, so long as its costs were prudent, it was transparent with the PSC, and it complied with the approved construction schedule and costs. Ex. 3.

3.    **Disputed.** This statement misrepresents the cited evidence, which says nothing regarding whether Federal law "incentivized" any such development," Ex. 13 at 449.

4.    **Disputed.** The cited materials do not provide evidence of "ongoing, publicly known efforts" for an extension of the PTC deadline during the Class Period, and the PTC deadline as not extended until after the Class Period. *See* Ex. 9 at 90. Further, under PCAOB Standards, auditors "cannot consider tax legislation unless it has actually been enacted," so to the extent any such efforts were undertaken, they could not have been taken into account by Deloitte during the Class Period. Ex. 14 at 271:8-272:18. Completing the Nuclear Project in time to qualify for PTCs was important to SCANA and to the PSC. Pl.'s Mot. for Partial Summary J., ECF No. 261-2 at 4; Ex. 15; Ex. 16 at 111:4–9.

5.    **Disputed.** SCANA stated that the benefits of the PTCs are "expected" to be provided to its customers (Defs.' JF-Ex. 10 at 90), but as Plaintiff's expert explained – and Deloitte acknowledged in its memorandum – receipt of the PTCs was also expected to enhance SCANA's financial outlook, liquidity, and stock valuation, so SCANA shareholders also received value from receipt of the PTCs even if the direct recovery went to its customers, Ex. 17 at ¶¶ 61–63; *see also* Ex. 18; Ex. 19; Ex. 20; Ex. 21. As such, completing the Nuclear Project in time to qualify for PTCs was important to SCANA and to the PSC. Pl.'s Mot. for Summ. J. at 4; Ex. 15; Ex. 16 at 111:4–9. Deloitte noted that while "[a]ny tax credits generated are expected to be provided to ratepayers, .

. . such credits could be substantial, and will have the effect of reducing the overall rate effects to customers once the units are placed in service." Ex. 22.

6.      **Partially disputed.** Plaintiff disputes this statement because it is incomplete, as it does not reflect all relevant provisions of the BLRA. Plaintiff refers to the full text of the BLRA. Ex. 12.

7.      **Disputed.** Plaintiff disputes this statement as it is an incomplete and misleading recitation of the ORS's statutory obligations. *See* Ex, 12. Plaintiff additionally disputes this statement to the extent that Deloitte is implying ORS actually undertook these responsibilities as to the Nuclear Project, as ORS repeatedly made clear that it was unable to monitor the Nuclear Project's progress due to the lack of a schedule, and thus stopped issuing reports on the Nuclear Project schedule. SUF ¶¶ 12-13; Ex. 23 at 10; Ex. 24; Ex. 25.

8.      **Disputed.**  Beginning in July 2014, with its report on SCANA's 2014 Annual Request for Revised Rates, ORS made clear that it was unable to monitor the Nuclear Project schedule. Ex. 23 at 10; Ex. 24 at 8293; Ex. 25; Ex. 2 at 321:21-322:13. Additionally, there is no evidence of what ORS did or did not do in the record.

9.      **Disputed.** ORS initially developed a method for tracking "caution milestones," which were "key activities delayed more than ten months beyond the approved construction schedule and specifically noted in quarterly reports." Ex. 26 at ¶¶ 82–83. But in early 2014, when the Consortium suspended the provision of monthly scheduling updates, ORS publicly reported that it was unable to "monitor and provide updates to the Commission and the public on the status of pending construction activities." Ex. 27; Ex. 25; Ex. 27 ("temporary change in practice as it will impact ORS's ability to monitor and provide updates to the Commission on the status of milestone activities during this interim period, particularly as it relates to milestones equal to or greater than

4

sixteen months."); Ex. 23 at 10 (explaining that until monthly updates were resumed, ORS would "not have the ability to monitor and provide updates on the status of milestone activities.").  As a result, ORS "stopped putting schedule information" in its quarterly reports as of June 20, 2014, explaining it "had no confidence" in its ability to get schedule updates. Ex. 28 768:15–21; *see also* Ex. 25 at 8172. Following the issuance of its July 2015 quarterly report, ORS then suspended altogether issuance of quarterly reports because it still did not have the ability to "review" or "validate" the schedule. Ex. 29 at 36:13–25; *id.* at 35:22-36:12.

For the remainder of the Class Period, to the extent ORS conducted any monitoring or reporting regarding the Nuclear Project, it was conducted via confidential, nonpublic letters sent to SCANA that were not shared with the PSC. Ex. 30 114:24–115:1–10; Ex. 31 219:12–24. ORS did not keep copies of its letters sent to SCANA to avoid obligations that ORS had under FOIA, and no such letters exist in the record. Ex. 31 99:23–100:6.

10. **Disputed.**  ORS did not have a reporting obligation under the BLRA. *See* Ex. 12 at § 58-33-277(B) (2015). And the ORS suspended its issuance of quarterly reports altogether in 2015 because it still did not have access to "review" or "validate" the schedule, issuing its last quarterly report in July 2015—before the start of the Class Period, after which it conducted any monitoring via private letters not shared with the PSC. *See* response to #9. Furthermore, no schedule was ever provided to the PSC during the Class Period, as the ORS was unable to "monitor and provide updates to the Commission and the public on the status of pending construction activities," Ex. 27

11. **Partially disputed.** While, from the start of construction, the Nuclear Project did suffer both cost overruns and delays, only some of those cost overruns and delays were publicly disclosed—and, to the extent they were disclosed publicly, it was only at a general level.  Further,

5

there is no evidence in the documents cited to demonstrate that the coverage of the cost overruns and delays that were made public was "extensive." *See* Ex. 17 ¶ 16–26.

12.     **Disputed.** The cited evidence does not support that the "GSCDs" were revised "in light of the known cost overruns and project delays." *See* Ex. 10 at 79 ("The Revised, Fully-Integrated Construction Schedule indicated that the substantial completion of Unit 2 was expected to occur in mid-June 2019 and that substantial completion of Unit 3 was expected to be approximately 12 months later."). Further, Plaintiff disputes this statement to the extent it only includes certain and incomplete portions of the EPC Contract amendment.

13.     **Disputed.** The cited evidence does not support the proffered statement because it is a conclusory and inadmissible assertion in an affidavit from a Westinghouse employee that is not based on personal knowledge, contains hearsay, and does not show that the affiant is competent to testify about the matters stated. *See generally* ECF No. 265-31.

Separately, there is no evidence in the record that WEC developed or implemented any mitigation strategies to increase productivity (Ex.1 253:1–7; 301:15–18), and the evidence that does exist shows that productivity did not improve during the Class Period—indeed, the evidence shows the opposite – that productivity decreased over time. *See* Exs. 32 at 37724–5; 33 at 652911; 34: 35; 36; 37; 38; 39; 40; 41; 42; 43; 44; 45; 46, 47, 48; ECF No. 265-32.

