## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS LOCAL 98
PENSION FUND on behalf of itself and all
others similarly situated,

        *Plaintiff*,

vs.

DELOITTE & TOUCHE, LLP;
DELOITTE LLP,

        *Defendants*.

Case No. 3:19-cv-3304-JDA

## CLASS ACTION

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR AN ORDER PRELIMINARILY APPROVING CLASS ACTION SETTLEMENT AND AUTHORIZING DISSEMINATION OF NOTICE OF SETTLEMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................................. 3

    I.     Pleading Stage.................................................................................................... 3

    II.    Motions to Dismiss, for Class Certification, for Summary Judgment, and to Exclude Expert Opinions ................................................................. 4

    III.   The Parties' Settlement Negotiations................................................................. 5

    IV.   Terms of the Proposed Settlement ...................................................................... 6

    V.    The Proposed Notice Process.............................................................................. 8

ARGUMENT .......................................................................................................................... 9

    I.     The Court Should Grant Preliminary Approval of the Proposed Settlement........ 10

         A.    The Settlement Is the Product of Good-Faith, Arm's-Length Negotiations Among Experienced Counsel and a Mediator..................... 11

         B.    The Proposed Settlement Falls Well Within the Range of Approval ....... 13

         C.    The Settlement Treats All Settlement Class Members Fairly.................. 17

         D.    The Settlement Does Not Excessively Compensate Plaintiff's Counsel ................................................................................................ 18

    II.    The Court Should Approve the Proposed Form of Notice and Plan for Providing Notice to the Settlement Class ........................................................... 19

    III.   Proposed Schedule of Events............................................................................ 22

CONCLUSION...................................................................................................................... 23

**Cases**                                                                                                        **Page(s)**

*Bilinsky v. Gatos Silver, Inc.*,
    No. 22-CV-00453-PAB-KAS, 2024 WL 4494290 (D. Colo. Oct. 15, 2024).........................12

*Brown v. Charles Schwab & Co.*,
    No. 2:07-CV-03852-DCN, 2011 WL 13199227 (D.S.C. July 26, 2011) ...............................14

*Cosby v. Miller et al. (TV2)*,
    No. 3:16-cv-00121-TAV-DCP (E.D. Tenn. 2022) ................................................................20

*Epstein v. World Acceptance Corp.*,
    No. 6:14-cv-01606- MGL, 2017 WL 11461887 (D.S.C. Dec. 18, 2017)..............................19

*In re Genworth Fin. Sec. Litig.*,
    210 F. Supp. 3d 837 (E.D. Va. 2016) ...................................................................................19

*Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    855 F. Supp. 825 (E.D.N.C. 1994).......................................................................................10

*In re LandAmerica 1031 Exch. Servs., Inc. IRS § 1031 Tax Deferred Exch. Litig.*,
    MDL No. 2054, 2012 WL 13124593 (D.S.C. July 12, 2012) .................................................10

*In re Initial Pub. Offering Sec. Litig.*,
    226 F.R.D. 186 (S.D.N.Y. 2005) .........................................................................................13

*In re Jiffy Lube Sec. Litig.*,
    927 F.2d 155 (4th Cir. 1991) ...............................................................................................11

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
    No. 0:15-CV-02393-MGL, 2018 WL 3105072 (D.S.C. June 25, 2018) ...............................18

*Kirven v. Cent. States Health & Life Co. of Omaha*,
    No. CA 3:11-2149- MBS, 2015 WL 1314086 (D.S.C. Mar. 23, 2015)...........................11, 13

*In re Mut. Funds Inv. Litig.*,
    No. 04-MD-15863, 2011 WL 1102999 (D. Md. Mar. 23, 2011).................................9, 19, 21

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l Inc.*, No. 1:17-cv-05543-
    WHP, 2021 WL 76328 (S.D.N.Y. Jan. 7, 2011).....................................................................16

*Reed v. Big Water Resort, LLC*,
    No. 2:14-cv-01583-DCN, 2016 WL 374816 (D.S.C. Feb. 1, 2016).......................................10

*In re Regions Morgan Keegan Sec., Derivative, and ERISA Litig.*,
    No. 07-2784, 2016 WL 8290089 (W.D. Tenn. Aug. 2, 2016)................................................14

*S.C. Nat'l Bank v. Stone*,
  749 F. Supp. 1419 (D.S.C. 1990)......................................................................................11, 13

*In re SCANA Corporation Securities Litigation*,
  No. 3:17-cv-02616 (D.S.C.)...........................................................................1, 8, 9, 20

*Sykes v. Harris*, 2016 WL 3030156, (S.D.N.Y. May 24, 2016) ...................................14

*Temp. Servs., Inc. v. Am. Int'l Grp., Inc.*,
  No. 3:08-cv-00271-JFA, 2012 WL 13008138 (D.S.C. July 31, 2012).....................11

*In re The Boeing Co. Sec. Litig.*, No. 25-1492 (4th Cir.)...............................................14

*In re The Mills Corp. Sec. Litig.*,
  265 F.R.D. 246 (E.D. Va. 2009) ...............................................................................19

*Turka v. S.C. Pub. Serv. Auth.*,
  No. 2:19-cv-1102 (D.S.C. Feb. 11, 2021).................................................................21

*In re Wells Fargo & Co. Sec. Litig.*,
  No. 1:20-cv-04494-JLR-SN (S.D.N.Y. Sept. 8, 2023), ECF No. 207......................13

**Other Authorities**

5 James Wm. Moore, *Moore's Federal Practice* (3d ed. 2002).....................................10

Larni T. Bulan & Eric Tam, *Securities Class Action Settlements 2024 Review &
  Analysis*, Cornerstone Research (2025),
  https://www.cornerstone.com/insights/reports/securities-class-action-filings-
  2024-review-and-analysis/....................................................................................14

Lead Plaintiff International Brotherhood of Electrical Workers Local 98 Pension Fund ("Lead Plaintiff") submits this memorandum of law in support of its unopposed motion for entry of the proposed Order Preliminarily Approving Settlement and Authorizing Dissemination of Notice of Settlement ("Preliminary Approval Order" or "PAO"), as agreed upon by Lead Plaintiff and Defendants Deloitte & Touche, LLP and Deloitte LLP (together, "Defendants" or "Deloitte").[1]

## INTRODUCTION

After nearly six years of hard-fought litigation, Lead Plaintiff and Defendants ("Parties") have reached an agreement to settle all claims against Deloitte in this securities class action for $34 million in cash. This recovery adds to the $192.5 million settlement in the earlier class action brought against Deloitte's former client, SCANA Corporation, as well as SCANA's senior officers, *In re SCANA Corporation Securities Litigation*, No. 3:17-cv-02616 (D.S.C.). The total combined recovery to SCANA investors arising out of the alleged fraud involving the construction of the V.C. Summer nuclear project is $226.5 million.