14.     **Disputed.** The cited evidence does not support the proffered statement because the cited documents are not evidence of what "investors understood." In its workpapers, Deloitte repeatedly noted throughout the Class Period that analysts identified the "key risks" for SCANA to be the construction of the project and "whether or not the Company can stay on schedule and on budget." Ex. 49. Because of the "overall focus on the construction of the New Units by investors," Deloitte concluded that there was a "significant risk" that SCANA would not

"appropriately" disclose "significant changes, delays, or other events impacting the projected construction schedule or costs." Exs. 19 at 28; 21; 50 at 5821; 51; 52 at 2729; 53; 54; 55; 56 at 72.

As Dr. Cain explains, analysts and the investing public still expected the project to be completed by the PTC deadline of January 1, 2021 until the abandonment of the Nuclear Project on July 31, 2017. Exs. 17 at ¶¶ 25–26, 32–33, 43–45, 50–54, 62; 57 at ¶¶ 54–60; *see, e.g.,* Exs. 19 at 28; 56 at 72; 21 at 39, 41, 58; 18 at 42, 46–47; *see also* Ex. 58 at 48:18-51:11; 52:21-55:24; 57:22-63:10; 65:5-71:11.

15. **Disputed.** While the statement lists certain roles of an auditor under PCAOB Standards, it is an incomplete list of an auditor's responsibilities and cites to a financial statement summary instead of actual PCAOB Standards. *See* Exs. 10 at 44, 104; 9 at 44, 51. Under PCAOB Standards, auditors have numerous additional relevant roles not listed in the statement, including "to issue a report on whether the financial statements and accompanying disclosures present fairly and in accordance with GAAP, in all material respects, the financial position, results of operations, and cash flows of the audited entity . . . analyze[] and evaluate[] the financial statements and disclosures prepared by management . . . gaining sufficient, appropriate, and persuasive evidence to support the auditor's report by, among other things, making inquiries, testing the accuracy of examining and corroborating supporting documentation, reconciling and resolving inconsistent or contradictory audit evidence, and obtaining necessary information from the audited entity, its management, and third parties . . . to detect material misstatements of the financial statements, whether due to fraud or error." Ex. 9 ¶¶ 252–57, 264, 277, 295–296, 312–315, 317, 321–322, 351, 357–362; *id.* Appendix D.

Additionally, Plaintiff disputes Deloitte's use of "opinions" to refer to what are titled audit "reports." *See* Exs. 10 at 44, 104, 142, 146; 9 at 44, 98, 99, 103. And in these reports, Deloitte

made statements of fact about its compliance with PCAOB Standards. *See* Exs. 10 at 44, 104, 142, 146; 9 at 44, 98, 99, 103.

16.     **Disputed.** To be in compliance with PCAOB Standards, Deloitte was required to use a construction specialist in connection with its 2015 and 2016 audits of SCANA. Ex. 59 at ¶¶ 31a, 267–68, 331–45, 558; Ex. 14 at 175:23–176:11, 176:20–177:5, 222:17–223:2, 250:24–251:6.

Further, due to the fact that there was a significant risk associated with the nuclear disclosures, Deloitte represented to SCANA Audit Committee that construction specialist, Joe Zenk, would be "integral" to the audit and would "augment the core engagement audit team" to ensure that Deloitte applied "an appropriate level of professional skepticism to challenge significant management assumptions," as Deloitte had in prior audits. Exs. 53; 60; 61; 62; *see* Ex. 63 at 65:3-66:22, 71:15-73:22, 74:23-78:4, 78:7-80:18; *see* Ex. 64. Mr. Zenk, Deloitte said, was "actively involved in the planning and risk assessment process," Ex. 53, and would help to identify controls to "mitigate the risks associated" with the nuclear project, as well as evaluate potential disclosures about the "status of construction." Ex. 53.

Despite its assurances to the SCANA Audit Committee that construction specialists would be integral to its audits, Deloitte never used construction specialists to plan or perform audit procedures during its 2015 or 2015 Audits. Exs. 65; 66; 67 at 109:15-21, 111:6-19, 111:22-112:14, 112:23-113:3, 113:4-18, 130:19-133:7, 113:14-18, 119:20-120:17, 120:18-121:10, 132:3-14, 132:21-25, 133:2-7, 175:2-176:4, 210:22-211:4; 68 at 226:5-15, 227:25-228:15, 241:15-242:7; 2 at 43-45, 50:7-53:6, 175:19–23, 176:5–9, 228:21-229:8, 264:18-265:14, 298:14-300:14; 69 at 227:24-228:8; 70.

17.     **Partially disputed.** Plaintiff disputes Deloitte's use of "opinions" to refer to what are titled audit "reports" that include statements of fact. *See* Exs. 10 at 44, 104, 142, 146; 9 at 44,

98, 99, 103. Additionally, Deloitte's audits also encompassed internal controls over financial reporting. *See* Exs. 10 at 44; 9 at 44.

18.     **Disputed.** Under PCAOB Standards, an auditor's responsibility is not "limited to" auditing "financial statements through the performance of audit procedures and providing an opinion based on those procedures"; rather, this is one of many of its responsibilities under PCAOB Standards. Ex. 59 at ¶¶ 252–57, 264; *id.* Appendix D. Additionally, an auditor is also tasked with auditing a company's internal controls over financial reporting. *See, e.g.*, Ex. 71.

Among other things, Eileen Little testified that to comply with PCAOB standards, Deloitte needed to plan and perform its audit to obtain reasonable assurance that SCANA's Nuclear Project disclosures were free of material misstatements whether due to error or fraud. Ex. 68 at 53:8–54:17. Little explained that to obtain reasonable assurance, which is understood to be "a high level of assurance," Exs. 68 at 54:8–17; 69 at 44:21–25, Deloitte had to obtain audit evidence that supported the disclosures about the Nuclear Project, Ex. 68 at 53:8–54:17. This meant that Deloitte needed to perform procedures that supported, among other things, the reasonableness of SCANA's disclosures that the nuclear project was expected to be completed by the end of 2020 and to qualify for the production tax credits. Exs. 68 at 57:2–15; 59 at ¶¶ 315, 509. Because Deloitte identified the nuclear disclosures as a significant risk—the highest level in the range of risk of material misstatement, Ex. 2 at 64:23-65:17—PCAOB Standards required Deloitte to obtain "more persuasive" audit evidence by increasing the quantity of evidence or obtaining evidence that is more relevant or reliable. Exs. 2 at 64:23-65:17; 49 (professional skepticism).