This is an excellent result for the Class. The $34 million recovery from Deloitte is one of the largest securities class action settlements against an auditing firm in the last decade, and represents a substantial portion of—or even exceeds—the total amount that could have been recovered at trial. The settlement was also reached after extensive litigation, at a time when the Parties were fully aware of the strengths and weaknesses of their respective positions, and was the culmination of extensive arm's length negotiations overseen by a well-respected mediator. It also

---

[1] All capitalized terms not defined herein have the meanings ascribed to them in the Stipulation and Agreement of Settlement, dated October 10, 2025 (the "Stipulation"), which is attached as Exhibit 1 (the "Preliminary Approval Motion"). The proposed Preliminary Approval Order is attached as Exhibit 3 to the Preliminary Approval Motion.

satisfies all the approval factors required by Rule 23(e) of Federal Rules of Civil Procedure and Fourth Circuit precedent.

Entry of the proposed PAO (Exhibit 3 to the Preliminary Approval Motion) will begin the final approval process for the proposed Settlement, which is governed by Rule 23 and relevant case law. The PAO authorizes the dissemination of notice of the Settlement to investors believed to be members of the Settlement Class. The PAO also contemplates scheduling a final approval hearing (the "Settlement Hearing") for Plaintiff to present arguments for the Settlement, and for Settlement Class Members to also present any arguments for or against the Settlement should they choose to do so. Following the Settlement Hearing, the Court will then make a final determination of whether the Settlement is fair, reasonable, and adequate.

To facilitate this process, the proposed PAO: (i) preliminarily approves the Settlement on the terms set forth in the Stipulation; (ii) approves the form and content of the Long-form Notice, Claim Form, Postcard Notice and Summary Notice attached as Exhibits 1–4 to the Preliminary Approval Order; (iii) finds that the procedures for distribution of the Postcard Notice, posting of the Long-form Notice and Claim Form, and publication of the Summary Notice comply with due process, Rule 23, and the Private Securities Litigation Reform Act of 1995 ("PSLRA"); and (iv) sets a date and time for the Settlement Hearing, at which the Court will consider final approval of the Settlement, the proposed Plan of Allocation for distributing the proceeds of the Settlement, and Lead Counsel's application for attorneys' fees and expenses, including any request for reimbursement of Lead Plaintiff's costs and expenses under the PSLRA.

**FACTUAL AND PROCEDURAL BACKGROUND**

## I.  Pleading Stage

The original complaint in the above-captioned case was filed in this Court in November 2019. ECF No. 1. By Order dated February 18, 2020, the Court appointed: (i) International Brotherhood of Electrical Workers Local 98 Pension Fund as Lead Plaintiff, (ii) Cohen Milstein Sellers & Toll PLLC as Lead Counsel, and (iii) Tinkler Law Firm LLC as Liaison Counsel. ECF No. 37.

On May 19, 2020, Lead Plaintiff filed the Consolidated Class Action Complaint for violations of the federal securities law (the "Complaint") asserting claims against Deloitte & Touche LLP and Deloitte LLP under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. Among other things, the Complaint alleged that Defendants made materially false and misleading statements and omissions with respect to their audits of SCANA's effort to build two nuclear reactors at the V.C Summer nuclear generating station near Jenkinsville, South Carolina (the "Project"). The Complaint also alleged that, as SCANA's outside independent auditor throughout the Class Period, Deloitte knew, or was reckless in not knowing, that (i) SCANA's reported annual financial results for the fiscal years ended December 31, 2015 and December 31, 2016, which were disseminated to the investing public, were not presented in accordance with Generally Accepted Accounting Principles ("GAAP"); and (ii) its 2015 and 2016 audits of SCANA were not performed in accordance with Public Company Accounting Oversight Board Standards ("PCAOB") and, therefore, each of Deloitte's unqualified audit reports during the Class Period were materially false and misleading. The Complaint also alleged that the price of SCANA common stock was artificially inflated as a result of Defendants' allegedly false and misleading statements and omissions and declined when the truth was revealed through a series of partial corrective disclosures.

## II. Motions to Dismiss, for Class Certification, for Summary Judgment, and to Exclude Expert Opinions, and Fact and Expert Discovery

Defendants moved to dismiss the Complaint on July 20, 2020, which the Court orally denied in its entirety during a November 17, 2020 hearing. On December 22, 2020, Defendants filed and served their Answer to the Complaint, after which extensive fact discovery occurred, including the service and response to multiple requests for documents, to admit and interrogatories, production and review of over 295,000 documents for a total of approximately three million pages, and thirteen fact depositions.

Lead Plaintiff initially moved for class certification on April 30, 2021, and the parties fully briefed the motion by the end of October 2021. In connection with that motion, extensive class discovery was taken, including the production of thousands of pages of documents, three depositions and two expert reports. That motion was dismissed without prejudice on March 8, 2022, to allow for further class-related discovery.

On May 26, 2022, Defendants filed a second motion to dismiss claiming that the Lead Plaintiff lacked Article III standing, which was fully briefed on June 28, 2022. After holding oral argument on March 16, 2023, the Court denied Defendants' second motion to dismiss on August 7, 2023.