19.     **Disputed.** The cited evidence does not support the statement.  Rather, the cited evidence states that Plaintiff "does not name SCANA or any of its Officers or Directors as a Defendant in this Action and does not allege that SCANA or any of its Officers or Directors

violated the federal securities laws," but Plaintiff contends that certain "statements made by SCANA or its officers or directors during the Relevant Period" were "false or misleading, including statements that were misleading by omission," including statements in SCANA's 2015 and 2016 10-K. Ex. 72 at 5.

20.    **Disputed.** Plaintiff contends that multiple numbers and dates in SCANA's 2015 and 2016 financial statements were false and misleading, including disclosures of NND completion dates and costs and likelihood of recovering PTCs under the BLRA.

21.    **Disputed**. The proffered statement is conclusory and is not supported by the cited evidence, which expressly referred to "guaranteed substantial completion dates" and that misleadingly omits to disclose that the Nuclear Project would not be completed by the GSCDs and in time to obtain the PTCs. *See* Exs. 10 at 78–81; 9 at 87–90.

22.    **Partially disputed.** Plaintiff disputes this statement because it is incomplete, as it does not reflect all disclosures in Footnote 10 of SCANA's 2015 financial statements, and Plaintiff refers to the full text. Ex. 10 at 78–81.

23.    **Partially disputed.** Plaintiff disputes this statement because it is incomplete, as it does not reflect all disclosures in Footnote 10 of SCANA's 2016 financial statements, and Plaintiff refers to the full text. Ex. 9 at 87–90.

During the 2016 Audit, Fluor Corporation took over as construction manager of the Nuclear Project and SCANA told regulators and the public that one of Fluor's responsibilities was to develop a revised, fully resource-loaded integrated project schedule that would be completed later in 2016. *See* Ex. 73 at 964:6-13; SUF ¶¶ 5, 8, 21. As detailed in Plaintiff's motion for partial summary judgment, Deloitte knew by February 2017 that SCANA had not received Fluor's revised schedule. When SCANA announced in mid-February 2017 that Westinghouse had revised the

projected completion dates again to April 2020 and December 2020, Deloitte told SCANA it should disclose that SCANA had not actually received a revised schedule or evaluated the feasibility of the revised dates. SUF ¶¶ 18–20.

Deloitte told SCANA to make the same disclosure in its 2016 10-K, telling SCANA that it needed to include a disclosure that it had not received a revised schedule or evaluated its feasibility. SUF ¶¶ 27–29. Recognizing that this was material and necessary information, Deloitte also asked SCANA management to sign a written representation letter representing that it had "not received any schedule information" from Westinghouse "to enable it to evaluate if the revised completion dates are feasible." SUF ¶¶ 32–33, 37. SCANA ultimately signed a revised version of the letter that confirmed that SCANA had received only "certain schedule information" from Westinghouse and that, therefore, SCANA "has only just begun to evaluate it to, among other things, determine whether the revised completion dates are feasible." SUF ¶ 36.

In SCANA's 2016 10-K, however, the Company did not disclose that material information, stating that "[a]s part of its responsibility as a subcontracted construction manager, Fluor, has reviewed and assisted in the development of an updated integrated project schedule which reflects WEC's revised estimated completion dates of April 2020 and December 2020 for Units 2 and 3, respectively." SUF ¶ 21. Even though Deloitte knew that SCANA had omitted material information, Deloitte nonetheless signed a clean audit report certifying that the 2016 financial statements were free of material misstatement.

**24.** **Disputed.** Plaintiff disputes this statement as conclusory and refers to the complete text of the 2015 and 2016 financial statements for the text of the disclosure. Exs, 10 at 78–80; 9 at 87–90. In addition, throughout 2016, SCANA disclosed that as part of its responsibility as construction manager, Fluor was developing a fully resource-loaded integrated schedule that would be complete

by the fourth quarter of 2016, and then SCANA disclosed in its 2016 10-K that "[a]s part of its responsibility as a subcontracted construction manager, Fluor has reviewed and assisted in the development of an updated integrated project schedule which reflects WEC's revised estimated completion dates of April 2020 and December 2020 for Units 2 and 3, respectively."); Ex. 74 at ¶ 173.

In its 2015 Form 10-K, SCANA defined a "fully integrated project schedule" as a schedule that incorporates "detailed evaluation of the engineering and procurement activities necessary to accomplish the schedules" the "engineering and design resource allocations, procurement, construction work crew efficiencies, and other items," the "timing of specific construction activities" and "related cost information." Ex, 10 at 78–79; *see also* Ex. 74 at ¶ 173.

25.    **Disputed.** The September 1, 2016 settlement agreement recognized ORS had not received from SCANA a Fluor-completed and updated fully resource-loaded integrated schedule, but did not state that such a schedule or no other schedule existed. Ex. 5; *see* Ex. 57. Further, SCANA misleadingly stated in its 2016 10-K issued on February 24, 2017—5 months after September 2016—that "Fluor has reviewed and assisted in the development of an updated integrated project schedule which reflects WEC's revised estimated completion dates of April 2020 and December 2020 for Units 2 and 3, respectively," Exs. 10 at 88; 3 at ¶¶ 38, 47–54.

Deloitte's report in the 2016 10-K that SCANA "maintained, in all material respects, effective internal control over financial reporting as of December 31, 2016," and that Deloitte "conducted [its] audit in accordance with the standards of the Public Company Accounting Oversight Board," Ex. 9 at 99, is false and misleading, given that, as Turner explains, Deloitte (1) lacked sufficient evidence to confirm the Nuclear Project's timely completion and SCANA's eligibility for tax credits, (2) did not perform necessary audit procedures for SCANA's capitalized

construction costs and project estimates, (3) failed to assess risks related to SCANA's financial disclosures, and (4) represented that Fluor had completed an integrated schedule that supported the GSCDs. *See* Exs. 59 ¶¶ 100–699; 3 ¶ 38, 75 at -7953, 7669 at 309:15–22, 309:23–310:19.

26.    **Disputed.** The statement is conclusory and unsupported by the cited evidence, which are improper affidavits containing statements that are not based on personal knowledge but rather on information and belief. ECF No. 265-32 at ¶¶ 21–22, 35; ECF No. 265-31 at ¶¶ 33, 40. Even if it were nonconclusory, one individual's statement about his belief from years ago does not make this a statement of fact. ECF No. 265-32.