Lead Plaintiff filed its second motion for class certification on January 15, 2024. On February 5, 2024, Defendants filed their opposition to Lead Plaintiff's class certification motion, and on that same day, moved to exclude the damages-related opinions of Lead Plaintiff's expert, Dr. Cain. The parties conducted additional extensive class discovery in connection with this new class certification motion and motion to exclude, including three additional depositions and the submission of an additional two expert reports.

On November 12, 2024, the Court granted Lead Plaintiff's motion for class certification, denied Defendants' motion to exclude Dr. Cain's damages opinions, and appointed Lead Plaintiff as Class Representative, Cohen Milstein as Class Counsel, and Tinkler Law Firm as Liaison Counsel. Two weeks later, on November 26, 2024, Defendants filed a Rule 23(f) petition with the Fourth Circuit, seeking interlocutory review of the district court's class certification decision. The Fourth Circuit granted, in part, Defendants' petition on February 13, 2025.

Between September 27, 2024 and January 30, 2025, the parties submitted ten expert reports and took seven expert depositions.

On January 31, 2025, both Lead Plaintiff and Defendants moved for summary judgment. Defendants also moved to exclude the: (1) Loss Causation & Damages Opinions of Matthew D. Cain, and (2) Opinions of Alberto Ferrer and Derivative Opinions of Lynn Turner. These four motions were fully briefed on April 4, 2025.

### III. The Parties' Settlement Negotiations

Over the course of more than five years, the Parties have engaged in repeated and extensive settlement discussions and negotiations as the case has progressed, holding four formal mediation sessions under the auspices of a professional and experienced mediator. Lead Plaintiff and Defendants first explored the possibility of a settlement in early 2022, approximately two years into this Action, retaining Robert A. Meyer, Esq., of JAMS, an experienced mediator with a background in securities actions against auditing firms. On June 23, 2022, the Parties participated in a full-day mediation session before Mr. Meyer. In advance of that session, the Parties exchanged and submitted detailed mediation statements, which addressed both liability and damages issues. Over the course of that session, Mr. Meyer engaged in extensive discussions with the Parties and their counsel to try to find common ground between the Parties' respective positions. The session ended without any agreement being reached.

Just under a year later, the parties participated in a second mediation session before Mr. Meyer on April 12, 2023. In advance of that session, the Parties prepared detailed mediation-related presentations. But that session also ended without any agreement being reached.

A year-and-a-half later, shortly after the Court certified the Class, the Parties attempted mediation for a third time on December 13, 2024, again participating in a full-day session with Mr. Meyer. In connection with the mediation, the Parties each submitted and exchanged mediation statements that focused on what had occurred since the Parties' last mediation. This third mediation session did not result in an agreement.

Finally, in late April 2025, after summary judgment briefing was submitted and the Fourth Circuit granted Defendants' petition for an interlocutory appeal of the Court's order certifying the Class, the parties participated in a fourth mediation with Mr. Meyer. The attendees engaged in good-faith negotiations, and at the end of the mediation session, Mr. Meyer provided a mediator's proposal to resolve the entire Action. On April 24, 2025, Mr. Meyer informed the parties that both Plaintiff and Defendants had accepted the mediator's proposal and thus reached an agreement-in-principle. The agreement-in-principle contemplated full releases of liability in return for a cash payment of $34 million for the benefit of the Settlement Class (defined below), subject to the negotiation of the terms of a Stipulation of Settlement and approval by the Court. The parties executed a Term Sheet memorializing their agreement on June 17, 2025. The Term Sheet set forth, among other things, the Parties' agreement to settle and release claims against Defendants in return for a payment of $34,000,000.00 cash.

## IV. Terms of the Proposed Settlement

The Stipulation, dated October 10, 2025, *see* Exhibit 1 to the Preliminary Approval Motion, sets forth the terms and conditions of the Settlement. The Settlement provides that Deloitte will pay or cause to be paid $34 million in cash. Pursuant to the Stipulation, the $34 million Settlement

Amount shall be paid into an interest-bearing escrow account no later than thirty (30) business days after the later of (i) the date of entry by the Court of an order preliminarily approving this Settlement, or (ii) the date that Lead Counsel provides Defendants' Counsel with written payment instructions, including a valid W-9 for the Settlement Fund. *See* Stipulation ¶ 4.2.

The Settlement Amount—after adjustment for (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court; (iv) any attorneys' fees awarded by the Court; and (v) other Court-approved deductions ("Net Settlement Fund")—will be distributed among eligible Settlement Class Members who submit valid Claim Forms ("Authorized Claimants"), in accordance with a plan of allocation to be approved by the Court (discussed in more detail below).

Consistent with the Court's November 12, 2024 Opinion and Order, the Settlement Class consists of the certified class, defined as: all persons and entities who or which purchased or otherwise acquired publicly traded SCANA common stock during the period from February 26, 2016 through December 20, 2017, inclusive, and were damaged thereby. *See* Stipulation ¶¶ 1.8, 1.46.[2] As discussed below, and as the Court already held in its Order certifying the Class, the proposed Settlement Class satisfies the requirements of Rules 23(a) and 23(b)(3), and it is likely that the Court will ultimately decide, at or after the Settlement Hearing, that the Settlement Class should be certified for purposes of the proposed Settlement.

---

[2] Excluded from the Settlement Class are: (i) Defendants and their families; (ii) the officers and directors and affiliates of SCANA and Defendants, at all relevant times; (iii) members of their immediate families and their legal representatives, heirs, successors or assigns; (iv) any entity in which Defendants or SCANA officers or directors have or had a controlling interest; (v) SCANA's employee retirement and benefit plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity. Stipulation ¶ 1.46. Also excluded from the Settlement Class are any persons and entities who or which exclude themselves by submitting a request for exclusion that is accepted by the Court. *Id.*

The Parties have also entered into a confidential Supplemental Agreement, dated October 10, 2025. *See* Stipulation ¶ 9.5.2. The Supplemental Agreement sets forth the conditions under which Defendants may terminate the Settlement if requests for exclusion from the Settlement Class exceed a certain amount (the "Opt-Out Threshold"). As is standard in securities class actions, such agreements are not made public to avoid incentivizing the formation of a group of opt-outs to leverage the Opt-Out Threshold to exact an individual settlement. Under its terms, the Supplemental Agreement may be submitted to the Court *in camera* at the Court's request. The Supplemental Agreement, Stipulation, and Term Sheet (which has been superseded by the Stipulation) are the only agreements concerning the Settlement entered into by the Parties.