Further, the evidence demonstrates that SCANA's 2015 and 2016 10-Ks did not fairly and accurately represent SCANA's understanding of the status of the Nuclear Project. For example, despite stating otherwise in the 2016 10-K, as of the issuance of the 2016 10-K, SCANA did not have "an updated integrated project schedule which reflects WEC's revised estimated completion dates of April 2020 and December 2020 for Units 2 and 3" from Fluor, let alone had SCANA evaluated whether the "revised completion dates" of April 2020 and December 2020 were "feasible." *Compare* Ex. 9 at 88, *with* SUF ¶¶ 38–41. Additionally, key Nuclear Project team members at SCANA contemporaneously did not believe the Nuclear Project and its rate recovery were on track. Exs. 11 at 63:25-64:14, 102:10-105:8, 111:18-112:18, 117:6-118:11; 142:13–19; 77 at 63:25-64:14; 1 at 232:25-233:21; 78; 79; 80. And on February 16, 2017, Zenk predicted that the first unit would be an additional 2 years late, or April 2022.  Ex. 81.

27.    **Disputed.** The proffered statements are unsupported by the cited evidence, which is an improper affidavit that (1) is not based on personal knowledge, (2) is inadmissible, and (3) cannot testify to what Westinghouse believed. ECF No. 265-33. Even if the cited evidence was admissible (which it is not), the affidavit does not support the proposition Deloitte uses it for.

28.     **Disputed.** The proffered statement is not supported by and misrepresents the cited evidence. Both Kenneth Browne and Carlette Walker testified that completion of the project in time to obtain the PTCs was neither realistic nor achievable, going so far as to say that SCANA could not have improved productivity or hired enough people to "finish the plan according to the schedule[.]"(Ex, 11 61:22-62:5); *see also* Exs, 1 at 302:14–17; 11 118:3–11; 105:4–8; 266:8–20). Walker estimated that, based on the productivity factors, the project would not be completed until 20 to 30 months after the PTC deadline Ex. 1 at 254:12–20.

29.     **Disputed.** Despite its assurances to the SCANA Audit Committee that construction specialists would be integral to its audits, Deloitte never used construction specialists to plan or perform audit procedures during its 2015 Audit. *See, e.g.*, Exs. 70; 67 at 109:15-21, 111:12-19, 111:22-112:14, 112:23-113:3, 130:19-133:7, 113:14-18, 132:10-14, 109:15-21, 111:6-11, 132:21-25, 133:2-7113:4-13 and 210:22-211:4, 119:20-120:17, 120:18-121:10, 132:3-9, 175:2-176:4; 68 at 226:5-15, 227:25-228:15, 241:15-242:7; 2 at 43-45, 50:7-53:6, 228:21-229:8, 264:18-265:14, 298:14-24, 299:25-300:4; 69 at 227:24-228:8.

Instead, Deloitte assigned the primary responsibility for auditing SCANA's nuclear disclosures and internal controls to Natashia Hawkins, a 25-year-old junior auditor with only two years of auditing experience and no prior experience with large construction projects. Ex. 69 at 30:15 – 32:20. Despite that limited experience, Hawkins was responsible for performing Deloitte's substantive procedures and internal control testing related to the Nuclear Project, Ex. 69 at 168:16–20, 78:2–14, including (1) reviewing the Consortium's reports on the status of construction and (2) preparing the audit documentation of those procedures. Exs. 82 and attachments; 83 and attachment; 84, 80; 85; 86 and attached Ex. 87; *see also* Ex. 1 at 221:3–8. Ms. Hawkins testified that she could not recall receiving any training, guidance, or consultation with construction

specialists to prepare her for these tasks. Ex. 69 42:18–23, 205:7–13, 227:19–23, 227:19-228:8, 225:15 – 228:8. Hawkins further testified that she did not have any other reasons other than Deloitte's use of Deloitte templates for believing that Deloitte complied with PCAOB Standards for the 2015 and 2016 SCANA Audits. Ex. 69 at 60:9–16.

Tricia Pemberton, Deloitte's Quality Assurance Partner, noted in both a contemporaneous document and in her testimony that she had no experience working with nuclear companies prior to the SCANA engagement. Ex. 88 at 81:14–18; *id.* at 28:10-29:19, 33:7-34:16, 37:20-38:9; Ex. 89 at '5959. PCAOB Standards required the engagement quality reviewer to "possess the level of knowledge and competence related to accounting, auditing, and financial reporting required to serve as the engagement partner on the engagement under review." Ex. 90 at ¶ 5.

Neither Hawkins nor Little nor Schulz had any experience auditing companies undergoing mega construction projects like V.C. Summer prior to the SCANA engagement. *See* Exs. 69 at 30:15 – 32:20; 42:6-17; 2 at 173:23-174:8; *see also* Ex. 1 at 321:14–322:5 (testifying that she "never heard or saw anybody other" than Eileen Little and the "young girls that were working on the audit.").

30.    **Disputed.** The proffered material fact is unsupported by the cited evidence, which is an uncorroborated audit workpaper that Deloitte refused to admit are records of acts or events by someone with knowledge. Ex. 91.

Further, under PCAOB Standards, Deloitte was required to document audit procedures that enabled it to confirm SCANA's financial statements, Ex. 105, which Plaintiff's expert explained that Deloitte did not do: Deloitte's audit workpapers did not comply with that standard as it represented that procedures were performed when they were not, omitted procedures that Deloitte performed that identified audit evidence inconsistent with the NND disclosures, and

misrepresented procedures that were performed. *See, e.g.*, Ex. 59 at ¶¶ 802–806.

      **31.**   **Disputed.** Deloitte did not "[o]btain sufficient, appropriate, and persuasive audit evidence" "to support the accuracy and completeness of the Nuclear Project construction schedule, GSCDs, EAC, and Tax Credit disclosures." Ex. 59 at ¶¶ 270. Former Chief Accountant of the SEC, Lynn Turner, detailed in a 400-page expert report outlining all of the ways that Deloitte failed to meet the PCAOB Standards, including detailing why the audit evidence Deloitte received and/or reviewed was not confirmatory of SCANA's financial statement disclosures, and how Deloitte failed to test those disclosures. *See id.* at ¶¶ 100–699.

      **32.**   **Disputed.** The proffered material fact is not supported by the cited evidence, which includes Deloitte's interrogatory responses that are neither based on personal knowledge nor corroborated. There is no evidence in the record of the actual number of hours recorded for the procedures performed, as Deloitte denied that records of logged hours produced in discovery are accurate and complete records of the time recorded on the 2015 and 2016 SCANA Audits, nor do the records provide any sort of indication of the number of hours spent on the financial statement disclosures. Ex. 91 at 7–8.