If the Settlement receives the Court's final approval, Settlement Class Members will release any and all claims covered by the Class's Release in exchange for the Settlement Amount. *See* Stipulation ¶¶ 1.9, 4.1. The Class's Release's scope is reasonable as it is limited to claims related to the purchase of SCANA common stock *and* to the Complaint's factual allegations. *See* Stipulation ¶ 1.9.

## V. The Proposed Notice Process

Lead Plaintiff proposes that Epiq (the "Claims Administrator") administers the notice and claims process. The Claims Administrator is an independent settlement and claims administrator that Lead Counsel selected as the proposed claims administrator based on its extensive experience in similar securities class actions, including that it served as the Claims Administrator in the settlement against SCANA and its senior officers in *In re SCANA Corporation Securities Litigation*, No. 3:17-cv-02616 (D.S.C.) ("*SCANA I*"), such that the Claims Administrator has intimate knowledge of the Settlement Class.

Here, Lead Plaintiff proposes a Proposed Notice Program that includes: (1) the mailing and emailing (if email information is available) of a Postcard Notice to the Settlement Class Members

who participated in the *SCANA I* settlement; (2) the publishing of the Long-form Notice and Proof of Claim Form on a website to be developed for the Settlement ("Settlement Website"); (3) the publishing of the Summary Notice in the *Wall Street Journal*; and (4) the transmittal of the Summary Notice over the *PR Newswire*. Declaration of Stephanie Amin-Giwner Regarding Notice, dated October 17, 2025 ("Notice Decl."), ¶¶ 4–11, Ex. 2, submitted herewith. The Postcard Notice will include the information for the Settlement Website, which includes the Long-form Notice and Proof of Claim Form, though Class Members who submitted a claim in *SCANA I* need not submit a new Claim Form in this Settlement. *Id.* ¶¶ 4–5; Stipulation ¶¶ 7.2, 7.9.1;

Lead Plaintiff proposes this Proposed Notice Program because it is "reasonably calculated to reach interested parties," *In re Mut. Funds Inv. Litig.*, 2011 WL 1102999, at *1 (D. Md. Mar. 23, 2011) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 318 (1950)), in that the proposed process both leverages the *SCANA I* settlement notice process, which is most cost-effective, and also alerts the broader Settlement Class and community of the Settlement in more than one way. *See* Notice Decl. ¶ 13.

## ARGUMENT

The Settlement warrants preliminary approval because of the significant benefit achieved for the Settlement Class, the substantial costs and risks that would otherwise be associated with continued prosecution of the Action, and the fact that the proposed Settlement is the result of extensive arm's-length negotiations by experienced counsel and a mediator's proposal by an experienced mediator.

## VI. The Court Should Grant Preliminary Approval of the Proposed Settlement

Federal Rule of Civil Procedure 23(e) provides that a class-action settlement should be approved if the Court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). "There is a strong judicial policy in favor of settlements, particularly in the class action context." *Reed v. Big Water Resort, LLC*, 2016 WL 374816, at *3 (D.S.C. Feb. 1, 2016). "The voluntary resolution of litigation through settlement is strongly favored by the courts and is particularly appropriate in class actions." *In re LandAmerica 1031 Exch. Servs., Inc. IRS § 1031 Tax Deferred Exch. Litig.*, 2012 WL 13124593, at *4 (D.S.C. July 12, 2012) (cleaned up).

District court review of a proposed class action settlement is a two-step process. The first step is a preliminary approval, pre-notification determination of whether notice of the proposed settlement should be sent to the class. Fed. R. Civ. P. 23(e)(1); *see Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 855 F. Supp. 825, 827 (E.D.N.C. 1994). Second, after notice has been provided, the court conducts a "fairness" hearing and decides whether to finally approve the settlement. Fed. R. Civ. P. 23(e)(2); *see also Manual for Complex Litig.* (4th) ¶21.632 (2004). The first stage of settlement is the posture of the Motion currently before the Court.

At the preliminary approval stage, the court need not answer the ultimate question of whether the settlement is fair, reasonable, and adequate.[3] *See* 5 James Wm. Moore, *Moore's*

---

[3] At the final Settlement Hearing, the Court will have before it extensive papers submitted in support of the Settlement and will be asked to make a determination of whether the Settlement is fair, reasonable, and adequate, under all of the circumstances. Final approval will involve analysis of the following factors from amended Rule 23(e)(2): (a) whether Lead Plaintiff and Lead Counsel adequately represented the Settlement Class; (b) whether the Settlement was negotiated at arm's-length; (c) whether the relief is adequate; and (d) whether the Settlement treats Settlement Class Members equitably relative to each other. The Court may also consider the Fourth Circuit's approval factors: (1) the extent of discovery that has taken place and the stage of the proceedings; (2) bad faith or collusion and circumstances of the negotiation; (3) the experience of counsel; (4) objections from class members; (5) the relative strength of the plaintiff's case on the merits; (6) the

*Federal Practice* §23.83[1], at 23-336.2 to 23-339 (3d ed. 2002). Rather, "[o]n [a] motion for preliminary approval, the court's function is merely to ascertain whether there is 'probable cause' to notify class members of the proposed settlement and proceed with a fairness hearing." *Kirven*, 2014 WL 12734325, at *8 (quoting *In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. 1379 (D. Md. 1983)). "In assessing the fairness and adequacy of a proposed settlement, 'there is a strong initial presumption that the compromise is fair and reasonable.'" *S.C. Nat'l Bank*, 139 F.R.D. at 339 (citation omitted). "Preliminary approval of a class action settlement should be granted when the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies such as unduly preferential treatment of class representatives or of segments of the class or excessive compensation for attorneys and appears to fall within the range of possible approval." *Temp. Servs., Inc. v. Am. Int'l Grp., Inc.*, 2012 WL 13008138, at *5 (D.S.C. July 31, 2012). This $34 million Settlement satisfies the standards for preliminary approval.