      **33.**   **Disputed.** As Plaintiff's expert explained, the record evidence does not support that Deloitte obtained sufficient audit evidence related to SCANA's financial statements. Ex. 59 at ¶¶ 267–270, 279–81, 289–291, 314–316, 352, 356, 363, 377, 508–510, 518–519, 565, 569, 583–584, 595, 669–672, 699, 770, 777, 799–800, 803, 805–808. Further, the record evidence demonstrates that any third-party confirmations received by Deloitte were not confirmatory of SCANA's financial statements. *Id.*; *see also* Ex. 74 at ¶ 456; SUF ¶ 28. Plaintiff also specifically disputes that Deloitte had reviewed "ORS review reports on the status of Nuclear Project construction" as those reports stopped after July 2015. Ex,. 29at 36:13–25.

34.    **Disputed.** Plaintiff disputes this statement as Plaintiff's expert makes clear that Deloitte's audit procedures were deficient according to PCAOB standards and explained how none of the audit procedures were confirmatory of SCANA's Nuclear Project disclosures. *See, e.g.*, Ex. 59 at 802–06; *see* Response to #33; ECF No. 265-32; Ex. 52 at 12765.

35.    **Disputed.** This proffered fact misrepresents Mr. Turner's testimony, which stated that while Deloitte "did . . . work," it was not "work that then met the requirements of the standards with respect to the type and level of evidence[.]" Ex. 14 at 250:2–8.

36.    **Disputed.** This proffered fact misrepresents testimony, in which Mr. Turner testified that he is "not allowed to answer that question [about whether Deloitte acted fraudulently]" because it would violate AICPA standards. Ex. 14 at 186:24–187:8.

37.    **Disputed.** As noted in the prior response, this misrepresents Mr. Turner's testimony, in which he explained that "[i]ntent runs back to the fraud issue," on which he is not allowed to opine under AICPA standards. Ex. 14 at 189:5 – 189:10.

38.    **Disputed.** This misrepresents Turner's testimony for the same reasons explained in #35: Mr. Turner's testimony stated that while Deloitte "did . . . work," it was not "work that then met the requirements of the standards with respect to the type and level of evidence[.]" Ex, 14 at 250:2–8. Additionally, while Deloitte may have made certain suggested changes to SCANA about its Nuclear Project disclosures in order to make them accurate, SCANA did not incorporate those changes into its financial statements, yet Deloitte still signed off on and provided clean Audit Reports on both the 2015 and 2016 10-Ks. SUF ¶¶ 19–21, 28–31; *see also* Exs. 92, 83, 84, 93, 94, 95, 96, 97.

39.    **Disputed.** Plaintiff disputes this statement as incomplete. In late 2015 or early 2016, Walker raised the accuracy of the Consortium's construction schedule and cost estimates to

senior management, including Kevin Marsh and Jimmy Addison. Ex. 98 at 44:14 – 46:11, 201:2 – 202:17. Walker specifically provided Addison with a file that documented the findings of SCANA's internal EAC Review Team, Ex. 21 at 36:6 – 41:17, Ex. 1 at 30:18-21, 247:16-249:21, which had concluded in January 2015 that based on the Consortium's productivity, the costs to complete the Nuclear Project would be at least $500 million higher than the Consortium's estimates that SCANA submitted to the PSC, Exs. 99; 98 at 36:6 – 41:17. By that time, Deloitte knew the EAC Review Team's assessment that the Consortium's target of a 1.15 productivity factor had been proven correct, with the productivity factor steadily rising throughout 2015. Ex. 99. Walker raised and was aware of myriad problems with the Nuclear Project's completion and schedule. *See* Ex. 1 at 178:20-179:17, 238:22-25, 251:15-252:1, 254:1-20, 302:14-17, 373:11-374:24, 391:20-392:19; *see also* Ex. 59 at ¶¶ 443–504. As a result, as Walker testified, she thought SCANA's reporting of the Nuclear Project in its filings with the SEC, including statements indicating that "the completion dates stood as they were and that that was correct," was false. Ex. 1 at 246:5–9, 246:24 – 247:7.

40. **Disputed.** Plaintiff's expert documented the shortcomings in Deloitte's investigation into Walker's concerns. Ex. 59 at ¶¶ 443–504. According to a Deloitte workpaper, Little and Schulz attended a meeting with SCANA's investigators on February 15, 2016, where SCANA's "final report regarding the investigation was read to them," Ex. 104 at '7953–6. Ms. Little testified that the read-out of the final report was the only documentation that Deloitte obtained of the work conducted by SCANA in connection with the Walker Investigation, and further testified that she did not obtain SCANA's records of the interviews they conduced or any written documentation from the interviews, Ex. 68 at 266:4–7, 270:2–7; did not keep any records of her own interviews or take notes, *id.* at 255:20–256:7; did not inspect Walker's emails that

SCANA allegedly reviewed, and did not confirm that any such email review was conducted, *id.* at 286:23–288:15. That final report said nothing about any interviews or review of emails; instead, the report's findings on Walker's allegations (which are barely a half page long) mention only an assessment of Byrne's testimony and an interrogatory response. Ex. 100.

Sprowls was asked to review SCANA's investigation of Walker's concerns, Ex. 63 at 149:6-150:2,152:14–22,160:14–20, and noted that the investigation was conducted by three lawyers with SCANA's office of general counsel, who had "limited or no construction, engineering, or project management background" or "experience," Ex. 63 at 157:25-158:9, 159:18-22, 161:10-162:12, 166:22-167:2, 168:1-6, and 170:7-171:23; Ex. No. 117. Kevin Monroe, Deloitte's fraud specialist, explained that, as it relates to Walker's concerns, "the consultation with [him] was, effectively, focused on Deloitte's response to the audit team's response to the company's investigation in their manner of addressing it from their perspective and its effect on our audit procedures, if any." Ex. 101, 132:11 – 136:18

While Deloitte attended a SCANA Audit Committee meeting where Walker raised concerns over internal controls, Deloitte never talked to Walker directly about her allegations, including about her concerns about the schedule, internal controls, or WEC's management. Ex. 1 at 277:23-278:12, 280:9–12; 308:19–22, 318:20-319:22; *see also id.* at 227:13–17, 254:23-255:1, 260:3–18, 273:21–24, 319:25-320:7, 358:16-359:1, 359:20–25. They also did not speak to Browne or Smith about Walker's allegations, nor were either of them aware of any other inquiries. Exs. 11 at 137:4–138:25, 140:3–21; 16 at 133:22–134:11; *see also* Ex. 11 at 63:25-64:14, 111:18-112:18, 142:13–19. Smith testified that he never told Deloitte that he did not agree with Walker. Ex. 16 at 133:15–21.