### A. The Settlement Is the Product of Good-Faith, Arm's-Length Negotiations Among Experienced Counsel and a Mediator

The Parties reached the Settlement after extensive, arm's-length negotiations between experienced counsel, with the help of a renowned mediator, which supports the presumption of its fairness. *See In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 159 (4th Cir. 1991) (a court should consider if a settlement "was reached as a result of good-faith bargaining at arm's length, without collusion"); *Temp. Servs., Inc.*, 2012 WL 4061537, at *12 ("supervision by a mediator lends an air of fairness to agreements that are ultimately reached").

---

existence of any difficulties of proof or strong defenses the plaintiff is likely to encounter if the case goes to trial; (7) the anticipated duration and expense of additional litigation; and (8) the solvency of the defendants and the likelihood of recovery on a litigated judgment. *See Kirven v. Cent. States Health & Life Co. of Omaha*, 2015 WL 1314086, at *4 (D.S.C. Mar. 23, 2015).

Here, the Settlement was reached after multiple mediations overseen and a mediator's proposal by Robert A. Meyer, an experienced mediator with extensive experience resolving securities cases, including cases against auditors. *See, e.g.*, *Bilinsky v. Gatos Silver, Inc.*, 2024 WL 4494290, at *1 (D. Colo. Oct. 15, 2024) (granting final approval following mediation before Mr. Meyer); *McFadden v. Sprint Commc'ns, LLC*, 2024 WL 1533897, at *6 (D. Kan. Apr. 9, 2024) (preliminary approval granted following mediation before Mr. Meyer). The Parties' negotiations were informed by the exchange of multiple rounds of detailed mediation statements and extensive mediation presentations, which guided each of the four separate mediation sessions.

In addition, over the course of informal and formal discovery, Lead Plaintiff and Lead Counsel obtained a firm understanding of the strengths and weaknesses of the Class's claims. Lead Plaintiff obtained and reviewed over 217,000 documents, totaling over 2 million pages of documents, from Defendants, as well as numerous deposition and hearing transcripts from other proceedings against or involving SCANA. Lead Plaintiff also obtained and reviewed almost 35,000 documents (totaling approximately 530,000 pages) as a result of its FOIA requests, as well as over 41,000 documents (totaling approximately 292,000 pages) from various third parties, including members of SCANA's board of directors and Lead Plaintiff's non-party investment managers who purchased and/or sold SCANA common stock on Lead Plaintiff's behalf during the Class Period. In total, the Parties obtained and reviewed almost 295,000 documents, totaling approximately 3 million pages, over the course of this Action. Further, thirteen fact depositions, six depositions at the class certification stage and seven depositions at the expert stage of the litigation were taken, for a total of 26 depositions, and twelve expert reports were served over the course of this action. This extensive discovery—combined with the thorough investigation conducted by Lead Plaintiff before filing the Complaint and the extensive briefing on the motions

to dismiss, for class certification, and for summary judgment—resulted in Lead Plaintiff's, as well as the Lead Counsel's, thorough understanding of the legal and factual issues here.

Courts also give considerable weight to the opinion of "experienced" counsel that share "expertise in this field" and "extensive knowledge of the details of this case." *In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 194 (S.D.N.Y. 2005). Here, Lead Plaintiff were represented during these negotiations by experienced counsel with a proven track record of success in securities class action litigation and in cases against auditors, in particular. Lead Counsel have many years of experience in complex federal civil litigation, particularly the litigation of securities and other class actions, and Lead Counsel are among the most experienced securities class action law firms in the country, with a proven track record of success.[4]

### B. The Proposed Settlement Falls Well Within the Range of Approval

"When a proposed settlement appears to fall within the range of 'possible approval,' it is appropriate to issue preliminary approval and direct notice to members of the settlement class." *Kirven*, 2014 WL 12734325, at *8 (quoting *Horton*, 855 F. Supp. at 827–28). The proposed $34 million Settlement—particularly when combined with the previous $192.5 million settlement in the earlier class-action against SCANA—is an excellent recovery for the Settlement Class. Given the significant risks of continued litigation, the settlement amount falls well within the range of what is fair, reasonable, and adequate.

First, although Lead Plaintiff and Lead Counsel believe that the claims asserted against Defendants are strong, courts recognize that securities litigation is "notoriously uncertain," *S.C.*

---

[4] *See* Cohen Milstein Resume, ECF No. 185-3; Class Certification Op. & Order, ECF No. 241 (concluding that Plaintiffs' Counsel are qualified, experienced, and able to conduct the litigation); J., *In re Wells Fargo & Co. Sec. Litig.*, No. 1:20-cv-04494-JLR-SN (S.D.N.Y. Sept. 8, 2023), ECF No. 207 (obtaining approval of a $1 billion settlement—the 17th largest in U.S. history); *Law360 Names Practice Groups* (Jan. 21, 2024), https://www.law360.com/articles/1781974.

*Nat'l Bank*, 749 F. Supp. at 1426, and "difficult and complex by its nature," *Brown v. Charles Schwab & Co.*, 2011 WL 13199227, at *3 (D.S.C. July 26, 2011). Those difficulties and risks are even greater here. Indeed, courts regularly observe that while establishing liability in any securities fraud case is difficult, cases brought against auditors like this one add even greater "complexity to the legal and factual issues." *In re Regions Morgan Keegan Sec., Derivative, and ERISA Litig.*, 2016 WL 8290089, at *4 (W.D. Tenn. Aug. 2, 2016). Establishing falsity and scienter here would turn largely on expert testimony about auditing standards and practices, as well as expert testimony about nuclear construction projects. Proving liability at summary judgment or trial would thus necessarily require "a battle of experts," making continued litigation both riskier and significantly more expensive. *Id.*

Second, Lead Plaintiff would face still more risks with continued litigation. Lead Plaintiff would need favorable results from Defendants' pending 23(f) appeal,[5] as well as their motion for summary judgment. And even if plaintiffs "were to prevail at trial, post-trial motions and the potential for appeal could prevent the class members from obtaining any recovery for several years, if at all." *Sykes v. Harris*, 2016 WL 3030156, at *12 (S.D.N.Y. May 24, 2016); *see also In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 256–57 (E.D. Va. 2009).