Other than the Walker Investigation Report that was ready orally to Deloitte, Deloitte never

asked SCANA to provide any documents prepared, collected, or reviewed in connection with the Walker Investigation, including interview notes, memoranda, or other written documentation of interviews conducted, documents reviewed, and investigation methods (including search terms used to identify documents). ECF No. 265-32 at ¶ 15I; Exs. 102, 104.

Yet, Deloitte knew by mid-June 2016 that SCANA intended to code the $2.5 million settlement payment to Walker in a way that would conceal it from Santee Cooper, regulators, and the public. Ex. 102

41.     **Disputed.**  Refer to response #40.

42.     **Disputed.** The purportedly expanded "fraud inquiry" was comprised of only one interview with Walker's successor, who had no role in the Nuclear Project up until that time, and a generic three-question email sent to three people – only one of which replied – the day *after* Little completed her workpaper on the Walker investigation. Exs. 1 at 309:14–310:2; 11 at 137:4–138:25; 103; 10.

43.     **Disputed.** Plaintiff disputes the use of "including" in the proffered statement, as there is no evidence that Deloitte considered any other evidence. The record evidence is clear that Deloitte failed to consider relevant audit evidence when conducting its review of the Walker investigation. *See* Ex. 59 at ¶¶ 443–504.

44.     **Disputed.** Plaintiff disputes the proffered as it mischaracterizes the cited evidence, which does not state "productivity factors moving forward would be between 1.5 to 2." Plaintiff further disputes the proffered fact that "by September 2016, the information that Walker claimed was withheld from regulators was known with specificity by those regulators through publicly filed documents" as conclusory and unsupported by evidence. Further, SCANA did not disclose to

regulators the internal cost estimates or performance factor analysis developed by the EAC Review Team. Ex. 105 at 77:23–78:16.

45.    **Disputed.** Plaintiff disputes Deloitte's use of "opinions" to refer to what are titled audit "reports." *See* Ex. 10 at 44, 104, 142, 146; 9 at 44, 98, 99, 103. Additionally, the financial statements include the primary financial statements themselves, as well as the associated notes to the financial statements and disclosures. Ex. 68 at 19:24–20:20. Plaintiff alleges and the evidence shows that Deloitte's misconduct and its issuance of "clean" audit reports, concealed and dramatically understated the foreseeable material risks that SCANA would not complete the Nuclear Project by the GSCDs or PTC deadlines, that the Nuclear Project was not on schedule or on budget, that no integrated schedule existed that supported meeting the GSCDs or PTC deadlines, and, ultimately, that SCANA would be unable to recoup its costs under the BLRA and be the subject of numerous investigations. Exs. at 53–144; 17 at 39–74. Deloitte's failure to comply with PCAOB Standards and that SCANA's financial statements were not in accordance with GAAP rendered its unqualified Audit Reports materially false and misleading. *See* Ex. 59 at pp. 100–369.

46.    **Disputed.** Plaintiff partially disputes the first sentence in the proffered statement as incomplete and refers to the full text of the Bechtel reports. Defs. Ex 63; Defs. Ex. 64. Plaintiff disputes the second sentence in the proffered statement because it is not supported by the cited evidence, which is an audit workpaper that states only that "[t]o date we are not aware of any information that would lead us to believe that Deloitte & Touche LLP audit team was aware of either a project assessment performed by Bechtel or any related formal report that was issued by Bechtel, prior to August 22, 2017." Defs Ex. 51.

47. **Disputed.** As Plaintiff's expert's report shows, SCANA's stock price was artificially inflated by the lack of truth in the market about the true status of the Nuclear Project's schedule and costs, the investigations and regulatory actions facing SCANA, SCANA's inability to recover losses from the Nuclear Project under the BLRA, and SCANA's lack of a reliable, fully resource-loaded, integrated schedule that supported the GSCDs, all by way of Deloitte's clean unqualified audit reports. Ex. 57 ¶¶ 11; *see* Ex. 106 at 259:11–260:12, 263:14-264:2; *see also* Exs. 57 at ¶¶ 76–287, 303, 320, 325, 329; 17 at 37, 39–74.

48. **Disputed.** While the corrective disclosures and inflation creating events do not explicitly reference Deloitte's Audit Reports, as Plaintiff's expert makes clear, the Corrective Disclosure Events implicitly reference and correct the foreseeable risks stemming from Deloitte's misleading clean Audit Reports of SCANA's financial statements. *See* Exs. 57 at ¶¶ 76–287, 289; 17 ¶¶ 64, 69–131; *see also* Ex. 106 at 277:7-24.

49. **Disputed.** A number of the corrective disclosures and inflation creating events reference the information included in SCANA's financial statements that Deloitte audited. *See* Ex. 116. Further, as Plaintiff's expert makes clear, the Corrective Disclosures Events also implicitly reference and correct the foreseeable risks stemming from Deloitte's misleading clean Audit Reports of SCANA's financial statements. *See* Ex. 57 at ¶ 85-86, 289; *see also* Ex. 106 at 277:7-24.

50. **Disputed.** The cited evidence provides no basis for speaking to how "financial analysts" interpreted the corrective disclosures. Further, the evidence shows that analysts did interpret the Corrective Disclosure Events to be corrective of the foreseeable risks stemming from Deloitte's misleading clean Audit Reports on SCANA's financial statements. *See* Exs. 57 at pp. 53–144; 17 at pp. 37, 39–74.

51.     **Disputed.** Disputed for the same reasons stated in Response #50.

52.     **Disputed.** By omitting relevant information about the true status of the Nuclear Project, Deloitte's clean and unqualified audit reports bolstered investors' confidence, even though market commentary did not explicitly reference Deloitte. *See* Ex. 57 at ¶¶ 288–329.

53.     **Disputed.** The proffered statement of fact omits relevant context from Dr. Cain's testimony, in which Dr. Cain explained that he was "not allocating any disclosure to particular falsities that are alleged in the 10-Ks but, rather, explaining how a portion of the relevant truth was revealed to investors on this date." Ex. 106 at 220:2–6.

54.     **Disputed.** The proffered statement of fact omits relevant context from Dr. Cain's testimony, in which Dr. Cain explained that he was "not suggesting the specific wording of any hypothetical but-for disclosure," but rather was "describing the relevant economic factors that any such disclosure would convey based upon my understanding of the Complaint's allegations." Ex. 57 at ¶ 38 n.94.

55.     **Disputed.** The cited evidence provides no basis for speaking to what investors knew. Further, SCANA made no disclosures about what SCANA had in terms of a resource loaded schedule, other than to falsely state in its 2016 Form 10-K issued on February 24, 2017, that "Fluor has reviewed and assisted in the development of an updated integrated project schedule which reflects WEC's revised estimated completion dates of April 2020 and December 2020 for Units 2 and 3, respectively." Ex. 9 at 88. Further, at no point did SCANA publicly disclose that they were not operating under a reliable schedule or that they did not have a reliable, fully resource-loaded integrated schedule supporting the GSCDs, which is critical because "[a] regulator stating that they have not received a schedule is not the same as SCANA announcing that they did not have one or that one does not exist." Ex. 17 at Section III.B.iii.