Third, even if Lead Plaintiff established liability, there would be significant risks that the recoverable damages would be reduced substantially. For instance, Defendants argued that the Class Period should be shortened by nearly five months to end on July 31, 2017, when SCANA announced the abandonment of the Project. The Court declined to reach that issue at class certification, concluding that it raised a factual dispute. ECF No. 241 at 19–21. If the factfinder

---

[5] In the spring of 2025, the Fourth Circuit also granted a 23(f) petition in *In re The Boeing Company Securities Litigation*, No. 25-1492 (4th Cir.), on a related loss causation issue, thereby increasing Lead Plaintiff's risk on appeal.

agreed with Defendants, the total recoverable damages would have been cut by more than 62%. In addition, Defendants would also be entitled to invoke the "proportionate liability" provision of the PSLRA, which would reduce the total damages to correspond to the percentage of responsibility of Defendants. *See* 15 U.S.C. § 78u-4(f). Given the prior litigation against SCANA and criminal convictions of two of its executives, Defendants' percentage of responsibility would likely be limited to only a small fraction of the total recoverable damages. For example, if the factfinder found Defendants to be 10% responsible, the maximum recoverable damages would decline to $89.1 million. If the Class Period was also shortened, those damages would decline even more to only $33.4 million, less than the $34 million settlement reached.

Based on the likely reductions for proportionate liability and a potentially shortened class period, the $34 million settlement is an excellent result for the Class. The settlement represents from around 13% to more than 200% of the total likely recoverable damages, as shown in the chart below:

| Class Period | Total Damages | | Proportionate Liability Reduction | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | 30% | 25% | 20% | 15% | 10% | 5% |
| Full Class Period | $891.40 | Total | $267.4 | $222.9 | $178.3 | $133.7 | $89.1 | $44.6 |
| | | Settlement % | 12.71% | 15.26% | 19.07% | 25.43% | 38.14% | 76.28% |
| Ending July 31, 2017 | $334 | Total | $100.2 | $83.5 | $66.8 | $50.1 | $33.4 | $16.7 |
| | | Settlement % | 33.9% | 40.7% | 50.9% | 67.9% | 101.8% | 203.6% |

The recovery from Deloitte also reflects more than 15% of the total amount recovered for all SCANA investors, when combining this settlement with *SCANA I*, which exceeds the typical amount recovered from an auditing firm. *See, e.g., In re Mattel, Inc. Securities Litigation*, No. 2:19-cv-10860, ECF No. 143-1 (C.D. Cal. Nov. 24, 2021) (auditor settlement 12.24% of total recovered); *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 1:18-cv-04993, ECF Nos.

330-1, 351-3 (S.D.N.Y. Nov. 9, 2021) (auditor settlements 8.52% of total recovered); *In re American Realty Capital Properties, Inc. Litig.*, 1:15-mc-0040, ECF No. 1272 (S.D.N.Y. Sept. 30, 2019) (auditor settlement 4.78% of total recovered). And when combined with the *SCANA I* settlement, the amount recovered for SCANA investors also represents more than 25% of the maximum recoverable damages from all potential responsible parties, which far exceeds the typical recoveries in securities class actions. *See* Larni T. Bulan & Eric Tam, *Securities Class Action Settlements 2024 Review & Analysis* 8, Cornerstone Research (2025), https://www.cornerstone.com/insights/reports/securities-class-action-filings-2024-review-and-analysis/ (calculating the median settlement as a percentage of potential losses for 10(b) claim settlements between 2015 and 2024 as 6.9%); *see, e.g.*, Order, *KBC Asset Mgmt. NV v. 3D Sys. Corp.*, No. 0:15-cv-02393-MGL (D.S.C. June 25. 2018), ECF No. 189 (approving settlement that was 9% of estimated damages); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 2021 WL 76328, at *3 (S.D.N.Y. Jan. 7, 2021) (approving settlement that was 10% of the estimated damages, noting that the settlement was "within the range previously approved by judges in this District," referencing recoveries ranging from 3% to 11% of estimated damages).

For these reasons, the $34 million settlement falls well within the range of what is reasonable. The recovery represents a substantial portion of or even *exceeds* the total amount that might have been recovered at trial and provides an immediate, certain, and substantial benefit to the Class rather than a possible and uncertain recovery that could be achieved only with more delay and greater costs.

## C.    The Settlement Treats All Settlement Class Members Fairly

The Settlement does not improperly grant preferential treatment to Lead Plaintiff or any segment of the Settlement Class. Rather, all Settlement Class Members will receive a *pro rata* distribution from the Net Settlement Fund pursuant to a plan of allocation approved by the Court.

At the final Settlement Hearing, Lead Plaintiff will ask the Court to approve the proposed Plan of Allocation for the Net Settlement Fund (the "Plan," set forth in full in the Long-form Notice). *See* Stipulation, Ex. A-1. Lead Plaintiff's damages expert, Dr. Matthew Cain, in consultation with Lead Counsel, developed the Plan, which is comparable to plans of allocation that courts have approved in many other securities class actions, as well as nearly identical to the plan of allocation approved by the Court in the *SCANA I* litigation.[6] The Plan is based on Lead Plaintiff's allegations that Defendants' alleged materially false and misleading statements and omissions that artificially inflated the prices of SCANA common stock during the Class Period, and that a series of public disclosures that partially corrected the alleged misrepresentations and omissions removed the inflation.