56.     **Partially disputed.** The "WEC/Toshiba Events" partially revealed the relevant truth about the status of the NND, as the financial condition of Westinghouse – the contractor for the Nuclear Project – was directly related to whether the Nuclear Project would be completed "on schedule and on budget." Exs. 57 at ¶¶ 113–77, 296–303; 7 at ¶¶ 79–90, 118–27; *see, e.g.*, Ex. 18 at 42, 46–47.

57.     **Disputed.** The cited evidence does not support what was "revealed to the investing public." As Dr. Cain explain, the "WEC/Toshiba Events" partially revealed the truth about the status of the NND, as the financial condition of Westinghouse – the contractor for the Nuclear Project – was directly related to whether the Nuclear Project would be completed "on schedule and on budget" such that SCANA would qualify for the PTCs. *See* Exs. 19 at ¶¶ 113–77, 296–303; 17 at ¶¶ 79–90, 118–27; *see, e.g.* Ex. 18 at 42, 46–47.

58.     **Disputed.** Dr. Cain explains that the "WEC / Toshiba Events" partially revealed the truth about the status of the NND, as the financial condition of Westinghouse – the contractor for the Nuclear Project – was directly related to whether the Nuclear Project would be completed "on schedule and on budget" such that SCANA would qualify for the PTCs. *See* Exs. 19 at ¶¶ 113–77, 296–303; 17 at ¶¶ 79–90, 118–27; *see, e.g.* Ex. 18 at 42, 46–47.

59.     **Disputed.** As Dr. Cain testified, he is not offering any opinions about what PCAOB Standards or GAAP required SCANA to disclose in its financial statements.  *See* Ex. 106 at 278:17–279:2. As Dr. Cain explains in his report, the 2015 and 2016 financial statements did not need to explicitly mention this WEC and Toshiba information in order to have concealed relevant schedule and cost information from investors. *See* Exs. 19at ¶¶ 113–77, 296–303; 17 at ¶¶ 79–90, 118–27.

60.     **Disputed.** After July 28, 2017, the foreseeable risks stemming from Deloitte's misleading audit reports continued to materialize, including "new details related to SCANA's prudency regarding the Nuclear Project, the threat of investigations and regulatory action, and SCANA's ability to recoup losses from the project, all of which Plaintiff alleges were hidden from investors by Defendants' false statements." Ex. 17 at ¶¶ 108–31; *see also* Ex. 57 at ¶¶ 178–287, 304–329.  Further, after July 28, 2017, the Corrective Disclosure Events continued to "partially reveal[] information that corrected the false and misleading statements and omissions" about the status of the project and recovery under the BLRA. *See* Exs. 57 at ¶¶ 113–77, 296, 302; 17 at ¶¶ 108–31; *see, e.g.*, Ex. 18 at 42, 46–47.

61.     **Disputed.** Deloitte cites to no evidence of what the "market understood." *See* Ex. 17, Section V.B.iii.

62.     **Disputed.** First, Deloitte cites no evidence of what the "market understood." Second, after July 28, 2017, the foreseeable risks stemming from Deloitte's misleading clean Audit Reports continued to materialize, including "new details related to SCANA's prudency regarding the Nuclear Project, the threat of investigations and regulatory action, and SCANA's ability to recoup losses from the project, all of which Plaintiff alleges were hidden from investors by Defendants' false statements." Ex. 17 at ¶¶ 108–17; *see also* Ex. 57 at Sections VII.H-VII.S. Further, after July 28, 2017, the Corrective Disclosure Events continued to "partially reveal[] information that corrected the false and misleading statements and omissions" about the status of the project and recovery under the BLRA.  *See* Ex. 57 at ¶¶ 113–77, 296, 302; Ex. 17 at ¶¶ 108–31; *see, e.g.* Ex. 18 at 42, 46–47.

63.     **Disputed.** First, Deloitte cites no evidence of what the "market understood." Second, the "Post-Abandonment Events" continued to "partially reveal[] information that

corrected the false and misleading statements and omissions" about the status of the NND and the decreasing likelihood of recovery under the BLRA, as no such information was understood and no such risks materialized until the "Post-Abandonment Events." Ex. 17 at ¶¶ 118–31. What the "WEC/Toshiba Events" disclosed was that meeting the GSCDs and PTCs was significantly less likely than previously understood. Ex. 57 at 58–91; Ex. 17 at 45–53.

64.    **Disputed.** The cited portions of Mr. Turner's report state only what Deloitte should have disclosed in order to make its audit reports not misleading to investors; he did not opine on what the foreseeable risks were that stemmed from Deloitte's misleading clean audit reports. Ex. 59.

65.    **Disputed.** In the 2016 10-K, SCANA misleadingly represented that SCANA would complete the Nuclear Project in time to receive the $1.4 billion in tax credits, stating "[b]ased on the guaranteed substantial completion dates provided above [August 2019 and 2020], both New Units are expected to be operational and to qualify for the nuclear production tax credits." Ex. 10 at 80, 135. It further omitted material information necessary to make its 2016 10-K not misleading. *See* Ex. 59 at ¶¶ 700–800.

66.    **Disputed.** The statement misrepresents the cited evidence, in which Dr. Cain states: "To be clear, I am not suggesting that Deloitte should have necessarily disclosed the abandonment of the Nuclear Project as of the first day of the Class Period. Instead, it is my understanding that Plaintiff alleges that Deloitte should have disclosed the true status of the Nuclear Project on the first day of the Class Period. Had Deloitte disclosed the true status of the Nuclear Project on the first day of the Class Period, SCANA's Common Stock price would have reflected its true, non-artificially inflated value at that time. Because Deloitte did not disclose the true status of the Nuclear Project on the first day of the Class Period, then the market learned the relevant truth, in

part, through the revelation of Toshiba's $2.168 billion payment for its Westinghouse obligations to the Nuclear Project, material overrun of anticipated Westinghouse estimates for costs of the Nuclear Project, and the inability to qualify for production tax credits on the July 28, 2017 Corrective Disclosure Event." Ex. 17 at ¶ 93.