The Plan calculates a "Recognized Loss Amount" or "Recognized Gain Amount" for each purchase or acquisition of publicly-traded SCANA common stock during the Class Period that is listed in the Claim Form and for which adequate documentation is provided by the claimant. The calculation of Recognized Loss Amounts under the Plan will depend on when the claimant purchased and/or sold the shares, whether the claimant held the shares through the statutory 90-

---

[6] *See* Order and Op. on Plan of Allocation, *In re SCANA Corporation Securities Litig.*, No. 3:17-cv-2616 (D.S.C. Jul. 30, 2020), ECF No. 239 (approving a nearly identical plan of allocation, except for (1) a minor difference in the operative Class Period—the *SCANA I* period began about five months earlier than the Class Period here (October 27, 2015, versus February 26, 2017)—and (2) a minor variation in the alleged disclosures—*SCANA I* involves one fewer alleged corrective disclosure).

day look-back period, *see* 15 U.S.C. § 78u-4(e), and the value of the shares when the claimant purchased, sold, or held them. Under the Plan, a claimant's "Recognized Claim" will be the sum of the claimant's Recognized Loss Amounts minus the sum of the claimant's Recognized Gain Amounts, and the Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims.

The Claims Administrator will calculate claimants' Recognized Claims using the transaction information that claimants provide to the Claims Administrator in their Proof of Claim and Release Forms. Once the Claims Administrator has processed all submitted claims, notified claimants of deficiencies or ineligibility, processed responses, and made claim determinations, the Claims Administrator will make distributions to eligible Authorized Claimants. If any monies remain in the Net Settlement Fund, the Claims Administrator will conduct additional re-distributions until it is no longer cost effective. At such time, any remaining balance will be contributed to non-sectarian, not-for-profit, 501(c)(3) organization(s), to be recommended by Lead Counsel and approved by the Court.

The proposed Plan is thus a fair and reasonable method for allocating the Net Settlement Fund to eligible Settlement Class Members and merits approval at the Settlement Hearing.

### D.   The Settlement Does Not Excessively Compensate Plaintiff's Counsel

Under the proposed Settlement, Lead Counsel will only be compensated out of the Settlement Fund as approved of the Court. In connection with Lead Counsel's fee and expense application, Lead Counsel will seek no more than 33.33% of the Settlement Fund, an amount that is well within the percentages that courts in the Fourth Circuit approve in securities class actions with comparable recoveries. Indeed, courts in South Carolina and other Fourth Circuit districts routinely approve fee awards in securities and other class actions around 30% of total recovery. *See*, *e.g.*, *KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2018 WL 3105072, at *1 (D.S.C. June 25, 2018)

(approving 30% fee award in securities class action); *Epstein v. World Acceptance Corp.*, 2017 WL 11461887, at *1 (D.S.C. Dec. 18, 2017) (approving 30% fee award in securities class action); *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. at 264 ("Though varied, it is worth noting as a starting point that percentage awards are 'often between 25% and 30% of the fund.'"); *see also* Order on Att'ys' Fees, *In re Under Armour Sec. Litig.*, No. 1:17-cv-388 (D. Md. Nov. 7, 2024), ECF No. 449 (approving 25.83% of $434 million settlement fund). But unlike most cases, this Action was extensively litigated for almost six years, including two rounds of class certification briefing and full summary judgment briefing. Lead Counsel will also seek payment of litigation expenses incurred in connection with the institution, prosecution, and resolution of the Action, no greater than $6,040,000.

Lead Counsel's fee and expense application will be fully briefed and justified upon filing of a formal motion under the Preliminary Approval Order. By granting preliminary approval of the proposed Settlement, the Court in no way passes upon the reasonableness of any subsequent fee or expense application, which will be decided *de novo* at the Settlement Hearing.

## VII. The Court Should Approve the Proposed Form of Notice and Plan for Providing Notice to the Settlement Class

Rule 23(c)(2)(B) requires the court to direct to a class certified under Rule 23(b)(3) "the best notice that is *practicable* under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B) (emphasis added); *see also* Fed. R. Civ. P. 23(e)(1) (requiring the court to "direct notice in a *reasonable* manner to all class members who would be bound" by a proposed settlement). "Notice need not be perfect," but rather must be "reasonably calculated to reach interested parties." *In re Mut. Funds Inv. Litig.* 2011 WL 1102999, at *1. The Proposed Notice Program easily meets this threshold.

First, the notice program is both reasonable and cost-effective. As described above, Lead Plaintiff proposes that Epiq administer the notice and claims process and leverage its prior handling of the *SCANA I* Settlement. Following preliminary approval, Epiq will (1) mail (and email, if available) the Postcard Notice to the Settlement Class Members who participated in the *SCANA I* settlement, *see* Stipulation, Ex. A-3; (2) post the Long-form Notice and Proof of Claim Form on a website to be developed for the Settlement, *see* Stipulation, Ex. A-1 and A-2; and (3) publish the Summary Notice to be published once in the *Wall Street Journal* and be transmitted over the *PR Newswire*, *see* Stipulation, Ex. A-4.[7] *See* Notice Decl. ¶¶ 4–11, Ex. 2. The notices will inform potential Class Members that if they participated in the *SCANA I* settlement, they do not need take any further action to participate in this Settlement. Epiq will be able to use the claims they submitted in *SCANA I* to determine whether they are eligible to participate in the Settlement and their share of the total recovery.[8] Any other potential Class Members can participate by submitting a Claim Form. This process provides reasonable notice to the Class,[9] while significantly reducing the costs of the notice and claims administration process.

---

[7] The Parties have also agreed that, no later than ten calendar days after the filing of the Stipulation with the Court, Defendants shall serve the notice required under the Class Action Fairness Act, 28 U.S.C. § 1715 (2005) *et seq.* ("CAFA"). *See* Stipulation ¶ 7.3.

[8] The *SCANA I* settlement class consisted of all persons and entities—other than limited exclusions—who or which purchased or otherwise acquired publicly traded SCANA common stock during the period from October 27, 2015 through December 20, 2017, inclusive, and were damaged thereby. *SCANA I*, ECF No. 238, ¶ 3. Because the *SCANA I* class period includes the Class Period at issue here—February 26, 2016 through December 20, 2017—every member of the Settlement Class received notice of and had an opportunity to participate in the *SCANA I* settlement.