67.  **Disputed.** The evidence demonstrates that SCANA's stock price experienced a statistically significant, negative decline on each of the Corrective Disclosure Events, and that each of those negative declines was the result of the materialization of the very risks that Deloitte itself identified and investors were focused on – which Deloitte's own expert concedes. *See* Exs. 57 at p. 53–144; 58 at 83:11–24; 89:9–90:14; 92:12–93:17; 94:11–20; 95:12–23; 96:22–97:14; 98:8–16; 100:2–18; 101:11–18; 102:12–103:3; 103:20–104:5; 104:21–105:10; 106:3–15; 107:18–108:5; 108:22–109:9; 110:2–11; 111:4–15; 112:18–113:12; 114:6–16; 115:9–23 (concessions "that Dr. Cain correctly identified in his merits report all of the SCANA specific news that was disclosed on each of the alleged Corrective Disclosure Event"), *id.* at 82:12–83:3; see also id. at 80:21–81:7; 81:22–82:7; 86:21–87:5; 137:10-139:5 (testifying that all of the calculations in "Dr. Cain's event study output . . . [are] accurate and reliable."), *id.* at 85:24–86:20; 90:15–92:11; 93:18–94:10; 94:21–95:11; 96:7–21; 97:15–98:7; 98:17–99:25; 100:19–101:10; 101:19–102:11; 103:4–19; 104:6–20; 105:11–106:2; 106:16–107:17; 108:6–21; 109:10–25; 110:12–111:3; 111:16–112:17; 113:13–114:5; 114:17–115:8; 115:24–116:15 (concessions that "Dr. Cain properly calculated the abnormal declines in the market price of SCANA common stock on each of the alleged Corrective Disclosure Events"), *id* at 86:21–87:5; 90:21–92:11; 93:18–94:10; 94:21–95:11; 96:7–21; 97:15–98:7; 98:17–99:25; 100:19–101:10; 101:19–102:11; 103:4–19; 104:6–20; 105:11–106:2; 106:16–107:17; 108:6–21; 109:10–25; 110:12–111:3; 111:16–112:17; 113:13–114:5; 114:17–115:8; 115:24–116:15 (testifying "that Dr. Cain's event study correctly identified that SCANA common

27

stock experienced a statistically significant and abnormal price decline on each of the alleged Corrective Disclosure Event"), *id.* at 116:25–117:10; 123:14–124:3 (testifying that "he was not opining that Dr. Cain's use of 2-day event windows on the alleged Corrective Disclosure Events was "improper"). *See also* Exs. 107 at ¶ 27; 58 at 229:6-231:6; 17at p. 37, n. 83; 66 at '00733931; 17 at pp. 39–74.

## II.    PLAINTIFF-OPPONENT'S ADDITIONAL MATERIAL FACTS IN SUPPORT OF ITS OPPOSITION TO DELOITTE'S MOTION FOR SUMMARY JUDGMENT

1.    In response to the constant stream of issues with the Nuclear Project, SCANA and Santee Cooper had formed a Construction Oversight Review Board – an external group tasked with, among other things assessing the "establishment and implement of" an integrated schedule. *See* Exs. 59 at ¶¶ 169, 591–97; 108 at 157:11–158:14.

2.    Little was unable to state more than one piece of evidence in support of the August 2019 and 2020 GSCDs. Ex. 68 78:12-80:13.

3.    Members of Deloitte's SCANA Audit Team testified that it was not Deloitte's role to evaluate the Nuclear Project's performance factors, including the productivity factor; that Deloitte was neither auditing nor "focused on the schedule"; and that Deloitte was "not opining on" "[w]hether their estimates for completion dates were accurate." *See, e.g.,* Exs. 69 at 208:22 – 210:2, 231:15 – 234:14; 68 at 205:11–21 and 313:12–16; *see also* Ex. 1 at 221:3–8.

4.    Deloitte recognized that Carlette Walker's experience "provided her with the necessary background in technical accounting matters (both in disclosures requirements monitored by the SEC and guidance mandated under GAAP), regulatory and compliance matters and oversight responsibilities to oversee the financial aspects and critically assess the information she receives from the Consortium each period." *See, e.g.*, Ex. 92 at '12751.

5.    Deloitte held three quarterly update meetings with Walker in 2015 that lasted from 20 to 30 minutes each.  Ex. 1 at 221:3–8, 351:5–16, 318:20-319:22, 319:25-320:7, 228:15–18, 254:23-255:1, 273:21–24, 358:16-359:1, 359:20–25; Ex. 92.

6.    Hagood testified to the ongoing issue lack of schedule information from WEC. ECF No. 265-31 at 159:17-160:1, 162:4–6, 164:3–7, 164:23-165:6, 167:2–8.

7.  In August and September 2016, Fluor considered the existing project schedule to be "unrealistic," "improbable," "unachievable," and "a complete farce," and did not trust any schedule dates "outside of 3 weeks." Exs. 97, 109, 110.

8.  Fluor also documented that while Westinghouse personnel privately, "off the record" agreed that the current Westinghouse project schedule was "unrealistic" and "not achievable," "almost certainly none would likely commit to any kind of formal acknowledgement or confirmation of the same." Exs. 97, 109, 110.

9.  Westinghouse ordered Fluor to stop developing an independent schedule and refused to provide Fluor with any copies of the schedule or perform any risk review or evaluations on the overall schedules. Exs. 111, 112.

10. In December 2016, Westinghouse assigned Kenneth Langdon, the Vice President and Deputy Project Director of the Nuclear Project, who was responsible for project execution and forecasting, to conduct an independent review of the ETC, which used the expertise of Westinghouse and Fluor's employees, as well as experts from KPMG and Alix Partners. Langdon presented the results to Westinghouse that the revised ETC required an increase of $7.08 Billion and that the current GSCDs "were not achievable, and that even with significant improvements to productivity and efficiency, it was not possible that any of the projects would be completed on schedule." Ex. 113.

February 28, 2025

Respectfully submitted,

/s/ *Williams Tinkler*

William Tinkler (D.S.C. Bar Number 11794)
TINKLER LAW FIRM LLC
PO Box 31813
Charleston, SC 29417-1813
Tel.: (843) 853-5203
Fax: (843) 261-5647
williamtinkler@tinklerlaw.com

*Liaison Counsel for Lead Plaintiff and the
Class*

COHEN MILSTEIN SELLERS & TOLL
PLLC
Laura H. Posner
88 Pine Street, 14th Floor
New York, New York 10005
Tel.: (212) 220-2925
Fax: (212) 838-7745
lposner@cohenmilstein.com

Steven J. Toll (admitted *pro hac vice*)
Jan Messerschmidt (admitted *pro hac vice*)
Margaret (Emmy) Wydman (*pro hac vice*
forthcoming)
1100 New York Avenue, N.W., Suite 800
Washington, D.C. 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
jmesserschmidt@cohenmilstein.com
ewydman@cohenmilstein.com

*Lead Counsel for Plaintiff and the Class*

31