[9] Courts routinely find that comparable notice programs, combining postcard notice, supplemented with publication notice and a settlement website, meet all the requirements of Rule 23 and due process. *See, e.g.*, Order Preliminarily Approving Proposed Settlement and Providing for Notice at 45, *Cosby v. Miller*, No. 3:16-cv-00121 (M.D. Tenn. Mar. 23, 2022), ECF No. 237 (authorizing postcard notice by first-class mail and publication in *Investors' Business Daily* and over *PR Newswire*); Order Preliminarily Approving Settlement and Authorizing Dissemination of Notice

Second, the Court should approve the form and content of the proposed Settlement Notices. *See* Stipulation, Ex. A-1 (Long-form Notice), Ex. A-3 (Postcard Notice), A-4 (Summary Notice); *see also* Notice Decl. ¶¶ 4–11, Ex. 2. The Settlement Notices are written in plain language and clearly set out the relevant information and answers to most questions that Settlement Class Members will have. Consistent with Rules 23(c)(2)(B) and 23(e)(1), the Settlement Notices objectively and neutrally apprise all Settlement Class Members of (among many other disclosures) the nature of the Action; the definition of the Settlement Class; the claims and issues involved; that the Court will exclude from the Settlement Class any Settlement Class Member who requests exclusion (and sets forth the procedures and deadlines for doing so); and the binding effect of a class judgment on Settlement Class Members under Rule 23(c)(3)(B). The Settlement Notices collectively provide all the information required by the PSLRA, including: (1) the amount of the Settlement on an absolute and per-share basis; (2) a statement concerning the issues about which the Parties disagree; (3) the amount of attorneys' fees and litigation expenses that Lead Counsel will seek; (4) the name, mailing address, email address, and telephone number of Lead Counsel, who will be available to answer questions from Settlement Class Members; and (5) a brief statement explaining why the Parties are proposing the Settlement. 15 U.S.C. § 78u-4(a)(7); *see* Notice Decl. ¶¶ 4–5.

---

of Class Action Settlement at 4–5, *Turka v. S.C. Pub. Serv. Auth.*, No. 2:19-cv-1102 (D.S.C. Feb. 11, 2021), ECF No. 70 (authorizing postcard notice by first-class mail and publication on a settlement website); *see also In re Mut. Funds Inv. Litig.*, 2011 WL 1102999, at *1–2 (D. Md. Mar. 23, 2011) (rejecting shareholder challenge to postcard and website notice procedures).

For these reasons, the Proposed Notice Program here is "reasonably calculated to reach interested parties," *In re Mut. Funds Inv. Litig.*, 2011 WL 1102999, at *1, and is also less costly and more efficient.

## VIII.  Proposed Schedule of Events

In connection with preliminary approval of the Settlement, the Court must set a final approval hearing date, dates for mailing and publication of the Postcard Notice, Summary Notice, and Settlement Website, and deadlines for submitting claims or for objecting to the Settlement.[10] The Parties respectfully propose the following schedule for the Court's consideration, as agreed to by the Parties and set forth in the proposed Preliminary Approval Order:

| **Event** | **Time for Compliance** |
|---|---|
| Deadline to commence mailing the Postcard Notice as identified in the Preliminary Approval Order (the "Notice Date") | 20 business days after entry of Preliminary Approval Order |
| Deadline for posting the Long-form Notice and Proof of Claim Form on website to be developed for the Settlement | 20 business days after entry of Preliminary Approval Order |
| Deadline for publishing Summary Notice | 10 business days after Notice Date |
| Deadline for filing final approval and fee motions | 35 calendar days before Settlement Hearing |
| Deadline for receipt of exclusion requests or objections | 21 calendar days before Settlement Hearing |
| Deadline for filing reply papers | 7 calendar days before Settlement Hearing |
| Settlement Hearing | 100 days after entry of Preliminary Approval Order, or at the Court's earliest convenience thereafter |
| Deadline for submitting Claim Forms | 120 calendar days after Notice Date |

---

[10] The blanks for certain deadlines currently contained in the agreed-upon form of Notice will be filled in once the Court sets those dates and before mailing to Settlement Class Members with the proposed schedule if the Court enters the Preliminary Approval Order within the next 14 days, or by November 3, 2025.

If the Court agrees with the proposed schedule, Lead Plaintiff requests that the Court schedule the Settlement Hearing for a **date 100 calendar days** after entry of the Preliminary Approval Order, or at the Court's earliest convenience thereafter. Lead Plaintiff requests that the hearing be scheduled, if possible, during the week of **February 11, 2026**, which is consistent with the proposed schedule if the Court enters the Preliminary Approval Order within the next 14 days, or by November 3, 2025.

## CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court enter the proposed Preliminary Approval Order, submitted herewith, which will: (i) preliminarily approve the Settlement; (ii) approve the proposed manner and forms of notice to Settlement Class Members; (iii) approve Epiq as the Claims Administrator; and (iv) set a date and time for the Settlement Hearing to consider final approval of the Settlement and related matters.

Dated:  October 17, 2025

Respectfully submitted,

*/s/ William Tinkler*

TINKLER LAW FIRM LLC
William Tinkler (D.S.C. Bar Number 11794)
PO Box 31813
Charleston, SC 29417-1813
Tel.: (843) 853-5203
Fax.: (843) 261-5647
williamtinkler@tinklerlaw.com

*Liaison Counsel for the Proposed Class*

*/s/ Laura H. Posner*

COHEN MILSTEIN SELLERS & TOLL PLLC
Laura H. Posner
88 Pine Street, 14th Floor

New York, NY 10005
Telephone:  (212) 220-2925
Fax:  (212) 838-7745
Email:  lposner@cohenmilstein.com

Steven J. Toll
Jan E. Messerschmidt
Margaret (Emmy) Wydman
Cohen Milstein Sellers & Toll, PLLC
1100 New York Ave. NW, Suite 800
Washington, D.C. 20005
Telephone:  (202) 408-4600
Fax:  (202) 408-4699
Emails: stoll@cohenmilstein.com
        jmesserschmidt@cohenmilstein.com
        ewydman@cohenmilstein.com

*Lead Counsel for Lead Plaintiff*